1

**DWIN LEGAL, APC**
Evan Dwin (SBN 241027)

2  2121 Palomar Airport Road, Suite 170
Carlsbad, CA 92011

3  Tel: (760) 536-6471
Fax:(760) 585-4649

4

Attorneys for Plaintiff

5  KATHYRN KAILIKOLE

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**11/20/2018** at 04:46:02 PM

Clerk of the Superior Court
By Veronica Navarro,Deputy Clerk

6

7                     **SUPERIOR COURT OF CALIFORNIA**

8                     **FOR THE COUNTY OF SAN DIEGO**

9  KATHRYN KAILIKOLE, an individual;      Case No.   37-2018-00058754-CU-WT-NC

10              Plaintiff,                 **COMPLAINT FOR:**

11       vs.

12  PALOMAR COMMUNITY COLLEGE
    DISTRICT, a governmental entity; and DOES      **(1) RETALIATION IN VIOLATION OF 20**
13  1 through 25, inclusive;                            **U.S.C. § 1681 et. seq.**

14              Defendants.                  **(2) RETALIATION IN VIOLATION OF 42**
                                                 **U.S.C. § 2000d et seq.**

15                                          **(3) RETALIATION IN VIOLATION OF**
                                                 **GOVERNMENT CODE § 12940(h)**
16

17                                          **(4) DISABILITY DISCRIMINATION IN**
                                                 **VIOLATION OF GOVERNMENT**
18                                               **CODE § 12940(a)**

19                                          **(5) FAILURE TO ACCOMMODATE**
                                                 **DISABILITY IN VIOLATION OF**
20                                               **GOVERNMENT CODE § 12940(m)**

21                                          **(6) FAILURE TO ENGAGE IN THE**
                                                 **INTERACTION PROCESS IN**
22                                               **VIOLATION OF GOVERNMENT**
                                                 **CODE § 12940(n)**
23
                                            **(7) RETALIATION IN VIOLATION OF**
24                                               **LABOR CODE § 1102.5**

25

26                                          **DEMAND FOR JURY TRIAL**

27

28

                                    - 1 -

Plaintiff Dr. Kathryn Kailikole ("Dr. Kailikole" or "Plaintiff") hereby alleges the following Complaint against defendant Palomar Community College District ("Defendant" or the "District") as follows:

## INTRODUCTION

1.    This case concerns the District's campaign to discredit, discriminate against, embarrass, retaliate against and illegally terminate Plaintiff, who was the Dean of Mathematics and the Natural and Health Sciences ("MNHS") Division for Palomar Community College.

2.    Plaintiff was first employed by the District as the Interim Dean of the MNHS Division in January 2016.  In or about July 2017, Plaintiff was officially named to the role Dean of the MNHS due to her excellent performance as an administrator, her leadership in managing the faculty, her uncompromising commitment to the well-being of students and her ability to raise funds for the College.

3.    In May of 2017, Plaintiff received a report from a faculty member, Dr. Daniel Finkenthal, that two tenured professors in the Physics and Engineering Department, Takashi Nakajima ("Nakajima") and Arthur Gerwig ("Gerwig") were engaged in racist and sexually harassing conduct.  The incident was reported to Dr. Finkenthal by a student who was afraid to file the complaint on his or her own behalf for fear of retaliation by Nakajima or Gerwig.  Nakajima's and Gerwig's conduct included posting, or allowing to be posted, racist and sexually explicit messages in the physics lab.  The postings included, among other things, a written mnemonic that referenced "black boys" raping girls, a racist word play on a Hispanic student's name, a post referring to "#blackcock slut" and a sexually explicit drawing of a female student.  Plaintiff immediately reported the harassing conduct by Nakajima and Gerwig to Shawna Cohen, the District's Manager of the Equal Opportunity and Compliance and Deputy Title IX Coordinator.

4.    Because of the outrageous nature of the conduct by Nakajima and Gerwig, and the imminent danger posed to students as a result of it, Plaintiff requested Nakajima and Gerwig be placed on paid leave and removed from the classroom while the District investigated the racist and harassing postings.  The District refused this request.  This decision was perplexing to Plaintiff because the District officials who reviewed the postings determined right away that they violated

1  state and federal anti-discrimination regulations, including Title IX.  Further, this was not the first
2  time that Nakajima and Gerwig engaged in discriminatory conduct that was known to the District.
3  In fact, 2009 (seven years before Plaintiff worked at the College), the United States Department of
4  Education's OCR Office investigated the Physics and Engineering Department and found that
5  Nakajima and Gerwig discriminated against a disabled student.  Even though Nakajima and Gerwig
6  were found by the OCR Office to have engaged in discrimination, the District did not punish them
7  and, instead, merely ordered them to undergo sensitivity training.

8      5.    After the District's Title IX officials reviewed the postings in the physics lab, the
9  District began an investigation of Nakajima and Gerwig.  The District's investigation of Nakajima's
10  and Gerwig's racist and sexually harassing conduct lasted from about July 2017 until November
11  2017.

12      6.    On November 1, 2017, the District's investigator concluded that Plaintiff and Dr.
13  Finkenthal were credible, and that Nakajima and Gerwig were guilty of violating the College's anti-
14  harassment policies by either allowing the postings or even making the postings themselves, as well
15  as other misconduct.  The investigator also concluded that Nakajimi and Gerwig lied to the
16  investigator about their involvement with the postings.

17      7.    On December 4, 2017, Plaintiff met with Dr. Jack Khan, the Assistant
18  Superintendent and Vice-President Instruction to discuss her job duties.  In the meeting, Plaintiff
19  advised Dr. Khan that she was suffering from anxiety and expressed concern about her
20  overwhelming workload, which included duties that are not typically part of the Dean's job.  Dr.
21  Kahn assured Plaintiff that she was an "incredibly valuable member of the team" and that he was
22  dedicated to providing her with his "complete support."  In other words, Dr. Kahn acknowledged
23  that Plaintiff suffered from a disability and indicated that the District would accommodate it.

24      8.    On or about December 12, 2017, the District placed Nakajima and Gerwig on one
25  month of unpaid leave.  It was clear from the District's toothless response to the overtly racist and
26  sexist conduct in the classroom by professors with a history of discriminatory conduct that the
27  District's goal was not to protect students, but rather to avoid the appearance of anything out of the
28

1   ordinary involving Nakajima and Gerwig.  Plaintiff was shocked by the District's disregard for the

2   well-being of the students by failing to take appropriate action against Nakajima and Gerwig.

3         9.     On December 14, 2017, Plaintiff was mysteriously and suddenly placed on paid

4   leave.  The decision to place Plaintiff on paid leave was barely a week after Dr. Kahn pledged to

5   accommodate her medical condition and within two days of the District's failure to impose

6   appropriate discipline on Nakajima and Gerwig for the overtly racist and sexually harassing conduct

7   reported by Plaintiff.

8         10.    When Plaintiff was placed on paid leave, she was escorted off campus like a

9   criminal, locked out of her office, cut off from her e-mail, relieved of all of her duties in overseeing

10   her Division and instructed not to speak to anyone at the college.  Plaintiff was not given any

11   information about why she was suddenly removed from the campus except that she was told it

12   allegedly had to do with an investigation of a purported "confidentiality" issue.  Plaintiff was

13   shocked and confused by the District's action, especially given its earlier refusal to place Nakajima

14   and Gerwig on paid leave when they were caught red-handed engaging in racist and sexually

15   harassing conduct.

16         11.    The District left Plaintiff on paid leave for 5 months without ever informing her of

17   the specific nature of the charges against her.  No mention was made to Plaintiff about any alleged

18   job performance issues.  During that time, Plaintiff was forbidden from checking in with her

19   faculty, her staff or students and had no idea what was being said about her on campus, although

20   she did receive an unsolicited message from a faculty member informing her that the District was

21   telling faculty members that Plaintiff was on medical leave, which was false.

22         12.    In January 2018, Dr. Kailikole hired an attorney and throughout January and

23   February of 2018 made repeated attempts to obtain further information about why she was placed

24   on leave.  However, the District refused to provide any substantive information.  The only thing the

25   District would disclose to Dr. Kailikole was that the investigation originated in the Physics and

26   Engineering Department.  When provided with this information, Dr. Kailikole informed the District

27   that she believed the decision to suddenly place her on leave and investigate her was in retaliation

28   for reporting Nakajima and Gerwig's misconduct.

13.     On February 27, 2018, while she was still on paid leave, and less than a week after she expressed her belief that the decision to place her on leave was retaliatory, the District decided not to renew Plaintiff's contract. The District did not provide Plaintiff with a reason for the decision not to renew her contract.

14.     On February 28, 2018, the day after her contract was non-renewed without explanation (and prior to any investigation concluding), Plaintiff was interviewed by the District's investigator about, among other things, an incident where Nakajima and Gerwig used an airsoft gun in the classroom. When that incident happened, in April 2016, Plaintiff reported it to the Campus Police, which conducted and completed an investigation into the matter and concluded that the gun should not have been used without prior approval by the police. Although Nakajima and Gerwig used the gun for at least the two previous years (*i.e.*, before Plaintiff arrived on campus), Plaintiff was the first, and only, administrator to ever do anything about it. After the Campus Police confirmed that approval was required, Plaintiff directed Nakajima and Gerwig not to use the gun again without prior approval from the police.

15.     The airsoft gun incident was mentioned to Plaintiff by Dr. Lisa Norman, the Assistant Superintendent/Vice President, Human Resources, in the fall of 2017, after Plaintiff described it to the investigator in connection with the investigation of the racially and sexually harassing conduct by Nakajima and Gerwig. During that time, Dr. Norman also advised Plaintiff that she or Dr. Finkenthal, who was now the Chair of the Physics and Engineering Department, should observe Nakajima and Gerwig to determine if they were violating any rules. Accordingly, Plaintiff contacted Dr. Finkenthal to tell him about the incident with the airsoft gun and to make sure it was not being used any more. Dr. Finkenthal said he did not think a gun was being used and requested further information so he could check on it. Accordingly, on or about December 8, 2017, Plaintiff forwarded Dr. Finkenthal an e-mail about the airsoft gun incident. Plaintiff is informed and believes that Dr. Norman reviewed this e-mail as part of a search of Dr. Kailikole's e-mails that was done without Dr. Kailikole's consent and as part of an effort by the District to look for information to discredit Dr. Kailikole after she reported Nakajima's and Gerwig's racist behavior.

16.     Plaintiff's obvious, and only, purpose in forwarding the e-mail about the airsoft gun incident to Dr. Finkenthal was so that Dr. Finkenthal could confirm Nakajima and Gerwig were following Plaintiff's prior directive not to use the gun any more.  Advising Dr. Finkenthal of the prior incident with the airsoft gun was entirely proper and also consistent with the recommendation by Dr. Norman that Dr. Kailikole involve Dr. Finkenthal in her oversight of Nakajima and Gerwig.

17.     When the District's investigator interviewed Plaintiff about the alleged "confidentiality" issue, he asked her if she ever agreed with Dr. Finkenthal that he would provide information about the airsoft gun incident to any other person.  Plaintiff informed the investigator that she never had any agreement with Dr. Finkenthal to provide the information to anyone else. The investigator also asked Plaintiff if Dr. Finkenthal ever indicated to her that he intended to provide the information about the airsoft gun incident to his wife or members of the District's governing Board or "anything like that."  Plaintiff informed the investigator that Dr. Finkenthal never indicated to her that he planned to provide the information to anyone else.

18.     On or about March 4, 2018, while she was still on paid leave without explanation, Plaintiff received another unsolicited message from a faculty member informing her that the faculty member was told by Dr. Kahn, the Vice-President of Instruction, that Dr. Kailikole would not be returning.  Plaintiff was disturbed by the fact that faculty members were being told she was not returning, particularly when the investigation of the alleged "confidentiality" issue was pending, and she had received no information about the status of her employment.

19.     On May 2, 2018, nearly two months after it began telling faculty members that Plaintiff was not returning, Plaintiff received a letter informing her that Dr. Kahn was recommending her termination.

20.     One of the reasons stated for Plaintiff's termination was a purported conclusion by the District's investigator about Plaintiff's e-mail to Dr. Finkenthal regarding the airsoft gun incident.  Specifically, the investigator claimed that he did not believe that Plaintiff forwarded Dr. Finkenthal the information about the airsoft gun incident for her stated, and obviously proper purpose, of advising the Chair of the Department of relevant information in connection with his oversight of two Professors who had just been found guilty of grossly improper racist and harassing

1  conduct in the classroom.  Instead, the investigator claimed to have reached the absurd conclusion

2  that Plaintiff was actually part of a conspiracy to leak confidential information about Nakajima and

3  Gerwig outside the College.  The only "evidence" cited in support of this alleged conspiracy is that,

4  three days after Plaintiff forwarded the e-mail about the gun incident to Dr. Finkenthal, Dr.

5  Finkenthal forwarded the e-mail to his wife.  Of course, Plaintiff had no idea that Dr. Finkenthal

6  forwarded the e-mail to his wife or anyone else, and she certainly did not ask him to do it.  Further,

7  the investigator does not explain why Plaintiff would try to "leak" information to Dr. Finkenthal's

8  wife.  The very idea that Dr. Finkenthal's e-mail to his wife implicates Plaintiff in some type of

9  leaking conspiracy is nonsensical on its face.  Accordingly, Plaintiff is informed and believes that

10  alleged leak "conspiracy" was manufactured by the District because it lacked any legitimate reason

11  to non-renew and terminate Plaintiff's contract.

12        21.    In addition to the absurd allegation that Plaintiff conspired to leak confidential

13  information to Dr. Finkenthal's wife, the May 2, 2018 letter contains a list of alleged performance

14  issues, none of which would constitute cause for termination and none of which were ever presented

15  to Plaintiff as potential reasons for any type of discipline, let alone termination.

16        22.    To add insult to injury, as an additional purported reason for the termination, the

17  District stated Plaintiff purportedly <u>failed to appropriately monitor Nakajima and Gerwig</u>.  This

18  reason is false and pretextual on its face, given that Plaintiff was the first Dean to actually exercise

19  any supervision over Nakajima and Gerwig, including reporting their overtly racist and sexually

20  harassing conduct to the District only to see the District willfully fail to take any real action.

21  Plaintiff is informed and believes that the District was angry at Plaintiff for reporting the harassing

22  conduct by Nakajima and Gerwig because it required the District to take action against tenured

23  professors which risked raising suspicions and questions by students and faculty if they were

24  terminated or placed on an extensive leave.

25        23.    On June 13, 2018, the District terminated Plaintiff's employment.

26        24.    The District's decisions to place Plaintiff on paid leave, non-renew her contract and

27  terminate her were all clearly made to retaliate against her for complaining about Nakajima and

28  Gerwig' and the retaliatory decision to place her on leave, to discriminate and retaliate against her

1   for requesting a disability accommodation and to avoid accommodating the disability she disclosed

2   to the District barely a week before she was mysteriously placed on leave and subjected to a bogus

3   investigation. Indeed, until the District was forced to deal with Plaintiff's report about the

4   Nakajima and Gerwig and her disclosure of her disability, she was never given any indication that

5   her job was in any danger and, in fact, received a stellar review and a promotion and was told that

6   she was an "incredibly valuable member" of the administration.

7       25.     Because of the District's discriminatory and retaliatory conduct, after exhausting her

8   administrative remedies with the Department of Fair Employment and Housing ("DFEH"), Plaintiff

9   brings this action for: 1)   retaliation in violation of 20 U.S.C. § 1681; 2) retaliation in violation of

10  42 U.S.C. § 2000d; 3) retaliation in violation of Government Code section 12940(h); 4) disability

11  discrimination in violation of Government Code section 12940(a); 5) failure to accommodate

12  disability in violation of Government Code section 12940(m); 6) failure to engage in the interactive

13  process in violation of Government Code section 12940(n); and 7) retaliation in violation of Labor

14  Code section 1102.5.

15                          **JURISDICTION AND VENUE**

16      26.     This Court has personal jurisdiction over Defendants because the District and

17  Palomar College are in California and because the transactions described in this Complaint took

18  place in California.

19      27.     Venue is proper in this Court because the injuries alleged herein took place in the

20  County of San Diego and the District resides in the County of San Diego.

21                              **THE PARTIES**

22      28.     Plaintiff is an individual residing in San Diego County.

23      29.     The District is a public entity which operates in, and has its principal place of

24  business in, San Diego County.

25      30.     Plaintiff does not know the true names and/or capacities, whether individual,

26  partners, or corporate, of the Defendants sued herein as DOES 1 through 20, inclusive, and for that

27  reason sues said Defendants under fictitious names. Plaintiff will seek leave to amend this

28  Complaint when the true names and capacities of these Defendants have been ascertained. Plaintiff

1 | is informed and believes and thereon alleges that these Defendants are responsible in whole or in
2 | part for Plaintiff's alleged damages.

3 | **FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

4 | **A.   Plaintiff Is Appointed As Interim Dean.**

5 |      31.     On or about January 13, 2016, Daniel Sourbeer, the Dean of the Mathematics and the
6 | MNHS Division accepted the position of Interim Vice-President of Instruction which required the
7 | College to hire an interim Dean.

8 |      32.     Plaintiff was hired as interim Dean of the MNHS Department or about January 13,
9 | 2016.  Plaintiff was recommended for the position by Sourbeer.

10 |      33.     The term of Plaintiff's written Contract to be employed as Interim Dean was January
11 | 13, 2016 through June 30, 2016.  The Agreement was amended on May 10, 2016 so that Plaintiff's
12 | term as Interim Dean was extended from July 1, 2016 through June 30, 2017.  Thus, as of May 10,
13 | 2016, the administration and Board was plainly satisfied with Plaintiff's performance.

14 |      34.     Pursuant to her contract, Plaintiff could only be terminated for a "material and
15 | substantial breach" of her Agreement and/or "for cause."  Cause is defined as "actions, omissions,
16 | or behaviors which are detrimental to the operations of the District and/or its major instructional,
17 | student and administrative divisions, or which impair the District's mission purpose or objectives . .
18 | . which includes, but is not limited to, unsatisfactory work performance, dishonesty, misconduct,
19 | unprofessional conduct, or insubordination."

20 | **B.   Plaintiff Reports Professors Najajima and Gerwig To The Campus Police For**
21 |      **Improperly Using An Airgun In The Classroom.**

22 |      35.     Shortly after her appointment as interim Dean, on or about April 19, 2016, two
23 | students advised Plaintiff's assistant, Debra McBrayer of a safety concern regarding their Physics
24 | 230 Class.

25 |      36.     The students reported that Nakajima used an airsoft gun as part of a rotational inertia
26 | lab in an unsafe manner.  Specifically, the students alleged that, among other things, Nakajima
27 | failed to take appropriate safety measures and stayed in the back of the room talking with Gerwig
28 | and other students while the gun was being used.

1      37.    Immediately after receiving the report from the two students, Ms. McBrayer reported

2  the incident to the Campus Police.

3      38.    When Plaintiff returned to her office, she spoke with the students and Ms. McBrayer.

4  Ms. McBrayer informed Plaintiff that she spoke with the Campus Police. Plaintiff responded by

5  calling the Campus Police and requesting that they come to her office to speak with her.

6      39.    At Plaintiff's request, the Campus Police conducted an investigation, including

7  dispatching Officer So'Oto of the Palomar Community College Police Department to meet with

8  Plaintiff and the two students.

9      40.    During the course of the investigation, Plaintiff provided Officer So'Oto with a copy

10  of the District's policy on the use of weapons in the class room, which requires that such uses are

11  approved by the Chief of Police. The students later e-mailed Dr. Kailikole the details of their

12  allegations as well as a video, which she provided to the Campus Police.

13      41.    In addition to reporting the matter to the Campus Police, Plaintiff reported the

14  incident to her supervisor, Sourbeer.

15      42.    Officer So'Oto interviewed Nakajima as part of his investigation. Nakajima told him

16  that he had been using the gun as part of his curriculum for two years.

17      43.    Officer So'Oto determined that Nakajima needed to get approval from the Chief of

18  Police if he wanted to use the gun in class. Accordingly, Plaintiff directed Nakajima to cease using

19  the gun without first obtaining approval from the Chief of Police.

20      44.    At the time of the gun incident, Plaintiff had only worked for the District for about

21  three months. Thus, she was the first (and only) administrator to ever take any action on

22  Nakajima's use of an airsoft gun in his physics lab, even though it started two years before

23  Plaintiff's appointment as Dean. Plaintiff did not receive any further complaints about the gun after

24  she directed Nakajima to stop using it.

25  **C.   The District Promotes Dr. Kaikole to Dean Of The MNHS Division.**

26      45.    On April 28, 2017, Sourbeer submitted a formal evaluation of Plaintiff's

27  performance as Interim Dean.

28

46.     In the review, Sourbeer stated that Plaintiff "stepped into the MNHS Interim Dean position with confidence and passion."  Sourbeer further stated that Plaintiff had been "a fierce advocate for students and has taken on some difficult issues."

47.     In addition, Sourbeer determined that:

- "[m]orale" was high in the division which "speaks" to Plaintiff's "ability to work effectively with faculty and staff in her division."

- Plaintiff is "an excellent communicator" and that her "contributions toward grant writing and management have been superior."

- Plaintiff has "an excellent understanding of budgets and how to use them.

- Plaintiff has "a tremendous work ethic and works to exhaustion" and that she "wrote a funded proposal for $2m in one day."

- That the "welfare" of the students is "always in [Plaintiff's] thoughts, and she is also appreciative of the commitments and work of staff and faculty."

48.     In May 2017, Dr. Jack Kahn was hired by the District as the Vice-President of Instruction.  Rather than exercise his retreat rights, Sourbeer retired, which left open the permanent position of Dean of the MNHS Department.  Due to its satisfaction with Plaintiff's performance as Interim Dean, the Board promoted Plaintiff to the position of Dean of the MNHS Department.

49.     Plaintiff was hired as Dean of the MNHS Department pursuant to an Employment Contract with the District dated as effective April 11, 2017 and executed by Plaintiff on May 9, 2017.  The term of the Employment Contract is July 1, 2017 through June 30, 2019.  As with her prior contracts, Plaintiff could only be terminated for "a material and substantial breach of the agreement" and/or for "cause."

**D.   Plaintiff Reports Racist And Sexually Harassing Conduct By Nakajima and Gerwig.**

50.     Sometime in May 2017 Dr. Finkenthal reported to Plaintiff that a student complained to him about various posters and other materials that were posted conspicuously on the walls and doors of rooms NS-249 and NS-252 in the Physics and Engineering Department.  Dr. Finkenthal showed the materials to Plaintiff.  NS-249 and NS-252 are rooms used by Nakajima and Gerwig.

51.     On May 31, 2017, in response to the report from Dr. Finkenthal, Plaintiff reported to Shawna Cohen, Manager Equal Employment Opportunity and Compliance with the District's Deputy Title IX Coordinator, that she received the report regarding the offensive postings.  The next day, a group of administrators reviewed the materials and removed them after determining that the postings violated federal, state and District nondiscrimination regulations, including Title IX.

The postings included:

- A recitation of a nmeumonic device stating: "Black Boys Rape Our Young Girls But Violet Gives Willingly Get Some Now."

- A posting entitled "Vogue May Edition" which portrayed a student lying across the hood of a pickup truck holding a piece of paper with a drawing of a penis in an enlarged and gratuitous characterization.

- A posting portraying a latino student named Juan which stated "2017 you know you juant me?/Hello Ladies" as a racist play on the student's name.

- A sexually harassing and racist posting which stated "Dick got her like" which was accompanied by a hashtag remark of "#black cock slut."

- A derogatory posting about a female student, who is short in stature, which stated "Jen's Height in Influence".

52.     Plaintiff is informed and believes that students, student assistants employed by the District and faculty including females, latinos and other members of minority groups, were or could be subjected to the postings.

53.     Because of the seriousness of the allegations, and the facially harassing content of the postings personally observed by Plaintiff and the other administrators, Plaintiff recommended that Nakajima and Gerwig be removed from the classroom.  This request was denied.

54.     On June 28, 2017, nearly a month after Plaintiff reported the harassing postings to Ms. Cohen, Adrian Gonzalez, the Assistant Superintendent/Vice President, Student Services and the District's Title IX Coordinator, notified Ms. Cohen that an investigation was required.

55.     The investigation was conducted by an outside attorney, Jeffrey Love.  In conducting his investigation of the postings, Mr. Love interviewed Dr. Finkenthal, Plaintiff, Nakajima,

1   Gerwig, Hector Garcia Villa, another Physics and Engineering Professor, and Susan Snow, a

2   professor in the Mathematics Department who was also Nakajima and Gerwig's union

3   representative.

4       56.     On November 1, 2017, four months after Plaintiff reported the postings, Mr. Love

5   issued a summary of his investigation.  In the report, Mr. Love concluded that Nakajima and

6   Gerwig were not credible and that their claimed unawareness of the postings was not plausible.  In

7   fact, Mr. Love concluded "clearly [Nakajima and Gerwig] were aware of these materials [and] had

8   either displayed the items themselves or allowed and even encouraged others to do so."  Mr. Love

9   further concluded that Nakajima and Gerwig demonstrated a general attitude of indifference to

10  following the rules of the District concerning the avoidance of sexual harassment, discrimination

11  and maintaining a wholesome student academic environment."  A copy of the report, without

12  exhibits, is attached hereto as **Exhibit A**.

13      57.     Mr. Love found Dr. Finkenthal and Plaintiff to be credible witnesses.

14      58.     Notably, this was not the first time Nakajima and Gerwig were found to engage in

15  discriminatory conduct.  In 2009 (seven years before Plaintiff worked at the College), the United

16  States Department of Education's OCR Office found that Nakajima and Gerwig failed to

17  accommodate a student with a disability.  Plaintiff is informed and believes that instead of imposing

18  any actual discipline for discriminating against a disabled student, the District required Nakajima

19  and Gerwig to undergo sensitivity training.  Plaintiff is also informed and believes that the District

20  and prior administrators received other complaints about Nakajima and Gerwig but that no action

21  was ever taken against them.  Further, during the investigation of the illegal postings, Dr. Finkenthal

22  informed the investigator that shortly after the sensitivity training, also in 2009, Nakajima refused to

23  accommodate a student who used a wheelchair and even told the student that he should just take

24  vitamins and "take care" of himself.

25      59.     On November 27, 2018, Dr. Norman e-mailed Plaintiff and specifically instructed

26  Plaintiff to involve Dr. Finkenthal in the oversight of Nakajima and Gerwig and to have Dr.

27  Finkenthal observe Nakajima and Gerwig so that he could substantiate any complaints.  Dr. Norman

28  further made it clear that the District would not place Nakajima and Gerwig on any type of leave,

1  even paid leave, so as to avoid doing anything that may "create liability and deviate from our goals
2  and mission."

3      60.    Dr. Norman's e-mail appeared to request that she wanted Plaintiff and Dr. Finkenthal
4  to handle overseeing to Nakajima and Gerwig and made it clear that the Title IX office was afraid to
5  take any action to protect students from Nakajima and Gerwig.

6      61.    On December 4, 2017, Plaintiff met with Dr. Jack Khan, the Assistant
7  Superintendent and Vice-President Instruction to discuss her job duties.  In the meeting, Plaintiff
8  discussed her overwhelming work load which included duties not normally performed by the Dean,
9  and advised Dr. Khan that she was suffering from anxiety.  Dr. Kahn assured Plaintiff that she was
10  an "incredibly valuable member of the team" and that he was dedicated to providing her with his
11  "complete support."  Dr. Kahn also promised that they would meet again to review Plaintiff's
12  schedule "and discuss strategies to help structure [her] workload better."  Dr. Kahn further stated he
13  "look[ed] forward to continuing" to work together.  At no point did Dr. Kahn indicate that he
14  believed Plaintiff had done anything that would place her job in danger.  To the contrary, Dr. Kahn
15  expressed his overall satisfaction with Plaintiff's work, confirmed that she was "incredibly
16  valuable," and pledged to accommodate her medical condition.

17      62.    On December 12, 2017, the District determined that Nakajima and Gerwig would
18  only be placed on unpaid leave for one month even though they had a history of discriminatory
19  conduct, were just found not only to have engaged in overtly racist and sexually harassing conduct
20  but also were found to have lied about their sexist and racist conduct to the investigator.  Dr.
21  Kailikole is informed and believes that this grossly inadequate punishment was part of a pattern and
22  practice by the District to cover up misconduct by Gerwig and Nakajima, even though it knew their
23  continued presence in the classroom subjected students, student assistants and faculty to
24  discriminatory and harassing conduct.

25  **E.  The District Retaliates Against Plaintiff For Reporting Harasment And Discrimination**
26      **And For Requesting An Accomodation For Her Disability.**

27      63.    On December 14, 2017, two days after Nakajima and Gerwig were essentially
28  excused from punishment and barely a week after she disclosed her disability, Plaintiff was

1 | suddenly placed on paid leave. Plaintiff was given no warning and was not given any specific
2 | reason for being placed on leave. In fact, she was escorted out of her office like a criminal, locked
3 | out of her e-mail account and, importantly, instructed not to return to campus or speak with anyone
4 | from the College. The only information Plaintiff was given was that she was purportedly under
5 | investigation for some unspecified "breach of confidential information." From that point forward,
6 | Plaintiff was completely cut-off from the College.

7 |       64.    The District left Plaintiff on paid leave for 5 months without ever informing her of
8 | the specific nature of the charges against her. During the time Plaintiff was on paid leave, faculty
9 | members were falsely told that Plaintiff was on medical leave. Plaintiff could not do anything about
10 | the false information the District was disseminating about her because the District prohibited her
11 | from contacting anyone at the College.

12 |       65.    In January 2018, Dr. Kailikole hired an attorney and throughout January and
13 | February of 2018 made repeated attempts to obtain further information about why she was placed
14 | on leave. However, the District refused to provide any substantive information. The only thing the
15 | District would disclose to Dr. Kailikole was that the investigation originated in the Physics and
16 | Engineering Department. When provided with this information, Dr. Kailikole informed the District
17 | that she believed the decision to suddenly place her on leave and investigate her was in retaliation
18 | for reporting Nakajima and Gerwig's misconduct.

19 |       66.    On February 27, 2018, the District decided to non-renew Plaintiff's contract. The
20 | District did not provide Plaintiff with any reason whatsoever for the decision not to renew her
21 | contract.

22 |       67.    On February 28, 2018, the day after her contract was non-renewed without
23 | explanation, Plaintiff was interviewed by the District's investigator about, among other things, the
24 | incident where Nakajima and Gerwig used an airsoft gun in the classroom.

25 |       68.    Plaintiff informed the investigator that Dr. Lisa Norman had asked about the airsoft
26 | gun incident during the investigation of the racially and sexually harassing conduct by Nakajima
27 | and Gerwig. Plaintiff also informed the investigator that she contacted Dr. Finkenthal with
28 | information about that incident to make sure it was not being used any more. Dr. Finkenthal said he

1   did not think a gun was being used and requested further information so he could check on it.

2   Accordingly, on or about December 8, 2017, Plaintiff forwarded Dr. Finkenthal an e-mail about the

3   airsoft gun incident. Plaintiff is informed and believes that Dr. Norman reviewed this e-mail as part

4   of a search of Dr. Kailikole's e-mails that was done without Dr. Kailikole's consent and as part of

5   an effort by the District to look for information to discredit Dr. Kailikole after she reported

6   Nakajima's and Gerwig's racist and harassing behavior.

7        69.    Plaintiff's obvious, and only purpose, in forwarding the e-mail about the gun

8   incident to Dr. Finkenthal was so that Dr. Finkenthal could confirm Nakajima and Gerwig were

9   following Plaintiff's prior directive not to use the gun in the interest of student safety. Advising Dr.

10   Finkenthal of the prior incident with the airsoft gun was also consistent with the recommendation by

11   Lisa Norman, the Assistant Superintendent/Vice President, Human Resources, that she involve Dr.

12   Finkenthal in her oversight of Nakajima and Gerwig.

13        70.    When the District's investigator interviewed Plaintiff, he asked her if she ever agreed

14   with Dr. Finkenthal that he would provide information about the airsoft gun incident to any person.

15   Plaintiff informed the investigator that she never had any agreement with Dr. Finkenthal to provide

16   the information to anyone else. The investigator asked Plaintiff if Dr. Finkenthal ever indicated to

17   her that he intended to provide the information about the airsoft gun incident to his wife or members

18   of the District's governing Board or "anything like that." Plaintiff informed the investigator that Dr.

19   Finkenthal never indicated to her that he planned to provide the information to anyone else.

20        71.    On or about March 4, 2018, a faculty member sent Plaintiff an unsolicited text

21   message informing Plaintiff that Dr. Kahn was telling faculty members that Plaintiff was not

22   returning. Given that the investigator told her it would be several weeks before he completed his

23   investigation and would issue his report, it was clear to Plaintiff that the District had already

24   decided to terminate her and that it was simply using the investigator to manufacture a purported

25   reason.

26        72.    On May 2, 2018, nearly two months after it began telling faculty members that

27   Plaintiff was not returning, Plaintiff received a letter informing that Dr. Kahn was recommending

28   her termination.

73.     One of the reasons stated for Plaintiff's termination was the absurd and implausible conclusion by the District's investigator that Plaintiff did not forward Dr. Finkenthal the information about the gun incident for the logical, obvious and entirely proper purpose of advising the Chair of the Department of relevant information in connection with his oversight of two Professors who had just been found guilty of grossly improper racist and harassing conduct in the classroom.  Instead, the investigator claims, Plaintiff was actually part of a conspiracy to leak confidential information outside the College.  According to the investigator's report, the full extent of the alleged conspiracy was that Plaintiff would forward the e-mail to Dr. Finkenthal, who would then forward the e-mail to his wife.  The only "evidence" cited in support of this ridiculous conclusion is that, three days after Plaintiff forwarded the e-mail about the gun incident to Dr. Finkenthal, Dr. Finkenthal forward the e-mail to his wife.  Of course, Plaintiff had no idea that Dr. Finkenthal forwarded the e-mail to his wife or anyone else, and she certainly did not ask him to do it.  Indeed, there is there a complete lack of evidence that Plaintiff was involved in any such "conspiracy."  The very idea that Plaintiff conspired with Dr. Finkenthal to expose Nakajima's and Gerwig's misdeeds to Dr. Finkenthal's wife is nonsensical.  Accordingly, Plaintiff is informed and believes that the alleged leak "conspiracy" was manufactured to try to cover up the true, discriminatory and retaliatory reasons for Plaintiff's termination.

74.     Notably, the investigator's report does not list a specific person who made a complaint about Dr. Kailikole.  Instead the report simply states that it was "internally generated at the request of Human Resources."  Further, the investigator interviewed only two witnesses, Plaintiff and Dr. Finkenthal.  He did not interview anyone from the Human Resources department even though someone in the department purportedly originated the complaint.  The investigator also did not collect or review any documents related to the origins of the investigation.

75.     In addition to the absurd allegation that she conspired to leak confidential information to Dr. Finkenthal's wife, the May 2, 2018 letter recommending Plaintiff's termination contains a list alleged of performance issues, none of which were ever presented to Plaintiff as potential reasons for any type of discipline, let alone termination.

76. To add insult to injury, as an additional purported reason for the termination, the District stated Plaintiff purportedly <u>failed to appropriately monitor Nakajima and Gerwig</u>. This reason is false and pretextual on its face, given that Plaintiff was the first Dean to actually risk exercising any supervision over Nakajima and Gerwig, including reporting their overtly racist and sexually harassing conduct to the District only to see the District willfully fail to take any real action. Plaintiff is informed and believes that the District was angered and embarrassed by Plaintiff's reporting of the harassing conduct by Nakajima and Gerwig because it required the District to take action against tenured professors which risked raising suspicions and questions by students and faculty if they were punished appropriately, such as by termination or placement on an extensive leave. Plaintiff is further informed and believed that the District wanted to punish Plaintiff for asserting her rights by suggesting that the investigation was illegitimate and retaliatory.

77. On June 13, 2018, the District terminated Plaintiff's employment.

78. The District's decisions to place Plaintiff on paid leave, non-renew her contract and terminate her were all clearly made to retaliate against her for complaining about Nakajima's and Gerwig's illegal conduct, which it quickly swept under the rug by issuing a disproportionately light penalty they served over winter break, for reporting that the purported investigation of the "confidentiality" issue was pretextual and retaliatory, and to retaliate and discriminate against Plaintiff for, and to avoid accommodating, Plaintiff's mental health condition. Indeed, until the District was forced to deal with Plaintiff's disability and her complaint about Nakajima and Gerwig's conduct and the investigation, she was never given any indication that her job – to which she had recently been promoted - was in any danger whatsoever.

79. Prior to being suddenly placed on leave, Plaintiff had a reputation at the College as a strong leader, an advocate for students, a talented fundraiser, and, above all, an educator dedicated to the College's mission. Plaintiff was completely humiliated by her sudden removal from campus, the non-renewal of her contract and being subjected to a sham investigation and termination over allegations manufactured by the District to punish her for raising the embarrassing issue of racism and sexual harassment in the classroom and to discriminate against Plaintiff for, and to avoid accommodating, Plaintiff's mental health condition. As a result of this illegal conduct by the

1   District, Plaintiff has suffered lost back wages and benefits, lost future earnings and benefits, lost

2   promotions, extreme amounts of emotional distress and other damages.

3                            **FIRST CAUSE OF ACTION**

4                    **Retaliation in Violation of 20 U.S.C. § 1681**

5                    **(Against the District and DOES 1 through 20).**

6        80.    Plaintiff incorporates by reference each and every paragraph in the Complaint as if

7   set forth fully herein.

8        81.    The District is an educational program receiving Federal financial assistance and is

9   subject to the provisions of Title IX of the Education Amendments of 1972, as amended, 20 U.S.C.

10  Section 1681 *et seq.* (hereinafter "Title IX").

11       82.    Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

12  excluded from participation in, be denied the benefits of, or be subjected to discrimination under

13  any education program or activity receiving Federal financial assistance." 20 U.S.C. § 6181(a).

14  Title IX also prohibits retaliatory employment actions based on an employee's complaints about sex

15  discrimination. *Jackson v. Birmingham*, 544 U.S. 167 (2005).

16       83.    Plaintiff engaged in statutorily protected activity under Title IX when she reported

17  sex discrimination by Nakajima and Gerwig to the District and participated in the investigation

18  thereof and when she reported her belief that she was placed on leave in retaliation for reporting sex

19  discrimination by Nakajima and Gerwig.

20       84.    As a direct and proximate cause of Plaintiff engaging the protected activity under

21  Title IX, Defendants engaged in adverse employment actions against Plaintiff, including placing her

22  on paid leave, non-renewing her contract and terminating her employment.

23       85.    There is a causal link between Plaintiff participating in a statutorily protected activity

24  under Title IX and Defendants' adverse employment actions against her.

25       86.    Defendants' violations of Title IX have proximately caused Plaintiff to suffer

26  damages including, but not limited to, back wages, future wages, lost benefits, severe emotional

27  distress and other pecuniary and non-pecuniary losses in an amount to be proven at trial.

28

87.     The actions of Defendants complained of herein were taken with malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

88.     As a result of Defendants' conduct, Plaintiff is also entitled to attorneys' fees and costs as provided by 42 U.S.C. section 1988 or other applicable law.

## SECOND CAUSE OF ACTION

### Retaliation in Violation of 42 U.S.C. 2000d *et seq.*

### (Against the District and DOES 1-20)

89.     Plaintiff incorporates by reference each and every paragraph in this Complaint as if set forth fully herein.

90.     Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*) ("Title VI") prohibits discrimination on the basis of race, color, or national origin in programs or activities receiving federal financial assistance.  The District receives federal financial assistance and is subject to Title VI.  As with Title IX and other federal discrimination statutes, there is an implied right of action for retaliatory employment actions based on an employee's complaints about race discrimination.

91.     Plaintiff engaged in statutorily protected activity under Title VI when she reported race and national origin discrimination by Nakajima and Gerwig to the District and participated in the investigation thereof and when she reported her belief that she was placed on leave in retaliation for reporting race and national origin discrimination by Nakajima and Gerwig.

92.     As a direct and proximate cause of Plaintiff engaging the protected activity under Title VI, Defendants engaged in adverse employment actions against Plaintiff, including placing her on paid leave, non-renewing her contract and terminating her employment.

93.     There is a causal link between Plaintiff participating in a statutorily protected activity under Title VI and Defendants' adverse employment actions against her.

94.     Defendants' violations of Title VI have proximately caused Plaintiff to suffer damages including, but not limited to, back wages, future wages, lost benefits, severe emotional distress and other pecuniary and non-pecuniary losses in an amount to be proven at trial.

95.   The actions of Defendants complained of herein were taken with malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

96.   The actions of Defendants complained of herein were taken with malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

97.   As a result of Defendants' conduct, Plaintiff is also entitled to attorneys' fees and costs as provided by 42 U.S.C. section 1988 or other applicable law.

**THIRD CAUSE OF ACTION**

**Retaliation in Violation of Government Code § 12940(h)**

**(Against the District and DOES 1-20)**

98.   Plaintiff incorporates by reference each and every paragraph in this First Amended Complaint as if set forth fully herein.

99.   At all times relevant herein, Government Code section 12940 et seq. was in full force and effect and binding upon each of Defendants.  Section 12940(h) prohibits retaliation against any person who makes a complaint for harassment and/or discrimination on the basis of race, sex and/or national origin.  Plaintiff is informed and believes that students, student assistants employed by the District and faculty who were members of a protected class, including females, latinos and other minority groups, were subjected to the harassing and discriminatory postings by Nakajima and Gerwig.

100.   Plaintiff was terminated for complaining about the discriminatory and harassing conduct alleged herein which she reasonably believed to constitute discrimination and/or harassment on the basis of race, national origin, sex and/or gender and for reporting her belief that she was placed on leave in retaliation for reporting discriminatory and harassing conduct.

101.   As a proximate result of Defendants' violation of Government Code section 12940(h), Plaintiff has suffered the loss of wages, salary, benefits and additional monies Plaintiff would have received if she was not terminated in violation of Government Code section 12940(h), including future earnings.  As a further proximate result of the violation of Government Code

1   section 12940(h), Plaintiff has suffered, and will continue to suffer, humiliation, mental anguish,

2   and emotional and physical duress.   As a result of such violation of Government Code section

3   12940(h) and consequent harm, Plaintiff suffered damages in an amount according to proof at trial.

4       102.    The actions of Defendant's complained of herein were taken with malice, oppression

5   and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring

6   Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

7       103.    As a result of Defendants' conduct, Plaintiff is also entitled to attorneys' fees and

8   costs as provided by Government Code section 12965(b).

9                           **FOURTH CAUSE OF ACTION**

10          **Disability Discrimination in Violation of Government Code section 12940(a)**

11                           **(Against the District and DOES 1-20)**

12      104.    Plaintiff re-alleges and incorporates by reference each and every allegation set forth

13  in the preceding paragraphs of the Complaint.

14      105.    Under the Fair Employment and Housing Act ("FEHA") codified in Government

15  Code § 12940 *et seq.*, it is unlawful for an employer to discriminate against an employee on the

16  basis of the employee's disability and/or perceived disability.

17      106.    As a result of her disability, including anxiety, Plaintiff is a disabled individual under

18  FEHA in that major life activities are limited.  Defendants knew that Plaintiff was disabled because

19  she told Jack Khan that she suffered from anxiety and he pledged to support her with that issue.

20      107.    Defendants engaged in unlawful employment practices in violation of FEHA by,

21  among other things, failing to accommodate Plaintiff on the basis of her disability, failing to engage

22  in the interactive process, retaliating against her for disclosing her disability, placing her on paid

23  leave, stripping her of her duties, non-renewing her contract and terminating her.

24      108.    Plaintiff is informed and believes and based thereon alleges that her disability was a

25  motivating factor in Defendants' decision to place her on paid leave and strip her of her duties, non-

26  renew her contract and terminate her.

27

28

109.     Defendants' violations of FEHA have proximately caused Plaintiff to suffer damages including, but not limited to, back wages, future wages, lost benefits, severe emotional distress and other pecuniary and non-pecuniary losses in an amount to be proven at trial.

110.     The actions of Defendants complained of herein were taken with malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

111.     As a result of Defendants' conduct, Plaintiff is also entitled to attorneys' fees and costs as provided by Government Code section 12965(b) or other applicable law.

**FIFTH CAUSE OF ACTION**

**Failure to Accommodate Disability and Retaliation in Violation of Government Code §**

**12940(m)**

**(Against the District and DOES 1-20)**

112.     Plaintiff incorporates by reference each and every paragraph in this First Amended Complaint as if set forth fully herein.

113.     Government Code section 12940(m) provides that it is unlawful for an employer to fail to make reasonable accommodations for the known physical disability and/or perceived disability of an employee, or to retaliate or discriminate against an employee for requesting a reasonable accommodation.

114.     Defendants failed to make a reasonable accommodation for Plaintiff's known disability and/or perceived disability and retaliated and discriminated against Plaintiff for requesting a reasonable accommodation.

115.     Defendants' failure to provide a reasonable accommodation, and retaliation and discrimination against her for requesting a reasonable accommodation. proximately caused Plaintiff to suffer damages including, but not limited to, back wages, future wages, lost benefits, severe emotional distress and other pecuniary and non-pecuniary losses in an amount to be proven at trial.

116.     The actions of Defendants complained of herein were taken with malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

117.   As a result of Defendants' conduct, Plaintiff is also entitled to attorneys' fees and costs as provided by Government Code section 12965(b) or other applicable law.

## SIXTH CAUSE OF ACTION

### Failure to Engage in the Interactive Process in Violation of Government Code section 12940(n)

### (Against the District and DOES 1-20)

118.   Plaintiff incorporates by reference each and every paragraph in this Complaint as if set forth fully herein.

119.   Government Code section 12940(n) provides that it is unlawful for an employer to fail to engage in a timely, good faith, interactive process with a disabled employee to determine effective reasonable accommodations, if any.

120.   Defendants failed to engage in the interactive process with Plaintiff in order to accommodate Plaintiff's disability and/or perceived disability.

121.   Defendants' failure to engage in the interactive process proximately caused Plaintiff to suffer damages including, but not limited to, back wages, future wages, lost benefits, severe emotional distress and other pecuniary and non-pecuniary losses in an amount to be proven at trial.

122.   The actions of Defendants complained of herein were taken with malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

123.   As a result of Defendants' conduct, Plaintiff is also entitled to attorneys' fees and costs as provided by Government Code section 12965(b) or other applicable law.

## SEVENTH CAUSE OF ACTION

### Retaliation In Violation Of Labor Code § 1102.5

### (Against the District and DOES 1-20)

124.   Plaintiff incorporates by reference each and every paragraph in this Complaint as if set forth fully herein.

125.   Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

1  any education program or activity receiving Federal financial assistance." 20 U.S.C. § 6181(a).

2  Title IX also prohibits retaliatory employment actions based on an employee's complaints about sex

3  discrimination. *Jackson v. Birmingham*, 544 U.S. 167 (2005).

4       126.    Title VI prohibits discrimination on the basis of race, color, or national origin in

5  programs or activities receiving federal financial assistance.

6       127.    Section 12940(h) prohibits retaliation against any person who makes a complaint for

7  harassment and/or discrimination on the basis of race, sex and/or national origin and Section

8  12940(m) prohibits retaliation for requesting a reasonable accommodation for a disability.

9       128.    It is the public policy of the State of California to prevent discrimination on the basis

10  of sex, race and national origin and to prevent retaliation against persons who report retaliation.

11       129.    Under Labor Code section 1102.5, employers and individuals are prohibited from

12  retaliating against an employee for:

13       disclosing information . . . to a person with authority over the employee or another employee

14  who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the

15  employee has reasonable cause to believe that the information discloses a violation of state or

16  federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation.

17       130.    The District's termination of Plaintiff violated Labor Code section 1102.5 because it

18  was in retaliation for Plaintiff's reporting the illegal conduct by Nakajima and Gerwig alleged

19  herein.

20       131.    As a proximate result of Defendants' violation of Labor Code section 1102.5,

21  Plaintiff has suffered the loss of wages, salary, benefits and additional monies Plaintiff would have

22  received if she was not terminated in violation of Labor Code section 1102.5, including future

23  earnings. As a further proximate result of the violation of Labor Code section 1102.5, Plaintiff has

24  suffered, and will continue to suffer, humiliation, mental anguish, and emotional and physical

25  duress. As a result of such violation of Labor Code section 1102.5 and consequent harm, Plaintiff

26  has suffered damages in an amount according to proof at trial.

27

28

1    132.   The actions of Defendant complained of herein were taken with malice, oppression

2  and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring

3  Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

4  **EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER GOVERNMENT CODE**

5  **SECTION 1265(b)**

6         Plaintiff has exhausted her administrative remedies under Government Code section

7  12965(b).  A copy of Plaintiff's Complaint with, and Right to Sue Letter from, the DFEH is

8  attached hereto as **Exhibit B**.

9  **DEMAND FOR JURY TRIAL**

10        Plaintiff hereby requests a trial by jury.

11  **PRAYER FOR RELIEF**

12  Plaintiff prays for judgment against Defendants as follows:

13    1.    For general and special damages;

14    2.    For backpay and front pay;

15    3.    For emotional distress and pain and suffering damages.

16    4.    For nominal and compensable damages;

17    5.    For punitive damages;

18    6.    For pre-judgment and post-judgment interest where allowable;

19    7.    For an injunction and declaratory relief where applicable;

20    8.    For costs of suit and expenses;

21    9.    For reasonable attorneys' fees; and

22    10.   For such other and further relief as this Court may deem just and proper.

23  Respectfully submitted,

24

25  Dated: November 20, 2018                    **DWIN LEGAL, APC**

26

27                                              Attorneys for Plaintiff KATHRYN

28                                              KAILIKOLE

- 26 -
COMPLAINT

# EXHIBIT A

**Confidential Summary of Investigation Report**
Complaint of Unlawful Discrimination
Daniel Finkenthal on Behalf of Anonymous Complainant vs.
Arthur Gerwig, Takashi Nakajima, and Hector Garcia Villa, Respondents
November 1, 2017

## PURPOSE OF INVESTIGATION.

This matter relates to an administrative investigation undertaken for Palomar Community District (District).  This matter related to investigating material that was deemed objectionable which had been displayed on walls, doors and over doors in the Physics and Engineering Department at the District's main campus.  Daniel Finkenthal (Dr. Finkenthal), the newly appointed Department Chair, had brought forward the complaint on behalf of an anonymous student, when he assumed his leadership role and claimed that the material was objectionable, discriminatory and inappropriate to be displayed or posted on District property.

The scope of this investigation was to determine whether certain District employees allowed and/or were aware that the objectionable material was displayed in the Physics and Engineering Department in certain areas, visible to both other employees, as well as students.  Specifically, Professors Arthur Gerwig (Mr. Gerwig), Takashi Nakajima (Mr. Nakajima) and Hector Garcia Villa (Mr. Garcia Villa) were observed to teach in the department in the general area of these materials.  The materials involved included pictures, images, wording and other items that were seen as patently offensive, discriminatory in content and nature and generally inappropriate for a District environment.  Added to this, Dr. Finkenthal alleged that Mr. Gerwig and Mr. Nakajima had utilized a syllabus and other material that was inappropriate, threatening in nature and inconsistent with the department's philosophy and goals.

## BACKGROUND AND METHODOLOGY OF INVESTIGATION.

This matter began in May 2017 after Dr. Finkenthal was appointed the Chair of the Physics and Engineering Department.  Previously, Mr. Nakajima had been the Department Chair for several years.  Dr. Finkenthal contacted his dean, Kathryn Kailikole(Dr. Kailkole), who serves as the Dean, Mathematics and the Natural and Health Sciences, to report that a student had contacted him with concerns regarding various types of posters and other materials that were posted conspicuously on the walls and doors of rooms NS-249 and NS-252.  Dr. Finkenthal showed Dr. Kailikole the various materials and indicated that he did not want to disclose the name of the student for fear that the student would be subject to some form of retaliation.

On May 31, 2017, Dr. Kailikole reported to Shawna Cohen (Ms. Cohen), Manager, Equal Employment Opportunity and Compliance and the District's Deputy Title IX Coordinator, that she had received the report from Dr. Finkenthal regarding the offensive postings in the two rooms.  The following day, on June 1, 2017, a group of District administrators visited NS-249 and NS-252 to view the areas.  The officials determined that a number of postings had been placed on the walls and other surfaces that violated federal, state, and District nondiscrimination regulations, including Title IX.  The officials took pictures of the offending items and removed them from the rooms, retaining them for future reference.

Jack Kahn, Assistant Superintendent/Vice President, Instruction (Dr. Kahn), Dr. Kailikole, and Ms. Cohen met with Dr. Finkenthal, Mr. Garcia Villa, Mr. Gerwig, Mr. Nakajima, and Susan Snow (Ms. Snow), Palomar Faculty Federation Grievance Officer, on June 11, 2017 for purposes of determining whether the Physics and Engineering faculty had prior knowledge of the postings.  During the meeting, Ms. Cohen distributed the postings to the parties and asked whether the faculty had seen them before.  Dr. Finkenthal stated that he saw the items after the anonymous student had pointed them out to him; the other three faculty stated that they had never seen the postings before.  Mr. Garcia Villa, Mr. Gerwig, and Mr. Nakajima all indicated that they occasionally used the two rooms, whereas Dr. Finkenthal stated that he never used them.

On June 28, 2017, Adrian Gonzales, Assistant Superintendent/Vice President, Student Services and the District's Title IX Coordinator, notified Ms. Cohen that an investigation into the complaint was necessary.  Dr. Finkenthal met with Ms. Cohen on June 29, 2017 to present additional information relevant to the investigation.  The District retained an independent investigator and attorney, Jeffrey Love (fact finder), to conduct the investigation.  Mr. Love commenced the investigation on July 11, 2017.  The investigation involved the review of documents, including evidence and applicable District rules and regulations, as well as conducting interviews of District employees.  Once factual evidence was developed, the various statements of the interviewees were compared and contrasted with one another as well as other evidence and determinations of credibility were established.  Once credibility was established along with a factual framework of the alleged events, conclusions were formed based on the greater weight of the credible evidence.  For the purpose of findings, direct and circumstantial evidence may be given equal weight.

_CONFIDENTIAL_
_Palomar Community College District_
_Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima_

## SCOPE OF THE INVESTIGATION.

The scope of this investigation was to determine:

**A. Did District employees allow and/or condone objectionable and/or discriminatory material to be displayed on District property in violation of District rules?**

## SOURCE OF THE COMPLAINT.

A. **Daniel Finkenthal, Ph.D.** (_acting on behalf of an anonymous student_)
   Professor/Department Chair
   Physics and Engineering
   Palomar Community College District

## ACCUSED/FOCUS EMPLOYEES.

A. **Hector Garcia Villa**
   Assistant Professor
   Physics and Engineering
   Palomar Community College District

B. **Arthur Gerwig**
   Associate Professor
   Physics and Engineering
   Palomar Community College District

C. **Takashi Nakajima**
   Professor
   Physics and Engineering
   Palomar Community College District

## WITNESSES.

A. **Daniel Finkenthal, Ph.D.**
   Professor/Department Chair
   Physics and Engineering Department
   Palomar Community College District

B. **Kathryn Kailikole, Ed.D.**
   Dean
   Mathematics and the Natural and Health Sciences Division
   Palomar Community College District

C. **Arthur Gerwig**
   Associate Professor
   Physics and Engineering Department
   Palomar Community College District

D. **Takashi Nakajima**
   Professor
   Physics and Engineering Department
   Palomar Community College District

E. **Hector Garcia Villa**
   Assistant Professor
   Physics and Engineering Department
   Palomar Community College District

F.  **Susan Snow**
        Professor
        Mathematics Department
        Palomar Community College District

## CREDIBILITY OF THE WITNESSES.

The analysis of the credibility of the witnesses is an important aspect of a fact-finding investigation.  As an accepted rule of evidence, a fact finder can disregard the statements of a witness who has been found to have provided false or unreliable information during their testimony in a matter.  Those witnesses' statements can be disregarded in their entirety and not believed unless there is compelling evidence to conclude that individual statements otherwise are true.[1]  Concerning the witnesses' statements, this fact finder considered:

a)  The witness' demeanor while providing a statement and the manner in which he/she provided the statement.

b)  The character of the witness' statement.

c)  The extent of the witness' capacity to perceive, to recollect, or to communicate any matter about which he/she gave a statement.

d)  The extent of the witness' opportunity to perceive any matter about which he/she gave a statement.

e)  The witness' character for honesty or veracity or their opposites.

f)  The existence or nonexistence of a bias, interest, or other motive.

g)  A statement previously made by the witness that is consistent with his/her statement during the fact-finding investigation.

h)  A statement made by the witness that is inconsistent with any part of his/her statement during the fact-finding investigation.

i)  The existence or nonexistence of any fact given in statement by the witness.

j)  The witness' attitude toward the fact-finding investigation in which he/she gave a statement or toward the giving of a statement.

### *Discussion of Witness Credibility.*

**Witness Daniel Finkenthal, Ph.D.**

Dr. Finkenthal appeared to be a credible witness in this matter.  Dr. Finkenthal is the current Chair of the Physics and Engineering Department of the District.  Dr. Finkenthal came forward after he had been elevated to his current position in order to make his complaint concerning the display of what he considered objectionable material in or about the Physics Department.  Dr. Finkenthal was deemed credible due to the fact that his statements to this fact finder tended to be corroborated by the physical evidence located in the area of the Physics Department, as well as the statements of other credible witnesses.

**Kathryn Kailikole, Ed.D.**

Dr. Kailikole appeared to be a credible witness in this investigation.  Dr. Kailikole said that she observed the offensive materials and further noted that Mr. Gerwig and Mr. Nakajima had specifically denied knowledge of the materials that were displayed in areas that they were known to frequent on a daily basis.  Dr. Kailikole also noted that she believed both Mr. Gerwig and Mr. Nakajima had been insubordinate concerning the publication and use of certain inappropriate policy and rules statements, syllabi and a student warning letter.

**Witness Arthur Gerwig**

Mr. Gerwig did not appear to be a credible witness in this matter.  Mr. Gerwig has been a long-term faculty member in the Physics and Engineering Department, and seemed to be unaware that materials had been displayed on various walls in

---

[1] See *California Civil Jury Instruction* Section 5003.

the area in which he has worked nearly on a daily basis.  It appeared to the fact finder that Mr. Gerwig's statements were implausible, in that he would have observed these materials having worked in that area.

**Witness Takashi Nakajima**

Mr. Nakajima also appeared to lack credibility in his statements to the fact finder.  Many of the objectionable materials that were observed and removed from the Physics and Engineering Department were displayed on the doors and in the room associated with areas that Mr. Nakajima used on a daily basis.  Mr. Nakajima's statement that he was unaware of many of these materials was implausible and inconsistent with rational reason and logic.

**Witness Hector Garcia Villa**

Mr. Garcia Villa appeared to be a credible witness in this matter.  Mr. Garcia Villa is a relatively new Assistant Professor to the department.  Mr. Garcia Villa said that he was aware of some of the materials that had been displayed in the area, however, he was uncertain as to the ownership or who had authored these items.  Mr. Garcia Villa was deemed credible, as he was relatively new to the department, did not typically use the rooms where the associated objectionable materials were located and appeared earnest and truthful in his statements.

**Witness Susan Snow**

Ms. Snow did not appear to be a credible witness in this matter.  Ms. Snow appeared as a witness; however, she was little more than a thinly-veiled advocate for Mr. Gerwig and Mr. Nakajima.  Ms. Snow had represented both Mr. Gerwig and Mr. Nakajima at their interviews as their union representative as part of the Palomar Faculty Federation.  Ms. Snow claimed that she was a witness in this matter, as she had observed an item that had been hung over a door in one of the offices in the Physics and Engineering Department.  Ms. Snow knew early on, and prior to her representation of Mr. Nakajima and Mr. Gerwig, that she would therefore be a witness in this matter, yet she sat through and participated in their interviews, as a representative.  Ms. Snow appeared to be biased and motivated to advocate for her association members, and was seen as a witness who lacked credibility.

**FINDINGS.**

**A. Did District employees allow and/or condone objectionable and/or discriminatory material to be displayed on District property in violation of District rules?**

Short Answer: **YES**

*Discussion*

**Background.**

Dr. Finkenthal indicated to the fact finder that he believes inappropriate behavior relevant to the allegations had taken place in the Physics and Engineering Department under the chairmanship of Mr. Nakajima for a number of years.

The facts further demonstrate that in 2009, a student with certain disabilities had filed a complaint with the Department of Education, Office of Civil Rights regarding discrimination by the Physics and Engineering faculty.  The Office of Civil Rights had upheld the student's complaint and Dr. Finkenthal provided a copy of these relevant documents to the fact finder.  Dr. Finkenthal also provided the fact finder with emails he had received that are purported to be between Mr. Nakajima and a student that had occurred on or about August 24, 2009.

Dr. Finkenthal pointed out that these emails display that Mr. Nakajima had violated the Americans with Disabilities Act (ADA) and refused to make a reasonable accommodation to the student who filed the complaint.  Dr. Finkenthal noted that this exchange occurred only four months after the Office of Civil Rights (OCR) had published their report concerning the previous violation of the ADA.

**Materials Found Displayed in Rooms NS-249 and NS-252.**

As part of the scope of this investigation, a number of items that were located in the areas surrounding rooms NS-252 and NS-249 in the Physics and Engineering area of the NS Building were documented in place, and removed.  This fact finder's charge was to investigate whether these items were placed by any District staff or whether any District staff

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

members had allowed the placement of these materials, or were aware of their presence. The various items are identified by item number as detailed below.

| Item # | Item Description | Room | Specific Location |
|---|---|---|---|
| 1 | "Safe Space...No!!!!" | Hallway | Above door into NS-252 |
| 2 | "Carbon Resistors" (mnemonic device) | NS-249 | Door exiting into hallway |
| 3 | "Vogue May Edition" | NS-249 | File cabinet |
| 4 | "2017 you know you juant me"/"Hello Ladies" | NS-249 | Door leading into NS-252 |
| 5 | "Dick got her like" | NS-249 | Inside of door |
| 6 | "Peek a Boo"/"Jen's Height in influence" | NS-249 | Covering of window of door to hallway |
| 7 | "TURN THIS SHIT OFF" | NS-252 | Taped to coffee pot |
| 8 | "Do not leave your shit in the sink." | NS-252 | Above sink |
| 9 | "Stop Making Fucking Tea in the Kettle!" | NS-252 | Above coffee pot/sink area |
| 10 | "In class what he taught us..." (cartoon) | NS-252 | Inside of door |
| 11 | "Resistance is FUTILE!" | NS-252 | Inside of door |
| 12 | Man with discus | NS-252 | Above microwave |
| 13 | Fluke Multi-Meter | NS-252 | Inside of door |

**a)   Issues of Sexual and/or Gender, Racial, National Origin Harassment/Discrimination Relevant to Above Items**

Several of these items concerned issues of either sexual and/or gender harassment and discrimination. For instance, Item No. 2 was a document that was posted on the door exiting into the hallway from Room NS-249. This item which was titled "*Carbon Resisters*" provided a mnemonic in order to allow students to memorize the names of the various colors of the bans on resisters. Mnemonics are often aides to the memory and serve students and others to recall specific details with greater ease.

On this item, the mnemonic contained a negative, violent and racial reference to African American males raping women. The mnemonic stated, "*Black Boys Rape Our Young Girls But Violet Gives Willingly Get Some Now.*" Additionally, it also makes an objectified reference to a woman (Violet) who is purported to be promiscuous. These sorts of comments touch on and concern issues of racial, sexual and/or gender harassment and discrimination.

Item No. 3 which was titled the "*Vogue May Edition*" portrayed a student lying across the hood of a pickup truck holding a paper where a large phallic symbol was drawn upon it. This item also displays an issue of sexual or gender discrimination by portraying a male penis in a drawing in an enlarged and gratuitous characterization. This item was posted on the file cabinet in Room NS-249.

Item No. 4, identified as "*2017 You Know You Want Juant Me*" portrayed a male adult student who appeared to be Latino in race. The document indicates that women might have some form of sexual desire for the individual portrayed in the document. This individual was identified as a student and the term was "juant" was a joking reference to the individual's true name, Juan. The document indicates "*Hello Ladies*" in an apparent joking invitation to women who might want to have some form of sexual contact with the individual portrayed therein.

Item No. 5, another document located in NS-249 posted on the inside of the door shows a subject identified generally as a student in the Physics and Engineering Department staring at a large item that states "*Dick got her like.*" There is a hash tag remark below that states "#black cock slut." This item was making reference to a penis and specifically the penis of an African American.

Item No. 6 was essentially a covering of a window located in a door that leads to the hallway from Room NS-249. This item had the word "*Peek-a-Boo*" written on it as well as "*Jen's height in influence.*" "Jen" was identified by an interviewee as a former student assistant who was short in stature. This item appears to have been posted in order to make light of "Jen's" height as well as her particular influence as a student assistant. Both of these references can be seen as derogatory both towards the student concerning her height, as well as her influence in the department as female student staff member.

**b)   Issues of Profanity and/or Intimidation/Inappropriate Behavior Relevant to Above Items**

Item No. 7 was a paper sign taped to the coffee maker in the NS-252 laboratory classroom. This sign states "*Turn this Shit Off*". This sign was indicative of a seeming tolerance for profanity and/or intimidation in the department. In addition

*CONFIDENTIAL*
Palomar Community College District
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

to this, Item No. 8 was a sign posted above the sink in NS-252 that stated, "*Do Not Leave Your Shit in the Sink.*" Again, this sign uses profanity and tends to demonstrate issues of profanity and/or intimidation in the department.

Item No. 9 was a sign posted above the coffee pot and sink area in NS-252 that states, "*Stop Making Fucking Tea in the Kettle!*" Once again, this sign makes reference to issues of profanity and intimidation in the department. All of these signs posted in or about the coffee pot, kettle/sink area were both open to both staff members, as well as students.

Finally, Item No. 13 was a memorandum written and posted by Mr. Nakajima that contains threatening language concerning expelling a student from District and ruining their "life" over a missing Fluke multimeter. This item was left up long after the meter had been returned and/or located and was seen as another display in support of an intimidating academic environment.

**Additional Documents Relevant to this Fact Finding.**

| Item | Description |
|------|-------------|
| A | Physics 230/231 Student "Cautionary Letter" |
| B | Regulations and Rules for Physics 230 Lab |
| C | August 24, 2009 email exchange between Mr. Nakajima and student |
| D | April 16, 2009 United States Department of Education, OCR, Region IX Letter to the District |

**a) Syllabus, Physics Department Policies/Procedures and Warning Materials**

As part of the investigation, the fact finder was provided documents identified above as Document Items A and B. These items were seen as inappropriate and Dr. Kailikole had instructed faculty to cease using these items in 2016. These items had been placed on a non-District website known as PCpepso.com, which had been created years ago by Mr. Gerwig and remains active to this day.

Document Item A was titled *To Physics 230/231 students from Physics 230 and 231 instructors.* This item appears to be a portion of a syllabus for the Physics 230/231 courses. A review of this document demonstrates a rather harsh and threatening tone. Here, the document tends to threaten students who engage in certain behaviors such as "...studying only for an exam, trying to get a maximum score with a minimum effort, and dropping a course just before the deadline." The document states "...we don't want to see those students in our classes anymore."

The document goes on to make other negative and harsh comments making reference to students that are "lazy" or who "don't want to change your bad study habit." This document encourages such students to "give your seat to someone else who is more serious than you." Although it is laudable to encourage students to academic excellence and rigor, such commentary in a document seems inappropriate, threatening and demonstrates an unwelcoming commentary concerning these classes. Additionally, the second page of this document has an area that can seemingly be detached where a student was requested to print their name and sign and date the document agreeing to certain terms. These terms state:

> I (print your name) read the statements above. I am serious about my education and will follow the guidelines given above. I will be working my hardest to learn the subjects from today, and I will decide whether or not this class is for me within the first 4 weeks. If I do not drop by the end of the fourth week, I will receive a course grade of whatever I deserve.

This document requires a signature and states "...this sheet is to be turned in by Friday of the first week of a semester. Any student who failed to turn it in will be dropped from the course."

Here, it appears that the student is required to sign this document and the document tends to want to amend the official course drop policies by the District. The document directly states that if a student fails to agree with the terms of this document and sign in agreement, that they would be dropped from the course.

In addition to this required signing aspect of the document, the document also details how students will be treated in class. In relevant part, the document states "...you'll be treated exactly the way you treat this class. If you want to be treated nicely, treat this class and the professor nicely."

This document tends to demonstrate a threatening and inappropriate tone and required students to sign a document that they were not legally bound to sign under pain and penalty of being dropped from the course.

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

Document Item B seems to be the Rules and Regulations for the Physics Lab 230. This document, like Document Item A, has a threatening tone and makes reference to "lazy" students and encourages other students to "kick out" those students that they deem to be "lazy." Essentially, this document gives authority for students to apply peer pressure in what appears to be a rather capricious fashion in determining who they subjectively believe is being "lazy" and subjecting that student to be forced out of the laboratory course.

Ironically, the document states in bold underlined print that the "...instructor is not available to answer any questions regarding the lab during the lab period." Again, the instruction states "...if anyone who is not willing, capable, or lazy is in your group, kick that person out from your group." In a rather odd commentary, the document goes on to state "...this sounds very cold, but unless you don't mind losing your job because if that person does not do his/her part, you have to learn how to protect yourself."

Essentially, the document and its authors, Mr. Gerwig and Mr. Nakajima, are encouraging students to self-select other students from whom they differ and feel might not be operating or working to a particular standard. Essentially, Mr. Nakajima and Mr. Gerwig are allowing students to grade other students, something that is only under the purview of Mr. Gerwig and Mr. Nakajima as faculty of the District. This document, like Document Item A, contains a threatening tone and gives other students seemingly unfettered authority to pressure and/or remove other students from the course in what could only be seen as an inappropriate delegation of professorial authority.

**Knowledge of the Materials.**

One of the issues in this fact-finding investigation was to determine whether any members of the faculty had knowledge of the materials that were posted. Although during a meeting on June 22, 2017, both Mr. Gerwig and Mr. Nakajima denied general knowledge of any of these materials, the facts in this matter demonstrate that both of these faculty used the classrooms where these items were openly and notoriously posted for all to see.

Even though these two faculty denied particular knowledge during this meeting, and generally when interviewed by the fact finder, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima knew, or should have known, about the presence of these documents. Both faculty knew, or should have known, that these materials were patently offensive, inconsistent with the District's policy concerning sexual and/or racial discrimination and further inconsistent with the academic goals of the District.

The facts in this matter tend to demonstrate that Mr. Garcia Villa, a newly appointed Assistant Professor, was generally unaware of these documents, as he typically did not use the rooms where the documents were identified. It appeared to this fact finder that these rooms were typically and nearly exclusively used by both Mr. Gerwig and Mr. Nakajima.

In addition to the materials identified as posted on walls and doors in these areas, both Mr. Gerwig and Mr. Nakajima appeared to have been aware and/or even authored documents that were placed on an unauthorized non-District sponsored website known as "PCPepso." The facts in this matter demonstrate that PCPepso was set up by the department and was loosely run by student assistants with knowledge of internet technology. This website contained documents that portend to be syllabi and recitations of the department's rules and regulations; however, these items were seen as offensive, threatening, inappropriate, and inconsistent with District policy and/or state and/or federal law.

Concerning general knowledge of the materials located in rooms NS-249 and NS-252, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima were well aware of the materials that had been placed in this area. It appeared to this fact finder that there had been a general attitude of indifference to following the rules of the District concerning the avoidance of sexual harassment, discrimination and maintaining a wholesome student academic environment. It appeared that Mr. Gerwig and Mr. Nakajima routinely departed from established protocols and propriety, and had resisted changes by Dr. Kailikole.

According to Dr. Finkenthal, both Mr. Gerwig and Mr. Nakajima routinely, and continually, used rooms NS-249 and NS-252 and were often in that area. Even Mr. Gerwig stated that if he were looking for Mr. Nakajima, he would look in room NS-249. For Mr. Gerwig and Mr. Nakajima to claim that they were unaware of the items that were openly and notoriously displayed there requires a departure from reason, common sense and logic. Clearly, they were aware of these materials, had either displayed the items themselves or allowed and even encouraged others to do so. These items were inappropriate, displayed racial, gender and national identity discrimination and harassment, and supported an intimidating and unwelcoming academic environment. Dr. Finkenthal accurately described these areas as displaying a "frat house" environment.

Dr. Kailikole told the fact finder that Mr. Gerwig and Mr. Nakajima had been insubordinate to her direction to remove the materials from the PCpepso website and to refrain from using the documents concerning their classes. Mr. Garcia Villa was aware of these directions and never used these materials, as directed by Dr. Kallikole. Even so, Mr. Nakajima and Mr. Gerwig continued to allow the PCpepso website to function, claiming they were unaware how to close the link and disallow access.

In summary, even though Mr. Gerwig and Mr. Nakajima deny knowledge of the aforementioned materials found in rooms NS-249 and NS-252, the greater weight of the credible evidence demonstrates that they were aware of the materials, allowed and/or participated in their postings and display, and were untruthful concerning their assertions otherwise.

## Findings in Reference to Respondents.

### Mr. Garcia Villa

#### 1. PCPepso Website Documents

Mr. Garcia Villa said that he was aware of the PCPepso website. Mr. Garcia Villa acknowledged that he had never used the documents contained on this unofficial website set up by Mr. Gerwig in the Physics and Engineering Department. Mr. Garcia Villa recalled that Dr. Kailikole had admonished him, as well as Mr. Gerwig and Mr. Nakajima, not to use these documents. Mr. Garcia Villa is a recently-hired Assistant Professor working full-time in the last year. It appeared to the fact finder that Mr. Garcia Villa abided by Dean Kailikole's direction and did not use these documents.

#### 2. Offensive Materials in Rooms NS-252 and NS-249

The facts tend to demonstrate that Mr. Garcia Villa was a relatively new Professor in the Engineering and Physics Department. Mr. Garcia Villa taught classes, as well as a lab portion in support of his lecture courses. Mr. Garcia Villa indicated that some of the materials that were identified as Items No. 1 through 13, above, were placed in the interior areas generally of Room NS-252 and NS-249. Mr. Garcia Villa said that he did not utilize Room NS-249 and was rarely in that area. Interestingly, Mr. Garcia Villa seemed more forthright concerning his observations than Mr. Gerwig and Mr. Nakajima, who are known to utilize these rooms on a frequent basis. There was no information to conclude that Mr. Garcia Villa was aware of the more offensive materials located in these rooms, nor that he participated and/or encouraged their display.

#### 3. Truthfulness

This fact finder found that Mr. Garcia Villa was a credible witness in this matter. There was no credible evidence to conclude that Mr. Garcia Villa had been untruthful in his statements to this fact finder when questioned concerning the documents on the PCpepso website or the offensive material that was found to have been displayed in Rooms NS-252 and NS-249.

### Mr. Gerwig and Mr. Nakajima

#### 1. PCPepso Website Documents

The facts in this matter demonstrate that Mr. Gerwig had developed the PCpepso website. This website was an unofficial District website that certain members of the Physics and Engineering Department used to post materials, such as syllabi and various rules and regulations. Some of these materials, identified as Document Items A and B, above were identified as being problematic and inappropriate. The facts demonstrate that in 2016, Dr. Kailikole directed staff that these documents not be used due to the inappropriate language and tone contained therein.

Even so, these documents remained on the website and were seemingly available to students even though there was insufficient credible evidence to show that students were purposely directed to this website after Dr. Kailikole's direction not to do so. Mr. Gerwig was responsible for maintaining this website, but claimed that he was unable to access the website to make any particular changes as this task had been assigned to previous students who acted as "webmasters." The facts demonstrated though that Mr. Gerwig made no real efforts in attempting to contact or take steps to remove the documents from the website after direction had been given to remove Document Items A and B from the website by Dean Kailikole.

Document Items A and B were documents that seemingly were created by Mr. Gerwig and Mr. Nakajima which, taken together, formed a syllabus for students for the Physics 230 and 231 class instruction. Both of these documents

*CONFIDENTIAL*
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

contained harsh verbiage, referred to students as being lazy and essentially encouraged students to take negative action against other students. For instance, Document Item B states in relative part, "If a member is not working or contributing for the group, I encourage you to kick out that student." Here, the document purports to allow and even encourage to take retribution on other students that they feel might not be "contributing" to a group effort. Clearly, this sort of peer pressure is inappropriate, as the faculty member should decide as to whether a student is putting forth sufficient effort in a group environment. It appeared to this fact finder that Document Item B attempts to relegate the duties of a faculty member to peer students concerning the performance of others.

Additionally, both Document Items A and B make reference to the term "lazy." Whereas laziness is not considered a laudable trait concerning academic performance, such language and negative characterizations seem inappropriate in a professional academic document such as these purport to be. It was clear to this fact finder that based on the greater weight of the credible evidence these documents were created in collaboration between Mr. Gerwig and Mr. Nakajima. Even though Mr. Nakajima attempted to claim some predecessor had created Document Item B described as the Regulations and Rules for Physics 230 Lab the facts tend to demonstrate that this is not true. Mr. Gerwig seemed to recall that he and Mr. Nakajima had crafted this document together, and the plain evidence in the document demonstrates that the only instructors referenced in the document were, in fact, Mr. Gerwig and Mr. Nakajima. There was no reference to any other faculty within this document.

Both Document Items A and B tend to depart from the District's code of ethics. These items do not tend to encourage the free pursuit of learning in their students, nor do they demonstrate respect for students as individuals. Instead, these documents present a harsh and threatening tone and encourage students to engage in self-selection by "kicking out" other students that they feel might be "lazy" or do not "deserve the same score" as they do. Neither Mr. Gerwig nor Mr. Nakajima seemed to understand or maintain their "proper roles an intellectual guides and counselors." Instead, they wrongfully delegated their authority and duties to students to essentially police other students in a group environment. Such authority and encouragement can lead to disastrous results, including the development of cliques, discriminatory behavior and bestowing of inappropriate authority to those who will not wield that authority in a prudential fashion.

## 2.  Offensive Materials in Rooms NS-252 and NS-249

Concerning the offensive materials located in Room NS-252 and NS-249 identified herein as Items 1 through 13, it was clear to the fact finder that both Mr. Gerwig and Mr. Nakajima were aware of these materials, and had essentially allowed their display, participated in their display or were recklessly indifferent to the display of these items. The display of these items seems consistent with the tone as demonstrated in the two documents identified as Item A and Item B above. As Dr. Finkenthal described, Mr. Gerwig and Mr. Nakajima encouraged a "frat house" environment in the department and seemed to allow and encourage discriminatory behavior, as displayed in those offensive materials, and encourage other students to participate in this wrongful conduct.

Both Mr. Gerwig and Mr. Nakajima claimed that they were unaware of the more discriminatory and wrongful documents. However, the greater weight of the credible evidence, as described above under Section X.A.6, demonstrates that they were well aware of these items, but refused to acknowledge their presence in some attempt to evade culpability for either posting these materials or allowing their students to do so. Many of these items appear to have been potentially crafted by students that were in the Physics and Engineering Department.

Allowing these items to be created and then posted in the department demonstrated that Mr. Gerwig and Mr. Nakajima had given their imprimatur for students to engage in discriminatory and biased activities. Indeed, some of the items that had been identified in the room that Mr. Nakajima and Mr. Gerwig often used (NS-249) and specifically the "carbon resisters" mnemonic learning aid demonstrate a complete departure from the District's mandate of providing an academic environment free of discriminatory content and racist/sexist stereotypes. That these items were openly and notoriously displayed in the department where students often congregated would seemingly encourage students to engage in similar behavior and it appears that they did so.

In addition to obvious departures from the District's rules concerning discrimination and harassment, several items, such as various signs and notes located in room NS-252, in or about the sink and coffee service area displayed foul language and intimidating content that was wholly inappropriate in a professional academic environment. The idea that Mr. Gerwig and Mr. Nakajima were not fully aware of all of these items is absurd. The District has rules concerning sexual harassment and intimidation. B.P. 3430 Prohibition of Harassment states in relevant part:

*The District shall be free of sexual harassment and all forms of sexual intimidation and exploitation including acts of sexual violence. It shall also be free of other unlawful harassment, including that which is based on any of the following statuses: race, religious creed, color, national origin, ancestry, physical*

- Page 9 -

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, or sexual orientation of any person, or because he/she is perceived to have one or more of the foregoing characteristics.

In addition, the District has rules concerning general harassment that would be based on a legally recognized protected characteristic. A.P. 3430 Prohibition of Harassment states in relevant part:

General Harassment -- Harassment based on race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, gender, gender identity, gender expression, sex, age, or sexual orientation of any person, or the perception that a person has one or more of these characteristics is illegal and violates District policy. Gender based harassment does not necessarily involve conduct that is sexual. Any hostile or offensive conduct based on gender can constitute prohibited harassment.

Apart from these harassment and discrimination rules, the District's mission statement requires "[di]versity in learning environments, philosophies, cultures, beliefs and people" as well as "[i]nclusiveness of individual and collective viewpoints."

Article 3: Code of Ethics of the Constitution of the Faculty of Palomar College states, in relevant part:

Faculty members have an obligation to the District, their students, colleagues, profession, the public and themselves to maintain the highest standards of ethical conduct. In recognition of this obligation, faculty members adopt the following standards of ethical conduct: Adapted from the American Association of University Professors (AAUP) Ethics Statement.

1. Professors, recognizing their social responsibility:
   - Develop and improve scholarly competence,
   - Exercise critical self-discipline and judgment in transmitting knowledge,
   - Practice intellectual honesty.

2. Professors, as teachers:
   - Encourage the free pursuit of leaning in their students,
   - Demonstrate respect for students as individuals,
   - Keep to their proper roles as intellectual guides and counselors,
   - Evaluate students in an unbiased manner,
   - Respect the confidentiality of students,
   - Acknowledge significant or scholarly assistance from students.
   - Do not exploit, harass, or discriminate against their students.

3. Professors, as colleagues:
   - Do not discriminate against or harass colleagues,
   - Respect and defend the free inquiry of associates,
   - Exchange criticism and ideas,
   - Acknowledge academic debt,
   - Strive to be objective in their professional judgment of colleagues,
   - Accept their share of faculty responsibilities for the governance of their institution.

4. Professors, as members of an academic institution:
   - Seek to be effective teachers and scholars,
   - Uphold academic freedom,
   - Maintain their right to criticize and seek revision,
   - Give due regard to their responsibilities within the institution, when considering termination of their employment, give due notice of their intentions.

5. Professors, as members of their community:
   - When they speak or act as private persons avoid creating the impression of speaking or acting for their District,
   - Promote free inquiry and further public understanding of academic freedom."

*CONFIDENTIAL*
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

Finally, B.P. 3050 Institutional Code of Ethics states that "[t]he District is committed to the highest ethical standards in furtherance of our mission of education and public service:

*Excellence in teaching, learning, and service*
*Integrity as the foundation for all we do*
*Access to our programs and services*
*Equity and fair treatment of all in our daily interactions*
*Diversity in learning environments, philosophies, cultures, beliefs, and people*
*Inclusiveness of individual and collective viewpoints*
*Mutual respect and trust through transparency, civility, and open communications*
*Creativity and innovation in engaging students, faculty, staff, and administrators*
*Physical presence and participation in the community"*

Here, Mr. Gerwig and Mr. Nakajima departed from the District's anti-harassment and discrimination rules and further violated their duties as faculty of the District. It was clear, based on the greater weight of the credible evidence developed in this investigation, that both Mr. Gerwig and Mr. Nakajima were aware of the use of the inappropriate documents identified as Document Items A and B, above as well as the offensive materials located in rooms NS-249 and NS-252. Their knowledge of these items demonstrates a lack of prudential judgment and reckless indifference to the rules of the organization that mean to prevent discrimination, harassment and promote an open and welcoming academic environment.

In addition to Mr. Gerwig and Mr. Nakajima's violations of the District's rules concerning harassment and discrimination, as well as the breach of their ethical duties, it appeared clear that they both had resisted and had acted in a spiteful manner towards their supervisor, Dr. Kailikole.  Dr. Kailikole informed the fact finder that student reviews for Mr. Nakajima's class contained negative references to Dr. Kailikole that she attributed to comments by Mr. Nakajima made to students.

Indeed, Dr. Kailikole is correct in her assumption here as Mr. Nakajima acknowledged that he had told students that somehow Dr. Kailikole had promised additional equipment, but thereafter had reneged on that promise.  Mr. Nakajima indicated that students were upset by this news. Mr. Nakajima appeared to have told students this derogatory information about Dr. Kailikole in order to hold Dean Kailikole out to hatred and ridicule by his students.  There was no legitimate business reason for Mr. Nakajima to share such information with his students but for to cause students to be angry at Dr. Kailikole with whom Mr. Nakajima had differed and had actively resisted as a subordinate instructor.

### 3.   Student Matter – Mr. Nakajima

The facts in this matter demonstrate that in April 2009 the Physics and Engineering Department had been investigated by the United States Department of Education, Office of Civil Rights (Document Item D) concerning a violation of the Americans with Disabilities Act.  Immediately thereafter, members of the Physics and Engineering Department were required to undergo sensitivity training in education concerning the ADA, and the idea concerning reasonable accommodations in an academic setting.

Dr. Finkenthal provided the fact finder with an email exchange, Document Item C, between a student and Mr. Nakajima. This email indicates the student, who had a disability and used a wheelchair, requested an accommodation concerning the Physics 230 course and its required lab section. The student was clearly seeking some form of accommodation when he wrote, "I was just wondering how flexible you would be under extreme circumstances."

Instead of working with the student and/or referring him to the District's Disability Resource Center, Mr. Nakajima wrote back to the student advising him to take "1,000 milligrams of Vitamin C, multivitamin, and CoQ-10, 50 milligrams or more every day, starting right now."  Mr. Nakajima refused to entertain any sort of reasonable sort of accommodation for the student's disability and wrote in relevant part, "I can't give you an extra treatment, but if you start taking care of yourself as I suggested, you should be doing better than a regular semester."

Here, the District, per Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990, is obligated to provide accommodations to ensure the student's equal access to the District's programs and activities. It is the student's responsibility to notify instructors of the need for accommodations and thereafter the instructor is required to refer the student to the Disability Resource Center and work with the student in order to provide reasonable accommodations. In this instance, Mr. Nakajima failed in his obligation in regard to this potential disability.  In this case, the student used a wheelchair, yet Mr. Nakajima purported to give the student advice on taking vitamins as opposed to

*CONFIDENTIAL*
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

engaging in meaningful communication concerning the use of the Disability Resource Center and the allowance of some form of reasonable accommodation, as required by law.

Added to this, this exchange occurred only months after the Physics and Engineering Department had undergone an investigation concerning the very same sort of issue. Mr. Nakajima and others had been interviewed in this matter and later had received training concerning reasonable accommodation requests. Even so, Mr. Nakajima failed to provide these required steps in potentially accommodating this disabled student.

## 4. Truthfulness

Here, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima failed to be truthful in their statements to the fact finder, as well as their statements during the June 22, 2017 meeting with District administrators concerning the offensive materials located in rooms NS-252 and NS-249. As detailed above, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima had knowledge of the materials that were displayed openly in areas that they frequented on a near daily basis.

The facts were clear that both Mr. Nakajima and Mr. Gerwig were often located in and using rooms NS-252 and NS-249 and were reasonably well aware of the items that were posted on doors in which they would pass and on walls in areas that they often frequented. Their claims that they were unaware of these items appear to this fact finder to be directly untruthful and offered merely for the purposes of evading culpability for allowing and/or encouraging the posting of such items.

Here, both Mr. Gerwig and Mr. Nakajima have failed to "accept their share of faculty responsibility for the governance of their institution" and "practice intellectual honesty" as required by the Constitution of the Faculty of Palomar College. B.P. 3050, the District's Institutional Code of Ethics, upholds "[i]ntegrity as the foundation for all we do." Here, both Mr. Gerwig and Mr. Nakajima failed to demonstrate integrity concerning their discussions on June 22, 2017, and then later when directly questioned specifically by the fact finder when questioned during this course of this fact-finding investigation.

## Summary of Findings.

There appeared, based on the investigation, to be a pattern and practice of posting and/or allowing the posting and/or display of objectionable material in or about the rooms used by Mr. Gerwig and Mr. Nakajima. The fact finder determined that Mr. Garcia Villa, who was relatively new to the Department, was generally unaware of the true nature of the materials that had been displayed. However, both Mr. Gerwig and Mr. Nakajima both knew, or should have known, that the materials posted in the offices and rooms that they used on a consistent basis were inappropriate, offensive and discriminatory in nature, and yet they allowed the materials to remain.

The fact finder also determined that it appeared that both Mr. Gerwig and Mr. Nakajima both provided false information at a meeting on June 22, 2017 wherein they disavowed knowledge of the documents that were the subject of this investigation. Indeed, both faculty told the fact finder that they were largely unaware of the materials, or had no recollection of having observed them. These statements were inconsistent with the facts as discovered in this investigation.

In summary, based on the greater weight of the credible evidence, it appears that both Mr. Gerwig and Mr. Nakajima were or should have been aware that materials that were deemed objectionable, offensive and discriminatory in nature had been displayed and/or allowed to be displayed in offices and school areas under their dominion and control. Even though both professors feigned that they were unaware of these materials, the greater weight of the credible evidence demonstrates that they were aware of the materials, and allowed them to be displayed in the area. This behavior tends to demonstrate unbecoming conduct by these professors, as the materials were seen as objectionable, inappropriate and discriminatory in nature.

Additionally, the fact finder found that faculty members of the Physics and Engineering Department used a non-District website in order to disseminate a syllabus and other documents that students were required to read and/or sign and return. These documents were seen as warning documents that admonished students concerning their study habits and how to interact with other students. These warnings and instructions appeared inconsistent with the District's goal in their educational pursuits.

There was insufficient credible evidence to show that Mr. Garcia Villa was aware of the nature of these materials due to his lack of tenure in the Physics and Engineering Department, and his lack of use and exposure to the areas in which the

*CONFIDENTIAL*
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

materials were displayed.  The fact finder therefore determines that the allegations are <u>sustained as to Mr. Gerwig and Mr. Nakajima, and not sustained as to Mr. Garcia Villa.</u>

## ADMINISTRATIVE DETERMINATION.

Based upon the investigator's assessment of the interviewees' credibility and documentary evidence, the burden of preponderance of evidence, which is required to uphold charge of unlawful discrimination and sexual harassment, is sufficient to sustain Dr. Finkenthal's allegations on behalf of the anonymous student.  The District's administrative determination is therefore to <u>sustain</u> the complaint against Mr. Gerwig and Mr. Nakajima and to <u>dismiss</u> the complaint against Mr. Garcia Villa.  This matter is hereby referred to the District's administration for disciplinary action against Mr. Gerwig and Mr. Nakajima.

The allegations were received and investigated as an informal complaint, although the District ensured that the usual steps undertaken in a formal investigation were followed.  Dr. Finkenthal and the anonymous student have the right to submit a formal written complaint of unlawful discrimination to the District in accordance with Title 5, § 59328 et. seq. using the form available on the District website at http://www2.palomar.edu/pages/hr/files/2014/07/Discrimination-Harassment-Complaint-Form-Web.pdf.  The form is also available at the Human Resource Services office in room ST-1.  A written complaint submitted in this manner may be filed up to  one (1) year from the date on which the unlawful discrimination allegedly occurred.

The anonymous student also has the right to file a complaint with United States Department of Education, Office of Civil Rights.   Information  regarding  filing  a  complaint  with  OCR  is  available  on  OCR's  website  at http://www2.ed.gov/about/offices/list/ocr/docs/howto.html or by calling OCR's office at (800) 421-3481.

Respectfully submitted,

Shawna H. Cohen
Manager, Equal Employment Opportunity and Compliance
   and Deputy Title IX Coordinator
Palomar Community College District
November 1, 2017

# EXHIBIT B



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                          GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                          DIRECTOR KEVIN KISH
2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) I California's Relay Service at 711
http://www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

November 16, 2018

Evan Dwin
Dwin Legal, APC, 2121 Palomar Airport Road Suite 170
Carlsbad, California 92011

RE:   **Notice to Complainant's Attorney**
      DFEH Matter Number: 201811-04256716
      Right to Sue: Kailikole / Palomar Community College District

Dear Evan Dwin:

Attached is a copy of your complaint of discrimination filed with the Department of Fair
Employment and Housing (DFEH) pursuant to the California Fair Employment and
Housing Act, Government Code section 12900 et seq. Also attached is a copy of your
Notice of Case Closure and Right to Sue.

**Pursuant to Government Code section 12962, DFEH will not serve these
documents on the employer.** You must serve the complaint separately, to all named
respondents. Please refer to the attached Notice of Case Closure and Right to Sue for
information regarding filing a private lawsuit in the State of California. A courtesy "Notice
of Filing of Discrimination Complaint" is attached for your convenience.

Be advised that the DFEH does not review or edit the complaint form to ensure that it
meets procedural or statutory requirements.

Sincerely,


Department of Fair Employment and Housing



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                         GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                         DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 I Elk Grove I CA I 95758
(800) 884-1684 (Voice) I (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov I email: contact.center@dfeh.ca.gov

November 16, 2018

RE:   **Notice of Filing of Discrimination Complaint**
DFEH Matter Number: 201811-04256716
Right to Sue: Kailikole / Palomar Community College District

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the
Department of Fair Employment and Housing (DFEH) in accordance with Government
Code section 12960. This constitutes service of the complaint pursuant to Government
Code section 12962. The complainant has requested an authorization to file a lawsuit.
This case is not being investigated by DFEH and is being closed immediately. A copy of
the Notice of Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their contact
information.

No response to DFEH is requested or required.

Sincerely,


Department of Fair Employment and Housing



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency _____ GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**          DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 (Voice) | (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

November 16, 2018

Kathryn Kailikole
1145 Festival Road
San Marcos, California 92078

RE:   **Notice of Case Closure and Right to Sue**
DFEH Matter Number: 201811-04256716
Right to Sue: Kailikole / Palomar Community College District

Dear Kathryn Kailikole,

This letter informs you that the above-referenced complaint was filed with the Department of Fair Employment and Housing (DFEH) has been closed effective November 16, 2018 because an immediate Right to Sue notice was requested. DFEH will take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section 12965, subdivision (b), a civil action may be brought under the provisions of the Fair Employment and Housing Act against the person, employer, labor organization or employment agency named in the above-referenced complaint. The civil action must be filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act, whichever is earlier.

Sincerely,

Department of Fair Employment and Housing

1  
2  **COMPLAINT OF EMPLOYMENT DISCRIMINATION**  
   **BEFORE THE STATE OF CALIFORNIA**  
   **DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING**  
3  **Under the California Fair Employment and Housing Act**  
   **(Gov. Code, § 12900 et seq.)**

4  
**In the Matter of the Complaint of**  
5  Kathryn Kailikole                                    DFEH No. 201811-04256716

6                              Complainant,

7  vs.

8  Palomar Community College District  
   1140 West Mission Road, San Marcos, CA 92069,  
9  San Marcos, California 92069

10                             Respondents

11  _____

12  1. Respondent **Palomar Community College District** is an **employer** subject to  
   suit under the California Fair Employment and Housing Act (FEHA) (Gov. Code, §  
13  12900 et seq.).

14  2. Complainant **Kathryn Kailikole**, resides in the City of **San Marcos** State of  
15  **California.**

16  3. Complainant alleges that on or about **June 13, 2018**, respondent took the  
   following adverse actions:  
17

18  **Complainant was discriminated against** because of complainant's disability  
   (physical or mental) and as a result of the discrimination was terminated,  
19  suspended, denied a work environment free of discrimination and/or retaliation,  
   denied reasonable accommodation for a disability, other.  
20

21  **Complainant experienced retaliation** because complainant reported or resisted  
   any form of discrimination or harassment, participated as a witness in a  
22  discrimination or harassment claim, requested or used a disability-related  
   accommodation and as a result was terminated, reprimanded, suspended, denied a  
23  work environment free of discrimination and/or retaliation.

24  
25  **Additional Complaint Details:** This case concerns the Palomar Community  
   College District's ("Defendant" or the "District") campaign to discredit, discriminate  
26

27                              -1-  
   *Complaint – DFEH No. 201811-04256716*

28  Date Filed: November 16, 2018

1  against, embarrass, retaliate against and illegally terminate Plaintiff Dr. Kathryn
2  Kaiilikole ("Plaintiff' or "Dr. Kaiilikole) who was the Dean of Mathematics and the
   Natural and Health Sciences ("MNHS") Division for Palomar Community College
3  ("Palomar College").

4  A. Plaintiff Is Appointed As Interim Dean.

5       On or about January 13, 2016, Daniel Sourbeer, the Dean of the Mathematics
   and the MNHS Division accepted the position of Interim Vice-President of Instruction
6  which required the College to hire an interim Dean.

7       Plaintiff was hired as interim Dean of the MNHS Department or about January 13,
8  2016 Plaintiff was recommended for the position by Sourbeer.

9       The term of Plaintiffs written Contract to be employed as Interim Dean was
   January 13, 2016 through June 30,2016.  The Agreement was amended on May
10 10,2016 so that Plaintiff s term as Interim Dean was extended from July 1,2016
11 through June 30,2017.  Thus, as of May 10, 2016, the administration and Board was
   plainly satisfied with Plaintiffs performance.
12
        Pursuant to her contract, Plaintiff could only be terminated for a "material and
13 substantial breach" of her Agreement and/or "for cause."  Cause is defined as
14 "actions, omissions, or behaviors which are detrimental to the operations of the
   District and/or its major instructional, student and administrative divisions, or which
15 impair the District's mission purpose or objectives .. which includes, but is not
   limited to, unsatisfactory work performance, dishonesty, misconduct, unprofessional
16 conduct, or insubordination."

17 B.     Plaintiff Reports Professors Nakajima and Gerwig To The Campus
18        Police For Improperly Using An Airgun In The Classroom.

19       Shortly after her appointment as interim Dean, on or about April 19,2016, two
   students advised Plaintiffs assistant, Debra McBrayer of a safety concern regarding
20 their Physics 230 Class.

21       The students reported that Professor Takashi Nakajima ("Nakajima") used an
22 airsoft gun as part of a rotational inertia lab in an unsafe manner. Specifically, the
   students alleged that, among other things, Nakajima failed to take appropriate safety
23 measures and stayed in the back of the room talking with Gerwig and other students
   while the gun was being used.
24
        Immediately after receiving the report from the two students, Ms. McBrayer
25 reported the incident to the Campus Police.
26

27                          -2-
                  Complaint – DFEH No. 201811-04256716
28
   Date Filed: November 16, 2018

1   When Plaintiff returned to her office, she spoke with the students and Ms. McBrayer.

2       Ms. McBrayer informed Plaintiff that she spoke with the Campus Police. Plaintiff
3   responded by calling the Campus Police and requesting that they come to her office
    to speak with her.

4
        At Plaintiff's request, the Campus Police conducted an investigation, including
5   dispatching Officer So'Oto of the Palomar Community College Police Department to
    meet with Plaintiff and the two students.
6

7       During the course of the investigation, Plaintiff provided Officer So'Oto with a
    copy of the District's policy on the use of weapons in the class room, which requires
8   that such uses are approved by the Chief of Police.  The students later e-mailed Dr.
    Kailikole the details of their allegations as well as a video, which she provided to the
9   Campus Police.

10      In addition to reporting the matter to the Campus Police, Plaintiff reported the
11  incident to her supervisor, Sourbeer.
    Officer So'Oto interviewed Nakajima as part of his investigation.  Nakajima told him
12  that he had been using the gun as part of his curriculum for two years.

13      Officer So'Oto determined that Nakajima needed to get approval from the Chief
14  of Police if he wanted to use the gun in class.
     Accordingly, Plaintiff directed Nakajima to cease using the gun without first
15  obtaining approval from the Chief of Police.
    At the time of the gun incident, Plaintiff had only worked for the District for about
16  three months. Thus, she was the first (and only) administrator to ever take any
    action on Nakajima's use of an airsoft gun in his physics lab, even though it started
17  two years before Plaintiff's appointment as Dean.  Plaintiff did not receive any further
    complaints about the gun after she directed Nakajima to stop using it.
18

19  C.    The District Promotes Dr. Kaikole to Dean Of The MNHS Division.

20      On April 28, 2017, Sourbeer submitted a formal evaluation of Plaintiff's
    performance as Interim Dean.
21

22      In the review, Sourbeer stated that Plaintiff "stepped into the MNHS Interim
    Dean position with confidence and passion." Sourbeer further stated that Plaintiff
23  had been "a fierce advocate for students and has taken on some difficult issues."

24  In addition, Sourbeer determined that:

25          •    "[m]orale" was high in the division which "speaks" to Plaintiffs
26

27                                      -3-
28  Date Filed: November 16, 2018

"ability to work effectively with faculty and staff in her division."

- Plaintiff is "an excellent communicator" and that her "contributions toward grant writing and management have been superior."

- Plaintiff has "an excellent understanding of budgets and how to use them.

- Plaintiff has "a tremendous work ethic and works to exhaustion" and that she "wrote a funded proposal for $2m in one day."

- That the "welfare" of the students is "always in [Plaintiffs] thoughts, and she is also appreciative of the commitments and work of staff and faculty."

In May 2017, Dr. Jack Kahn was hired by the District as the Vice-President of Instruction. Rather than exercise his retreat rights, Sourbeer retired, which left open the permanent position of Dean of the MNHS Department. Due to its satisfaction with Plaintiffs performance as Interim Dean, the Board promoted Plaintiff to the position of Dean of the MNHS Department.

Plaintiff was hired as Dean of the MNHS Department pursuant to an Employment Contract with the District dated as effective April 11, 2017 and executed by Plaintiff on May 9, 2017.  The term of the Employment Contract is July 1,2017 through June 30,2019.  As with her prior contracts, Plaintiff could only be terminated for "a material and substantial breach of the agreement" and/or for "cause."

D.    Plaintiff Reports Racist And Sexually Harassing Conduct Bv Nakajima and Gerwig.

Sometime in May 2017, the Chair of the Physics and Engineering Department, Dr. Daniel Finkenthal reported to Plaintiff that a student complained to him about various posters and other materials that were posted conspicuously on the walls and doors of rooms NS-249 and NS-252 in the Physics and Engineering Department. Dr. Finkenthal showed the materials to Plaintiff.  NS-249 and NS-252 are rooms used by Nakajima and Professor Arthur Gerwig ("Gerwig"). On May 31,2017, in response to the report from Dr. Finkenthal, Plaintiff reported to Shawna Cohen, Manager Equal Employment Opportunity and Compliance with the District's Deputy Title IX Coordinator, that she received the report regarding the

-4-

offensive postings.  The next day, a group of administrators reviewed the materials and removed them after determining that the postings violated federal, state and District nondiscrimination regulations, including Title IX.

The postings included:

- A recitation of a nmeumonic device stating: "Black Boys Rape Our Young Girls But Violet Gives Willingly Get Some Now."

- A posting entitled "Vogue May Edition" which portrayed a student lying across the hood of a pickup truck holding a piece of paper with a drawing of a penis in an enlarged and gratuitous characterization.

- A posting portraying a latino student named Juan which stated "2017 you know you juant me?/Hello Ladies" as a racist play on the student's name.

- A sexually harassing and racist posting which stated "Dick got her like" which was accompanied by a hashtag remark of "#black cock slut."

- A derogatory posting about a female student, who is short in stature, which stated "Jen's Height in Influence".

Plaintiff is informed and believes that students, student assistants employed by the District and faculty, including females, latinos and other members of minority groups, were or could be subjected to the postings.

Because of the seriousness of the allegations, and the facially harassing content of the postings personally observed by Plaintiff and the other administrators, Plaintiff recommended that Nakajima and Gerwig be removed from the classroom. This request was denied.

On June 28,2017, nearly a month after Plaintiff reported the harassing postings to Ms. Cohen, Adrian Gonzalez, the Assistant Superintendent/Vice President, Student Services and the District's Title IX Coordinator, notified Ms. Cohen that an investigation was required.
The investigation was conducted by an outside attorney, Jeffrey Love.  In conducting his investigation of the postings, Mr. Love interviewed Dr. Finkenthal, Plaintiff, Nakajima, Gerwig, Hector Garcia Villa, another Physics and Engineering Professor,

-5-
*Complaint – DFEH No. 201811-04256716*

Date Filed: November 16, 2018

and Susan Snow, a professor in the Mathematics Department who was also Nakajima's and Gerwig's union representative.

On November 1, 2017, four months after Plaintiff reported the postings, Mr. Love issued a summary of his investigation.  In the report, Mr. Love concluded that Nakajima and Gerwig were not credible and that their claimed unawareness of the postings was not plausible.  In fact, Mr. Love concluded "clearly [Nakajima and Gerwig] were aware of these materials [and] had either displayed the items themselves or allowed and even encouraged others to do so."  Mr. Love further concluded that Nakajima and Gerwig demonstrated a general attitude of indifference to following the rules of the District concerning the avoidance of sexual harassment, discrimination and maintaining a wholesome student academic environment."

Mr. Love found Dr. Finkenthal and Plaintiff to be credible witnesses.

Notably, this was not the first time Nakajima and Gerwig were found to engage in discriminatory conduct. In 2009 (seven years before Plaintiff worked at the College), the United States Department of Education's OCR Office found that Nakajima and Gerwig failed to accommodate a student with a disability.  Plaintiff is informed and believes that instead of imposing any actual discipline for discriminating against a disabled student, the District required Nakajima and Gerwig to undergo sensitivity training.  Plaintiff is also informed and believes that the District and prior administrators received other complaints about Nakajima and Gerwig but that no action was ever taken against them.  Further, during the investigation of the illegal postings, Dr. Finkenthal informed the investigator that shortly after the sensitivity training, also in 2009, Nakajima refused to accommodate a student who used a wheelchair and even told the student that he should just take vitamins and "take care" of himself.

On November 27, 2017, Dr. Norman e-mailed Plaintiff and specifically instructed Plaintiff to involve Dr. Finkenthal in the oversight of Nakajima and Gerwig and to have Dr. Finkenthal observe Nakajima and Gerwig so that he could substantiate any complaints.  Dr. Norman further made it clear that the District would not place Nakajima and Gerwig on any type of leave, even paid leave, so as to avoid doing anything that may "create liability and deviate from our goals and mission."

Dr. Norman's e-mail appeared to request that she wanted Plaintiff and Dr. Finkenthal to handle overseeing to Nakajima and Gerwig and made it clear that the Title IX office was afraid to take any action to protect students from Nakajima and Gerwig.

On December 4, 2017, Plaintiff met with Dr. Jack Khan, the Assistant Superintendent and Vice-President Instruction to discuss her job duties. In the

-6-

Date Filed: November 16, 2018

meeting, Plaintiff discussed her overwhelming work load and advised Dr. Khan that she was suffering from anxiety.  Dr. Kahn assured Plaintiff that she was an "incredibly valuable member of the team" and that he was dedicated to providing her with his "complete support."  Dr. Kahn also promised that they would meet again to review Plaintiffs schedule "and discuss strategies to help structure [her] workload better."  Dr. Kahn further stated he "look[ed] forward to continuing" to work together. At no point did Dr. Kahn indicate that he believed Plaintiff had done anything that would place her job in danger.  To the contrary, Dr. Kahn expressed his overall satisfaction with Plaintiffs work, confirmed that she was "incredibly valuable," and pledged to accommodate her medical condition.

On December 12, 2017, the District determined that Nakajima and Gerwig would only be placed on unpaid leave for one month even though they had a history of discriminatory conduct, were just found not only to have engaged in overtly racist and sexually harassing conduct but also were found to have lied about their sexist and racist conduct to the investigator. Dr. Kailikole is informed and believes that this grossly inadequate punishment was part of a pattern and practice by the District to cover up misconduct by Gerwig and Nakajima, even though it knew their continued presence in the classroom subjected students and faculty to discriminatory and harassing conduct.

E.      Plaintiff Is Wrongfully Placed On Leave, Non-Renewed And
        Terminated.

On December 14, 2017, two days after Nakajima and Gerwig were essentially excused from punishment and barely a week after she disclosed her disability, Plaintiff was suddenly placed on paid leave.  Plaintiff was given no warning and was not given any specific reason for being placed on leave. In fact, she was escorted out of her office like a criminal, locked out of her e-mail account and, importantly, instructed not to return to campus or speak with anyone from the College.  The only information Plaintiff was given was that she was purportedly under investigation for some unspecified "breach of confidential information."  From that point forward, Plaintiff was completely cut-off from the College.

The District left Plaintiff on paid leave for 5 months without ever informing her of the specific nature of the charges against her.  During the time Plaintiff was on paid leave, faculty members were falsely told that Plaintiff was on medical leave. Plaintiff could not do anything about the false information the District was disseminating about her because the District prohibited her from contacting anyone.

In January 2018, Dr. Kailikole hired an attorney and throughout January and February of 2018 made repeated attempts to obtain further information about why she was placed on leave.  However, the District refused to provide any substantive

-7-
Complaint – DFEH No. 201811-04256716

Date Filed: November 16, 2018

1  information. The only thing the District would disclose to Dr. Kailikole was that the
   investigation originated in the Physics and Engineering Department. When provided
2  with this information, Dr. Kailikole informed the District that she believed the decision
3  to suddenly place her on leave and investigate her was in retaliation for reporting
   Nakajima and Gerwig's misconduct.

4
       On February 27, 2018, the District decided to non-renew Plaintiff's contract.
5  The District did not provide Plaintiff with any reason whatsoever for the decision not
6  to renew her contract.

7      On February 28, 2018, the day after her contract was non-renewed without
   explanation, Plaintiff was interviewed by the District's investigator about, among
8  other things, the incident where Nakajima and Gerwig used an airsoft gun in the
   classroom.
9
       Plaintiff informed the investigator that Dr. Lisa Norman had asked about the
10 airsoft gun incident during the investigation of the racially and sexually harassing
11 conduct by Nakajima and Gerwig. Plaintiff also informed the investigator that she
   contacted Dr. Finkenthal with information about that incident to make sure it was not
12 being used any more. Dr. Finkenthal said he did not think a gun was being used
   and requested further information so he could check on it. Accordingly, on or about
13 December 8, 2017, Plaintiff forwarded Dr. Finkenthal an e-mail about the airsoft gun
14 incident. Plaintiff is informed and believes that Dr. Norman reviewed this e-mail as
   part of a search of Dr. Kailikole's e-mails that was done without Dr. Kailikole's
15 consent and as part of an effort by the District to look for information to discredit Dr.
   Kailikole after she reported Nakajima's and Gerwig's racist and harassing behavior.
16
       Plaintiff's obvious, and only purpose, in forwarding the e-mail about the gun
17 incident to Dr. Finkenthal was so that Dr. Finkenthal could confirm Nakajima and
18 Gerwig were following Plaintiff's prior directive not to use the gun in the interest of
   student safety. Advising Dr. Finkenthal of the prior incident with the airsoft gun was
19 also consistent with the recommendation by Dr. Norman, the Assistant
   Superintendent/Vice President, Human Resources, that she involve Dr. Finkenthal in
20 her oversight of Nakajima and Gerwig.

21     When the District's investigator interviewed Plaintiff, he asked her if she ever
22 agreed with Dr. Finkenthal that he would provide information about the airsoft gun
   incident to any person. Plaintiff informed the investigator that she never had any
23 agreement with Dr. Finkenthal to provide the information to anyone else. The
   investigator asked Plaintiff if Dr. Finkenthal ever indicated to her that he intended to
24 provide the information about the airsoft gun incident to his wife or members of the
25 District's governing Board or "anything like that." Plaintiff informed the investigator

26

27                                            -8-
28
Date Filed: November 16, 2018

1  that Dr. Finkenthal never indicated to her that he planned to provide the information
2  to anyone else.

3       On or about March 4, 2018, a faculty member sent Plaintiff an unsolicited text
message informing Plaintiff that Dr. Kahn was telling faculty members that Plaintiff
4  was not returning.  Given that the investigator told her it would be several weeks
before he completed his investigation and would issue his report, it was clear to
5  Plaintiff that the District had already decided to terminate her and that it was simply
using the investigator to manufacture a purported reason.
6

7       On May 2, 2018, nearly two months after it began telling faculty members that
Plaintiff was not returning, Plaintiff received a letter informing that Dr. Kahn was
8  recommending her termination.

9       One of the reasons stated for Plaintiffs termination was the absurd and
implausible conclusion by the District's investigator that Plaintiff did not forward Dr.
10  Finkenthal the information about the gun incident for the logical, obvious and entirely
proper purpose of advising the Chair of the Department of relevant information in
11  connection with his oversight of two Professors who had just been found guilty of
grossly improper racist and harassing conduct in the classroom.  Instead, the
12  investigator claims, Plaintiff was actually part of a conspiracy to leak confidential
information outside the College. According to the investigator's report, the full extent
13  of the alleged conspiracy was that Plaintiff would forward the e-mail to Dr.
Finkenthal, who would then forward the e-mail to his wife.  The only "evidence" cited
14  in support of this ridiculous conclusion is that, three days after Plaintiff forwarded the
e-mail about the gun incident to Dr. Finkenthal, Dr. Finkenthal forward the e-mail to
15  his wife.  Of course, Plaintiff had no idea that Dr. Finkenthal forwarded the e-mail to
his wife or anyone else, and she certainly did not ask him to do it.  Indeed, there is
16  there a complete lack of evidence that Plaintiff was involved in any such
"conspiracy."  The very idea that Plaintiff conspired with Dr. Finkenthal to expose
17  Nakajima's and Gerwig's misdeeds to Dr. Finkenthal's wife is nonsensical.
18  Accordingly, Plaintiff is informed and believes that alleged leak "conspiracy" was
manufactured to try to cover up the true, discriminatory and retaliatory reasons for
19  Plaintiffs termination.
20  Notably, the investigator's report does not list a specific person who made a
complaint about Dr. Kailikole.  Instead the report simply states that it was "internally
21  generated at the request of Human Resources."  Further, the investigator
interviewed only two witnesses, Plaintiff and Dr. Finkenthal.  He did not interview
22  anyone from the Human Resources department even though someone in the
department purportedly originated the complaint. The investigator also did not collect
23  or review any documents related to the origins of the investigation.

24

25

26

27  <center>-9-</center>
<center>*Complaint – DFEH No. 201811-04256716*</center>

28  Date Filed: November 16, 2018

1    In addition to the absurd allegation that she conspired to leak confidential
2 information to Dr. Finkenthal's wife, the May 2, 2018 letter recommending Plaintiffs
   termination contains a list of alleged performance issues, none of which were ever
3 presented to Plaintiff as potential reasons for any type of discipline, let alone
   termination.
4 To add insult to injury, as an additional purported reason for the termination, the
   District stated Plaintiff purportedly failed to appropriately monitor Nakaiima and
5 Gerwig.  This reason is false and pretextual on its face, given that Plaintiff was the
   first Dean to actually risk exercising any supervision over Nakajima and Gerwig.
6 including reporting their overtly racist and sexually harassing conduct to the District
7 only to see the District willfully fail to take any real action. Plaintiff is informed and
   believes that the District was angered and embarrassed by Plaintiffs reporting of the
8 harassing conduct by Nakajima and Gerwig because it required the District to take
   action against tenured professors which risked raising suspicions and questions by
9 students and faculty if they were punished appropriately, such as by termination or
   placement on an extensive leave. Plaintiff is further informed and believed that the
10 District wanted to punish Plaintiff for asserting her rights by suggesting that the
11 investigation was illegitimate and retaliatory.

12    On June 13,2018, the District terminated Plaintiffs employment.

13    The District's decisions to place Plaintiff on paid leave, non-renew her contract
14 and terminate her were all clearly made to retaliate against her for complaining
   about Nakajima's and Gerwig's illegal conduct, which it quickly swept under the rug
15 by issuing a disproportionately light penalty they served over winter break, for
   reporting that the purported investigation of the "confidentiality" issue was pretextual
16 and retaliatory, and to discriminate against Plaintiff based upon, and to avoid
   accommodating, Plaintiff's mental health condition.  Indeed, until the District was
17 forced to deal with Plaintiffs disability and her complaint about Nakajima and
18 Gerwig's conduct and the investigation, she was never given any indication that her
   job - to which she had recently been promoted - was in any danger whatsoever.
19 Prior to being suddenly placed on leave, Plaintiff had a reputation at the College as a
   strong leader, an advocate for students, a talented fundraiser, and, above all, an
20 educator dedicated to the College's mission.  Plaintiff was completely humiliated by
21 her sudden removal from campus, the non-renewal of her contract and being
   subjected to a sham investigation and termination over allegations manufactured by
22 the District to punish her for raising the embarrassing issue of racism and sexual
   harassment in the classroom and to discriminate against Plaintiff for, and to avoid
23 accommodating, Plaintiff's mental health condition.  As a result of this illegal conduct
24 by the District, Plaintiff has suffered lost back wages and benefits, lost future
   earnings and benefits, lost promotions, extreme amounts of emotional distress and
25 other damages.

26
27                                    -10-
28
Date Filed: November 16, 2018

1      Plaintiff alleges causes of action under Government Code section 12940 et seq., including under Government Code section 12940(a), Government Code section 12940(j), Government Code section 12940(m) and Government Code section 12940(n), as well as claims for retaliation in violation of Labor Code section 1102.5 and violations of federal law, including 20 U.S.C. section 1681 and 42 U.S.C. section 2000d.

-11-
*Complaint – DFEH No. 201811-04256716*

Date Filed: November 16, 2018

VERIFICATION

I, **Kathryn Kailikole**, am the **Complainant** in the above-entitled complaint.  I have read the foregoing complaint and know the contents thereof.  The same is true of my own knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters, I believe it to be true.

On November 16, 2018, I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

**San Marcos, CA**

-12-
*Complaint – DFEH No. 201811-04256716*

Date Filed: November 16, 2018