**DWIN LEGAL, APC**
Evan Dwin (SBN 241027)
2121 Palomar Airport Road, Suite 170
Carlsbad, CA 92011
Tel: (760) 536-6471
Fax:(760) 585-4649
e-mail: edwin@dwinlegal.com

Attorneys for Plaintiff
KATHYRN KAILIKOLE

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHRYN KAILIKOLE, an individual;<br><br>                    Plaintiff,<br><br>    vs.<br><br>PALOMAR COMMUNITY COLLEGE DISTRICT, a governmental entity; and DOES 1 through 25, inclusive;<br><br>                    Defendants. | Case No. 3:18-cv-02877-AJB-MSB<br><br>[Previously San Diego Superior Court Case No. 37-2018-00058754-CU-WT-NC]<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**(1) RETALIATION IN VIOLATION OF 20 U.S.C. § 1681** *et. seq.*<br><br>**(2) RETALIATION IN VIOLATION OF 42 U.S.C. § 2000d** *et seq.*<br><br>**(3) RETALIATION IN VIOLATION OF GOVERNMENT CODE § 12940(h)**<br><br>**(4) DISABILITY DISCRIMINATION IN VIOLATION OF GOVERNMENT CODE § 12940(a)**<br><br>**(5) FAILURE TO ACCOMMODATE DISABILITY IN VIOLATION OF GOVERNMENT CODE § 12940(m)**<br><br>**(6) FAILURE TO ENGAGE IN THE INTERACTION PROCESS IN VIOLATION OF GOVERNMENT CODE § 12940(n)**<br><br>**(7) RETALIATION IN VIOLATION OF LABOR CODE § 1102.5** |

- 1 -

FIRST AMENDED COMPLAINT

Plaintiff Dr. Kathryn Kailikole ("Dr. Kailikole" or "Plaintiff") hereby alleges the following First Amended Complaint against defendant Palomar Community College District ("Defendant" or the "District") as follows:

**INTRODUCTION**

1.     Plaintiff was the Dean of Mathematics and the Natural and Heath Sciences Division ("MNHS") for Palomar College which is a public community college.

2.     This case concerns the District's campaign to discredit, discriminate against, embarrass, and retaliate against Plaintiff through the adverse employment actions of placing Plaintiff on involuntary leave, non-renewing her contract and ultimately terminating her employment.  Each of Plaintiff's claims arise out of these adverse employment actions which were taken by the District to retaliate against Plaintiff for complaining about racist and sexually harassing conduct by two professors, to discriminate against Plaintiff on the basis of her mental health disability and to avoid accommodating her disability.

3.     Plaintiff was first employed by the District as the Interim Dean of the MNHS Division in January 2016.  Pursuant to a new employment agreement with an effective date of April 11, 2017 and with a two-year term to start on July 1, 2017, Plaintiff was officially named to the role Dean of the MNHS due to her excellent performance as an administrator, her leadership in managing the faculty, her uncompromising commitment to the well-being of students and her ability to raise funds for the College.

4.     On or about May 5, 2017, Plaintiff needed to leave a meeting because she believed she was having a heart attack.  It turned out that Plaintiff was not having a heart attack but was having a panic attack.  Plaintiff was diagnosed with anxiety which limits her in her major life activities.  Plaintiff's anxiety causes her to suffer feelings of being overwhelmed, helpless and nervous and also causes her to suffer

- 2 -

FIRST AMENDED COMPLAINT

1   vertigo and cysts.  Plaintiff informed Dr. Jack Kahn, the Vice-President of
2   Instruction, that she suffered from anxiety.
3        5.    Also in May 2017, Plaintiff received a report from a faculty member, Dr.
4   Daniel Finkenthal, that two tenured professors in the Physics and Engineering
5   Department, Takashi Nakajima ("Nakajima") and Arthur Gerwig ("Gerwig") were
6   engaged in racist and sexually harassing conduct.  The incident was reported to Dr.
7   Finkenthal by a student who was afraid to file the complaint on his or her own behalf
8   for fear of retaliation by Nakajima or Gerwig.  Nakajima's and Gerwig's conduct
9   included posting, or allowing to be posted, racist and sexually explicit messages in
10  the physics lab.  The postings included, among other things, a written mnemonic that
11  referenced "black boys" raping girls, a racist word play on a Hispanic student's name,
12  a post referring to "#blackcock slut" and a sexually explicit drawing of a female
13  student.
14       6.    Plaintiff was an academic dean responsible for planning, organizing,
15  administering, developing and evaluating the instructional programs, projects and
16  activities of her division.  Plaintiff is not a lawyer, compliance officer or human
17  resources professional.  Thus, Plaintiff was not responsible for ensuring compliance
18  with relevant anti-discrimination laws, regulations and policies, which is the
19  responsibility of the Human Resources Department, Office of Student Affairs and
20  Equal Opportunity and Compliance Office ("EEO Office").  Accordingly, when
21  Plaintiff learned about Nakajima's and Gerwig's shocking conduct, she immediately
22  reported it to Shawna Cohen, the District's Manager of the Equal Opportunity and
23  Compliance and Deputy Title IX Coordinator.  Plaintiff made the complaint about
24  Nakajima and Gerwig to Ms. Cohen on or about May 31, 2017.
25       7.    Plaintiff reported Nakajima's and Gerwig's discriminatory and harassing
26  conduct so she could advocate for students, student assistants and faculty who she
27  believes have a right to an environment free from racism and sexual harassment.
28  Plaintiff had no control over the investigation or any potential remedial action by the

FIRST AMENDED COMPLAINT

1  District, all of which are the responsibility of the EEO Office and Human Resources
2  Department.

3        8.    After the District's Title IX officials reviewed the postings in the physics
4  lab, the District began an investigation of Nakajima and Gerwig.  The District's
5  investigation of Nakajima's and Gerwig's racist and sexually harassing conduct
6  lasted from about July 2017 until November 2017.  Plaintiff was interviewed as a
7  witness in the investigation.

8        9.    On November 1, 2017, the District's investigator concluded that Plaintiff
9  and Dr. Finkenthal were credible, and that Nakajima and Gerwig were guilty of
10  violating the College's anti-harassment policies by either allowing the postings or
11  even making the postings themselves, as well as other misconduct.  The investigator
12  also concluded that Nakajima and Gerwig lied to the investigator about their
13  involvement with the postings.

14        10.    Towards the end of November 2017, Plaintiff met with Dr. Lisa
15  Norman, who was the newly appointed Assistant Superintendent/Vice President,
16  Human Resources, to discuss Nakajima and Gerwig.  Plaintiff suggested that in light
17  of Nakajima's and Gerwig's openly racist and sexually harassing conduct, that they
18  should be terminated.  Dr. Norman indicated that the District would not terminate
19  Nakajima and Gerwig because the offense did not merit harming their careers and
20  damaging their livelihood.  Plaintiff was disappointed with Dr. Norman's apparent
21  indifference to ensuring an environment free of discrimination and harassment.

22        11.    On December 4, 2017, Plaintiff met with Dr. Jack Khan to discuss her
23  job duties.  In the meeting, Plaintiff discussed her anxiety with Dr. Khan and
24  expressed concern about her overwhelming workload, which included duties that are
25  not typically part of the Dean's job.  Dr. Kahn assured Plaintiff that she was an
26  "incredibly valuable member of the team" and that he was dedicated to providing her
27  with his "complete support."  In other words, Dr. Kahn acknowledged that Plaintiff
28  suffered from a disability and indicated that the District would accommodate it.

12.     On or about December 12, 2017, the District placed Nakajima and Gerwig on one month of unpaid leave.  It was clear from the District's toothless response to the overtly racist and sexist conduct in the classroom by professors with a history of discriminatory conduct that the District's goal was not to protect students, but rather to avoid the appearance of anything out of the ordinary involving Nakajima and Gerwig.  Plaintiff was shocked by the District's disregard for the well-being of the students by failing to take appropriate action against Nakajima and Gerwig.

13.     On December 14, 2017, Plaintiff was mysteriously and suddenly placed on paid leave.  The decision to place Plaintiff on paid leave was barely a week after Dr. Kahn pledged to accommodate her medical condition and within two days of the District's failure to impose appropriate discipline on Nakajima and Gerwig for the overtly racist and sexually harassing conduct reported by Plaintiff.

14.     When Plaintiff was placed on paid leave, she was escorted off campus like a criminal, locked out of her office, cut off from her e-mail, relieved of all of her duties in overseeing her Division and instructed not to speak to anyone at the college. Plaintiff was not given any information about why she was suddenly removed from the campus except that she was told it allegedly had to do with an investigation of a purported "confidentiality" issue.  Plaintiff was shocked and confused by the District's action, especially given its earlier refusal to place Nakajima and Gerwig on paid leave when they were caught red-handed engaging in racist and sexually harassing conduct.

15.     The District left Plaintiff on paid leave for 5 months without ever informing her of the specific nature of the charges against her.  No mention was made to Plaintiff about any alleged job performance issues.  During that time, Plaintiff was forbidden from checking in with her faculty, her staff or students and had no idea what was being said about her on campus, although she did receive an unsolicited message from a faculty member informing her that the District was telling faculty members that Plaintiff was on medical leave, which was false.

16.     In January 2018, Dr. Kailikole hired an attorney and throughout January and February of 2018 made repeated attempts to obtain further information about why she was placed on leave.  However, the District refused to provide any substantive information.  The only thing the District would disclose to Dr. Kailikole was that the investigation originated in the Physics and Engineering Department.  When provided with this information, Dr. Kailikole informed the District that she believed the decision to suddenly place her on leave and investigate her was in retaliation for reporting Nakajima and Gerwig's misconduct.

17.     On February 27, 2018, while she was still on paid leave, and less than a week after she expressed her belief that the decision to place her on leave was retaliatory, the District decided not to renew Plaintiff's contract.  The District did not provide Plaintiff with a reason for the decision not to renew her contract.

18.     On February 28, 2018, the day after her contract was non-renewed without explanation (and prior to any investigation concluding), Plaintiff was interviewed by the District's investigator about, among other things, an incident where Nakajima and Gerwig used an airsoft gun in the classroom.  When that incident happened, in April 2016, Plaintiff reported it to the Campus Police, which is is respon conducted and completed an investigation into the matter and concluded that the gun should not have been used without prior approval by the police.  Although Nakajima and Gerwig used the gun for at least the two previous years (*i.e.*, before Plaintiff arrived on campus), Plaintiff was the first, and only, administrator to ever do anything about it.  After the Campus Police confirmed that approval was required, Plaintiff directed Nakajima and Gerwig not to use the gun again without prior approval from the police.

19.     The airsoft gun incident was mentioned to Plaintiff by Dr. Lisa Norman, the Assistant Superintendent/Vice President, Human Resources, in the fall of 2017, after Plaintiff described it to the investigator in connection with the investigation of the racially and sexually harassing conduct by Nakajima and Gerwig.  During that

1   time, Dr. Norman also advised Plaintiff that she or Dr. Finkenthal, who was now the
2   Chair of the Physics and Engineering Department, should observe Nakajima and
3   Gerwig to determine if they were violating any rules.  Accordingly, Plaintiff
4   contacted Dr. Finkenthal to tell him about the incident with the airsoft gun and to
5   make sure it was not being used any more.  Dr. Finkenthal said he did not think a gun
6   was being used and requested further information so he could check on it.
7   Accordingly, on or about December 8, 2017, Plaintiff forwarded Dr. Finkenthal an e-
8   mail about the airsoft gun incident.  Plaintiff is informed and believes that Dr.
9   Norman reviewed this e-mail as part of a search of Dr. Kailikole's e-mails that was
10  done without Dr. Kailikole's consent and as part of an effort by the District to look
11  for information to discredit Dr. Kailikole after she reported Nakajima's and Gerwig's
12  racist and sexist behavior.

13        20.     Plaintiff's obvious, and only, purpose in forwarding the e-mail about the
14  airsoft gun incident to Dr. Finkenthal was so that Dr. Finkenthal could confirm
15  Nakajima and Gerwig were following Plaintiff's prior directive not to use the gun any
16  more.  Advising Dr. Finkenthal of the prior incident with the airsoft gun was entirely
17  proper and also consistent with the recommendation by Dr. Norman that Dr.
18  Kailikole involve Dr. Finkenthal in her oversight of Nakajima and Gerwig.

19        21.     When the District's investigator interviewed Plaintiff about the alleged
20  "confidentiality" issue, he asked her if she ever agreed with Dr. Finkenthal that he
21  would provide information about the airsoft gun incident to any other person.
22  Plaintiff informed the investigator that she never had any agreement with Dr.
23  Finkenthal to provide the information to anyone else.  The investigator also asked
24  Plaintiff if Dr. Finkenthal ever indicated to her that he intended to provide the
25  information about the airsoft gun incident to his wife or members of the District's
26  governing Board or "anything like that."  Plaintiff informed the investigator that Dr.
27  Finkenthal never indicated to her that he planned to provide the information to
28  anyone else.

FIRST AMENDED COMPLAINT

1   22.   On or about March 4, 2018, while she was still on paid leave without
2   explanation, Plaintiff received another unsolicited message from a faculty member
3   informing her that the faculty member was told by Dr. Kahn, that Dr. Kailikole would
4   not be returning.  Plaintiff was disturbed by the fact that faculty members were being
5   told she was not returning, particularly when the investigation of the alleged
6   "confidentiality" issue was pending, and she had received no information about the
7   status of her employment.

8   23.   On May 2, 2018, nearly two months after it began telling faculty
9   members that Plaintiff was not returning, Plaintiff received a letter informing her that
10  Dr. Kahn was recommending her termination.

11  24.   One of the reasons stated for Plaintiff's termination was a purported
12  conclusion by the District's investigator about Plaintiff's e-mail to Dr. Finkenthal
13  regarding the airsoft gun incident.  Specifically, the investigator claimed that he did
14  not believe that Plaintiff forwarded Dr. Finkenthal the information about the airsoft
15  gun incident for her stated, and obviously proper purpose, of advising the Chair of the
16  Department of relevant information in connection with his oversight of two
17  Professors who had just been found guilty of grossly improper racist and harassing
18  conduct in the classroom.  Instead, the investigator claimed to have reached the
19  absurd conclusion that Plaintiff was actually part of a conspiracy to leak confidential
20  information about Nakajima and Gerwig outside the College.  The only "evidence"
21  cited in support of this alleged conspiracy is that, three days after Plaintiff forwarded
22  the e-mail about the gun incident to Dr. Finkenthal, Dr. Finkenthal forwarded the e-
23  mail to his wife.  Of course, Plaintiff had no idea that Dr. Finkenthal forwarded the e-
24  mail to his wife or anyone else, and she certainly did not ask him to do it.  Further,
25  the investigator does not explain why Plaintiff would try to "leak" information to Dr.
26  Finkenthal's wife.  The very idea that Dr. Finkenthal's e-mail to his wife implicates
27  Plaintiff in some type of leaking conspiracy is nonsensical on its face.  Accordingly,
28  Plaintiff is informed and believes that alleged leak "conspiracy" was manufactured by

1  the District because it lacked any legitimate reason to non-renew and terminate
2  Plaintiff's contract.

3      25.    In addition to the absurd allegation that Plaintiff conspired to leak
4  confidential information to Dr. Finkenthal's wife, the May 2, 2018 letter contains a
5  list of alleged performance issues, none of which would constitute cause for
6  termination and none of which were ever presented to Plaintiff as potential reasons
7  for any type of discipline, let alone termination.

8      26.    To add insult to injury, as an additional purported reason for the
9  termination, the District stated Plaintiff purportedly <u>failed to appropriately monitor</u>
10 <u>Nakajima and Gerwig</u>.  This reason is false and pretextual on its face, given that
11 Plaintiff was the first Dean to actually exercise any supervision over Nakajima and
12 Gerwig, including reporting and complaining about their overtly racist and sexually
13 harassing conduct to the District only to see the District willfully fail to take any real
14 action.  Plaintiff is informed and believes that the District was angry at Plaintiff for
15 reporting the harassing conduct by Nakajima and Gerwig because it required the
16 District to take action against tenured professors which risked raising suspicions and
17 questions by students and faculty if they were terminated or placed on an extensive
18 leave.

19     27.    On June 13, 2018, the District terminated Plaintiff's employment.

20     28.    The District's adverse employment actions in placing Plaintiff on paid
21 leave, non-renewing her contract and terminating her were all clearly made to
22 retaliate against her for complaining about Nakajima and Gerwig's racist and
23 sexually harassing conduct, for complaining about the retaliatory decision to place
24 her on leave for reporting Nakajima and Gerwig, to discriminate and retaliate against
25 Plaintiff for requesting a disability accommodation and to avoid accommodating the
26 disability she discussed with Dr. Kahn barely a week before she was mysteriously
27 placed on leave and subjected to a bogus investigation.  Indeed, until the District was
28 forced to deal with Plaintiff's report about the Nakajima and Gerwig and her request

1    for an accommodation for her disability, she was never given any indication that her

2    job was in any danger and, in fact, received a stellar review and a promotion and was

3    told that she was an "incredibly valuable member" of the administration.

4         29.    Because of the District's discriminatory and retaliatory conduct, after

5    exhausting her administrative remedies with the Department of Fair Employment and

6    Housing ("DFEH"), Plaintiff brings this action for: 1)  retaliation in violation of 20

7    U.S.C. § 1681; 2) retaliation in violation of 42 U.S.C. § 2000d; 3) retaliation in

8    violation of Government Code section 12940(h); 4) disability discrimination in

9    violation of Government Code section 12940(a); 5) failure to accommodate disability

10   in violation of Government Code section 12940(m); 6) failure to engage in the

11   interactive process in violation of Government Code section 12940(n); and 7)

12   retaliation in violation of Labor Code section 1102.5.

### JURISDICTION AND VENUE

14        30.    This Court has personal jurisdiction over the District because the District

15   resides in California and has subjected itself to this Court's jurisdiction by appearing

16   in this action and removing it to this Court.

17        31.    Venue is proper in this Court under 28 U.S.C. 1391(b) because the

18   District resides in this District and a substantial part of the events or omissions giving

19   rise to the claims occurred in this District.

### THE PARTIES

21        32.    Plaintiff is an individual residing in San Diego County.

22        33.    The District is a public entity which operates in, and has its principal

23   place of business in, San Diego County.

### FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A.  Plaintiff Is Appointed As Interim Dean.**

26        34.    On or about January 13, 2016, Daniel Sourbeer, the Dean of the

27   Mathematics and the MNHS Division accepted the position of Interim Vice-President

28   of Instruction which required the College to hire an interim Dean.

35.   Plaintiff was hired as interim Dean of the MNHS Department or about January 13, 2016.  Plaintiff was recommended for the position by Sourbeer.

36.   The term of Plaintiff's written Contract to be employed as Interim Dean was January 13, 2016 through June 30, 2016.  The Agreement was amended on May 10, 2016 so that Plaintiff's term as Interim Dean was extended from July 1, 2016 through June 30, 2017.  Thus, as of May 10, 2016, the administration and Board was plainly satisfied with Plaintiff's performance.

37.   Pursuant to her contract, Plaintiff could only be terminated for a "material and substantial breach" of her Agreement and/or "for cause."  Cause is defined as "actions, omissions, or behaviors which are detrimental to the operations of the District and/or its major instructional, student and administrative divisions, or which impair the District's mission purpose or objectives . . . which includes, but is not limited to, unsatisfactory work performance, dishonesty, misconduct, unprofessional conduct, or insubordination."

**B.   Plaintiff Reports Professors Najajima and Gerwig To The Campus Police For Improperly Using An Airgun In The Classroom.**

38.   Shortly after her appointment as interim Dean, on or about April 19, 2016, two students advised Plaintiff's assistant, Debra McBrayer of a safety concern regarding their Physics 230 Class.

39.   The students reported that Nakajima used an airsoft gun as part of a rotational inertia lab in an unsafe manner.  Specifically, the students alleged that, among other things, Nakajima failed to take appropriate safety measures and stayed in the back of the room talking with Gerwig and other students while the gun was being used.

40.   Immediately after receiving the report from the two students, Ms. McBrayer reported the incident to the Campus Police, which is responsible for student safety issues.

41.     When Plaintiff returned to her office, she spoke with the students and Ms. McBrayer.  Ms. McBrayer informed Plaintiff that she spoke with the Campus Police.  Plaintiff responded by calling the Campus Police and requesting that they come to her office to speak with her.

42.     At Plaintiff's request, the Campus Police conducted an investigation, including dispatching Officer So'Oto of the Palomar Community College Police Department to meet with Plaintiff and the two students.

43.     During the course of the investigation, Plaintiff provided Officer So'Oto with a copy of the District's policy on the use of weapons in the class room, which requires that such uses are approved by the Chief of Police.  The students later e-mailed Dr. Kailikole the details of their allegations as well as a video, which she provided to the Campus Police.

44.     In addition to reporting the matter to the Campus Police, Plaintiff reported the incident to her supervisor, Sourbeer.

45.     Officer So'Oto interviewed Nakajima as part of his investigation. Nakajima told him that he had been using the gun as part of his curriculum for two years.

46.     Officer So'Oto determined that Nakajima needed to get approval from the Chief of Police if he wanted to use the gun in class.  Accordingly, Plaintiff directed Nakajima to cease using the gun without first obtaining approval from the Chief of Police.

47.     At the time of the gun incident, Plaintiff had only worked for the District for about three months.  Thus, she was the first (and only) administrator to ever take any action on Nakajima's use of an airsoft gun in his physics lab, even though it started two years before Plaintiff's appointment as Dean.  Plaintiff did not receive any further complaints about the gun after she directed Nakajima to stop using it.

**C.   The District Promotes Dr. Kaikole to Dean Of The MNHS Division.**

48.   On April 28, 2017, Sourbeer submitted a formal evaluation of Plaintiff's performance as Interim Dean.

49.   In the review, Sourbeer stated that Plaintiff "stepped into the MNHS Interim Dean position with confidence and passion."  Sourbeer further stated that Plaintiff had been "a fierce advocate for students and has taken on some difficult issues."

50.   In addition, Sourbeer determined that:

- "[m]orale" was high in the division which "speaks" to Plaintiff's "ability to work effectively with faculty and staff in her division."
- Plaintiff is "an excellent communicator" and that her "contributions toward grant writing and management have been superior."
- Plaintiff has "an excellent understanding of budgets and how to use them.
- Plaintiff has "a tremendous work ethic and works to exhaustion" and that she "wrote a funded proposal for $2m in one day."
- That the "welfare" of the students is "always in [Plaintiff's] thoughts, and she is also appreciative of the commitments and work of staff and faculty."

51.   In May 2017, Dr. Kahn was hired by the District as the Vice-President of Instruction.  Rather than exercise his retreat rights, Sourbeer retired, which left open the permanent position of Dean of the MNHS Department.  Due to its satisfaction with Plaintiff's performance as Interim Dean, the Board promoted Plaintiff to the position of Dean of the MNHS Department.  As an academic dean, Plaintiff was responsible for planning, organizing, administering, developing and evaluating the instructional programs, projects and activities of her division.

52.   Plaintiff was hired as Dean of the MNHS Department pursuant to an Employment Contract with the District dated as effective April 11, 2017 and

executed by Plaintiff on May 9, 2017. The term of the Employment Contract is July 1, 2017 through June 30, 2019. As with her prior contracts, Plaintiff could only be terminated for "a material and substantial breach of the agreement" and/or for "cause."

### D. Plaintiff Reports Racist And Sexually Harassing Conduct By Nakajima and Gerwig.

53.     On May 5, 2017, Plaintiff needed to leave a meeting because she believed she was having a heart attack. It turned out that Plaintiff was not having a heart attack but was having a panic attack. Plaintiff was diagnosed with anxiety which limits her in her major life activities. Plaintiff's anxiety causes her to suffer feelings of being overwhelmed, helpless and nervous and also causes her to suffer vertigo and cysts. Plaintiff informed Dr. Kahn, that she suffered from anxiety.

54.     Also in May 2017 Dr. Finkenthal reported to Plaintiff that a student complained to him about various posters and other materials that were posted conspicuously on the walls and doors of rooms NS-249 and NS-252 in the Physics and Engineering Department. Dr. Finkenthal showed the materials to Plaintiff. NS-249 and NS-252 are rooms used by Nakajima and Gerwig.

55.     On May 31, 2017, in response to the report from Dr. Finkenthal, Plaintiff reported to Shawna Cohen, Manager Equal Employment Opportunity and Compliance with the District's Deputy Title IX Coordinator, that she received the report regarding the offensive postings. The next day, a group of administrators reviewed the materials and removed them after determining that the postings violated federal, state and District nondiscrimination regulations, including Title IX.

The postings included:

- A recitation of a mnemonic device stating: "Black Boys Rape Our Young Girls But Violet Gives Willingly Get Some Now."

- A posting entitled "Vogue May Edition" which portrayed a student lying across the hood of a pickup truck holding a piece of paper with a drawing of a penis in an enlarged and gratuitous characterization.
- A posting portraying a Latino student named Juan which stated "2017 you know you juant me?/Hello Ladies" as a racist play on the student's name.
- A sexually harassing and racist posting which stated "Dick got her like" which was accompanied by a hashtag remark of "#black cock slut."
- A derogatory posting about a female student, who is short in stature, which stated "Jen's Height in Influence".

56.     Plaintiff is informed and believes that students, student assistants employed by the District and faculty including females, Latinos and other members of minority groups, were or could be subjected to the postings.

57.     Plaintiff was an academic dean.  She is not a lawyer, human resources professional or compliance officer.  Thus, Plaintiff was not responsible for ensuring compliance with relevant anti-discrimination laws and regulations, which is the responsibility of the Human Resources Department, Student Affairs Office and Equal Opportunity and Compliance Office ("EEO Office").  Accordingly, Plaintiff complained about Nakajima's and Gerwig's shocking conduct by reporting it to Shawna Cohen because she is the District's Manager of the Equal Opportunity and Compliance and Deputy Title IX Coordinator.

58.     Plaintiff reported Nakajima's and Gerwig's discriminatory and harassing conduct so she could advocate for students, student assistants and faculty, who she believes have a right to an environment free from racism and sexual harassment.  Plaintiff had no control over the investigation or any potential remedial action by the District, all of which are the responsibility of the EEO Office and Human Resources Department.  Despite the seriousness of the allegations, and the facially harassing

1  content of the postings personally observed by Plaintiff and the other administrators,

2  the District denied Plaintiff's request to place Nakajima and Gerwig on leave.

3       59.   On June 28, 2017, nearly a month after Plaintiff reported the harassing

4  postings to Ms. Cohen, Adrian Gonzalez, the Assistant Superintendent/Vice

5  President, Student Services and the District's Title IX Coordinator, notified Ms.

6  Cohen that an investigation was required.

7       60.   Because of the outrageous nature of the conduct by Nakajima and

8  Gerwig, and the imminent danger posed to students as a result of it, Plaintiff

9  requested Nakajima and Gerwig be placed on paid leave and removed from the

10  classroom while the District investigated the racist and harassing postings.  The

11  District refused this request.  This decision was perplexing to Plaintiff because the

12  District officials who reviewed the postings determined right away that they violated

13  state and federal anti-discrimination regulations, including Title IX.

14       61.   The investigation of Nakajima and Gerwig was conducted by an outside

15  attorney, Jeffrey Love.  In conducting his investigation of the postings, Mr.  Love

16  interviewed Dr. Finkenthal, Plaintiff, Nakajima, Gerwig, Hector Garcia Villa, another

17  Physics and Engineering Professor, and Susan Snow, a professor in the Mathematics

18  Department who was also Nakajima and Gerwig's union representative.

19       62.   On November 1, 2017, four months after Plaintiff reported the postings,

20  Mr. Love issued a summary of his investigation.  In the report, Mr. Love concluded

21  that Nakajima and Gerwig were not credible and that their claimed unawareness of

22  the postings was not plausible.  In fact, Mr. Love concluded "clearly [Nakajima and

23  Gerwig] were aware of these materials [and] had either displayed the items

24  themselves or allowed and even encouraged others to do so."  Mr. Love further

25  concluded that Nakajima and Gerwig demonstrated a general attitude of indifference

26  to following the rules of the District concerning the avoidance of sexual harassment,

27  discrimination and maintaining a wholesome student academic environment."  A

28

1  copy of the report, without exhibits, is attached hereto as **Exhibit A**.  Plaintiff was

2  interviewed as a witness in the investigation.

3        63.  Mr. Love found Dr. Finkenthal and Plaintiff to be credible witnesses.

4        64.  Notably, this was not the first time Nakajima and Gerwig were found to

5  engage in discriminatory conduct.  In 2009 (seven years before Plaintiff worked at the

6  College), the United States Department of Education's OCR Office found that

7  Nakajima and Gerwig failed to accommodate a student with a disability.  Plaintiff is

8  informed and believes that instead of imposing any actual discipline for

9  discriminating against a disabled student, the District required Nakajima and Gerwig

10  to undergo sensitivity training.  Plaintiff is also informed and believes that the District

11  and prior administrators received other complaints about Nakajima and Gerwig but

12  that no action was ever taken against them.  Further, during the investigation of the

13  illegal postings, Dr. Finkenthal informed the investigator that shortly after the

14  sensitivity training, also in 2009, Nakajima refused to accommodate a student who

15  used a wheelchair and even told the student that he should just take vitamins and

16  "take care" of himself.

17        65.  Towards the end of November 2017, Plaintiff met with Dr. Norman to

18  discuss Nakajima and Gerwig.  Plaintiff suggested that in light of Nakajima's and

19  Gerwig's openly racist and sexually harassing conduct, that they should be

20  terminated.  Dr. Norman indicated that the District would not terminate Nakajima and

21  Gerwig because the offense did not merit harming their careers and damaging their

22  livelihood.  Plaintiff was disappointed with Dr. Norman's apparent indifference to

23  ensuring an environment free of discrimination and harassment.

24        66.  On November 27, 2018, Dr. Norman e-mailed Plaintiff and specifically

25  instructed Plaintiff to involve Dr. Finkenthal in the oversight of Nakajima and

26  Gerwig and to have Dr. Finkenthal observe Nakajima and Gerwig so that he could

27  substantiate any complaints.  Dr. Norman further made it clear that the District would

28

1  not place Nakajima and Gerwig on any type of leave, even paid leave, so as to avoid

2  doing anything that may "create liability and deviate from our goals and mission."

3      67.   Dr. Norman's e-mail appeared to request that she wanted Plaintiff and

4  Dr. Finkenthal to handle overseeing to Nakajima and Gerwig and made it clear that

5  the Title IX office was afraid to fulfill its responsibilities by taking action to protect

6  students from Nakajima and Gerwig. As academic dean, Plaintiff responsibilities

7  related to the instruction of students and administration of academic programs. She

8  had no power, or responsibility for ensuring that professors comply with anti-

9  discrimination laws which is an express function of the Human Resources Office,

10  Student Affairs Office EEO Office and Title IX Office. All Plaintiff could do was

11  continue to complain to Dr. Norman or Ms. Cohen about further discriminatory or

12  harassing conduct she discovered in the hope that appropriate action would be taken.

13      68.   On December 4, 2017, Plaintiff met with Dr. Jack Khan, the Assistant

14  Superintendent and Vice-President of Instruction to discuss her job duties. In the

15  meeting, Plaintiff discussed her anxiety with Dr. Khan and expressed concern about

16  her overwhelming workload, which included duties that are not typically part of the

17  Dean's job. Dr. Kahn assured Plaintiff that she was an "incredibly valuable member

18  of the team" and that he was dedicated to providing her with his "complete support."

19  Dr. Kahn also promised that they would meet again to review Plaintiff's schedule

20  "and discuss strategies to help structure [her] workload better." Dr. Kahn further

21  stated he "look[ed] forward to continuing" to work together. At no point did Dr.

22  Kahn indicate that he believed Plaintiff had done anything that would place her job in

23  danger. To the contrary, Dr. Kahn expressed his overall satisfaction with Plaintiff's

24  work, confirmed that she was "incredibly valuable," and pledged to accommodate her

25  medical condition.

26      69.   On December 12, 2017, the District determined that Nakajima and

27  Gerwig would only be placed on unpaid leave for one month even though they had a

28  history of discriminatory conduct, were just found not only to have engaged in

1  overtly racist and sexually harassing conduct but also were found to have lied about

2  their sexist and racist conduct to the investigator.  Dr. Kailikole is informed and

3  believes that this grossly inadequate punishment was part of a pattern and practice by

4  the District to cover up misconduct by Gerwig and Nakajima, even though it knew

5  their continued presence in the classroom subjected students, student assistants and

6  faculty to discriminatory and harassing conduct.

7  **E.   The District Takes Adverse Employment Actions Against Plaintiff In**

8  **Retaliation For Reporting Harasment And Discrimination And For**

9  **Requesting An Accomodation For Her Disability.**

10  70.   On December 14, 2017, two days after Nakajima and Gerwig were

11  essentially excused from punishment and barely a week after she disclosed her

12  disability, Plaintiff was suddenly placed on involuntary paid leave.  Plaintiff was

13  given no warning and was not given any specific reason for being placed on leave.  In

14  fact, she was escorted out of her office like a criminal, locked out of her e-mail

15  account and, importantly, instructed not to return to campus or speak with anyone

16  from the College.  The only information Plaintiff was given was that she was

17  purportedly under investigation for some unspecified "breach of confidential

18  information."  From that point forward, Plaintiff was completely cut-off from the

19  College.

20  71.   The District left Plaintiff on paid leave for 5 months without ever

21  informing her of the specific nature of the charges against her.  During the time

22  Plaintiff was on paid leave, faculty members were falsely told that Plaintiff was on

23  medical leave.  Plaintiff could not do anything about the false information the District

24  was disseminating about her because the District prohibited her from contacting

25  anyone at the College.

26  72.   In January 2018, Dr. Kailikole hired an attorney and throughout January

27  and February of 2018 made repeated attempts to obtain further information about

28  why she was placed on leave.  However, the District refused to provide any

**FIRST AMENDED COMPLAINT**

1  substantive information.  The only thing the District would disclose to Dr. Kailikole
2  was that the investigation originated in the Physics and Engineering Department.
3  When provided with this information, Dr. Kailikole informed the District that she
4  believed the decision to suddenly place her on leave and investigate her was in
5  retaliation for reporting Nakajima and Gerwig's misconduct.

6      73.  On February 27, 2018, the District decided to non-renew Plaintiff's
7  contract.  The District did not provide Plaintiff with any reason whatsoever for the
8  decision not to renew her contract.

9      74.  On February 28, 2018, the day after her contract was non-renewed
10  without explanation, Plaintiff was interviewed by the District's investigator about,
11  among other things, the incident where Nakajima and Gerwig used an airsoft gun in
12  the classroom.

13      75.  Plaintiff informed the investigator that Dr. Lisa Norman had asked about
14  the airsoft gun incident during the investigation of the racially and sexually harassing
15  conduct by Nakajima and Gerwig.  Plaintiff also informed the investigator that she
16  contacted Dr. Finkenthal with information about that incident to make sure it was not
17  being used any more.  Dr. Finkenthal said he did not think a gun was being used and
18  requested further information so he could check on it.  Accordingly, on or about
19  December 8, 2017, Plaintiff forwarded Dr. Finkenthal an e-mail about the airsoft gun
20  incident.  Plaintiff is informed and believes that Dr. Norman reviewed this e-mail as
21  part of a search of Dr. Kailikole's e-mails that was done without Dr. Kailikole's
22  consent and as part of an effort by the District to look for information to discredit Dr.
23  Kailikole after she reported Nakajima's and Gerwig's racist and harassing behavior.

24      76.  Plaintiff's obvious, and only purpose, in forwarding the e-mail about the
25  gun incident to Dr. Finkenthal was so that Dr. Finkenthal could confirm Nakajima
26  and Gerwig were following Plaintiff's prior directive not to use the gun in the interest
27  of student safety.  Advising Dr. Finkenthal of the prior incident with the airsoft gun
28  was also consistent with the recommendation by Lisa Norman, the Assistant

1  Superintendent/Vice President, Human Resources, that she involve Dr. Finkenthal in
2  her oversight of Nakajima and Gerwig.

3     77.   When the District's investigator interviewed Plaintiff, he asked her if she
4  ever agreed with Dr. Finkenthal that he would provide information about the airsoft
5  gun incident to any person.  Plaintiff informed the investigator that she never had any
6  agreement with Dr. Finkenthal to provide the information to anyone else.  The
7  investigator asked Plaintiff if Dr. Finkenthal ever indicated to her that he intended to
8  provide the information about the airsoft gun incident to his wife or members of the
9  District's governing Board or "anything like that."  Plaintiff informed the investigator
10 that Dr. Finkenthal never indicated to her that he planned to provide the information
11 to anyone else.

12    78.   On or about March 4, 2018, a faculty member sent Plaintiff an
13 unsolicited text message informing Plaintiff that Dr. Kahn was telling faculty
14 members that Plaintiff was not returning.  Given that the investigator told her it
15 would be several weeks before he completed his investigation and would issue his
16 report, it was clear to Plaintiff that the District had already decided to terminate her
17 and that it was simply using the investigator to manufacture a purported reason.

18    79.   On May 2, 2018, nearly two months after it began telling faculty
19 members that Plaintiff was not returning, Plaintiff received a letter informing that Dr.
20 Kahn was recommending her termination.

21    80.   One of the reasons stated for Plaintiff's termination was the absurd and
22 implausible conclusion by the District's investigator that Plaintiff did not forward Dr.
23 Finkenthal the information about the gun incident for the logical, obvious and entirely
24 proper purpose of advising the Chair of the Department of relevant information in
25 connection with his oversight of two Professors who had just been found guilty of
26 grossly improper racist and harassing conduct in the classroom.  Instead, the
27 investigator claims, Plaintiff was actually part of a conspiracy to leak confidential
28 information outside the College.  According to the investigator's report, the full

extent of the alleged conspiracy was that Plaintiff would forward the e-mail to Dr.
Finkenthal, who would then forward the e-mail to his wife.  The only "evidence"
cited in support of this ridiculous conclusion is that, three days after Plaintiff
forwarded the e-mail about the gun incident to Dr. Finkenthal, Dr. Finkenthal forward
the e-mail to his wife.  Of course, Plaintiff had no idea that Dr. Finkenthal forwarded
the e-mail to his wife or anyone else, and she certainly did not ask him to do it.
Indeed, there is a complete lack of evidence that Plaintiff was involved in any such
"conspiracy."  The very idea that Plaintiff conspired with Dr. Finkenthal to expose
Nakajima's and Gerwig's misdeeds to Dr. Finkenthal's wife is nonsensical.
Accordingly, Plaintiff is informed and believes that the alleged leak "conspiracy" was
manufactured to try to cover up the true, discriminatory and retaliatory reasons for
Plaintiff's termination.

81.    Notably, the investigator's report does not list a specific person who
made a complaint about Dr. Kailikole.  Instead the report simply states that it was
"internally generated at the request of Human Resources."  Further, the investigator
interviewed only two witnesses, Plaintiff and Dr. Finkenthal.  He did not interview
anyone from the Human Resources department even though someone in the
department purportedly originated the complaint.  The investigator also did not
collect or review any documents related to the origins of the investigation.

82.    In addition to the absurd allegation that she conspired to leak
confidential information to Dr. Finkenthal's wife, the May 2, 2018 letter
recommending Plaintiff's termination contains a list alleged of performance issues,
none of which were ever presented to Plaintiff as potential reasons for any type of
discipline, let alone termination.

83.    To add insult to injury, as an additional purported reason for the
termination, the District stated Plaintiff purportedly failed to appropriately monitor
Nakajima and Gerwig.  This reason is false and pretextual on its face, given that
Plaintiff was the first Dean to actually risk exercising any supervision over Nakajima

- 22 -
FIRST AMENDED COMPLAINT

and Gerwig, including complaining about their overtly racist and sexually harassing conduct by reporting it to the Title IX Office, which is responsible for enforcing compliance with anti-discrimination laws and policies, only to see the District willfully fail to take any real action.  Plaintiff is informed and believes that the District was angered and embarrassed by Plaintiff's reporting of, and testimony about, the harassing conduct by Nakajima and Gerwig because it required the District to take action against tenured professors which risked raising suspicions and questions by students and faculty if they were punished appropriately, such as by termination or placement on an extensive leave.  Plaintiff is further informed and believed that the District wanted to punish Plaintiff for suggesting that the investigation of her was pretextual and was carried out to provide false support for the District's retaliatory adverse employment action in placing her on involuntary leave.

84.     On June 13, 2018, the District terminated Plaintiff's employment.

85.     The District's decisions to place Plaintiff on paid leave, non-renew her contract and terminate her were all clearly made to retaliate against her for complaining about Nakajima's and Gerwig's illegal conduct, which it quickly swept under the rug by issuing a disproportionately light penalty they served over winter break, for reporting that the purported investigation of the "confidentiality" issue was pretextual and done in retaliation for reporting Nakajima and Gerwig, to retaliate and discriminate against Plaintiff for, and to avoid accommodating, Plaintiff's mental health disability.  Indeed, until the District was forced to deal with Plaintiff's disability and her complaint about Nakajima and Gerwig's conduct and the investigation, she was never given any indication that her job – to which she had recently been promoted - was in any danger whatsoever.

86.     Prior to being suddenly placed on leave, Plaintiff had a reputation at the College as a strong leader, an advocate for students, a talented fundraiser, and, above all, an educator dedicated to the College's mission.  Plaintiff was completely

1  humiliated by her sudden removal from campus, the non-renewal of her contract and

2  being subjected to a sham investigation that was used to support her illegal

3  termination in retaliation for raising the embarrassing issue of racism and sexual

4  harassment in the classroom, to discriminate against Plaintiff for, and to avoid

5  accommodating, Plaintiff's mental health disability.  As a result of this illegal

6  conduct, and specifically the adverse employment actions carried out by the District

7  in placing Plaintiff on involuntary leave, non-renewing her contract and terminating

8  her, Plaintiff has suffered lost back wages and benefits, lost future earnings and

9  benefits, lost promotions, extreme amounts of emotional distress and other damages.

10                                    **COUNT I**

11                    **Retaliation in Violation of 20 U.S.C. § 1681**

12                   **(Against the District and DOES 1 through 20).**

13       87.     Plaintiff incorporates by reference each and every paragraph in the

14  Complaint as if set forth fully herein.

15       88.     The District is an educational program receiving Federal financial

16  assistance and is subject to the provisions of Title IX of the Education Amendments

17  of 1972, as amended, 20 U.S.C. Section 1681 *et seq.* (hereinafter "Title IX").

18       89.     Title IX provides that "[n]o person in the United States shall, on the

19  basis of sex, be excluded from participation in, be denied the benefits of, or be

20  subjected to discrimination under any education program or activity receiving Federal

21  financial assistance." 20 U.S.C. § 6181(a).  Title IX also prohibits retaliatory

22  employment actions based on an employee's complaints about sex discrimination.

23  *Jackson v. Birmingham*, 544 U.S. 167 (2005).

24       90.     Plaintiff engaged in statutorily protected activity under Title IX when

25  she complained about sex discrimination by Nakajima and Gerwig by reporting it to

26  the District and participated in the investigation thereof and when she reported her

27  belief that she was placed on leave in retaliation for reporting sex discrimination by

28  Nakajima and Gerwig.

91.     As a direct and proximate cause of Plaintiff engaging the protected activity under Title IX, Defendants engaged in adverse employment actions against Plaintiff, which were to place her on paid leave, non-renew her contract and terminate her employment.

92.     There is a causal link between Plaintiff participating in a statutorily protected activity under Title IX and Defendants' adverse employment actions against her.

93.     Defendants' violations of Title IX have proximately caused Plaintiff to suffer damages including, but not limited to, back wages, future wages, lost benefits, severe emotional distress and other pecuniary and non-pecuniary losses in an amount to be proven at trial.

94.     The actions of Defendants complained of herein were taken with malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

95.     As a result of Defendants' conduct, Plaintiff is also entitled to attorneys' fees and costs as provided by 42 U.S.C. section 1988 or other applicable law.

## COUNT II

### Retaliation in Violation of 42 U.S.C. 2000d *et seq.*

### (Against the District and DOES 1-20)

96.     Plaintiff incorporates by reference each and every paragraph in this Complaint as if set forth fully herein.

97.     Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d *et seq.*) ("Title VI") prohibits discrimination on the basis of race, color, or national origin in programs or activities receiving federal financial assistance.  The District receives federal financial assistance and is subject to Title VI.  As with Title IX and other federal discrimination statutes, there is an implied right of action for retaliatory employment actions based on an employee's complaints about race discrimination.

FIRST AMENDED COMPLAINT

98.   Plaintiff engaged in statutorily protected activity under Title VI when she complained about race and national origin discrimination by Nakajima and Gerwig by reporting it to the District and participated in the investigation thereof and when she reported her belief that she was placed on leave in retaliation for reporting race and national origin discrimination by Nakajima and Gerwig.

99.   As a direct and proximate cause of Plaintiff engaging the protected activity under Title VI, Defendants engaged in adverse employment actions against Plaintiff, which were to place her on paid leave, non-renew her contract and terminate her employment.

100.   There is a causal link between Plaintiff participating in a statutorily protected activity under Title VI and Defendants' adverse employment actions against her.

101.   Defendants' violations of Title VI have proximately caused Plaintiff to suffer damages including, but not limited to, back wages, future wages, lost benefits, severe emotional distress and other pecuniary and non-pecuniary losses in an amount to be proven at trial.

102.   The actions of Defendants complained of herein were taken with malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

103.   The actions of Defendants complained of herein were taken with malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

104.   As a result of Defendants' conduct, Plaintiff is also entitled to attorneys' fees and costs as provided by 42 U.S.C. section 1988 or other applicable law.

# COUNT III

## Retaliation in Violation of Government Code § 12940(h)

### (Against the District and DOES 1-20)

105.   Plaintiff incorporates by reference each and every paragraph in this First Amended Complaint as if set forth fully herein.

106.   At all times relevant herein, Government Code section 12940 et seq. was in full force and effect and binding upon each of Defendants.  Section 12940(h) prohibits retaliation against any person who makes a complaint for harassment and/or discrimination on the basis of race, sex and/or national origin.  Plaintiff is informed and believes that students, student assistants employed by the District and faculty who were members of a protected class, including females, latinos and other minority groups, were subjected to the harassing and discriminatory postings by Nakajima and Gerwig.

107.   Defendant retaliated against Plaintiff for complaining about the discriminatory and harassing conduct alleged herein which she reasonably believed to constitute discrimination and/or harassment on the basis of race, national origin, sex and/or gender and for reporting her belief that she was placed on leave in retaliation for reporting discriminatory and harassing conduct.  Specifically, in retaliation for reporting the discriminatory and harassing conduct herein, Defendant engaged in adverse employment actions against Plaintiff, which were to place her on paid leave, non-renew her contract and terminate her employment.

108.   As a proximate result of Defendants' violation of Government Code section 12940(h), Plaintiff has suffered the loss of wages, salary, benefits and additional monies Plaintiff would have received if she was not terminated in violation of Government Code section 12940(h), including future earnings.  As a further proximate result of the violation of Government Code section 12940(h), Plaintiff has suffered, and will continue to suffer, humiliation, mental anguish, and emotional and physical duress.   As a result of such violation of Government Code section 12940(h)

1  and consequent harm, Plaintiff suffered damages in an amount according to proof at
2  trial.

3       109.   The actions of Defendant's complained of herein were taken with
4  malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the
5  malicious intent of injuring Plaintiff, who is therefore entitled to punitive or
6  exemplary damages according to proof at trial.

7       110.   As a result of Defendants' conduct, Plaintiff is also entitled to attorneys'
8  fees and costs as provided by Government Code section 12965(b).

9  **COUNT IV**

10  **Disability Discrimination in Violation of Government Code section 12940(a)**
11  **(Against the District and DOES 1-20)**

12       111.   Plaintiff re-alleges and incorporates by reference each and every
13  allegation set forth in the preceding paragraphs of the Complaint.

14       112.    Under the Fair Employment and Housing Act ("FEHA") codified in
15  Government Code § 12940 *et seq.*, it is unlawful for an employer to discriminate
16  against an employee on the basis of the employee's disability and/or perceived
17  disability.

18       113.   As a result of her disability, including anxiety, Plaintiff is a disabled
19  individual under FEHA in that her major life activities are limited.  Defendants knew
20  that Plaintiff was disabled because she told Jack Khan that she suffered from anxiety
21  and he pledged to support her with that issue.

22       114.   Defendants engaged in unlawful employment practices in violation of
23  FEHA by, among other things, failing to accommodate Plaintiff on the basis of her
24  disability, failing to engage in the interactive process, retaliating against her for
25  disclosing her disability, placing her on paid leave, stripping her of her duties, non-
26  renewing her contract and terminating her.

27

28

- 28 -
FIRST AMENDED COMPLAINT

115.   Plaintiff is informed and believes and based thereon alleges that her disability was a motivating factor in Defendants' decision to place her on paid leave and strip her of her duties, non-renew her contract and terminate her.

116.   Defendants' violations of FEHA have proximately caused Plaintiff to suffer damages including, but not limited to, back wages, future wages, lost benefits, severe emotional distress and other pecuniary and non-pecuniary losses in an amount to be proven at trial.

117.   The actions of Defendants complained of herein were taken with malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

118.   As a result of Defendants' conduct, Plaintiff is also entitled to attorneys' fees and costs as provided by Government Code section 12965(b) or other applicable law.

**COUNT V**

**Failure to Accommodate Disability and Retaliation in Violation of Government Code § 12940(m)**

**(Against the District and DOES 1-20)**

119.   Plaintiff incorporates by reference each and every paragraph in this First Amended Complaint as if set forth fully herein.

120.   Government Code section 12940(m) provides that it is unlawful for an employer to fail to make reasonable accommodations for the known physical disability and/or perceived disability of an employee, or to retaliate or discriminate against an employee for requesting a reasonable accommodation.

121.   Defendants failed to make a reasonable accommodation for Plaintiff's known disability and/or perceived disability and retaliated and discriminated against Plaintiff for requesting a reasonable accommodation.

FIRST AMENDED COMPLAINT

122.   Defendants' failure to provide a reasonable accommodation, and retaliation and discrimination against her for requesting a reasonable accommodation. proximately caused Plaintiff to suffer damages including, but not limited to, back wages, future wages, lost benefits, severe emotional distress and other pecuniary and non-pecuniary losses in an amount to be proven at trial.

123.   The actions of Defendants complained of herein were taken with malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

124.   As a result of Defendants' conduct, Plaintiff is also entitled to attorneys' fees and costs as provided by Government Code section 12965(b) or other applicable law.

**COUNT VI**

**Failure to Engage in the Interactive Process in Violation of Government Code section 12940(n)**

**(Against the District and DOES 1-20)**

125.   Plaintiff incorporates by reference each and every paragraph in this Complaint as if set forth fully herein.

126.   Government Code section 12940(n) provides that it is unlawful for an employer to fail to engage in a timely, good faith, interactive process with a disabled employee to determine effective reasonable accommodations, if any.

127.   Defendants failed to engage in the interactive process with Plaintiff in order to accommodate Plaintiff's disability and/or perceived disability.

128.   Defendants' failure to engage in the interactive process proximately caused Plaintiff to suffer damages including, but not limited to, back wages, future wages, lost benefits, severe emotional distress and other pecuniary and non-pecuniary losses in an amount to be proven at trial.

- 30 -

**FIRST AMENDED COMPLAINT**

1   129.   The actions of Defendants complained of herein were taken with malice,

2   oppression and fraud, in conscious disregard of Plaintiff's rights, and with the

3   malicious intent of injuring Plaintiff, who is therefore entitled to punitive or

4   exemplary damages according to proof at trial.

5   130.   As a result of Defendants' conduct, Plaintiff is also entitled to attorneys'

6   fees and costs as provided by Government Code section 12965(b) or other applicable

7   law.

8   ## COUNT VII

9   ### Retaliation In Violation Of Labor Code § 1102.5

10   ### (Against the District and DOES 1-20)

11   131.   Plaintiff incorporates by reference each and every paragraph in this

12   Complaint as if set forth fully herein.

13   132.   Title IX provides that "[n]o person in the United States shall, on the

14   basis of sex, be excluded from participation in, be denied the benefits of, or be

15   subjected to discrimination under any education program or activity receiving Federal

16   financial assistance." 20 U.S.C. § 6181(a).  Title IX also prohibits retaliatory

17   employment actions based on an employee's complaints about sex discrimination.

18   *Jackson v. Birmingham*, 544 U.S. 167 (2005).

19   133.   Title VI prohibits discrimination on the basis of race, color, or national

20   origin in programs or activities receiving federal financial assistance.

21   134.   Section 12940(h) prohibits retaliation against any person who makes a

22   complaint for harassment and/or discrimination on the basis of race, sex and/or

23   national origin and Section 12940(m) prohibits retaliation for requesting a reasonable

24   accommodation for a disability.

25   135.   It is the public policy of the State of California to prevent discrimination

26   on the basis of sex, race and national origin and to prevent retaliation against persons

27   who report retaliation.

28

136.   Under Labor Code section 1102.5, employers and individuals are prohibited from retaliating against an employee for:

> disclosing information . . . to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance . . . if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation. . . regardless of whether disclosing the information is part of the employee's job duties."

137.   The District violated Labor Code section 1102.5 for the same reasons it violated Title IX, Title VI and California Government Code section 12940(h), which is that it retaliated against her for complaining about the sexually harassing and racially discriminating conduct by Nakajima and Gerwig by reporting it to the District.  Specifically, Defendants engaged in adverse employment actions against Plaintiff, which were to place her on paid leave, non-renew her contract and terminate her employment.

138.   As a proximate result of Defendants' violation of Labor Code section 1102.5, Plaintiff has suffered the loss of wages, salary, benefits and additional monies Plaintiff would have received if she was not terminated in violation of Labor Code section 1102.5, including future earnings.  As a further proximate result of the violation of Labor Code section 1102.5, Plaintiff has suffered, and will continue to suffer, humiliation, mental anguish, and emotional and physical duress.   As a result of such violation of Labor Code section 1102.5 and consequent harm, Plaintiff has suffered damages in an amount according to proof at trial.

139.   The actions of Defendant complained of herein were taken with malice, oppression and fraud, in conscious disregard of Plaintiff's rights, and with the malicious intent of injuring Plaintiff, who is therefore entitled to punitive or exemplary damages according to proof at trial.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER
## GOVERNMENT CODE SECTION 1265(b)

Plaintiff has exhausted her administrative remedies under Government Code section 12965(b).  A copy of Plaintiff's Complaint with, and Right to Sue Letter from, the DFEH is attached hereto as **Exhibit B**.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a trial by jury.

## PRAYER FOR RELIEF

Plaintiff prays for judgment against Defendants as follows:

1.      For general and special damages;

2.      For backpay and front pay;

3.      For emotional distress and pain and suffering damages.

4.      For nominal and compensable damages;

5.      For punitive damages;

6.      For pre-judgment and post-judgment interest where allowable;

7.      For an injunction and declaratory relief where applicable;

8.      For costs of suit and expenses;

9.      For reasonable attorneys' fees; and

10.      For such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Dated: January 18, 2019            **DWIN LEGAL, APC**

By:    /s/ Evan Dwin
         Evan Dwin
Attorneys for Plaintiff KATHRYN
KAILIKOLE

FIRST AMENDED COMPLAINT