# EXHIBIT A

**Confidential Summary of Investigation Report**
Complaint of Unlawful Discrimination
Daniel Finkenthal on Behalf of Anonymous Complainant vs.
Arthur Gerwig, Takashi Nakajima, and Hector Garcia Villa, Respondents
November 1, 2017

## PURPOSE OF INVESTIGATION.

This matter relates to an administrative investigation undertaken for Palomar Community District (District).  This matter related to investigating material that was deemed objectionable which had been displayed on walls, doors and over doors in the Physics and Engineering Department at the District's main campus.  Daniel Finkenthal (Dr. Finkenthal), the newly appointed Department Chair, had brought forward the complaint on behalf of an anonymous student, when he assumed his leadership role and claimed that the material was objectionable, discriminatory and inappropriate to be displayed or posted on District property.

The scope of this investigation was to determine whether certain District employees allowed and/or were aware that the objectionable material was displayed in the Physics and Engineering Department in certain areas, visible to both other employees, as well as students.  Specifically, Professors Arthur Gerwig (Mr. Gerwig), Takashi Nakajima (Mr. Nakajima) and Hector Garcia Villa (Mr. Garcia Villa) were observed to teach in the department in the general area of these materials.  The materials involved included pictures, images, wording and other items that were seen as patently offensive, discriminatory in content and nature and generally inappropriate for a District environment.  Added to this, Dr. Finkenthal alleged that Mr. Gerwig and Mr. Nakajima had utilized a syllabus and other material that was inappropriate, threatening in nature and inconsistent with the department's philosophy and goals.

## BACKGROUND AND METHODOLOGY OF INVESTIGATION.

This matter began in May 2017 after Dr. Finkenthal was appointed the Chair of the Physics and Engineering Department. Previously, Mr. Nakajima had been the Department Chair for several years.  Dr. Finkenthal contacted his dean, Kathryn Kailikole(Dr. Kailikole), who serves as the Dean, Mathematics and the Natural and Health Sciences, to report that a student had contacted him with concerns regarding various types of posters and other materials that were posted conspicuously on the walls and doors of rooms NS-249 and NS-252.  Dr. Finkenthal showed Dr. Kailikole the various materials and indicated that he did not want to disclose the name of the student for fear that the student would be subject to some form of retaliation.

On May 31, 2017, Dr. Kailikole reported to Shawna Cohen (Ms. Cohen), Manager, Equal Employment Opportunity and Compliance and the District's Deputy Title IX Coordinator, that she had received the report from Dr. Finkenthal regarding the offensive postings in the two rooms. The following day, on June 1, 2017, a group of District administrators visited NS-249 and NS-252 to view the areas.  The officials determined that a number of postings had been placed on the walls and other surfaces that violated federal, state, and District nondiscrimination regulations, including Title IX.  The officials took pictures of the offending items and removed them from the rooms, retaining them for future reference.

Jack Kahn, Assistant Superintendent/Vice President, Instruction (Dr. Kahn), Dr. Kailikole, and Ms. Cohen met with Dr. Finkenthal, Mr. Garcia Villa, Mr. Gerwig, Mr. Nakajima, and Susan Snow (Ms. Snow), Palomar Faculty Federation Grievance Officer, on June 11, 2017 for purposes of determining whether the Physics and Engineering faculty had prior knowledge of the postings. During the meeting, Ms. Cohen distributed the postings to the parties and asked whether the faculty had seen them before. Dr. Finkenthal stated that he saw the items after the anonymous student had pointed them out to him; the other three faculty stated that they had never seen the postings before.  Mr. Garcia Villa, Mr. Gerwig, and Mr. Nakajima all indicated that they occasionally used the two rooms, whereas Dr. Finkenthal stated that he never used them.

On June 28, 2017, Adrian Gonzales, Assistant Superintendent/Vice President, Student Services and the District's Title IX Coordinator, notified Ms. Cohen that an investigation into the complaint was necessary.  Dr. Finkenthal met with Ms. Cohen on June 29, 2017 to present additional information relevant to the investigation. The District retained an independent investigator and attorney, Jeffrey Love (fact finder), to conduct the investigation. Mr. Love commenced the investigation on July 11, 2017.  The investigation involved the review of documents, including evidence and applicable District rules and regulations, as well as conducting interviews of District employees. Once factual evidence was developed, the various statements of the interviewees were compared and contrasted with one another as well as other evidence and determinations of credibility were established.  Once credibility was established along with a factual framework of the alleged events, conclusions were formed based on the greater weight of the credible evidence.  For the purpose of findings, direct and circumstantial evidence may be given equal weight.

Exhibit A
P. 1

<u>CONFIDENTIAL</u>
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

## SCOPE OF THE INVESTIGATION.

The scope of this investigation was to determine:

**A.** **Did District employees allow and/or condone objectionable and/or discriminatory material to be displayed on District property in violation of District rules?**

## SOURCE OF THE COMPLAINT.

**A.** **Daniel Finkenthal, Ph.D.** (*acting on behalf of an anonymous student*)
   Professor/Department Chair
   Physics and Engineering
   Palomar Community College District

## ACCUSED/FOCUS EMPLOYEES.

**A.** **Hector Garcia Villa**
   Assistant Professor
   Physics and Engineering
   Palomar Community College District

**B.** **Arthur Gerwig**
   Associate Professor
   Physics and Engineering
   Palomar Community College District

**C.** **Takashi Nakajima**
   Professor
   Physics and Engineering
   Palomar Community College District

## WITNESSES.

**A.** **Daniel Finkenthal, Ph.D.**
   Professor/Department Chair
   Physics and Engineering Department
   Palomar Community College District

**B.** **Kathryn Kailikole, Ed.D.**
   Dean
   Mathematics and the Natural and Health Sciences Division
   Palomar Community College District

**C.** **Arthur Gerwig**
   Associate Professor
   Physics and Engineering Department
   Palomar Community College District

**D.** **Takashi Nakajima**
   Professor
   Physics and Engineering Department
   Palomar Community College District

**E.** **Hector Garcia Villa**
   Assistant Professor
   Physics and Engineering Department
   Palomar Community College District

- Page 2 -

*CONFIDENTIAL*
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

**F.  Susan Snow**
   Professor
   Mathematics Department
   Palomar Community College District

## CREDIBILITY OF THE WITNESSES.

The analysis of the credibility of the witnesses is an important aspect of a fact-finding investigation.  As an accepted rule of evidence, a fact finder can disregard the statements of a witness who has been found to have provided false or unreliable information during their testimony in a matter.  Those witnesses' statements can be disregarded in their entirety and not believed unless there is compelling evidence to conclude that individual statements otherwise are true.[1]  Concerning the witnesses' statements, this fact finder considered:

a) The witness' demeanor while providing a statement and the manner in which he/she provided the statement.

b) The character of the witness' statement.

c) The extent of the witness' capacity to perceive, to recollect, or to communicate any matter about which he/she gave a statement.

d) The extent of the witness' opportunity to perceive any matter about which he/she gave a statement.

e) The witness' character for honesty or veracity or their opposites.

f) The existence or nonexistence of a bias, interest, or other motive.

g) A statement previously made by the witness that is consistent with his/her statement during the fact-finding investigation.

h) A statement made by the witness that is inconsistent with any part of his/her statement during the fact-finding investigation.

i) The existence or nonexistence of any fact given in statement by the witness.

j) The witness' attitude toward the fact-finding investigation in which he/she gave a statement or toward the giving of a statement.

### *Discussion of Witness Credibility.*

**Witness Daniel Finkenthal, Ph.D.**

Dr. Finkenthal appeared to be a credible witness in this matter.  Dr. Finkenthal is the current Chair of the Physics and Engineering Department of the District.  Dr. Finkenthal came forward after he had been elevated to his current position in order to make his complaint concerning the display of what he considered objectionable material in or about the Physics Department.  Dr. Finkenthal was deemed credible due to the fact that his statements to this fact finder tended to be corroborated by the physical evidence located in the area of the Physics Department, as well as the statements of other credible witnesses.

**Kathryn Kailikole, Ed.D.**

Dr. Kailikole appeared to be a credible witness in this investigation.  Dr. Kailikole said that she observed the offensive materials and further noted that Mr. Gerwig and Mr. Nakajima had specifically denied knowledge of the materials that were displayed in areas that they were known to frequent on a daily basis.  Dr. Kailikole also noted that she believed both Mr. Gerwig and Mr. Nakajima had been insubordinate concerning the publication and use of certain inappropriate policy and rules statements, syllabi and a student warning letter.

**Witness Arthur Gerwig**

Mr. Gerwig did not appear to be a credible witness in this matter.  Mr. Gerwig has been a long-term faculty member in the Physics and Engineering Department, and seemed to be unaware that materials had been displayed on various walls in

---

[1] See *California Civil Jury Instruction Section 5003.*

the area in which he has worked nearly on a daily basis. It appeared to the fact finder that Mr. Gerwig's statements were implausible, in that he would have observed these materials having worked in that area.

**Witness Takashi Nakajima**

Mr. Nakajima also appeared to lack credibility in his statements to the fact finder. Many of the objectionable materials that were observed and removed from the Physics and Engineering Department were displayed on the doors and in the room associated with areas that Mr. Nakajima used on a daily basis. Mr. Nakajima's statement that he was unaware of many of these materials was implausible and inconsistent with rational reason and logic.

**Witness Hector Garcia Villa**

Mr. Garcia Villa appeared to be a credible witness in this matter. Mr. Garcia Villa is a relatively new Assistant Professor to the department. Mr. Garcia Villa said that he was aware of some of the materials that had been displayed in the area, however, he was uncertain as to the ownership or who had authored these items. Mr. Garcia Villa was deemed credible, as he was relatively new to the department, did not typically use the rooms where the associated objectionable materials were located and appeared earnest and truthful in his statements.

**Witness Susan Snow**

Ms. Snow did not appear to be a credible witness in this matter. Ms. Snow appeared as a witness; however, she was little more than a thinly-veiled advocate for Mr. Gerwig and Mr. Nakajima. Ms. Snow had represented both Mr. Gerwig and Mr. Nakajima at their interviews as their union representative as part of the Palomar Faculty Federation. Ms. Snow claimed that she was a witness in this matter, as she had observed an item that had been hung over a door in one of the offices in the Physics and Engineering Department. Ms. Snow knew early on, and prior to her representation of Mr. Nakajima and Mr. Gerwig, that she would therefore be a witness in this matter, yet she sat through and participated in their interviews, as a representative. Ms. Snow appeared to be biased and motivated to advocate for her association members, and was seen as a witness who lacked credibility.

**FINDINGS.**

**A. Did District employees allow and/or condone objectionable and/or discriminatory material to be displayed on District property in violation of District rules?**

Short Answer: YES

*Discussion*

**Background.**

Dr. Finkenthal indicated to the fact finder that he believes inappropriate behavior relevant to the allegations had taken place in the Physics and Engineering Department under the chairmanship of Mr. Nakajima for a number of years.

The facts further demonstrate that in 2009, a student with certain disabilities had filed a complaint with the Department of Education, Office of Civil Rights regarding discrimination by the Physics and Engineering faculty. The Office of Civil Rights had upheld the student's complaint and Dr. Finkenthal provided a copy of these relevant documents to the fact finder. Dr. Finkenthal also provided the fact finder with emails he had received that are purported to be between Mr. Nakajima and a student that had occurred on or about August 24, 2009.

Dr. Finkenthal pointed out that these emails display that Mr. Nakajima had violated the Americans with Disabilities Act (ADA) and refused to make a reasonable accommodation to the student who filed the complaint. Dr. Finkenthal noted that this exchange occurred only four months after the Office of Civil Rights (OCR) had published their report concerning the previous violation of the ADA.

**Materials Found Displayed in Rooms NS-249 and NS-252.**

As part of the scope of this investigation, a number of items that were located in the areas surrounding rooms NS-252 and NS-249 in the Physics and Engineering area of the NS Building were documented in place, and removed. This fact finder's charge was to investigate whether these items were placed by any District staff or whether any District staff

- Page 4 -

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

members had allowed the placement of these materials, or were aware of their presence. The various items are identified by item number as detailed below.

| Item # | Item Description | Room | Specific Location |
|--------|------------------|------|-------------------|
| 1 | "Safe Space...No!!!" | Hallway | Above door into NS-252 |
| 2 | "Carbon Resistors" (mnemonic device) | NS-249 | Door exiting into hallway |
| 3 | "Vogue May Edition" | NS-249 | File cabinet |
| 4 | "2017 you know you juant me"/"Hello Ladies" | NS-249 | Door leading into NS-252 |
| 5 | "Dick got her like" | NS-249 | Inside of door |
| 6 | "Peek a Boo"/"Jen's Height in influence" | NS-249 | Covering of window of door to hallway |
| 7 | "TURN THIS SHIT OFF" | NS-252 | Taped to coffee pot |
| 8 | "Do not leave your shit in the sink." | NS-252 | Above sink |
| 9 | "Stop Making Fucking Tea in the Kettle!" | NS-252 | Above coffee pot/sink area |
| 10 | "In class what he taught us..." (cartoon) | NS-252 | Inside of door |
| 11 | "Resistance is FUTILE!" | NS-252 | Inside of door |
| 12 | Man with discus | NS-252 | Above microwave |
| 13 | Fluke Multi-Meter | NS-252 | Inside of door |

**a)  Issues of Sexual and/or Gender, Racial, National Origin Harassment/Discrimination Relevant to Above Items**

Several of these items concerned issues of either sexual and/or gender harassment and discrimination.  For instance, Item No. 2 was a document that was posted on the door exiting into the hallway from Room NS-249.  This item which was titled "*Carbon Resisters*" provided a mnemonic in order to allow students to memorize the names of the various colors of the bans on resisters.  Mnemonics are often aides to the memory and serve students and others to recall specific details with greater ease.

On this item, the mnemonic contained a negative, violent and racial reference to African American males raping women.  The mnemonic stated, "*Black Boys Rape Our Young Girls But Violet Gives Willingly Get Some Now.*"  Additionally, it also makes an objectified reference to a woman (Violet) who is purported to be promiscuous.  These sorts of comments touch on and concern issues of racial, sexual and/or gender harassment and discrimination.

Item No. 3 which was titled the "*Vogue May Edition*" portrayed a student lying across the hood of a pickup truck holding a paper where a large phallic symbol was drawn upon it.  This item also displays an issue of sexual or gender discrimination by portraying a male penis in a drawing in an enlarged and gratuitous characterization.  This item was posted on the file cabinet in Room NS-249.

Item No. 4, identified as "*2017 You Know You Want Juant Me*" portrayed a male adult student who appeared to be Latino in race.  The document indicates that women might have some form of sexual desire for the individual portrayed in the document.  This individual was identified as a student and the term want "juant" was a joking reference to the individual's true name, Juan.  The document indicates "*Hello Ladies*" in an apparent joking invitation to women who might want to have some form of sexual contact with the individual portrayed therein.

Item No. 5, another document located in NS-249 posted on the inside of the door shows a subject identified generally as a student in the Physics and Engineering Department staring at a large item that states "*Dick got her like.*"  There is a hash tag remark below that states "*#black cock slut.*"  This item was making reference to a penis and specifically the penis of an African American.

Item No. 6 was essentially a covering of a window located in a door that leads to the hallway from Room NS-249.  This item had the word "*Peek-a-Boo*" written on it as well as "*Jen's height in influence.*"  "Jen" was identified by an interviewee as a former student assistant who was short in stature.  This item appears to have been posted in order to make light of "Jen's" height as well as her particular influence as a student assistant.  Both of these references can be seen as derogatory both towards the student concerning her height, as well as her influence in the department as female student staff member.

**b)  Issues of Profanity and/or Intimidation/Inappropriate Behavior Relevant to Above Items**

Item No. 7 was a paper sign taped to the coffee maker in the NS-252 laboratory classroom.  This sign states "*Turn this Shit Off*".  This sign was indicative of a seeming tolerance for profanity and/or intimidation in the department.  In addition

Exhibit A
P. 5

*CONFIDENTIAL*
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

to this, Item No. 8 was a sign posted above the sink in NS-252 that stated, *"Do Not Leave Your Shit in the Sink."* Again, this sign uses profanity and tends to demonstrate issues of profanity and/or intimidation in the department.

Item No. 9 was a sign posted above the coffee pot and sink area in NS-252 that states, *"Stop Making Fucking Tea in the Kettle!"* Once again, this sign makes reference to issues of profanity and intimidation in the department. All of these signs posted in or about the coffee pot, kettle/sink area were both open to both staff members, as well as students.

Finally, Item No. 13 was a memorandum written and posted by Mr. Nakajima that contains threatening language concerning expelling a student from District and ruining their "life" over a missing Fluke multimeter. This item was left up long after the meter had been returned and/or located and was seen as another display in support of an intimidating academic environment.

**Additional Documents Relevant to this Fact Finding.**

| Item | Description |
|------|-------------|
| A | Physics 230/231 Student "Cautionary Letter" |
| B | Regulations and Rules for Physics 230 Lab |
| C | August 24, 2009 email exchange between Mr. Nakajima and student |
| D | April 16, 2009 United States Department of Education, OCR, Region IX Letter to the District |

**a) Syllabus, Physics Department Policies/Procedures and Warning Materials**

As part of the investigation, the fact finder was provided documents identified above as Document Items A and B. These items were seen as inappropriate and Dr. Kailikole had instructed faculty to cease using these items in 2016. These items had been placed on a non-District website known as PCpepso.com, which had been created years ago by Mr. Gerwig and remains active to this day.

Document Item A was titled *To Physics 230/231 students from Physics 230 and 231 instructors.* This item appears to be a portion of a syllabus for the Physics 230/231 courses. A review of this document demonstrates a rather harsh and threatening tone. Here, the document tends to threaten students who engage in certain behaviors such as "...studying only for an exam, trying to get a maximum score with a minimum effort, and dropping a course just before the deadline." The document states "...we don't want to see those students in our classes anymore."

The document goes on to make other negative and harsh comments making reference to students that are "lazy" or who "don't want to change your bad study habit." This document encourages such students to "give your seat to someone else who is more serious than you." Although it is laudable to encourage students to academic excellence and rigor, such commentary in a document seems inappropriate, threatening and demonstrates an unwelcoming commentary concerning these classes. Additionally, the second page of this document has an area that can seemingly be detached where a student was requested to print their name and sign and date the document agreeing to certain terms. These terms state:

> *I (print your name) read the statements above. I am serious about my education and will follow the guidelines given above. I will be working my hardest to learn the subjects from today, and I will decide whether or not this class is for me within the first 4 weeks. If I do not drop by the end of the fourth week, I will receive a course grade of whatever I deserve.*

This document requires a signature and states "...this sheet is to be turned in by Friday of the first week of a semester. Any student who failed to turn it in will be dropped from the course."

Here, it appears that the student is required to sign this document and the document tends to want to amend the official course drop policies by the District. The document directly states that if a student fails to agree with the terms of this document and sign in agreement, that they would be dropped from the course.

In addition to this required signing aspect of the document, the document also details how students will be treated in class. In relevant part, the document states "...you'll be treated exactly the way you treat this class. If you want to be treated nicely, treat this class and the professor nicely."

This document tends to demonstrate a threatening and inappropriate tone and required students to sign a document that they were not legally bound to sign under pain and penalty of being dropped from the course.

- Page 6 -

*CONFIDENTIAL*
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

Document Item B seems to be the Rules and Regulations for the Physics Lab 230. This document, like Document Item A, has a threatening tone and makes reference to "lazy" students and encourages other students to "kick out" those students that they deem to be "lazy." Essentially, this document gives authority for students to apply peer pressure in what appears to be a rather capricious fashion in determining who they subjectively believe is being "lazy" and subjecting that student to be forced out of the laboratory course.

Ironically, the document states in bold underlined print that the "...instructor is not available to answer any questions regarding the lab during the lab period." Again, the instruction states "...if anyone who is not willing, capable, or lazy is in your group, kick that person out from your group." In a rather odd commentary, the document goes on to state "...this sounds very cold, but unless you don't mind losing your job because if that person does not do his/her part, you have to learn how to protect yourself."

Essentially, the document and its authors, Mr. Gerwig and Mr. Nakajima, are encouraging students to self-select other students from whom they differ and feel might not be operating or working to a particular standard. Essentially, Mr. Nakajima and Mr. Gerwig are allowing students to grade other students, something that is only under the purview of Mr. Gerwig and Mr. Nakajima as faculty of the District. This document, like Document Item A, contains a threatening tone and gives other students seemingly unfettered authority to pressure and/or remove other students from the course in what could only be seen as an inappropriate delegation of professorial authority.

**Knowledge of the Materials.**

One of the issues in this fact-finding investigation was to determine whether any members of the faculty had knowledge of the materials that were posted. Although during a meeting on June 22, 2017, both Mr. Gerwig and Mr. Nakajima denied general knowledge of any of these materials, the facts in this matter demonstrate that both of these faculty used the classrooms where these items were openly and notoriously posted for all to see.

Even though these two faculty denied particular knowledge during this meeting, and generally when interviewed by the fact finder, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima knew, or should have known, about the presence of these documents. Both faculty knew, or should have known, that these materials were patently offensive, inconsistent with the District's policy concerning sexual and/or racial discrimination and further inconsistent with the academic goals of the District.

The facts in this matter tend to demonstrate that Mr. Garcia Villa, a newly appointed Assistant Professor, was generally unaware of these documents, as he typically did not use the rooms where the documents were identified. It appeared to this fact finder that these rooms were typically and nearly exclusively used by both Mr. Gerwig and Mr. Nakajima.

In addition to the materials identified as posted on walls and doors in these areas, both Mr. Gerwig and Mr. Nakajima appeared to have been aware and/or even authored documents that were placed on an unauthorized non-District sponsored website known as "PCPepso." The facts in this matter demonstrate that PCPepso was set up by the department and was loosely run by student assistants with knowledge of internet technology. This website contained documents that portend to be syllabi and recitations of the department's rules and regulations; however, these items were seen as offensive, threatening, inappropriate, and inconsistent with District policy and/or state and/or federal law.

Concerning general knowledge of the materials located in rooms NS-249 and NS-252, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima were well aware of the materials that had been placed in this area. It appeared to this fact finder that there had been a general attitude of indifference to following the rules of the District concerning the avoidance of sexual harassment, discrimination and maintaining a wholesome student academic environment. It appeared that Mr. Gerwig and Mr. Nakajima routinely departed from established protocols and propriety, and had resisted changes by Dr. Kailikole.

According to Dr. Finkenthal, both Mr. Gerwig and Mr. Nakajima routinely, and continually, used rooms NS-249 and NS-252 and were often in that area. Even Mr. Gerwig stated that if he were looking for Mr. Nakajima, he would look in room NS-249. For Mr. Gerwig and Mr. Nakajima to claim that they were unaware of the items that were openly and notoriously displayed there requires a departure from reason, common sense and logic. Clearly, they were aware of these materials, had either displayed the items themselves or allowed and even encouraged others to do so. These items were inappropriate, displayed racial, gender and national identity discrimination and harassment, and supported an intimidating and unwelcoming academic environment. Dr. Finkenthal accurately described these areas as displaying a "frat house" environment.

*CONFIDENTIAL*
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

Dr. Kailikole told the fact finder that Mr. Gerwig and Mr. Nakajima had been insubordinate to her direction to remove the materials from the PCpepso website and to refrain from using the documents concerning their classes. Mr. Garcia Villa was aware of these directions and never used these materials, as directed by Dr. Kailikole. Even so, Mr. Nakajima and Mr. Gerwig continued to allow the PCpepso website to function, claiming they were unaware how to close the link and disallow access.

In summary, even though Mr. Gerwig and Mr. Nakajima deny knowledge of the aforementioned materials found in rooms NS-249 and NS-252, the greater weight of the credible evidence demonstrates that they were aware of the materials, allowed and/or participated in their postings and display, and were untruthful concerning their assertions otherwise.

**Findings in Reference to Respondents.**

**Mr. Garcia Villa**

**1. PCPepso Website Documents**

Mr. Garcia Villa said that he was aware of the PCPepso website. Mr. Garcia Villa acknowledged that he had never used the documents contained on this unofficial website set up by Mr. Gerwig in the Physics and Engineering Department. Mr. Garcia Villa recalled that Dr. Kailikole had admonished him, as well as Mr. Gerwig and Mr. Nakajima, not to use these documents. Mr. Garcia Villa is a recently-hired Assistant Professor working full-time in the last year. It appeared to the fact finder that Mr. Garcia Villa abided by Dean Kailikole's direction and did not use these documents.

**2. Offensive Materials in Rooms NS-252 and NS-249**

The facts tend to demonstrate that Mr. Garcia Villa was a relatively new Professor in the Engineering and Physics Department. Mr. Garcia Villa taught classes, as well as a lab portion in support of his lecture courses. Mr. Garcia Villa indicated that some of the materials that were identified as Items No. 1 through 13, above, were placed in the interior areas generally of Room NS-252 and NS-249. Mr. Garcia Villa said that he did not utilize Room NS-249 and was rarely in that area. Interestingly, Mr. Garcia Villa seemed more forthright concerning his observations than Mr. Gerwig and Mr. Nakajima, who are known to utilize these rooms on a frequent basis. There was no information to conclude that Mr. Garcia Villa was aware of the more offensive materials located in these rooms, nor that he participated and/or encouraged their display.

**3. Truthfulness**

This fact finder found that Mr. Garcia Villa was a credible witness in this matter. There was no credible evidence to conclude that Mr. Garcia Villa had been untruthful in his statements to this fact finder when questioned concerning the documents on the PCpepso website or the offensive material that was found to have been displayed in Rooms NS-252 and NS-249.

**Mr. Gerwig and Mr. Nakajima**

**1. PCPepso Website Documents**

The facts in this matter demonstrate that Mr. Gerwig had developed the PCpepso website. This website was an unofficial District website that certain members of the Physics and Engineering Department used to post materials, such as syllabi and various rules and regulations. Some of these materials, identified as Document Items A and B, above were identified as being problematic and inappropriate. The facts demonstrate that in 2016, Dr. Kailikole directed staff that these documents not be used due to the inappropriate language and tone contained therein.

Even so, these documents remained on the website and were seemingly available to students even though there was insufficient credible evidence to show that students were purposely directed to this website after Dr. Kailikole's direction not to do so. Mr. Gerwig was responsible for maintaining this website, but claimed that he was unable to access the website to make any particular changes as this task had been assigned to previous students who acted as "webmasters." The facts demonstrated though that Mr. Gerwig made no real efforts in attempting to contact or take steps to remove the documents from the website after direction had been given to remove Document Items A and B from the website by Dean Kailikole.

Document Items A and B were documents that seemingly were created by Mr. Gerwig and Mr. Nakajima which, taken together, formed a syllabus for students for the Physics 230 and 231 class instruction. Both of these documents

Exhibit A
P. 8

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

contained harsh verbiage, referred to students as being lazy and essentially encouraged students to take negative action against other students. For instance, Document Item B states in relative part, "If a member is not working or contributing for the group, I encourage you to kick out that student." Here, the document purports to allow and even encourage to take retribution on other students that they feel might not be "contributing" to a group effort. Clearly, this sort of peer pressure is inappropriate, as the faculty member should decide as to whether a student is putting forth sufficient effort in a group environment. It appeared to this fact finder that Document Item B attempts to relegate the duties of a faculty member to peer students concerning the performance of others.

Additionally, both Document Items A and B make reference to the term "lazy." Whereas laziness is not considered a laudable trait concerning academic performance, such language and negative characterizations seem inappropriate in a professional academic document such as these purport to be. It was clear to this fact finder that based on the greater weight of the credible evidence these documents were created in collaboration between Mr. Gerwig and Mr. Nakajima. Even though Mr. Nakajima attempted to claim some predecessor had created Document Item B described as the Regulations and Rules for Physics 230 Lab the facts tend to demonstrate that this is not true. Mr. Gerwig seemed to recall that he and Mr. Nakajima had crafted this document together, and the plain evidence in the document demonstrates that the only instructors referenced in the document were, in fact, Mr. Gerwig and Mr. Nakajima. There was no reference to any other faculty within this document.

Both Document Items A and B tend to depart from the District's code of ethics. These items do not tend to encourage the free pursuit of learning in their students, nor do they demonstrate respect for students as individuals. Instead, these documents present a harsh and threatening tone and encourage students to engage in self-selection by "kicking out" other students that they feel might be "lazy" or do not "deserve the same score" as they do. Neither Mr. Gerwig nor Mr. Nakajima seemed to understand or maintain their "proper roles an intellectual guides and counselors." Instead, they wrongfully delegated their authority and duties to students to essentially police other students in a group environment. Such authority and encouragement can lead to disastrous results, including the development of cliques, discriminatory behavior and bestowing of inappropriate authority to those who will not wield that authority in a prudential fashion.

## 2. Offensive Materials in Rooms NS-252 and NS-249

Concerning the offensive materials located in Room NS-252 and NS-249 identified herein as Items 1 through 13, it was clear to the fact finder that both Mr. Gerwig and Mr. Nakajima were aware of these materials, and had essentially allowed their display, participated in their display or were recklessly indifferent to the display of these items. The display of these items seems consistent with the tone as demonstrated in the two documents identified as Item A and Item B above. As Dr. Finkenthal described, Mr. Gerwig and Mr. Nakajima encouraged a "frat house" environment in the department and seemed to allow and encourage discriminatory behavior, as displayed in these offensive materials, and encourage other students to participate in this wrongful conduct.

Both Mr. Gerwig and Mr. Nakajima claimed that they were unaware of the more discriminatory and wrongful documents. However, the greater weight of the credible evidence, as described above under Section X.A.6, demonstrates that they were well aware of these items, but refused to acknowledge their presence in some attempt to evade culpability for either posting these materials or allowing their students to do so. Many of these items appear to have been potentially crafted by students that were in the Physics and Engineering Department.

Allowing these items to be created and then posted in the department demonstrated that Mr. Gerwig and Mr. Nakajima had given their imprimatur for students to engage in discriminatory and biased activities. Indeed, some of the items that had been identified in the room that Mr. Nakajima and Mr. Gerwig often used (NS-249) and specifically the "carbon resisters" mnemonic learning aid demonstrate a complete departure from the District's mandate of providing an academic environment free of discriminatory content and racist/sexist stereotypes. That these items were openly and notoriously displayed in the department where students often congregated would seemingly encourage students to engage in similar behavior and it appears that they did so.

In addition to obvious departures from the District's rules concerning discrimination and harassment, several items, such as various signs and notes located in room NS-252, in or about the sink and coffee service area displayed foul language and intimidating content that was wholly inappropriate in a professional academic environment. The idea that Mr. Gerwig and Mr. Nakajima were not fully aware of all of these items is absurd. The District has rules concerning sexual harassment and intimidation. B.P. 3430 Prohibition of Harassment states in relevant part:

> *The District shall be free of sexual harassment and all forms of sexual intimidation and exploitation including acts of sexual violence. It shall also be free of other unlawful harassment, including that which is based on any of the following statuses: race, religious creed, color, national origin, ancestry, physical*

- Page 9 -

*CONFIDENTIAL*
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

*disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, or sexual orientation of any person, or because he/she is perceived to have one or more of the foregoing characteristics.*

In addition, the District has rules concerning general harassment that would be based on a legally recognized protected characteristic. A.P. 3430 Prohibition of Harassment states in relevant part:

*General Harassment -- Harassment based on race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, gender, gender identity, gender expression, sex, age, or sexual orientation of any person, or the perception that a person has one or more of these characteristics is illegal and violates District policy. Gender based harassment does not necessarily involve conduct that is sexual. Any hostile or offensive conduct based on gender can constitute prohibited harassment.*

Apart from these harassment and discrimination rules, the District's mission statement requires "[d]iversity in learning environments, philosophies, cultures, beliefs and people" as well as "[i]nclusiveness of individual and collective viewpoints."

Article 3: Code of Ethics of the Constitution of the Faculty of Palomar College states, in relevant part:

*Faculty members have an obligation to the District, their students, colleagues, profession, the public and themselves to maintain the highest standards of ethical conduct. In recognition of this obligation, faculty members adopt the following standards of ethical conduct: Adapted from the American Association of University Professors (AAUP) Ethics Statement.*

1. *Professors, recognizing their social responsibility:*
   - *Develop and improve scholarly competence,*
   - *Exercise critical self-discipline and judgment in transmitting knowledge,*
   - *Practice intellectual honesty.*

2. *Professors, as teachers:*
   - *Encourage the free pursuit of leaning in their students,*
   - *Demonstrate respect for students as individuals,*
   - *Keep to their proper roles as intellectual guides and counselors,*
   - *Evaluate students in an unbiased manner,*
   - *Respect the confidentiality of students,*
   - *Acknowledge significant or scholarly assistance from students.*
   - *Do not exploit, harass, or discriminate against their students.*

3. *Professors, as colleagues:*
   - *Do not discriminate against or harass colleagues,*
   - *Respect and defend the free inquiry of associates,*
   - *Exchange criticism and ideas,*
   - *Acknowledge academic debt,*
   - *Strive to be objective in their professional judgment of colleagues,*
   - *Accept their share of faculty responsibilities for the governance of their institution.*

4. *Professors, as members of an academic institution:*
   - *Seek to be effective teachers and scholars,*
   - *Uphold academic freedom,*
   - *Maintain their right to criticize and seek revision,*
   - *Give due regard to their responsibilities within the institution, when considering termination of their employment, give due notice of their intentions.*

5. *Professors, as members of their community:*
   - *When they speak or act as private persons avoid creating the impression of speaking or acting for their District,*
   - *Promote free inquiry and further public understanding of academic freedom."*

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

Finally, B.P. 3050 Institutional Code of Ethics states that "[t]he District is committed to the highest ethical standards in furtherance of our mission of education and public service:

*Excellence in teaching, learning, and service*
*Integrity as the foundation for all we do*
*Access to our programs and services*
*Equity and fair treatment of all in our daily interactions*
*Diversity in learning environments, philosophies, cultures, beliefs, and people*
*Inclusiveness of individual and collective viewpoints*
*Mutual respect and trust through transparency, civility, and open communications*
*Creativity and innovation in engaging students, faculty, staff, and administrators*
*Physical presence and participation in the community"*

Here, Mr. Gerwig and Mr. Nakajima departed from the District's anti-harassment and discrimination rules and further violated their duties as faculty of the District. It was clear, based on the greater weight of the credible evidence developed in this investigation, that both Mr. Gerwig and Mr. Nakajima were aware of the use of the inappropriate documents identified as Document Items A and B, above as well as the offensive materials located in rooms NS-249 and NS-252. Their knowledge of these items demonstrates a lack of prudential judgment and reckless indifference to the rules of the organization that mean to prevent discrimination, harassment and promote an open and welcoming academic environment.

In addition to Mr. Gerwig and Mr. Nakajima's violations of the District's rules concerning harassment and discrimination, as well as the breach of their ethical duties, it appeared clear that they both had resisted and had acted in a spiteful manner towards their supervisor, Dr. Kalilkole. Dr. Kalilkole informed the fact finder that student reviews for Mr. Nakajima's class contained negative references to Dr. Kalilkole that she attributed to comments by Mr. Nakajima made to students.

Indeed, Dr. Kalilkole is correct in her assumption here as Mr. Nakajima acknowledged that he had told students that somehow Dr. Kalilkole had promised additional equipment, but thereafter had reneged on that promise. Mr. Nakajima indicated that students were upset by this news. Mr. Nakajima appeared to have told students this derogatory information about Dr. Kalilkole in order to hold Dean Kalilkole out to hatred and ridicule by his students. There was no legitimate business reason for Mr. Nakajima to share such information with his students but for to cause students to be angry at Dr. Kalilkole with whom Mr. Nakajima had differed and had actively resisted as a subordinate instructor.

## 3. Student Matter – Mr. Nakajima

The facts in this matter demonstrate that in April 2009 the Physics and Engineering Department had been investigated by the United States Department of Education, Office of Civil Rights (Document Item D) concerning a violation of the Americans with Disabilities Act. Immediately thereafter, members of the Physics and Engineering Department were required to undergo sensitivity training in education concerning the ADA, and the idea concerning reasonable accommodations in an academic setting.

Dr. Finkenthal provided the fact finder with an email exchange, Document Item C, between a student and Mr. Nakajima. This email indicates the student, who had a disability and used a wheelchair, requested an accommodation concerning the Physics 230 course and its required lab section. The student was clearly seeking some form of accommodation when he wrote, "I was just wondering how flexible you would be under extreme circumstances."

Instead of working with the student and/or referring him to the District's Disability Resource Center, Mr. Nakajima wrote back to the student advising him to take "1,000 milligrams of Vitamin C, multivitamin, and CoQ-10, 50 milligrams or more every day, starting right now." Mr. Nakajima refused to entertain any sort of reasonable sort of accommodation for the student's disability and wrote in relevant part, "I can't give you an extra treatment, but if you start taking care of yourself as I suggested, you should be doing better than a regular semester."

Here, the District, per Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990, is obligated to provide accommodations to ensure the student's equal access to the District's programs and activities. It is the student's responsibility to notify instructors of the need for accommodations and thereafter the instructor is required to refer the student to the Disability Resource Center and work with the student in order to provide reasonable accommodations. In this instance, Mr. Nakajima failed in his obligation in regard to this potential disability. In this case, the student used a wheelchair, yet Mr. Nakajima purported to give the student advice on taking vitamins as opposed to

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

engaging in meaningful communication concerning the use of the Disability Resource Center and the allowance of some form of reasonable accommodation, as required by law.

Added to this, this exchange occurred only months after the Physics and Engineering Department had undergone an investigation concerning the very same sort of issue. Mr. Nakajima and others had been interviewed in this matter and later had received training concerning reasonable accommodation requests. Even so, Mr. Nakajima failed to provide these required steps in potentially accommodating this disabled student.

## 4.  Truthfulness

Here, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima failed to be truthful in their statements to the fact finder, as well as their statements during the June 22, 2017 meeting with District administrators concerning the offensive materials located in rooms NS-252 and NS-249. As detailed above, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima had knowledge of the materials that were displayed openly in areas that they frequented on a near daily basis.

The facts were clear that both Mr. Nakajima and Mr. Gerwig were often located in and using rooms NS-252 and NS-249 and were reasonably well aware of the items that were posted on doors in which they would pass and on walls in areas that they often frequented. Their claims that they were unaware of these items appear to this fact finder to be directly untruthful and offered merely for the purposes of evading culpability for allowing and/or encouraging the posting of such items.

Here, both Mr. Gerwig and Mr. Nakajima have failed to "accept their share of faculty responsibility for the governance of their institution" and "practice intellectual honesty" as required by the Constitution of the Faculty of Palomar College. B.P. 3050, the District's Institutional Code of Ethics, upholds "[i]ntegrity as the foundation for all we do." Here, both Mr. Gerwig and Mr. Nakajima failed to demonstrate integrity concerning their discussions on June 22, 2017, and then later when directly questioned specifically by the fact finder when questioned during this course of this fact-finding investigation.

## Summary of Findings.

There appeared, based on the investigation, to be a pattern and practice of posting and/or allowing the posting and/or display of objectionable material in or about the rooms used by Mr. Gerwig and Mr. Nakajima. The fact finder determined that Mr. Garcia Villa, who was relatively new to the Department, was generally unaware of the true nature of the materials that had been displayed. However, both Mr. Gerwig and Mr. Nakajima both knew, or should have known, that the materials posted in the offices and rooms that they used on a consistent basis were inappropriate, offensive and discriminatory in nature, and yet they allowed the materials to remain.

The fact finder also determined that it appeared that both Mr. Gerwig and Mr. Nakajima both provided false information at a meeting on June 22, 2017 wherein they disavowed knowledge of the documents that were the subject of this investigation. Indeed, both faculty told the fact finder that they were largely unaware of the materials, or had no recollection of having observed them. These statements were inconsistent with the facts as discovered in this investigation.

In summary, based on the greater weight of the credible evidence, it appears that both Mr. Gerwig and Mr. Nakajima were or should have been aware that materials that were deemed objectionable, offensive and discriminatory in nature had been displayed and/or allowed to be displayed in offices and school areas under their dominion and control. Even though both professors feigned that they were unaware of these materials, the greater weight of the credible evidence demonstrates that they were aware of the materials, and allowed them to be displayed in the area. This behavior tends to demonstrate unbecoming conduct by these professors, as the materials were seen as objectionable, inappropriate and discriminatory in nature.

Additionally, the fact finder found that faculty members of the Physics and Engineering Department used a non-District website in order to disseminate a syllabus and other documents that students were required to read and/or sign and return. These documents were seen as warning documents that admonished students concerning their study habits and how to interact with other students. These warnings and instructions appeared inconsistent with the District's goal in their educational pursuits.

There was insufficient credible evidence to show that Mr. Garcia Villa was aware of the nature of these materials due to his lack of tenure in the Physics and Engineering Department, and his lack of use and exposure to the areas in which the

Exhibit A
P. 12

*CONFIDENTIAL*
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

materials were displayed.  The fact finder therefore determines that the allegations are <u>sustained as to Mr. Gerwig and Mr. Nakajima</u>, and <u>not sustained as to Mr. Garcia Villa</u>.

## ADMINISTRATIVE DETERMINATION.

Based upon the investigator's assessment of the interviewees' credibility and documentary evidence, the burden of preponderance of evidence, which is required to uphold charge of unlawful discrimination and sexual harassment, is sufficient to sustain Dr. Finkenthal's allegations on behalf of the anonymous student.  The District's administrative determination is therefore to <u>sustain</u> the complaint against Mr. Gerwig and Mr. Nakajima and to <u>dismiss</u> the complaint against Mr. Garcia Villa.  This matter is hereby referred to the District's administration for disciplinary action against Mr. Gerwig and Mr. Nakajima.

The allegations were received and investigated as an informal complaint, although the District ensured that the usual steps undertaken in a formal investigation were followed.  Dr. Finkenthal and the anonymous student have the right to submit a formal written complaint of unlawful discrimination to the District in accordance with Title 5, § 59328 et. seq. using the form available on the District website at http://www2.palomar.edu/pages/hr/files/2014/07/Discrimination-Harassment-Complaint-Form-Web.pdf.  The form is also available at the Human Resource Services office in room ST-1.  A written complaint submitted in this manner may be filed up to  one (1) year from the date on which the unlawful discrimination allegedly occurred.

The anonymous student also has the right to file a complaint with United States Department of Education, Office of Civil Rights.  Information regarding filing a complaint with OCR is available on OCR's website at http://www2.ed.gov/about/offices/list/ocr/docs/howto.html or by calling OCR's office at (800) 421-3481.

Respectfully submitted,

Shawna H. Cohen
Manager, Equal Employment Opportunity and Compliance
  and Deputy Title IX Coordinator
Palomar Community College District
November 1, 2017