Regina A. Petty (SBN 106163)
    E-Mail:  rpetty@fisherphillips.com
Adam F. Sloustcher (SBN 291657)
    E-Mail:  asloustcher@fisherphillips.com
**FISHER & PHILLIPS LLP**
4747 Executive Drive, Suite 1000
San Diego, California  92121
Telephone:  (858)597-9600
Facsimile:   (858)597-9601

Attorneys for Defendant
Palomar Community College District

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KATHRYN KAILIKOLE, an individual,<br><br>                    Plaintiff,<br><br>        v.<br><br>PALOMAR COMMUNITY COLLEGE DISTRICT, a governmental entity; and DOES 1 through 25, inclusive,<br><br>                    Defendants. | Case No: 3:18-cv-02877-AJB-MSB<br><br>*[Previously San Diego Superior Court Case No. 37-2018-00058754-CU-WT-NC  before the Honorable Ronald F. Frazier]*<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT PALOMAR COMMUNITY COLLEGE DISTRICT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO F.R.C.P. 12(B) AND 12(B)(6)**<br><br>Date:  April 4, 2019<br>Time: 2:00 p.m.<br>Courtroom: 4A<br><br>State Complaint:  November 20, 2018<br>Removed:  December 26, 2018 |

1

FPDOCS 34969107.1

**PLEASE TAKE NOTICE** that pursuant to Federal Code of Evidence Section 201, Defendant, PALOMAR COMMUNITY COLLEGE DISTRICT ("Defendant") hereby requests that the Court take judicial notice of the following attached documents in support of Defendant's Motion to Dismiss:

**Exhibit A:** The Notice of Proposed Disciplinary Action provided to Plaintiff, which Plaintiff references in her complaint, informing Plaintiff of proposed disciplinary action to be taken against her.

**Exhibit B:** The Governing Board Regular Meeting Agenda for June 12, 2018.

**Exhibit C:** The 24-Hour of Notice of Termination provided to Plaintiff to inform her of the Governing Board's impending vote regarding her proposed discharge.

**Exhibit D:** The Governing Board Minutes for the June 12, 2018 Meeting of the Governing Board.

**Exhibit E:** Defendant's written Notice of Termination to Plaintiff informing Plaintiff of the Governing Board's final decision to terminate her employment.

Federal Rule of Evidence 201 provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed.R.Evid. 201(b)(1)-(2).

The Court may properly take judicial notice of the foregoing Exhibits because the District is a public entity and therefore all of the foregoing Exhibits are public records. Judicially noticed facts often consist of matters of public record. See, e.g., *Merced Irr. Dist. v. County of Mariposa* (E.D. Cal. 2013) 941 F.Supp.2d 1237, 1262. Moreover, their existence "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." California Government Code Section 6252, subdivision (d) defines public records within the

2

meaning of the California Public Records Act as "any writing containing information relating to the conduct of the public's business prepared, owned, used, or retained by any state or local agency regardless of physical form or characteristics." *Id* at 1262 (taking judicial notice of an agreement between county and irrigation district because it was a public record); *Retired Employees Ass'n of Orange County, Inc. v. County of Orange* (C.D. Cal. 2009) 632 F.Supp.2d 983, 985 (taking judicial notice of a county board of supervisors' resolution under Rule 201); *Braun v. City of Taft* (1984) 154 Cal.App.3d 332, 340 (letter appointing public employee to a position and letter subsequently demoting employee from the position were public records). Accordingly, Governing Board resolutions, agendas, and minutes, and public employee letters of notice of adverse employment action are public records. *Id.*

Based on the foregoing, as well as the documents attached hereto, Defendant requests that the Court take judicial notice of the documents identified above.

Dated:  February 1, 2019

Respectfully submitted,

**FISHER & PHILLIPS LLP**

By:   */s/ Adam F. Sloustcher*
Regina A. Petty
Adam F. Sloustcher
Attorneys for Palomar Community
College District

DEF'S REQUEST FOR JUDICIAL NOTICE
CASE NO: 3:18-CV-02877-AJB-MSB

FPDOCS 34969107.1

1

## <u>INDEX OF EXHIBITS</u>

2   **Exhibit A**: Notice of Proposed Discharge

3   **Exhibit B**: Governing Board Regular Meeting Agenda for June 12, 2018

4   **Exhibit C**: June 11, 2018 24-Hour Notice Pursuant to Government Code section

5   54957

6   **Exhibit D**: Governing Board Minutes for the June 12, 2018 Meeting of the

7   Governing Board

8   **Exhibit E**: Notice of Termination

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

DEF'S REQUEST FOR JUDICIAL NOTICE
CASE NO: 3:18-CV-02877-AJB-MSB

# EXHIBIT A

**PALOMAR COLLEGE®**
Learning for Success
1140 West Mission Road, San Marcos, California 92069-1487 • 760-744-1150 • www.palomar.edu

<u>**VIA CERTIFIED MAIL AND EMAIL:**</u> *kathrynkailikole@gmail.com*

| | |
|---|---|
| **To:** | Kathryn Kailikole, Ed.D.<br>Dean, Instructional, Mathematics and the Natural and Health Sciences |
| **From:** | Jack Kahn, Ph.D.<br>Assistant Superintendent/Vice President, Instruction |
| **RE:** | Notice of Proposed Disciplinary Action (Termination) and<br>Notice of Right to Pre-Disciplinary Meeting and/or Evidentiary Hearing |
| **Date:** | May 2, 2018 |

After consulting with the Assistant Superintendent/Vice President, Human Resource Services, this letter constitutes official notice that you are being recommended for termination from your employment as the Dean, Instructional, Mathematics and the Natural and Health Sciences with the Palomar Community College District ("District"). You are being recommended for termination under Section 15 of the Administrative Association Handbook **(attached hereto as Exhibit 1),** Education Code section 87732 **(attached hereto as Exhibit 2)** and Paragraph 14 of your employment contract dated April 11, 2017 ("Employment Contract") **(attached hereto as Exhibit 3).** These attachments are incorporated herein by reference as if set forth verbatim. Please read these and all attachments to this notice carefully.

The specific acts, omissions, causes, and reasons upon which the recommended disciplinary action is based are set forth herein and in the documents attached hereto, and are incorporated herein by reference as though fully set forth verbatim.

<u>**The Causes or Grounds for the Proposed Termination**</u>

The proposed termination is based on violations set forth in Section 15 of the Administrative Association Handbook, Education Code section 87732, and Paragraph 14 of your Employment Contract. The specific causes for disciplinary action are as follows:

- Unsatisfactory work performance;

- Unprofessional Conduct;

- Insubordination;

- Misconduct; and

- Other conduct which is detrimental to the operations of the District and/or its major instructional, student and administrative divisions and which impairs the District's mission, purpose, or objectives.

## Specific Acts and Omissions Upon Which the Proposed Termination is Based

You are being recommended for termination based on your poor work performance, including your constant failure to meet deadlines, failure to properly supervise your staff, inability to work collaboratively with your colleagues, complete lack of organizational skills, and your failure to properly oversee grants awarded to your division, which has placed the District at risk of losing grant funding. Indeed, despite being more than one year into the Title V/HIS/STEM grant, you failed to assign *any* of the release time funded by the grant, and several full-time grant funded positions remain unfilled. Because the majority of the STEM Center's funding is obtained from this grant, it is essential to the STEM Center to keep this funding.

You have also failed to properly address blatant violations of District rules and regulations and the Education Code by faculty members under your direct supervision, even when those violations directly impacted student safety. Indeed, despite learning that a faculty member allowed an Airsoft pistol to be used in the classroom in an unsafe manner and in direct violation of the District's policy regarding weapons on campus, you never attempted to initiate an administrative investigation into his conduct nor did you notify Human Resource Services about the incident until more than eighteen months after it occurred. You also failed to monitor faculty members' conduct even though you believed they were violating a directive you issued not to use a hazardous and unsafe room as a classroom laboratory.

You have also been repeatedly counseled regarding your unprofessional, disrespectful tone, which has disrupted meetings and severely affected the work environment for staff members under your supervision. Your conduct toward the STEM Center Supervisor at last year's STEM Conference was so demeaning that she specifically requested not to work with you on the conference this year. Moreover, despite being in an administrator position, you often fail to work for the District's mission and goals. You have not worked collaboratively with your colleagues, particularly those in other instructional divisions, failing to respond to their inquiries about available grant funds. You have also failed to follow my directives and have repeatedly attempted to undermine my authority during meetings.

Finally, you breached your duty to maintain confidential employee information by disclosing confidential personnel information about one of the faculty members under your supervision. Indeed, you disclosed such information with the intent that it be more broadly disseminated, knowing that it could affect the faculty member's reputation and employment. As an administrator, your failure to adequately safeguard confidential information – *and in fact promote its disclosure* – is unacceptable and will not be tolerated.

Therefore, it is recommended that your employment be terminated based on your continued job performance deficiencies, breach of your duty to protect confidential personnel information, your unprofessional and disrespectful conduct, and your failure to follow my directives. Pursuant to Section 15 of the Administrative Association Handbook and Paragraph 14 of your Employment

Agreement, the specific acts and omissions upon which the proposed disciplinary action is based are as follows:

*Failure to Meet Deadlines/Follow Directives*

- In or around early September 2017, you received a verbal warning from me because you continually failed to meet your work deadlines. Despite this warning, you continued to submit documents late or not at all.

- In October 2017, you missed the deadline for submitting the paperwork necessary to schedule second-level interviews for the Assistant Professor, Computer Science position, which could have jeopardized the hiring process and resulted in the loss of qualified candidates. Because of your inability to submit documentation on time – despite ample notice from Human Resource Services regarding the items needed to schedule the interviews – you placed a significant burden on Human Resource Services to complete the scheduling in a very short timeframe. **(A copy of email correspondence dated October 11, 2017, regarding scheduling for the second-level Assistant Professor, Computer Science interviews, is attached hereto as Exhibit 4.)**

- You also failed to review the Program Review and Planning (PRP) reports for the disciplines in your division, despite being reminded multiple times that the PRPs were due on November 29, 2017. As a Dean, you were required to review the PRPs for your disciplines, and your failure to do so created extra work for me and your colleagues.

- In or around the end of November 2017, I met with you again regarding your failure to meet deadlines and arrive timely to meetings, as well as concerns regarding your tone and professionalism. You were specifically directed to show up to meetings on time, meet deadlines on work projects, and communicate in a positive manner in an effort to support District initiatives. **(A copy of email correspondence dated December 4, 2017, from Jack Kahn regarding the meeting about performance issues is attached hereto as Exhibit 5.)**

- You continued to have issues with meeting deadlines, however. In early December 2017, you missed the deadline for submitting your Annual Division Update Report, even though you were provided with email reminders and reports from other divisions as examples. **(A copy of email correspondence dated November 8 and 27, 2017 and December 1 and 2, 2017 regarding the Annual Division Update is attached hereto as Exhibit 6.)**

- You were also several weeks late in providing me the information needed to finish the upcoming class schedule. Because you were not timely in gathering and submitting the required class information, I had to perform duties you should have been doing in order to provide you with extra time to finish the scheduling. In addition, even though I directed you not to attend the December Governing Board meeting because I wanted you to finish the schedule, you defied my directive and attended the meeting regardless.

*Failure to Properly Oversee Grants/Collaborate with Colleagues*

- In overseeing the CCC Maker Grant, you repeatedly failed to respond to requests from Professor Mark Bealo for information regarding the remaining seed funds, which he wanted to use to purchase equipment and technology. On September 11, 2017, Mr. Bealo complained that despite several emails to your administrative assistant, he had received only one response which stated that she was *"not sure what is going to be done with the remaining funds."* Mr. Bealo expressed frustration that the funds would need to be returned if invoices were not submitted by the

-3-

September 15, 2017 deadline, which was only four days away. **(A copy of email correspondence dated September 11 and 12, 2017, from Mark Bealo regarding the CCC Maker Seed Funds is attached hereto as Exhibit 7.)**

- Your failure to adequately oversee the Title V/HSI/STEM grant also placed the District at risk of losing grant funding, which could have affected the STEM Center, the Math Center and the District's relationship with the California State University at San Marcos, which shares the Title V grant with the District. Specifically, despite being more than one year into the grant, you had not assigned *any* of the release time funded by the grant, and several full-time grant funded positions remained unfilled – including the Title V/HSI/STEM Project Supervisor and Assistant positions. Several committees/councils that were supposed to be established had not been started (including a Title V/STEM Steering Committee, Industry Council and Interdisciplinary Council), and other activities such as developing virtual labs, starting an accelerated ESL and collecting feedback from project participants had not been done. **(A copy of correspondence dated January 25, 2018, from Cindy Anfinson regarding the Title V/HSI/STEM Grant is attached hereto as Exhibit 8.)** As the Dean overseeing this grant, it is your responsibility to ensure positions are filled and the conditions of the grant are being fulfilled.

- STEM Center Supervisor Mireya Gutierrez-Aguero also complained that your conduct toward her during the STEM Conference in 2017 was so demeaning and disrespectful that she could not work with you again to plan the STEM Conference in 2018. Ms. Gutierrez-Aguero noted that you belittled her in front of work group members, which affected the work environment for her and the other members. **(A copy of email correspondence dated January 31 and February 1, 2018 between Jack Kahn and Mireya Gutierrez-Aguero is attached hereto as Exhibit 9.)**

*Failure to Properly Supervise Staff*

- In April 2016, you received student complaints that faculty member Takashi Nakajima had allowed students to shoot an Airsoft pistol in his classroom as part of an "experiment" without taking proper safety precautions and/or supervising the students' use of the pistol. You also received copies of a video taken with a cell phone which showed the pistol being used in the unsafe manner described by the students. During conversations with campus Police Officer Magauli So'oto, you provided him with a copy of the District administrative procedure A.P. 3530 Weapons on Campus, which requires firearms or other weapons used in educational activities to be authorized by the District's Chief of Police before the activity occurs. However, despite information that Mr. Nakajima never received proper authorization to use the Airsoft pistol -- and clear evidence that he allowed the pistol to be used in the classroom in an unsafe manner – you never took any action to initiate an administrative investigation into the incident and failed to notify Human Resource Services that it occurred until November 2017, *more than eighteen months later.* **(A copy of the investigation report dated April 25, 2018 is attached hereto as Exhibit 10.)**

- You also learned during the fall 2016 semester or spring 2017 semester that Mr. Nakajima and faculty member Arthur Gerwig were using room NS-249 as a classroom/laboratory, even though the room was only to be used for storage. Although you directed Mr. Nakajima and Mr. Gerwig not to use the room as a lab because the room was hazardous and unsafe for students, you expressed concerns that Mr. Nakajima and Mr. Gerwig secretly continued to use room NS-249 as a classroom/laboratory. Despite your concerns and the safety risk to students, however, you never went to the classroom to monitor the situation, even though you were the faculty

members' direct supervisor and you believed they were violating a directive you had issued to them related to student safety. **(Exhibit 10.)**

- You also received complaints that Mr. Nakajima had been holding lab prep sessions outside of normally scheduled times, had changed the exam schedule by allowing students to vote on and set the exam schedule, and had given three-hour examinations (outside of the normally scheduled one-hour lecture periods) – in violation of the Education Code and previous directives that had been issued. Despite reports that a faculty member under your supervision was violating the Education Code and various directives – and requests from Human Resource Services that you follow up on the complaints and try to observe the conduct (i.e., prep sessions) – you failed to follow up regarding the complaints or take action to try to confirm the conduct in the complaints. **(Exhibit 10.)**

*Breach of Your Duty to Maintain Confidential Information*

- On November 27, 2017, Lisa Norman, Assistant Superintendent/Vice President, Human Resource Services responded to an email from you and from which she had removed Dr. Finkenthal as a recipient. Dr. Norman wrote in her response that she had not copied Dr. Finkenthal on the email because its contents referred to disciplinary action against two faculty members. Dr. Norman's clear inference was that Dr. Finkenthal's inclusion would have violated confidentiality since the discipline of faculty is the sole purview of the District. **(Exhibit 10.)**

- On December 8, 2017, you forwarded several emails regarding Mr. Nakajima to another faculty member, Daniel Finkenthal. The email correspondence you forwarded had information from the Palomar College Police Department regarding a complaint that had been filed against Mr. Nakajima (relating to the use of an Airsoft pistol in his classroom), information regarding your discovery that Mr. Nakajima was improperly using room NS-249 as a lab room, and your discussions with Mr. Nakajima about his use of a "warning letter." Immediately after you provided the emails to Dr. Finkenthal, he forwarded the emails to his wife, who sits on the governing board of the San Marcos Unified School District. Following a neutral investigation, it was determined that you disclosed such information with the intent that it be more broadly disseminated, knowing that it could affect the faculty member's reputation, employment and any potential disciplinary action against the faculty member. **(Exhibit 10.)**

Your complete inability to meet work deadlines, difficulty collaborating with your colleagues, inadequate supervision of staff, failure to properly oversee grants awarded to your division and improper disclosure of confidential personnel information has had a negative impact on your division, your colleagues and the District. Your actions have compromised the integrity of this institution, placed the District at risk of losing grant funding, and has increased my workload and the workloads of your colleagues who are required to perform duties that you are responsible for performing. Despite the numerous times you have been counseled, your **continued failure** to meet deadlines, abide by my directives, properly manage your staff and workload, and work in a positive and collaborate manner with your colleagues warrants termination.

## YOUR RIGHTS

### Pre-Disciplinary (Skelly) Meeting

Pursuant to Section 15 of the Administrative Association Team Handbook, you are entitled to appear personally before Ron Perez, Assistant Superintendent/Vice President, Finance and Administrative Services for a pre-disciplinary meeting within ten (10) workdays after you receive this Notice. Within the stated ten (10) workday period, you are also entitled to submit oral and/or written information, including affidavits, regarding any reason you believe this recommended discipline is inappropriate. The pre-disciplinary meeting is not an evidentiary hearing; rather, it is simply an opportunity to present relevant information to Mr. Perez for him to consider before making a determination whether the proposed disciplinary action, including the proposed penalty, is appropriate.

### Representation

You are entitled to have a representative of your choice at this pre-disciplinary meeting.  If you intend to have legal representation at this pre-disciplinary meeting, please notify Mr. Perez' office at (760) 744-1150 ext. 2109 of your intent so that District may be represented by legal counsel as well.

### Pre-Disciplinary (Skelly) Meeting - Scheduling

A pre-disciplinary (Skelly) meeting has been scheduled on Wednesday, May 16, 2018 at 10:30 a.m. with Mr. Perez.  To confirm your attendance at this pre-disciplinary meeting, please contact Mr. Perez' office at (760) 744-1150 ext. 2109.  No such pre-disciplinary meeting will be held unless you contact Mr. Perez' office confirming that you want to attend the meeting with him scheduled for Wednesday, May 16, 2018 at 10:30 a.m. Failure to timely confirm and/or to attend the pre-disciplinary (Skelly) meeting shall mean that you have waived your right to pre-disciplinary meeting and no such meeting will be held.

### Evidentiary Hearing

You are also entitled, upon written request, to an evidentiary hearing before the Governing Board (Board) or a hearing officer designated by the Board. Enclosed is a form **(attached hereto as Exhibit 11)** that you must sign and return to the District to request an evidentiary hearing. *Note that you must request the evidentiary hearing within ten (10) workdays after receipt of this Notice of Proposed Disciplinary Action, even if you are also requesting a pre-disciplinary meeting with the Mr. Perez.*  If you request an evidentiary hearing, you have the right to appear in person, with counsel, or with other representation. In the absence of a timely demand for a hearing, the Board may act upon this proposed disciplinary action after the time period for demanding a hearing has expired.

**FAILURE TO FILE A TIMELY REQUEST FOR AN EVIDENTIARY HEARING SHALL MEAN THAT YOU HAVE WAIVED YOUR RIGHT TO AN EVIDENTIARY HEARING AND NO HEARING WILL BE HELD.**

### Commencement of Discipline

The proposed discipline may be imposed after the pre-disciplinary (Skelly) meeting is held or waived, and ten (10) working days after service of this notice. In the absence of a timely demand for an evidentiary hearing, the Board may act upon this proposed disciplinary action after the time period for demanding a hearing has expired.

Copies of the materials I have relied upon are attached hereto and incorporated herein by reference as though set forth herein in full.

If you have any questions regarding this notice or any of its attachments, please contact me as soon as possible.

**THIS DOCUMENT AND ITS ATTACHMENTS WILL BE PLACED IN YOUR OFFICIAL PERSONNEL FILE WITHIN FIVE (5) WORKDAYS FROM THE DATE OF THIS NOTICE.  WITHIN THIS FIVE (5) DAY PERIOD, YOU HAVE THE RIGHT TO SUBMIT A STATEMENT WHICH WILL BE ATTACHED TO THIS DOCUMENT AND PLACED IN YOUR PERSONNEL FILE.**

Sincerely,

Jack S. Kahn, Ph.D.
Assistant Superintendent/Vice President, Instruction

**Exhibits**

| | |
|---|---|
| **Exhibit 1** | Section 15 of the Administrative Association Handbook |
| **Exhibit 2** | Education Code section 87732 |
| **Exhibit 3** | Employment Contract, Educational Senior Administrator, dated April 11, 2017 |
| **Exhibit 4** | Email correspondence dated October 11, 2017, regarding scheduling for second-level Assistant Professor, Computer Science interviews |
| **Exhibit 5** | Email correspondence dated December 4, 2017, from Jack Kahn regarding the meeting about performance issues |
| **Exhibit 6** | Email correspondence dated November 8 and 27, 2017, and December 1 and 2, 2017, regarding the Annual Division Update |
| **Exhibit 7** | Email correspondence dated September 11 and 12, 2017, from Professor Mark Bealo's regarding the CCC Maker Seed Funds |
| **Exhibit 8** | Correspondence from Cindy Anfinson dated January 25, 2018, regarding the Title V/HIS/STEM Grant |
| **Exhibit 9** | Email correspondence between Jack Kahn and Mireya Gutierrez-Aguero dated January 31 and February 1, 2018 |

| | |
|---|---|
| **Exhibit 10** | Investigation Report dated April 25, 2018 |
| **Exhibit 11** | Evidentiary Hearing Request Form |

# EXHIBIT 1



**PALOMAR COLLEGE**
Learning for Success

# PALOMAR COMMUNITY COLLEGE DISTRICT

## Administrative Association Handbook

**Approved by the Governing Board on September 25, 1990**

**Amended**

January 1993

September 1993

October 1995

September 2000

October 2003

March 2015

**RECEIPT FOR**

**PALOMAR COMMUNITY COLLEGE DISTRICT**

**ADMINISTRATIVE ASSOCIATION HANDBOOK**

I, the undersigned, acknowledge receipt of the Administrative Association Team Handbook (amended March 2015) for the Educational and Classified Administrators of the Palomar Community College District.

I further understand that I am required to read and become familiar with all the provisions of this handbook.

I understand that neither this handbook nor any provisions of this handbook is or implies an employment contract or any other type of contract.

_____

Printed Name

_____

Signature

_____

Department                                    Date

# Table of Contents

1 - CLASSIFICATION ........................................................................... 7
2 - SALARIES ................................................................................... 8
3 - PERFORMANCE EVALUATION ....................................................... 9
4 - ADMINISTRATIVE RETREAT RIGHTS ............................................. 9
5 - VACATION ................................................................................. 11
6 - LEAVES ..................................................................................... 12
7 - UNPAID LEAVES OF ABSENCE ..................................................... 26
8 - FAILURE TO RETURN TO WORK AFTER A LEAVE OF ABSENCE .......... 26
9 - HOLIDAYS ................................................................................. 26
10 - PROFESSIONAL DEVELOPMENT ................................................. 27
11 - PROFESSIONAL GROWTH PROGRAM .......................................... 31
12 - MANAGEMENT DEVELOPMENT PROGRAM ................................... 36
13 - PERSONNEL FILES ................................................................... 37
14 - COMPLAINT PROCESS ............................................................... 37
15 - DISCIPLINE .............................................................................. 39
16 - SEPARATION FROM THE DISTRICT ............................................. 41
17 - POST-RETIREMENT EMPLOYMENT .............................................. 42
18 - EMERITUS STATUS ................................................................... 42
19 - TERMINATION .......................................................................... 43
20 - REDUCTION IN FORCE ............................................................... 43
21 - DEATH OF AN ACTIVE EMPLOYEE OR RETIREE ............................. 43
22 - FRINGE BENEFITS .................................................................... 43
23 - NOTARY PUBLIC ....................................................................... 43
24 - TAX-SHELTERED ANNUITIES ..................................................... 43
25 - SECTION 125 PRE-TAX FLEXIBLE SPENDING PLAN ....................... 44
26 - ALCOHOL AND DRUGS .............................................................. 44
27 - UNLAWFUL DISCRIMINATION/SEXUAL HARASSMENT .................... 45
28 - WORKPLACE VIOLENCE ............................................................. 45
29 - INCOMPATIBLE ACTIVITIES ....................................................... 45
**APPENDIX A**-ADMINISTRATIVE ASSOCIATION STATEMENT OF ETHICS ............ 47

e.  Complaint Guidelines

   i.  All proceedings, hearings, conferences, and meetings dealing with resolution of complaint will be confidential and private.  All employees involved in the complaint have the right and the obligation to maintain confidentiality regarding the complaint and the employee involved.

   ii.  Administrators who file complaints in bad faith, frivolously, or as retaliation will be subject to disciplinary action.  The burden of proof rests upon the employee who files the complaint.

   iii.  The complainant, the respondent and other employees involved as witnesses are granted release time as necessary to participate in the complaint procedure.

   iv.  It is a violation of District policy to retaliate against complainants.

   v.  Failure to follow the above procedure and/or failure to meet stated time periods will result in forfeiting the right to pursue the complaint.

15. DISCIPLINE: An administrator may be disciplined for cause.  The term "discipline" refers to disciplinary actions, penalties, and/or settlements including demotion, suspension, or dismissal without voluntary consent.  All discipline must be reasonable, timely, and related in severity to the seriousness of the offense and imposed with adherence to the concept of progressive discipline.  The term "cause" is defined as those actions, omissions or behaviors which are detrimental to the operations of the District and/or its major instructional; student and administrative divisions or which impair the District's mission, purpose, and objectives.  In addition, educational administrators may be disciplined for violations of Education Code 87732, and classified administrators for violation of BP/AP 7365.

a.  Discipline Procedure: After consultation with the assistant superintendent/vice-president for Human Resource Services, the appropriate administrator or designee will give written notice of the proposed disciplinary action to the employee.  All such notices require the signature of the appropriate executive administrator.  The notice will be served at least ten (10) working days prior to the date when discipline may be imposed.  The notice must contain the following information:

   i.  A statement in ordinary and concise language of the specified acts and omissions upon which the proposed disciplinary action is based, as well as the cause of action for the discipline (supporting documentation may be attached).

   ii.  The specific disciplinary action proposed.

   iii.  A copy or statement of applicable regulation(s) policy (s) where it is claimed a violation occurred.

iv. A statement that the employee has the right to respond to the matters raised in the notice both orally and in writing including the submission of affidavits, within ten (10) workdays following the date the written notice was served.

v. A statement that the employee is entitled to appear personally before the Superintendent/President or designee regarding the matters raised in the written notice with ten (10) workdays following the date the written notice was served.

vi. A statement that the employee, upon written request, is entitled to an evidentiary hearing before the Board or a hearing officer designated by the Board. The District shall provide a form for the employee, the signing and filing of which shall constitute a demand for hearing, and a denial of charges. The employee must request the hearing within ten (10) workdays after receipt of the Notice of Discipline, even when requesting a meeting with the superintendent/president as noted above.

vii. If requested by the employee, an evidentiary hearing shall be scheduled within forty-five (45) calendar days of the request, or as soon as practicable. The employee has the right to appear in person, with counsel, or other representation. The District will have the burden of proof and will present evidence first. Normal procedures are followed; i.e., charging party presentation, defense cross-examination, and defense presentation, charging party cross-examination, and rebuttal evidence from each party. Hearings will be recorded at the request of either party with the expense being borne by both parties.

viii. The Board's determination of the sufficiency of the cause for disciplinary action will be conclusive in all cases. If a hearing officer is utilized, the hearing officer shall make a recommendation to the Board, and the Board shall take final action.

ix. Hearings are closed to the public unless otherwise requested by the employee.

x. In the absence of a timely demand for a hearing, the Board may act upon the proposed disciplinary action after the time period for hearing demand has expired.

xi. Probationary employees and other non-permanent employees are not covered by any provision in this disciplinary procedure.

xii. In lieu of a disciplinary action, the recommendation of the executive administrator in consultation with the assistant superintendent/vice-president for Human Resource Services, an employee may be offered as a condition of employment the option to enter certain structured rehabilitative treatment programs and/or medical/psychiatric care for specified duration's either voluntarily and/or when such treatment is indicated by competent medical authority.

xiii. At any time during the disciplinary process, an employee may offer to resign, and, if the superintendent/president accepts such offer, the employee's official reason for termination shall be recorded as a voluntary resignation. In extenuating and/or unforeseen circumstances exceptions to the time frames may be granted upon mutual agreement of the parties involved.

16. SEPARATION FROM THE DISTRICT

a. Resignation: Administrators who plan to resign should do so with as much written notice to the District as possible (a minimum of thirty (30) calendar days is suggested whenever possible.) The superintendent/president is authorized by the Governing Board to officially accept the resignation of administrators.

i. Payment for service will be made up to and including the last day that service is performed.

ii. Accrued and unused vacation will be paid.

iii. When the letter of resignation is received by Human Resource Services, a separation letter will be sent to the resigning employee. This letter will outline details the resigning employee will need to be aware of such as continuation of insurance, converting life and long-term disability insurance, and options with regard to the retirement plan.

iv. The separation letter will also include a copy of Palomar's exit interview questionnaire, found on the Human Resource Services website. The resigning administrator will be invited to schedule an exit interview with the manager of Human Resource Services to assure proper handling of personal and business matters. The administrator shall return all college-owned property and settle any indebtedness to the college prior to their exit interview. The administrator shall return all college keys, employee identification card, parking pass and a procurement/purchasing card (if one has been issued in the administrator's name).

v. Only the following information will be provided to prospective employers seeking information on Palomar employees:

1. Date hired

2. Last day worked

3. Last position held

4. Final salary

# EXHIBIT 2

West's Annotated California Codes
   Education Code (Refs & Annos)
      Title 3. Postsecondary Education (Refs & Annos)
         Division 7. Community Colleges (Refs & Annos)
            Part 51. Employees (Refs & Annos)
               Chapter 3. Employment (Refs & Annos)
                  Article 6. Termination of Services and Reduction in Force (Refs & Annos)

West's Ann.Cal.Educ.Code § 87732

§ 87732. Grounds for dismissal of regular employee

Currentness

No regular employee or academic employee shall be dismissed except for one or more of the following causes:

(a) Immoral or unprofessional conduct.

(b) Dishonesty.

(c) Unsatisfactory performance.

(d) Evident unfitness for service.

(e) Physical or mental condition that makes him or her unfit to instruct or associate with students.

(f) Persistent violation of, or refusal to obey, the school laws of the state or reasonable regulations prescribed for the government of the community colleges by the board of governors or by the governing board of the community college district employing him or her.

(g) Conviction of a felony or of any crime involving moral turpitude.

(h) Conduct specified in Section 1028 of the Government Code.

**Credits**
(Stats.1976, c. 1010, § 2, operative April 30, 1977. Amended by Stats.1978, c. 909, p. 2864, § 30; Stats.1981, c. 470, p. 1793, § 383; Stats.1982, c. 251, p. 822, § 38, eff. June 11, 1982; Stats.1990, c. 1302 (S.B.2298), § 125, eff. Sept. 25, 1990; Stats.1995, c. 758 (A.B.446), § 166; Stats.1998, c. 63 (A.B.1647), § 2.)

West's Ann. Cal. Educ. Code § 87732, CA EDUC § 87732
Current with urgency legislation through Ch. 10 of 2018 Reg.Sess

Case 3:18-cv-02877-AJB-MSB   Document 9-3   Filed 02/01/19   PageID.1285   Page 23 of 297

§ 87732. Grounds for dismissal of regular employee, CA EDUC § 87732

End of Document                                      © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.                2

Ex. A, Page 22

# EXHIBIT 3

# PALOMAR COMMUNITY COLLEGE DISTRICT
# EDUCATIONAL SENIOR ADMINISTRATOR,
# EMPLOYMENT CONTRACT 2017-2019

This employment contract (hereinafter referred to as the "Agreement") is made and entered into this eleventh day of April, 2017 of by and between the Governing Board of the Palomar Community College District (hereinafter referred to as the "Board" and "District") and **Kathryn Kailikole** (hereinafter referred to as the "Employee").

**WHEREAS** it is the desire of the Board to employ Employee in the Position of **Dean, Instructional, Mathematics and The Natural and Health Sciences** (hereinafter referred to as "Position").

**NOW, THEREFORE,** the parties mutually agree as follows:

1.  **EMPLOYMENT.**  The Board hereby offers to employ Employee in the above identified Position on the conditions contained in this Agreement.  Employee is a member of the Administrative Team as described in the Administrative Team Handbook adopted by the Board, an academic employee as defined by Education Code section 87001(a), an educational administrator as defined in Education Code section 87002(b), and a management employee as defined by Government Code section 3540.1(g).  The Employee and the Board agree that this Agreement is not binding or enforceable unless it is ratified by the Board in open session at a regular meeting of the Board.

2.  **STATUTORY AUTHORIZATION AND EXTENSION.**  This Agreement is a contract of employment entered into pursuant to Education Code section 72411(a).  Employee understands upon Employee's execution of this Agreement and its adoption by the Board, this Agreement will automatically renew upon its expiration, and Employee will automatically be reemployed for one (1) additional year upon the expiration of this Agreement, unless the Governing Board provides written notice to Employee on or before March 15, 2018, of its intention not to reemploy Employee in Position for one additional academic year.  If the Governing Board provides such written notice to Employee, Employee's employment in Position and this Agreement will terminate effective July 1, 2019, without further action by the Board, subject to the provisions of paragraph 3.

3.  **RETREAT/RETURN RIGHTS.**  If the Governing Board provides notice to Employee of non-renewal of this Agreement, and Employee has seniority in another administrator or non-administrator education position in the District, such Employee may have the right to return to such position upon the expiration of this Agreement provided that Employee is not termination for cause.

4.     **TERM.**  The term of this Agreement shall begin on **July 1, 2017**, and continue through and including **June 30, 2019** or unless extended pursuant to paragraph 2.  Employee shall be required to render full time and regular service to the District during the period covered by this Agreement.  This Agreement shall be renewable or extended only by mutual, written agreement of the parties as set forth in paragraph 2 above.  In no event shall this Agreement be interpreted in any way to authorize the renewal or extension of this Agreement for a term of more than twenty-nine (29) months.  It is expressly understood, however, that if the position referred to in this Agreement is funded by a grant, categorical program, or other monies not in the District's unrestricted general fund, and if funding is discontinued, the Agreement will terminate on June 30 of the fiscal year in which the funding was discontinued, provided further that the District has given Employee written notice before May 15 of the year in which the funding is not received.

5.     **SALARY.**  Employee shall be compensated in accordance with the Administrative Salary Schedule as established, approved and revised from time to time by the Board, at salary grade **75/4** from July 1, 2017 through June 30, 2018 and at salary grade **75/5** from July 1, 2018 through June 30, 2018, **plus a $117.66 monthly doctoral stipend.**  The Board reserves the right to increase or decrease the schedule including across the board salary reduction or furloughs on the same basis and for the same time as faculty bargaining unit reductions.  Any actions to modify the salary schedule shall not be interpreted as a new Agreement for employment or renewal or extension of this Agreement.  The Board reserves the right to increase the Employee's salary.  However, any action to increase the salary of the Employee shall not be interpreted as a new Agreement for employment or a renewal or extension of this Agreement.

6.     **DUTIES.**  Employee will perform the duties of the above Position as set forth in any Position description adopted by the Board, and all other duties as shall be assigned or required by the Superintendent/President, or designee, provided that such additional duties shall be consistent with Employee's Position.  The Board may adopt or amend the Position description for the Employee's Position at any time as long as the modifications are not inconsistent with the terms of the Agreement.  The Board reserves the right to reassign the Employee at any time during the term of this Agreement to another educational or student services administrative Position within the District.  Reassignment during the term of this Agreement solely for discretionary reasons will not result in a reduction of the Employee's compensation during the term of this Agreement. Reassignment will be made in compliance with the California Education Code and the Administrative Handbook.

7.     **EXCLUSION FROM OVERTIME PROVISIONS.**  Employee shall be exempt from the minimum wage and overtime provisions of the Fair Labor Standards Act and the California Education Code, and shall not be entitled to compensatory time off.

8.     **VACATION AND SICK LEAVE.**  Employee is entitled to accrue twenty-four (24) working days of vacation annually in accordance with the Administrative Vacation Policy set forth in the Administrative Team Handbook as adopted by the Board.  Vacation days are

exclusive of holidays otherwise granted to twelve (12) month regular administrative employees of the District.  Employee is entitled to accrue twelve (12) days of paid sick leave for illness or injury. Employee is eligible for any leaves authorized by law or provided in the Administrative Association Handbook as adopted by the Board

9. **FRINGE BENEFITS.**  Employee shall be afforded all fringe benefits of employment which are provided to the District's regular educational and student services administrators for which they are eligible under the terms of the Administrative Team Handbook.

10. **TRAVEL.**  Necessary transportation and travel expenses will be provided in accordance with policies duly adopted by the Board.

11. **SERVICE CLUBS AND COMMUNITY ORGANIZATIONS.**   The Board authorizes payment of dues and meals for meetings of one service or community organization. Funds shall be allocated to the appropriate expense accounts in the annual budget approved by the Governing Board.

12. **APPLICABLE LAW.**  This Agreement is subject to all applicable laws of the State of California, the rules and regulations of the State Board of Governors, and the rules, regulations, and policies of the Board, all of which are made a part of the terms and conditions of this Agreement as though set forth herein, to the extent that such terms are not inconsistent with the lawful terms of this Agreement.

13. **MAXIMUM CASH SETTLEMENT UPON TERMINATION OF THIS AGREEMENT WITHOUT CAUSE.**  Regardless of the term of this Agreement, the Board may terminate this Agreement at any time prior to the date on which the term of this Agreement would have otherwise expired, without cause.  In such an event, the maximum cash settlement that the Employee shall receive will be an amount equal to the monthly base salary of the Employee multiplied by the number of months remaining on the unexpired term of this Agreement, or eighteen (18) months, whichever is less, minus any amount(s) that could have been earned if the Employee has retreat rights, and an instructional Position is offered for the balance of the term of this Agreement.  Any cash settlement shall not include any other noncash items except health benefits, which may be continued for the same duration of time as covered in the settlement, or until Employee finds other employment, whichever occurs first.   The intent of this provision is to satisfy the requirements of Government Code sections 53260-53264, and this provision shall be interpreted in a manner consistent with those statutes.

The District agrees to pay Employee the lump sum cash payment ("Severance Pay"), less legally required for authorized deductions except contributions to CalSTRS, within fifteen (15) days of the effective date of termination.

In exchange for and as a condition to receipt of the Severance Pay, Employee shall execute a release and waiver, in a form acceptable to the legal counsel for the District,

releasing the District, and all of its elected officers, employees, agents, representations, and attorneys, from any claim associated with the termination.

14.   **TERMINATION OF THIS AGREEMENT DURING ITS TERM WITH CAUSE.** The Board may terminate this Agreement during its term and discharge Employee if Employee commits a material and substantial breach of this Agreement and/or for cause.  Such breach of Agreement and discharge shall nullify the terms of this Agreement and Employee shall cease to receive any form of compensation upon the effective date of termination.  The term "cause" is defined as those actions, omissions, or behaviors which are detrimental to the operations of the District and/or its major instructional, student and administrative divisions, or which impair the District's mission, purpose, or objectives. Conduct which constitutes a breach of contract and cause for discharge, includes, but is not limited to: unsatisfactory work performance, dishonesty, misconduct, unprofessional conduct, or insubordination.  Disciplinary actions, up to and including discharge from employment, shall be carried out in compliance with the disciplinary provisions applicable to administrative employees as set forth in the Administrative Team Handbook as adopted by the Board.

15.   **PROVISIONS OF GOVERNMENT CODE SECTIONS 53243.3-53243.4.**

   (a)   In the event that the District provides paid leave to Employee pending an investigation of a crime involving abuse of his office or position covered by Government Code section 53243.4, and should that investigation lead to a conviction, the Employee shall fully reimburse District for any salary provided for that purpose.

   (b)   In the event that the District provides funds for the legal criminal defense of Employee pending an investigation of a crime involving an abuse of his office or position covered by Government Code section 53243.4, and should that investigation lead to a conviction, the Employee shall fully reimburse the District for any funds provided for that purpose.

   (c)   In the event that the District provides a cash settlement related to the termination of Employee as defined in the terms of this Agreement and Employee subsequently is convicted of a crime involving abuse of office or position covered by Government Code section 53243.4, Employee shall fully reimburse the District for any funds provided for that purpose.

   (d)   "Abuse of office or position" is defined in Government Code section 53243.4 to mean either of the following:

      (i)   An abuse of public authority, including, but not limited to, waste, fraud, and violation of the law under color of authority.

(ii)     A crime against public justice, including, but not limited to, a crime described in Title 5 (commencing with Section 67), Title 6 (commencing with Section 85) or Title 7 (commencing with Section 92) of Part 1 of the Penal Code.

16.   **MODIFICATION OF CONTRACT.**  This Agreement may be modified by mutual consent of the parties provided, however, that the party seeking such change shall give not less than 45 (forty-five) calendar days, written notice to the other party of the requested modification.

17.   **RESIGNATION.**  Employee may resign from employment at any time during the term of this Agreement upon ninety (90) days prior written notice to the Board or upon a shorter period of time if approved by the Board.

18.   **SAVINGS CLAUSE.**  If any provision of this Agreement is held to be contrary to law by a court of competent jurisdiction, such provision shall not be deemed valid or binding except to the extent permitted by law, but all other provisions shall continue to remain in full force and effect.

19.   **ENTIRE AGREEMENT.**  This Agreement contains and expresses the entire and final agreement of the parties with respect to the matters covered herein, and supersedes all negotiations, prior discussions, prior agreements and preliminary agreements between the parties.   No promises or representations, express or implied, concerning this Agreement have been made by the parties other than those contained in this Agreement concerning the offer and acceptance of employment described herein.

20.   **NO CONTINUING WAIVER.**  No waiver of any term or condition of this Agreement by either party shall be deemed a continuing waiver of such term and condition.

21.   **GOVERNING LAW.**  This Agreement is delivered in the State of California, concerns employment in the State of California, and the rights and obligations of the parties hereto shall be construed and enforced in accordance with the laws of the State of California.

22.   **MISCELLANEOUS PROVISIONS.**  This Agreement and applicable provisions of the Administrative Team Handbook contain the entire agreement and understanding between the parties.   There are no oral understandings, or terms and conditions not contained or referenced in this Agreement.   This Agreement cannot be changed orally.   It may be modified in writing by mutual agreement of the parties as set forth above.   This Agreement supersedes all Board Policies, rules, regulations, handbooks or practices which are inconsistent with or in conflict with this Agreement.

**ACCEPTANCE OF SENIOR EDUCATIONAL ADMINISTRATOR
EMPLOYMENT CONTRACT**

I have reviewed this Senior Educatinal Administrator Employment Contract, and I accept this Agreement and the terms and conditions of employment it contains. I have not agreed to employment and/or contracted for employment with the governing board of any other school, university, college, or community college district which will in any way conflict with the satisfactory performance of all of the duties of the Position for which employed.

Please return signed contract to Human Resource Services as soon as possible.

Date:_____         _____
                                      Employee Signature

Approved by the Governing Board of Palomar Community College District in open session at regular Board meeting.

Date:_____         _____
                                      Dr. Joi Blake, Secretary to the Governing Board

Copy: Employee

# EXHIBIT 4

**Andrea**

| | |
|---|---|
| **From:** | Norman, Lisa M. <lnorman@palomar.edu> |
| **Sent:** | Sunday, February 04, 2018 12:31 PM |
| **To:** | Andrea@currierhudson.com |
| **Subject:** | Fwd: Reschedule 2nd Level Computer Science Interviews |
| **Attachments:** | Re: Asst. Prof CIS (Networking) - 2nd level Info Needed (5.83 KB); ATT00001.htm |

Sent from my iPhone

Begin forwarded message:

> **From:** "Kahn, Jack S." <jkahn1@palomar.edu>
> **Date:** February 3, 2018 at 9:03:24 PM PST
> **To:** "Norman, Lisa M." <lnorman@palomar.edu>
> **Subject: FW: Reschedule 2nd Level Computer Science Interviews**
>
>
> Cheers,
>
> Jack
>
> Jack S. Kahn Ph.D.
> Assistant Superintendent/ Vice President Instruction
> 1140 W. Mission Road
> San Marcos, CA 92069-1487
> 760-744-1150 ext. 2521
> Jkahn1@palomar.edu
>
> **From:** Dumbrique, Monique A.
> **Sent:** Wednesday, October 11, 2017 11:54 AM
> **To:** Kahn, Jack S. <jkahn1@palomar.edu>
> **Subject:** RE: Reschedule 2nd Level Computer Science Interviews
>
> Hi Jack. Can we talk about how to improve the current faculty hiring process in regards to scheduling/timing? Please note the Dean received an email on 9/26/17 about what items were needed for second-level interviews to be scheduled. I'm not trying to overstep. I just want to have the current process that's in place run as smooth as possible, and to not add extra stress/pressure on my staff (and me)/HR.
>
> Thank you,
> Monique Dumbrique
> Supervisor, Human Resources
> Palomar College
> 1140 West Mission Road
> San Marcos, CA 92069
> 760.744.1150 ext. 2852

Ex. A, Page 31

**From:** De La Torre, Celina
**Sent:** Wednesday, October 11, 2017 11:24 AM
**To:** Dumbrique, Monique A.
**Subject:** FW: Reschedule 2nd Level Computer Science Interviews
**Importance:** High

**From:** Kahn, Jack S.
**Sent:** Wednesday, October 11, 2017 11:10 AM
**To:** McBrayer, Debra <dmcbrayer@palomar.edu>; Ashour, Cheryl <CAshour@palomar.edu>; Canon,
Terrie <TCanon@palomar.edu>; LaVigueur, Michelle <MLaVigueur@palomar.edu>; Green, Rand
<RGreen@palomar.edu>; Finkenthal, Daniel <DFinkenthal@palomar.edu>
**Cc:** Blake, Joi L. <jblake@palomar.edu>; De La Torre, Celina <CDeLaTorre@palomar.edu>; Kailikole,
Kathryn L. <kkailikole@palomar.edu>
**Subject:** RE: Reschedule 2nd Level Computer Science Interviews
**Importance:** High

Celina is willing to bend over backwards to make this work for our schedule that already exists. I need
ALL materials submitted in the next 30 minutes. Kathy will work with Debbie to get everything
correct. We are not changing the schedule. Thank you.

Cheers,

Jack

Jack S. Kahn Ph.D.
Assistant Superintendent/ Vice President Instruction
1140 W. Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2521
Jkahn1@palomar.edu

**From:** McBrayer, Debra
**Sent:** Wednesday, October 11, 2017 10:56 AM
**To:** Ashour, Cheryl <CAshour@palomar.edu>; Canon, Terrie <TCanon@palomar.edu>; LaVigueur,
Michelle <MLaVigueur@palomar.edu>; Green, Rand <RGreen@palomar.edu>; Finkenthal, Daniel
<DFinkenthal@palomar.edu>
**Cc:** Blake, Joi L. <jblake@palomar.edu>; Kahn, Jack S. <jkahn1@palomar.edu>; De La Torre, Celina
<CDeLaTorre@palomar.edu>; Kailikole, Kathryn L. <kkailikole@palomar.edu>
**Subject:** RE: Reschedule 2nd Level Computer Science Interviews

It depends on what Celina authorizes. Dean Kailikole said she wouldn't be able to get the questions sent
to Celina until tomorrow. Yes, it would be best to keep them on the original date. Dean Kailikole left a
phone message for Celina and I sent an email.

**From:** Ashour, Cheryl
**Sent:** Wednesday, October 11, 2017 10:54 AM
**To:** McBrayer, Debra <dmcbrayer@palomar.edu>; Canon, Terrie <TCanon@palomar.edu>; LaVigueur,
Michelle <MLaVigueur@palomar.edu>; Green, Rand <RGreen@palomar.edu>; Finkenthal, Daniel
<DFinkenthal@palomar.edu>
**Cc:** Blake, Joi L. <jblake@palomar.edu>; Kahn, Jack S. <jkahn1@palomar.edu>; De La Torre, Celina

2

<CDeLaTorre@palomar.edu>; Ashour, Cheryl <CAshour@palomar.edu>
**Subject:** RE: Reschedule 2nd Level Computer Science Interviews

Everyone,

Can't we make the original date work? It is only Wednesday morning and gives the candidates 6 days to prepare.

Dr. Blake is not available October 20. Dr. Kahn already has interviews scheduled for October 20 as well.

*Cheryl Ashour*

Executive Assistant to the Superintendent/
President, Joi Lin Blake, Ed.D.
Palomar Community College District
1140 W. Mission Road
Room LL-202
San Marcos, CA 92069
(760) 744-1150 x2105
(760) 591-0698 (Fax)

**From:** McBrayer, Debra
**Sent:** Wednesday, October 11, 2017 10:44 AM
**To:** Canon, Terrie <TCanon@palomar.edu>; Ashour, Cheryl <CAshour@palomar.edu>; LaVigueur, Michelle <MLaVigueur@palomar.edu>; Green, Rand <RGreen@palomar.edu>; Finkenthal, Daniel <DFinkenthal@palomar.edu>
**Subject:** RE: Reschedule 2nd Level Computer Science Interviews

If Celina gives the go ahead and Dr. Blake and Dr. Kahn are available, Friday is open on Dr. Kailikole's calendar for October 20, after 11:30.  Michelle is going to coordinate with Cheryl to see when Dr. Blake and Dr. Kahn are available.

**From:** Canon, Terrie
**Sent:** Wednesday, October 11, 2017 10:41 AM
**To:** McBrayer, Debra <dmcbrayer@palomar.edu>; Ashour, Cheryl <CAshour@palomar.edu>; LaVigueur, Michelle <MLaVigueur@palomar.edu>; Green, Rand <RGreen@palomar.edu>; Finkenthal, Daniel <DFinkenthal@palomar.edu>
**Subject:** RE: Reschedule 2nd Level Computer Science Interviews

Hi,

Celina stated that the candidates need reasonable time to prep for the teaching demo,
so maybe Oct 20th or the following week.  Please consider that when offering times available.

Sincerely,

3

Ex. A, Page 33

**Terrie L. Canon**
Professor
Department Chairperson
Computer Science & Information Technology
Palomar College, CA
(760) 744-1150 x2610
tcanon@palomar.edu

**Areas of emphasis and advising:**
  Computer Information Systems
  Management Information Systems

**Courses I currently teach are:**
  CSIT 105 – Computer Concepts and Applications
  CSIT 125 – Computer Information Systems

**Website:** http://www2.palomar.edu/csit/
**Facebook:** https://www.facebook.com/PalomarIT/

---

**From:** McBrayer, Debra
**Sent:** Wednesday, October 11, 2017 10:38 AM
**To:** Ashour, Cheryl; LaVigueur, Michelle; Green, Rand; Canon, Terrie; Finkenthal, Daniel
**Subject:** Reschedule 2nd Level Computer Science Interviews
**Importance:** High

Dean Kailikole was unable to get all the required paperwork submitted prior to her vacation; therefore, the second level interviews for the computer sciences position must be re-scheduled.  We don't want to lose the candidates, so please provide options as soon as possible as to your availability to do the interviews.  I didn't any three hour openings on the calendar.  Thanks for your assistance.  Dean Kailikole apologizes.

*Debbie McBrayer*
MNHS Division
Ext. 2253, NS-147B

# EXHIBIT 5

**Andrea**

| | |
|---|---|
| **From:** | Norman, Lisa M. <lnorman@palomar.edu> |
| **Sent:** | Friday, February 02, 2018 4:44 PM |
| **To:** | andrea@currierhudson.com |
| **Subject:** | FW: Follow-up |

*Respectfully,*
*Lisa Norman, Ed.D, J.D.*
*Assistant Superintendent/Vice President Human Resources*
*Palomar Community College*
*(760) 744-1150 x2531*

*"Be the change you wish to see in the world."*

*Gandhi*

**From:** Kahn, Jack S.
**Sent:** Friday, February 2, 2018 4:43 PM
**To:** Norman, Lisa M. <lnorman@palomar.edu>
**Subject:** FW: Follow-up

Cheers,

Jack

Jack S. Kahn Ph.D.
Assistant Superintendent/ Vice President Instruction
1140 W. Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2521
Jkahn1@palomar.edu

**From:** Kahn, Jack S.
**Sent:** Monday, December 4, 2017 4:59 PM
**To:** Kailikole, Kathryn L. <kkailikole@palomar.edu>
**Subject:** Follow-up

Dear Kathy,

Thank you for meeting with me last week to catch up and discuss a few items pertaining to MNHS.  As I shared, you are an incredibly valuable member of the dean team and I am dedicated to provide you with any level of support in helping you become more successful in your work.

1

Ex. A, Page 36

As a brief recap of our meeting, in addition to the update on the FON and ISA's in the North & South Center, you were instructed to work on the following:

    (1) Timeliness
          a.  Show-up to meetings on time
          b.  Make deadlines on work projects

    (2) Tone and role: As a District Educational Administrator, communicate in a positive manner in the effort to support district initiatives.

When we meet in December we can review your schedule and discuss strategies to help structure your workload better. I am dedicated to helping find mechanisms that will make you more successful with these issues.

In addition, you shared that you were experiencing medical concerns, some that may be work-related. Because you have notified me of this concern, the District is obligated to provide you with information related to worker's compensation that you may elect to pursue. Please be aware that medical documentation will be provided to you from the Human Resources Department and you may also contact Wendy Corbin, Benefits Technician, regarding any medical concerns you believe are work-related issues.

I look forward to continuing our work together and please do not hesitate to contact me if you need further assistance or clarification on any of the above related matters.

Cheers,

Jack

Jack S. Kahn Ph.D.
Assistant Superintendent/ Vice President Instruction
1140 W. Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2521
Jkahn1@palomar.edu

# EXHIBIT 6

**Andrea**

| | |
|---|---|
| **From:** | Norman, Lisa M. <lnorman@palomar.edu> |
| **Sent:** | Sunday, February 04, 2018 12:32 PM |
| **To:** | Andrea@currierhudson.com |
| **Subject:** | Fwd: Annual Division Update - due November 22nd |
| **Attachments:** | image001.jpg; ATT00001.htm; SBS 2016 2017 Annual Division Update.docx; ATT00002.htm |

Sent from my iPhone

Begin forwarded message:

> **From:** "Kahn, Jack S." <jkahn1@palomar.edu>
> **Date:** February 3, 2018 at 9:08:35 PM PST
> **To:** "Norman, Lisa M." <lnorman@palomar.edu>
> **Subject: FW: Annual Division Update - due November 22nd**

> Cheers,
>
> Jack
>
> Jack S. Kahn Ph.D.
> Assistant Superintendent/ Vice President Instruction
> 1140 W. Mission Road
> San Marcos, CA 92069-1487
> 760-744-1150 ext. 2521
> Jkahn1@palomar.edu

> **From:** Kahn, Jack S.
> **Sent:** Saturday, December 2, 2017 7:49 AM
> **To:** Kailikole, Kathryn L. <kkailikole@palomar.edu>
> **Subject:** Fwd: Annual Division Update - due November 22nd

> Hi Kathy hope all is well.  This was due Friday.
>
> J
>
> Sent from my iPhone
>
> Begin forwarded message:

>> **From:** "Smiley, Justin" <jsmiley@palomar.edu>
>> **Date:** December 1, 2017 at 5:40:38 PM PST
>> **To:** "LaVigueur, Michelle" <MLaVigueur@palomar.edu>
>> **Cc:** "Kahn, Jack S." <jkahn1@palomar.edu>
>> **Subject: Re: Annual Division Update - due November 22nd**

1

Hi Michelle,

The SBS Division Update is attached.

Thanks,

**Justin Smiley**
Acting Dean, Social and Behavioral Sciences
Palomar College
1140 W. Mission Road
San Marcos, CA 92069
(760) 744-1150 ext. 2758

**From:** "LaVigueur, Michelle" <MLaVigueur@palomar.edu>
**Date:** Monday, November 27, 2017 at 9:08 AM
**To:** "VPICabinetDG@palomar.edu" <VPICabinetDG@palomar.edu>
**Subject:** FW: Annual Division Update - due November 22nd

Good morning:

I am forwarding the annual reports received by AMBA and L&L as examples.

Thanks,
Michelle

**From:** LaVigueur, Michelle
**Sent:** Wednesday, November 8, 2017 7:57 AM
**To:** VPI Cabinet List <VPICabinetDG@palomar.edu>
**Subject:** Annual Division Update - due November 22nd

Good morning all:

Please see the attached template regarding the Annual Division Update report for each division.

VP Kahn would like the update due to our office on Wednesday, November 22nd.

Thank you,
Michelle

*Michelle LaVigueur*
Executive Assistant to the Vice President for Instruction
Palomar College
1140 W. Mission Road
San Marcos, CA 92069
760-744-1150 x2826
FAX: 760-471-9318

2

# EXHIBIT 7

**Andrea**

| | |
|---|---|
| **From:** | Norman, Lisa M. <lnorman@palomar.edu> |
| **Sent:** | Sunday, February 04, 2018 12:31 PM |
| **To:** | Andrea@currierhudson.com |
| **Subject:** | Fwd: $40k CCC Maker Seed Funds deadline this Friday Sept 15th... |

Sent from my iPhone

Begin forwarded message:

> **From:** "Kahn, Jack S." <jkahn1@palomar.edu>
> **Date:** February 3, 2018 at 9:06:25 PM PST
> **To:** "Norman, Lisa M." <lnorman@palomar.edu>
> **Subject: FW: $40k CCC Maker Seed Funds deadline this Friday Sept 15th...**

> Cheers,
>
> Jack
>
> Jack S. Kahn Ph.D.
> Assistant Superintendent/ Vice President Instruction
> 1140 W. Mission Road
> San Marcos, CA 92069-1487
> 760-744-1150 ext. 2521
> Jkahn1@palomar.edu
>
> **From:** Kahn, Jack S.
> **Sent:** Tuesday, September 12, 2017 5:15 AM
> **To:** Fritch, Margie A. <mfritch@palomar.edu>
> **Subject:** Re: $40k CCC Maker Seed Funds deadline this Friday Sept 15th...
>
> Wasn't Kathy overseeing the seed funds?
>
> J
>
> Sent from my iPhone
>
> On Sep 11, 2017, at 7:49 PM, Fritch, Margie A. <mfritch@palomar.edu> wrote:
>
> > Jack,
> >
> > Can we authorize these equipment purchases so we don't have to give back the funds?

1

Ex. A, Page 42

Margie

Sent from my iPad

Begin forwarded message:

> **From:** "Bealo, Mark" <MBealo@palomar.edu>
> **Date:** September 11, 2017 at 7:08:24 PM PDT
> **To:** "Kahn, Jack S." <jkahn1@palomar.edu>, "Kailikole, Kathryn
> L." <kkailikole@palomar.edu>, "Fritch, Margie A."
> <mfritch@palomar.edu>
> **Cc:** "Miyamoto, Norma" <NMiyamoto@palomar.edu>,
> "McBrayer, Debra" <dmcbrayer@palomar.edu>, "Schultz, Jay"
> <jschultz@palomar.edu>
> **Subject: $40k CCC Maker Seed Funds deadline this Friday
> Sept 15th...**
>
> May 2nd I sent an email to Debra McBrayer asking "Debra, do you
> have a current accounting available of the $20k seed grant funds
> for the CCC Maker grant along with any planned future
> expenditures?" No reply.
>
> June 16th Jay Schultz and I worked out a wish list for possible
> equipment and technology to use some of the seed funds on so our
> students would be able to get more of the making experience in our
> courses.
>
> On June 27th I sent an email to Dean Fritch requesting to discuss
> how to utilize the seed funds from the CCC Maker project. Jay and
> I met with Dean Fritch and discussed some options.
>
> July 19th I sent an email to Debra, Dean Fritch and Jay: "Debra,
> attached is the list that Jay and I developed. It's a wishlist of items
> we would like to get via the seed funds from the CCC Maker grant
> if there are any left from the $40,000"
> Debra's reply 3 minutes later: "Thank you for the list.  I'm not sure
> what is going to be done with the remaining funds."
>
> Sept 3rd email to Debra McBrayer: "The seed grant funding
> deadline is September 15, so that leaves an extremely short amount
> of time to order some of the equipment items that Jay and I have
> requested. What do you suggest we do? Should we have Purchase
> Orders already to submit? Should I work with Meei Chun, our
> department ADA to get that going? Please advise and if you can
> provide any ballpark figure as to what is still available from the
> $40,000 seed funds for the CCC Maker project, that would be
> greatly appreciated." No reply.
>
> I spoke with Debra today and she had no new information for me
> about the seed funds, so this email is my last effort to get
> something done before the deadline passes and the funds are lost.

From CCC Maker email on June 7th:

CCC Maker Seed Grant – Fiscal Reporting Update
• Seed grant funding documentation and invoicing is due:
• 15 September, 2017 – Colleges with extension approval
• Colleges eligible to apply for future funding
• Must submit expense for the entire $40,000 CCC Maker Seed Grant
• Once approved the second installment of $20,000 will be processed
• All colleges should have received a Dropbox File Request with the due date in the subject
• Colleges that do not submit their Fiscal Expense Invoice-Reimbursement by the due date will be invoiced for the return of funds
• Any question regarding the Fiscal Reporting or if you did not receive a File Request: Contact Toni Edgerton,tedgerton@sierracollege.edu, 916-660-7620

Here are the details I was able to put together as to what monies have already been spent supposedly out of the $40,000 seed funds. The equipment and technology items are what Jay and I would like to try to get with any remaining funds, in the order of priority starting with the Carbide3D Nomad first.

| CCC Maker Seed Funds | Q | Price | SubTotal | Tax | Shipping | Total | $ 40,000.00 | Total |
|---|---|---|---|---|---|---|---|---|
| Open Source Maker Labs - Consulting Fees | 1 | $6,427.85 | $6,427.85 | | | | | |
| | | | | | | $6,427.85 | | |

$ 33,572.15

Open Source Maker Labs - Consulting Fees

1
$3,680.00
$3,680.00
$3,680.00

$ 29,892.15

$10,107.85
$12,000.00

Mark Bealo - NOHE CCC Maker Project May-June

1
$3,405.02
$3,405.02
$3,405.02

$ 26,487.13
Jay Schultz - HOHE CCC Maker Project April-May

1
$2,523.53
$2,523.53
$2,523.53

$ 23,963.60
Jay Schultz - HOHE CCC Maker Project May-June

1
$2,474.13
$2,474.13
$2,474.13

$ 21,489.47
Mark Bealo - Travel CCC Maker/Maker Faire

3

|  | 1 |
| --- | --- |
|  | $2,112.21 |
|  | $2,112.21 |
|  | $2,112.21 |

$
19,377.26
Richard Albistegui-Dubois - Travel Maker Faire

|  | 1 |
| --- | --- |
|  | $815.33 |
|  | $815.33 |
|  | $815.33 |

$
18,561.93
Debra McBrayer - Maker Faire Tickets

|  | 5 |
| --- | --- |
|  | $59.02 |
|  | $295.10 |
|  | $295.10 |

$
18,266.83

|  | $0.00 |
| --- | --- |
|  | $0.00 |
|  | $0.00 |

$
18,266.83
Carbide3D Nomad 883 Pro Desktop CNC Bamboo

|  | 1 |
| --- | --- |
|  | $3,139.00 |
|  | $3,139.00 |
|  | $243.27 |

50.00

| | $3,432.27 |
| --- | --- |

$
14,834.56
Carbide3D

6000

Pocket NC 5 Axis CNC Mill

|  | 1 |
| --- | --- |
|  | $6,609.00 |
|  | $6,609.00 |
|  | $512.20 |
|  | $7,121.20 |

$
7,713.36
PocketNC

6000

Matter & Form 3D Scanner

|  | 1 |
| --- | --- |
|  | $519.99 |
|  | $519.99 |
|  | $40.30 |
|  | $560.29 |

$
7,153.07
Matter&Form

6000

JBC DIT-1D Soldering Station

|  | 1 |
| --- | --- |
|  | $642.69 |
|  | $642.69 |
|  | $49.81 |
|  | $692.50 |

$
6,460.57
FlexibleAssym

6000

Nederman FX 50 Fume Extraction Arm

|  | 1 |
| --- | --- |
|  | $365.00 |
|  | $365.00 |
|  | $28.29 |
|  | $393.29 |

$
6,067.28
SMTSupplies

4000

Aven 26501-LED-8D Magnifying Lamp

|  | 1 |
| --- | --- |
|  | $79.63 |
|  | $79.63 |
|  | $6.17 |

4

|  |  |
|---|---|
|  | $85.80 |
| $<br>5,981.48<br>TestEquipmentDept | |
|  | 4000 |
| Carbide3D Shapeoko XL 33"x17" | |
|  | 1 |
|  | $1,499.00 |
|  | $1,499.00 |
|  | $116.17 |
|  | $1,615.17 |
| $<br>4,366.31<br>Carbide3Dv | |
|  | 6000 |
| Type A Machines Series 1 3D Printer | |
|  | 1 |
|  | $3,995.00 |
|  | $3,995.00 |
|  | $309.61 |
|  | $4,304.61 |
| $<br>61.70<br>TypeAMachines | |
|  | 6000 |

https://www2.palomar.edu/pages/governingboard/files/minutes-agendas-newsletters/Exhibit_2017-07-11.pdf

In Exhibit J-24, #249 Dean Kailikole was authorized to pay an amount not to exceed $12,000.00 to Open Source Maker Labs (owned by Dan Hendricks) for "Agreement to provide consulting services supporting possible implementation of Palomar College Maker Space." which is to come out of the $20,000 seed funds based on the 6/1/2017 – 9/30/2017 timeline.

Please advise on what we need to do to best utilize the remaining seed funds.

Sincerely,

Mark Bealo
Professor, Graphic Communications
Palomar College
1140 W. Mission Rd.
San Marcos, CA 92069
760-744-1150
http://www2.palomar.edu/users/mbealo/
https://www.facebook.com/GCDepartment

5

# EXHIBIT 8

1/25/2018

Cindy Anfinson

I am extremely concerned that we might lose the Title V Grant.  We are well into the second year of this grant.  *No one* has been assigned release time to work on this grant.

**Basics about the Title V HSI STEM Grant:**

- The Title V Grant is shared with CSUSM.
- The total amount of the grant is $3,243,814.00, paid out over five years.
- The first year of the grant was fall 2016.
- We are now well into the second year of the grant.
- The yearly amounts received by the two institutions are approximately:
  - Palomar College: $645,000
  - CSUSM: $150,000
- Approximately 95% of the STEM Center's current funding is from this Grant.  The STEM Center has no other identified funding source at this point in time.
- The Math Center is currently receiving about $21,800.00 from this Grant.

**Positions not currently filled listed in the Grant:**

- Title V STEM Project Supervisor - 100%, funded in the grant.
- Title V STEM Assistant - 100%,  funded in the grant
- Student Pathways Coordinator - 60% release time, funded in the grant.
- STEM CORE and Guided Pathways Facilitator - 40% release time, funded in the grant.
- STEM CTE Facilitator - 40% release time, funded in the grant.
- Math Acceleration Lead - 20% release time, funded in the grant.
- ESL Acceleration Lead - release time, funded in the grant.
- Program and Curriculum Alignment Lead - stipend of $3,500 a year, funded in the grant
- Professional Development Coordinator - 40% release time, release time, funded in the grant.
- Leading and Participating in Communities of Practice - stipend amounts from $600 to $2,500 over the five years of the grant

**Activities listed in the Grant that have not been started:**

- We were supposed to start developing noncredit supplemental instruction conducted by faculty attached to targeted classes - not started.
- We were supposed to start on accelerated ESL - not started.
- STEM faculty were supposed to visit their sister departments at UCSD and CSUSM - not done.
- STEM faculty have not started to develop virtual labs.
- We have not collected feedback from project participants overall.

**Committees, workgroups, etc. listed in the Grant that have not been started:**
- There is no official *Title V STEM Steering Committee* that anyone knows of.
- No *Industry Council* was started.
- No *Interdisciplinary Council* was started.
- We have not started two separate *Communities of Practice* for Physics and Engineering. The Physics/Engineering department has never heard of Communities of Practice.

**What can happen if Palomar loses this grant:**
- The STEM Center will lose almost all of its funding.  With the budget deficit, it is unlikely to stay open this spring semester.  Staff and tutors will be laid off, and student learning in MNHS will be negatively impacted.
- The Math Center will not have funding to pay for embedded tutors in spring 2018 classes.
- Palomar shares this grant with CSUSM.  This is the second federal grant we have shared with them.  It will be unlikely they will want to work with us in the near future if we fail.
- The STEM Academies program, Palomar's first guided pathways program, will close.
- AMG (Accelerated Math Gateway) program, well into its third year, will lose funding for embedded tutors, which are an integral part of the program.  We are working with the Dana Center on this program; they are collecting data from our results and paying for release time for one of our faculty members.  See: http://www.utdanacenter.org/higher-education/dcmp/

**What Palomar can do to save this grant:**
1. Hire the positions listed above *immediately*.  The money is in the grant.  Especially the Title V Project Supervisor and faculty release time positions.
2. Get faculty release time approved so faculty can start working on the grant.
3. Set up the required committees/workgroups/councils.  Start the planning process so by fall 2018 some of the grant activities are ready to go.
4. Distribute a copy of the grant to all participants working on the grant.  No copies of the grant has been made available to any participants; no one has an overview of the activities, including the STEM Center Supervisor.  This needs to be rectified immediately.
5. Identify a person to discuss with Victor Rocha and Charles DeLeone (both at CSUSM) what has happened and how Palomar is working to rectify the situation.

# EXHIBIT 9

**Andrea**

| | |
|---|---|
| **From:** | Norman, Lisa M. <lnorman@palomar.edu> |
| **Sent:** | Friday, February 02, 2018 12:14 PM |
| **To:** | andrea@currierhudson.com |
| **Cc:** | Cohen, Shawna |
| **Subject:** | FW: STEM Conference/Mireya |

*Respectfully,*
*Lisa Norman, Ed.D, J.D.*
*Assistant Superintendent/Vice President Human Resources*
*Palomar Community College*
*(760) 744-1150 x2531*

*"Be the change you wish to see in the world."*

*Gandhi*

**From:** Kahn, Jack S.
**Sent:** Thursday, February 1, 2018 7:23 AM
**To:** Blake, Joi L. <jblake@palomar.edu>; Norman, Lisa M. <lnorman@palomar.edu>
**Subject:** FW: STEM Conference/Mireya

FYI.

Cheers,

Jack

Jack S. Kahn Ph.D.
Assistant Superintendent/ Vice President Instruction
1140 W. Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2521
Jkahn1@palomar.edu

**From:** Kahn, Jack S.
**Sent:** Thursday, February 1, 2018 7:22 AM
**To:** Gutierrez-Aguero, Mireya <mgutierrez-aguero@palomar.edu>
**Subject:** RE: STEM Conference/Mireya

1

Good morning Mireya,

Thank you very much for coming to meet with me yesterday. As we discussed, I am working with HR on the hires for the STEM grant and the release times etc. In addition, we have additional support to assist with the STEM conference and I am very appreciative of your willingness to continue working on the event. I will check-in with you to see how things are progressing, but as I said please do not hesitate to contact me anytime.

I am concerned about what you expressed below and will follow-up appropriately. I am also concerned about the stress you mentioned at our meeting. Because you have notified me of this concern, the District is obligated to provide you with information related to worker's compensation that you may elect to pursue. Please be aware that medical documentation will be provided to you from the Human Resources Department and you may also contact Wendy Corbin, Benefits Technician (ext. 2889), regarding any medical concerns you believe are work-related issues.

Should you have any additional concerns at this time, again please let me know and let me know how I can assist.

Cheers,

Jack

Jack S. Kahn Ph.D.
Assistant Superintendent/ Vice President Instruction
1140 W. Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2521
Jkahn1@palomar.edu


**From:** Gutierrez-Aguero, Mireya
**Sent:** Wednesday, January 31, 2018 11:54 AM
**To:** Kahn, Jack S. <jkahn1@palomar.edu>
**Subject:** STEM Conference/Mireya

Hi Jack,
Thank you for meeting with me about getting adequate support for the STEM Conference. I will gladly take the lead for the STEM Conference; however, if Kathryn Kailikole is involved with the conference when she returns I will discontinue my efforts immediately.

Last year, she belittled me in front of the workgroup members which appeared to be a tactic to assert her power over people. Soon after this incident, I noticed we were afraid of her and we simply worked to please her demands.

I have decided that I will no longer tolerate her demeaning and disempowering behavior towards me, and I will mostly likely quit my position on campus or leave on stress leave upon her return.

*Mireya Gutiérrez-Agüero, Ed.D.*
STEM Center Supervisor
Palomar College
Natural Sciences (NS) 321
1140 West Mission Road
San Marcos, CA 92069
(760) 744-1150 ext. 3748
stemprogram@palomar.edu
www.palomar.edu/stem

2

Ex. A, Page 52



# EXHIBIT 10

# PALOMAR COMMUNITY COLLEGE DISTRICT

## IN THE MATTER OF KATHYRN KAILIKOLE AND DANIEL FINKENTHAL

JEFFREY B. LOVE, P.C., ESQ.
JEFFREY B. LOVE AND ASSOCIATES, LLC
Attorney at Law
30025 Alicia Parkway, Suite 327
Laguna Niguel, CA 92677
LOVEJB@GMAIL.COM
(949) 282-8181

# TABLE OF CONTENTS

| Item | # |
|---|---|
| Investigative Report | 1 |
| Transcript of Interview of Kathryn Kailikole | 2 |
| Exhibits (E-mails)* | 3 |
| Palomar College Police Department Report 2016-00138 | 4 |
| Dr. Kailikole's Employment Contract with the District | 5 |

*Video attachments to e-mails are on file in Human Resource Services.*

April 25, 2018

TO:          SHAWNA COHEN
             Manager, Equal Employment Opportunity and Compliance
             and Deputy Title IX Coordinator
             Palomar Community College District

FROM:        JEFFREY B. LOVE
             Attorney at Law
             Jeffrey B. Love and Associates, A.P.C.

SUBJECT:     ADMINISTRATIVE INVESTIGATION – *Kailikole/Finkenthal Matter*

## I.    EXECUTIVE SUMMARY:

This matter related to an administrative investigation concerning various allegations centered around Kathryn Kailikole, Ed. D. (Dr. Kailikole), the Interim Dean of the Mathematics and the Natural and Health Sciences Division at Palomar Community College (District).  Concerning Dr. Kailikole, it was alleged that she breached employee confidentiality concerning her communications with Daniel Finkenthal, Ph.D. (Dr. Finkenthal), the Chair of the Physics and Engineering Department.  Likewise, Dr. Finkenthal was accused of breaching employee confidentiality concerning his communication with others, including his wife, Stacy Carlson (Ms. Carlson).  The facts indicate that Dr. Kailikole forwarded e-mails to Dr. Finkenthal who in turn forwarded those e-mails to Ms. Carlson, and potentially others.  Additionally, Dr. Finkenthal provided a confidential administrative investigation summary to a member of the District Governing Board.

A second aspect of this investigation was to determine whether Dr. Kailikole had failed to reasonably and prudently take action concerning two professors in the Physics and Engineering Department.  These professors, Takashi Nakajima (Mr. Nakajima) and Arthur Gerwig (Mr. Gerwig), had been said to have engaged in behavior that, if true, would tend to violate the rules of the District, as well as direction given to them previously by Dr. Kailikole.

The facts in this matter demonstrate that Dr. Kailikole was retained as the Dean of Mathematics and the Natural and Health Sciences on or about July 1, 2017.  Prior to serving in that role, the District employed Dr. Kailikole as the Interim Dean of Mathematics and the Natural and Health Sciences beginning on or about January 13, 2016. During the course of her employment, Dr. Kailikole became aware that Mr. Nakajima and Mr. Gerwig had engaged in negative and sanctionable behavior concerning their employment as professors in the Physics and Engineering Department.  In addition to this, Dr. Kailikole received information from students, as well as Dr. Finkenthal, concerning specific allegations of

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

misconduct.  These issues concerned an instance where Mr. Nakajima had used an Airsoft pistol in his class in an unsafe and unsupervised fashion.  In addition to this, Dr. Kailikole learned that Mr. Nakajima was using a storage room known as NS-249 as a laboratory/classroom even though she (Kailikole) had directed him not to do so previously. Finally, Dr. Kailikole had heard from students and others that Mr. Nakajima was holding classes outside the regular scheduled times and additionally allowed unauthorized changes in examination schedules.

The facts in this matter further demonstrate that Dr. Finkenthal and Dr. Kailikole were both frustrated and somewhat angered by the fact that Mr. Nakajima and Mr. Gerwig had not been dismissed from their employment concerning a complaint that Dr. Finkenthal made that had previously been investigated by this fact finder in 2017.  This complaint concerned the display of objectionable material and words in the Physics and Engineering Department that would tend to violate the discrimination rules of the District.  The facts demonstrate that Dr. Finkenthal had attempted to lobby a member of the District Governing Board to impose or seek more stringent disciplinary measures against Mr. Nakajima and Mr. Gerwig and had provided this member of the District Governing Board a copy of a confidential document detailing the fact-finding investigation into Mr. Nakajima, Mr. Gerwig and another professor, Hector Garcia-Villa (Mr. Garcia-Villa).

Circumstantial evidence developed in this matter demonstrated that Dr. Finkenthal and Dr. Kailikole had seemingly worked together to leak information in relationship to Mr. Nakajima and Mr. Gerwig with a goal of it potentially influencing the disciplinary process concerning these employees.  The facts demonstrate that on December 8, 2017, Dr. Finkenthal asked Dr. Kailikole to call him at his office extension on campus.  Even though both Dr. Kailikole and Dr. Finkenthal deny recollection of this particular phone call, the credible circumstantial evidence demonstrates that mere moments after this phone call, Dr. Kailikole forwarded to Dr. Finkenthal numerous documents containing confidential and/or sensitive information concerning Mr. Nakajima to Dr. Finkenthal who thereafter forwarded this information to his wife, Ms. Carlson.  This activity, coupled with Dr. Finkenthal's admitted and observed activity in coordinating information with a member of the District's Governing Board tends to demonstrate a degree of collusion and leaking of confidential information.

The greater weight of the credible evidence here demonstrates that both Dr. Finkenthal and Dr. Kailikole engaged in leaking and/or disclosing confidential information without a legitimate business purpose.  Additionally, the greater weight of the credible evidence demonstrates that Dr. Kailikole failed to reasonably and prudently take meaningful and competent action concerning what appeared to be misconduct occurring in the Physics and Engineering Department, which was under her dominion and control. These allegations are therefore, **sustained**.

Dr. Kailikole reported that she had been the subject of retaliation both by the action of Mr. Nakajima and Mr. Gerwig and her attempts to supervise them, and by the District by placing her on administrative leave with pay and electing to discontinue her renew for

- 2 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

her employment contract with the District.  The evidence demonstrated that neither Mr. Nakajima nor Mr. Gerwig were in positions of authority over Dr. Kailikole, nor did they engage in any discernable or direct unlawful action against her in reaction to her attempts to manage them in the workplace.  Furthermore, the District had a legitimate business purpose in placing Dr. Kailikole on administrative leave when they suspected that she had leaked and/or participated in leaking and/or breaching confidential employee information.

Finally, Dr. Kailikole enjoyed no expectation of continued employment with the District by virtue of a renewal of her employment contract.  There was no credible evidence to show that any inappropriate or unlawful motives were brought to bear on the decision to not renew her employment contract with the District or to sever that contract under the "for cause" provisions.  The allegation that Dr. Kailikole was subject to retaliation in her employment at the District is therefore, **unfounded**.

## II.     SCOPE OF THE INVESTIGATION:

The scope of this investigation is to determine:

A. **Did Dr. Kathryn Kailikole breach employee confidentiality concerning her communications with Dr. Daniel Finkenthal?**
B. **Did Dr. Kathryn Kailikole fail to reasonably take action concerning Takashi Nakajima's use of an Airsoft pistol in his classroom?**
C. **Did Dr. Kathryn Kailikole fail to reasonably take action concerning Takashi Nakajima's use of storage room NS-249 as a laboratory?**
D. **Did Dr. Kathryn Kailikole fail to reasonably take action concerning Takashi Nakajima's holding of classes outside their regularly scheduled times?**
E. **Did Dr. Daniel Finkenthal breach employee confidentiality concerning his communications with others including his wife, Stacy Carlson?**
F. **Was Dr. Kathryn Kailokole subject to retaliation by Mr. Nakajima, Mr. Gerwig and/or others concerning her role as the Dean of the Department, her administrative leave status and/or her employment contract?**

## III.    METHODOLOGY:

This investigation involved the review of documents, as well as conducting interviews of District employees. Once factual evidence was developed, the various statements of the witnesses were compared and contrasted with one another as well as other evidence and determinations of credibility were established.   Once credibility was established along with a factual framework of the alleged events, conclusions were formed based on the greater weight of the credible evidence.  For the purpose of findings, direct and circumstantial evidence may be given equal weight. The investigation also involved:

A.     Reviewing applicable District rules and regulations and;

Ex. A, Page 59

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

B.   Reviewing applicable personnel documents, including relevant personnel file(s) and any related investigation records;

C.   Interviewing co-workers, supervisors and witnesses;

D.   Following-up on other evidentiary leads; and

E.   Providing additional services as may be requested by the District.

## IV.   SOURCE OF THE COMPLAINT:

This complaint was internally generated at the direction of Human Resources.

## V.   ACCUSED/FOCUS EMPLOYEE:

**A. Kathryn Kailikole, Ed. D.**
Dean
Mathematics and the Natural and Health Sciences Division
Palomar Community College

**B. Daniel Finkenthal, Ph.D.**
Professor and Department Chair
Physics and Engineering Department
Palomar Community College

## VI.   RULES:

This matter related to fact-finding.

## VII:   WITNESSES:

**A. Kathryn Kailikole, Ed. D.**
Dean
Mathematics and the Natural and Health Sciences Division
Palomar Community College

**B. Daniel Finkenthal, Ph.D.**
Professor and Department Chair
Physics and Engineering Department
Palomar Community College

## VIII:   CREDIBILITY OF THE WITNESSES:

The analysis of the credibility of the witnesses is an important aspect of a fact-finding investigation.  As an accepted rule of evidence, a fact finder can disregard the

- 4 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

statements of a witness who has been found to have provided false or unreliable information during their testimony in a matter. Those witnesses' statements can be disregarded in their entirety and not believed unless there is compelling evidence to conclude that individual statements otherwise are true.[1]   Concerning the witnesses' statements, this fact finder considered:

(a) The witness' demeanor while providing a statement and the manner in which he/she provided the statement.

(b) The character of the witness' statement.

(c) The extent of the witness' capacity to perceive, to recollect, or to communicate any matter about which he gave a statement.

(d) The extent of the witness' opportunity to perceive any matter about which he gave a statement.

(e) The witness' character for honesty or veracity or their opposites.

(f) The existence or nonexistence of a bias, interest, or other motive.

(g) A statement previously made by the witness that is consistent with his statement during the fact-finding investigation.

(h) A statement made by the witness that is inconsistent with any part of his statement during the fact-finding investigation.

(i) The existence or nonexistence of any fact given in statement by the witness.

(j) The witness' attitude toward the fact-finding investigation in which he gave a statement or toward the giving of a statement.

*Discussion*

### A.  Witness Kathryn Kailikole, Ed. D.

Dr. Kailikole appeared to lack a degree of credibility in this matter. It was apparent that Dr. Kailikole was frustrated with the disciplinary process and what, in her opinion,

---

[1] See *California Civil Jury Instruction* Section 5003.

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

appeared to be interference by the labor union in regard to her ability to supervise and manage Mr. Nakajima. Even so, Dr. Kailikole's indication that she did not somehow agree with or conspire with Dr. Finkenthal regarding leaking or disclosing confidential information did not seem plausible.

As discussed in this investigation, the circumstantial evidence demonstrates that after a phone communication on December 8, 2017, this fact finder observed a flurry of e-mails being sent from Dr. Kailikole to Dr. Finkenthal who thereafter provided this information to his wife, who is a member of a local school board. Additionally, Dr. Finkenthal, around the same time had provided a confidential summary of an investigation concerning Mr. Nakajima and Mr. Gerwig to a member of the District Governing Board. All of this had the distinct appearance of Dr. Finkenthal and Dr. Kailikole working together in order to shape a more stringent disciplinary action to be taken against Mr. Nakajima.

**B.  Witness Daniel Finkenthal, Ph.D**

Dr. Finkenthal appeared to be a credible witness in certain aspects of his statements to this fact finder. Dr. Finkenthal was forthright concerning his sharing of the confidential administrative report summary that had been sent to him by Shawna Cohen (Ms. Cohen), the Manager, Equal Employment Opportunity and Compliance in Human Resources. Dr. Finkenthal offered that he felt it proper for him to provide this information to Nina Deerfield (Ms. Deerfield), a member of the District's Governing Board. However, what did not seem plausible about Dr. Finkenthal's statements to this fact finder was his denial that he and Dr. Kailikole had somehow conspired or agreed to share information concerning Mr. Nakajima, and perhaps Mr. Gerwig, with others.

Dr. Finkenthal's denial that such an agreement had been reached does not seem plausible considering e-mail evidence where it was demonstrated that Dr. Finkenthal and Dr. Kailikole had spoken together late in the afternoon on December 8, 2017 and thereafter, Dr. Kailikole sent numerous e-mails to Dr. Finkenthal, all of which concerned issues related to Mr. Nakajima and his behavior in the Department. This information coupled with Dr. Finkenthal's obvious intent on providing information to Ms. Deerfield with an aim at causing more severe and stringent disciplinary measures to be taken against Mr. Nakajima, tends to demonstrate that Dr. Kailikole and Dr. Finkenthal were working together in order to seek greater and more harsh discipline against Mr. Nakajima.

**IX.   INVESTIGATION:**

**A.  Summary of Interview with Kathryn Kailikole, Ed. D.**

On February 28, 2018, this fact finder conducted an audio-recorded interview of Dr. Kailikole, the Interim Dean of the Mathematics and Natural Health Sciences Division for the District. She has been with the District for two years. Dr. Kailikole was advised of the nature of the investigation as it relates to a previous investigation undertaken by this

Ex. A, Page 62

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

fact finder concerning two professors in the District's Physics and Engineering Department, Mr. Nakajima and Mr. Gerwig. Dr. Kailikole was placed on administrative leave on December 14, 2017. She was represented at her interview by her legal counsel, Evan Dwin. She was admonished to answer all questions directed to her truthfully and to the fullest extent of her knowledge.

Dr. Kailikole stated that prior to being placed on administrative leave on December 14, 2017, no one had ever indicated to her any dissatisfaction with her employment or behavior. Her direct supervisor is Jack Kahn (Dr. Kahn), the Vice President of Instruction for the District. Her most recent evaluation was done by the previous, Interim Vice President of Instruction, Daniel Sourbeer (Mr. Sourbeer) in May of 2011. She indicated that her evaluation was good.

Dr. Kailikole stated that on December 14, 2017, she was summoned to Dr. Kahn's office to discuss the outcome of the previous investigation report prepared by this fact finder regarding the Physics and Engineering Department investigation. She said that during this meeting, she was read a letter stating that she was being placed on administrative leave due to allegations that she had breached confidentiality. She told this fact finder that at that time, she was at a loss, as she had no idea what confidence she had breached, and no specific information was provided to her concerning the allegations. She was provided with a copy of the letter concerning her administrative leave, but it did not shed any light on what she had allegedly done.

Dr. Kailikole said that she was then escorted by Ms. Cohen to her (Dr. Kailikole's) office to get her personal belongings, and then Ms. Cohen walked with her to the faculty parking area to obtain her parking pass. Ms. Cohen thanked her for "not yelling at her" over the situation, and Dr. Kailikole told her that she felt it was unfair that two people (Mr. Nakajima and Mr. Gerwig) who had violated Titles 5 and IX had never been put on leave. She said Ms. Cohen told her, "I can't answer that." She indicated that Ms. Cohen, at that time, directed her to maintain confidentiality and not to speak to anyone associated with the District, which gave her the impression she was not to speak to anyone at the District except Ms. Cohen regarding this investigation.

Dr. Kailikole stated that on December 14, 2017, she was also informed that the District would be engaging an investigator, and that she would be contacted concerning the matter by mid-January 2018. She said the next time she had any communication with any one from the District was on February 15, 2018, via e-mail, wherein she was asked to come in on February 22, 2018 for an interview. She indicated that in the interim, she sought legal counsel. She said that she continued to receive her salary while on leave, but she was fearful that she may not continue to be paid, as she had not received reimbursement for travel expenses she had requested in November 2017. She stated that as of the date of her interview she has not received a reimbursement check for those travel expenses.

Dr. Kailikole said that prior to being placed on administrative leave, she had looked into the outcome of the prior investigation concerning Mr. Nakajima and Mr. Gerwig, as

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

she was receiving complaints from students in their classes.  She indicated that she learned that Mr. Nakajima had altered the exam schedules and had been giving three-hour exams, which is in violation of the *Education Code*.  She said that he changed the exam schedule by allowing the students to set and vote on the exam schedule.  She also learned that Mr. Nakajima had devised a grading scheme that penalized students if they did not complete lab projects within a certain amount of time.  After learning this, Dr. Kailikole directed Mr. Nakajima to stop using the negative grading scheme.  She said that in response, he revised the scheme such that students would receive extra credit if the completed their lab projects early—positive reinforcement vs. negative reinforcement.

Dr. Kailikole stated that after these issues came to light, and based upon their previous history, she and Dr. Finkenthal requested that Mr. Nakajima and Mr. Gerwig not be allowed to teach for the 2018 Spring semester.  She said she made that request, via e-mail, to Dr. Kahn and Vice President, Dr. Lisa Norman (Dr. Norman), which she copied Dr. Finkenthal with, as he is the Department Chair.  She noted that she did receive a response, although not in writing, from Dr. Norman that the District could not honor her request at that time, and she does not recall if Dr. Norman indicated to her why that was.  However, Dr. Kailikole did tell this fact finder that she is under the impression that neither Mr. Nakajima, nor Mr. Gerwig, are currently teaching this semester (2018 Spring).

Dr. Kailikole confirmed that she has previously indicated that she had experienced insubordination by Mr. Nakajima and Mr. Gerwig, as they did not comply with her directives concerning their class syllabi and signage.  She stated that their problematic behavior, particularly Mr. Nakajima's, has continued for the last 20 years, and everyone on campus is aware of it.  She indicated that she has spoken with several of the previous deans to her division, including Mr. Sourbeer, who all experienced similar problems in managing Mr. Nakajima and Mr. Gerwig.

Dr. Kailikole got the sense that Mr. Nakajima and Mr. Gerwig felt they were "untouchable" and could behave the way they did "with impunity".  She said that her observations of their behavior in the workplace reinforced that, not only in her mind, but also with others, such as the former deans.  She said that she was informed by former deans and faculty that when they had "come up against" Mr. Nakajima and/or Mr. Gerwig, no one, including the administration, would back them up.  She noted that, in fact, the Counseling Department told her that they advise their students to stay clear of Mr. Nakajima and Mr. Gerwig as instructors, suggesting that they enroll at Mira Costa College to avoid taking those courses at Palomar College.  She indicated that the Counseling Department staff has told her that they believe that Mr. Nakajima and Mr. Gerwig are "mean" and that they "discriminate".

Dr. Kailikole stated that she has been advised that complaints made by students who are also military veterans concerning their treatment by Mr. Nakajima and Mr. Gerwig have gone without resolution, thereby further empowering them.  She confirmed that it is her belief that because she tried to "touch the untouchables" she fell out of favor with the

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

District's administration, and that the breach of confidentiality allegation is a pretext for placing her on administrative leave.

Dr. Kailikole told this fact finder that she believes that the true reason she has been placed on administrative leave is that she has taken on and attempted to instill some form of discipline concerning Mr. Nakajima and Mr. Gerwig. She said that prior to her being placed on leave, she was told by others on campus, including her former supervisor, Mr. Sourbeer, they are concerned for her safety. She said that Mr. Sourbeer had himself, previously attempted to rein in Mr. Nakajima and Mr. Gerwig, but with negative results, in that, he received no support from the District's administration. She indicated that Mr. Sourbeer was aware of her mission to bring Mr. Nakajima and Mr. Gerwig in line, and that Mr. Sourbeer was supportive of that effort, which heartened her resolve to do so. However, when Mr. Sourbeer left, she lost that support.

Dr. Kailikole said she is cannot explain why Mr. Nakajima and Mr. Gerwig have been permitted to continue their "distasteful" conduct. She said the entire campus is aware of "what these two are about" yet, instead of addressing the problem, the behavior has continued without rebuke.

Dr. Kailikole also told this fact finder that since she arrived two years ago, she has attempted to actively address the ongoing violations of policies and procedures by Mr. Nakajima and Mr. Gerwig, and each time she attempted, with Mr. Sourbeer's support, to change something or provide a directive, Mr. Nakajima would do everything possible to thwart or rescind her efforts. She said Mr. Nakajima would undermine her by going to the Senate President and/or other faculty to undo her directives, even, at one point, going to the Dean for Career and Technical Education, Margie Fritch (Dean Fritch), during the 2018 Spring semester, who informed her that Mr. Nakajima had come to her and how it appeared that Mr. Nakajima was attempting to turn Dean Fritch against her.

Dr. Kailikole told this fact finder that she had sent an e-mail directive to Mr. Nakajima to refrain from doing certain things, but at that point, she did not know that Room NS-249 was being used as a classroom/lab. She said that Dr. Finkenthal contacted her in either late in the 2016 Fall semester or early 2017 Spring semester, inviting her to attend a Department meeting to discuss the directives she had made, and that this meeting took place in Room NS-249. She stated that during this Department meeting, she realized that the room was, in fact, being used as a classroom.

Dr. Kailikole indicated that she learned that Mr. Nakajima and/or Mr. Gerwig had been teaching two classes at the same time and that Room NS-249 was being used for one of those classes. She confirmed that Room NS-249 was supposed to be used for storage only and not as a classroom, because she observed that the room was hazardous and not safe. She said she never gave any direction to either Mr. Nakajima or Mr. Gerwig to use it as a lab. She stated that she gave a directive not to use Room NS-249 as a lab to Mr. Nakajima and Mr. Gerwig in front of Dr. Finkenthal and a junior professor, Hector Garcia-Villa (Mr. Garcia-Villa).

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

Dr. Kailikole said that in addition to her concerns that Mr. Nakajima and Mr. Gerwig were secretly continuing to use Room NS-249 as a classroom, she came to believe that Mr. Nakajima and Mr. Gerwig had created a "Lord of the Flies environment" whereby the 1B students were acting as TAs and grading the 1A students. She said they had established such a hostile environment, that students who did not go along with the structure they created, were penalized. She said this led her to stop the practice of classes being scheduled concurrently, although she later learned that the practice had continued, when the Title 5 and IX violations were brought forward by Dr. Finkenthal in the 2017 Fall semester.

Dr. Kailikole told this fact finder that between the time that the previous investigation started through the day she was placed on administrative leave, she never went down to the classroom and/or lab locations to monitor the situation, because she felt that was Dr. Finkenthal's responsibility, as the Department Chair. She explained that as the Dean, as a matter of professional courtesy and in trying to build trust with your faculty, you don't "check-up" on faculty without "fair notice". She noted that this was the practice at the District, and also governed by the faculty's union.

Dr. Kailikole stated that as for Mr. Nakajima and Mr. Gerwig, if someone was to sit in on one of their classes for evaluation purposes, they would evaluate each other, which she found problematic. It is her understanding that tenured faculty can request who evaluates them.

Dr. Kailikole told this fact finder that in April 2016, two students of Mr. Nakajima advised her that Mr. Nakajima had allowed the use of an air pistol firearm in one of his classes and, one of the women who is trained in the use of firearms, was appalled that no proper safety protocols were being observed. One of the students told her that she observed Mr. Nakajima load the gun, cock it and then hand it to another student, which caused the student who was familiar with firearms to become "outraged". A student took a video of the incident. She said that after giving the firearm to the student, Mr. Nakajima walked to rear of the classroom, and joked around with Mr. Gerwig and the TAs, while allowing the students to fire the air pistol at a target positioned at the front entrance to the classroom— such that anyone who walked into the classroom could have been injured by a pellet.

Dr. Kailikole said that after the firearm incident, the two women came to her assistant, Debbie McBrayer (Ms. McBrayer) and told her what occurred, as Dr. Kailikole was in a meeting at the time. She said that Ms. McBrayer called the campus police, and the police came to the location and talked to Mr. Nakajima and others, and who reported back to Ms. McBrayer that the incident had been blown out of proportion, and as such, dismissed Ms. McBrayer's concern as an overreaction.

Dr. Kailikole stated that after her meeting concluded, she saw Ms. McBrayer, who told her what happened and how the police "dismissed" her concerns, Dr. Kailikole called the police and told them to come back and further investigate the firearm issue, as Dr.

- 10 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

Kailikole knew how upset the two students who reported the incident were. She does not remember the names of the two female students. Upon further investigation and a review of the District's policy regarding firearms, it was determined that the firearm, although not a real gun (based on the orange tip), should not have been used in a classroom setting without getting prior approval from the Chief of the District police. She said the Chief told her that he was shocked that something like this would be brought into a classroom setting and, was further concerned that it had not been kept under lock and key in the classroom. She does not believe the police generated a report concerning the matter, but she did give Mr. Nakajima and Mr. Gerwig a directive not to use the firearm without getting prior approval from the District Police Chief each semester.

Dr. Kailikole indicated that sometime later, she contacted Dr. Finkenthal and asked him if he knew if the gun was still being used in the Physics class. She said he told her that there is not a gun used in the curriculum. She said she described the gun to him and he became extremely concerned, as he was uninformed of the gun incident or the District police's investigation.

Dr. Kailikole stated that Dr. Finkenthal asked her to provide him with whatever information she had regarding the matter, which she agreed to do as he is the Department Chair. She said she forwarded all the information she had concerning the incident to him via e-mail, because she felt he needed it to be fully informed of the matter. She said she was not told that she could not discuss the incident with the Department Chair, and to her knowledge, there was no administrative investigation concerning the Airsoft pistol incident. She said that there was no agreement between her and Dr. Finkenthal such that he would share information with his wife, Ms. Carlson, or any members of the District's Governing Board. She said she did provided the information to Dr. Norman, pursuant to Dr. Norman's request.

Dr. Kailikole told this fact finder that after the two female students reported the firearm incident, she learned that one of them had experienced some difficulty with Mr. Nakajima after she had suffered a severe concussion as the result of an automobile accident. She indicated that the woman's doctor had given medical orders that she was not to attend classes while she was recovering. When the woman contacted her instructors, Mr. Nakajima told her that if she did not attend class, she would be failed. She said that against medical orders, she went to class with her concussion. She later learned that the woman was not able to lift anything during her lab studies, and she had to rely upon the assistance of her classmates to help her get through the lab class. Dr. Kailikole cited this as an example of Mr. Nakajima refusing to make reasonable accommodations for a student with a disability.

Dr. Kailikole reiterated how Mr. Nakajima and Mr. Gerwig never followed any of her directives and always worked to "squelch" her efforts to gain their compliance. She said she did try to follow-up the best way she could without violating their union rights.

- 11 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

Dr. Kailikole said that with regard to the previous confidential investigative report prepared by this fact finder, Dr. Finkenthal never told her that he had provided a copy of the confidential summary of that report to his wife, Ms. Carlson. She could not recall if Dr. Finkenthal ever told her that he had provided a copy of that confidential summary to Ms. Deerfield, one of the District's Governing Board Trustees.

Dr. Kailikole told this fact finder that her recollection is that Dr. Finkenthal told her that Ms. Deerfield and John Halcón (Mr. Halcón), another Board Trustee, had asked to meet with him concerning the previous investigation. Her recollection is that Dr. Finkenthal told her that he did, in fact, meet with them. She said she speculated that by that point, the District's Governing Board had received the investigative report, as she does not attend their closed session meetings.

When asked about an e-mail exchange of December 8, 2017, at 4:47 p.m., wherein Dr. Finkenthal asked her to call him, if she was still on campus, she said she did not recall if she spoke to him at that time. She said that she was aware that Dr. Finkenthal would talk to his wife, Ms. Carlson, concerning workplace issues, specifically complaining about how he was being treated at work and the hostilities he felt were directed toward him.

Dr. Kailikole stated that in August or September 2017, Dr. Finkenthal came to her, as his supervisor, and advised her that he felt he was being "maligned" by Mr. Nakajima and Mr. Gerwig, in much the same way as they maligned her and some of their students. She said that from Dr. Finkenthal's perspective, he was suffering mistreatment at the hands of Mr. Nakajima and Mr. Gerwig because he had brought forward the issues that this fact finder previously investigated. She indicated that Mr. Nakajima and Mr. Gerwig looked at Dr. Finkenthal as a "traitor" for notifying her, which resulted in her involving administration.

Dr. Kailikole indicated that when Dr. Finkenthal realized that she was going to take a stance against Mr. Nakajima and Mr. Gerwig, he said he would be willing to become the Department Chair. She said that the previous Chair was Mr. Nakajima, who had served in that position for 15 years, which she later learned was in violation of the union rules. She stated that Mr. Nakajima was ousted as the Chair when, after reviewing the union rules, he had not ever held annual elections, as required by those rules. After she raised this issue with Ms. Cohen, and Dr. Kahn took the position that Mr. Nakajima could not run again for Department Chair, because he (Mr. Nakajima) had violated the union rules, which left only Dr. Finkenthal and Mr. Gerwig, wherein Dr. Finkenthal was duly elected and appointed the Department Chair.

Dr. Kailikole did not recall that she ever gave or told Dr. Finkenthal anything that should have been kept confidential. She said she never asked Dr. Finkenthal or anyone else to share any Department information. She stated she was not aware that Dr. Finkenthal ever shared any school-related confidential information or documentation with anyone else, including his wife or Ms. Deerfield.

- 12 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

Dr. Kailikole was asked about the claims that Mr. Nakajima and Mr. Gerwig had discriminated against students, she told this fact finder that after she learned about the issues the veteran students had, she asked the admissions office for data on students in their classes by ethnicity, gender, and veteran status. She wanted to review when students enrolled in the classes, if they withdrew from the class and/or the grade they received. She said she discovered that 80% of the students enrolled in their classes either failed, withdrew or dropped the class, and that the majority of those students were veterans, women and "underrepresented minorities" (i.e., African American and Hispanic). She said she reviewed data for the 2015 Fall and/or 2016 Spring semesters.

Dr. Kailikole indicated that when she shared her concerns over the data she had obtained from the 2015 Fall and/or 2016 Spring semesters with Mr. Nakajima and Mr. Gerwig, they responded that she did not know what she was talking about and told her that she was lying. She said she shared this information with Mr. Sourbeer, who told her he was not surprised by the revelation. She does not know if Mr. Sourbeer took any action regarding that information.

Dr. Kailikole recalled that there had been a previous finding by the Office of Civil Rights concerning a disabled student who had been denied accommodations in Mr. Nakajima's class. This resulted in sensitivity training for Mr. Nakajima and Mr. Gerwig as a form of remedy for that violation. She said that after the report was issued by the Office of Civil Rights, the problematic "warning letter" which was part of the previous investigation began to be circulated.

After her initial interview concluded, Dr. Kailikole wanted to go back on the record to share additional information concerning comments that some students made on their instructor's evaluations. She noted that some students made comments along the lines of "the dean needed to keep her nose out of the business of the Physics and Engineering Department". She said that in May 2017 she reported this to Mr. Sourbeer, and further told Ms. Cohen that she had concerns for her safety. She told Ms. Cohen she wanted administrative action, but no one seemed to take her concerns seriously, as she does not believe any action has been taken.

**B. Summary of Interview with Daniel Finkenthal, Ph.D**

On February 28, 2018, this fact finder conducted an audio-recorded interview of Dr. Finkenthal, a professor of Physics and Engineering and Department Chair. He has been with the District for 21 years. He is the subject of this investigation and was admonished to answer all questions truthfully and to the fullest extent of his knowledge. He elected not to have representation at his interview and was advised that if he felt it necessary to obtain representation during his interview, it could be stopped and rescheduled to allow him to do so.

Dr. Finkenthal indicated that he became the Department Chair in Spring 2017, and that the prior Department Chair was Mr. Nakajima. He stated that Dr. Kailikole is the Dean

- 13 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

of his Division and his direct supervisor. He confirmed that he is aware that Dr. Kailikole is currently on indefinite administrative leave. He stated that Ms. Carlson is his wife and that Ms. Deerfield is a member the District's Governing Board of Trustees.

In addressing the allegation that Dr. Finkenthal provided confidential information to others outside of the organization (i.e., Ms. Deerfield and Ms. Carlson) he told this fact finder that he believes he has "an absolute right, responsibility and duty" to share information he feels may compromise the safety and wellbeing of his students. He considers the District's Governing Board as his "boss" and that he has a responsibility to inform the board of what he witnesses and experiences on campus. He further stated that he shares everything with his wife, Ms. Carlson, who is also an educator, and who insisted that he work through the proper channels in bringing the civil rights violations to light as he did in the previous investigation conducted by this fact finder.

Dr. Finkenthal made a point of telling this fact finder that he is "tired and exhausted from the District's inaction on following through" with what he feels were clear routes for proper disciplinary action for Mr. Nakajima and Mr. Gerwig concerning the matters he brought forward in the previous investigation.

Dr. Finkenthal was shown an e-mail communication from Dr. Kailikole to him dated December 8, 2017 at 5:22 p.m., that relates to information Dr. Kailikole had received from a representative of the District's police department, Christopher Moore, concerning Mr. Nakajima's classroom using an Airsoft pellet gun without proper supervision. He said on that issue, he could only recall having a discussion with Dr. Kailikole by telephone about her concerns that a pellet gun had been used in a classroom setting. He recalled responding via e-mail to Dr. Kailikole's call, essentially dismissing those concerns, as he was fairly certain that use of a pellet gun is not part of the curriculum, and that he had no knowledge that such was being used.

Dr. Finkenthal said that while the curriculum does include some study on ballistics, as far as he knew, the Department did not own a pellet gun. He said since the District has deemed Mr. Nakajima and Mr. Gerwig fit to be Physics professors, and either deems it appropriate to engage in a ballistics experiment, then it is their decision to do that. He stated that while he is the Department Chair, he is not Mr. Nakajima's nor Mr. Gerwig's boss or supervisor and it is not his job to "report" on members of the faculty.

When asked if Dr. Kailikole had asked him to observe Mr. Nakajima and Mr. Gerwig and report back to her, he said Dr. Kailikole was "extremely upset that the District did not follow her recommendation and my recommendation that these guys be put on administrative leave until the investigation was completed."

Dr. Finkenthal said Dr. Kailikole had concerns that based upon previous experiences with Mr. Nakajima and Mr. Gerwig, their behavior would continue and that they were a "direct threat to the safety of students." He further noted that while it is clear to him that Mr. Nakajima and Mr. Gerwig should not be teaching in the classroom, it was

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

the District's decision to allow them to continue teaching, but he does not want to be put in a position where he is "policing" people.

Dr. Finkenthal told this fact finder that Dr. Kailikole was upset that Mr. Nakajima and Mr. Gerwig were still teaching. He said that they seemed to be "flaunting the fact that they were still here . . . to the point where it was insubordinate." He said he was reluctant to challenge either Mr. Nakajima or Mr. Gerwig because he was completely unaware that any pellet gun was being used in the classroom. However, after Dr. Kailikole provided him with the video taken by a student in Mr. Nakajima's class of a pellet gun being used in the classroom, he realized it was "pretty serious".

Dr. Finkenthal indicated that his wife, Ms. Carlson, is on the school board for the San Marcos Unified School District, and that he shared the pellet gun video with her to get her "perspective" and opinion as to whether she found the video disconcerting. He said that after viewing the video, Ms. Carlson "flew off the rails" over the idea that something like that would be allowed in a classroom. She told him what she saw in the video was "a direct threat to student safety" and that the way the gun was being handled, could have easily been mistaken for an active shooter situation. He stated that he did not realize that the video was confidential information, nor why it would be. He said he did not ask Ms. Carlson to forward the video to anyone else.

Dr. Finkenthal told this fact finder that he came into possession of a copy of the confidential summary of the investigative report previously prepared by this fact finder when it was mailed directly from the District to him at his home. He recalled that it was handed to him by his wife, Ms. Carlson, as she opened it when it came in the mail to their home. He said he shared it with a number of people, including his attorney, members of the District's Governing Board and Trustees, such as Ms. Deerfield. He did not direct his wife, Ms. Carlson, to send the materials to anyone else.

Dr. Finkenthal claimed that although the summary is marked "confidential", and not knowing the legal definition of "confidential" he did not feel he was obligated to keep the document "secret". He said he assumed that the District's Board would have seen the report before he was sent a copy, although he was never told by Ms. Deerfield that she had received information from the previous investigation.

Dr. Finkenthal noted that he is aware that Mr. Nakajima and Mr. Gerwig also received copies of the report and that they have reacted negatively toward him for his part in the previous investigation. He said the entire matter has made it difficult for him to serve as the Department Chair and build any consensus. He stated that he has suffered retaliation in the form of anonymous letters sent to his colleagues and collaborators accusing him of misusing government grant funds and exploiting students. He said these actions have made it awkward for him in his dealings with collaborators at other institutions. He said he has only seen one of these letters but has been told by other colleagues that they also received similar communications.

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

Dr. Finkenthal said that he did have discussions with Ms. Deerfield concerning his desire for the District's Governing Board to intervene and press for harsher discipline for Mr. Nakajima and Mr. Gerwig. He said that he and Ms. Deerfield are both civil rights activists and that he knows, from having served on her election campaigns, that she wants the District to "become better at serving minority communities" so he knew that sending her the report would "be of particular interest to her and her desire to . . . fulfill that mission."

Dr. Finkenthal said that from his perspective, Dr. Kailikole was monitoring Mr. Nakajima and Mr. Gerwig, however, even at the Dean's level, there was little she could do other than "write them up" and document their behavior. He indicated that Mr. Nakajima and Mr. Gerwig remained insubordinate to Dr. Kailikole's direction, and that he was "mystified as to why and how these guys got away with" openly challenging and/or refusing to follow direction.

Dr. Finkenthal told this fact finder that Room NS-249 continues to be used as a classroom/lab, and that he received a student complaint over being failed a class for being asked to do something outside of regulations, such as being required to sit for three to four hours for an examination.

Dr. Finkenthal said that he ran for Department Chair only after being urged to do so by Dr. Kahn, the current Vice President of Instruction, and Dr. Kailikole. He said Dr. Kailikole had been pushing for reform within their Department and she had a "fresh perspective on what were good practices and bad practices". He felt it was a good time to take that step, in addition to the fact that Mr. Nakajima, as the previous Department Chair, had failed to have regular elections for that position, which came to light during the same meeting in which Human Resources revealed the discovery of the discriminatory materials that resulted in the previous investigation. He said a week after that meeting, elections were held wherein he was elected the new Department Chair.

Dr. Finkenthal offered that Dr. Kailikole in no way orchestrated any plan by which he was to share information or materials through any back channels to Dr. Kailikole's supervisors and/or the District's Governing Board, as he absolutely did that on his own. He said he believes he had an "absolute right to share this information with the Governing Board."

Dr. Finkenthal indicated that it appears that the District does not have a successful/effective approach to progressive discipline, and that it would be almost unfair, after all the years of allowing issues to progress, to all at once come down with an "iron fist" on Mr. Nakajima and Mr. Gerwig without any progressive discipline. He noted that after discussing the matter with the union, he feels that the District has not done its job over the years documenting and providing progressive discipline. He suggested that had the District intervened sooner, perhaps Mr. Nakajima and Mr. Gerwig could have been "reformed".

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

## X.    FINDINGS:

### A. **Did Dr. Kathryn Kailikole breach employee confidentiality concerning her communications with Dr. Daniel Finkenthal?**

Short Answer:  **YES**

*Discussion*

The issue presented here is to determine whether Dr. Kailikole breached employee confidentiality concerning her communications with Dr. Finkenthal.  Dr. Kailikole was the Dean of the Mathematics and the Natural and Health Sciences Division and Dr. Finkenthal is the Department Chair of the Physics and Engineering Department which is within the aforementioned Division.  This fact finder requested and received various e-mail exchanges involving Dr. Kailikole and Dr. Finkenthal where there were issues of discussion concerning personnel matters and professors' behavior such as Mr. Nakajima and Mr. Gerwig, both professors working in the Physics and Engineering Department.

It was apparent, based on interviews with Dr. Kailikole and Dr. Finkenthal that there was a high level of frustration related to discipline that had been handed down concerning a previous investigation into misconduct by Mr. Nakajima and Mr. Gerwig. That matter related to various posters and other items that had discriminatory messages that Dr. Finkenthal had pointed out and which was subsequently investigated.  Both Dr. Kailikole and Dr. Finkenthal expressed their frustration to this fact finder that Mr. Nakajima and Mr. Gerwig were not sufficiently punished and/or disciplined concerning this and other forms of misconduct.

The facts in this matter demonstrate that the previous investigation concerning Mr. Nakajima and Mr. Gerwig was concluded in late October 2017.  The facts demonstrate that a "Confidential Summary of Investigation" was provided to Dr. Finkenthal because he was a complainant in the matter.  The providing of this confidential document was consistent with District rules and regulations.

The facts in this matter further demonstrate that Dr. Finkenthal provided a copy of this investigation by e-mail to Ms. Deerfield, a member of the District's Governing Board. In this e-mail Dr. Finkenthal writes, "the findings show that there have been no ongoing practices of unlawful discrimination in the physics and engineering department here at Palomar.  It is time for a change, especially given the recent public outcry regarding sexual and workplace harassment discrimination.  Please help me by making this a Board priority."  Additionally, in this e-mail, Dr. Finkenthal writes "please do not share with anyone outside the Palomar College governing board." Clearly, Dr. Finkenthal understood this document to be confidential and sensitive.[2]

---

[2] See Section E below concerning Dr. Finkenthal's breach of employee confidentiality concerning this communication and others.

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

The facts demonstrate that on December 11, 2017, Dr. Finkenthal sent this e-mail which also included his e-mail to Ms. Deerfield that also contained the aforementioned "Confidential Summary of Investigation Report" in regard to Dr. Finkenthal's complaint of unlawful discrimination against Mr. Gerwig, Mr. Nakajima and Mr. Garcia-Villa to an individual identified as Stacy Carlson.  Dr. Finkenthal indicated and acknowledged that Ms. Carlson is, in fact, his wife.

Concerning Dr. Kailikole's involvement in releasing any confidential information, this fact finder reviewed the circumstantial evidence concerning the timing of various e-mail exchanges between Dr. Kailikole and Dr. Finkenthal.  Specifically, an e-mail was identified from Dr. Kailikole to Dr. Finkenthal that was sent on Friday, December 8, 2017 at 4:46 p.m.  This e-mail titled "Internship" was followed up almost immediately by a response from Dr. Finkenthal asking Dr. Kailikole to call him at his office number of 2974. This e-mail chain was sent on December 8, 2017 at 4:47 p.m. and only included Dr. Kailikole and did not include the other individuals in the previous e-mail correspondence from Dr. Kailikole to Dr. Finkenthal, Mireya Gutierrez-Aguero and Quan Nguyen.[3]

This December 8, 2017 e-mail is important as this fact finder observed a flurry of other e-mails that were sent immediately thereafter from Dr. Kailikole to Dr. Finkenthal. Even though neither Dr. Finkenthal nor Dr. Kailikole acknowledged that there were any nefarious discussions during the requested phone call that Dr. Finkenthal made of Dr. Kailikole, the facts in this matter, as established by the circumstantial evidence, tends to show otherwise.  Not long after the December 8th communication between Dr. Kailikole and Dr. Finkenthal, Dr. Finkenthal is observed sending e-mails to his wife, Ms. Carlson. Item No. 1, as attached to this fact-finding investigation, shows Dr. Finkenthal sending Ms. Carlson a forwarded e-mail from Dr. Kailikole that was sent only moments after the requested phone call on December 8, 2017.

This e-mail information related to details from the District Police Department concerning an Airsoft pistol that had been used in Mr. Nakajima's class and has been the subject of police review.  This fact finder found that it was somewhat suspicious that Dr. Kailikole sent this e-mail moments after the phone call that was requested on December 8, 2017.  The e-mail chain shows that Dr. Kailikole had initially received this e-mail from Dr. Norman on November 21, 2017.

Additionally, on December 8, 2017, only moments after the requested call from Dr. Finkenthal to Dr. Kailikole, Dr. Kailikole sent Dr. Finkenthal an e-mail identified herein as Item No. 4.  This e-mail indicated a discussion between Dr. Kailikole and Mr. Nakajima in relationship to 2016 Fall semester class cancellations and adjustments. This fact finder also found that this sudden forwarding of this e-mail to Dr. Finkenthal

---

[3]  See attached e-mail titled FW:  Internship dated December 8, 2017.

Ex. A, Page 74

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

immediately after the proposed phone call on December 8th was suspicious. Dr. Kailikole had initially received this e-mail from Ms. Norman on November 20, 2017, and then suddenly sent the e-mail by forwarding to Dr. Finkenthal on December 8, 2017 at 5:27 p.m. Further suspicious is the fact that Dr. Finkenthal forwarded this e-mail to his wife, Ms. Carlson, on December 10, 2017 at 2:19 p.m. along with many other similar e-mails, all relating to issues within the Department.

On December 8, 2017 at 5:26 p.m., Dr. Kailikole forwarded to Dr. Finkenthal an e-mail exchange concerning issues relating to the use of an Airsoft pistol in Mr. Nakajima's classroom. This information contained statements by witnesses who had observed what they concluded was unsafe usage of an Airsoft pistol during a class presentation. In addition to the fact that Dr. Kailikole sent this e-mail moments after the purported phone call between her and Dr. Finkenthal, this fact finder found it further suspicious that Dr. Finkenthal, like other e-mails, forwarded in this matter to his wife, Ms. Carlson, on December 10, 2017. This e-mail exchange and forwarding from Dr. Kailikole to Dr. Finkenthal and thereafter to Dr. Finkenthal's wife, Ms. Carlson, also included video evidence and other details concerning the Airsoft pistol matter.

In addition to the aforementioned e-mails concerning the Airsoft pistol matter, additional e-mails that had been initially forwarded to Dr. Kailikole on April 20, 2016 regarding the Airsoft pistol were ultimately forwarded to Dr. Finkenthal on December 8, 2017 at 5:24 p.m., again moments after the purported phone call between Dr. Finkenthal and Dr. Kailikole. Like the other e-mails, this information concerning confidential personnel issues and complaints was thereafter forwarded by Dr. Finkenthal to his wife, Ms. Carlson, on December 10, 2017.

This fact finder also observed an e-mail, identified as Item No. 14, that Dr. Kailikole received on November 20, 2017, concerning a meeting proposed to have taken place on September 1, 2016. This meeting involved Dr. Finkenthal and Mr. Nakajima. This e-mail chain was forwarded by Dr. Kailikole to Dr. Finkenthal on December 8, 2017 at 5:28 p.m., again, mere moments after the purported phone conversation between Dr. Finkenthal and Dr. Kailikole that same afternoon.

It appeared to this fact finder that some sort of discussion concerning Dr. Finkenthal and Dr. Kailikole's frustration and concern about Dr. Nakajima had occurred in the late afternoon on December 8, 2017. It was established by e-mail that Dr. Finkenthal requested a phone call from Dr. Kailikole. However, the topic of the call was not indicated in the e-mail exchange, and neither witness seemed to recall the nature of the phone call. However, the circumstantial evidence here tends to demonstrate that the call related to the two's concern about Mr. Nakajima and Mr. Gerwig as established by a flurry of e-mails that were quickly and contemporaneously sent by Dr. Kailikole to Dr. Finkenthal moments after this phone conversation likely occurred.

Further solidifying that the issues concerned their frustrations and unhappiness regarding Mr. Nakajima's behavior and lack of discipline, e-mail evidence establishes that

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

Dr. Finkenthal thereafter forwarded these messages to his wife, Ms. Carlson. Dr. Finkenthal indicated that his wife, Ms. Carlson, is on the school board for the San Marcos Unified School District and that he had shared various information to her in order to gain her perspective and opinion about various issues that were occurring in his Department.  Mr. Finkenthal claimed that he did not ask nor was he aware if his wife had forwarded the videos, e-mails or the confidential investigative report to any other individuals.  This statement by Dr. Finkenthal seemed to lack credibility to this fact finder.

The facts here demonstrate that Dr. Finkenthal had openly provided information to Ms. Deerfield, a member of the District's Governing Board and discussed his opinion that Mr. Nakajima and Mr. Gerwig deserved harsher discipline than they had been given concerning his complaint.  The facts tend to demonstrate here that Dr. Kailikole forwarded information that could be considered derogatory relating to Mr. Nakajima's employment to Dr. Finkenthal for the purposes of Dr. Finkenthal to forward that information to his wife, and perhaps others, such that the information could reach the Governing Board members in order to attempt to perfect some form of greater or more harsher discipline or administrative difficulties for Mr. Nakajima.

Essentially, instead of dealing more directly with Mr. Nakajima and Mr. Gerwig as an effective Dean, Dr. Kailikole appears to have used Dr. Finkenthal as a "go between" to leak details and employment information about these two District employees. Even though Dr. Kailikole's frustrations and lack of regard for Mr. Nakajima may be well placed, using others such as Dr. Finkenthal or other third parties to convey and leak confidential information to others is inappropriate and inconsistent with Dr. Kailikole's duties as the Dean of the Division.

Here, the greater weight of the credible evidence establishes that Dr. Kailikole forwarded what she knew to be confidential and even derogatory information concerning Mr. Nakajima to Dr. Finkenthal for the purposes of Dr. Finkenthal to thereafter forward that information to others in order to promote a more negative viewpoint on Mr. Nakajima and/or to encourage or cause more stringent disciplinary measures to be taken against Mr. Nakajima.  Although Dr. Finkenthal, as the Chair of the Department, would have some need and/or right to know this information about a professor working in that Department, it was clear that the information was shared with Dr. Finkenthal solely for his ability to forward it to his wife, and perhaps others for nefarious and inappropriate reasons.  The allegation that Dr. Kailikole violated confidences in this behavior, is therefore, **sustained**.

**B. Did Dr. Kathryn Kailikole fail to reasonably take action concerning Takashi Nakajima's use of an Airsoft pistol in his classroom?**

Short Answer:  **YES**

**C. Did Dr. Kathryn Kailikole fail to reasonably take action concerning Takashi Nakajima's use of storage room NS-249 as a laboratory?**

- 20 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

Short Answer:  **YES**

**D. Did Dr. Kathryn Kailikole fail to reasonably take action concerning Takashi Nakajima's holding of classes outside their regularly scheduled times?**

Short Answer:  **YES**

*Discussion*

This matter relating to allegations B, C and D are being discussed together as these issues touch on and concern Dr. Kailikole's actions and/or inactions concerning Dr. Nakajima in her role as the Dean of the Mathematics and the Natural and Health Sciences Division.  The facts demonstrate that Mr. Nakajima is a professor in the Physics and Engineering Department and has worked for the District for a number of years.  In the more recent past, Dr. Finkenthal had been elected and installed as the Department Chair of the Physics and Engineering Department.

The issue in question presented here is whether Dr. Kailikole failed to take action in a reasonable and prudent fashion consistent with her office concerning issues that arose in relationship to Mr. Nakajima's behavior as a professor in the Department.  Specifically, Mr. Nakajima was accused of using an Airsoft pistol as a sanctioned activity in one of his classes.  Furthermore, Mr. Nakajima continued to utilize a storage room known as NS-249 as a classroom laboratory, when it was not designed as such, and after Dr. Kailikole had specifically told him to not do so.  Finally, Mr. Nakajima apparently had been holding classes outside their regular scheduled times causing concerns and conflicts from various students.  As the Dean of the Division, Dr. Kailikole had a duty to take reasonable and prudent action concerning these and other potential transgressions by Mr. Nakajima, or others who work under Dr. Kailikole's sphere of responsibility.

The facts in this matter demonstrate that on April 19, 2016, Dr. Kailikole was contacted by a student by the name of Dallas Brown (Ms. Brown), as well as another student identified as "Shelby."  The facts demonstrate that Ms. Brown and Shelby had contacted Dr. Kailikole after they had sat through Mr. Nakajima's class where an Airsoft pistol had been used ostensibly as some form of experiment and part of the curriculum. The students were concerned that the Airsoft pistol had been used in an unsafe manner, that students had not been protected from the hazard of using the pistol and the pellets that are fired from it, and the fact that Mr. Nakajima was not engaged in the activity and was not properly supervising the use of this device.  In addition to this contact, the student, Ms. Brown, provided e-mail documentation of the discussion on the following day on April 20, 2016.  Student Shelby Friends (Ms. Friends) also provided copies of a video taken with her cell phone showing the use of the pistol as described in their communication with Dr. Kailikole two days earlier.

Even though this information was provided to Dr. Kailikole on April 21, 2016 she only provided information concerning this issue to Dr. Norman on November 21, 2017.  In

- 21 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

the interim, however, Dr. Kailikole had been present and spoke with campus police after Ms. Friends had made a complaint and Officer Magauli So'Oto had responded to take a report.[4]

Based on the report it appeared that Officer So'Oto had met with the complainants at Office NS-147, and had spoken with Ms. Brown and Ms. Friends. Officer So'Oto points out that–Dr. Kailikole was also present during his interview with both Ms. Brown and Ms. Friends. Officer So'Oto points out that Ms. Brown and Mr. Friends had been somewhat concerned about how the Airsoft gun had been handled unsafely during class. Their specific concerns were that there were no protective goggles, nor were there any safety instructions given out prior to the handling of the weapon. Prior to speaking with these two complainants, Officer So'Oto had spoken with Mr. Nakajima. Mr. Nakajima had told Officer So'Oto that the Airsoft gun was part of his curriculum and he had used it for his semester examinations. After Officer So'Oto told Dr. Kailikole this information she assured Officer So'Oto that she would look into this issue and respond back to him if use of such a weapon for an exam was within acceptable policies for the Department.

Later, on April 21, 2016, Officer So'Oto responded back to NS-147 and met with Dr. Kailikole. Dr. Kailikole handed Officer So'Oto a copy of the Palomar Community College District Procedure Manual and under Section AP 3530, titled "Weapons on Campus", Dr. Kailikole pointed out that any activities involving educational pursuits involving firearms or other weapons was to be authorized by the Chief of police before the activity took place. Officer So'Oto points out that the Airsoft gun utilized in Mr. Nakajima's class was never approved for usage by the Chief of police.

Dr. Kailikole indicated that she thereafter admonished Mr. Nakajima and Mr. Gerwig not to use the weapon during class and further instructed them concerning obtaining the Chief of police's permission before using any such device. Dr. Kailikole acknowledged that there was no administrative investigation done to the matter by her or others to her knowledge. She also acknowledged that she was unaware as to whether the police had crafted a police report about their investigation and/or findings.

Dr. Kailikole merely reiterated how Mr. Nakajima and Mr. Gerwig never seem to follow any of her directions and always worked to "squelch" her efforts to gain their compliance.

Dr. Kailikole also indicated that she had received complaints from students in Mr. Nakajima's and Mr. Gerwig's classes indicating that Mr. Nakajima had altered exam schedules and gave lengthy exams that were inconsistent with those exam schedules which Dr. Kailikole claims are in violation of the *Education Code*. Dr. Kailikole said that it was reported to her that Mr. Nakajima had changed the exam schedule by allowing students to vote on and set the exam schedule. Dr. Kailikole also learned that Mr. Nakajima had

---

[4]  See attached Palomar College Police Report 2016-00138.

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

devised a grading scheme that penalized students if they did not complete lab projects within a certain amount of time. Dr. Kailikole said after learning of this, she directed Mr. Nakajima to cease using this negative grading scheme however, in response she learned that he merely revised this same scheme such students would receive extra credits if they completed their lab projects early.

Dr. Kailikole said that after all these issues had come to light, and based upon their previous history, she and Dr. Finkenthal requested that Mr. Nakajima and Mr. Gerwig not be allowed to teach for the 2018 Spring semester. Dr. Kailikole said that Vice President Dr. Norman spoke to her and indicated that the District could not honor that request. Dr. Kailikole said she is not certain as to what reasons Dr. Norman had offered as to why this request could not be honored, however, she was under the impression that neither Mr. Nakajima nor Mr. Gerwig are currently teaching this semester (2018 Spring).

Dr. Kailikole also noted that she had previously experienced an insubordinate tone by both Mr. Nakajima and Mr. Gerwig, as they did not comply with the directions concerning their class syllabi and signage. Dr. Kailikole went on to say that there had been a nearly 20-year history of negative behavior, particularly by Mr. Nakajima, and that no previous administrators had been effective in dealing with his negative behavior. Dr. Kailikole even cited examples where she concluded that Mr. Nakajima and Mr. Gerwig were potentially discriminating against individuals based on protected characteristics. Dr. Kailikole stated that she had been advised that complaints made by students who were military veterans concerning their treatment by Mr. Nakajima and Mr. Gerwig had gone without resolution. It was noted that Dr. Kailikole did not take any action or report this sort of behavior to Ms. Cohen or others at the District.

Dr. Kailikole remarked that since she arrived as the Interim Dean nearly two years earlier, she has attempted to actively address the ongoing violations of policy and procedures by Mr. Nakajima and Mr. Gerwig, and that each time she has attempted with her previous supervisor, Mr. Sourbeer's support, Mr. Nakajima would do everything possible to thwart or rescind her efforts. Dr. Kailikole reported that Mr. Nakajima would attempt to undermine her by going to the Senate President or other faculty members to undermine or demean Dr. Kailikole's directives. Another issue Dr. Kailikole indicated that she was attempting to resolve was Mr. Nakajima's use of Room NS-249. Dr. Kailikole said that she was aware that this room had been designed as a storage room however it was improperly being used by Mr. Nakajima as a classroom/laboratory. Dr. Kailikole said that Dr. Finkenthal had contacted her in the 2016 Fall semester or early in the 2017 Spring semester and had invited her to attend a Department meeting when she became aware that this room was being used improperly.

Dr. Kailikole learned that Mr. Nakajima and Mr. Gerwig had been teaching two classes at the same time and that Room NS-249 was being used for one of those classes. Dr. Kailikole said that when she made this discovery she gave a directive to Mr. Nakajima, Mr. Gerwig and Mr. Garcia-Villa to not use Room NS-249 as a laboratory or classroom.

- 23 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

Although Dr. Kailikole seems to conclude that Mr. Nakajima and Mr. Gerwig were seemingly "untouchable" and that she was powerless to affect any positive change or to bring them into compliance, it was interesting to note that Dr. Kailikole never paid unannounced visits to the Department to check on these professors' behavior, activity and/or potential violations of rules or directives given previously. Dr. Kailikole seemed to conclude that it would be inappropriate or unprofessional for her to "check-up" on these faculty members without "fair notice."

Dr. Kailikole went on to explain that as the Dean, as a matter of professional courtesy and trying to build trust with her faculty, she was not supposed to merely "check-up" on faculty without giving them prior notice. Dr. Kailikole claims that this was a practice at the District and was also governed by the faculty's union. Ironically, Dr. Kailikole stated that Mr. Nakajima and Mr. Gerwig, even though suspected of violating various rules and regulations, as well as being insubordinate to Dr. Kailikole's directions, would evaluate each other concerning their evaluation processes. Again, Dr. Kailikole said she seemed to believe that tenured faculty can request who evaluates them in their evaluation processes.

Here, the greater weight of the credible evidence demonstrates that Dr. Kailikole failed to reasonably and prudently supervise Mr. Nakajima and Mr. Gerwig. Dr. Finkenthal, as a Department Chair, was not empowered to supervise and/or discipline these two individuals. It was clear to Dr. Kailikole that Mr. Nakajima and Mr. Gerwig were engaged in various forms of insubordination and misconduct, including the issue related to the Airsoft pistol, use of classroom facilities in an inappropriate manner and potentially changing exam schedules and class structures inconsistent with the *Education Code* or rules of the District, yet Dr. Kailikole seemed bashful about directly contacting or engaging these individuals.

It seemed to this fact finder that Dr. Kailikole, as a Dean of the Division was duty bound to go to the Physics and Engineering Department and further investigate her suspicions and to take affirmative action even when she concluded that prior actions had been unfruitful. Here, the facts demonstrate that Dr. Kailikole took no such steps but merely acted as a passive manager seemingly hiding behind what she concluded were union protocols in relationship to actively and assertively supervising Mr. Nakajima and Mr. Gerwig. Dr. Kailikole knew, or should have known, that Mr. Nakajima and Mr. Gerwig required assertive supervision and management and that a "hands off" approach would be inappropriate and ineffective.

The greater weight of the credible evidence here tends to show that Dr. Kailikole failed to take reasonable and prudent steps concerning various activities occurring in the Physics and Engineering Department, and specifically relating to Mr. Nakajima and Mr. Gerwig. The allegation that Dr. Kailikole failed to take reasonable steps or action concerning Mr. Nakajima's use of an Airsoft pistol in his classroom, his continued use of a storage room known as NS-249 as a classroom and laboratory and the idea that he may be holding classes outside of their regularly scheduled times is, therefore, sustained.

- 24 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

**E. Did Dr. Daniel Finkenthal breach employee confidentiality concerning his communications with others including his wife, Stacy Carlson?**

Short Answer:  **YES**

*Discussion*

This issue concerns the allegation that Dr. Finkenthal had breached employee confidentiality concerning his communications with others, including his wife, about District employees' confidential matters.  Here, it was uncontroverted by the evidence including e-mail documentation, as well as Dr. Finkenthal's own admissions, that he provided information directly to Ms. Deerfield and to his wife, Ms. Carlson, relating to District business including the confidential findings of the Nakajima/Gerwig/Garcia-Villa investigation conducted previously by this fact finder.  The facts in this matter tend to demonstrate that Dr. Kailikole had used Dr. Finkenthal as a "go between" to leak information that would be seen as derogatory toward Mr. Nakajima particularly.

The facts further demonstrated that Dr. Finkenthal was dissatisfied with the discipline given out to Mr. Nakajima and Mr. Gerwig and had leaked information and had had discussions concerning confidential personnel issues with Ms. Deerfield, a member of the District's Governing Board.   Dr. Finkenthal said that these discussions with Ms. Deerfield concerned his desire for the District Board to intervene and to press for harder discipline for Mr. Nakajima and Mr. Gerwig after Dr. Finkenthal was dissatisfied with the level of discipline meted out to these two District employees, after Dr. Finkenthal had complained about their behavior and other issues in or about the Department offices.

It was further obvious that Dr. Finkenthal was somehow frustrated with Dr. Kailikole's lack of efficiency in administratively dealing with Mr. Nakajima and Mr. Gerwig.  Dr. Finkenthal indicated that he was "mystified as to why and how these guys got away with" openly challenging Dr. Kailikole and even refusing to follow her directions.  Dr. Finkenthal told this fact finder that Room NS-249 continued to be used as a classroom/laboratory even after Dr. Kailikole had instructed Mr. Nakajima and Mr. Gerwig to not use this storage room for such a purpose.  Dr. Finkenthal was also frustrated over the fact that both Dr. Nakajima and Mr. Gerwig tended to operate classes and activities outside of normal schedules.   Dr. Finkenthal had even sided his communication with a student who had complained of her being failed in one of Mr. Nakajima's and/or Mr. Gerwig's classes for being required to sit for an examination period outside of what was required in the initial class syllabus.

Even though Dr. Finkenthal claimed that Dr. Kailikole in no way orchestrated or suggested any plan by which he was to share information or materials through any back channels either to Dr. Kailikole's superiors and/or the District's Governing Board and that he did so on his own, the circumstantial evidence in this matter demonstrates otherwise.  As indicated above, on December 8, 2017, in the afternoon, Dr. Finkenthal sent Dr.

- 25 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

Kailikole an e-mail requesting that she call him at his office extension. Even though Dr. Finkenthal and Dr. Kailikole deny any recollection of this conversation and both deny that there was any sort of nefarious plan or conspiracy of sorts, a review of various e-mail correspondence occurring nearly immediately thereafter shows Dr. Kailikole sending Dr. Finkenthal a number of e-mails relating to issues concerning Mr. Nakajima and concerns in the District that Dr. Finkenthal soon thereafter, forwarded to his wife, Ms. Carlson.

It was noted that Ms. Carlson is an educator and a board member of a local school district. It seemed unusual to this fact finder that Dr. Finkenthal would send his wife these materials without some other purpose in mind. Dr. Finkenthal's statement that he was merely sharing this information with his wife to get her input and opinion about various conditions in the Department seemed to lack credibility and/or believability to this fact finder. The more reasoned excuse for sending these materials, in the opinion of this fact finder, was to enlist his wife's assistance in an attempt to color the disciplinary charges that had been proffered for Mr. Nakajima and Mr. Gerwig after Dr. Finkenthal's previous complaint led to disciplinary actions that were unsatisfactory in Dr. Finkenthal's opinion.

Here, the greater weight of the credible evidence tends to demonstrate that Dr. Finkenthal had, in fact, breached employee confidentiality in his various shared communications with others including his wife, Ms. Carlson. Indeed, Dr. Finkenthal had shared a confidential summary of an investigation report concerning his complaint of unlawful discrimination leveled against Mr. Gerwig, Mr. Nakajima and Mr. Garcia-Villa. This report contained confidential personnel information and had been prepared by Ms. Cohen, the Manager of Equal Employment Opportunity and Compliance in response to Dr. Finkenthal's initial complaint against these individuals.

Dr. Finkenthal acknowledged that he had shared this information in discussions with Ms. Deerfield, a member of the District's Governing Board and e-mail evidence demonstrates that Dr. Finkenthal had sent this information by e-mail to Ms. Deerfield on November 13, 2017, and then to his wife on December 11, 2017. Dr. Finkenthal was aware that this matter was confidential as it was marked as such both in the title of the document as well as how Dr. Finkenthal titled his own e-mail to Ms. Deerfield as a "Confidential Summary of Investigation." Additionally, Dr. Finkenthal also admonishes Ms. Deerfield to "please do not share with anyone outside the Palomar College governing board."

Even though Dr. Finkenthal was reasonably discouraged and frustrated with the lack of disciplinary action taken against Mr. Nakajima and Mr. Gerwig, his release of this Confidential Summary of Investigation to both Ms. Deerfield and to his wife, Ms. Carlson, was wrongful, as it had the effect of improperly releasing confidential personnel information about both Mr. Gerwig, Mr. Nakajima and Mr. Garcia-Villa. Dr. Finkenthal had no legitimate business purpose in providing this Confidential Summary of Investigation or the other e-mailed information sent to either his wife, Ms. Carlson or to District Governing Board member, Ms. Deerfield. By doing so, Dr. Finkenthal breached

- 26 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

the employee confidentiality concerning these materials and information and the allegation is therefore, **sustained**.

**F. Was Dr. Kathryn Kailokole subject to retaliation by Mr. Nakajima, Mr. Gerwig and/or others concerning her role as the Dean of the Department, her administrative leave status and/or her employment contract?**

Short Answer:  **NO**

*Discussion*

During her interview with this fact finder, Dr. Kailikole claimed that she was the victim of retaliation concerning her attempts and activities related to supervising Mr. Nakajima and Mr. Gerwig, as well as her claim that she had been placed on administrative leave without just cause, and that her employment contract was not going to be renewed and to be severed for cause.

**1.  Concerning retaliation from Mr. Nakajima and/or Mr. Gerwig**

Dr. Kailikole pointed out that both Mr. Nakajima and Mr. Gerwig were difficult to supervise, and she further claimed there had been a history lackadaisical oversight of their activities in their Division.   The facts demonstrate that Dr. Kailikole was the Dean of the Department and that both Mr. Nakajima and Mr. Gerwig worked under her command.  It was further clear that neither Mr. Nakajima nor Mr. Gerwig could discipline, reprimand or otherwise negatively affect Dr. Kailikole's employment at the District.

**Retaliation rules generally** protect an employee from loss of wages or negative job actions as a result of a failure to hire, demotion, suspension, or discharge from employment because the employee engaged in lawful conduct.  Here, Dr. Kailikole asserts that she was subject to retaliation by Ms. Nakajima and Mr. Gerwig for engaging in the lawful conduct of oversight and supervision.  However, there appears to be no nexus concerning either Ms. Nakajima and/or Mr. Gerwig engaging in any inappropriate or unlawful activities that may have caused such a negative job action against Dr. Kailikole.

Mr. Nakajima and Mr. Gerwig may well have been difficult employees and further may have, in the past, freely engaged in inappropriate activities while on-duty.  Additionally, these activities may have been ignored in the past by Dr. Kailikole's predecessors.  Indeed, there was some evidence to show that this was, in fact, the case. None the less, Dr. Kailikole was hired as Dean to manage her Division and this Department, and to bring to bear her skill and acumen as a manager to correct inappropriate behaviors of which she learned.  Further, Dr. Kailikole was required to act within the framework of the law and the various rules and procedures instituted in the District.  As discussed above, Dr. Kailikole seemed to have failed in this mission.

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

Furthermore, Dr. Kailikole cited no instances of any negative job action occasioned directly by these two subordinate employees. Dr. Kailikole's complaints about labor union activities and/or rules seemed and attempt by her to sidestep her responsibilities as a manager. Indeed, the activities that Mr. Nakajima and Mr. Gerwig undertook related to their reliance on members of their union was protected activity and cannot be seen as retaliatory, albeit aggressive and confounding to Dr. Kailikole.

Dr. Kailikole in her interview with this fact finder claimed that somehow her safety was in jeopardy due to the fact that it appeared to her that Mr. Nakajima had perhaps disclosed her lack of support and her oversight to students who thereafter wrote unflattering remarks in their class critiques that seemed to hold Dr. Kailikole out to contempt and ridicule. Although these remarks were discouraging and perhaps hurtful, and it was possible that Mr. Nakajima had been somewhat disparaging in his comments about Dr. Kailikole to his students, there was no indication that any student would somehow visit violence upon Dr. Kailikole due to any unflattering comments made by Mr. Nakajima to these students.

There was additionally no evidence that Mr. Nakajima or anyone else had suggested or encouraged any form of violence against Dr. Kailikole. The idea that Dr. Kailikole was somehow in fear for her life in this regard was unreasonable and hyperbolic. In summary, there was no credible evidence that Dr. Kailikole was somehow the subject and/or victim of retaliation or mistreatment by Mr. Nakajima or Mr. Gerwig.

2. **Concerning retaliation from the District related to her administrative leave status and/or failure to renew her employment contract and/or severing the contract for cause**

Concerning Dr. Kailikole being placed on administrative leave by District officials on December 14, 2017, she concludes that act was a form of retaliation, however, the record demonstrates that there was a legitimate business interest in placing Dr. Kailikole on administrative leave for the purposes that attended this fact-finding investigation concerning suspicious communications between Dr. Kailikole and Dr. Finkenthal, wherein materials and confidential information was inappropriately leaked to those outside of the District organization that had neither a right nor a need to know of such matters.

The record was clear that after, what appeared to be, a phone conversation between Dr. Kailikole and Dr. Finkenthal on December 8, 2017, that seemed to have set into motion a flow of information consisting of at least several e-mails from Dr. Kailikole to Dr. Finkenthal, which were in turn were forwarded to Dr. Finkenthal's wife. It was clear to District administrative staff that there was probable cause to believe that Dr. Kailikole was involved in the inappropriate sharing of confidential information to Dr. Finkenthal who shared this information with others.

Indeed, a review of Dr. Kailikole's e-mails and this fact-finding investigation demonstrated just such activity. When this suspicion arose, the District was duty bound to

- 28 -

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

protect evidence and to safeguard the integrity of this investigation by removing Dr. Kailikole from the workplace to be certain that additional leaking of sensitive and/or confidential information did not occur. As such, her administrative leave status beginning on December 14, 2017, mere days after the December 8, 2017 suspicious sharing of e-mailed information with Dr. Finkenthal, was undertaken for the legitimate business purpose of preserving evidence and protecting the confidential personnel information of the District and not as a form of retaliation.

Concerning Dr. Kailikole's claim that the District's refusal to renew her employment contract is a form of retaliation, her assertion here is based on her misguided belief that she was *entitled* to continued employment at the District. Dr. Kailikole claimed that the District had informed her that her contract would not be renewed. The relevant law concerning Dr. Kailikole's contract is detailed in relevant part at *California Education Code* Section 72411, which states:

> *"(a) Every educational administrator shall be employed, and all other administrators may be employed, by the governing board of the district by an appointment or contract of up to four years in duration. The governing board of a community college district, with the consent of the administrator concerned, may at any time terminate, effective on the next succeeding first day of July, the term of employment of, and any contract of employment with, the administrator of the district, and reemploy the administrator, on any terms and conditions as may be mutually agreed upon by the board and the administrator, for a new term to commence on the effective date of the termination of the existing term of employment.*

> *(b) If the governing board of a district determines that an administrator is not to be reemployed by appointment or contract in his or her administrative position upon the expiration of his or her appointment or contract, the administrator shall be given written notice of this determination by the governing board. For an administrator employed by appointment or contract, the term of which is longer than one year, the notice shall be given at least six months in advance of the expiration of the appointment or contract unless the contract or appointment provides otherwise. For every other administrator, notice that the administrator may not be reemployed by appointment or contract in his or her administrative position for the following college year shall be given on or before March 15."*

Here, the District Governing Board apparently gave written notice to Dr. Kailikole *on or before March 15* that her employment would not be continued with the District. This notice is in keeping with both the law and Dr. Kailikole's contract with the District. Dr. Kailikole's contract states, in relevant part:[5]

---

[5] See attached employment contract between the District and Dr. Kailikole.

Palomar Community College District
Administrative Investigation – *Kailikole/Finkenthal Matter*
**CONFIDENTIAL**

> *"...this Agreement will automatically renew upon its expiration, and Employee will automatically be reemployed for one (1) additional year upon the expiration of this Agreement, **unless the Governing Board provides written notice to Employee on or before March 15, 2018, of its intention not to reemploy Employee** in Position for one additional academic year."* [Emphasis added]

Dr. Kailikole acknowledged to this fact finder that she had been given timely notice by the Governing Board that her contract would not be renewed. Additionally, in keeping with her contract, her employment continued while she was on paid administrative leave. The District (Ms. Cohen) advised this fact finder that Dr. Kailikole's employment contract is to be severed under Section 14 of the contract concerning "*termination of this agreement during its term with cause*." Dr. Kailikole's contract defines "*cause*" for terminations as:

> *"...those actions, omissions, or behaviors which are detrimental to the operations of the District and/or its major instructional, student and administrative divisions, or which impair the District's mission, purpose, or objectives. Conduct which constitutes a breach of contract and cause for discharge, includes, but is not limited to: unsatisfactory work performance, dishonesty, misconduct, unprofessional conduct, or insubordination."*

This investigation revealed that Dr. Kailikole engaged in misconduct, as described above, that would lead a reasonable and prudent District employer to not desire to renew an employment contract with someone who had engaged in such behavior and who could further reasonably sever the employment contract "for cause." Indeed, Dr. Kailikole's behavior related to the inappropriate sharing of confidential employee information, and a demonstrated lack of proper managerial oversite, all of which together and separately formed the basis of "*unsatisfactory work performance, dishonesty, misconduct, unprofessional conduct, or insubordination.*" Such misconduct would, under the terms of the employment contract, constitute *a breach of contract and cause for discharge*.

Dr. Kailikole had no expectation of continued service with the District and she engaged in misconduct that formed the basis of a breach of contract and cause for discharge under the terms of her employment contract. There is no credible evidence to show that there were any inappropriate motivations for either not renewing her contract and/or discharging her for cause other than legitimate business reasons and purposes. The allegation that Dr. Kailikole was subject to any form of retaliation is therefore, **unfounded**.

# 2. Interview Transcript:
# Dr. Kathryn Kailikole

## Transcript of Interview of Kathryn Kailikole – February 28, 2018

Jeff Love:    Okay, I've, uh, turned on the tape recorder and the date is, uh, February 28th, 2018.  My name is Jeff Love, L-O-V-E.  I'm an attorney.  I've been hired as a neutral factfinder for Palomar Community College.  It's about 11:45 right now in the morning.  I'm here with, uh, Kathryn Kailikole and that's K-A-I-L-I-K-O-L-E, and, uh, she is represented here in this meeting by her attorney, Evan Dwin, that's D-W-I-N.  And, uh, Kathryn, you, you realize we're recording this, correct?

Kathryn Kailikole: Yes.

Jeff Love:    And you understand that you've been, uh, directed to be here to answer my questions truthfully and to the fullest extent of your knowledge.

Kathryn Kailikole: Yes.

Jeff Love:    You intend to do so.

Kathryn Kailikole: Yes.

Jeff Love:    Thank you.  Now, um, the purpose of this interview is, uh, almost five-fold.  First and foremost, I wanna hear about, uh, your complaint of potential retaliation, these sort of things –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – that have led to apparently an administrative leave that you were placed on, uh, on or about December 14th.  Um, and your attorney, before we turned on the record, had gone through, um, and given me some context, uh, timing and issues that sort of stem back from an investigation that I had done earlier, uh, last year, uh, regarding, um, a couple of, uh, professors in the department, the physics and engineering department that, of which you're the dean of that had, uh, engaged in, uh, potential misconduct, and, and I had interviewed you at the time.  We spoke on the phone and I conducted, so you were a witness in that investigation and, and, and essentially, I think, had kind of brought the whole thing forward, uh, when you had ob, observed a number of inflammatory postings and all sorts of other things of that nature.  Does that sound familiar?

Kathryn Kailikole: Yes.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:    Okay.  Good.  Okay.  Uh, apart from that, after we hear from that, I wanna talk to you a little bit about, um, this business about the use of the, uh, uh, the ubiquitous, uh, office and that's 249, which, um, is nothing more than a storage room I understand, but it's been continually, uh, used as a laboratory, um, even against, uh, direction and so forth, so I wanna hear about that.  And then apparently there was some business where an Airsoft type gun that looks like a real gun but shoots, like, pellets, uh, was used in one of the classes.  I believe a student had brought it forward.  There was some videos and things of that nature.  I wanna, 'cause I'm investigating that whole thing as well, why that gun was there, gun, well, Airsoft pistol was there and was it used properly and did people use prudential judgment in the way they were allowing students to use it.  So, I wanna, uh, talk a little about that as well.  So, um, how long have you been with the college here?

Kathryn Kailikole: I've been with the college since January 13, 2015.

Jeff Love:    And you were hired here as the dean, were you?

Kathryn Kailikole: The interim dean.

Jeff Love:    Interim dean, and, um, tell me the technical name of the department.

Kathryn Kailikole: It's Mathematics and the Natural and Health Sciences.

Jeff Love:    Okay.  And –

Kathryn Kailikole: And it's a division.

Jeff Love:    – a division.  Thank you.  That's, was my next question 'cause there's divisions and departments, and the division, uh, concerning that part, that complaint that I investigated last year involving Nakajima, Gerwig and, and so forth, that's considered a department, is it not?

Kathryn Kailikole: Yes, the Physics and Engineering Department.

Jeff Love:    Okay.  And, um, okay.  So, um, I conducted that investigation.  Um, I had made some findings.  I had published a report.  I believe, uh, some of that report, uh, perhaps you'd been given a copy of it?

Kathryn Kailikole: Yes.

## Transcript of Interview of Kathryn Kailikole – February 28, 2018

Jeff Love:    Okay.  Um, and as part of that investigation, you were interviewed as a witness, um, and, uh, provided me information as you, as I recall, correct?

Kathryn Kailikole: Yes.

Jeff Love:    Okay, and the information you provided to me, uh, was, uh, not entirely flattering concerning Mr. Nakajima and Mr. Gerwig, correct?

Kathryn Kailikole: Yes.

Jeff Love:    Okay.  So, you get place on administrative leave on December 14th. At that time, did anybody, had, just say, let's go prior to December 14th.  Had anybody, uh, indicated to you, uh, any dissatisfaction with your employment, your behavior, uh, anything of the sort?

Kathryn Kailikole: No.

Jeff Love:    Okay.  Who is your direct supervisor there?

Kathryn Kailikole: Jack Kahn.

Jeff Love:    Kahn?  That's K-A-H-N?

Kathryn Kailikole: Yes.

Jeff Love:    Okay, and who is he?

Kathryn Kailikole: He's a vice president at, president of instruction.

Jeff Love:    Okay, the VPI.  And, uh, have you had any discussions with Mr. Kahn about, uh, your employment, um, and I don't mean in a derogatory sense, but I mean, had you met with him and said, hey, you're doing a good job, or anything like that?  Any reviews, and evaluations?

Kathryn Kailikole: My last evaluation was done by Daniel Sourbeer who was the ad, um, interim vice president of instruction.

Evan Dwin: I have a copy of that, by the way, if you, uh –

Jeff Love:    Okay.  Sourbeer, that's S-A-U-B-E-E-R –

- 3 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: It's Sour, S-O-U-R –

Jeff Love:     Oh.  Oh, okay.

Kathryn Kailikole: Beer.

Jeff Love:     B-E, B-E-E-R, right?

Kathryn Kailikole: Mm hmm.  '

Jeff Love:     Sourbeer.  Okay.  Um, and that, and, and that evaluation was done when?

Kathryn Kailikole: Um, May I believe?

Jeff Love:     Of 2 –

Kathryn Kailikole: Of last year.

Jeff Love:     May of 2017, okay.  And so, uh, and that evaluation, your attorney, Mr. Der, uh, Dwin said that he has a copy of it and I may get a look, take a look at that or get a copy from the college.  Give me, what did, how was the evaluation?  Uh, I mean, was, was it, uh, glowing?  Was it average, uh, give me your interpretation as to what you read and what you were told.

Kathryn Kailikole: It was good.

Jeff Love:     Okay.  All right.

Evan Dwin: Just to, to, uh, as a follow up to that, you know, she, she didn't review it in preparation for this interview, so she'd have to look, look, look back –

Jeff Love:     All right –

Evan Dwin: – at the –

Jeff Love:     – there, was it, uh –

Evan Dwin: Her general sense of it, you know, she can certainly.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:      Did, did you get the sense that there was anything in there derogatory, or –

Kathryn Kailikole: No.

Jeff Love:      – any, a room, needs improvement, anything like that?

Kathryn Kailikole: No.

Jeff Love:      Okay.

Kathryn Kailikole: I need to smile more when I'm under stress.  I remember that sentence –

Jeff Love:      Well, we all, yes.

Kathryn Kailikole: – because Evan read it to me.

Evan Dwin: I did.  Okay.

Jeff Love:      Yeah.  All right.

Evan Dwin: Don't, don't talk about things that we talked about.

Jeff Love:      Yeah, right –

Kathryn Kailikole: Oh, sorry about that.

Jeff Love:      – yeah.  I may ask you questions and your, you and your attorney –

Kathryn Kailikole: Sorry.

Evan Dwin: That one's okay.

Jeff Love:      – you and your attorney enjoy a certain privilege, uh, that I cannot, not anybody else can intrude upon in, in most cases.  Um –

Kathryn Kailikole: I was just trying to lighten the atmosphere.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Evan Dwin: Yeah.

Jeff Love:     Yeah.  Okay.  So, uh, you had a good evaluation.

Kathryn Kailikole: Yes.

Jeff Love:     Okay.  And, uh, December 14th, you're in your office, and what happens?

Kathryn Kailikole: I'm asked to come down to, um, DPI Kahn's office –

Jeff Love:     Mm hmm.

Kathryn Kailikole: – to discuss the outcome of the physics and engineering, um, report.

Jeff Love:     And that was the report that I prepared.

Kathryn Kailikole: Mm hmm.

Jeff Love:     Okay.  Uh, answer yes or no, uh –

Kathryn Kailikole: Yes.  Sorry.

Jeff Love:     – mm hmm sometimes it tran-, it's, uh, the court reporter might not know what you mean, but you meant yes.

Kathryn Kailikole: Yes.

Jeff Love:     Okay.  So, then what happened?

Kathryn Kailikole: I went to the office, and, um, Jack's door was closed so I had to wait.  Shawna Cohen was outside wait, also waiting.  Um, I was called in.

Jeff Love:     Mm hmm.

Kathryn Kailikole: Um, and we sat down and Shawna said to me, you may not be, you may be surprised by this.  Or expecting this.  To my recollection.

Jeff Love:     Okay.

- 6 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: I don't remember if it was –

Jeff Love:    So, she, she was –

Kathryn Kailikole: – surprised or expect –

Jeff Love:    – telling that there's gonna be a surprise.  You didn't know if there –

Kathryn Kailikole: Yes.

Jeff Love:    – was gonna be party favors –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – and they were gonna give you gifts, or –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – what was gonna happen.

Kathryn Kailikole: Right.

Jeff Love:    Okay.

Kathryn Kailikole: And, um, and, uh, and then she read the, the letter to me that –

Jeff Love:    And this letter was what?

Kathryn Kailikole: – was that I was being put on, put on administrative leave, and that because of allegations, and she stressed that they were only allegations.

Jeff Love:    Mm hmm.

Kathryn Kailikole: Of, uh, breach of confidentiality.

Jeff Love:    Okay.

Kathryn Kailikole: But I had no idea what confidentiality I had breached.

Ex. A, Page 94

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     Okay.

Kathryn Kailikole: Uh –

Evan Dwin:  Alleged, alleged.

Kathryn Kailikole: – alleged.

Jeff Love:     Right, yeah, right.

Kathryn Kailikole: Um –

Jeff Love:     Okay.

Kathryn Kailikole: – and, um, and that was all that they, so, I, I didn't know what breach of confidence –

Jeff Love:     Okay.  Did, what, was it –

Kathryn Kailikole: I honestly did not know –

Jeff Love:     – was there –

Kathryn Kailikole: – what they were talking about.

Jeff Love:     – was it, okay.  Was there any discussion point?  Did you say, well, you know, what the heck you talking about here?  I mean, uh –

Kathryn Kailikole: Yeah, I said I was at a loss.

Jeff Love:     Okay.  And, did they –

Kathryn Kailikole: Then they said they, I could ask questions.

Jeff Love:     Okay.

Kathryn Kailikole: But they, every time I asked a question, they said I can't answer that.

Jeff Love:     Okay.  All right, so –

- 8 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: And then, oh.

Jeff Love:     Okay.  I'm sorry, go ahead, then what happened?

Kathryn Kailikole: I turned to Jack, and I said, what do you need right now?

Jeff Love:     Mm hmm.

Kathryn Kailikole: Because it was happening at the worst time.

Jeff Love:     Okay.

Kathryn Kailikole: And I had to think really quickly about all the things that needed to be done –

Jeff Love:     Mm hmm.

Kathryn Kailikole: – that could be a problem.  We had a, um, annual report due.

Jeff Love:     Uh huh.

Kathryn Kailikole: For the Title 5 grant.

Jeff Love:     Okay.

Kathryn Kailikole: So, I had to make sure that he understood that that was happening.  Fortunately, that's a good very good evaluator.  She was able to get it done, I think.  I don't know.

Jeff Love:     Okay.

Kathryn Kailikole: I haven't been informed.

Jeff Love:     Okay.

Kathryn Kailikole: Um, and at that point, Jack said, it's, you can't, we can't, no.  We can't do that.  So, I just tried to, he just took notes as quickly as possible about what he needed to get done.

- 9 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:    Okay.  So, you were sorta conveying to him the projects, the critical projects and things that you were working –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – on.  No information, though, to you concerning, uh, what it was that you were said to have breached –

Kathryn Kailikole: No.

Jeff Love:    – in confidence.

Kathryn Kailikole: No.

Jeff Love:    Okay.  All right.

Evan Dwin: I just wanna put on the record that, um, I've made, uh, repeated requests to the, to the District to, um, under the, uh, personnel file statute to obtain, um, information about what the allegations are –

Jeff Love:    Mm hmm.

Evan Dwin: – against her, and, um, they've, uh, refused to provide it.

Jeff Love:    Okay.

Evan Dwin: Um, and I, um, citing inapplicable authority and, and not responding to what I think is relevant authority that demonstrates that, that she, uh, has a right to review any grievance against her.

Jeff Love:    Okay.  So, um, what happened then?  Uh, were you led out of campus, or –

Kathryn Kailikole: Yeah, I asked to be, I wanted to read it before I left the room.

Jeff Love:    The, this document –

Kathryn Kailikole: The letter.  The document that they –

Jeff Love:    – that they had.  Did they provide you a copy of that document?

- 10 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: They did.  And –

Jeff Love:    Okay.

Kathryn Kailikole: – um, Evan has it –

Jeff Love:    Okay.

Kathryn Kailikole: – at this point.

Jeff Love:    All right.  Okay.

Kathryn Kailikole: Um, but I wanted to read it and it basically was essentially what was read to me.

Jeff Love:    Okay.

Kathryn Kailikole: Um, and I –

Jeff Love:    There wasn't anything else in the document that shed light on what –

Kathryn Kailikole: No.

Jeff Love:    – it was that you –

Kathryn Kailikole: Nothing.

Jeff Love:    – particularly had, were alleged to have done wrong.  Okay.  So, then what happened?

Kathryn Kailikole: Um, Shawna had to, uh, walk me –

Jeff Love:    Mm hmm.

Kathryn Kailikole: – to my office because she had to take my key and, um, my parking pass.

Jeff Love:    Okay.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: And, they had informed me that my, uh, I would not have access to my computer –

Jeff Love:     Okay.

Kathryn Kailikole: – my email.

Jeff Love:     You'd been locked out of your computer?

Kathryn Kailikole: I'd been locked out.

Jeff Love:     Okay.

Kathryn Kailikole: Um, and so we walked and, um, VPI Kahn's office is down here.

Jeff Love:     Mm hmm.

Kathryn Kailikole: My office is up at the top of the hill, and –

Jeff Love:     I see.

Kathryn Kailikole: – we walked to there.

Jeff Love:     Okay.

Kathryn Kailikole: And as, um, we were walking, Shawna said to me, thank you for not yelling at me.  And I said, why would I do that?  And she said because other people always do.

Jeff Love:     Mm, okay.

Kathryn Kailikole: And I said, what's the point?  It is what it is.

Jeff Love:     Yeah, okay.

Kathryn Kailikole: Um, and then she asked again, do you have any questions?  And I said, I don't understand.  You had two people who, uh, violated Title 9 and Title 5, and they were never put on any kind of leave.

- 12 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:      You're talking about Nakajima and –

Kathryn Kailikole: Mm hmm.

Jeff Love:      – Gerwig.

Kathryn Kailikole: Mm hmm.

Jeff Love:      Yeah.

Kathryn Kailikole: Um, and they were left in the classroom, and I had been getting complaints last fall up until December about them from students.  And from Dr. Finkenthal.

Jeff Love:      Okay.

Kathryn Kailikole: Um, but they were never put on any kind of leave.  And I said, I, I don't understand.  How is this fair?  And she said, I can't answer that.

Jeff Love:      Hmm.  Okay.  All right.

Kathryn Kailikole: So, she, we walked into my office.  Um, I got what I could, you know, and I know she was giving me time, but it –

Jeff Love:      Mm hmm.

Kathryn Kailikole: – I –

Jeff Love:      You felt an urgency to move along.

Kathryn Kailikole: Yeah.

Jeff Love:      I'm assuming, yeah.

Kathryn Kailikole: Especially because my administrative assistant was sitting right out there.

Jeff Love:      Hmm.

Kathryn Kailikole: And she's a sweetheart.

- 13 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     Yeah.

Kathryn Kailikole: Um, and I didn't wanna make this any more stressful than I –

Jeff Love:     Right.

Kathryn Kailikole: – needed to for her.

Jeff Love:     Right, right.

Kathryn Kailikole: Um, because I couldn't say anything.  And, um –

Jeff Love:     Was there a directive, uh, that you maintain confidentiality and don't discuss anything?  Or if you could just –

Kathryn Kailikole: Yes.

Jeff Love:     – okay.

Kathryn Kailikole: There was a directive for me not to talk to anyone at Palomar College.

Jeff Love:     Okay.

Evan Dwin: Just to clarify, what time are you talking about, that, that question about the directive?

Jeff Love:     Yeah, was that –

Evan Dwin: Are you saying Shawna Cohen at this point.

Jeff Love:     – was, was that in your December 14th memo?

Evan Dwin: I don't believe so.

Kathryn Kailikole: I don't think so.

Jeff Love:     Okay.  Who was it that told you that you couldn't talk to anybody at Palomar College?

- 14 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: Uh, Shawna.

Jeff Love:   Okay.  And that was as you were walking, and –

Kathryn Kailikole: No, she said it in the, in the, in the office with, uh, Jack.

Jeff Love:   Oh, I see.  Okay.  All right.  So, it happened that day.

Kathryn Kailikole: Yeah.

Jeff Love:   And what did, what particularly or specifically did, did Shawna say?  About that?  You're not to talk or discuss this matter with anybody here at the college?

Kathryn Kailikole: Yeah.

Jeff Love:   Okay.  Was there any exception to that –

Kathryn Kailikole: To my recollection.

Jeff Love:   Okay.  All right.  Okay.  And –

Kathryn Kailikole: There was no exception.

Jeff Love:   – no exceptions.  Okay.

Kathryn Kailikole: That I know of.  Or that –

Jeff Love:   I mean, you, if you –

Kathryn Kailikole: – to my –

Jeff Love:   – don't talk to anybody here at the college except for me or Jack or anything like that?  I mean –

Kathryn Kailikole: No, it wasn't even, you know, if I was to talk to anybody at the college about this or about this –

Jeff Love:   Mm hmm.

- 15 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: – was to her.

Jeff Love:    I see.  Okay.  Okay.  So, you were allowed to talk to her, but nobody else.  That was your impression anyway.

Kathryn Kailikole: Yes.

Jeff Love:    Okay.

Kathryn Kailikole: That was my impression.

Jeff Love:    All right.  Okay.

Kathryn Kailikole: Hence, I felt that I was put under house arrest quite frankly.

Jeff Love:    Okay.  Okay.  All right.  And then, then what happened?  You went to your office and you're trying to kinda hustle through it.  You don't want your assistant who's sitting outside to become –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – embroiled in –

Kathryn Kailikole: Yes.

Jeff Love:    – it and upset and whatnot.

Kathryn Kailikole: Yes, and, and more than once, Shawna said, thank you for not yelling at me.

Jeff Love:    Okay.

Kathryn Kailikole: Um –

Jeff Love:    I guess people yell at her, huh?

Kathryn Kailikole: Yes.

Jeff Love:    Okay.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: Uh, and, um, and as we were walking out, my assistant asked me to sign things.  By that point of time, I felt that all my rights had been taken away.

Jeff Love:     Well, right, yeah.

Kathryn Kailikole: So, I'm standing there at a loss of what to do.

Jeff Love:     Mm hmm.

Kathryn Kailikole: Um, and I had to look at Shawna and she just shook her head and let, allowed me to make those signatures.

Jeff Love:     Okay.

Kathryn Kailikole: So, I wouldn't have to explain to –

Jeff Love:     Right.

Kathryn Kailikole: – my assistant what was going on.

Jeff Love:     What were the things that you were allowed to sign?

Kathryn Kailikole: I don't know.  Whatever she put in front of me.  I mean, I looked at 'em but at the time, I was so upset.  It was pretty much the normal standard kinds of things that I would sign –

Jeff Love:     Perfunctory type of –

Kathryn Kailikole: Mm hmm.

Jeff Love:     – uh, things, okay.  All right.  So, then what happened?

Kathryn Kailikole: Um, and then she walked me to, um, the car.  They also told me that, um, now, I'm sorry.  I'm just trying to remember –

Jeff Love:     Sure.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: That, um, they, they needed to hire an investigator.  And they weren't gonna do anything now.  And then ironically told me to just go and enjoy my holidays, which of course, I didn't.  Um, and, that they would have somebody hired, uh, by mid-January.  I didn't hear from them until mid-February.

Jeff Love:     Okay.

Kathryn Kailikole: So, I was left –

Jeff Love:     Okay.

Kathryn Kailikole: – in a quagmire.

Jeff Love:     Yeah.  So, uh, were you walked to your car, or were you just allowed to leave –

Kathryn Kailikole: Yes, well, I, well, I, she had to walk me to the car because she had to pick up the parking pass.

Jeff Love:     Oh, okay.

Kathryn Kailikole: And, and –

Jeff Love:     You have faculty parking then?

Kathryn Kailikole: Yeah.  And I asked her, do you wanna ride back down.  I'm happy to give you a ride back down.

Jeff Love:     Mm hmm.

Kathryn Kailikole: And, um, and she said, no, it's okay.  I'll walk.  And then she said, I'm so sorry.  I just need to remind you because we were, 'cause I had forgotten that she wanted the parking pass.

Jeff Love:     Mm hmm.

Kathryn Kailikole: And I could tell she was feeling really bad.  So, I handed her the parking pass, and my last words to her was that I valued her.

Jeff Love:     Mm hmm.

- 18 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: I got in my car and I drove home.

Jeff Love:    Okay.  And, uh, uh, when was the next time you had any communication from the college as to the status of your –

Kathryn Kailikole: February 15th.

Jeff Love:    Okay, and on, was there ever, uh, a directive for you, like, to check in with the college, or it was, it, was it one of these things, don't call us, we'll call you type of a deal?

Kathryn Kailikole: Yes.

Jeff Love:    Okay, so, February 15th, who calls you?

Kathryn Kailikole: Nobody called me.

Jeff Love:    Somebody contacted you?

Kathryn Kailikole: Email.

Jeff Love:    Email.  And, uh, what'd the email say?

Kathryn Kailikole: That they wanted me to come in on February 22nd to, um, be interviewed.

Jeff Love:    Okay.

Kathryn Kailikole: By ****.

Jeff Love:    Okay.

Kathryn Kailikole: Between the time, however, because I had not heard from the campus, I sought legal.

Jeff Love:    Okay.

Kathryn Kailikole: Counsel.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     Okay.

Evan Dwin:  She, just, she'd been **** like she'd been in **** like she's told you before, she'd been instructed not to do what she just, e, e, to contact anybody, so I don't, you know, how can she –

Jeff Love:     No, nobody on campus.

Evan Dwin:  Right, so how's –

Kathryn Kailikole: Yeah.

Evan Dwin:  – she supposed to check in if she's been –

Jeff Love:     Yeah, right.

Evan Dwin:  – instructed not to talk to anyone?

Jeff Love:     No, I'm just, I'm just wondering if they had given her an instruction to contact any particular person to check in or anything.  But it sounds like not.

Evan Dwin:  They told her the opposite I think is what I'm saying.

Jeff Love:     And were, was your salary continued?

Kathryn Kailikole: Yes.

Jeff Love:     Okay.  All right.

Kathryn Kailikole: However, I did have fear that I wasn't gonna get paid.  The reason I had fear regarding this matter was because I still have not been given reimbursement checks for travel for the college that occurred in November.

Jeff Love:     Mm.

Kathryn Kailikole: So, I, every month I would –

Jeff Love:     Have you, have you, have –

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: – I would be surpri, I mean, I really had concern whether or not I would be paid.  Even though –

Jeff Love:     Okay.

Kathryn Kailikole: – they said that I would be put on paid leave.

Jeff Love:     Did those, were you finally given reimbursement?

Kathryn Kailikole: No.

Jeff Love:     Not yet?

Kathryn Kailikole: No.

Jeff Love:     Okay.  And this is something you submitted in November?

Kathryn Kailikole: Yes.

Jeff Love:     Is it characteristic of the department to have a delay like that?

Kathryn Kailikole: Not for 2½ months.

Jeff Love:     Okay.  All right.  How would you normally receive those checks?

Kathryn Kailikole: They would have been, they would've come to my office.

Jeff Love:     Interoffice mail?

Kathryn Kailikole: Mm hmm.

Jeff Love:     Okay.

Kathryn Kailikole: And it's not as if everybody does not know I'm on administrative, I mean, on leave.

Jeff Love:     Right.

Kathryn Kailikole: Maybe not administrative.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     Okay.  All right.  Okay.  So, um, tell me why it is you thing that, uh, this might be retaliatory?  Your attorney, we had talked, before we turned on the tape and that, that there, that the timing was somewhat suspicious.  Hey, come on over.  We're gonna talk about this investigation, which wasn't the case.  It doesn't sound like you talked about the investigation, did it?  Did you?  I mean, you, you're shaking your head no.

Evan Dwin:  I don't understand, understand the question, sir.

Kathryn Kailikole: We, I don't understand.

Jeff Love:     Oh, I'm sorry.  Um, it, it, you, in other words, they called, they.  Um, somebody called you on, on December 14th and said, hey, come on over to Jack's office.  We wanna talk about the –

Kathryn Kailikole: Yeah, I wasn't even –

Jeff Love:     – investigation –

Kathryn Kailikole: – really called.  I was given an email –

Jeff Love:     An email.

Kathryn Kailikole: – sent an email.

Jeff Love:     Okay.

Kathryn Kailikole: Saying, and it wasn't about the investigation.  It was the outcome of the investigation.

Jeff Love:     Or, the outcome of the investigation.

Kathryn Kailikole: Mm hmm.

Jeff Love:     Okay.  But, did you –

Kathryn Kailikole: Because I was asking –

Jeff Love:     Mm hmm.

Ex. A, Page 109

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: – whether, what, what need, because I was asking about the outcome.

Jeff Love:     Mm hmm.

Kathryn Kailikole: Because I was getting complaints from the students, because they had been allowed to remain in the class.

Jeff Love:     What sort of complaints were you getting from students?

Kathryn Kailikole: Um, Nakajima was, um, giving 3-hour exams, which is against Ed Code.  He was changing the time of the exams and having the students come in at a different time to take 3-hour exams.

Jeff Love:     Is that allowed?

Kathryn Kailikole: No.

Jeff Love:     Or, it, it, was he directing the students to do that, or allowing the students to do that?

Kathryn Kailikole: He was having them all take a vote in class by hand.

Jeff Love:     Okay.  In other words, how many people wanna take the, uh, by raise, by show of hands, how many, uh, students want to take the test on this date?  And it may be different than the scheduled date that's on the syllabus.

Kathryn Kailikole: Right.

Jeff Love:     Okay, and so, a majority of students ostensibly would raise their hand, and the, uh, test date would be moved to the, the date that was proposed?

Kathryn Kailikole: Yes.

Jeff Love:     Okay.

Kathryn Kailikole: He was also, so, he had a practice and at the beginning of the, um, semester, I had also directed them, um, with Daniel Finkenthal –

Jeff Love:     Mm hmm.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: – that the, um, that their syllabus for the laboratory had to change, um, and, because the syllabus, like the letter, the warning letter?

Jeff Love:     Right, I remember the –

Kathryn Kailikole: That I believe I shared with you?

Jeff Love:     – warning letter, right.

Kathryn Kailikole: So, the syllabus also had information similar to the letter in the laboratory syllabus, but it also had a grading scheme, that if you didn't finish the lab within a certain amount of time, you –

Jeff Love:     Right.

Kathryn Kailikole: – started earning negative points.

Jeff Love:     Right.  Okay.

Kathryn Kailikole: And I, and they still were using it.

Jeff Love:     I remember that.

Kathryn Kailikole: So, I gave them the directive that they had to stop using it.  So, instead, Nakajima switched it to extra credit.  But it still –

Jeff Love:     Finishing early, you get extra credit.

Kathryn Kailikole: Mm hmm.

Jeff Love:     Okay.

Kathryn Kailikole: So, essentially, fundamentally doing the same thing.

Jeff Love:     Right.  Right.  It was, uh, using it, a –

Kathryn Kailikole: Mm hmm.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:      – positive reinforcement as opposed to a negative reinforcement to get people to finish their exam sooner.

Kathryn Kailikole: Mm hmm.

Jeff Love:      Okay.

Kathryn Kailikole: Dr. Finkenthal and I had requested that they not be put in class during the investigation.

Jeff Love:      Mm hmm.

Kathryn Kailikole: Given their history.  But they were allowed to stay in class.  So, at, as this outcome was coming up, I was insisting that they not be allowed to teach in the spring semester.

Jeff Love:      And who were you making that request to?

Kathryn Kailikole: To my boss and to VP Norman.

Jeff Love:      Uh, Norman.

Kathryn Kailikole: Lisa Norman, Dr. Norman.

Jeff Love:      Okay.  So, you talked, uh, Dr. Norman and Jack Kahn –

Kathryn Kailikole: Mm hmm.

Jeff Love:      – hey, I don't want these guys, I didn't want them teaching during the pendency of their investigation.

Kathryn Kailikole: Mm hmm.

Jeff Love:      I don't, I, and I don't want them teaching in the spring, uh, 2018 semester.

Kathryn Kailikole: Yes.

Jeff Love:      Okay.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: And, and, um, and I sent that in email.

Jeff Love:     Okay.  Okay.

Kathryn Kailikole: I made that request in email.  And I did include Dr. Finkenthal because he was making the request with me.

Jeff Love:     Okay, and, and Finkenthal is your chair, is he not?

Kathryn Kailikole: Yes.

Jeff Love:     Okay.

Kathryn Kailikole: Mm hmm.

Jeff Love:     And what, uh, what was the outcome of that?

Kathryn Kailikole: Well, we –

Jeff Love:     I mean, was there a response back?

Kathryn Kailikole: Yeah, so there, well, not in writing that I, I don't, I don't recall. I mean, there could've an email response back.

Jeff Love:     But I mean, was there some sort of communication back with you from –

Kathryn Kailikole: Yes.

Jeff Love:     – either Norman –

Kathryn Kailikole: Norman I believe, and it was that we couldn't do that at that, this time.

Jeff Love:     Did, uh, did, uh, she indicate why?

Kathryn Kailikole: No.

Jeff Love:     Okay.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: I don't remember.  I don't recall.

Jeff Love:    Okay.  All right.  All right, but Norman was the one that responded back to that –

Kathryn Kailikole: Yeah.

Jeff Love:    – request.

Kathryn Kailikole: Mm hmm.

Jeff Love:    And that request –

Kathryn Kailikole: And that, but –

Jeff Love:    – after they –

Kathryn Kailikole: – they, but it, I believe, I don't know for sure, um, that, um, they aren't in class at this time for the spring.

Jeff Love:    Okay.  So, you think they may be on administrative leave?

Kathryn Kailikole: No.  They're –

Jeff Love:    Okay.

Kathryn Kailikole: – paid.  They're here.  They're just no in class.  I, I hope.

Jeff Love:    Okay.

Kathryn Kailikole: I don't know.

Jeff Love:    All right, but they're not teaching this semester?

Kathryn Kailikole: That's my hope.

Jeff Love:    Okay.

Kathryn Kailikole: That was my, that was my request.

- 27 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:    Okay.  And the, the request for you, for them not teaching was their poor behavior –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – as, as indicated in my investigation and, and other things.  I think there was some issues –

Kathryn Kailikole: Right.

Jeff Love:    – of insubordination to –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – your direction –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – and you talked about this, now the, their, uh, syllabi was –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – not consistent with, uh, what you had directed them to conform it to.

Kathryn Kailikole: Mm hmm.

Jeff Love:    Yes?

Kathryn Kailikole: Yes.

Jeff Love:    Okay.  All right.

Kathryn Kailikole: Yes, I'm sorry.

Jeff Love:    Okay, and that's all right.  Okay.  So, for those reasons, you wanted them to not be teaching.  You felt that they were not acting appropriately and –

Kathryn Kailikole: Right.

Jeff Love:    – and all the signage and the things –

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: Mm hmm.

Jeff Love:     – that were there –

Kathryn Kailikole: Right.

Jeff Love:     – uh, the, for students to see and all that sorta –

Kathryn Kailikole: Yes.

Jeff Love:     – stuff.  Okay.

Kathryn Kailikole: And, and –

Jeff Love:     Was, was there, was there any sense that, um, there was some support for them?  Them being Nakajima, uh, Gerwig, that there was some inordinate support, uh, for them as opposed to, uh, heeding your wishes in that regard?

Evan Dwin: Could we just clarify the timeframe here?

Jeff Love:     Yeah, I'm talking about when you made the request of Norman, uh, and Kahn.  I know that, uh, Norman came back, says, uh, we're, we're not gonna do that.  We can't do that.  Um, but did you get the sense during that timeframe that there was something else going on that was protecting them?  In the, in a sense that, you know, you as the, as the dean, uh, saying, hey, I don't want these, uh, these two guys teaching, but that, that didn't happen.

Kathryn Kailikole: Um –

Jeff Love:     I mean, if you know.  I mean, you, you might not know what other –

Kathryn Kailikole: I don't, I don't know.

Jeff Love:     – people are thinking, obviously.

Kathryn Kailikole: I can tell you what I feel, but I can't tell you what I know.

Jeff Love:     Well, tell me what you feel.  And I, and I understand, it's, uh, it's, it's maybe a degree of conjecture, but it may be based on some circumstantial facts.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Evan Dwin: Can we take a 1-minute break?

Jeff Love:    Sure, yeah.  Let's put the re, uh, the, everything on hold.  If you guys wanna step outside.

Evan Dwin: Yeah, that's perfect.  Thanks.

Jeff Love:    Okay, we're back on the record.  We took a quick break for Ms. Kailikole to, uh, consult with her attorney.  Um, think we were talking about, um –

Kathryn Kailikole: Why –

Jeff Love:    – your speculation, or your thoughts and beliefs concerning, um, why these fellows, uh, Gerwig and Nakajima were not placed on administrative leave, or stopped from teaching, or maybe even punished more harshly or whatever, 'cause I'm not certain what the outcome of their, their disciplinary action was.

Kathryn Kailikole: Oh.  Um, their behavior, Nakajima's in particular, has been going on for 20 years.

Jeff Love:    I think you told me that before **** –

Kathryn Kailikole: Everyone on this campus knows it.

Jeff Love:    Mm hmm.

Kathryn Kailikole: My previous, um, my predecessors, the deans before me.

Jeff Love:    Right.

Kathryn Kailikole: That I have spoken to, all had problems with Nakajima and Gerwig.

Jeff Love:    Wasn't Sourbeer your predecessor?

Kathryn Kailikole: He was one of them, yes.

Jeff Love:    Okay.

- 30 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: But, there were other deans –

Jeff Love:     Uh, right.

Kathryn Kailikole: – that I've spoken to.

Jeff Love:     Right.

Kathryn Kailikole: Where this was still the same problem.

Jeff Love:     Okay.

Kathryn Kailikole: Um, and the sense that I got was that, um, that these two were untouchable and that they felt they were untouchable.  And that they could, um, behave in the way that they behaved with impunity.

Jeff Love:     Did your observations of their workplace, the posters and all that sort of stuff, tend to reinforce that in your mind?

Kathryn Kailikole: Yes.

Jeff Love:     Okay.  And, um, did anybody ever kinda tell you that?

Kathryn Kailikole: Yes.

Jeff Love:     Who was that?

Kathryn Kailikole: Numerous people did.

Jeff Love:     Okay, that they were sort of untouchable, they'd been there so long and –

Kathryn Kailikole: That they've, that they've tried.  The former deans.

Jeff Love:     Okay.  Okay.

Kathryn Kailikole: That they had tried.  That they had come up against these problems.  Nobody would back them up.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:    Okay.

Kathryn Kailikole: Including the administration.

Jeff Love:    Okay.  Okay.

Kathryn Kailikole: I had faculty not even in my division tell me this.

Jeff Love:    Other, other faculty members that were –

Kathryn Kailikole: Other faculty members.

Jeff Love:    – that may've taught course with them, or –

Kathryn Kailikole: Yes.  I've been in meetings –

Jeff Love:    Mm hmm.

Kathryn Kailikole: – with the whole department, the counseling department, telling me they will not let, they will not send any of their students to Nakajima or Gerwig, and they'll have them go to MiraCosta instead.

Jeff Love:    Mm hmm.  And it, because they don't like their teaching style, they feel they're loose cannons?  Did they say exactly what it was they didn't like about them?  The gen, what was the general flavor I guess?

Kathryn Kailikole: That they, um, that they're mean.

Jeff Love:    Oh, okay.

Kathryn Kailikole: That they discriminate.

Jeff Love:    Mm hmm.  Okay.  And was that –

Kathryn Kailikole: I was called in –

Jeff Love:    I'm sorry, go ahead.

Kathryn Kailikole: Well, Veterans Affairs.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:    Uh huh.

Kathryn Kailikole: I was in a meeting with Veterans Affairs to listen to what they had done to veteran students.

Jeff Love:    Okay.  And they, these were veteran students that were veterans that had complained about Nakajima and Gerwig.

Kathryn Kailikole: To, to no result.

Jeff Love:    Mm hmm.  Okay.

Kathryn Kailikole: So, so these two believe they're untouchable.

Jeff Love:    Okay.  Okay.  Is it your belief, then, that because you tried to touch the untouchables that, um, you got yourself in bad odor with the college?

Kathryn Kailikole: Yes.

Jeff Love:    Okay.  Is it your belief, then, that the idea that you may have, this allegation that you shared, um, confidential information, whether it's real or imagined, did, do you feel that that was just a pretext?  In the sense, that, then when I say pretext, in other words –

Evan Dwin: Let's take a break so I can –

Jeff Love:    – just, you know, just a casual –

Evan Dwin: Just wait a second.  Sorry.  Can we take a break so that I can go out with her –

Jeff Love:    Well, I think she can answer the question.  I mean –

Evan Dwin: I, I think I'd like a break first to talk to her and –

Jeff Love:    Okay.  Gonna have to comment on her credibility if she can't answer questions without your coaching.  But you can take a break.

Evan Dwin: I wanna explain then ****.  Then we, I wanna –

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     Sure.  Yeah.

Evan Dwin:  – explain –

Jeff Love:     Maybe that would be helpful.

Evan Dwin:  – that –

Jeff Love:     But, you know what?  Look, go ahead and take a break.  You, you, you can, you can talk to her.  Go ahead.  I, I'll put this on hold.  In fact, I'll step out.

Evan Dwin:  **** explain that sorta stuff.

Jeff Love:     Yeah, we're back on the record now, but there, we were talking off the record about a term that I used, uh, pretext.  I think I had asked you that if you thought, I'm not suggesting it was, but if you thought that the reason that you were placed on administrative leave, this idea that you had, um, allegedly shared confidential information was merely a pretext.  In other words, a, uh, a red herring. A, uh, uh, a phony reason, if you will, um, to punish you, and the real reason was that you had taken on and attempted to discipline or instill some sort of, uh, scholastic sanity down there in the department with Gerwig and, uh, uh, Nakajima. Did, did you conclude that?  That, ah, you know, this, uh, this leaking of confidential information is a buncha hooey.  Um, I think what's going on here is that I pushed the wrong buttons here and I went after a couple of sacred cows.  I'm using these clichés.  I'm sorry, but I, I think it's the best way for me to, to try to get that response.

Kathryn Kailikole: It's what I believe.

Jeff Love:     Okay.

Kathryn Kailikole: And it's what I believe because, because even before this happened –

Jeff Love:     Mm hmm.

Kathryn Kailikole: – there are people on this campus who had acknowledged that that was what I was doing.

Jeff Love:     So, he –

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: And they had concerns for me.

Jeff Love:    Oh, okay.  So, people had said to you, um, that, hey.  Um, you know, the, they've tried to go after these guys before to, to get them, uh, in proper order and you need to be careful.

Kathryn Kailikole: Yes.

Jeff Love:    People told you that?

Kathryn Kailikole: Yes.

Jeff Love:    Who told you that?

Kathryn Kailikole: Um, my former boss.

Jeff Love:    Who's that?

Kathryn Kailikole: Daniel Sourbeer.

Jeff Love:    Sourbeer.  Okay, and he used to be the dean there?

Kathryn Kailikole: Mm hmm.

Jeff Love:    And you said he had a bad experience trying to –

Kathryn Kailikole: He, he could –

Jeff Love:    – do the same thing.

Kathryn Kailikole: – not get support.

Jeff Love:    Okay.

Kathryn Kailikole: From the administration.  And he supported me.  And that's why I did it.  Um –

Jeff Love:    I see.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: – but then, he left.

Jeff Love:    Mm hmm.  Okay.  What, so what the heck's going on there?  I mean, what, what's with Nakajima and, uh, and Gerwig?  Why, why –

Kathryn Kailikole: I don't know.

Jeff Love:    Okay.

Kathryn Kailikole: Because the entire campus knows.  What these two are about –

Jeff Love:    And they've been around for, they've been around for many years it looks like.

Kathryn Kailikole: Yes, and so, instead of addressing it, it's been there and it's festered.

Jeff Love:    Okay.

Kathryn Kailikole: And it's become, um, so distasteful.

Jeff Love:    Okay.

Kathryn Kailikole: Um, that instead, people on this campus have instead done workarounds.  Like the counselors.  Telling all of our students, some of whom can't afford to be at two colleges and pay two, um, registration fees.

Jeff Love:    Right.

Kathryn Kailikole: To go to MiraCosta.

Jeff Love:    To avoid taking their classes.

Kathryn Kailikole: Yes.

Jeff Love:    Okay.  And I'm assuming in your, uh, previous role, uh, and your complaint against them for all of the things that were – pardon me?

Kathryn Kailikole: Can I stop a minute?

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:    Oh, sure.  Let's go off the record just for a second.  Okay, we're, we're back on the record.  We took just a brief, uh, respite if you want.  Um, and we were kinda talking about the, this, uh, idea that supposedly Gerwig, Mr. Gerwig, Mr. Nakajima who have taught for many years, uh, uh, seem, uh, seem, uh, according to, uh, what Dr. Kailikole's telling me she's hearing from others that, that they have su, kind of run roughshod and have run unchecked and seem to evade any sort of corrective action.  Prior Dean Sourbeer, others have told you, they've tried to correct it, couldn't get support from administration to, to bring them to heel.  Um, to, uh, you know, to com, comply with educational standards.  You had noticed, um, going, harking back to, harkening back to our prior in, investigation that their, their syllabus, their, some of these warning letters, uh, certainly the, the all the postings and commentary that was open and notoriously left about the area where students conj, uh, congregated and were taught and so forth were inconsistent with what, um, what the law would require, certainly, and what you expected I'm assuming.

Kathryn Kailikole: Yes.

Jeff Love:    Okay.  Beyond the fact that they've just been here forever, so to speak, um, and might have, uh, certain, uh, entitlements under the law, um, is there anything else that would, uh, indicate, uh, why it was that they, that there was this reluctance to do anything with these two folks?

Evan Dwin:  If you know.

Jeff Love:    If you know.  I mean, you might not, and you only know what you know.  And you've only been here, really, a relatively short period of time.

Kathryn Kailikole: Yeah.

Jeff Love:    Okay.  All right.  Fair enough.  Okay, um, anything else about the, your departure here on administrative leave, and its connection to the, uh, your role as a witness and complainant in the underlying, um, investigation that I conducted.  Is there anything else that we haven't talked about would be important for me to know about in that regard?

Kathryn Kailikole: Um, since starting in, uh, January of 2015 –

Jeff Love:    Mm hmm.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: – um, I have tried to address issues in the division, my former boss, VPI Sourbeer, um, was helpful in that he was, he let me know some of the conditions that existed.

Jeff Love:    Right.

Kathryn Kailikole: And one of 'em was in the Physics and Engineering.  For the past 2 years, I've been trying to address it.

Jeff Love:    Mm hmm.

Kathryn Kailikole: And I've addressed it following policy and procedure and Ed Code.  And while Dean Sour, uh, VPI Sourbeer was here, he would support me in that.  Every time I tried to make a change and provide a directive, Nakajima would do everything in his power to get it rescinded.  He would go around me, um, go to the, the senate president, go to other faculty, to try to, um, get things turned around.

Jeff Love:    So, he was undermining you?

Kathryn Kailikole: Mm hmm.

Jeff Love:    Okay.

Kathryn Kailikole: He even went to another dean.

Jeff Love:    Who was that?

Kathryn Kailikole: Margie Fritch.

Jeff Love:    Fritch?

Kathryn Kailikole: Yes, F-R-I-T-C-H.

Jeff Love:    And who's she?

Kathryn Kailikole: She's the dean for, um, career and technical education.

Jeff Love:    Did she talk to you about, uh –

- 38 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: She told me that he had come to her.  And she said it was, it, um, um, and he was, uh, not sleazy but, um, suspicious –

Jeff Love:     Oh, uh, yeah, right.

Kathryn Kailikole: – I mean it was sus –

Jeff Love:     It was, it was, uh, uneth –

Kathryn Kailikole: Just it didn't smell good.

Jeff Love:     – un, kinda unethical.

Kathryn Kailikole: Yeah.

Jeff Love:     That, uh, he's going over to one of your peers and was he kinda badmouthing you to her?

Kathryn Kailikole: More or less and wanting to, because, because there were things that I was stopping, practices –

Jeff Love:     Right.

Kathryn Kailikole: – that I was stopping.  And, he was trying to, to say, well, wait a minute.  Doesn't that practice exist in your division?

Jeff Love:     Oh, I see.  In other words, trying to get her to say something that later he could use, uh, and pit her against you perhaps.

Kathryn Kailikole: Mm hmm.

Jeff Love:     Yeah, okay.  When was that, that that happened?  Was that –

Kathryn Kailikole: This –

Jeff Love:     – early on?

Kathryn Kailikole: – all of, this has gone on from the moment I started to address the issues that were going on in that department.  So, it's been going on for 2 years.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:      Two years.

Evan Dwin:  Let's listen to his question too.  I think he was –

Jeff Love:      Yeah, I mean, when, when –

Evan Dwin:  – he was asking about this issue with the other deans –

Jeff Love:      – Margie Fritch –

Kathryn Kailikole: Oh –

Jeff Love:      – contacted you –

Kathryn Kailikole: – that one happened in the Spring of last year I believe.

Jeff Love:      Okay.  So, this –

Kathryn Kailikole: I believe.  It could've been the Fall.

Jeff Love:      Okay.  So, this was during the whole time where this investigation was unfolding –

Kathryn Kailikole: Mm hmm.

Jeff Love:      – that I conducted.

Kathryn Kailikole: Mm hmm.

Jeff Love:      Okay.  And which was part of your attempts to sort of rein these fellas in.

Kathryn Kailikole: Mm hmm.

Jeff Love:      Okay.  All right.  Okay.  Let me, uh, couple of other, the, let's get these other collateral things off the table.  This business with this, this, um, Room NS-249 which –

Kathryn Kailikole: Yes.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     – I think we all know, is it supposed to be the storage room?

Kathryn Kailikole: Yes.

Jeff Love:     Is that, isn't that so?

Kathryn Kailikole: Yes.  Yes.

Jeff Love:     Okay.  And I, correct me if I'm wrong, but didn't you give direction to Nakajima and to Gerwig and whoever else to please use that as a storage room and not as a laboratory?

Kathryn Kailikole: Yes.  It was, do you need to more details?

Jeff Love:     Yeah, yeah.  I mean, I mean, I think we talked about this before, but I, you had given 'em pretty clear direction to, thou shalt not use NS-249 as a lab.

Kathryn Kailikole: Yes.

Jeff Love:     Okay.

Kathryn Kailikole: And, that was done in front of, um, not only to Dan, to Gerwig and to Nakajima –

Jeff Love:     Mm hmm.

Kathryn Kailikole: – but, um, Finkenthal and, um, I'm sorry, it's just that, so I'm having difficulty remembering the name of the young man.

Jeff Love:     The young, yeah, Hispanic last name?

Kathryn Kailikole: Mm hmm.  Yes.

Jeff Love:     Um, it'll come to me.  I know who you're talking about.  He was another witness in, in the underlying –

Kathryn Kailikole: Mm hmm.

Evan Dwin:  The other professor?

- 41 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: Yes.  He's the –

Jeff Love:    Hold on, hold on.

Kathryn Kailikole: – junior profe, uh, faculty.

Jeff Love:    Hold on.  I think I know.  I, well, just so we get the record straight here.  That would be, um, Hector Garcia Villa?

Kathryn Kailikole: Yes.

Jeff Love:    Villa?  V-I-L-L-A.

Kathryn Kailikole: Yeah.  Yes.

Jeff Love:    Okay, right.  Anyway.

Kathryn Kailikole: So that it's clear, I had –

Evan Dwin:  And what you're –

Kathryn Kailikole: – given –

Evan Dwin:  Oh, sorry.  What you're talking about is in your giving the direction –

Kathryn Kailikole: Right.

Evan Dwin:  – to not **** –

Jeff Love:    You're giving the direction to everybody –

Kathryn Kailikole: Well, I was giving the direc, yeah, so I'm letting you, I, I gave the direction so that that directive was given in front of people.

Jeff Love:    Right.

Kathryn Kailikole: Um –

Jeff Love:    It was at a staff, uh, uh, department, uh –

- 42 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: It was at a department meeting.

Jeff Love:      Uh huh.

Kathryn Kailikole: Um, I had given an email directive to Nakajima to stop doing certain things, and that other things would happen.  I did not at that point in time know that they were using that room as a classroom.  Finkenthal contacted me and said, we're having, um, a, a department meeting to discuss the directives that you gave.  I think you should be there.

Jeff Love:      Okay.

Kathryn Kailikole: So, I went up there.

Jeff Love:      When was that, approximately?

Kathryn Kailikole: This was in the, um, Fall of 2016.

Jeff Love:      Okay.

Kathryn Kailikole: I think.

Jeff Love:      Okay.

Kathryn Kailikole: It was, I, it was at the start of a semester.  I believe it was the Fall of 2016.

Jeff Love:      Right.

Kathryn Kailikole: It could've been the Spring of 2017.

Jeff Love:      Okay.

Kathryn Kailikole: But it was one of the two.

Jeff Love:      Okay.  Okay.

Kathryn Kailikole: And the meeting was taking place in the 249.  And, as I'm sitting there and they're, they're discussing, the issue that they used the room,

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

because part of what was happening was that they were, they were teaching two different classes at the same time.  One class in the, in the storage space.

Jeff Love:     Right.

Kathryn Kailikole: And another class in there.

Jeff Love:     Mm hmm.

Kathryn Kailikole: Uh, in the actual classroom.  And, um, and it, via Code, it's just wrong.

Jeff Love:     Right.

Kathryn Kailikole: Um, the other thing that I, I found out from, um, VPI Sourbeer was that at some point in time, and there was still concern that they were doing it and hiding it, they would have, because it was, um, sort of like Physics 1A and 1B.

Jeff Love:     Right.

Kathryn Kailikole: They would use the 1B students as TAs and have them grade the 1A students.

Jeff Love:     Yeah, pushing off their work onto students –

Kathryn Kailikole: Well, also, that, right, and creating a, um, to, I'm using the description from one of the adjunct physics faculty, a, um, Lord of the Flies environment.

Jeff Love:     Right.  Treating them like, uh, grad assistants and they haven't graduated from anything.

Kathryn Kailikole: Right.

Jeff Love:     Yeah.

Kathryn Kailikole: And, and, and also, they've created such a, um, hostile environment where if you're not a syc, a sycophant –

Jeff Love:     Mm hmm.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: – um, you would be penalized for it.

Jeff Love:     Right.

Kathryn Kailikole: So, those 1B students would behave in the same way –

Jeff Love:     Right.

Kathryn Kailikole: – that they did and, and then heap it onto the one, the 1B students would heap it onto the 1A students.

Jeff Love:     Okay.

Kathryn Kailikole: So, um, so I had stopped the practice of those, the classes being allowed to be scheduled at the same time, taught by one instructor.

Jeff Love:     Okay.

Kathryn Kailikole: Because I thought it was in the same lab room.

Jeff Love:     Okay.

Kathryn Kailikole: And as I'm sitting there, I come to realize that they're using the storage room as a lab.  And I start to look around the room, and I see all sorts of hazards.

Jeff Love:     It wasn't permitted to be used as a laboratory –

Kathryn Kailikole: No.

Jeff Love:     – was it?

Kathryn Kailikole: No.  And there –

Jeff Love:     Okay.

Kathryn Kailikole: – were so many hazards in the room –

Jeff Love:     Right.

- 45 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: – that, um, that, that a student could've been injured at any, any point in time. And then, when I realized that, that's when I gave the directive that they could no longer use that room as a lab. It is a storage room.

Jeff Love:    And, that was, uh, around Fall of 2016? Early –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – 2017?

Kathryn Kailikole: Mm hmm.

Jeff Love:    Did you get information to conclude that it was still going on thereafter?

Kathryn Kailikole: Yes.

Jeff Love:    And how, how did you come about knowing that?

Kathryn Kailikole: Um, when the Title 5/Title 9 violation occurred.

Jeff Love:    Okay. That's when all of, uh, when Finkenthal came forward with, look at these, uh, posters. Look at these documents and that sorta stuff.

Kathryn Kailikole: Yes.

Jeff Love:    Okay. From the time that you had learned about that lab being used, continuing to be used, that storage room, uh, used as a lab, um, even through that, uh, Title 5, uh, did you actually ever go down there, or check in or do anything like that? To see for yourself?

Kathryn Kailikole: Um, no.

Evan Dwin: Well, what timeframe **** –

Kathryn Kailikole: Yeah, what, when?

### Transcript of Interview of Kathryn Kailikole – February 28, 2018

Jeff Love:    I mean, from the time, uh, let's just say from the time that you, this Fall 2016 to 2017, I know that you had heard about it from Finkenthal.  He showed you all the, the, you know, the postings –

Kathryn Kailikole: Mm hmm.  Mm hmm.

Jeff Love:    – and all that stuff that was in there.  Was there a ch, a time that you went down to that location –

Kathryn Kailikole: During the time of the investigation?

Jeff Love:    From the time of the investigation 'til even the time you were placed administrative leave.

Kathryn Kailikole: No.

Jeff Love:    Okay.  How come you didn't go down there and look?  I'm just curious?  I mean, didn't you wanna see if, if they were complying?  Or were you relying on some other information from Finkenthal?

Kathryn Kailikole: I was, uh, it was Finkenthal's responsibility.  He is the chair.

Jeff Love:    Okay.  All right.

Kathryn Kailikole: And, also, um, uh, trying to figure how to, so, you know, as the dean, um, you want to, um, you want your faculty to trust you.

Jeff Love:    Right, yeah.

Kathryn Kailikole: Um, and so, one of the things that, as a, a dean doesn't do, they don't go into the classroom.  Check up on things.  Um, uh, check up on their faculty without, uh, fair notice.  Um, and, so, I wouldn't have gone.

Jeff Love:    Okay.

Kathryn Kailikole: And this is why it was the chair's responsibility.

Jeff Love:    Is that sort of a practice here?

Kathryn Kailikole: Yes.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     Okay.  Is that particular to, uh –

Kathryn Kailikole: Dean.

Jeff Love:     – Palomar?

Kathryn Kailikole: Might be particular to Palomar, yes.  It's, I think it's a little bit, it's connected to the faculty union as well.

Jeff Love:     Is it due to union rights?

Kathryn Kailikole: I think so.

Jeff Love:     Okay.

Kathryn Kailikole: Um, but I would, because I've been at other institutions, um, it is a, uh, professional courtesy.

Jeff Love:     Hmm, okay.  Does, um, I'm just curious.  During evaluation periods and so forth, sometimes colleges or departments will have somebody sit in on classes.

Kathryn Kailikole: Yes.

Jeff Love:     Um, with having taught myself in the Cal State system, it, you know, they, if somebody would walk in and you'd write something on the board, you turn around, they were gone, and they've already done their evaluation on you.  I mean, it wasn't anything meaningful it seemed like.  But, do they do that here?

Kathryn Kailikole: Yes.

Jeff Love:     And who would do that?  How would that work?  Say, Nakajima or Gerwig, um, are gonna have an evaluation and somebody's gonna sit in and just monitor their class and, you know, for that, uh, evaluation piece.

Kathryn Kailikole: Yes.

Jeff Love:     Who would do that?

- 48 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: So, for Nakajima and Gerwig –

Jeff Love:     Mm hmm.

Kathryn Kailikole: – they would evaluate each other.

Jeff Love:     Hmm.  Did that seem problematic to you?

Kathryn Kailikole: Yes.

Jeff Love:     And was that a rule, uh, or just a practice?

Kathryn Kailikole: Um, I think you would have to check with the college.

Jeff Love:     Okay.

Kathryn Kailikole: My understanding is, um, that the faculty can request who evaluates, if they're, if you're tenured.

Jeff Love:     Okay.

Kathryn Kailikole: Um, the faculty can request who evaluates them.

Jeff Love:     Hmm.  Okay.  Um, tell me about this, uh, this business with this Airsoft gun.  Um, I understand that there was, uh, uh, the mainten, maintenance and use of an Airsoft kind of a pellet, that's not really a pellet gun, but a pellet-style gun that was used in one of the classes, and you may come to know about this, um –

Kathryn Kailikole: Yes.

Jeff Love:     – what did, what did you find out about that?

Kathryn Kailikole: So, um, there were two students in the, the lab.  One, and they were both women.  One of the women knew how to use firearms.

Jeff Love:     Mm hmm.

- 49 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: And had been trained.  Um, and there was, um, the pellet gun being used in the classroom and she was appalled, because she knows how to use a firearm.

Jeff Love:    They weren't using proper safety protocols and stuff –

Kathryn Kailikole: There was no, there were no goggles.  There was no proper protocol or safety.  There –

Jeff Love:    Okay.

Kathryn Kailikole: – was nothing written down on the use of the firearm. Nakajima loaded the gun and pointed it at a student, cocked, and handed it to him. And the student who knew how to use firearms was outraged.

Jeff Love:    Mm hmm.  I understand, I saw some video, uh, depicting some of that – '

Kathryn Kailikole: The student took the video.

Jeff Love:    Right.  Okay.

Kathryn Kailikole: And she told me when she reported this, so, what –

Evan Dwin: The outraged student, right?

Kathryn Kailikole: – the outraged student –

Jeff Love:    Right.  Yeah.

Kathryn Kailikole: So, the, um, and what she took a picture of because what she was also outraged by was probably also an accumulation of outrage of, of Nakajima's behavior in the classroom.  He went to the back of the classroom and hung out with Gerwig and TAs in the back of the classroom and were joking around while Nakajima allowed students to fire the gun.

Jeff Love:    Okay.

Kathryn Kailikole: At a target that was in front of the entrance to the classroom. So, anybody could've walked in the classroom and been hit by a pellet.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     Could've had an eye put out.

Kathryn Kailikole: Yes, exactly.  And in fact, the pellets were ricocheting and hitting students.  And none of 'em were rota, were, were pro, wearing protective gear.  That was what the video of, was that she took.

Jeff Love:     Was that the first you ever heard of such a thing?

Kathryn Kailikole: Yes.

Jeff Love:     Okay.  And, um, when was that, if you remember, approximately?

Kathryn Kailikole: It happened in the Spring of 20, I don't know.

Evan Dwin: We just started '18, so, so the, the last –

Jeff Love:     I, I may have an email here that could help refresh –

Evan Dwin: Okay.

Jeff Love:     – your recollection.  I might.  Hold on just a second.  Let me look here.

Kathryn Kailikole: I wanna say it happened early on but it may have been the, in was in the spring '16.

Jeff Love:     Um, let me look here.  April 2016?

Kathryn Kailikole: Yes.

Jeff Love:     Okay.  And what if, what if anything, uh, occurred, um, in relationship to that whole thing?  I mean was there any sort of –

Kathryn Kailikole: So –

Jeff Love:     – inquiry or you – I'm sorry.  Go ahead.

Kathryn Kailikole: Yeah.  So, um, the students had come down to my office.

- 51 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     Mm hmm.

Kathryn Kailikole: I was not there.  I was in a meeting.  They, the students spoke to my assistant, Debbie McBrayer.

Jeff Love:     How do you spell the last name?

Kathryn Kailikole: M-C, capital B-R-A-Y-E-R.

Jeff Love:     Okay.  Debbie McBrayer.  And, uh, –

Kathryn Kailikole: And what she heard was there was a gun in classroom so she called the police.

Jeff Love:     Okay.  Good for her.

Kathryn Kailikole: Yes.

Jeff Love:     And, uh, what then happened?

Kathryn Kailikole: So, the police came up.  I went up to check and every, and, and I don't know who they talked to.  Um, I, it was clear that they had, had talked to more than one person and one of 'em was Nakajima and he poo-pooed it as hysterics.

Jeff Love:     He dismissed it as an overreaction?

Kathryn Kailikole: Mm hmm.

Jeff Love:     Okay.

Kathryn Kailikole: And when I got there Ms. McBrayer was upset that she had been dismissed in such a way.

Jeff Love:     Okay.

Kathryn Kailikole: And so, what, because she knew the students were upset.  So, I called the police and I said you're coming back up here.

Jeff Love:     Did they even come up and investigate –

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: They did.

Jeff Love:     – the police?  Okay.  And did, what, did they write a report or –

Kathryn Kailikole: Well it turns out yes and no.  So, the officer comes up, and I say there is something.  I want you to find out because I'm, because in the meantime, and it was because Ms. McGray, McBrayer was so insensitive by being dismissed –

Jeff Love:     Mm hmm.

Kathryn Kailikole: – that she looked up the policy on firearms in the classroom and had it ready for me when I got there.

Jeff Love:     Okay.

Kathryn Kailikole: Um, and so when the police officer got there I showed him the policy.  And I said you're going back up there and I wanna know what's going on.  So he went up, back up there and he interviewed Nakajima, and then the officer did come back and basically was apologetic and said yeah so there's a concern because when you look at the, the gun –

Jeff Love:     Right.

Kathryn Kailikole: – unless you know guns you would think it's a real gun.  And the only thing that identifies it as not being a real gun, and I'm sure you know, is the orange tab.

Jeff Love:     Right.  Yeah.  Orange tip.

Kathryn Kailikole: And so, he took a picture of it.  And then he also took a picture of this ballistic machine that they had and he had concerns about both of those, and he also looked to check because one of the policy is that you must, um, get approval of a use of a firearm by the Chief of Police of Palomar College before using such, um, a device.

Jeff Love:     It, is this, uh, airsoft gun considered a firearm –

Kathryn Kailikole: Yes.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:      – under the policy?

Kathryn Kailikole: Yes.  Any firearm.

Jeff Love:      Okay.

Kathryn Kailikole: Any –

Jeff Love:      Well how, well how does, well I can –

Evan Dwin:  Yeah.

Jeff Love:      – look up the rules, you know.  Okay.

Evan Dwin:  Yeah, she's not a lawyer.  She not a lawyer and expert in firearms or of the law.

Kathryn Kailikole: But I called –

Jeff Love:      I mean if the, if the –

Kathryn Kailikole: – I called Chief, Chief DiMaggio immediately.

Jeff Love:      Mm hmm.

Kathryn Kailikole: And he agreed no they cannot be using that in the classroom without –

Jeff Love:      Okay.

Kathryn Kailikole: – without contacting us, without going over procedure.  They had no procedure.  Chief DiMaggio was also as flabbergasted by this.

Jeff Love:      Okay.  Is he still here?  I thought he was going to retire.

Kathryn Kailikole: He did retire however I believe he is still, I think he is, um, helping with the police academy.

Jeff Love:      Oh okay.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: Maybe.

Jeff Love:    Okay.

Kathryn Kailikole: Under, uh, CTE.

Jeff Love:    Sure.

Kathryn Kailikole: Margie Fritch.

Jeff Love:    Sure, sure, sure.  I know, I know what that is over there.  Um, okay.  So, he thought it was a violation of the rules and was somewhat shocked and appalled that they would bring something –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – even if it wasn't a what we commonly know as a firearm that, you know, fires a bullet, that's a deadly weapon that certainly looked like one.

Kathryn Kailikole: Mm hmm.

Jeff Love:    Okay.

Kathryn Kailikole: And it wasn't kept under lock and key.  It was just in one of the drawers.  So, any student could have taken it out and played with it at any time.

Jeff Love:    Okay.

Kathryn Kailikole: Especially given that they would let students in and out of the room with no supervision.

Jeff Love:    Right.  Allowing others to perhaps even monitor the classes –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – and what not.  Okay.  Was there any disciplinary action handed down to, uh, Nakajima or, um, Gerwig if he was pre-, obviously he was present.  He was at the back of the room talking –

- 55 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: Mm hmm.

Jeff Love:      – to Nakajima.

Kathryn Kailikole: No.  I, I gave directive them the directive that they could not use the firearm anymore.

Jeff Love:      Okay.  Did you get any flack from them over that?

Kathryn Kailikole: He just said yes.

Jeff Love:      Okay.  Did –

Kathryn Kailikole: And that if he was going to use it that –

Jeff Love:      Okay.

Kathryn Kailikole: – he had to go to the chief of police every semester because that was what Chief DiMaggio said to me.

Jeff Love:      Okay.  Did DiMaggio ever tell you whether or not he did that?

Kathryn Kailikole: No, he did not.

Jeff Love:      Okay.  Do –

Kathryn Kailikole: And I got concerned –

Jeff Love:      Mm hmm.

Kathryn Kailikole: – um, about it when this came up again.

Jeff Love:      Okay.

Kathryn Kailikole: About whether or not he did or not.

Jeff Love:      Okay.  Did, um, did you, is there any information that you have that Nakajima or Gerwig continued to use the gun in a similar fashion?

Kathryn Kailikole: No.  I don't know.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:    Okay.  Okay.  Was there a, any, um, inspections or anything like that that you had directed anybody to do or that you did it yourself, I mean to the extent you could do it, to see if anything like that had occurred?

Evan Dwin:  You mean after?

Jeff Love:    Afterward.  Yeah, after he had been told hey, you know, don't, don't use that, and if you do you need to go talk to the chief.  After that time was there any, I mean **** if you talked to –

Kathryn Kailikole: So, going –

Jeff Love:    – Blumenthal or if somebody –

Kathryn Kailikole: Yes.

Jeff Love:    – else, you know?  Go ahead.

Kathryn Kailikole: So, um, the general counsel had put something in about the air pistol in after the investigation, um, and so Dr. Norman had asked for all of the information regarding it.  And that's when I got concerned because, um, because I didn't feel comfortable in checking on things because of some of the rules around the union –

Jeff Love:    Mm hmm.

Kathryn Kailikole: – and what you can and can't do.

Jeff Love:    Right.  This would be like checking on the class without –

Kathryn Kailikole: Right, and whether or not that –

Jeff Love:    – okay.

Kathryn Kailikole: – a gun was being used.  So, I contacted Dr. Finkenthal and I said, uh, do you know if the gun is still being used in, in the –

Jeff Love:    Right.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: – the physics **** lab, and he said what are you talking about. And I said the gun that you guys use in your lab.  He goes we have no gun in our, in our, in our curriculum.  Um, and I said yes you do.  I, I've had complaints.  He said, what are you talking about.  And so, I started to describe it and he said I don't, so he was really concerned.

Jeff Love:     Mm hmm.

Kathryn Kailikole: Um, and so he asked what information do you have on it, um, and I will look to see.  And I said this is what I have.  And he asked if he could have the information.

Jeff Love:     Okay.

Kathryn Kailikole: And I said yes.

Jeff Love:     Okay.  You forward it to him by email?

Kathryn Kailikole: Yes.

Jeff Love:     Okay.  And you did that.  Uh, he's the chair, correct?

Kathryn Kailikole: He's the chair.

Jeff Love:     He's not some stranger on the street.

Kathryn Kailikole: No.

Jeff Love:     Okay.  He's a chair, and you wanted him to kind of keep an eye on that or –

Kathryn Kailikole: Yeah.

Jeff Love:     – check into it further or whatever –

Kathryn Kailikole: Yes.

Jeff Love:     – because of his concern and your concern?

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: Yes.  And I think in a way it almost became –  because at the time that this occurred –

Jeff Love:    Right.

Kathryn Kailikole: – the two young women had come back because, um, Ms. Brayer had kept their number.  She took their numbers and said –

Jeff Love:    Right.

Kathryn Kailikole: – the dean will wanna talk to you.  Um, so she'll, so I'm gonna call you when she gets back.

Jeff Love:    Right.

Kathryn Kailikole: So, she calls the young women, and they come in and they speak to me.  And so, at the time when they were speaking to me and this, um, pistol incident occurred –

Jeff Love:    Right.

Kathryn Kailikole: – several other things were divul-, divulged to me by the young women; the warning letter.

Jeff Love:    So that's –

Kathryn Kailikole: Uh.

Jeff Love:    – kind of when all that came –

Kathryn Kailikole: Yes.

Jeff Love:    – for –

Kathryn Kailikole: The, their behavior in the classroom.

Jeff Love:    Okay.

Kathryn Kailikole: The negative points.  Then also to find out that the other young woman who was not, um, the firearms expert –

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     Right.  Yeah.

Kathryn Kailikole: – um, had had a severe car accident.  Had had a concussion.  She had medical orders not to go to, to go to class.

Jeff Love:     Right.

Kathryn Kailikole: She contacted all of her faculty to tell them that she couldn't come to class.  Nakajima told her, he didn't write it down but he told her she would fail if she didn't show up to class.  So, she went to class with a concussion.  Her classmates, the young woman who was sitting by her said that they had to help her just lift things and do the lab, and the young woman had no recollection of that lab that day.

Jeff Love:     And who was this woman?  Yeah, what's her name?  Do you remember?

Kathryn Kailikole: I don't remember their names –

Jeff Love:     Okay.

Kathryn Kailikole: – right now.

Jeff Love:     Okay.

Kathryn Kailikole: And I asked that they provide me that information.  And so, I, to be honest with you, I was so incensed and upset about the warning letter, about the behavior in the classroom –

Jeff Love:     Right.

Kathryn Kailikole: – about the fact that we just endangered a student.  Um, that I was leaving it up to the police department and the fact that I had already directed to **** to not use the pistol, but I didn't think about it again because I was more concerned about this warning letter, and the recurring, um, discrimination that was going on regarding that warning letter.  Um, and so, it was at the time when, when it did come up again and people were asking, I, I realized, I don't know if they're, you know, I don't if he, because clearly he doesn't listen to any of my directives.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:    Wasn't there some, correct me if I'm wrong, but wasn't there some prior issues with the Nakajima not making reasonable accommodations, uh –

Kathryn Kailikole: Yes.

Jeff Love:    – to students –

Kathryn Kailikole: Yes.

Jeff Love:    – and so forth for –

Kathryn Kailikole: Yes.

Jeff Love:    – legitimate type injuries and so forth.

Kathryn Kailikole: Yes.

Jeff Love:    Okay.

Kathryn Kailikole: And, and, uh, disabilities.

Jeff Love:    Okay, alright, um –

Evan Dwin: Let's take a 1-minute, uh, restroom break.

Jeff Love:    Oh, absolutely, yeah, let's, let's put this on hold.  We'll wrap up very quickly after this.  And let me just put this on hold right now.  Okay, we're back on the record.  We just had a quick, uh, break, to take care of our personal necessities, as it were.  Um, we were talking about the Airsoft business, uh, with this gun and, um, I think you told me that you had received information form a student, the students had come and talked to your assistant, uh, Ms. McBrayer.  The police were summoned.  Initially the police, uh, you know, were like ah, it's no big deal, and then there was some further discussion and dialogue and then it became a little bit of a bigger deal. They came down, you spoke with the chief and, uh, he concluded that it would be a violation to, to engage in such behavior to have that there without, uh, written permission from him and certain guidance and protocols and so forth, which apparently were not in place.  Um, and then you had mentioned something – I have a note here about Dr. Norman, and so Dr. Norman asked about it?

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: She asked about it because their, their coun-, general counsel had put it into, um, into the, I guess into the outcome of the report in terms of how they were going to deal with, um, Nakajima.

Jeff Love:     Okay, so, what, what did Dr. Norman want to know about it?

Kathryn Kailikole: She wanted all of the information that I had.  Um, the emails from the students, the video.

Jeff Love:     I see, okay.

Kathryn Kailikole: Um, and I don't know if it's because I mentioned the video to you or some, but somehow the general counsel knew about the video and she felt because he had mentioned it or maybe it was you who mentioned it, I don't know, um, that they wanted the video.

Jeff Love:     Okay.

Kathryn Kailikole: So, I went back in my emails and I found the video and it, it's at that point when she was asking these questions I started to get worried because, because it was one of so many things.

Jeff Love:     Mm hmm.

Kathryn Kailikole: Uh, about these two men that I had to deal with.  But –

Jeff Love:     Did you get, uh, concerned that she felt that you hadn't done your job with these?

Kathryn Kailikole: No, no, I, that's not what my concern was.

Jeff Love:     Okay.

Kathryn Kailikole: They've never listened to me.

Jeff Love:     Mm hmm.

Kathryn Kailikole: They've never followed any of my directives.

Jeff Love:     Okay.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: They have always tried to get around me and, um, and squashed, or squelched anything that I tried to do, and that's why I was worried.

Jeff Love:    I see.

Kathryn Kailikole: Was that that was one of the one – because I was constantly having to follow-up –

Jeff Love:    Uh huh.

Kathryn Kailikole: – on whether or not they were – in, in the best way that I could without violating their rights, their union rights.

Jeff Love:    Mm.  Um, and, uh, what, what kind of follow-up was done regarding the, um, the gun business?  I mean was there any –

Kathryn Kailikole: Well, so –

Jeff Love:    –was there or could there have been anything done?

Kathryn Kailikole: I don't know.  I actually, I honestly –

Jeff Love:    I mean, apart from –

Kathryn Kailikole: Apart me giving the directive, don't do this again if you're going to use this, if it's part of the curriculum, this is what it says in policy, and you must follow policy.

Jeff Love:    Contact the chief of police.

Kathryn Kailikole: Right, exactly.

Jeff Love:    Use safety protocols.

Kathryn Kailikole: Right.

Jeff Love:    from that.

Kathryn Kailikole: Right.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:      Okay.

Kathryn Kailikole: Um, and, um, and, but because of it, it reminded me, um, that I did ask the police to come, I wanted a report.  So, I contacted the of-, the police office.

Jeff Love:      Mm hmm.

Kathryn Kailikole: And I asked to talk to Chief Miller who's now the chief of police.

Jeff Love:      Right.

Kathryn Kailikole: Um, and I said there was this incident and there was and I, and I couldn't remember the officer's name.  The officer was supposed to – he took pictures and he was supposed to do a report.  So, they went to look for it.  The report was not finished, but they did have the pictures, and he said, and I said it's okay.  I think he also sent me the pictures.  Um, and, uh, and I can't remember if he sent, uh, I think that he sent them –

Jeff Love:      Mm hmm.

Kathryn Kailikole: – to me, and then I also sent those pictures to, um, Dr. Norman.

Jeff Love:      Did you send them to Finkenthal?

Kathryn Kailikole: I sent him everything –

Jeff Love:      Okay.

Kathryn Kailikole: – that had to do with the, the air pistol, because he was concerned and of good reason.

Jeff Love:      Okay, alright.  And –

Kathryn Kailikole: And it is his responsibility to –

Evan Dwin:  Right.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: – to, to maintain –

Jeff Love:     He's the chair.

Kathryn Kailikole: – the safety in, in the, in the labs.

Jeff Love:     Is your vision of him as a chair, is he sort of a supervi-, not a supervisor per se, but sort of oversight on the department?

Kathryn Kailikole: Yes, the chair's responsibility is oversight on the department and so for the chairs with labs –

Jeff Love:     Mm hmm.

Kathryn Kailikole: – and I have many chairs with labs, their responsibility also is to ensure the safety of not only the faculty  but the students and the staff that would be in those rooms.

Jeff Love:     Okay, did you share other things like this with Finkenthal?

Evan Dwin: Can you be a little more –

Jeff Love:     In other words, other issues concerning Gerwig, um, uh, problems in the department, things of that nature.

Kathryn Kailikole: Not beyond –

Jeff Love:     Just with the Airsoft gun.

Kathryn Kailikole: Yeah.

Jeff Love:     You know, anything like that that you can think of?

Kathryn Kailikole: You, you know –

Jeff Love:     That, uh, and I mean, and if you know –

Kathryn Kailikole: – that would be normal.

Jeff Love:     – and if you don't remember, yeah.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: **** yeah.

Evan Dwin:  Yeah, I mean she's got documents –

Kathryn Kailikole: I mean beyond what would be normal functioning of a department.

Jeff Love:    Did you provide him, it looks like, um, you did, but maybe you, tell me if you remember if you had provided, um, mister, uh, Finkenthal, um, the, uh, report, or the info-, your exchange with Chief Moore, um, regarding, um, the, the –

Kathryn Kailikole: The air pistol.

Jeff Love:    The air pistol thing.

Kathryn Kailikole: Anything that had to do with that incident.  I –

Jeff Love:    Okay.

Kathryn Kailikole: –I provided to him, because I felt that he needed to be completely informed of the situation.

Jeff Love:    And he's, and he's, and he's –

Kathryn Kailikole: In order to be able to ***** his duties.

Jeff Love:    – and by this time he's the chair.  He's been the chair since –

Kathryn Kailikole: Yes, yes.

Jeff Love:    Okay, good.

Evan Dwin:  And certainly nobody ever told you not to discuss this with them, right?

Kathryn Kailikole: No, you are correct.  Nobody told me I could not discuss with the chair.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:   I mean, and this wasn't, the, this Airsoft.  To your knowledge it wasn't some sort of administrative investigation ongoing with it, or anything of that nature.

Kathryn Kailikole: No.

Jeff Love:   Okay, okay.  Was there any discussion with, uh, Mr. Finkenthal that he would provide this information to anyone else?  If you forwarded him something that he would provide, it's to some other person?

Evan Dwin: If, you remember, it's just document that's about this.

Kathryn Kailikole: I took –

Jeff Love:   I know, this has nothing to do with the document.  Just if there was any agreement between the two of you?

Kathryn Kailikole: No.

Jeff Love:   Did he ever indicate that he was going to do anything of the sort?

Kathryn Kailikole: NO.

Jeff Love:   Provide the documents to his wife or to members of the governing board hear, anything like that?

Kathryn Kailikole: No.

Jeff Love:   Okay, okay.

Evan Dwin: That you know, right?

Kathryn Kailikole: That I know of, I mean.

Jeff Love:   Right, okay.  Who's Nina Deerfield?

Kathryn Kailikole: She's a governing board trustee.

Jeff Love:   Okay, and, um, did she ever, uh, speak to you at all about the, uh, summary of my investigation report?

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: No.

Jeff Love:    Okay, did she ever indicate to you that, uh, Mr. Finkenthal had provided, uh, a copy of that confidential **** of investigation report?  Anything like that?

Kathryn Kailikole: No.

Jeff Love:    Did Finkenthal, Mr. Finkenthal ever say that he had done such a thing?  Provided it to, uh –

Kathryn Kailikole: Not that I recall.

Jeff Love:    – ****.  Okay.

Evan Dwin: Provided it to who?  Sorry.

Jeff Love:    To, uh, Nina Deerfield.

Kathryn Kailikole: I, I don't know.

Jeff Love:    Okay, did Mis-, did Dr. Finkenthal ever say that he had provided the, uh, confidential summary of my investigation to his wife, Stacy Carlson?  Did he ever say anything about that?  And I'm not suggesting you told him to do it, or there was some agreement, I'm just saying did he ever tell you that he had done such a thing?

Kathryn Kailikole: No.

Jeff Love:    Okay, okay, alright.

Kathryn Kailikole: So, I, you know, I just –

Evan Dwin: No, but it's just, he, he just, could you stop right there for a second.  We'll stay in the room and, and I don't need to have a privileged conversation with her.  I just want to –

Jeff Love:    Yeah, hold on just one – just a second here.

- 68 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Evan Dwin:  Okay.

Jeff Love:     Okay, we're gonna go off the record for just a second.

Evan Dwin:  Yeah, and, and –

Jeff Love:     Okay, we're back on the record and, um, we were talking sort of about, um, providing, uh, Dr. , uh, Kailikole providing, um, information to her chair, uh, uh, Mr. Finkenthal, Dr. Finkenthal, and then I was asking questions about whether there had been any, uh, arrangement that, uh, between that, Dr. Finkenthal and, and, uh, Dr. Kailiko- uh, Kailikole whether that Finkenthal would provide that information to others, which, uh, she said there was no such arrangement and apparently no such knowledge that he had.  Now, um, uh, Dr. Kailikole's attorney has a question, I think, that'll help clarify.  Please, sir.

Evan Dwin:  I just, yeah, I mean, I did say, now that I hearing you explain the questions you just asked, this doesn't, this doesn't pertain to any of that, but there was some questions about, uh, Ms. Deerfield, is that Nina's last name?

Kathryn Kailikole: Yes.

Evan Dwin:  Ms. Deerfield, and was some questions about Daniel and Mrs. Deerfield, and there is some information that you have about that, that Daniel told you something, so I just want you to tell him about that, and then if anything happened; that you know of.

Jeff Love:     Perfect.

Evan Dwin:  That if you know anything else that's right.

Jeff Love:     Right, and I had asked her about Nina Deerfield in relationship to the idea that mister, that Dr. Finkenthal had shared that confidential investigation with her.

Kathryn Kailikole: Right.  That I didn't know.

Evan Dwin:  Yeah.

Kathryn Kailikole: However, um, what Dr. Finkenthal, to my recollection, told me.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:      Sure.

Kathryn Kailikole: Was that, um, um, both, uh, Nina Deerfield, and Don Halcon had, um –

Jeff Love:      Dina Deerfield and Joe –

Kathryn Kailikole: Halcon.

Jeff Love:      Halcon?

Kathryn Kailikole: He's another trustee.

Jeff Love:      How do you spell that name?

Kathryn Kailikole: Um, H-A-L-C-O-N.

Evan Dwin: Oh, okay.

Jeff Love:      Halcon, okay.

Kathryn Kailikole: And I may be wrong that it was –

Jeff Love:      Sure.

Kathryn Kailikole: – John as well.

Jeff Love:      Mm hmm.

Kathryn Kailikole: But that they, they had, uh, requested to meet with him regarding this issue.

Evan Dwin: That's what Daniel told you.

Kathryn Kailikole: That's what Daniel told me, to my recollection.

Jeff Love:      Had asked to meet with, uh, Daniel Finkenthal in relationship to the whole investigation.

Kathryn Kailikole: Investigation.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:    The whole thing.  Did, uh, Daniel indicate that he did in fact meet with them?

Kathryn Kailikole: Um, I don't, I'm not sure.  I mean, yeah, I think that he did.  I did, you know, I didn't hear –

Evan Dwin: I, but, but you're only saying that, right, just because he told you this before?  After that he didn't hear anything, did you hear anything about it?

Kathryn Kailikole: No.

Jeff Love:    He, he didn't say anything.  For instance, hey, I met with those guys, uh, about that.  He didn't say anything like that.  He just said that –

Evan Dwin:  Later.

Jeff Love:    – that they requested a meeting with him.

Kathryn Kailikole: Right, and that point in time my understanding was that they all had everything anyway.

Jeff Love:    Okay, what leads you to conclude that?

Kathryn Kailikole: Um, because the report was, the report was supposed to be given to the board.

Jeff Love:    Oh, okay.

Evan Dwin: If you're speculating though, ****, is that you're specific question?  When the real specific question –

Jeff Love:    Yeah, yeah.

Evan Dwin:  – when you know that they have ****

Kathryn Kailikole: Oh, I, alright, I'm speculating, I'm sorry.  I, I, that was my assumption.

Jeff Love:    Okay, alright, yeah.  And if –

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: – at the time that this was taken.

Jeff Love:     and I, and I take it as such, right.  You don't attend the board meetings in their closed sessions and stuff.

Kathryn Kailikole: No.

Jeff Love:     Okay.

Kathryn Kailikole: No.

Jeff Love:     Alright, well, I'm talking about the purposes of this –

Kathryn Kailikole: No, no

Jeff Love:     – disciplinary action that, you know, may have flowed from my investigation.

Evan Dwin:  We attended one yesterday, so I wanted to make sure we were being ****

Jeff Love:     Yeah, you had mentioned that earlier, right, but you didn't routinely go to these board meetings.

Kathryn Kailikole: Not the   closed session.

Jeff Love:     Right.

Kathryn Kailikole: As part of my responsibilities, and as you know, I must to go to the open session.

Jeff Love:     Yeah, right, yeah, I'm sure you enjoyed every one of them.  Yes, okay, um, alright.  Now I noted in some email exchanges that, um, Finkenthal, uh, Daniel Finkenthal had asked you to call him on December 8th, 2017 and he'd asked you to call him by email, um, he had sent you an email, at, uh, 4:47 p.m. on that date.

Evan Dwin:  What was the date again, sir?

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:    December 8th, 2017.  It says, if you are on campus, can you call me at 2974, which I'm assuming is his extension.  Do you remember, um, hav-, having a phone conversation with him around that?  I know it's a very difficult question because, I mean, most people don't remember what they had for lunch 3 days ago.  But, I mean, does that ring a bell to you at all?

Kathryn Kailikole: No, I get that from my chairs all the time.

Jeff Love:    Okay, okay.

Kathryn Kailikole: So, and, and it can be from anything as an in Nina's, um, you haven't approved the thing yet.

Evan Dwin:  Oh, okay.

Kathryn Kailikole: Can you find it and approve it.

Evan Dwin:  Alright.

Kathryn Kailikole: To, um, we've got a crisis.

Jeff Love:    Okay, then, then don't worry about it then.  I mean, I, I wouldn't, I didn't think you'd probably, but I had to ask anyway.  Um, did, uh, did Daniel Finkenthal ever talk about sharing anything at work with his wife?  You know, it, and, and I'm not saying that he came up to you and says, you know, by the way I shared something with my wife.  But maybe, you know, a conversation that might go something like this, yeah, I was talking to my wife yesterday about something here, and she opined about this, and I said that.  Was there ever a conversation like that you would remember that would lead you to conclude, um, that he shared or talked about work stuff with his, his wife.  And, and I'm not suggesting that, that he couldn't.  I mean, it's his wife, you know, he –

Kathryn Kailikole: Yeah.

Jeff Love:    – got to her, but, do you remember anything like that?

Evan Dwin: I just want to make sure that we're clear that this is an extraordinarily broad –

Jeff Love:    Yeah it is.

- 73 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Evan Dwin: – question about do you believe he talked with his wife about work ever?

Jeff Love:    No.

Evan Dwin: And, and you got to have a basis for it, like the –

Jeff Love:    No, no, no, no, no, no, no, no, no

Evan Dwin: ****

Jeff Love:    No, you're wrong.

Evan Dwin: Okay.

Jeff Love:    Um, I'm not asking you if he did talk to his wife, I'm asking you if he ever portrayed that he was routinely or had talked to his wife about issues at work?

Evan Dwin: Anything at work.

Jeff Love:    In anything.

Kathryn Kailikole: Sure, yes.

Jeff Love:    Okay, and kind of, if you can think back, and it may be something innocuous and maybe you don't remember the details, but, do you remember what he may have said?  I mean, what, what he was talking with her about?

Kathryn Kailikole: The workplace.

Jeff Love:    Okay, sort of maybe kind of complaining about some of the issues.

Kathryn Kailikole: The way that he is treated.

Jeff Love:    Okay, okay.  Did Daniel –

Kathryn Kailikole: The hostilities directed towards him.

Jeff Love:    Okay.  What hostilities if you know was he referring to?

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Evan Dwin: Just to make sure that we're understanding here, not generally hostilities that you know that Daniel felt about the workplace, but anything that you know because he told you he told his wife about, that's the question, right?

Jeff Love:    No.

Kathryn Kailikole: Well, I'm –

Jeff Love:    No, that's the, the question.  The question is, is I don't know what he told his wife about and I don't really care other than, than the fact that he may have talked to his wife that may have context to some of the communications I've observed.  What I want to know is did Daniel claim that he was the subject of some hostilities?

Kathryn Kailikole: Yes.

Jeff Love:    Okay, tell me about –

Kathryn Kailikole: Because he claimed them to me as –

Jeff Love:    Okay.

Kathryn Kailikole: – his supervisor.

Jeff Love:    Okay.

Kathryn Kailikole: that he was being, um, maligned, that he was, uh, being, uh, treated, you know, that, that the, um, the, uh, they were, they were, the, the same way that they would malign me to the students, they would malign him –

Jeff Love:    Mm hmm.

Kathryn Kailikole: – to the students, but he –

Jeff Love:    They, they being Nakajima, Gerwig?

Kathryn Kailikole: Gerwig, Mm hmm.

- 75 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:    And did this all, uh, uh, flow from his perspective anyway, was it because of his involvement in that, in bringing forward those issues that I investigated?  The postings, and all the –

Kathryn Kailikole: Yes.

Jeff Love:    – all the rest?

Kathryn Kailikole: Yes.

Jeff Love:    Okay.

Kathryn Kailikole: And he was, and, and in fact because they felt he was and, and in fact because they felt he was a traitor.

Jeff Love:    Mm hmm.  Okay, so he was sort of being –

Kathryn Kailikole: Because his –

Jeff Love:    – punished for that.

Kathryn Kailikole: – yeah, he was being punished for, um, for notifying me.

Jeff Love:    Mm hmm.  Okay.

Kathryn Kailikole: Because I then notified the campus.

Jeff Love:    Okay.

Kathryn Kailikole: I mean to the administration.

Jeff Love:    When did Daniel tell you that, that he started feeling that?

Kathryn Kailikole: Um, he, uh, as soon as the fall, as Nakajima and Gerwig returned to campus after the summer.

Jeff Love:    Mm hmm.  Okay, so, like, uh, August or September of 2017.

Kathryn Kailikole: Mm hmm.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     Okay.  And, um, what if anything did you do about that?  Did you tell anybody about that or investigate or do anything?

Kathryn Kailikole: I didn't, I didn't know what to do really.

Jeff Love:     Okay, okay.

Kathryn Kailikole: Because, because that behavior had been consistent.  Um, and in order, in order for him to be able to exist in that department for as long as he has, Dr. Finkenthal –

Jeff Love:     Right.

Kathryn Kailikole: – he just focused on his classes and he didn't get involved.

Jeff Love:     Okay, okay.

Kathryn Kailikole: Um, and when he finally realized that he had dean who was going to take a stance he was willing to step up and become the chair, and when that happened he started to, to be treated very, even more poorly than he had in the past.

Jeff Love:     And this August of 2017 where he first told you about this treatment, that was just only a couple of months after he had taken the chair.

Kathryn Kailikole: Mm hmm.

Jeff Love:     Okay, alright.

Evan Dwin:  Who was the chair before Daniel?

Kathryn Kailikole: Nakajima, for 15 years.  Would you like to know how he was asked?

Jeff Love:     Yeah, yeah, actually I would.

Kathryn Kailikole: So, I like to read the union handbook.

Jeff Love:     Mm hmm.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: Contract.  And in the contract it says that the chairs required every year to hold, um, elections.

Jeff Love:     Right.

Kathryn Kailikole: Um, for a chair, and to hold a meeting.  Nakajima would not hold meetings, and Nakajima would not hold elections.

Jeff Love:     So, he was violating his own union rules?

Kathryn Kailikole: Yes.

Jeff Love:     Okay.

Evan Dwin: I'm sorry, I hate to do this, can I take a 1-minute break off the record?

Jeff Love:     Sure.

Evan Dwin: thanks.

Jeff Love:     Go ahead, I'll turn this off if you guys want to step outside.  Okay, we were just, uh, kind of talking about the idea that, um, uh, Nakajima had, uh, he had learned that he had kind of violated their own, uh, rules regarding holding a meeting, having an election every year.

Kathryn Kailikole: Right.

Jeff Love:     to elect the chair.

Kathryn Kailikole: Right.

Jeff Love:     And, uh, what if anything did you do about that when you became dean?

Kathryn Kailikole: So, I didn't realize that –

Jeff Love:     Mm hmm.

Kathryn Kailikole: – until, um, uh, until all of this with the, uh, title, 9 and Title 5 violations –

- 78 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     Right.

Kathryn Kailikole: Had occurred, and so I felt that it at this point in time, knowing what I knew I needed to get him out of, um, the chair position.

Jeff Love:     Right.

Kathryn Kailikole: Because he was a cancer.

Jeff Love:     Right, okay.

Kathryn Kailikole: And, um, so after the meeting with Shawna Cohen regarding, um, the postings –

Jeff Love:     Right, yes.

Kathryn Kailikole: In the room.

Jeff Love:     Yes.

Kathryn Kailikole: Um, we stayed in, um, the VPI Kahn's office, uh, with the union representative.

Jeff Love:     Mm hmm.

Kathryn Kailikole: Who also knew because I informed her that, um, that their , own, um, faculty were violating the union contract.

Jeff Love:     Mm hmm.

Kathryn Kailikole: That it needed to be addressed.

Jeff Love:     And who was the union rep?

Kathryn Kailikole: Um, Susan Snow.

Jeff Love:     Right, okay.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: And so, uh, at that point in time then, uh, we discussed the fact that no meetings had been held, no elections had been held.  Um, and that at this point in time there is no chair.

Jeff Love:     Right.

Kathryn Kailikole: And an election must happen, which at that point, um, VPI Kahn took advantage of the situation and told Nakajima he could not run since he had violated the rule.

Jeff Love:     Okay.

Kathryn Kailikole: And so that left Finkenthal and Gerwig to run, because they were the only two.

Jeff Love:     And Finkenthal was duly elected and appointed.

Kathryn Kailikole: Mm hmm.

Jeff Love:     Okay.

Evan Dwin:  And that was Kahn's decision and not yours, right?  To, to –

Kathryn Kailikole: To say to Nakajima he could not run.

Evan Dwin:  Right.

Jeff Love:     Did the rules provide for that sort of, uh, sanction, if you, uh, disobeyed the rules, that you're, uh, if, if you know.

Kathryn Kailikole: I don't know.

Jeff Love:     And you might not.

Kathryn Kailikole: I don't know.

Jeff Love:     Okay, alright, don't worry about that then, okay.

Kathryn Kailikole: And so from that point on he was, you know, he was able to keep his distance from them.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     right.

Kathryn Kailikole: By just focusing on his classes and his students, but at that point, um, he became persona non grata.

Jeff Love:     Okay.  Okay, um, let me just ask you just some general questions as we conclude here.  Um, did, um, did you ever give, uh, or provide or tell, uh, the, um, Daniel Finkenthal anything that should have been held confidential in any way, shape or form?  In other words, some, some sort of confidential personnel matter or somebody told you not to tell them, and in those circumstances did you ever violate those confidences?

Kathryn Kailikole: No, not that I recall.

Jeff Love:     Okay, um, did you, um, in any, uh, ever, uh, ask, uh, and I've already kind of asked you this, but you can tell me no again.  Uh, did, did you ever ask Dr. Finkenthal through him or some other straw, uh, player, to pass on any sort of department information?

Kathryn Kailikole: No.

Jeff Love:     Okay, um, you were aware that, uh, Dr. Finkenthal had ever passed on any sort of documents that might be confidential or school-related to anyone else, whether it's his wife, or Ms. Deerfield or anyone else to you knowledge?

Kathryn Kailikole: No.

Jeff Love:     Okay.

Kathryn Kailikole: I do not know.

Jeff Love:     Okay, okay, alright, fair enough.  I don't think I have any other questions.  Um, is there anything else about this matter that I haven't asked you about that you think would be important for me to know about?

Evan Dwin: I, I'd like to ask one follow-up question –

Jeff Love:     Sure.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Evan Dwin: – on something you shared about earlier.

Jeff Love:    Yeah.

Evan Dwin: Earlier, uh, Mr. Love was talking to you about, um, about the question of Nakajima and Professor Gerwig, and, um, some of the sort of, um, issues that, that, that students had had with him, and you mentioned discrimination and then you talked about, uh, veterans.  I just, was there any other discri- discrimination that you heard about and, and, and if so, I'll just ask the follow-up question to you just to save us time, and if so, what, what did you do about it and what did you about it and what did you find?

Kathryn Kailikole: Um, so I found different cases of discrimination.  Um, I had asked, uh, after meeting with the, the veterans, um, I had asked the admissions office for data on, um, students by ethnicity, by veteran status, by gender, um, that had enrolled in Nakajima's and Gerwig's classes.

Evan Dwin: Mm hmm.

Kathryn Kailikole: And I wanted from when they enrolled and whether they dropped the class, whether they withdraw from the class or the grade that they got.

Evan Dwin: Right.

Kathryn Kailikole: Um, and then I looked at it because my, um, job prior to this was, um, director of analysis and strategic planning in Drexall.

Evan Dwin: Uh huh.

Kathryn Kailikole: So, I know how to handle data.

Evan Dwin: right.

Kathryn Kailikole: so I looked at it and, um, discovered that 80% of the students that enrolled in the class either failed, withdrew or dropped the class.  The majority of the students that did that were veterans, women and underrepresented minorities.

Jeff Love:    What do you mean underrepresented?

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: African American.

Jeff Love:    Why are they underrepresented?

Kathryn Kailikole: Mexican, well, it's the term.

Jeff Love:    I've always worried about – I wondered about that.

Kathryn Kailikole: Well, underrepresented –

Evan Dwin: **** use that term or –

Kathryn Kailikole: Yeah, yeah, so it's a historic term.  I mean –

Evan Dwin: Anyway, so, you could just –

Kathryn Kailikole: I can off the record I can talk to you about underrepresentation, but, uh –

Jeff Love:    Right, right.

Kathryn Kailikole: But, um, but, um, uh, at risk populations.

Jeff Love:    Uh huh.

Kathryn Kailikole: Um, were the majority that made up –

Jeff Love:    Okay.

Kathryn Kailikole: – the 80%.  Um, and, and they looked at that after talking to the veterans, because I was very concerned.

Jeff Love:    Okay, when was that that you determined this sort of desperate impact?

Kathryn Kailikole: Um, uh, it was, I think it was the fall of 2015, it might have been the spring of 2016 when all of this started to happen.

Jeff Love:    Okay.

## Transcript of Interview of Kathryn Kailikole – February 28, 2018

Kathryn Kailikole: Because it, it almost all came at once, the meeting with the veterans, the two young women.  Um, finding out that the counselors told students to go elsewhere.

Jeff Love:     Okay.

Kathryn Kailikole: Um, the other one that I found was the, um, was the OCR finding.

Jeff Love:     The what finding?

Kathryn Kailikole: The Office of Civil Rights finding.

Jeff Love:     Right, that was the, was that the student with the disability?

Kathryn Kailikole: Yes.

Jeff Love:     Right.

Kathryn Kailikole: I met –

Jeff Love:     Was that dealt with?  Was there any, any action taken on that to your knowledge?  I know that preceded you.

Kathryn Kailikole: Yes, it preceded me, and, um, so the warning letter, because I was livid.

Jeff Love:     Mm hmm.

Kathryn Kailikole: Um, and I had called, um, VPI, interim VPI Sourbeer.

Jeff Love:     Mm hmm.

Kathryn Kailikole: And he didn't know about the warning letter.  Um, so I asked, um, Finkenthal, and he didn't know about the warning letter.  So, he asked, you know, where is it?  I said it's on the website for everyone to see.

Jeff Love:     Mm hmm.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: Um, and so he looked at it.  He then came down and asked Ms. McBrayer do you remember when we had to do, um, sensitivity training?

Jeff Love:     Mrs. Finkenthal asked you this question.

Kathryn Kailikole: Finkenthal, to, and she said yes, and he goes, do you remember, um, do you know why that happened?  Because they never told me.  Um, and she said, oh, yes.  Um, they, there was, um, that the, um, there was an OCR finding.  Um, because a student, because a student was not given the rights to, to be able to take the, uh, uh, there, was not given the accommodations.

Jeff Love:     So that training –

Kathryn Kailikole: Was denied the accommodations.

Jeff Love:     – that triggered the, uh, sensitivity training as being some form of a remedy?

Kathryn Kailikole: Yes, and so there was a, the prior dean had kept a, kept a, a file on all of this.

Jeff Love:     Mm hmm.

Kathryn Kailikole: And the, and this is why I, I believe – one, uh, for example this happened under another dean, Dean Francis.

Jeff Love:     Right.

Kathryn Kailikole: Um, so Dean Sourbeer didn't even know about it.  Because I asked him and he said he didn't know.  Um, HR, you know, didn't have a copy of it.  Um, and the response of the institution was to put them into sensitivity training.  There was never any follow up.  But when you look at the OCR report and then you read the, uh, morning letter, it is everything, the, so they were basically telling students with disabilities don't come into my class.  Because, there's a direct response that the, that response there matches –

Jeff Love:     Okay.

Kathryn Kailikole: – the OC, the OCR report and findings.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     So, this OCR report, did you see that when you first came on board here?

Kathryn Kailikole: No, I didn't.

Jeff Love:     When did you see that?

Kathryn Kailikole: I saw it when, um, when I started asking people how can you let this **** warning letter out there.  Um, and doing this and, and –

Jeff Love:     Mm hmm.

Kathryn Kailikole: – it was, um, it was the, it was me asking about this warning letter and trying to understand why would anybody do this?

Jeff Love:     Mm hmm.  Did this OCR, uh, report and this warning letter, is that what triggered you to do the analysis that led you to con-, conclude that there was some sort of desperate impact on students?

Kathryn Kailikole: Yes.

Jeff Love:     In their class, in, in, in, was this in Nakajima's class?

Kathryn Kailikole: Yes.

Jeff Love:     Or Gerwig's class as well?

Kathryn Kailikole: Both, yes.

Jeff Love:     Oh, okay, and that was fall of 2015, spring of 2016?

Kathryn Kailikole: Mm hmm.

Jeff Love:     Okay, what if anything did you do with that data?  Did you share it with –

Kathryn Kailikole: I did, I, I talked to them about it.  I said I have serious concerns.

Jeff Love:     And what did they have to say?  They being Nakajima and Gerwig.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: That I was lying.  That I didn't know what I was talking about.

Jeff Love:     Okay, did you tell anybody at the college –

Kathryn Kailikole: I did.

Jeff Love:     – the compliance department here, anybody?

Kathryn Kailikole: I did, I don't, I don't know if we have a compliance department.

Evan Dwin:  Well, who did you tell?  That's okay.

Jeff Love:     Yes, ****

Kathryn Kailikole: I told my boss, um, Daniel Sourbeer.

Jeff Love:     Okay.  And what if anything did Daniel Sourbeer do or say in response to that?

Kathryn Kailikole: He, well, he wasn't surprised.

Jeff Love:     Did he take some action?  You know, it was investigated.  It, it, it could be a violation of, uh, discrimination rules or anything  like that?

Kathryn Kailikole: No.

Jeff Love:     Was that, if you, if you know, did he, I mean –

Kathryn Kailikole: I don't know if he did or not.

Jeff Love:     I mean, okay, alright.  You don't know what he might have told her.

Evan Dwin:  Maybe not have told her or done anything with it.

Kathryn Kailikole: Yeah.

Jeff Love:     Alright, we'll check into that, then, okay.  Alright, so, Finken-, I'm sorry, Nakajima, Gerwig sort of brush off, ah, you're lying, you know, you're cooking the books or whatever.  We didn't do anything wrong.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: I'm a B.

Jeff Love:    You're a what?

Evan Dwin:  Bit-

Kathryn Kailikole: Ch.

Jeff Love:     he referred, they, did they –

Kathryn Kailikole: He never called B-it to my name.

Jeff Love:    I see.

Kathryn Kailikole: But they told the students that.

Jeff Love:    I remember something about that.

Kathryn Kailikole: Yes.

Jeff Love:    Where the students had, uh, didn't a student –

Kathryn Kailikole: There was more than one student who wrote in the evaluations.

Jeff Love:    One or two students had wrote it in the evaluations.  It, it kind of led you to conclude that they had heard it in class and they were –

Kathryn Kailikole: Mm hmm.

Jeff Love:    – just aping what they had heard their professor say.

Kathryn Kailikole: Yeah.

Jeff Love:    Okay, yeah, I remember that.  Okay.  They were dismissive in other words.

Kathryn Kailikole: Mm hmm.

Jeff Love:    Okay, okay.  Was there any other analysis that you did after that that, uh, in regard to the student flow in these classes?

- 88 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Kathryn Kailikole: I didn't have a chance in getting data's, kind of difficult here.

Jeff Love:    Uh, yeah, yes, I know.  Yeah, they hold on to that like it's a sacred, even though everywhere you turn, everybody asks your ethnicity.  But she can't get the information out of them.  Okay, I don't think I have any other questions at this point.  Um, is there anything else about this matter that I haven't asked you about that you think will be important for me to know about?

Evan Dwin: And not, so,  nothing that I can think of, but I have your card, and we can call you if we want to.

Jeff Love:    Yeah.

Evan Dwin: If she wants to chat with you again.

Jeff Love:    Okay, alright.  I'm going to turn the recorder off.   You realize we've been recording.

Kathryn Kailikole: Yes.

Jeff Love:    Without the exception of our breaks and what we said when off the record.  Have you understood my questions?

Kathryn Kailikole: I have.

Jeff Love:    Have you answered them truthfully and accurately to the best of your knowledge and ability?

Kathryn Kailikole: Yes.

Jeff Love:    Very good, okay, let me turn this off.

Evan Dwin: Um.

Jeff Love:    Oh, I'm sorry.

Evan Dwin: Oh, I just want to know if, if we would be able to, if we want a copy of the transcript, whether we would be able to get it.

- 89 -

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:    I don't think that's a problem.  I'll ask the college.  I've certainly, I've offered you a copy of the, uh, audio format.

Evan Dwin:  Oh, right, you know, and I'll take you up on it.  Maybe if its ****

Jeff Love:    Yeah, that's no problem.

Evan Dwin:  **** just take it out of your tape.

Jeff Love:    Yeah.

### [Break in the Interview]

Jeff Love:    Okay.  I've, uh, turned on the tape recorder and, uh, this'll actually be a continuation of an interview, uh, but for the record, um, those present, uh, are myself, Jeff Love, LOVE, I'm an attorney but hired as a neutral fact finder for the, uh, Palomar Community College District and also present is, uh, Kathryn Kailikole, and that's K-A-I-L-I-K-O-L-E, as well as her attorney, Evan Dwin, that's D-W-I-N.  And we were speaking, it's, uh, February 28th, 2018 and, um, after concluding our interview, uh, Ms., u h, Dr. Kailikole had recalled that sh, an event, uh, an, uh, some information that she wanted to share, so, um, Kathryn, you realize we're recording?

Dr. Kathryn Kailikole:    Yes.

Jeff Love:    Okay, very good.  So tell me what it is that you'd like me to know about.

Dr. Kathryn Kailikole:    Um, the comments that the students were writing on, um, the evaluation.

Jeff Love:    Yeah, the ones –

Dr. Kathryn Kailikole:    Yes.

Jeff Love:    – where you –

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Dr. Kathryn Kailikole:     Where I –

Jeff Love:     – characterize in a derogatory –

Dr. Kathryn Kailikole:     Right.

Jeff Love:     – sense, yes.

Dr. Kathryn Kailikole:     And also one of the other ones was that the dean needed to keep her nose out of the business –

Jeff Love:     Right.

Dr. Kathryn Kailikole:     – of, um, physics and engineering.  Um, uh –

Jeff Love:     Did, did you, did you re, did you report anything about that to anyone –

Dr. Kathryn Kailikole:     I did –

Jeff Love:     – or –

Dr. Kathryn Kailikole:     So –

Jeff Love:     And who did you report to?

Dr. Kathryn Kailikole:     – so, Takashi and Art have **** advanced students.

Jeff Love:     Right, yeah, right, they have **** to them –

Dr. Kathryn Kailikole:     Yes.

Jeff Love:     – or whatnot, yes.

Dr. Kathryn Kailikole:     So I had concern when it was brought to my attention –

Jeff Love:     Mm hmm.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Dr. Kathryn Kailikole:     – by my boss, Dan Sourbeer that this was going on.  And my concern was that this, that all I needed was one and stable student to believe that I was the font of all evil.

Jeff Love:     Right.

Dr. Kathryn Kailikole:     And that if they got rid of me because I should keep my nose out of physics and engineering, that physics and engineering would be okay. Because I believe that Takashi believes that.

Jeff Love:     Right.

Dr. Kathryn Kailikole:     Um, so I said I wanted something done.  I wanted administrative action on this to my boss, Dan Sourbeer.  I don't know if anything ever happened.

Jeff Love:     Okay.

Dr. Kathryn Kailikole:     I, then also on the phone, said to Shawna Cohen that I have concerns for my safety and I wanted administrative action on it and nothing happened as far as I know regarding –

Jeff Love:     To protect you.

Dr. Kathryn Kailikole:     – this incident, to protect me.

Jeff Love:     Okay.

Dr. Kathryn Kailikole:     And, and, and nobody seemed to be taking my concerns seriously.

Jeff Love:     Were you concerned about your physical, uh –

Dr. Kathryn Kailikole:     Yes, I was con –

Jeff Love:     – well being, that –

Dr. Kathryn Kailikole:     – yeah.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Jeff Love:     – some student would, uh, you know, hey, I'm on Nakajima's side and what's, what's this, uh, dean doing and become unhinged or –

Dr. Kathryn Kailikole:     Yeah.

Jeff Love:     – become ugly with you?

Dr. Kathryn Kailikole:     Yes.

Jeff Love:     Okay.  I think you may have told me about that, uh, it, that sounds familiar to me –

Dr. Kathryn Kailikole:     Mm hmm.

Jeff Love:     – from before, okay.

Dr. Kathryn Kailikole:     Yeah.

Jeff Love:     And to your knowledge, uh, so you spoke with Dan Sourbear, beer, is it Sourbeer?

Dr. Kathryn Kailikole:     Sourbeer.

Jeff Love:     S-O-U-R-B-E-E-R –

Dr. Kathryn Kailikole:     Yeah.

Jeff Love:     – for the record.  And Shawna Cohen, C-O-H-E-N.  You s, did you speak to both of 'em about the same time?  When did you talk to Sourbeer?

Dr. Kathryn Kailikole:     Um, when it first came up.

Jeff Love:     Okay.

Dr. Kathryn Kailikole:     And I'm trying to remember when it first came up, um, and I think it was in the spring of 2017.

Jeff Love:     Yeah, I recall and it flowed from your reading of certain evaluations and so forth.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Dr. Kathryn Kailikole:     And I didn't read them.  It was that the, um, the tenure and evaluation, the faculty's responsible for that.  They have to transcribe everything.

Jeff Love:     Right.

Dr. Kathryn Kailikole:     And they saw the comments.  And I am sure I didn't, they didn't tell me the worst of 'em.

Jeff Love:     Right.

Dr. Kathryn Kailikole:     Uh, but that faculty was really concerned about what she was reading.  So she notified, um, VPI Sourbeer.

Jeff Love:     Who's that faculty?

Dr. Kathryn Kailikole:     Um, Leslie Williams, Le, um, she's got a hyphenated name.

Jeff Love:     Oh, I hate that.

Dr. Kathryn Kailikole:     I know, I'm, and I'm so sorry –

Jeff Love:     I'm joking.

Dr. Kathryn Kailikole:     – I'm just not remembering it right now.

Jeff Love:     Leslie Williams hyphenated something.

Dr. Kathryn Kailikole:     Yes.

Jeff Love:     Okay, all right.

Dr. Kathryn Kailikole:     And I feel really bad –

Jeff Love:     No, that's okay.  She went –

Dr. Kathryn Kailikole:     – about that.

Jeff Love:     – to Sourbeer.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Dr. Kathryn Kailikole:     Yes.  And –

Jeff Love:     Did Sourbeer then talk to you about it?

Dr. Kathryn Kailikole:     Yes.

Jeff Love:     And you told him you wanted some administrative action –

Dr. Kathryn Kailikole:     Yeah.

Jeff Love:     – taken, whatever that might be –

Dr. Kathryn Kailikole:     Right.

Jeff Love:     – to be sure that this, you know, get to the bottom of it –

Dr. Kathryn Kailikole:     Right.

Jeff Love:     – you know, and find out what's going on.

Dr. Kathryn Kailikole:     Yeah.

Jeff Love:     Nothing happened to your knowledge.

Dr. Kathryn Kailikole:     Nothing happened to my knowledge.

Jeff Love:     And then at some point, you talked to Shawna Cohen –

Dr. Kathryn Kailikole:     And it was when this –

Jeff Love:     – at this office.

Dr. Kathryn Kailikole:     – other incident happened.

Jeff Love:     I see.  That's when you, when you were reporting all of that.

Dr. Kathryn Kailikole:     Yeah.

Jeff Love:     Okay.

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Dr. Kathryn Kailikole:     That –

Jeff Love:     Okay, all right, that makes sense then.

Dr. Kathryn Kailikole:     And I later, when, uh, VPI Kahn, um, took over –

Jeff Love:     Mm hmm.

Dr. Kathryn Kailikole:     – I also told him I had concerns –

Jeff Love:     Okay.

Dr. Kathryn Kailikole:     – and fears and I didn't believe anything had been done.

Jeff Love:     Okay.  Okay, all right.  And when did Kahn take over?

Dr. Kathryn Kailikole:     He took over, I think in May, end of May, June.

Jeff Love:     May of last year?

Dr. Kathryn Kailikole:     Uh, yes.

Jeff Love:     Okay, all right.  Anything else?

Dr. Kathryn Kailikole:     Mm, no –

Jeff Love:     Okay.

Dr. Kathryn Kailikole:     – no.

Jeff Love:     All right.  Um, I'll go ahead and turn off the, uh, recorder then.

Dr. Kathryn Kailikole:     Okay.

Jeff Love:     Okay, and the same questions and answers, uh –

Dr. Kathryn Kailikole:     Yes.

Jeff Love:     – I'm sure that are the same –

**Transcript of Interview of Kathryn Kailikole – February 28, 2018**

Dr. Kathryn Kailikole:     Yes.

Jeff Love:     – so to speak.  All right, let me go ahead and turn this off.

# 3. Exhibits (E-Mails)

**Cohen, Shawna**

**Exhibit A**

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:33 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Case#2016-00138 |
| **Attachments:** | Case 2016-00138 Photos.pdf; image001.jpg |

**Importance:**          High

Respectfully,
Lisa Norman, Ed.D, J.D.
Assistant Superintendent/Vice President Human Resources Palomar Community College
(760) 744-1150 x2531

"Be the change you wish to see in the world."

                    Gandhi

-----Original Message-----
From: Finkenthal, Daniel
Sent: Sunday, December 10, 2017 2:21 PM
To: stacyncarlson@yahoo.com
Subject: FW: Case#2016-00138
Importance: High

===============
Daniel Finkenthal, Ph.D.
Palomar College
San Marcos, CA 92069

_____
From: Kailikole, Kathryn L.
Sent: Friday, December 8, 2017 5:22 PM
To: Finkenthal, Daniel
Subject: FW: Case#2016-00138

From: Kailikole, Kathryn L.
Sent: Tuesday, November 21, 2017 4:24 PM
To: Norman, Lisa M. <lnorman@palomar.edu>
Cc: Kahn, Jack S. <jkahn1@palomar.edu>
Subject: FW: Case#2016-00138
Importance: High

Ex. A, Page 186

Lisa,

Please find Chief Moore's response to my inquiry regarding the police report on the use of the airsoft gun in the physics lab.   There are photos attached.  The responding officer showed the photos to me and explained the following:

He took a photo of the drawers (first photo) where the gun was kept.  There was no lock on the drawer and the drawer was easily accessible.

The third photo on the second page is the airsoft gun.  He was concerned that the gun was kept in the original box and not in a lockbox or locked drawer.  In addition, the gun looks like a real gun the only way to know the difference is the orange tab at the end of the muzzle.

Thank you,

Kathy
Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>
[Scr3_ol]

From: Moore, Christopher
Sent: Tuesday, November 21, 2017 3:02 PM
To: Kailikole, Kathryn L. <kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>>
Subject: FW: Case#2016-00138

Sorry there are not more photos.  Looks like April 21st or so 2016

From: Suarez, Nieves
Sent: Tuesday, November 21, 2017 2:30 PM
To: Moore, Christopher <cmoore1@palomar.edu<mailto:cmoore1@palomar.edu>>
Subject: Case#2016-00138

Chief,

Reference: Nakajima

Attached is the report and photos (separate). The Report Exec report shows it is incomplete and not all the photographs are in there so I had to pull the hard copy. Also, the narrative states there is a video in evidence.

Thank you,

Nieves Suarez

Ex. A, Page 187

Dispatch Coordinator
Community Service Officer
Palomar College Police Department
1140 W. Mission Rd.
San Marcos, CA 92069
760-744-1150 ext. 2289

P Please consider the environment before printing this e-mail CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

Ex. A, Page 188

**Exhibit B**

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Case#2016-00138 |
| **Date:** | Wednesday, January 10, 2018 4:33:26 PM |
| **Attachments:** | Case 2016-00138 Photos.pdf |
| | image001.jpg |
| **Importance:** | High |

Respectfully,

Lisa Norman, Ed.D, J.D.

Assistant Superintendent/Vice President Human Resources

Palomar Community College

(760) 744-1150 x2531

"Be the change you wish to see in the world."

                             Gandhi

-----Original Message-----

From: Finkenthal, Daniel

Sent: Sunday, December 10, 2017 2:21 PM

To: stacyncarlson@yahoo.com

Subject: FW: Case#2016-00138

Importance: High

===============

Daniel Finkenthal, Ph.D.

Palomar College

San Marcos, CA 92069

_____

From: Kailikole, Kathryn L.

Sent: Friday, December 8, 2017 5:22 PM

To: Finkenthal, Daniel

Subject: FW: Case#2016-00138

From: Kailikole, Kathryn L.

Sent: Tuesday, November 21, 2017 4:24 PM

To: Norman, Lisa M. <lnorman@palomar.edu>

Cc: Kahn, Jack S. <jkahn1@palomar.edu>

Subject: FW: Case#2016-00138

Importance: High

Lisa,

Please find Chief Moore's response to my inquiry regarding the police report on the use of the airsoft gun in the physics lab. There are photos attached. The responding officer showed the photos to me and explained the following:

He took a photo of the drawers (first photo) where the gun was kept.  There was no lock on the drawer and the drawer was easily accessible.

The third photo on the second page is the airsoft gun.  He was concerned that the gun was kept in the original box and not in a lockbox or locked drawer.  In addition, the gun looks like a real gun the only way to know the difference is the orange tab at the end of the muzzle.

Thank you,

Kathy
Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>
[Scr3_ol]

From: Moore, Christopher
Sent: Tuesday, November 21, 2017 3:02 PM
To: Kailikole, Kathryn L. <kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>>
Subject: FW: Case#2016-00138

Sorry there are not more photos.  Looks like April 21st or so 2016

From: Suarez, Nieves
Sent: Tuesday, November 21, 2017 2:30 PM
To: Moore, Christopher <cmoore1@palomar.edu<mailto:cmoore1@palomar.edu>>
Subject: Case#2016-00138

Chief,

Reference: Nakajima

Attached is the report and photos (separate). The Report Exec report shows it is incomplete and not all the photographs are in there so I had to pull the hard copy. Also, the narrative states there is a video in evidence.

Thank you,

Nieves Suarez
Dispatch Coordinator
Community Service Officer
Palomar College Police Department
1140 W. Mission Rd.
San Marcos, CA 92069
760-744-1150 ext. 2289
P Please consider the environment before printing this e-mail CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the

sender and destroy all copies of the communication.

CN # 2016 - 00138SM



2 of 4





**Cohen, Shawna**                                                          **Exhibit C**

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:27 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Confidential Summary of Investigation |
| **Attachments:** | Summary_Investigation.pdf |

Hi Shawna,
Please share with Jeff that we will need to open an inquiry into this related issue involving Daniel. This is an email he sent to one of the Board Members as well as to someone named Stacy Carlson? Do you know who that is?


Respectfully,
Lisa Norman, Ed.D, J.D.
Assistant Superintendent/Vice President Human Resources Palomar Community College
(760) 744-1150 x2531

"Be the change you wish to see in the world."

                    Gandhi


-----Original Message-----
From: Finkenthal, Daniel
Sent: Monday, December 11, 2017 2:12 PM
To: stacyncarlson <stacyncarlson@yahoo.com>
Subject: FW: Confidential Summary of Investigation



-----Original Message-----
From: Finkenthal, Daniel
Sent: Monday, November 13, 2017 4:27 PM
To: Deerfield, Nina
Subject: Confidential Summary of Investigation

Hello Nina,
I received this summary of the of the Investigation Report via certified mail. Please do not share with anyone outside the Palomar College Governing Board.

The findings show that there have been ongoing practices of unlawful discrimination in the Physics and Engineering Department here at Palomar. It is time for a change, especially given the recent public outcry regarding sexual and workplace harassment and discrimination. Please help me by making this a Board priority.

Thank You,
Daniel

=======================
Daniel Finkenthal, Ph.D.

Professor and Chair
Department of Physics and Engineering
Palomar College
San Marcos, CA  92069

**Confidential Summary of Investigation Report**
Complaint of Unlawful Discrimination
Daniel Finkenthal on Behalf of Anonymous Complainant vs.
Arthur Gerwig, Takashi Nakajima, and Hector Garcia Villa, Respondents
November 1, 2017

## PURPOSE OF INVESTIGATION.

This matter relates to an administrative investigation undertaken for Palomar Community District (District). This matter related to investigating material that was deemed objectionable which had been displayed on walls, doors and over doors in the Physics and Engineering Department at the District's main campus. Daniel Finkenthal (Dr. Finkenthal), the newly appointed Department Chair, had brought forward the complaint on behalf of an anonymous student, when he assumed his leadership role and claimed that the material was objectionable, discriminatory and inappropriate to be displayed or posted on District property.

The scope of this investigation was to determine whether certain District employees allowed and/or were aware that the objectionable material was displayed in the Physics and Engineering Department in certain areas, visible to both other employees, as well as students. Specifically, Professors Arthur Gerwig (Mr. Gerwig), Takashi Nakajima (Mr. Nakajima) and Hector Garcia Villa (Mr. Garcia Villa) were observed to teach in the department in the general area of these materials. The materials involved included pictures, images, wording and other items that were seen as patently offensive, discriminatory in content and nature and generally inappropriate for a District environment. Added to this, Dr. Finkenthal alleged that Mr. Gerwig and Mr. Nakajima had utilized a syllabus and other material that was inappropriate, threatening in nature and inconsistent with the department's philosophy and goals.

## BACKGROUND AND METHODOLOGY OF INVESTIGATION.

This matter began in May 2017 after Dr. Finkenthal was appointed the Chair of the Physics and Engineering Department. Previously, Mr. Nakajima had been the Department Chair for several years. Dr. Finkenthal contacted his dean, Kathryn Kailikole (Dr. Kailikole), who serves as the Dean, Mathematics and the Natural and Health Sciences, to report that a student had contacted him with concerns regarding various types of posters and other materials that were posted conspicuously on the walls and doors of rooms NS-249 and NS-252. Dr. Finkenthal showed Dr. Kailikole the various materials and indicated that he did not want to disclose the name of the student for fear that the student would be subject to some form of retaliation.

On May 31, 2017, Dr. Kailikole reported to Shawna Cohen (Ms. Cohen), Manager, Equal Employment Opportunity and Compliance and the District's Deputy Title IX Coordinator, that she had received the report from Dr. Finkenthal regarding the offensive postings in the two rooms. The following day, on June 1, 2017, a group of District administrators visited NS-249 and NS-252 to view the areas. The officials determined that a number of postings had been placed on the walls and other surfaces that violated federal, state, and District nondiscrimination regulations, including Title IX. The officials took pictures of the offending items and removed them from the rooms, retaining them for future reference.

Jack Kahn, Assistant Superintendent/Vice President, Instruction (Dr. Kahn), Dr. Kailikole, and Ms. Cohen met with Dr. Finkenthal, Mr. Garcia Villa, Mr. Gerwig, Mr. Nakajima, and Susan Snow (Ms. Snow), Palomar Faculty Federation Grievance Officer, on June 11, 2017 for purposes of determining whether the Physics and Engineering faculty had prior knowledge of the postings. During the meeting, Ms. Cohen distributed the postings to the parties and asked whether the faculty had seen them before. Dr. Finkenthal stated that he saw the items after the anonymous student had pointed them out to him; the other three faculty stated that they had never seen the postings before. Mr. Garcia Villa, Mr. Gerwig, and Mr. Nakajima all indicated that they occasionally used the two rooms, whereas Dr. Finkenthal stated that he never used them.

On June 28, 2017, Adrian Gonzales, Assistant Superintendent/Vice President, Student Services and the District's Title IX Coordinator, notified Ms. Cohen that an investigation into the complaint was necessary. Dr. Finkenthal met with Ms. Cohen on June 29, 2017 to present additional information relevant to the investigation. The District retained an independent investigator and attorney, Jeffrey Love (fact finder), to conduct the investigation. Mr. Love commenced the investigation on July 11, 2017. The investigation involved the review of documents, including evidence and applicable District rules and regulations, as well as conducting interviews of District employees. Once factual evidence was developed, the various statements of the interviewees were compared and contrasted with one another as well as other evidence and determinations of credibility were established. Once credibility was established along with a factual framework of the alleged events, conclusions were formed based on the greater weight of the credible evidence. For the purpose of findings, direct and circumstantial evidence may be given equal weight.

Ex. A, Page 197

CONFIDENTIAL
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

## SCOPE OF THE INVESTIGATION.

The scope of this investigation was to determine:

**A.  Did District employees allow and/or condone objectionable and/or discriminatory material to be displayed on District property in violation of District rules?**

## SOURCE OF THE COMPLAINT.

**A.  Daniel Finkenthal, Ph.D. (***acting on behalf of an anonymous student***)**
        Professor/Department Chair
        Physics and Engineering
        Palomar Community College District

## ACCUSED/FOCUS EMPLOYEES.

**A.  Hector Garcia Villa**
        Assistant Professor
        Physics and Engineering
        Palomar Community College District

**B.  Arthur Gerwig**
        Associate Professor
        Physics and Engineering
        Palomar Community College District

**C.  Takashi Nakajima**
        Professor
        Physics and Engineering
        Palomar Community College District

## WITNESSES.

**A.  Daniel Finkenthal, Ph.D.**
        Professor/Department Chair
        Physics and Engineering Department
        Palomar Community College District

**B.  Kathryn Kailikole, Ed.D.**
        Dean
        Mathematics and the Natural and Health Sciences Division
        Palomar Community College District

**C.  Arthur Gerwig**
        Associate Professor
        Physics and Engineering Department
        Palomar Community College District

**D.  Takashi Nakajima**
        Professor
        Physics and Engineering Department
        Palomar Community College District

**E.  Hector Garcia Villa**
        Assistant Professor
        Physics and Engineering Department
        Palomar Community College District

Ex. A, Page 198

CONFIDENTIAL
*Palomar Community College District*
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

F.  **Susan Snow**
        Professor
        Mathematics Department
        Palomar Community College District


## CREDIBILITY OF THE WITNESSES.

The analysis of the credibility of the witnesses is an important aspect of a fact-finding investigation.  As an accepted rule of evidence, a fact finder can disregard the statements of a witness who has been found to have provided false or unreliable information during their testimony in a matter.  Those witnesses' statements can be disregarded in their entirety and not believed unless there is compelling evidence to conclude that individual statements otherwise are true.[1]  Concerning the witnesses' statements, this fact finder considered:

a)  The witness' demeanor while providing a statement and the manner in which he/she provided the statement.

b)  The character of the witness' statement.

c)  The extent of the witness' capacity to perceive, to recollect, or to communicate any matter about which he/she gave a statement.

d)  The extent of the witness' opportunity to perceive any matter about which he/she gave a statement.

e)  The witness' character for honesty or veracity or their opposites.

f)  The existence or nonexistence of a bias, interest, or other motive.

g)  A statement previously made by the witness that is consistent with his/her statement during the fact-finding investigation.

h)  A statement made by the witness that is inconsistent with any part of his/her statement during the fact-finding investigation.

i)  The existence or nonexistence of any fact given in statement by the witness.

j)  The witness' attitude toward the fact-finding investigation in which he/she gave a statement or toward the giving of a statement.

### *Discussion of Witness Credibility.*

**Witness Daniel Finkenthal, Ph.D.**

Dr. Finkenthal appeared to be a credible witness in this matter.  Dr. Finkenthal is the current Chair of the Physics and Engineering Department of the District.  Dr. Finkenthal came forward after he had been elevated to his current position in order to make his complaint concerning the display of what he considered objectionable material in or about the Physics Department.  Dr. Finkenthal was deemed credible due to the fact that his statements to this fact finder tended to be corroborated by the physical evidence located in the area of the Physics Department, as well as the statements of other credible witnesses.

**Kathryn Kailikole, Ed.D.**

Dr. Kailikole appeared to be a credible witness in this investigation.  Dr. Kailikole said that she observed the offensive materials and further noted that Mr. Gerwig and Mr. Nakajima had specifically denied knowledge of the materials that were displayed in areas that they were known to frequent on a daily basis.  Dr. Kailikole also noted that she believed both Mr. Gerwig and Mr. Nakajima had been insubordinate concerning the publication and use of certain inappropriate policy and rules statements, syllabi and a student warning letter.

**Witness Arthur Gerwig**

Mr. Gerwig did not appear to be a credible witness in this matter.  Mr. Gerwig has been a long-term faculty member in the Physics and Engineering Department, and seemed to be unaware that materials had been displayed on various walls in

---

[1] See *California Civil Jury Instruction* Section 5003.

Ex. A, Page 199

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

the area in which he has worked nearly on a daily basis. It appeared to the fact finder that Mr. Gerwig's statements were implausible, in that he would have observed these materials having worked in that area.

**Witness Takashi Nakajima**

Mr. Nakajima also appeared to lack credibility in his statements to the fact finder. Many of the objectionable materials that were observed and removed from the Physics and Engineering Department were displayed on the doors and in the room associated with areas that Mr. Nakajima used on a daily basis. Mr. Nakajima's statement that he was unaware of many of these materials was implausible and inconsistent with rational reason and logic.

**Witness Hector Garcia Villa**

Mr. Garcia Villa appeared to be a credible witness in this matter. Mr. Garcia Villa is a relatively new Assistant Professor to the department. Mr. Garcia Villa said that he was aware of some of the materials that had been displayed in the area, however, he was uncertain as to the ownership or who had authored these items. Mr. Garcia Villa was deemed credible, as he was relatively new to the department, did not typically use the rooms where the associated objectionable materials were located and appeared earnest and truthful in his statements.

**Witness Susan Snow**

Ms. Snow did not appear to be a credible witness in this matter. Ms. Snow appeared as a witness; however, she was little more than a thinly-veiled advocate for Mr. Gerwig and Mr. Nakajima. Ms. Snow had represented both Mr. Gerwig and Mr. Nakajima at their interviews as their union representative as part of the Palomar Faculty Federation. Ms. Snow claimed that she was a witness in this matter, as she had observed an item that had been hung over a door in one of the offices in the Physics and Engineering Department. Ms. Snow knew early on, and prior to her representation of Mr. Nakajima and Mr. Gerwig, that she would therefore be a witness in this matter, yet she sat through and participated in their interviews, as a representative. Ms. Snow appeared to be biased and motivated to advocate for her association members, and was seen as a witness who lacked credibility.

**FINDINGS.**

**A. Did District employees allow and/or condone objectionable and/or discriminatory material to be displayed on District property in violation of District rules?**

Short Answer: **YES**

*Discussion*

**Background.**

Dr. Finkenthal indicated to the fact finder that he believes inappropriate behavior relevant to the allegations had taken place in the Physics and Engineering Department under the chairmanship of Mr. Nakajima for a number of years.

The facts further demonstrate that in 2009, a student with certain disabilities had filed a complaint with the Department of Education, Office of Civil Rights regarding discrimination by the Physics and Engineering faculty. The Office of Civil Rights had upheld the student's complaint and Dr. Finkenthal provided a copy of these relevant documents to the fact finder. Dr. Finkenthal also provided the fact finder with emails he had received that are purported to be between Mr. Nakajima and a student that had occurred on or about August 24, 2009.

Dr. Finkenthal pointed out that these emails display that Mr. Nakajima had violated the Americans with Disabilities Act (ADA) and refused to make a reasonable accommodation to the student who filed the complaint. Dr. Finkenthal noted that this exchange occurred only four months after the Office of Civil Rights (OCR) had published their report concerning the previous violation of the ADA.

**Materials Found Displayed in Rooms NS-249 and NS-252.**

As part of the scope of this investigation, a number of items that were located in the areas surrounding rooms NS-252 and NS-249 in the Physics and Engineering area of the NS Building were documented in place, and removed. This fact finder's charge was to investigate whether these items were placed by any District staff or whether any District staff

Ex. A, Page 200

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

members had allowed the placement of these materials, or were aware of their presence. The various items are identified by item number as detailed below.

| Item # | Item Description | Room | Specific Location |
|--------|-----------------|------|-------------------|
| 1 | "Safe Space...Not!!!" | Hallway | Above door into NS-252 |
| 2 | "Carbon Resistors" (mnemonic device) | NS-249 | Door exiting into hallway |
| 3 | "Vogue May Edition" | NS-249 | File cabinet |
| 4 | "2017 you know you juant me"/"Hello Ladies" | NS-249 | Door leading into NS-252 |
| 5 | "Dick got her like" | NS-249 | Inside of door |
| 6 | "Peek a Boo"/"Jen's Height in influence" | NS-249 | Covering of window of door to hallway |
| 7 | "TURN THIS SHIT OFF" | NS-252 | Taped to coffee pot |
| 8 | "Do not leave your shit in the sink." | NS-252 | Above sink |
| 9 | "Stop Making Fucking Tea in the Kettle!" | NS-252 | Above coffee pot/sink area |
| 10 | "In class what he taught us..." (cartoon) | NS-252 | Inside of door |
| 11 | "Resistance is FUTILE!" | NS-252 | Inside of door |
| 12 | Man with discus | NS-252 | Above microwave |
| 13 | Fluke Multi-Meter | NS-252 | Inside of door |

**a)  Issues of Sexual and/or Gender, Racial, National Origin Harassment/Discrimination Relevant to Above Items**

Several of these items concerned issues of either sexual and/or gender harassment and discrimination.  For instance, Item No. 2 was a document that was posted on the door exiting into the hallway from Room NS-249.  This item which was titled "*Carbon Resisters*" provided a mnemonic in order to allow students to memorize the names of the various colors of the bans on resisters.  Mnemonics are often aides to the memory and serve students and others to recall specific details with greater ease.

On this item, the mnemonic contained a negative, violent and racial reference to African American males raping women.  The mnemonic stated, "*Black Boys Rape Our Young Girls But Violet Gives Willingly Get Some Now.*"  Additionally, it also makes an objectified reference to a woman (Violet) who is purported to be promiscuous.  These sorts of comments touch on and concern issues of racial, sexual and/or gender harassment and discrimination.

Item No. 3 which was titled the "*Vogue May Edition*" portrayed a student lying across the hood of a pickup truck holding a paper where a large phallic symbol was drawn upon it.  This item also displays an issue of sexual or gender discrimination by portraying a male penis in a drawing in an enlarged and gratuitous characterization.  This item was posted on the file cabinet in Room NS-249.

Item No. 4, identified as "*2017 You Know You Want Juant Me*" portrayed a male adult student who appeared to be Latino in race.  The document indicates that women might have some form of sexual desire for the individual portrayed in the document.  This individual was identified as a student and the term want "juant" was a joking reference to the individual's true name, Juan.  The document indicates "*Hello Ladies*" in an apparent joking invitation to women who might want to have some form of sexual contact with the individual portrayed therein.

Item No. 5, another document located in NS-249 posted on the inside of the door shows a subject identified generally as a student in the Physics and Engineering Department staring at a large item that states "*Dick got her like.*"  There is a hash tag remark below that states "#black cock slut."  This item was making reference to a penis and specifically the penis of an African American.

Item No. 6 was essentially a covering of a window located in a door that leads to the hallway from Room NS-249.  This item had the word "P*eek-a-Boo*" written on it as well as "*Jen's height in influence.*"  "Jen" was identified by an interviewee as a former student assistant who was short in stature.  This item appears to have been posted in order to make light of "Jen's" height as well as her particular influence as a student assistant.  Both of these references can be seen as derogatory both towards the student concerning her height, as well as her influence in the department as female student staff member.

**b)  Issues of Profanity and/or Intimidation/Inappropriate Behavior Relevant to Above Items**

Item No. 7 was a paper sign taped to the coffee maker in the NS-252 laboratory classroom.  This sign states "*Turn this Shit Off*".  This sign was indicative of a seeming tolerance for profanity and/or intimidation in the department. In addition

Ex. A, Page 201

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

to this, Item No. 8 was a sign posted above the sink in NS-252 that stated, "*Do Not Leave Your Shit in the Sink.*" Again, this sign uses profanity and tends to demonstrate issues of profanity and/or intimidation in the department.

Item No. 9 was a sign posted above the coffee pot and sink area in NS-252 that states, "*Stop Making Fucking Tea in the Kettle!*" Once again, this sign makes reference to issues of profanity and intimidation in the department. All of these signs posted in or about the coffee pot, kettle/sink area were both open to both staff members, as well as students.

Finally, Item No. 13 was a memorandum written and posted by Mr. Nakajima that contains threatening language concerning expelling a student from District and ruining their "life" over a missing Fluke multimeter. This item was left up long after the meter had been returned and/or located and was seen as another display in support of an intimidating academic environment.

**Additional Documents Relevant to this Fact Finding.**

| Item | Description |
|------|-------------|
| A | Physics 230/231 Student "Cautionary Letter" |
| B | Regulations and Rules for Physics 230 Lab |
| C | August 24, 2009 email exchange between Mr. Nakajima and student |
| D | April 16, 2009 United States Department of Education, OCR, Region IX Letter to the District |

**a) Syllabus, Physics Department Policies/Procedures and Warning Materials**

As part of the investigation, the fact finder was provided documents identified above as Document Items A and B. These items were seen as inappropriate and Dr. Kailikole had instructed faculty to cease using these items in 2016. These items had been placed on a non-District website known as PCpepso.com, which had been created years ago by Mr. Gerwig and remains active to this day.

Document Item A was titled *To Physics 230/231 students from Physics 230 and 231 instructors.* This item appears to be a portion of a syllabus for the Physics 230/231 courses. A review of this document demonstrates a rather harsh and threatening tone. Here, the document tends to threaten students who engage in certain behaviors such as "...studying only for an exam, trying to get a maximum score with a minimum effort, and dropping a course just before the deadline." The document states "...we don't want to see those students in our classes anymore."

The document goes on to make other negative and harsh comments making reference to students that are "lazy" or who "don't want to change your bad study habit." This document encourages such students to "give your seat to someone else who is more serious than you." Although it is laudable to encourage students to academic excellence and rigor, such commentary in a document seems inappropriate, threatening and demonstrates an unwelcoming commentary concerning these classes. Additionally, the second page of this document has an area that can seemingly be detached where a student was requested to print their name and sign and date the document agreeing to certain terms. These terms state:

> *I (print your name) read the statements above. I am serious about my education and will follow the guidelines given above. I will be working my hardest to learn the subjects from today, and I will decide whether or not this class is for me within the first 4 weeks. If I do not drop by the end of the fourth week, I will receive a course grade of whatever I deserve.*

This document requires a signature and states "...this sheet is to be turned in by Friday the first week of a semester. Any student who failed to turn it in will be dropped from the course."

Here, it appears that the student is required to sign this document and the document tends to want to amend the official course drop policies by the District. The document directly states that if a student fails to agree with the terms of this document and sign in agreement, that they would be dropped from the course.

In addition to this required signing aspect of the document, the document also details how students will be treated in class. In relevant part, the document states "...you'll be treated exactly the way you treat this class. If you want to be treated nicely, treat this class and the professor nicely."

This document tends to demonstrate a threatening and inappropriate tone and required students to sign a document that they were not legally bound to sign under pain and penalty of being dropped from the course.

Ex. A, Page 202

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

Document Item B seems to be the Rules and Regulations for the Physics Lab 230. This document, like Document Item A, has a threatening tone and makes reference to "lazy" students and encourages other students to "kick out" those students that they deem to be "lazy." Essentially, this document gives authority for students to apply peer pressure in what appears to be a rather capricious fashion in determining who they subjectively believe is being "lazy" and subjecting that student to be forced out of the laboratory course.

Ironically, the document states in bold underlined print that the "...instructor is not available to answer any questions regarding the lab during the lab period." Again, the instruction states "...if anyone who is not willing, capable, or lazy is in your group, kick that person out from your group." In a rather odd commentary, the document goes on to state "...this sounds very cold, but unless you don't mind losing your job because if that person does not do his/her part, you have to learn how to protect yourself."

Essentially, the document and its authors, Mr. Gerwig and Mr. Nakajima, are encouraging students to self-select other students from whom they differ and feel might not be operating or working to a particular standard. Essentially, Mr. Nakajima and Mr. Gerwig are allowing students to grade other students, something that is only under the purview of Mr. Gerwig and Mr. Nakajima as faculty of the District. This document, like Document Item A, contains a threatening tone and gives other students seemingly unfettered authority to pressure and/or remove other students from the course in what could only be seen as an inappropriate delegation of professorial authority.

**Knowledge of the Materials.**

One of the issues in this fact-finding investigation was to determine whether any members of the faculty had knowledge of the materials that were posted. Although during a meeting on June 22, 2017, both Mr. Gerwig and Mr. Nakajima denied general knowledge of any of these materials, the facts in this matter demonstrate that both of these faculty used the classrooms where these items were openly and notoriously posted for all to see.

Even though these two faculty denied particular knowledge during this meeting, and generally when interviewed by the fact finder, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima knew, or should have known, about the presence of these documents. Both faculty knew, or should have known, that these materials were patently offensive, inconsistent with the District's policy concerning sexual and/or racial discrimination and further inconsistent with the academic goals of the District.

The facts in this matter tend to demonstrate that Mr. Garcia Villa, a newly appointed Assistant Professor, was generally unaware of these documents, as he typically did not use the rooms where the documents were identified. It appeared to this fact finder that these rooms were typically and nearly exclusively used by both Mr. Gerwig and Mr. Nakajima.

In addition to the materials identified as posted on walls and doors in these areas, both Mr. Gerwig and Mr. Nakajima appeared to have been aware and/or even authored documents that were placed on an unauthorized non-District sponsored website known as "PCPepso." The facts in this matter demonstrate that PCPepso was set up by the department and was loosely run by student assistants with knowledge of internet technology. This website contained documents that portend to be syllabi and recitations of the department's rules and regulations; however, these items were seen as offensive, threatening, inappropriate, and inconsistent with District policy and/or state and/or federal law.

Concerning general knowledge of the materials located in rooms NS-249 and NS-252, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima were well aware of the materials that had been placed in this area. It appeared to this fact finder that there had been a general attitude of indifference to following the rules of the District concerning the avoidance of sexual harassment, discrimination and maintaining a wholesome student academic environment. It appeared that Mr. Gerwig and Mr. Nakajima routinely departed from established protocols and propriety, and had resisted changes by Dr. Kailikole.

According to Dr. Finkenthal, both Mr. Gerwig and Mr. Nakajima routinely, and continually, used rooms NS-249 and NS-252 and were often in that area. Even Mr. Gerwig stated that if he were looking for Mr. Nakajima, he would look in room NS-249. For Mr. Gerwig and Mr. Nakajima to claim that they were unaware of the items that were openly and notoriously displayed there requires a departure from reason, common sense and logic. Clearly, they were aware of these materials, had either displayed the items themselves or allowed and even encouraged others to do so. These items were inappropriate, displayed racial, gender and national identity discrimination and harassment, and supported an intimidating and unwelcoming academic environment. Dr. Finkenthal accurately described these areas as displaying a "frat house" environment.

Ex. A, Page 203

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

Dr. Kailikole told the fact finder that Mr. Gerwig and Mr. Nakajima had been insubordinate to her direction to remove the materials from the PCpepso website and to refrain from using the documents concerning their classes. Mr. Garcia Villa was aware of these directions and never used these materials, as directed by Dr. Kailikole. Even so, Mr. Nakajima and Mr. Gerwig continued to allow the PCpepso website to function, claiming they were unaware how to close the link and disallow access.

In summary, even though Mr. Gerwig and Mr. Nakajima deny knowledge of the aforementioned materials found in rooms NS-249 and NS-252, the greater weight of the credible evidence demonstrates that they were aware of the materials, allowed and/or participated in their postings and display, and were untruthful concerning their assertions otherwise.

**Findings In Reference to Respondents.**

**Mr. Garcia Villa**

**1. PCPepso Website Documents**

Mr. Garcia Villa said that he was aware of the PCPepso website. Mr. Garcia Villa acknowledged that he had never used the documents contained on this unofficial website set up by Mr. Gerwig in the Physics and Engineering Department. Mr. Garcia Villa recalled that Dr. Kailikole had admonished him, as well as Mr. Gerwig and Mr. Nakajima, not to use these documents. Mr. Garcia Villa is a recently-hired Assistant Professor working full-time in the last year. It appeared to the fact finder that Mr. Garcia Villa abided by Dean Kailikole's direction and did not use these documents.

**2. Offensive Materials in Rooms NS-252 and NS-249**

The facts tend to demonstrate that Mr. Garcia Villa was a relatively new Professor in the Engineering and Physics Department. Mr. Garcia Villa taught classes, as well as a lab portion in support of his lecture courses. Mr. Garcia Villa indicated that some of the materials that were identified as Items No. 1 through 13, above, were placed in the interior areas generally of Room NS-252 and NS-249. Mr. Garcia Villa said that he did not utilize Room NS-249 and was rarely in that area. Interestingly, Mr. Garcia Villa seemed more forthright concerning his observations than Mr. Gerwig and Mr. Nakajima, who are known to utilize these rooms on a frequent basis. There was no information to conclude that Mr. Garcia Villa was aware of the more offensive materials located in these rooms, nor that he participated and/or encouraged their display.

**3. Truthfulness**

This fact finder found that Mr. Garcia Villa was a credible witness in this matter. There was no credible evidence to conclude that Mr. Garcia Villa had been untruthful in his statements to this fact finder when questioned concerning the documents on the PCpepso website or the offensive material that was found to have been displayed in Rooms NS-252 and NS-249.

**Mr. Gerwig and Mr. Nakajima**

**1. PCPepso Website Documents**

The facts in this matter demonstrate that Mr. Gerwig had developed the PCpepso website. This website was an unofficial District website that certain members of the Physics and Engineering Department used to post materials, such as syllabi and various rules and regulations. Some of these materials, identified as Document Items A and B, above were identified as being problematic and inappropriate. The facts demonstrate that in 2016, Dr. Kailikole directed staff that these documents not be used due to the inappropriate language and tone contained therein.

Even so, these documents remained on the website and were seemingly available to students even though there was insufficient credible evidence to show that students were purposely directed to this website after Dr. Kailikole's direction not to do so. Mr. Gerwig was responsible for maintaining this website, but claimed that he was unable to access the website to make any particular changes as this task had been assigned to previous students who acted as "webmasters." The facts demonstrated though that Mr. Gerwig made no real efforts in attempting to contact or take steps to remove the documents from the website after direction had been given to remove Document Items A and B from the website by Dean Kailikole.

Document Items A and B were documents that seemingly were created by Mr. Gerwig and Mr. Nakajima which, taken together, formed a syllabus for students for the Physics 230 and 231 class instruction. Both of these documents

Ex. A, Page 204

*CONFIDENTIAL*
Palomar Community College District
*Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima*

contained harsh verbiage, referred to students as being lazy and essentially encouraged students to take negative action against other students. For instance, Document Item B states in relative part, "If a member is not working or contributing for the group, I encourage you to kick out that student." Here, the document purports to allow and even encourage to take retribution on other students that they feel might not be "contributing" to a group effort. Clearly, this sort of peer pressure is inappropriate, as the faculty member should decide as to whether a student is putting forth sufficient effort in a group environment. It appeared to this fact finder that Document Item B attempts to relegate the duties of a faculty member to peer students concerning the performance of others.

Additionally, both Document Items A and B make reference to the term "lazy." Whereas laziness is not considered a laudable trait concerning academic performance, such language and negative characterizations seem inappropriate in a professional academic document such as these purport to be. It was clear to this fact finder that based on the greater weight of the credible evidence these documents were created in collaboration between Mr. Gerwig and Mr. Nakajima. Even though Mr. Nakajima attempted to claim some predecessor had created Document Item B described as the Regulations and Rules for Physics 230 Lab the facts tend to demonstrate that this is not true. Mr. Gerwig seemed to recall that he and Mr. Nakajima had crafted this document together, and the plain evidence in the document demonstrates that the only instructors referenced in the document were, in fact, Mr. Gerwig and Mr. Nakajima. There was no reference to any other faculty within this document.

Both Document Items A and B tend to depart from the District's code of ethics. These items do not tend to encourage the free pursuit of learning in their students, nor do they demonstrate respect for students as individuals. Instead, these documents present a harsh and threatening tone and encourage students to engage in self-selection by "kicking out" other students that they feel might be "lazy" or do not "deserve the same score" as they do. Neither Mr. Gerwig nor Mr. Nakajima seemed to understand or maintain their "proper roles an intellectual guides and counselors." Instead, they wrongfully delegated their authority and duties to students to essentially police other students in a group environment. Such authority and encouragement can lead to disastrous results, including the development of cliques, discriminatory behavior and bestowing of inappropriate authority to those who will not wield that authority in a prudential fashion.

## 2. Offensive Materials in Rooms NS-252 and NS-249

Concerning the offensive materials located in Room NS-252 and NS-249 identified herein as Items 1 through 13, it was clear to the fact finder that both Mr. Gerwig and Mr. Nakajima were aware of these materials, and had essentially allowed their display, participated in their display or were recklessly indifferent to the display of these items. The display of these items seems consistent with the tone as demonstrated in the two documents identified as Item A and Item B above. As Dr. Finkenthal described, Mr. Gerwig and Mr. Nakajima encouraged a "frat house" environment in the department and seemed to allow and encourage discriminatory behavior, as displayed in these offensive materials, and encourage other students to participate in this wrongful conduct.

Both Mr. Gerwig and Mr. Nakajima claimed that they were unaware of the more discriminatory and wrongful documents. However, the greater weight of the credible evidence, as described above under Section X.A.6, demonstrates that they were well aware of these items, but refused to acknowledge their presence in some attempt to evade culpability for either posting these materials or allowing their students to do so. Many of these items appear to have been potentially crafted by students that were in the Physics and Engineering Department.

Allowing these items to be created and then posted in the department demonstrated that Mr. Gerwig and Mr. Nakajima had given their imprimatur for students to engage in discriminatory and biased activities. Indeed, some of the items that had been identified in the room that Mr. Nakajima and Mr. Gerwig often used (NS-249) and specifically the "carbon resisters" mnemonic learning aid demonstrate a complete departure from the District's mandate of providing an academic environment free of discriminatory content and racist/sexist stereotypes. That these items were openly and notoriously displayed in the department where students often congregated would seemingly encourage students to engage in similar behavior and it appears that they did so.

In addition to obvious departures from the District's rules concerning discrimination and harassment, several items, such as various signs and notes located in room NS-252, in or about the sink and coffee service area displayed foul language and intimidating content that was wholly inappropriate in a professional academic environment. The idea that Mr. Gerwig and Mr. Nakajima were not fully aware of all of these items is absurd. The District has rules concerning sexual harassment and intimidation. B.P. 3430 Prohibition of Harassment states in relevant part:

> *The District shall be free of sexual harassment and all forms of sexual intimidation and exploitation including acts of sexual violence. It shall also be free of other unlawful harassment, including that which is based on any of the following statuses: race, religious creed, color, national origin, ancestry, physical*

Ex. A, Page 205

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

> disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, or sexual orientation of any person, or because he/she is perceived to have one or more of the foregoing characteristics.

In addition, the District has rules concerning general harassment that would be based on a legally recognized protected characteristic. A.P. 3430 Prohibition of Harassment states in relevant part:

> General Harassment -- Harassment based on race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, gender, gender identity, gender expression, sex, age, or sexual orientation of any person, or the perception that a person has one or more of these characteristics is illegal and violates District policy. Gender based harassment does not necessarily involve conduct that is sexual. Any hostile or offensive conduct based on gender can constitute prohibited harassment.

Apart from these harassment and discrimination rules, the District's mission statement requires "[di]versity in learning environments, philosophies, cultures, beliefs and people" as well as "[i]nclusiveness of individual and collective viewpoints."

Article 3: Code of Ethics of the Constitution of the Faculty of Palomar College states, in relevant part:

> Faculty members have an obligation to the District, their students, colleagues, profession, the public and themselves to maintain the highest standards of ethical conduct. In recognition of this obligation, faculty members adopt the following standards of ethical conduct: Adapted from the American Association of University Professors (AAUP) Ethics Statement.
>
> 1. Professors, recognizing their social responsibility:
>    - Develop and improve scholarly competence,
>    - Exercise critical self-discipline and judgment in transmitting knowledge,
>    - Practice intellectual honesty.
>
> 2. Professors, as teachers:
>    - Encourage the free pursuit of leaning in their students,
>    - Demonstrate respect for students as individuals,
>    - Keep to their proper roles as intellectual guides and counselors,
>    - Evaluate students in an unbiased manner,
>    - Respect the confidentiality of students,
>    - Acknowledge significant or scholarly assistance from students.
>    - Do not exploit, harass, or discriminate against their students.
>
> 3. Professors, as colleagues:
>    - Do not discriminate against or harass colleagues,
>    - Respect and defend the free inquiry of associates,
>    - Exchange criticism and ideas,
>    - Acknowledge academic debt,
>    - Strive to be objective in their professional judgment of colleagues,
>    - Accept their share of faculty responsibilities for the governance of their institution.
>
> 4. Professors, as members of an academic institution:
>    - Seek to be effective teachers and scholars,
>    - Uphold academic freedom,
>    - Maintain their right to criticize and seek revision,
>    - Give due regard to their responsibilities within the institution, when considering termination of their employment, give due notice of their intentions.
>
> 5. Professors, as members of their community:
>    - When they speak or act as private persons avoid creating the impression of speaking or acting for their District,
>    - Promote free inquiry and further public understanding of academic freedom."

Finally, B.P. 3050 Institutional Code of Ethics states that "[t]he District is committed to the highest ethical standards in furtherance of our mission of education and public service:

**Excellence** *in teaching, learning, and service*
**Integrity** *as the foundation for all we do*
**Access** *to our programs and services*
**Equity** *and fair treatment of all in our daily interactions*
**Diversity** *in learning environments, philosophies, cultures, beliefs, and people*
**Inclusiveness** *of individual and collective viewpoints*
**Mutual respect** *and* **trust** *through transparency, civility, and open communications*
**Creativity** *and innovation in engaging students, faculty, staff, and administrators*
**Physical presence** *and* **participation** *in the community"*

Here, Mr. Gerwig and Mr. Nakajima departed from the District's anti-harassment and discrimination rules and further violated their duties as faculty of the District. It was clear, based on the greater weight of the credible evidence developed in this investigation, that both Mr. Gerwig and Mr. Nakajima were aware of the use of the inappropriate documents identified as Document Items A and B, above as well as the offensive materials located in rooms NS-249 and NS-252. Their knowledge of these items demonstrates a lack of prudential judgment and reckless indifference to the rules of the organization that mean to prevent discrimination, harassment and promote an open and welcoming academic environment.

In addition to Mr. Gerwig and Mr. Nakajima's violations of the District's rules concerning harassment and discrimination, as well as the breach of their ethical duties, it appeared clear that they both had resisted and had acted in a spiteful manner towards their supervisor, Dr. Kailikole. Dr. Kailikole informed the fact finder that student reviews for Mr. Nakajima's class contained negative references to Dr. Kailikole that she attributed to comments by Mr. Nakajima made to students.

Indeed, Dr. Kailikole is correct in her assumption here as Mr. Nakajima acknowledged that he had told students that somehow Dr. Kailikole had promised additional equipment, but thereafter had reneged on that promise. Mr. Nakajima indicated that students were upset by this news. Mr. Nakajima appeared to have told students this derogatory information about Dr. Kailikole in order to hold Dean Kailikole out to hatred and ridicule by his students. There was no legitimate business reason for Mr. Nakajima to share such information with his students but for to cause students to be angry at Dr. Kailikole with whom Mr. Nakajima had differed and had actively resisted as a subordinate instructor.

### 3. Student Matter – Mr. Nakajima

The facts in this matter demonstrate that in April 2009 the Physics and Engineering Department had been investigated by the United States Department of Education, Office of Civil Rights (Document Item D) concerning a violation of the Americans with Disabilities Act. Immediately thereafter, members of the Physics and Engineering Department were required to undergo sensitivity training in education concerning the ADA, and the idea concerning reasonable accommodations in an academic setting.

Dr. Finkenthal provided the fact finder with an email exchange, Document Item C, between a student and Mr. Nakajima. This email indicates the student, who had a disability and used a wheelchair, requested an accommodation concerning the Physics 230 course and its required lab section. The student was clearly seeking some form of accommodation when he wrote, "I was just wondering how flexible you would be under extreme circumstances."

Instead of working with the student and/or referring him to the District's Disability Resource Center, Mr. Nakajima wrote back to the student advising him to take "1,000 milligrams of Vitamin C, multivitamin, and CoQ-10, 50 milligrams or more every day, starting right now." Mr. Nakajima refused to entertain any sort of reasonable sort of accommodation for the student's disability and wrote in relevant part, "I can't give you an extra treatment, but if you start taking care of yourself as I suggested, you should be doing better than a regular semester."

Here, the District, per Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990, is obligated to provide accommodations to ensure the student's equal access to the District's programs and activities. It is the student's responsibility to notify instructors of the need for accommodations and thereafter the instructor is required to refer the student to the Disability Resource Center and work with the student in order to provide reasonable accommodations. In this instance, Mr. Nakajima failed in his obligation in regard to this potential disability. In this case, the student used a wheelchair, yet Mr. Nakajima purported to give the student advice on taking vitamins as opposed to

Ex. A, Page 207

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

engaging in meaningful communication concerning the use of the Disability Resource Center and the allowance of some form of reasonable accommodation, as required by law.

Added to this, this exchange occurred only months after the Physics and Engineering Department had undergone an investigation concerning the very same sort of issue. Mr. Nakajima and others had been interviewed in this matter and later had received training concerning reasonable accommodation requests. Even so, Mr. Nakajima failed to provide these required steps in potentially accommodating this disabled student.

## 4. Truthfulness

Here, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima failed to be truthful in their statements to the fact finder, as well as their statements during the June 22, 2017 meeting with District administrators concerning the offensive materials located in rooms NS-252 and NS-249. As detailed above, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima had knowledge of the materials that were displayed openly in areas that they frequented on a near daily basis.

The facts were clear that both Mr. Nakajima and Mr. Gerwig were often located in and using rooms NS-252 and NS-249 and were reasonably well aware of the items that were posted on doors in which they would pass and on walls in areas that they often frequented. Their claims that they were unaware of these items appear to this fact finder to be directly untruthful and offered merely for the purposes of evading culpability for allowing and/or encouraging the posting of such items.

Here, both Mr. Gerwig and Mr. Nakajima have failed to "accept their share of faculty responsibility for the governance of their institution" and "practice intellectual honesty" as required by the Constitution of the Faculty of Palomar College. B.P. 3050, the District's Institutional Code of Ethics, upholds "[i]ntegrity as the foundation for all we do." Here, both Mr. Gerwig and Mr. Nakajima failed to demonstrate integrity concerning their discussions on June 22, 2017, and then later when directly questioned specifically by the fact finder when questioned during this course of this fact-finding investigation.

## Summary of Findings.

There appeared, based on the investigation, to be a pattern and practice of posting and/or allowing the posting and/or display of objectionable material in or about the rooms used by Mr. Gerwig and Mr. Nakajima. The fact finder determined that Mr. Garcia Villa, who was relatively new to the Department, was generally unaware of the true nature of the materials that had been displayed. However, both Mr. Gerwig and Mr. Nakajima both knew, or should have known, that the materials posted in the offices and rooms that they used on a consistent basis were inappropriate, offensive and discriminatory in nature, and yet they allowed the materials to remain.

The fact finder also determined that it appeared that both Mr. Gerwig and Mr. Nakajima both provided false information at a meeting on June 22, 2017 wherein they disavowed knowledge of the documents that were the subject of this investigation. Indeed, both faculty told the fact finder that they were largely unaware of the materials, or had no recollection of having observed them. These statements were inconsistent with the facts as discovered in this investigation.

In summary, based on the greater weight of the credible evidence, it appears that both Mr. Gerwig and Mr. Nakajima were or should have been aware that materials that were deemed objectionable, offensive and discriminatory in nature had been displayed and/or allowed to be displayed in offices and school areas under their dominion and control. Even though both professors feigned that they were unaware of these materials, the greater weight of the credible evidence demonstrates that they were aware of the materials, and allowed them to be displayed in the area. This behavior tends to demonstrate unbecoming conduct by these professors, as the materials were seen as objectionable, inappropriate and discriminatory in nature.

Additionally, the fact finder found that faculty members of the Physics and Engineering Department used a non-District website in order to disseminate a syllabus and other documents that students were required to read and/or sign and return. These documents were seen as warning documents that admonished students concerning their study habits and how to interact with other students. These warnings and instructions appeared inconsistent with the District's goal in their educational pursuits.

There was insufficient credible evidence to show that Mr. Garcia Villa was aware of the nature of these materials due to his lack of tenure in the Physics and Engineering Department, and his lack of use and exposure to the areas in which the

Ex. A, Page 208

materials were displayed.  The fact finder therefore determines that the allegations are <u>sustained as to Mr. Gerwig and Mr. Nakajima</u>, and <u>not sustained as to Mr. Garcia Villa.</u>

## ADMINISTRATIVE DETERMINATION.

Based upon the investigator's assessment of the interviewees' credibility and documentary evidence, the burden of preponderance of evidence, which is required to uphold charge of unlawful discrimination and sexual harassment, is sufficient to sustain Dr. Finkenthal's allegations on behalf of the anonymous student.  The District's administrative determination is therefore to <u>sustain</u> the complaint against Mr. Gerwig and Mr. Nakajima and to <u>dismiss</u> the complaint against Mr. Garcia Villa.  This matter is hereby referred to the District's administration for disciplinary action against Mr. Gerwig and Mr. Nakajima.

The allegations were received and investigated as an informal complaint, although the District ensured that the usual steps undertaken in a formal investigation were followed.  Dr. Finkenthal and the anonymous student have the right to submit a formal written complaint of unlawful discrimination to the District in accordance with Title 5, § 59328 et. seq. using the form available on the District website at http://www2.palomar.edu/pages/hr/files/2014/07/Discrimination-Harassment-Complaint-Form-Web.pdf.  The form is also available at the Human Resource Services office in room ST-1. A written complaint submitted in this manner may be filed up to  one (1) year from the date on which the unlawful discrimination allegedly occurred.

The anonymous student also has the right to file a complaint with United States Department of Education, Office of Civil Rights.  Information regarding filing a complaint with OCR is available on OCR's website at http://www2.ed.gov/about/offices/list/ocr/docs/howto.html or by calling OCR's office at (800) 421-3481.

Respectfully submitted,

Shawna H. Cohen
Manager, Equal Employment Opportunity and Compliance
  and Deputy Title IX Coordinator
Palomar Community College District
November 1, 2017

Ex. A, Page 209

**Cohen, Shawna**

**Exhibit D**

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:33 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Fall 2016 Class Cancelations and Adjustments |
| **Attachments:** | image003.jpg; PHYS230_231WarningLetter.pdf.html; Psychological insights for improved physics teachi.pdf.html; image002.jpg; image001.jpg |
| **Importance:** | High |

Respectfully,
Lisa Norman, Ed.D, J.D.
Assistant Superintendent/Vice President Human Resources Palomar Community College
(760) 744-1150 x2531

"Be the change you wish to see in the world."

        Gandhi

-----Original Message-----
From: Finkenthal, Daniel
Sent: Sunday, December 10, 2017 2:19 PM
To: stacyncarlson@yahoo.com
Subject: FW: Fall 2016 Class Cancelations and Adjustments
Importance: High

===============
Daniel Finkenthal, Ph.D.
Palomar College
San Marcos, CA 92069

_____
From: Kailikole, Kathryn L.
Sent: Friday, December 8, 2017 5:27 PM
To: Finkenthal, Daniel
Subject: FW: Fall 2016 Class Cancelations and Adjustments

From: Kailikole, Kathryn L.
Sent: Monday, November 20, 2017 7:04 PM
To: Norman, Lisa M. <lnorman@palomar.edu>
Cc: Cohen, Shawna <SCohen@palomar.edu>; Kahn, Jack S. <jkahn1@palomar.edu>
Subject: FW: Fall 2016 Class Cancelations and Adjustments
Importance: High

Ex. A, Page 210

Hello Lisa,

Bill asked if I sent an email directing the department to not use the Warning Letter.  Please see the email below.

In addition, I sent back the Spring 2017 schedule with changes that the Chair, Takashi Nakajima, was to make.  The specific change that is relevant to this case is Item #1.


1.      Most critical change.  Split the Physics 230 and 231 labs.  The labs are schedules in the same room with the same instructor.  This practice is pedagogically unsound; does not meet with the curriculum requirements and prerequisites; and violates articulation agreements.  (If the department wants to have these labs schedule together, provide a rationale to Curriculum and Articulation. However there is no guarantee of approval.)

As you can see below, I sent this email to Chair Nakajima on August 17, 2016.  Chair Nakajima decided to have a department meeting on September 1, 2016 to discuss the content of the email below.  I was not invited to the meeting.  However, Daniel Finkenthal did not want the Department to meet without me so he informed my assistant, Debbie McBrayer.  At Dr. Finkenthal's request and at the last minute, I attended the meeting.  The meeting was never scheduled in my calendar.  I will be forwarding the meeting notice that Chair Nakajima sent to the permanent faculty in the Physics/Engineering department.  Dr. Finkenthal forwarded the email to me when I asked about the meeting since I could not find it in my calendar.  The meeting and Item #1 become important because it is at that meeting that I learned that NS-249, a support room, was improperly being used as a lab room.  It was at that meeting that I directed them to stop using the room immediately and move the Physics 231 lab into NS-252, a designated lab room and the room listed in the schedule of classes.  And, hence, why I believed that Physics 230 and 231 labs were in the same lab room. NS-249 was never listed in the schedule of classes as the location for any of the Physics labs.  You will see in Chair Nakajima's email that he refers to NS-249 as the "231 lab room."

From the looks of the room at the end of the academic year 2016-2017 and the references made by Mr. Nakajima and Mr. Gerwig during the June 22, 2017 meeting in VPI Kahn's office, NS-249 was still being used as a lab room in the spring semester.

Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>
[Scr3_ol]



From: Kailikole, Kathryn L.
Sent: Wednesday, August 17, 2016 1:34 PM
To: Nakajima, Takashi <tnakajima@palomar.edu<mailto:tnakajima@palomar.edu>>
Cc: Sourbeer, Daniel <DSourbeer@palomar.edu<mailto:DSourbeer@palomar.edu>>; Corona, Abigail <acorona@palomar.edu<mailto:acorona@palomar.edu>>; McBrayer, Debra

Ex. A, Page 211

<dmcbrayer@palomar.edu<mailto:dmcbrayer@palomar.edu>>; Physics Permanent Faculty
<PhysicsPermanentFaculty@palomar.edu<mailto:PhysicsPermanentFaculty@palomar.edu>>
Subject: RE: Fall 2016 Class Cancelations and Adjustments

Hello Takashi,

I know that student success matters to all of us at Palomar College.  For Physics 230, many students enroll in the course but for the last five semesters, at least, less than 20% completed the course with a C or better.  I appreciate the time and energy that you put into working with the subset of students who succeed.  You have had great success with some of your students.  However, we also must ensure that all of our students have the opportunity to learn and succeed.  A single pedagogic approach does not work for all students.  The use of the "Warning Letter" attached to this email and other strategies utilized in Physics 230 can have detrimental effects on students particularly our most vulnerable – Veterans, students with disabilities and underrepresented minority students.  In such a small department, students with diverse and different learning needs have had no other option to take a Physics 230 class with a different pedagogic strategy.  Under these conditions, students have been voting with their feet and going to other colleges to complete their physics requirements.  Unfortunately, also under these conditions, our own student support services at Palomar College counsel the students away from our Physics Department.  I don't believe any of us want this to happen.  The learning community is a pedagogic strategy utilized at Palomar College in other disciplines and has been used and studied nationally.  This pedagogic strategy has been found to work very well for disproportionately impacted groups (Veterans, students with disabilities and underrepresented minority students).  Instruction is addressing the needs of our diverse student body and allowing our faculty the opportunity to exercise their ability to use and engage in different pedagogic strategies.

Thank you for agreeing to remove the "Warning Letter" from the PEPSO website.  As we discussed in our last meeting, we cannot require the students to sign the letter to be in the class – we are an open access campus.  Please ensure that all of the faculty in the department are aware that they should not be using the warning letter in this way.  As we discussed, the letter contains inflammatory language, unsubstantiated and unsupportable statements, and some items conflict with the mission and goals of Palomar College. I have also attached an article on Stereotype Threat in Physics.  Research on stereotype threat has been conducted for years at Stanford University and has yielded great improvements in teaching and learning strategies in STEM fields.  The article and the research discussed is very good and informative.  I am trying to see if we can also get faculty copies of the recent publication from the National Academies, Barriers and Opportunities for 2-Year and 4-Year STEM Degrees: Systemic Change to Support Students' Diverse Pathways.  As we begin this academic year, I look forward to working with the department to build and repair relationships with others in the Palomar College community and CSUSM.
Instruction will be continuing the learning communities in Physics for the spring semester.  We are sending the spring semester schedule back to the department for the following changes:


1.      Most critical change.  Split the Physics 230 and 231 labs.  The labs are schedules in the same room with the same instructor.  This practice is pedagogically unsound; does not meet with the curriculum requirements and prerequisites; and violates articulation agreements.  (If the department wants to have these labs schedule together, provide a rationale to Curriculum and Articulation. However there is no guarantee of approval.)

2.      Schedule a Physics 231 lecture and connected lab with Daniel Finkenthal as instructor. Once this scheduled, Mathematics will schedule a corresponding SI course.

3.      Schedule a Physics 230 lecture and connected lab with Hector Garcia Villa as instructor. Once this scheduled, Mathematics will schedule a corresponding SI course.

I appreciate your time regarding this matter.

Sincerely,

Kathy

Dr. Kathryn Kailikole
Interim Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>
[Scr3_ol._70%]


From: Nakajima, Takashi
Sent: Thursday, August 11, 2016 1:08 PM
To: Kailikole, Kathryn L. <kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>>
Cc: Sourbeer, Daniel <DSourbeer@palomar.edu<mailto:DSourbeer@palomar.edu>>; Corona, Abigail
<acorona@palomar.edu<mailto:acorona@palomar.edu>>; McBrayer, Debra
<dmcbrayer@palomar.edu<mailto:dmcbrayer@palomar.edu>>; Physics Permanent Faculty
<PhysicsPermanentFaculty@palomar.edu<mailto:PhysicsPermanentFaculty@palomar.edu>>
Subject: Re: Fall 2016 Class Cancelations and Adjustments


Kathryn,


You email did not answer all of my questions plus gave me more questions.


You wrote:

Hector and the students will be supported by additional scaffolds through CSUSM funding,


Exactly what are "additional scaffolds through CSUSM funding"?  Once again, why was I not informed about this?  When did this "team teaching" idea start?   I do not think the idea started a few days ago.  Then, why did you wait this long?  Had we known, we could've discussed in the department and could've requested proper supports we need for 230. Who decided what Hector needed for 230?


You also mentioned that Hector will teach 231 in spring.  Let me remind you that his first priority is to take care of Physical Science.  He is going to try out new set of Physical Science lab exercises in fall and it will take at least two to three semesters before he can feel comfortable to pass it on to other instructors.  I am sure that Hector wants to do the best job possible on whatever he does.  However, assigning him to teach 231, which he has never taught before, will give him an extra pressure/burden on him. I do not think it is a good idea to give him this much of work on a newly hired

4

person and this is not a good way to welcome him. Did you ever think how much additional time he will have to spend to prepare for 231 lecture and lab besides keep working on PHSC lab experiments? It will take at least 3 hours of preparation/1 hour of lecture – Hence, 12 hours plus 3 hours/lab.  This means he will be spending minimum of 15 extra hours per week for 231.  We need to come up with a better way.

Once again, your/VP's idea could have been a good idea had it been brought to the department, discussed, well thought out, and implemented.  Now, I see this as an only extra pressure on Hector.

Please answer ALL of my questions this time.

Takashi

_____

From: Kailikole, Kathryn L.
Sent: Wednesday, August 10, 2016 6:43 PM
To: Nakajima, Takashi
Cc: Sourbeer, Daniel; Corona, Abigail; McBrayer, Debra; Physics Permanent Faculty
Subject: RE: Fall 2016 Class Cancelations and Adjustments

Hello Takashi,

We did consider the questions that you raised.  The VP of Instruction has given this project his full support.  For the short turnaround, this project has long term benefits and builds the relationship with CSUSM.  And, we can utilize the CSUSM funding now before the end of the grant this year.

Hector has 30 students in his lecture 72943; 19 of which are in his lecture and his lab.

There are 12 extra students in his lecture that are in four other labs:
2 in 72940,
2 in 72941,
4 in 72942, and
4 in 72946.

He has 21 students in his lab 72944; 19 in his lecture and 3 in 72939 Lecture.

Five spaces will then be open in Hector's lecture and lab.  So five students can still enroll in his lecture/lab.  As stated below, Hector and the students will be supported by additional scaffolds through CSUSM funding, and have the opportunity to continue to stay together in a productive learning community in the spring.

Abby can work with the Outreach Ambassador project that was piloted this summer with the ADA's to help students to adjust their classes.  The Outreach Ambassadors work with ADA's and Counseling to support the students in the process of adjusting classes.  The project is successful, and students have been proactively and positively guided through this process.  If Abby needs additional assistance, she may speak with Debbie to ask for Cynthia's or Maria's help.

Learning from this project, building the relationship with CSUSM and developing more opportunities such as this project would be great discussions for the department to have.

Sincerely,

Kathryn

Dr. Kathryn Kailikole
Interim Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>
[Scr3_ol._70%]

From: Nakajima, Takashi
Sent: Wednesday, August 10, 2016 2:56 PM
To: Kailikole, Kathryn L. <kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>>
Cc: Sourbeer, Daniel <DSourbeer@palomar.edu<mailto:DSourbeer@palomar.edu>>; Corona, Abigail <acorona@palomar.edu<mailto:acorona@palomar.edu>>; McBrayer, Debra <dmcbrayer@palomar.edu<mailto:dmcbrayer@palomar.edu>>; Physics Permanent Faculty <PhysicsPermanentFaculty@palomar.edu<mailto:PhysicsPermanentFaculty@palomar.edu>>
Subject: Re: Fall 2016 Class Cancelations and Adjustments

Kathryn,

There are questions I need you to answer regarding this community learning idea.

1.  Why are you implementing this late?  There are only 12 days left before the fall semester starts.  Notifying students this late, lots of students may not be able to adjust their class and work schedules.  Your idea will affect students in both lecture and lab - lecture students who are not taking Hector's lab will have to change their lab schedules and lab students who are in Hector's lab, but not in his lecture will be forced out of the lab. Currently there are thirty students enrolled in his lecture.  I do not think it is fair nor good practice to kick out six students from his lecture. Did you ever think that this change would create confusion/anger/inconvenience to students currently enrolled in 230 program?   I do not think it is a good idea to disturb their schedules at this point.

2.  If you want us to have a community learning, should you not discuss with us first so that we can plan, agree, and implement?  Why was I, as a department chair, not informed about this?

3.  Can we discuss this within the department so that we can implement successfully in spring 2017 or fall 2017?

4.  Lastly, it is very unfair to ask Abby to call and assist those students while she is busy preparing for fall 2016.

Takashi

_____

From: Kailikole, Kathryn L.
Sent: Wednesday, August 10, 2016 12:16 PM
To: Nakajima, Takashi
Cc: Sourbeer, Daniel; Corona, Abigail; McBrayer, Debra
Subject: Fall 2016 Class Cancelations and Adjustments

Hi Takashi,

The following Fall 2016 course is to be canceled due to low enrollment.

72881

13

11

LEC

PHYS

101

TTH

12.45 pm

2.10 pm

8/22/16

12/17/16

0216

20

5

7

NS-258

H

Pouladdej,Alix Hibba

72886

13

13

LEC

PHYS

102

TTH

12.45 pm

2.10 pm

8/22/16

12/17/16

0216

16

3

NS-258

NOP

Pouladdej,Alix Hibba


We are going to pilot a Learning Community in Physics 230 in the fall and 231 in the spring, working with CSUSM STEP. Hector is the logical choice in developing and building that relationship with CSUSM.  We are working with the Math department to schedule a support math used in physics supplemental instruction.  The Math faculty assigned to this class will work with Hector to design math content review and support.  To achieve this Learning Community, Abby will keep all students that are enrolled in both Hector's lecture and lab (listed below); the lecture will be capped at 24 to match the lab.  Students in the lecture or lab but not both should be notified that they must enroll in another lecture or lab.  They can also opt to take both Hector's lecture and lab.  All students currently enrolled should be notified that we are piloting a Physics Learning Community for PHYS 230/231 so that they know that they can continue with the Learning Community in the spring.  Hector and the math faculty will also be provided trained Learning Assistants funded by CSUSM STEP.  We are excited about improving and growing the relationship with CSUSM as you had expressed during the faculty search this past spring.

Ex. A, Page 217

72943

15

11

LEC

PHYS

230

MW

2.45 pm

4.50 pm

8/22/16

######

36

30

0

0

NS-258

CRC

Garcia Villa,Hector

72944

16

11

LAB

PHYS

230

TUE

2.40 pm

5.50 pm

8/22/16

######

24

21

0

0

NS-252

CRC

Garcia Villa,Hector

Thank you,

Kathy

Dr. Kathryn Kailikole
Interim Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>
[Scr3_ol._70%]

Ex. A, Page 219

**Cohen, Shawna**

**Exhibit E**

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:35 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Fall 2016 Class Cancelations and Adjustments |
| **Attachments:** | PHYS230_231WarningLetter.pdf.html; Psychological insights for improved physics teachi.pdf.html |
| | |
| **Importance:** | High |

*Respectfully,*
*Lisa Norman, Ed.D, J.D.*
*Assistant Superintendent/Vice President Human Resources*
*Palomar Community College*
*(760) 744-1150 x2531*

*"Be the change you wish to see in the world."*

*Gandhi*

**From:** Kailikole, Kathryn L.
**Sent:** Friday, December 8, 2017 5:28 PM
**To:** Finkenthal, Daniel <DFinkenthal@palomar.edu>
**Subject:** FW: Fall 2016 Class Cancelations and Adjustments
**Importance:** High

**From:** Kailikole, Kathryn L.
**Sent:** Monday, November 20, 2017 7:04 PM
**To:** Norman, Lisa M.
**Cc:** Cohen, Shawna ; Kahn, Jack S.
**Subject:** FW: Fall 2016 Class Cancelations and Adjustments
**Importance:** High

Hello Lisa,

Bill asked if I sent an email directing the department to not use the Warning Letter. Please see the email below.

In addition, I sent back the Spring 2017 schedule with changes that the Chair, Takashi Nakajima, was to make. The specific change that is relevant to this case is Item #1.

1.  Most critical change. Split the Physics 230 and 231 labs. The labs are schedules in the same room with the same instructor. This practice is pedagogically unsound; does not meet with the curriculum requirements and

1

Ex. A, Page 220

prerequisites; and violates articulation agreements. (If the department wants to have these labs schedule together, provide a rationale to Curriculum and Articulation. However there is no guarantee of approval.)

As you can see below, I sent this email to Chair Nakajima on August 17, 2016. Chair Nakajima decided to have a department meeting on September 1, 2016 to discuss the content of the email below. I was not invited to the meeting. However, Daniel Finkenthal did not want the Department to meet without me so he informed my assistant, Debbie McBrayer. At Dr. Finkenthal's request and at the last minute, I attended the meeting. The meeting was never scheduled in my calendar. I will be forwarding the meeting notice that Chair Nakajima sent to the permanent faculty in the Physics/Engineering department. Dr. Finkenthal forwarded the email to me when I asked about the meeting since I could not find it in my calendar. The meeting and Item #1 become important because it is at that meeting that I learned that NS-249, a support room, was improperly being used as a lab room. It was at that meeting that I directed them to stop using the room immediately and move the Physics 231 lab into NS-252, a designated lab room and the room listed in the schedule of classes. And, hence, why I believed that Physics 230 and 231 labs were in the same lab room. NS-249 was never listed in the schedule of classes as the location for any of the Physics labs. You will see in Chair Nakajima's email that he refers to NS-249 as the "231 lab room."

From the looks of the room at the end of the academic year 2016-2017 and the references made by Mr. Nakajima and Mr. Gerwig during the June 22, 2017 meeting in VPI Kahn's office, NS-249 was still being used as a lab room in the spring semester.

Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu



---

**From:** Kailikole, Kathryn L.
**Sent:** Wednesday, August 17, 2016 1:34 PM
**To:** Nakajima, Takashi <tnakajima@palomar.edu>
**Cc:** Sourbeer, Daniel <DSourbeer@palomar.edu>; Corona, Abigail <acorona@palomar.edu>; McBrayer, Debra <dmcbrayer@palomar.edu>; Physics Permanent Faculty <PhysicsPermanentFaculty@palomar.edu>
**Subject:** RE: Fall 2016 Class Cancelations and Adjustments

Hello Takashi,

I know that student success matters to all of us at Palomar College. For Physics 230, many students enroll in the course but for the last five semesters, at least, less than 20% completed the course with a C or better. I appreciate the time and

energy that you put into working with the subset of students who succeed. You have had great success with some of your students. However, we also must ensure that all of our students have the opportunity to learn and succeed. A single pedagogic approach does not work for all students. The use of the "Warning Letter" attached to this email and other strategies utilized in Physics 230 can have detrimental effects on students particularly our most vulnerable – Veterans, students with disabilities and underrepresented minority students. In such a small department, students with diverse and different learning needs have had no other option to take a Physics 230 class with a different pedagogic strategy. Under these conditions, students have been voting with their feet and going to other colleges to complete their physics requirements. Unfortunately, also under these conditions, our own student support services at Palomar College counsel the students away from our Physics Department. I don't believe any of us want this to happen. The learning community is a pedagogic strategy utilized at Palomar College in other disciplines and has been used and studied nationally. This pedagogic strategy has been found to work very well for disproportionately impacted groups (Veterans, students with disabilities and underrepresented minority students). Instruction is addressing the needs of our diverse student body and allowing our faculty the opportunity to exercise their ability to use and engage in different pedagogic strategies.

Thank you for agreeing to remove the "Warning Letter" from the PEPSO website. As we discussed in our last meeting, we cannot require the students to sign the letter to be in the class – we are an open access campus. Please ensure that all of the faculty in the department are aware that they should not be using the warning letter in this way. As we discussed, the letter contains inflammatory language, unsubstantiated and unsupportable statements, and some items conflict with the mission and goals of Palomar College. I have also attached an article on *Stereotype Threat* in Physics. Research on stereotype threat has been conducted for years at Stanford University and has yielded great improvements in teaching and learning strategies in STEM fields. The article and the research discussed is very good and informative. I am trying to see if we can also get faculty copies of the recent publication from the National Academies, *Barriers and Opportunities for 2-Year and 4-Year STEM Degrees: Systemic Change to Support Students' Diverse Pathways.* As we begin this academic year, I look forward to working with the department to build and repair relationships with others in the Palomar College community and CSUSM.

Instruction will be continuing the learning communities in Physics for the spring semester. We are sending the spring semester schedule back to the department for the following changes:

1. Most critical change. Split the Physics 230 and 231 labs. The labs are schedules in the same room with the same instructor. This practice is pedagogically unsound; does not meet with the curriculum requirements and prerequisites; and violates articulation agreements. (If the department wants to have these labs schedule together, provide a rationale to Curriculum and Articulation. However there is no guarantee of approval.)
2. Schedule a Physics 231 lecture and connected lab with Daniel Finkenthal as instructor. Once this scheduled, Mathematics will schedule a corresponding SI course.
3. Schedule a Physics 230 lecture and connected lab with Hector Garcia Villa as instructor. Once this scheduled, Mathematics will schedule a corresponding SI course.

I appreciate your time regarding this matter.

Sincerely,

Kathy

Dr. Kathryn Kailikole
Interim Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487

760-744-1150 ext. 2253
kkailikole@palomar.edu



---

**From:** Nakajima, Takashi
**Sent:** Thursday, August 11, 2016 1:08 PM
**To:** Kailikole, Kathryn L. <kkailikole@palomar.edu>
**Cc:** Sourbeer, Daniel <DSourbeer@palomar.edu>; Corona, Abigail <acorona@palomar.edu>; McBrayer, Debra <dmcbrayer@palomar.edu>; Physics Permanent Faculty <PhysicsPermanentFaculty@palomar.edu>
**Subject:** Re: Fall 2016 Class Cancelations and Adjustments

Kathryn,

You email did not answer all of my questions plus gave me more questions.

You wrote:
Hector and the students will be supported by additional scaffolds through CSUSM funding,

Exactly what are "additional scaffolds through CSUSM funding"? Once again, why was I not informed about this? When did this "team teaching" idea start? I do not think the idea started a few days ago. Then, why did you wait this long? Had we known, we could've discussed in the department and could've requested proper supports we need for 230. Who decided what Hector needed for 230?

You also mentioned that Hector will teach 231 in spring. Let me remind you that his first priority is to take care of Physical Science. He is going to try out new set of Physical Science lab exercises in fall and it will take at least two to three semesters before he can feel comfortable to pass it on to other instructors. I am sure that Hector wants to do the best job possible on whatever he does. However, assigning him to teach 231, which he has never taught before, will give him an extra pressure/burden on him. I do not think it is a good idea to give him this much of work on a newly hired person and this is not a good way to welcome him. Did you ever think how much additional time he will have to spend to prepare for 231 lecture and lab besides keep working on PHSC lab experiments? It will take at least 3 hours of preparation/1 hour of lecture – Hence, 12 hours plus 3 hours/lab. This means he will be spending minimum of 15 extra hours per week for 231. We need to come up with a better way.

Once again, your/VP's idea could have been a good idea had it been brought to the department, discussed, well thought out, and implemented. Now, I see this as an only extra pressure on Hector.

Please answer ALL of my questions this time.

Takashi

4

**From:** Kailikole, Kathryn L.
**Sent:** Wednesday, August 10, 2016 6:43 PM
**To:** Nakajima, Takashi
**Cc:** Sourbeer, Daniel; Corona, Abigail; McBrayer, Debra; Physics Permanent Faculty
**Subject:** RE: Fall 2016 Class Cancelations and Adjustments

Hello Takashi,

We did consider the questions that you raised. The VP of Instruction has given this project his full support. For the short turnaround, this project has long term benefits and builds the relationship with CSUSM. And, we can utilize the CSUSM funding now before the end of the grant this year.

Hector has 30 students in his lecture 72943; 19 of which are in his lecture and his lab.

There are 12 extra students in his lecture that are in four other labs:
2 in 72940,
2 in 72941,
4 in 72942, and
4 in 72946.

He has 21 students in his lab 72944; 19 in his lecture and 3 in 72939 Lecture.

Five spaces will then be open in Hector's lecture and lab. So five students can still enroll in his lecture/lab. As stated below, Hector and the students will be supported by additional scaffolds through CSUSM funding, and have the opportunity to continue to stay together in a productive learning community in the spring.

Abby can work with the Outreach Ambassador project that was piloted this summer with the ADA's to help students to adjust their classes. The Outreach Ambassadors work with ADA's and Counseling to support the students in the process of adjusting classes. The project is successful, and students have been proactively and positively guided through this process. If Abby needs additional assistance, she may speak with Debbie to ask for Cynthia's or Maria's help.

Learning from this project, building the relationship with CSUSM and developing more opportunities such as this project would be great discussions for the department to have.

Sincerely,

Kathryn

Dr. Kathryn Kailikole
Interim Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu



**From:** Nakajima, Takashi
**Sent:** Wednesday, August 10, 2016 2:56 PM
**To:** Kailikole, Kathryn L. <kkailikole@palomar.edu>
**Cc:** Sourbeer, Daniel <DSourbeer@palomar.edu>; Corona, Abigail <acorona@palomar.edu>; McBrayer, Debra <dmcbrayer@palomar.edu>; Physics Permanent Faculty <PhysicsPermanentFaculty@palomar.edu>
**Subject:** Re: Fall 2016 Class Cancelations and Adjustments

Kathryn,

There are questions I need you to answer regarding this community learning idea.

1. Why are you implementing this late? There are only 12 days left before the fall semester starts. Notifying students this late, lots of students may not be able to adjust their class and work schedules. Your idea will affect students in both lecture and lab - lecture students who are not taking Hector's lab will have to change their lab schedules and lab students who are in Hector's lab, but not in his lecture will be forced out of the lab. Currently there are thirty students enrolled in his lecture. I do not think it is fair nor good practice to kick out six students from his lecture. Did you ever think that this change would create confusion/anger/inconvenience to students currently enrolled in 230 program? I do not think it is a good idea to disturb their schedules at this point.

2. If you want us to have a community learning, should you not discuss with us first so that we can plan, agree, and implement? Why was I, as a department chair, not informed about this?

3. Can we discuss this within the department so that we can implement successfully in spring 2017 or fall 2017?

4. Lastly, it is very unfair to ask Abby to call and assist those students while she is busy preparing for fall 2016.

Takashi

**From:** Kailikole, Kathryn L.
**Sent:** Wednesday, August 10, 2016 12:16 PM
**To:** Nakajima, Takashi
**Cc:** Sourbeer, Daniel; Corona, Abigail; McBrayer, Debra
**Subject:** Fall 2016 Class Cancelations and Adjustments

Hi Takashi,

The following Fall 2016 course is to be canceled due to low enrollment.

6

| 72881 | 13 | 11 | LEC | PHYS | 101 | TTH | 12.45 pm | 2.10 pm | 8/22/16 | 12/17/16 | 0216 | 20 | 5 | NS-258 | H | Pouladdej,Alix Hibba |
| 72886 | 13 | 13 | LEC | PHYS | 102 | TTH | 12.45 pm | 2.10 pm | 8/22/16 | 12/17/16 | 0216 | 16 | 3 | NS-258 | NOP | Pouladdej,Alix Hibba |

We are going to pilot a Learning Community in Physics 230 in the fall and 231 in the spring, working with CSUSM STEP. Hector is the logical choice in developing and building that relationship with CSUSM. We are working with the Math department to schedule a support math used in physics supplemental instruction. The Math faculty assigned to this class will work with Hector to design math content review and support. To achieve this Learning Community, Abby will keep all students that are enrolled in both Hector's lecture and lab (listed below); the lecture will be capped at 24 to match the lab. Students in the lecture or lab but not both should be notified that they must enroll in another lecture or lab. They can also opt to take both Hector's lecture and lab. All students currently enrolled should be notified that we are piloting a Physics Learning Community for PHYS 230/231 so that they know that they can continue with the Learning Community in the spring. Hector and the math faculty will also be provided trained Learning Assistants funded by CSUSM STEP. We are excited about improving and growing the relationship with CSUSM as you had expressed during the faculty search this past spring.

| 72943 | 15 | 11 | LEC | PHYS | 230 | MW | 2.45 pm | 4.50 pm | 8/22/16 | ###### | | 36 | 30 | 0 | 0 | NS-258 | CRC |
| 72944 | 16 | 11 | LAB | PHYS | 230 | TUE | 2.40 pm | 5.50 pm | 8/22/16 | ###### | | 24 | 21 | 0 | 0 | NS-252 | CRC |

Thank you,

Kathy

Dr. Kathryn Kailikole
Interim Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu



Ex. A, Page 226

**Cohen, Shawna**

**Exhibit F**

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:36 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Internship |

This appears to be the phone call before the emails got distributed to him

*Respectfully,*
*Lisa Norman, Ed.D, J.D.*
*Assistant Superintendent/Vice President Human Resources*
*Palomar Community College*
*(760) 744-1150 x2531*

*"Be the change you wish to see in the world."*

*Gandhi*

---

**From:** Finkenthal, Daniel
**Sent:** Friday, December 8, 2017 4:47 PM
**To:** Kailikole, Kathryn L. <kkailikole@palomar.edu>
**Subject:** RE: Internship

If you are on campus can you call me at 2974?

---

**From:** Kailikole, Kathryn L.
**Sent:** Friday, December 08, 2017 4:46 PM
**To:** Finkenthal, Daniel; Gutierrez-Aguero, Mireya; Nguyen, Quan H.
**Subject:** RE: Internship

Sounds good. I defer to you and Quan.

Kathy

---

**From:** Finkenthal, Daniel
**Sent:** Friday, December 8, 2017 4:45 PM
**To:** Kailikole, Kathryn L. <kkailikole@palomar.edu>; Gutierrez-Aguero, Mireya <mgutierrez-aguero@palomar.edu>; Nguyen, Quan H. <qnguyen@palomar.edu>
**Subject:** RE: Internship

Ok, I'm just concerned that he may be over-qualified since he appears to have lots of experience in avionics from the Marine Corp. I'll try to arrange a meeting together with Quan after his class.

---

**From:** Kailikole, Kathryn L.
**Sent:** Friday, December 08, 2017 4:40 PM
**To:** Finkenthal, Daniel; Gutierrez-Aguero, Mireya; Nguyen, Quan H.
**Subject:** RE: Internship

1

I am okay with adding him if after you meet you feel he will be a good addition.

Kathy
Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu



PALOMAR COLLEGE®
Learning for Success

---

**From:** Finkenthal, Daniel
**Sent:** Friday, December 8, 2017 4:31 PM
**To:** Kailikole, Kathryn L. <kkailikole@palomar.edu>; Gutierrez-Aguero, Mireya <mgutierrez-aguero@palomar.edu>; Nguyen, Quan H. <qnguyen@palomar.edu>
**Subject:** FW: Internship

Hi Folks,
I just got this. I believe the student is referring to the Winter Camp. Is there any chance we can accommodate him? I want to meet with him to discuss his plans either way.

--Daniel

---

**From:** randy parker [mailto:randyp202088@gmail.com]
**Sent:** Thursday, December 07, 2017 9:28 PM
**To:** Finkenthal, Daniel
**Subject:** Internship

Hello Dr. Finkenthal,

I am Randy Parker and I am interested in the internship that is being offered over the winter break. I was just told about this last week and wanted to talk to you asap. I have been trying to make time in my schedule to come by and talk to you in person but sadly the only day available was this Friday. Since school is closed I figured this would be the next best way. I have enclosed a resume. I am currently in Professor Takashi's Physics 230 class. My major is electrical engineering and plan to transfer next year to SDSU. Let me know if there is anything else that you will need.

Thank you very much,
Randy Parker

**Cohen, Shawna**

**Exhibit G**

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:39 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Message from F6KLP01 |
| **Attachments:** | SF6KLP0117120521420.pdf |

Stacy Carlson is Daniel's wife.

*Respectfully,*
*Lisa Norman, Ed.D, J.D.*
*Assistant Superintendent/Vice President Human Resources*
*Palomar Community College*
*(760) 744-1150 x2531*

*"Be the change you wish to see in the world."*

*Gandhi*

**From:** F6@palomar.edu [mailto:F6@palomar.edu]
**Sent:** Tuesday, December 5, 2017 8:43 PM
**To:** Finkenthal, Daniel <DFinkenthal@palomar.edu>
**Subject:** Message from F6KLP01

Ex. A, Page 229



**Cohen, Shawna**

<b>Exhibit H</b>

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:35 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Palomar Physics Department safety concern |
| | |
| **Importance:** | High |

*Respectfully,*
*Lisa Norman, Ed.D, J.D.*
*Assistant Superintendent/Vice President Human Resources*
*Palomar Community College*
*(760) 744-1150 x2531*

*"Be the change you wish to see in the world."*

<i>Gandhi</i>

**From:** Kailikole, Kathryn L.
**Sent:** Friday, December 8, 2017 5:26 PM
**To:** Finkenthal, Daniel <DFinkenthal@palomar.edu>
**Subject:** FW: Palomar Physics Department safety concern
**Importance:** High

**From:** Kailikole, Kathryn L.
**Sent:** Tuesday, November 21, 2017 4:00 PM
**To:** Norman, Lisa M.
**Cc:** Kahn, Jack S.
**Subject:** FW: Palomar Physics Department safety concern
**Importance:** High

Lisa,

Please find the first email regarding the video that a student took of the lab in which an airsoft gun was being used. When I met with the student she informed me that she knew how to handle guns and that what she witnessed in the physics lab disturbed her. Hence, she reported it to the Dean. This first email is her accounting of what transpired in the physics lab. Please refrain from using the student's name.

Thank you,
Kathy
Dr. Kathryn Kailikole
Dean

Ex. A, Page 231

Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu



---

**From:** sfriends4957
**Sent:** Tuesday, April 19, 2016 12:57 PM
**To:** Kailikole, Kathryn L. <kkailikole@palomar.edu>
**Subject:** Palomar Physics Department safety concern

Hello Ms. Kailikole,
I spoke with you earlier today, April 19th, about a safety concern I had regarding my Physics 230 lab class. My name is Shelby Friends. I am sending you what I witnessed in class, my "incident report" if you will.
We were conducting a rotational inertia lab, as part of the calculations we needed to deduce we were required to pick a point of origin. To do such my professor, Takashi Nakajima, had us use an airsoft gun, which he called a BB gun. He pulled out the gun and loaded it, after making sure the class knew how the gun worked, he then cocked it and handed it to a student pointing the gun at the student in the process. He then left the students to shoot the gun while he sat in the back of the class conversing with students and other professors, not paying attention to the transactions with the gun between students. There was no safety lecture given on how to handle the gun or what not to do with it, ie. not to point the gun at anyone or to keep your finger off the trigger until ready to shoot. Also, no student was required to wear safety glasses. Due to this lack of safety knowledge several students were almost shot. Also since we shot the gun indoors, there was a ricochet and students were in charge of keeping track of the pellet, however students who shot the gun would sometimes get hit with the ricochet or just nearly.
Also, we discussed the Physics department as a whole and I thought it might be helpful to leave the Physics 230 website for you. There is where you will find the Warning letter that we are required to sign at the start of the class.
http://pcpepso.com/physics/phys230/
Thank you so much for taking the time to listen today and for reading this email.
If you have any questions for me, please ask.
Thanks again,
Shelby Friends

**Cohen, Shawna**

**Exhibit I**

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:33 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Palomar Physics Department safety concern |
| **Attachments:** | image001.jpg |

**Importance:** High

Respectfully,
Lisa Norman, Ed.D, J.D.
Assistant Superintendent/Vice President Human Resources Palomar Community College
(760) 744-1150 x2531

"Be the change you wish to see in the world."

Gandhi

-----Original Message-----
From: Finkenthal, Daniel
Sent: Sunday, December 10, 2017 2:19 PM
To: stacyncarlson@yahoo.com
Subject: FW: Palomar Physics Department safety concern
Importance: High

==============
Daniel Finkenthal, Ph.D.
Palomar College
San Marcos, CA 92069

_____
From: Kailikole, Kathryn L.
Sent: Friday, December 8, 2017 5:25 PM
To: Finkenthal, Daniel
Subject: FW: Palomar Physics Department safety concern

From: Kailikole, Kathryn L.
Sent: Tuesday, November 21, 2017 4:00 PM
To: Norman, Lisa M. <lnorman@palomar.edu>
Cc: Kahn, Jack S. <jkahn1@palomar.edu>
Subject: FW: Palomar Physics Department safety concern
Importance: High

1

Lisa,

Please find the first email regarding the video that a student took of the lab in which an airsoft gun was being used. When I met with the student she informed me that she knew how to handle guns and that what she witnessed in the physics lab disturbed her.  Hence, she reported it to the Dean.  This first email is her accounting of what transpired in the physics lab.  Please refrain from using the student's name.

Thank you,
Kathy
Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>
[Scr3_ol]

From: sfriends4957
Sent: Tuesday, April 19, 2016 12:57 PM
To: Kailikole, Kathryn L. <kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>>
Subject: Palomar Physics Department safety concern

Hello Ms. Kailikole,
I spoke with you earlier today, April 19th, about a safety concern I had regarding my Physics 230 lab class. My name is Shelby Friends. I am sending you what I witnessed in class, my "incident report" if you will.
We were conducting a rotational inertia lab, as part of the calculations we needed to deduce we were required to pick a point of origin. To do such my professor, Takashi Nakajima, had us use an airsoft gun, which he called a BB gun. He pulled out the gun and loaded it, after making sure the class knew how the gun worked, he then cocked it and handed it to a student pointing the gun at the student in the process. He then left the students to shoot the gun while he sat in the back of the class conversing with students and other professors, not paying attention to the transactions with the gun between students. There was no safety lecture given on how to handle the gun or what not to do with it, ie. not to point the gun at anyone or to keep your finger off the trigger until ready to shoot. Also, no student was required to wear safety glasses. Due to this lack of safety knowledge several students were almost shot. Also since we shot the gun indoors, there was a ricochet and students were in charge of keeping track of the pellet, however students who shot the gun would sometimes get hit with the ricochet or just nearly.
Also, we discussed the Physics department as a whole and I thought it might be helpful to leave the Physics 230 website for you. There is where you will find the Warning letter that we are required to sign at the start of the class.
http://pcpepso.com/physics/phys230/
Thank you so much for taking the time to listen today and for reading this email.
If you have any questions for me, please ask.
Thanks again,
Shelby Friends

**Cohen, Shawna**

**Exhibit J**

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:33 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Palomar Physics Department safety concern |
| **Attachments:** | IMG_1705.MOV; image001.jpg |

Respectfully,
Lisa Norman, Ed.D, J.D.
Assistant Superintendent/Vice President Human Resources Palomar Community College
(760) 744-1150 x2531

"Be the change you wish to see in the world."

Gandhi

-----Original Message-----
From: Finkenthal, Daniel
Sent: Sunday, December 10, 2017 2:19 PM
To: stacyncarlson@yahoo.com
Subject: FW: Palomar Physics Department safety concern

===============
Daniel Finkenthal, Ph.D.
Palomar College
San Marcos, CA 92069

_____
From: Kailikole, Kathryn L.
Sent: Friday, December 8, 2017 5:25 PM
To: Finkenthal, Daniel
Subject: FW: Palomar Physics Department safety concern

From: Kailikole, Kathryn L.
Sent: Tuesday, November 21, 2017 4:06 PM
To: Norman, Lisa M. <lnorman@palomar.edu>
Cc: Kahn, Jack S. <jkahn1@palomar.edu>
Subject: FW: Palomar Physics Department safety concern

Lisa,

Please find attached the video of the physics lab that the student took.  This email is the second of two emails that the student sent to me.

1

Thank you,
Kathy
Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>
[Scr3_ol]




From: sfriends4957
Sent: Thursday, April 21, 2016 3:39 PM
To: Kailikole, Kathryn L. <kkailikole@palomar.edu<mailto:kkailikole@palomar.edu>>
Subject: RE: Palomar Physics Department safety concern

Dr. Kailikole,
I have provided the videos attached from a forwarded email, for the videos were on my Ipad. Will there be any repercussions of me having these videos?
Thank you,
Shelby Friends
_____
From: Shelby Dee [shelby_dee@rocketmail.com]
Sent: Thursday, April 21, 2016 3:38 PM
To: sfriends4957
Subject:

**Cohen, Shawna**

# Exhibit K

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:35 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Palomar Physics Department safety concern |
| **Attachments:** | IMG_1705.MOV |

*Respectfully,*
*Lisa Norman, Ed.D, J.D.*
*Assistant Superintendent/Vice President Human Resources*
*Palomar Community College*
*(760) 744-1150 x2531*

*"Be the change you wish to see in the world."*

*Gandhi*

---

**From:** Kailikole, Kathryn L.
**Sent:** Friday, December 8, 2017 5:25 PM
**To:** Finkenthal, Daniel <DFinkenthal@palomar.edu>
**Subject:** FW: Palomar Physics Department safety concern

---

**From:** Kailikole, Kathryn L.
**Sent:** Tuesday, November 21, 2017 4:06 PM
**To:** Norman, Lisa M.
**Cc:** Kahn, Jack S.
**Subject:** FW: Palomar Physics Department safety concern

Lisa,

Please find attached the video of the physics lab that the student took. This email is the second of two emails that the student sent to me.

Thank you,
Kathy
Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487

1

Ex. A, Page 237

760-744-1150 ext. 2253
kkailikole@palomar.edu



---

**From:** sfriends4957
**Sent:** Thursday, April 21, 2016 3:39 PM
**To:** Kailikole, Kathryn L. <kkailikole@palomar.edu>
**Subject:** RE: Palomar Physics Department safety concern

Dr. Kailikole,
I have provided the videos attached from a forwarded email, for the videos were on my Ipad. Will there be any repercussions of me having these videos?
Thank you,
Shelby Friends

---

**From:** Shelby Dee [shelby_dee@rocketmail.com]
**Sent:** Thursday, April 21, 2016 3:38 PM
**To:** sfriends4957
**Subject:**

Ex. A, Page 238

**Cohen, Shawna**

# Exhibit L

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:33 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Physics issue |
| | |
| **Importance:** | High |

Hi Shawna,
I will be sending you the emails from Daniel Finkenthal's account first, which he forwarded to the person named Stacy Carlson. I have a flash drive with Kathy's emails but can't recall how to open it. I will leave it but if you could please contact Mike so he can assist with opening it, if needed. I will try before I leave but I'm not sure if I will have success. I will leave it on my desk just in case.


Respectfully,
Lisa Norman, Ed.D, J.D.
Assistant Superintendent/Vice President Human Resources Palomar Community College
(760) 744-1150 x2531

"Be the change you wish to see in the world."

Gandhi


-----Original Message-----
From: Finkenthal, Daniel
Sent: Sunday, December 10, 2017 2:19 PM
To: stacyncarlson@yahoo.com
Subject: FW: Physics issue
Importance: High



===============
Daniel Finkenthal, Ph.D.
Palomar College
San Marcos, CA 92069


_____
From: Kailikole, Kathryn L.
Sent: Friday, December 8, 2017 5:24 PM
To: Finkenthal, Daniel
Subject: FW: Physics issue

-----Original Message-----
From: Kailikole, Kathryn L.
Sent: Tuesday, November 21, 2017 4:13 PM
To: Norman, Lisa M. <lnorman@palomar.edu>

1

Cc: Kahn, Jack S. <jkahn1@palomar.edu>
Subject: FW: Physics issue
Importance: High

Lisa,

Please find below the email from the second female student who came to complain about safety issues in the physics lab.  You will find her accounting of what transpired in the lab in the first paragraph.

The rest of the email describes her account of a situation that was resolved.  I worked with Instructor Garcia Villa and Enrollment Services.  Instructor Garcia Villa approved a retroactive withdrawal from the course.

Please refrain from using the student's name.

Thank you,

Kathy
Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu


-----Original Message-----
From: dallygirl96@gmail.com [mailto:dallygirl96@gmail.com]
Sent: Wednesday, April 20, 2016 10:58 AM
To: Kailikole, Kathryn L. <kkailikole@palomar.edu>
Subject: Physics issue

Hello,
My friend Shelby and I (Dallas Brown) spoke with you yesterday regarding the physics lab safety with the BB (or rather airsoft) gun.
The professor, Takashi N, brought out the pellets and gun, loaded and cocked it and then handed it to a student stating don't miss and collect the BB after you shoot your paper. Since he called it a BB gun and the pellets he called BBs we believe it to be a BB gun. There was no instruction as to how to load it, how to hold or use it, or any other type of safety instructions. No safety glasses were worn either. Students did not know how to shoot it, they had it loaded and cocked and pointed at other students or walking around with their finger on the trigger. Students kept walking in the line of fire, and people came in and out of the classroom door which was in the line of fire too with no one watching the door for awhile. Eventually a student stood near the door. As students shot their paper the pellet bounced off and other students were attempting to catch the pellets. The professors, Takashi and Art, were in the room but not paying attention to the students shooting, they were talking amongst themselves and other students.

Also I was in a car accident on March 1st and missed several weeks of school. There is a police report with campus police and I have doctors notes as well (I can get a copy of the police report or give you the report number, and send you a copy of the doctors notes if needed). Takashi told me that I would not pass because I missed so much and could not make up the labs. He had me come to lab while I was still in the neck brace and had a doctors note stating no school or work because if I didn't then I would have to many zeros that I could not make up.

When I returned Hector Garcia Villa, the physics lecture professor that I have, said it did not look positive for me to pass this semester. I was not allowed to make up the quizzes I missed but I convinced him to let me make up the test with showing proof of the doctors notes. I did not have to material that I missed for when I had to take the test so I was not prepared for it. Several weeks later Hector told me I did a lot better on the test than he thought I would but still will probably not pass the class. Because I missed so much from the accident in all my classes it has been hard to catch up, I was provided with the material I missed from my other classes but not with physics. It has had a ripple effect for the rest of the quizzes since I've returned because I didn't get to fully learn and understand that material and the new concepts were building on that material I missed.

I met with a counselor in DRC on April 1st, her only suggestion was to purposefully make sure I get a F or D so I can retake the course since it was past the drop date when I returned. Shortly after that meeting I took that advice and was not taking the quizzes or putting much effort into that class so I would for sure get that low grade to retake the course.

Any questions, or concerns, or if you need to follow up please contact me at this email or the number below, Thank you,
Dallas Brown
760-547-4492

Ex. A, Page 241

**Cohen, Shawna**

**Exhibit M**

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:36 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Physics issue |
| | |
| **Importance:** | High |

Respectfully,
Lisa Norman, Ed.D, J.D.
Assistant Superintendent/Vice President Human Resources Palomar Community College
(760) 744-1150 x2531

"Be the change you wish to see in the world."

                        Gandhi

-----Original Message-----
From: Kailikole, Kathryn L.
Sent: Friday, December 8, 2017 5:25 PM
To: Finkenthal, Daniel <DFinkenthal@palomar.edu>
Subject: FW: Physics issue
Importance: High

-----Original Message-----
From: Kailikole, Kathryn L.
Sent: Tuesday, November 21, 2017 4:13 PM
To: Norman, Lisa M. <lnorman@palomar.edu>
Cc: Kahn, Jack S. <jkahn1@palomar.edu>
Subject: FW: Physics issue
Importance: High

Lisa,

Please find below the email from the second female student who came to complain about safety issues in the physics lab.  You will find her accounting of what transpired in the lab in the first paragraph.

The rest of the email describes her account of a situation that was resolved.  I worked with Instructor Garcia Villa and Enrollment Services.  Instructor Garcia Villa approved a retroactive withdrawal from the course.

Please refrain from using the student's name.

Thank you,

Ex. A, Page 242

Kathy
Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu

-----Original Message-----
From: dallygirl96@gmail.com [mailto:dallygirl96@gmail.com]
Sent: Wednesday, April 20, 2016 10:58 AM
To: Kailikole, Kathryn L. <kkailikole@palomar.edu>
Subject: Physics issue

Hello,
My friend Shelby and I (Dallas Brown) spoke with you yesterday regarding the physics lab safety with the BB (or rather airsoft) gun.
The professor, Takashi N, brought out the pellets and gun, loaded and cocked it and then handed it to a student stating don't miss and collect the BB after you shoot your paper. Since he called it a BB gun and the pellets he called BBs we believe it to be a BB gun. There was no instruction as to how to load it, how to hold or use it, or any other type of safety instructions. No safety glasses were worn either. Students did not know how to shoot it, they had it loaded and cocked and pointed at other students or walking around with their finger on the trigger. Students kept walking in the line of fire, and people came in and out of the classroom door which was in the line of fire too with no one watching the door for awhile. Eventually a student stood near the door. As students shot their paper the pellet bounced off and other students were attempting to catch the pellets. The professors, Takashi and Art, were in the room but not paying attention to the students shooting, they were talking amongst themselves and other students.


Also I was in a car accident on March 1st and missed several weeks of school. There is a police report with campus police and I have doctors notes as well (I can get a copy of the police report or give you the report number, and send you a copy of the doctors notes if needed). Takashi told me that I would not pass because I missed so much and could not make up the labs. He had me come to lab while I was still in the neck brace and had a doctors note stating no school or work because if I didn't then I would have to many zeros that I could not make up.
When I returned Hector Garcia Villa, the physics lecture professor that I have, said it did not look positive for me to pass this semester. I was not allowed to make up the quizzes I missed but I convinced him to let me make up the test with showing proof of the doctors notes. I did not have to material that I missed for when I had to take the test so I was not prepared for it. Several weeks later Hector told me I did a lot better on the test than he thought I would but still will probably not pass the class. Because I missed so much from the accident in all my classes it has been hard to catch up, I was provided with the material I missed from my other classes but not with physics. It has had a ripple effect for the rest of the quizzes since I've returned because I didn't get to fully learn and understand that material and the new concepts were building on that material I missed.

2

I met with a counselor in DRC on April 1st, her only suggestion was to purposefully make sure I get a F or D so I can retake the course since it was past the drop date when I returned. Shortly after that meeting I took that advice and was not taking the quizzes or putting much effort into that class so I would for sure get that low grade to retake the course.

Any questions, or concerns, or if you need to follow up please contact me at this email or the number below,
Thank you,
Dallas Brown
760-547-4492

Ex. A, Page 244

**Cohen, Shawna**

**Exhibit N**

| | |
|---|---|
| **From:** | Norman, Lisa M. |
| **Sent:** | Wednesday, January 10, 2018 4:35 PM |
| **To:** | Cohen, Shawna |
| **Subject:** | FW: Today's meeting |

Hi Shawna,
It appears that every piece of information Kathy received she just sent it over to Daniel. Strange. ..

*Respectfully,*
*Lisa Norman, Ed.D, J.D.*
*Assistant Superintendent/Vice President Human Resources*
*Palomar Community College*
*(760) 744-1150 x2531*

*"Be the change you wish to see in the world."*

*Gandhi*

---

**From:** Kailikole, Kathryn L.
**Sent:** Friday, December 8, 2017 5:28 PM
**To:** Finkenthal, Daniel <DFinkenthal@palomar.edu>
**Subject:** FW: Today's meeting

---

**From:** Kailikole, Kathryn L.
**Sent:** Monday, November 20, 2017 7:07 PM
**To:** Norman, Lisa M.
**Cc:** Cohen, Shawna ; Kahn, Jack S.
**Subject:** FW: Today's meeting

Please see the email below regarding the Physics/Engineering department meeting on September 1, 2016. Daniel Finkenthal asked me to attend. I referenced this email in my previous email to you.

Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu

Ex. A, Page 245



---

**From:** Finkenthal, Daniel
**Sent:** Monday, November 6, 2017 1:40 PM
**To:** Kailikole, Kathryn L. <kkailikole@palomar.edu>
**Subject:** FW: Today's meeting

Hi Kathy,
I think this is the meeting you asked about?

--Daniel

---

**From:** Nakajima, Takashi
**Sent:** Thursday, September 01, 2016 12:20 PM
**To:** Physics Permanent Faculty
**Subject:** Today's meeting

Hi everyone,

We are going to meet at 3 p.m. today to discuss a few issues that the dean asked. 231 lab room will be done at 2:40 p.m. today and will be free after that. Let's meet in NS-249, 231 lab room.

Takashi

Ex. A, Page 246

From: **Cohen, Shawna** SCohen@palomar.edu 📎
Subject: FW: Student Complaint Today
Date: February 22, 2018 at 2:18 PM
To: Jeff Love lovejb@gmail.com



**Exhibit O**

Hi Jeff –

Below is another email related to the Kailikole/Finkenthal investigation.  It shows that on November 27, 2017, Dr. Norman advised Dr. Kailikole regarding proceeding with a student complaint brought forth by Dr. Finkenthal.  I will add this to the others to print for the interviews.

I've contacted both individuals and am waiting for confirmation for interviews next Wednesday, February 28th.

Thanks,
Shawna



*Shawna H. Cohen*
**Manager, Equal Employment Opportunity and Compliance
and Deputy Title IX Coordinator**
Tel: (760) 744-1150 ext. 2608 | Fax: (760) 761-3530
Email: scohen@palomar.edu | Web: www.palomar.edu/hr

**PALOMAR COLLEGE®**
Learning for Success

---

**From:** Norman, Lisa M.
**Sent:** Wednesday, February 21, 2018 5:38 PM
**To:** Cohen, Shawna <SCohen@palomar.edu>
**Subject:** Fwd: Student Complaint Today

For Jeff Love's investigation

Sent from my iPhone

Begin forwarded message:

> **From:** "Norman, Lisa M." <lnorman@palomar.edu>
> **Date:** November 27, 2017 at 9:07:58 PM PST
> **To:** "Kailikole, Kathryn L." <kkailikole@palomar.edu>
> **Cc:** "Kahn, Jack S." <jkahn1@palomar.edu>
> **Subject: Re: Student Complaint Today**
>
> Hi Kathy,
> Because this concern addresses possible disciplinary actions, I did not include

Daniel in the email.

While I understand the concerns expressed below, these appear to be curriculum and instructional matters that would need to be addressed by providing due process to the instructors so they have opportunity to address the allegations. I understand the frustration in dealing with what sounds like their ongoing practices that is in violation of prior directives but we need to confirm that this is truly what is occurring. At the same time, we need to be cognizant that a student is presenting this complaint and make sure we follow any established process for addressing this type of complaint. If this conduct is substantiated then we will appropriately address it.

I understand that students may not want to come forward for fear of retaliation. If this is the case can you or Daniel go observe these additional Friday prep sessions? By witnessing this conduct directly can substantiate what has been shared by the students.

As you are aware, as administrators, it is our responsibility to address matters that impact the District that may create liability and deviate from our goals and mission. For this reason, placing the instructor on administrative leave with pay is not an appropriate remedy to this type of issue otherwise we may create precedence for why we would place instructors on leave, which is not an appropriate basis for an administrative leave.

As a next step, please ask Daniel if the student is willing to place his complaint in written form. If not, you can still proceed in asking both instructors, separately, about the expressed concerns that you have heard. However, prior to doing this, I would highly recommend you or Daniel trying to observe these actions firsthand.


Thanks,
Lisa

Sent from my iPhone

On Nov 27, 2017, at 6:00 PM, Kailikole, Kathryn L.
<kkailikole@palomar.edu> wrote:

> Dear Drs. Norman and Kahn,
>
> Please read the email below from Dr. Finkenthal.  Both Dr.
> Finkenthal and I believed that Instructors Nakajima and Gerwig
> should have been removed from classes this fall especially given
> their recent and past history in the District.  I am re-issuing our
> request that Instructors Nakajima and Gerwig be removed from the

classroom as soon as practicable.  I want to make you aware that they continue to violate California Education Code and directives from Deans Sourbeer and Kailikole hence violating students' civil rights.  I appreciate administrative processes however protecting students' rights is also our responsibility especially our most vulnerable populations.  In a time of watershed moments, I hope to see the Palomar Community College District be transparent and humane in processes affecting both faculty and students.  More importantly, I would like that in their actions, the District validates the numerous students who have had not only their voices silenced but their college pathways ruinously impacted by these instructors.

I appreciate your time regarding such a serious matter.

Respectfully,

Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu

-----Original Message-----
From: Finkenthal, Daniel
Sent: Monday, November 27, 2017 4:46 PM
To: Kailikole, Kathryn L. <kkailikole@palomar.edu>
Subject: Student Complaint Today

Hello Dean Kailikole,
I had a student come to my office today to make a complaint regarding our Physics 230 class taught by Professor Nakajima. His name is Nathan Uwin. I listened and provided advice as best I could, and asked that he make an appointment to discuss his issues with you directly.

Nathan appears to be a bright and effective student with a goal of transferring to Cal Poly in Mechanical Engineering. He chose to enroll in Professor Nakajima's Physics 230 because the class fit his

schedule with the college swim team. He said he took the 230 class "despite the reputation" since he had already earned an A in high school physics and Math 140 here at Palomar. Today he was told that he will fail the class and now plans to repeat the class at Mira Costa next spring. Nathan's complaint is that the expectations and requirements of the Physics 230 class are unfair and designed to cause students to fail unless they repeat the class two or three times.

Specifically:
*Students are required to take 3-hour plus long exams outside of the normally scheduled 1-hour lecture periods.
*Students are required to attend additional "lab prep" sessions on Friday afternoons in order to receive necessary instruction for the lab scheduled the following week. Nathan has attended every lab prep session this semester and reports that if he did not he would have gotten a zero for the lab.
*Students are expected to study and do homework for more than 20 hours per week for this one class.
*Students were unable to track their grade or standing in the class until today. Nathan and others received notice today that they are failing the class.
*Students are discouraged from taking the class with anyone other than Nakajima or Gerwig since they will "pay a price later" when they attempt other physics and engineering classes.

These complaints echo previous complaints, and indicate that there has been no attempt to reform the classroom environment in the Physics 230 courses taught by professors Nakajima and Gerwig. Of immediate concern is the requirement that students attend "lab prep" sessions and take exams outside of normally scheduled class times. All members of the Department have been previously notified by Dean Sourbeer that it is not appropriate to require students to attend exam sessions outside of class time. Last Fall you expressly forbid the department to require students to attend Friday Lab Prep sessions. The explanation in both cases was that these practices are not permitted by state education code.

The Physics 230 class is an introductory FIRST SEMESTER physics class and is a vital gateway for students who are considering a future in a STEM field. These ongoing violations are damaging our students and our program, and it is un-conscionable that the District permits them to continue. I am sorry to be a pest but I truly believe that the only way forward is to remove these two instructors from having power and authority over students. I have also made this clear to my union representatives and the faculty senate president.

Sincerely,
Daniel

========================

Daniel Finkenthal, Ph.D.
Professor and Chair
Department of Physics and Engineering
Palomar College
San Marcos, CA  92069

# 4. Palomar College Police Department Report 2016-00138



**Palomar College**
**PALOMAR COLLEGE**
**1140 W. MISSION ROAD**
**SAN MARCOS, CA, 92069**

Case Report

Reported By:   **OFFICER SO'OTO**

| Incident Types Label | Offender | Incident Disposition |
|---|---|---|
| **INFORMATION ONLY** | **NAKAJIMA, TAKASHI (SUSPECT)** | **INFORMATION ONLY REPORT** |

| Report Disposition | Method of Reporting |
|---|---|
| **REPORT** | |

| Related Number: |
|---|
| **2016-00021365** |

| Incident Occurred Date | Incident Occurred End Date | Incident Discovered / Called In |
|---|---|---|
| **04/19/2016 at 1030** | **04/21/2016 at 1115** | **04/21/2016 at 1115** |

| Location | Specific Location |
|---|---|
| **1140 W. MISSION RD. : SAN MARCOS CAMPUS : NS BLDG** | **NS252** |

| Manager/Supervisor On Duty | Manager/Supervisor Notified |
|---|---|
| | **NO** |

| Report Synopsis/Overview |
|---|
| An Instructor of "PHYSICS-230", Takashi NAKAJIMA was using a 6 millimeter airsoft gun as a part of his semester exams in physics lab room NS-252. Students in the class reported the experiment created an unsafe environment. |

| List of contacts in this report |
|---|

| **BROWN, DALLAS** | **REPORTING PERSON** |
| **FRIENDS, SHELBY** | **REPORTING PERSON** |
| **NAKAJIMA, TAKASHI** | **SUSPECT** |

| Contact # 1   (REPORTING PERSON) |
|---|

| Full Name |
|---|
| **DALLAS  BROWN** |

| Age | Date of Birth | Gender | Race |
|---|---|---|---|
| **19** | **11/13/1996** | **FEMALE** | **W - WHITE** |

| Addresses |
|---|

| Address : |
|---|
| **2001 CACTUS PLACE** |

| City | State | Zip | Country | Address Type |
|---|---|---|---|---|
| **ESCONDIDO** | **CA** | **92027** | **USA** | **HOME** |

| Phones : |
|---|
| **([IMPORTED]) (760)547-4492** |

| Other Id Numbers |
|---|

| Id Type | ID Number |
|---|---|

| Prepared By: | Submitted Date |
|---|---|
| OFFICER SO'OTO(P16 SO'OTO) | 04/21/2016 1118 |
| **Signature** | **Reviewed By/Date** |

Ex. A, Page 253

| SID | 010705068 |
|---|---|

| Contact # 2   (REPORTING PERSON) |
|---|

**Full Name**

**SHELBY  FRIENDS**

| Age | Date of Birth | Gender | Race |
|---|---|---|---|
| 19 | 06/23/1996 | FEMALE | W - WHITE |

| Addresses |
|---|

Address :

**1265 STONE DR**

| City | State | Zip | Country | Address Type |
|---|---|---|---|---|
| SAN MARCOS | CA | 92078 | | [IMPORTED |

| Phones : |
|---|

**([IMPORTED]) (951)760-1317**

| Other Id Numbers |
|---|

| Id Type | ID Number |
|---|---|
| SID | 010750984 |

| Contact # 3   (SUSPECT) |
|---|

**Full Name**

**TAKASHI  NAKAJIMA**

| Drivers License | Drivers LicenseState | Email Address |
|---|---|---|
| N6386562 | CA | |

| Age | Date of Birth | Gender | Race |
|---|---|---|---|
| 58 | 12/24/1957 | MALE | A - ASIAN |

| Height | Weight | Hair Color | Eye Color |
|---|---|---|---|
| 509 | 140 | BLK - BLACK | BRO - BROWN |

| Approx. Age | Demeanor | Build | Clothing |
|---|---|---|---|
| | | MEDIUM | |

| Addresses |
|---|

Address :

**1156 MEADOW LAKE DRIV E**

| City | State | Zip | Country | Address Type |
|---|---|---|---|---|
| VISTA | CA | 92084 | USA | HOME |

Address :

**1156 MEADOW LAKE DRIVE**

| City | State | Zip | Country | Address Type |
|---|---|---|---|---|
| VISTA | CA | 92084 | | [IMPORTED |

| Phones : |
|---|

**([IMPORTED]) (760)744-1150X4334**

| Digital Media List |
|---|

| Prepared By: | | Submitted Date |
|---|---|---|
| OFFICER SO'OTO(P16 SO'OTO) | | 04/21/2016 1118 |
| **Signature** | | **Reviewed By/Date** |
| | | |

Ex. A, Page 254

**Digital Media # 1**



Title

**3219.JPG**

Description

**Digital Media # 2**



Title

Description

**Digital Media # 3**



Title

Description

| Prepared By: | | Submitted Date |
|---|---|---|
| OFFICER SO'OTO(P16 SO'OTO) | | 04/21/2016 1118 |
| **Signature** | | **Reviewed By/Date** |

**Digital Media # 4**



Title

Description

**Narrative text**

ORIGIN:
On 04/19/16 at about 1030 hours, I received a radio call of a BB gun being used in a lab class at NS-252.  The complainants were waiting for me at NS-147 office.

Upon my arrival at NS-252, I spoke with Instructor NAKAJIMA.  NAKAJIMA told me that he was not using a BB gun and that he was using an airsoft pellet gun to shoot at paper targets as part of his semester exams.

I then went to NS-147 and met with R/P-Students Dallas BROWN and Shelby FRIENDS.  Health Science Interim Dean Kathryn KAILIKOLE was also present during my interview with BROWN and FRIENDS.  BROWN and FRIENDS were basically concerned about how the airsoft gun was being handled unsafely during class.  They were concerned that there were no protective goggles and no safety instructions prior to handling the weapon.  (See statements for further details of BROWN and FRIENDS statements.)  I then advised KAILIKOLE that NAKAJIMA told me the airsoft gun was part of his curriculum and he was using it for his semester exams.  KAILIKOLE then told me that she will look in to it and get back to me if it fell within policy.

On 04/21/16 at about 1115 hours, I responded back to the NS-147 building and met with Interim Dean KAILIKOLE.  KAILIKOLE handed me a copy of the Palomar Community College District Procedure and under AP 3530 WEAPONS ON CAMPUS.  (See attached copy.)  KAILIKOLE pointed out the section under Educational activities involving firearms or other weapons to be authorized by the Chief of Police before the activity take place.  The airsoft gun utilized in NAKAJIMA's class was never approved by the Chief of Police.

STATEMENTS:
Statement of Victim/Witness Dallas BROWN:
BROWN essentially told me that Professor NAKAJIMA brought out a pellet gun and load it with a rubber pellet , then handed it to a student and told the student not to miss and collect the BB after they shoot the paper.  BROWN said she thought it was a BB gun because NAKAJIMA was calling the pellets BBs'.  BROWN said there were no instructions as how to load the gun or how to use it.  BROWN said there were no safety classes and the students did not know how to shoot the gun.  There were students walking in the line of fire and no one was watching the door into the classroom for a while.  BROWN said as the students shot their paper, the pellets would bounce off the wall and other students were attempting to catch the pellets .  BROWN said NAKAJIMA was in the class but he was talking with another instructor and not paying attention to the students shooting.  BROWN said she is very concerned with the lack of safety instructions while handling the gun.

| Prepared By: | | Submitted Date |
|---|---|---|
| OFFICER SO'OTO(P16 SO'OTO) | | 04/21/2016 1118 |
| **Signature** | | **Reviewed By/Date** |
| | | |

Ex. A, Page 256

BROWN said she was hit with a pellet that ricochets off one of the shots . BROWN said it did not hurt and she was not injured. BROWN does not desire prosecution.

Statement of Witness Shelby FRIENDS:
FRIENDS told me they were conducting a rotational "inertia" lab as part of the calculations to pick a point of origin. FRIENDS said NAKAJIMA had the students use an airsoft gun "which he called a BB gun". FRIENDS said NAKAJIMA would pull out the airsoft gun and load it, after making sure the class knew how the gun worked. He then cocked it and hand it to a student pointing the gun at the student in the process. NAKAJIMA would then leave the student to shoot the gun while he sat in the back of the class conversing with students and other professors and not paying attention to the transactions with the gun between the students. There was no safety lectures given on how to handle the gun or what not to do. FRIENDS said no student was required to wear safety glasses. FRIENDS said several students were almost shot due to the lack of any safety lecture.

FRIENDS also videotaped one of the airsoft lab exercises. FRIENDS send the video to Interim Dean KALILIKOLE.I watched the video and saw the following:

- A female student being coached by two students on how to shoot the airsoft gun
- A student standing by the main door and in the line of fire to prevent anyone  entering class during the airsoft exercises
- A student siting to the left of the target, also in the line of fire and it appeared to be catching the spent rubber pellet and putting it back to a bucket or just on the desk
- NAKAJIMA was nowhere to be seen on the video
- No students on the video were wearing any protective gear ie: eye protection or body protection

Statement of Instructor Takashi NAKAJIMA:
NAKAJIMA told me he has been using the same airsoft gun for the last two years or more as part of his curriculum . The point of the airsoft is the students shoot at the paper target then they determined the point of origin on their paper targets. I asked NAKAJIMA if he knew about the policy of getting authorization from the Chief of Police before using any weapon on campus and he said, "No I didn't". I asked NAKAJIMA if he conducts any safety instructions prior to using the airsoft and he said he just tell the students to point it towards the target and shoot. NAKAJIMA also said he has all the students stand behind the line of fire. NAKAJIMA said he does not require students to wear safety goggles .

NAKAJIMA also showed me the other machine that he uses in his class to estimate velocity . (See attached photo.) It is called the "Balistic Pertulum". It is a metal machine with about an inch in diameter of a metal ball attached to a long screw with a spring that when the trigger is pulled, the round metal ball would fire forward while still attached to the screw and hit its point of rest on a metal catcher at the other side of the machine, which is about two feet in length. The metal ball never leaves or be separated from the machine.

NAKAJIMA said the second part of the curriculum is the firing of the airsoft pistol with rubber pellets in order for the student to determine its point of origin.

INVESTIGATION:
I took photos of the airsoft gun and the cabinet for where it is stored. (See attached.) The airsoft is kept inside its original box and stored inside the bottom drawer of the instructor's desk . The drawer is unlocked.

The airsoft gun is a P.169 Double Eagle Spring Airsoft Hand Gun. It shoots 6mm rubber pellets at 185 feet per second.

Based on BROWN and FRIENDS statements and the video, it appeared that it confirms the lack of any safety procedures and the lack of supervision by the Instructor(s) during airsoft gun exercises.

Pictures of the "Balistic Pertulum" was forwarded to KAILIKOLE.

| Prepared By: | Submitted Date |
|---|---|
| OFFICER SO'OTO(P16 SO'OTO) | 04/21/2016 1118 |
| **Signature** | **Reviewed By/Date** |

Ex. A, Page 257

INJURIES:
None.


EVIDENCE:
A copy of the video to be placed into the evidence room for safekeeping.


PROPERTY DAMAGE:
None.

| Prepared By: | | Submitted Date |
|---|---|---|
| OFFICER SO'OTO(P16 SO'OTO) | | 04/21/2016 1118 |
| **Signature** | | **Reviewed By/Date** |

# 5. Employment Contract:
## Dr. Kathryn Kailikole

HUMAN RESOURCES

2017 MAY 10  PM 2:11

EXHIBIT J-6

# PALOMAR COMMUNITY COLLEGE DISTRICT
## SENIOR EDUCATIONAL ADMINISTRATOR
## EMPLOYMENT CONTRACT

This employment contract (hereinafter referred to as the "Agreement") is made and entered into this eleventh day of April, 2017, of by and between the Governing Board of the Palomar Community College District (hereinafter referred to as the "Board" and "District") and **Kathryn Kailikole** (hereinafter referred to as the "Employee").

**WHEREAS** it is the desire of the Board to employ Employee in the Position of **Dean, Instructional, Mathematics and the Natural and Health Sciences** (hereinafter referred to as "Position").

**NOW, THEREFORE,** the parties mutually agree as follows:

1.   **EMPLOYMENT.**  The Board hereby offers to employ Employee in the above identified Position on the conditions contained in this Agreement.  Employee is a member of the Administrative Team as described in the Administrative Team Handbook adopted by the Board, an academic employee as defined by Education Code section 87001(a), an educational administrator as defined in Education Code section 87002(b), and a management employee as defined by Government Code section 3540.1(g).   The Employee and the Board agree that this Agreement is not binding or enforceable unless it is ratified by the Board in open session at a regular meeting of the Board.

2.   **STATUTORY AUTHORIZATION AND EXTENSION.**   This Agreement is a contract of employment entered into pursuant to Education Code section 72411(a). Employee understands upon Employee's execution of this Agreement and its adoption by the Board, this Agreement will automatically renew upon its expiration, and Employee will automatically be reemployed for one (1) additional year upon the expiration of this Agreement, unless the Governing Board provides written notice to Employee on or before March 15, 2018, of its intention not to reemploy Employee in Position for one additional academic year.  If the Governing Board provides such written notice to Employee, Employee's employment in Position and this Agreement will terminate effective July 1, 2019, without further action by the Board, subject to the provisions of paragraph 3.

3.   **RETREAT/RETURN RIGHTS.**  If the Governing Board provides notice to Employee of non-renewal of this Agreement, and Employee has seniority in another administrator or non-administrator education position in the District, such Employee may have the right to return to such position upon the expiration of this Agreement provided that Employee is not termination for cause.

4.    **TERM**.  The term of this Agreement shall begin on **July 1, 2017**, and continue through and including **June 30, 2019** or unless extended pursuant to paragraph 2.  Employee shall be required to render full time and regular service to the District during the period covered by this Agreement.  This Agreement shall be renewable or extended only by mutual, written agreement of the parties as set forth in paragraph 2 above.  In no event shall this Agreement be interpreted in any way to authorize the renewal or extension of this Agreement for a term of more than twenty-nine (29) months.  It is expressly understood, however, that if the position referred to in this Agreement is funded by a grant, categorical program, or other monies not in the District's unrestricted general fund, and if funding is discontinued, the Agreement will terminate on June 30 of the fiscal year in which the funding was discontinued, provided further that the District has given Employee written notice before May 15 of the year in which the funding is not received.

5.    **SALARY.**  Employee shall be compensated in accordance with the Administrative Salary Schedule as established, approved and revised from time to time by the Board, at salary grade **75/4** from July 1, 2017 through June 30, 2018 and at salary grade **75/5** from July 1, 2018 through June 30, 2019, **plus a $117.66 doctoral stipend**.  The Board reserves the right to increase or decrease the schedule including across the board salary reduction or furloughs on the same basis and for the same time as faculty bargaining unit reductions.  Any actions to modify the salary schedule shall not be interpreted as a new Agreement for employment or renewal or extension of this Agreement.  The Board reserves the right to increase the Employee's salary.  However, any action to increase the salary of the Employee shall not be interpreted as a new Agreement for employment or a renewal or extension of this Agreement.

6.    **DUTIES.**  Employee will perform the duties of the above Position as set forth in any Position description adopted by the Board, and all other duties as shall be assigned or required by the Superintendent/President, or designee, provided that such additional duties shall be consistent with Employee's Position.  The Board may adopt or amend the Position description for the Employee's Position at any time as long as the modifications are not inconsistent with the terms of the Agreement.  The Board reserves the right to reassign the Employee at any time during the term of this Agreement to another educational or student services administrative Position within the District.  Reassignment during the term of this Agreement solely for discretionary reasons will not result in a reduction of the Employee's compensation during the term of this Agreement.  Reassignment will be made in compliance with the California Education Code and the Administrative Handbook.

7.    **EXCLUSION FROM OVERTIME PROVISIONS.**  Employee shall be exempt from the minimum wage and overtime provisions of the Fair Labor Standards Act and the California Education Code, and shall not be entitled to compensatory time off.

8. **VACATION AND SICK LEAVE.** Employee is entitled to accrue twenty-four (24) working days of vacation annually in accordance with the Administrative Vacation Policy set forth in the Administrative Team Handbook as adopted by the Board. Vacation days are exclusive of holidays otherwise granted to twelve (12) month regular administrative employees of the District. Employee is entitled to accrue twelve (12) days of paid sick leave for illness or injury. Employee is eligible for any leaves authorized by law or provided in the Administrative Association Handbook as adopted by the Board

9. **FRINGE BENEFITS.** Employee shall be afforded all fringe benefits of employment which are provided to the District's regular educational and student services administrators for which they are eligible under the terms of the Administrative Team Handbook.

10. **TRAVEL.** Necessary transportation and travel expenses will be provided in accordance with policies duly adopted by the Board.

11. **SERVICE CLUBS AND COMMUNITY ORGANIZATIONS.** The Board authorizes payment of dues and meals for meetings of one service or community organization. Funds shall be allocated to the appropriate expense accounts in the annual budget approved by the Governing Board.

12. **APPLICABLE LAW.** This Agreement is subject to all applicable laws of the State of California, the rules and regulations of the State Board of Governors, and the rules, regulations, and policies of the Board, all of which are made a part of the terms and conditions of this Agreement as though set forth herein, to the extent that such terms are not inconsistent with the lawful terms of this Agreement.

13. **MAXIMUM CASH SETTLEMENT UPON TERMINATION OF THIS AGREEMENT.** Regardless of the term of this Agreement, the Board may terminate this Agreement at any time prior to the date on which the term of this Agreement would have otherwise expired. In such an event, the maximum cash settlement that the Employee shall receive will be an amount equal to the monthly base salary of the Employee multiplied by the number of months remaining on the unexpired term of this Agreement, or eighteen (18) months, whichever is less, minus any amount(s) that could have been earned if the Employee has retreat rights, and an instructional Position is offered for the balance of the term of this Agreement. Any cash settlement shall not include any other noncash items except health benefits, which may be continued for the same duration of time as covered in the settlement, or until Employee finds other employment, whichever occurs first. The intent of this provision is to satisfy the requirements of Government Code sections 53260-53264, and this provision shall be interpreted in a manner consistent with those statutes.

The District agrees to pay Employee the lump sum cash payment ("Severance Pay"), less legally required for authorized deductions except contributions to CalSTRS, within fifteen (15) days of the effective date of termination.

In exchange for and as a condition to receipt of the Severance Pay, Employee shall execute a release and waiver, in a form acceptable to the legal counsel for the District, releasing the District, and all of its elected officers, employees, agents, representations, and attorneys, from any claim associated with the termination.

14. **TERMINATION OF THIS AGREEMENT DURING ITS TERM WITH CAUSE.**
The Board may terminate this Agreement during its term and discharge Employee if Employee commits a material and substantial breach of this Agreement and/or for cause. Such breach of Agreement and discharge shall nullify the terms of this Agreement and Employee shall cease to receive any form of compensation upon the effective date of termination. The term "cause" is defined as those actions, omissions, or behaviors which are detrimental to the operations of the District and/or its major instructional, student and administrative divisions, or which impair the District's mission, purpose, or objectives. Conduct which constitutes a breach of contract and cause for discharge, includes, but is not limited to: unsatisfactory work performance, dishonesty, misconduct, unprofessional conduct, or insubordination. Disciplinary actions, up to and including discharge from employment, shall be carried out in compliance with the disciplinary provisions applicable to administrative employees as set forth in the Administrative Team Handbook as adopted by the Board. In the event of a termiantion of Agreement for cause, the provisons of Section 13 of Agreement shall not apply.

15. **PROVISIONS OF GOVERNMENT CODE SECTIONS 53243.3-53243.4.**

(a) In the event that the District provides paid leave to Employee pending an investigation of a crime involving abuse of his office or position covered by Government Code section 53243.4, and should that investigation lead to a conviction, the Employee shall fully reimburse District for any salary provided for that purpose.

(b) In the event that the District provides funds for the legal criminal defense of Employee pending an investigation of a crime involving an abuse of his office or position covered by Government Code section 53243.4, and should that investigation lead to a conviction, the Employee shall fully reimburse the District for any funds provided for that purpose.

(c) In the event that the District provides a cash settlement related to the termination of Employee as defined in the terms of this Agreement and Employee subsequently is convicted of a crime involving abuse of office or position covered

by Government Code section 53243.4, Employee shall fully reimburse the District for any funds provided for that purpose.

    (d)    "Abuse of office or position" is defined in Government Code section 53243.4 to mean either of the following:

        (i)    An abuse of public authority, including, but not limited to, waste, fraud, and violation of the law under color of authority.

        (ii)    A crime against public justice, including, but not limited to, a crime described in Title 5 (commencing with Section 67), Title 6 (commencing with Section 85) or Title 7 (commencing with Section 92) of Part 1 of the Penal Code.

**16.**     **MODIFICATION OF CONTRACT.** This Agreement may be modified by mutual consent of the parties provided, however, that the party seeking such change shall give not less than 45 (forty-five) calendar days, written notice to the other party of the requested modification.

**17.**     **RESIGNATION.** Employee may resign from employment at any time during the term of this Agreement upon ninety (90) days prior written notice to the Board or upon a shorter period of time if approved by the Board.

**18.**     **SAVINGS CLAUSE.** If any provision of this Agreement is held to be contrary to law by a court of competent jurisdiction, such provision shall not be deemed valid or binding except to the extent permitted by law, but all other provisions shall continue to remain in full force and effect.

**19.**     **ENTIRE AGREEMENT.** This Agreement contains and expresses the entire and final agreement of the parties with respect to the matters covered herein, and supersedes all negotiations, prior discussions, prior agreements and preliminary agreements between the parties. No promises or representations, express or implied, concerning this Agreement have been made by the parties other than those contained in this Agreement concerning the offer and acceptance of employment described herein.

**20.**     **NO CONTINUING WAIVER.** No waiver of any term or condition of this Agreement by either party shall be deemed a continuing waiver of such term and condition.

**21.**     **GOVERNING LAW.** This Agreement is delivered in the State of California, concerns employment in the State of California, and the rights and obligations of the parties hereto shall be construed and enforced in accordance with the laws of the State of California.

**22.**  **MISCELLANEOUS PROVISIONS.**  This Agreement and applicable provisions of the Administrative Team Handbook contain the entire agreement and understanding between the parties. There are no oral understandings, or terms and conditions not contained or referenced in this Agreement. This Agreement cannot be changed orally. It may be modified in writing by mutual agreement of the parties as set forth above.   This Agreement supersedes all Board Policies, rules, regulations, handbooks or practices which are inconsistent with or in conflict with this Agreement.

## ACCEPTANCE OF SENIOR EDUCATIONAL ADMINISTRATOR
## EMPLOYMENT CONTRACT

I have reviewed this Senior Educational Adminstrator Employment Contract, and I accept this Agreement and the terms and conditions of employment it contains. I have not agreed to employment and/or contracted for employment with the governing board of any other school, university, college, or community college district which will in any way conflict with the satisfactory performance of all of the duties of the Position for which employed.

Please return signed contract to Human Resource Services as soon as possible.

Date: 5/9/2017

Employee Signature

Approved by the Governing Board of Palomar Community College District in open session at a regular Board meeting.

Date: 5/15/17

Dr. Joi Lin Blake, Secretary to the Governing Board

Copy: Employee

2017 MAY 17  PM 2:40

# EXHIBIT 11

TO:   Human Resources Department
      Palomar Community College District

# REQUEST FOR FORMAL EVIDENTIARY HEARING

I, _____, acknowledge service of the Notice of Proposed Disciplinary Action (Termination). I hereby request a formal evidentiary hearing to determine if sufficient cause exists for the termination, as provided for in Section 15 of the Administrative Association Team Handbook. I understand that this Request for Hearing Form must be received by the District's Human Resources Department within ten (10) working days from the date of my receipt of the Notice of Proposed Disciplinary Action (Termination).

DATE:_____          _____
                         **SIGNATURE OF EMPLOYEE**

DATE RECEIVED BY DISTRICT: _____

_____
**SIGNATURE**

# EXHIBIT B



**GOVERNING BOARD AGENDA**
**MEETING OF THE GOVERNING BOARD**
**TUESDAY, JUNE 12, 2018**
**4:00 P.M. (CLOSED SESSION) 5:00 P.M. (OPEN SESSION)**
**PALOMAR COMMUNITY COLLEGE DISTRICT**
**ROOM SSC-1, SAN MARCOS CAMPUS**
**1140 W. MISSION RD., SAN MARCOS, CALIFORNIA**

*TO SPEAK TO THE BOARD AT TONIGHT'S MEETING:*

- *For items listed on the agenda: Please fill out a BLUE "Speaker" card.*
- *For items NOT listed on the agenda: Please fill out a YELLOW "Public Comment" card.*
- *Give speaker cards to Debra Doerfler, Senior Executive Assistant.*

*In accordance with Board Policy 2350, members of the public who wish to address the Board on matters within its jurisdiction have a <u>five-minute time limit</u> per person. The Board may ask a group to select a spokesperson and may limit the number of speakers on a particular topic unless the proposed speakers are addressing different concerns.*

*ORDER OF BUSINESS: The Board reserves the right to modify the order of business in the manner it deems appropriate. Please note all meetings are recorded electronically.*

*THE REGULAR MEETING of the Board convenes the second Tuesday of every month starting at 5:00 p.m. in the Governing Board Room (SSC-1) of the Student Services Building on the Palomar College Campus in San Marcos, California, unless changed in advance by Board action.*

*In compliance with Government Code §54957.5, non-exempt writings that are distributed to the Governing Board Members in advance of their meetings, may be viewed at the Governing Board Office, LL-204, or on the Governing Board web site at <u>https://www2.palomar.edu/pages/governingboard</u>/. In addition, if you would like a copy of any record related to an agenda item, please contact Debra Doerfler, Senior Executive Assistant, at (760) 744-1150, extension 2104, or <u>ddoerfler@palomar.edu</u>. Written agenda related items provided to the Board after distribution of the packet will be available for inspection during normal business hours. All Agenda related items will also be available at each meeting of the Board.*

*PUBLIC NOTICE—NONDISCRIMINATION:*
*Palomar College does not discriminate based on ethnicity, religion, age, gender, sexual orientation, color, or disability in any of its programs or activities.*

*AMERICANS WITH DISABILITIES: Palomar College is committed to providing reasonable accommodations for persons with disabilities. Upon request, this publication will be made available in alternate formats. Please contact Debra Doerfler, Senior Executive Assistant to the Superintendent/Governing Board, 1140 West Mission Road, San Marcos, CA 92069, (760) 744-1150 extension 2104, 8:00 a.m. to 5:00 p.m., Monday – Friday.*

**A.**     **CALL MEETING TO ORDER**: 4:00 p.m.

**B.**     **ROLL CALL**: Establishment of a Quorum

**C.**     **PUBLIC COMMENTS** *In accordance with Board Policy 2350, members of the public who wish to address the Board on matters within its jurisdiction have a* <u>*five-minute time limit*</u> *per person. The Board may ask a group to select a spokesperson and may limit the number of speakers on a particular topic unless the proposed speakers are addressing different concerns.*

**D.**     **RECESS TO CLOSED SESSION TO CONSIDER THE FOLLOWING MATTER(S):**

1. Public Employee Discipline/Dismissal/Release Pursuant to Government Code Section 54957, et seq. (3 cases)

2. Conference with Legal Counsel – Anticipated Litigation. Significant exposure to litigation pursuant to Government Code 54956.9(b) (2 cases)

3. Pursuant to Education Code Section 72122 – Deliberation regarding recommendation for the expulsion of students: 011152359, 003833603, and 000235871. *(Action will be taken and reported in Open Session in accordance with California Education Code Section 72122.)*

4. Public Employee Performance Evaluation, pursuant to Government Code §54957. Position Title: Superintendent/President

**E.**     **RECONVENE TO OPEN SESSION**

1. Reporting of actions(s) taken in Closed Session (*The Governing Board President shall report the overall action and if unanimous; otherwise, the individual votes of each trustee.)*

2. Presentation: 2018 NAACP Salute To Women of Color Distinguished Woman Award

3. Pledge of Allegiance

4. Administer Oath of Office to incoming Student Trustee, Amber Bancroft, and to newly hired Police Officers: Daniel Lopez, Gerald Rabidou and Mark Lynch.

5. Call for Removal of Items from – or Changes to – the Agenda

**F.**     **RECOMMENDATION ACTION: EXPULSION OF THREE STUDENTS**

Pursuant to California Education Code section 72122, and following the review and consideration of each matter, the Governing Board hereby approves the expulsion of the following students:

1. 011152359
2. 003833603
3. 000235871

**G.**     **PUBLIC COMMENTS** *In accordance with Board Policy 2350, members of the public who wish to address the Board on matters within its jurisdiction have a* <u>*five-minute time limit*</u> *per person. The Board may ask a group to select a spokesperson and may limit the number of speakers on a particular topic unless the proposed speakers are addressing different concerns.*

**H.**     **RECOMMENDATION ACTION: APPROVAL OF MINUTES FOR THE REGULAR AND SPECIAL MEETINGS IN THE PREVIOUS MONTH**

- May 8, 2018
- May 22, 2018

## I.   REPORTS

**Presentation on Parking Fees/License Plate Readers – Police Chief Christopher Moore**

***NOTICE TO PUBLIC:*** *Section 54954.2(a) of the Ralph M. Brown Act states "No action or discussion shall be undertaken on any item not appearing on the posted agenda, except that members of a legislative body or its staff may briefly respond to statements made or questions posed by persons exercising their public testimony rights under Section 54954.3. In addition, on their own initiative or in response to questions posed by the public, a member of a legislative body or its staff may ask a question for clarification, make a brief announcement, or make a brief report on his or her own activities. Furthermore, a member of a legislative body, or the body itself, subject to rules or procedures of the legislative body, may provide a reference to staff or other resources for factual information, request staff to report back to the body at a subsequent meeting concerning any matter, or take action to direct staff to place a matter of business on a future agenda."*

- **GOVERNING BOARD PRESIDENT**
- **GOVERNING BOARD TRUSTEES**
- **STUDENT TRUSTEE**
- **SUPERINTENDENT/PRESIDENT**

  - Report of Vice President for Instruction

  - Report of Vice President for Student Services

  - Report of Vice President for Finance and Administrative Services

  - Report of Vice President for Human Resource Services

## J.   APPROVAL OF CONSENT CALENDAR ITEMS

***NOTICE TO PUBLIC:*** *There will be no separate discussion of these items unless a Governing Board member or member of the public requests that particular item(s) be removed from the Consent Calendar. Items so removed will be considered separately. All matters remaining under Consent Calendar are considered to be routine and will be approved by one motion.*

### 1.   RECOMMENDATION: ACTION – RATIFY ACADEMIC EMPLOYMENT

The Governing Board hereby ratifies the recommendation of the Superintendent/President regarding the employment of the following academic employees:

a.   Name:                 Rebecca Mattson
     Position:             Assistant Professor, Nursing (Maternal Health/Obstetrics)
     Department:           Nursing Education
     Degrees:              M.S., Nursing: Nurse Educator
                           B.S.N., Nursing
     Position #:           6367
     New?:                 Yes
     Remarks:              Position approved 9/12/17.
     Sal Grade/Stp:        C/8
     Salary:               $8,096.39/month
     % of Position:        100%
     # of Mos:             10
     Effective:            August 16, 2018
     Account #(s):         A-111000-348200-12300-0000000/100%

b.     Name:             Gina Wilson
        Position:        Assistant Professor, Child Development/Early Childhood Education
        Department:    Child Development
        Degrees:        M.A., Human Development
                            B.S., Child Development
        Position #:     6729
        New?:           Yes
        Remarks:        Position approved 12/12/17.
        Sal Grade/Stp:  C/8
        Salary:         $8,096.39/month
        % of Position:   100%
        # of Mos:      10
        Effective:       August 16, 2018
        Account #(s):   A-111000-364200-13050-0000000/100%

c.     Name:             Elise Lindgren
        Position:        Assistant Professor, Biological Sciences
        Department:    Biology
        Degrees:        M.S., Biology
                            B.S., Biochemistry and Cell Biology
        Position #:     6727
        New?:           Yes
        Remarks:        Position approved 12/12/17.
        Sal Grade/Stp:  C/1
        Salary:         $6,200.53/month
        % of Position:   100%
        # of Mos:      10
        Effective:       August 16, 2018
        Account #(s):   A-111000-346200-04010-0000000/100%

d.     Name:             Joseph Lucido
        Position:        Assistant Professor, Architecture
        Department:    Design and Manufacturing Technologies
        Degrees:        Master of Architecture, Real Estate Development
                            Bachelor of Architecture
                            2+ Years of Experience
        Position #:     6301
        New?:           Yes
        Remarks:        Position approved 12/12/17.
        Sal Grade/Stp:  C/8
        Salary:         $8,096.39/month
        % of Position:   100%
        # of Mos:      10
        Effective:       August 16, 2018
        Account #(s):   A-111000-335600--02010-0000000/100%

|     | e. | Name: | Efrem Alexander |
|-----|----|-------|-----------------|
|     |    | Position: | Counselor/Assistant Professor |
|     |    | Department: | Counseling Services |
|     |    | Degrees: | M.A., Education |
|     |    |       | B.B.A., Business |
|     |    |       | Minimum qualifications approved by the Faculty Senate Equivalency Committee on 6/12/15. |
|     |    | Position #: | 6724 |
|     |    | New?: | Yes |
|     |    | Remarks: | Position approved on 11/14/17. |
|     |    | Sal Grade/Stp: | C/2 |
|     |    | Salary: | $6,471.38/month |
|     |    | % of Position: | 100% |
|     |    | # of Mos: | 11 |
|     |    | Effective: | July 1, 2018 |
|     |    | Account #(s): | N-122100-462100-63100-0000000/100% |

|     | f. | Name: | Ladylyn Dominguez |
|-----|----|-------|-------------------|
|     |    | Position: | Counselor/Assistant Professor |
|     |    | Department: | Counseling Services |
|     |    | Degrees: | M.S., Educational Counseling |
|     |    |       | B.S., Bus. Admin. (High Tech. Mgmt.) |
|     |    | Position #: | 6723 |
|     |    | New?: | Yes |
|     |    | Remarks: | Position approved on 11/14/17. |
|     |    | Sal Grade/Stp: | D/1 |
|     |    | Salary: | $6,471.38/month |
|     |    | % of Position: | 100% |
|     |    | # of Mos: | 11 |
|     |    | Effective: | July 1, 2018 |
|     |    | Account #(s): | W-122100-462100-63100-0000000/100% |

**2. RECOMMENDATION: ACTION – RATIFY PART-TIME FACULTY EMPLOYMENT**

The Governing Board hereby ratifies the recommendation of the Superintendent/President regarding the employment of the following part-time faculty; said part-time faculty are not scheduled to teach more than a 67 percent load in a single semester:

|     | a. | Name: | Buquet, Lori |
|-----|----|-------|--------------|
|     |    | Discipline: | Emergency Medical Technologies |
|     |    | Department: | Emergency Medical Education |
|     |    | Degrees: | B.S., Nursing |
|     |    |       | 2+ Years of Experience |
|     |    | Sal Grade/Stp: | A/1 |
|     |    | Salary: | $58.37 |
|     |    | Effective: | Spring 2018 |

|     | b. | Name: | Bergmanis, Eric |
|-----|----|-------|-----------------|
|     |    | Discipline: | Oceanography |
|     |    | Department: | Earth, Space and Environmental Sciences |
|     |    | Degrees: | M.S., Geology & Geophysics |
|     |    |       | B.A., Geology |
|     |    | Sal Grade/Stp: | B/1 |
|     |    | Salary: | $59.79 |
|     |    | Effective: | Summer 2018 |

c.    Name:           Haisten, David
     Discipline:      Biological Sciences
     Department:   Biology
     Degrees:      M.S., Evoltn, Ecol & Organismal Bio
                       B.S., Ecology and Evolution
     Sal Grade/Stp: B/1
     Salary:       $59.79
     Effective:      Summer 2018

d.    Name:           Harris, Bryan
     Discipline:      Sociology
     Department:   Behavioral Sciences
     Degrees:      M.A., Sociological Practice
                       B.A., Sociology
     Sal Grade/Stp: B/1
     Salary:       $59.79
     Effective:      Summer 2018

e.    Name:           Hill Cummings, Kristie
     Discipline:      Biological Sciences
     Department:   Biology
     Degrees:      Ph.D., Microbiology
                       B.S., Biology
     Sal Grade/Stp: D/1
     Salary:       $63.49
     Effective:      Summer 2018

f.    Name:           Khalulyan, Alina
     Discipline:      Psychology
     Department:   Behavioral Sciences
     Degrees:      M.A., Psychology
     Sal Grade/Stp: C/1
     Salary:       $60.85
     Effective:      Summer 2018

g.    Name:           MacMillan, Brian
     Discipline:      Emergency Medical Technologies
     Department:   Emergency Medical Education
     Degrees:      A.A., Paramedic Training
                       6+ Years of Experience
     Sal Grade/Stp: A/1
     Salary:       $58.37
     Effective:      Summer 2018

h.    Name:           Padilla, Laura
     Discipline:      Chicano Studies
     Department:   Multicultural Studies
     Degrees:      M.A., Chicana and Chicano Studies
                       B.A., History
     Sal Grade/Stp: B/1
     Salary:       $59.79
     Effective:      Summer/Fall 2018

i.    Name:           Seigel, Charles
     Discipline:      Political Science
     Department:   Economics, History and Political Science
     Degrees:      Master in Public Administration
                       B.A., History

|  |  | Minimum qualifications approved by the Faculty Senate Equivalency Committee on 4/26/2018. |
|  | Sal Grade/Stp: | B/1 |
|  | Salary: | $59.79 |
|  | Effective: | Summer 2018 |

| j. | Name: | Titus, Weston |
|  | Disciplines: | Health |
|  |  | Kinesiology |
|  | Department: | Health, Kinesiology, and Recreation Management |
|  | Degrees: | M.A., Kinesiology |
|  |  | B.S., Kinesiology |
|  |  | A.A., General Studies:  Science & Mathematics and Liberal Arts & Sciences |
|  | Sal Grade/Stp: | B/1 |
|  | Salary: | $59.79 |
|  | Effective: | Fall 2018 |

### 3. RECOMMENDATION: ACTION – RATIFY EARLY CHILDHOOD EDUCATION LAB SCHOOL TEACHER EMPLOYMENT

The Governing Board hereby ratifies the recommendation of the Superintendent/President regarding the employment of the following Early Childhood Education Lab School Teachers:

| a. | Name: | Baza, Jestina |
|  | Title: | Teacher |
|  | Degrees: | A.S., Infant/Toddler Teacher |
|  |  | 24+ units in Child Development or Early Childhood Education from an accredited college or university including child growth and development, child, family and community and at least one program/curriculum class. 16+ units General education as required by the current California Child Development Permit Matrix |
|  | Sal Grade/Stp: | C1/1 |
|  | Salary: | $14.00 |
|  | Effective: | Spring 2018 |

| b. | Name: | Martinez, Elizabet |
|  | Title: | Assistant Teacher |
|  | Degrees: | B.S., Child Development |
|  |  | 6+ units in Child Development |
|  |  | Valid Child Development Permit |
|  | Sal Grade/Stp: | A/3 |
|  | Salary: | $11.00 |
|  | Effective: | Spring 2018 |

### 4. RECOMMENDATION: ACTION – APPROVE A SALARY INCREASE EQUIVALENT TO THE 2018-19 STATE FUNDED COST OF LIVING ADJUSTMENT (COLA) FOR UNREPRESENTED EMPLOYEES IN THE EXECUTIVE BRANCH FOR FISCAL YEAR 2018-2019

It is recommended by the Governing Board of the Palomar Community College District to approve a salary increase equivalent to 2.71% or final COLA as approved in the state budget for all executive administrators effective fiscal year 2018-19. The following executive administrators are included:

Adrian Gonzales
Assistant Superintendent/Vice President, Student Services

Jack Kahn, Ph.D.
Assistant Superintendent/Vice President, Instruction

Lisa Norman, Ed.D., J.D.
Assistant Superintendent/Vice President, Human Resource Services

Ronnie Ballesteros-Perez
Assistant Superintendent/Vice President, Finance & Administrative Services

5. **RECOMMENDATION: ACTION – RATIFY MEMORANDUM OF UNDERSTANDING BETWEEN THE DISTRICT AND THE ADMINISTRATIVE ASSOCIATION**

The Governing Board hereby ratifies the Memorandum of Understanding (MOU) between the District and the Administrative Association with respect to the 2018-19 state funded Cost Of Living Adjustment (COLA).

**EXHIBIT J-5**

6. **RECOMMENDATION: ACTION – RATIFY MEMORANDUM OF UNDERSTANDING BETWEEN THE DISTRICT AND THE CONFIDENTIAL AND SUPERVISORY TEAM**

The Governing Board hereby ratifies the Memorandum of Understanding (MOU) between the District and the Confidential and Supervisory Team with respect to the 2018-19 state funded Cost Of Living Adjustment (COLA).

**EXHIBIT J-6**

7. **RECOMMENDATION: ACTION – RATIFY A MEMORANDUM OF UNDERSTANDING BETWEEN THE DISTRICT AND THE COUNCIL OF CLASSIFIED EMPLOYEES/AFT LOCAL 4522**

The Governing Board hereby ratifies a Memorandum of Understanding (MOU) between the District and the Council of Classified Employees/AFT Local 4522:

- MOU: Janus Ruling

**EXHIBIT J-7**

8. **RECOMMENDATION: ACTION – RATIFY THREE (3) MEMORANDA OF UNDERSTANDING AND FIVE (5) TENTATIVE AGREEMENTS BETWEEN THE DISTRICT AND THE PALOMAR FACULTY FEDERATION/AFT LOCAL 6161**

The Governing Board hereby ratifies three (3) Memoranda of Understanding (MOUs) and five (5) Tentative Agreements (TAs) between the District and the Palomar Faculty Federation/AFT Local 6161 with respect to the following sections of the PFF/District Agreement:

- MOU: Part-Time and Full-Time Coaching Contract Language
- MOU: Janus Ruling
- MOU: Article 9
- TA: Request to Use Banked Leave Form
- TA: Article 17 – Evaluation Procedure
- TA: Appendix L – Early Childhood Education Lab School Teachers
- TA: ECELS Part-Time Employee Review Report
- TA: ECELS Part-Time Employee Performance Improvement Plan

**EXHIBIT J-8**

9.   **RECOMMENDATION: ACTION – RATIFY ADMINISTRATIVE EMPLOYMENT**

The Governing Board hereby ratifies the recommendation of the Superintendent/President regarding the employment of the following administrative employee:

a.   Name:                   Steven Salter
     Position:               Director, Extended Opportunity Programs and Services
     Department:             EOP&S/CARE/CalWORKs
     District Location:      Main campus
     Position #:             5546
     New?:                   No
     Remarks:                Replacement for Anne Stadler.
     Sal Grade/Stp:          66/1
     Salary:                 $8,426.53/month
     % of Position:          100%
     # of Mos:               12
     Effective:              August 6, 2018
     Account #(s):           A-123600-473100-64300-0000000/100%

10.  **RECOMMENDATION: ACTION – RATIFY CONFIDENTIAL AND SUPERVISORY TEAM EMPLOYMENT**

The Governing Board hereby ratifies the recommendation of the Superintendent/President regarding the employment of the following Confidential and Supervisory Team employees:

a.   Name:                   Maria Zapien Rangel
     Position:               Executive Assistant (to Vice President)
     Department:             Human Resource Services
     District Location:      Main campus
     Position #:             5735
     New?:                   No
     Remarks:                Replacement for Jennie Vastola; promotion for Ms. Zapien Rangel.
     Sal Grade/Stp:          48/1
     Salary:                 $5,404.17/month
     % of Position:          100%
     # of Mos:               12
     Effective:              June 13, 2018
     Account #(s):           A-211000-611100-66600-0000000/100%

b.   Name:                   David Negrete
     Position:               Supervisor II, Custodial Services
     Department:             Custodial Services
     District Location:      Main campus
     Position #:             6660
     New?:                   No
     Remarks:                Replacement for Carlos Huerta.
     Sal Grade/Stp:          41/1
     Salary:                 $4,545.87/month
     % of Position:          100%
     # of Mos:               12
     Effective:              June 15, 2018
     Account #(s):           A-212100-542200-65300-0000000/100%
     Normal Work             Monday – Thursday, 10:00 p.m. – 6:30 a.m.; Friday, 5:00 p.m. – 1:30 a.m. A
     Schedule:               3% differential pay will be paid for hours worked between 6:00 p.m. and
                             10:00 p.m. A 6% differential pay will be paid for hours worked between
                             10:00 p.m. and 6:00 a.m.

| | | |
|---|---|---|
| c. | Name: | Timothy Cross |
| | Position: | Supervisor II, Custodial Services |
| | Department: | Custodial Services |
| | District Location: | North Education Center |
| | Position #: | 6717 |
| | New?: | Yes |
| | Remarks: | Position approved 11/14/17. |
| | Sal Grade/Stp: | 41/1 |
| | Salary: | $4,545.87/month |
| | % of Position: | 100% |
| | # of Mos: | 12 |
| | Effective: | June 15, 2018 |
| | Account #(s): | N-212100-542200-65300-0000000/100% |
| | Normal Work Schedule: | Monday – Friday, 2:30 p.m. – 11:30 p.m. A 3% differential pay will be paid for hours worked between 6:00 p.m. and 10:00 p.m. A 6% differential pay will be paid for hours worked between 10:00 p.m. and 6:00 a.m. |

| | | |
|---|---|---|
| d. | Name: | Izabel M. Solis |
| | Position: | Supervisor, TRIO/Student Support Services |
| | Department: | Grant Funded Student Programs |
| | Position #: | 6615 |
| | New?: | No |
| | Remarks: | Replacement for Juan Reyna; transfer for Ms. Solis. |
| | Sal Grade/Stp: | 45/1 |
| | Salary: | $5,018.00/month |
| | % of Position: | 100% |
| | # of Mos: | 12 |
| | Effective: | June 25, 2018, pending final approval by the US Department of Education |
| | Account #(s): | K-212100-471300-64300-1112300/100% |

## 11. RECOMMENDATION: ACTION – RATIFY CLASSIFIED EMPLOYMENT

The Governing Board hereby ratifies the recommendation of the Superintendent/President regarding the employment of the following classified employees:

| | | |
|---|---|---|
| a. | Name: | Amy Hinchman |
| | Position: | Academic Department Assistant |
| | Department: | Nursing Education |
| | District Location: | Main campus |
| | Position #: | 5299 |
| | New?: | No |
| | Remarks: | Replacement for Kelly Donaghy; promotion for Ms. Hinchman. |
| | Sal Grade/Stp: | 23/3 |
| | Salary: | $4,520.90/month |
| | % of Position: | 100% |
| | # of Mos: | 12 |
| | Effective: | June 15, 2018 |
| | Account #(s): | A-212200-348100-60910-0000000/100% |

| | | |
|---|---|---|
| b. | Name: | Aaron Sifferman |
| | Position: | Assessment Specialist |
| | Department: | Counseling Services |
| | District Location: | North Education Center |
| | Position #: | 6683 |
| | New?: | Yes |
| | Remarks: | Position approved on 11/14/17. |
| | Sal Grade/Stp: | 21/1 |

|  | Salary: | $3,904.59/month |
|---|---|---|
|  | % of Position: | 100% |
|  | # of Mos: | 12 |
|  | Effective: | June 15, 2018 |
|  | Account #(s): | W-212200-462100-63100-0000000/100% |

c.  Name:                 Arnulfo Arellano
    Position:             Assessment Specialist
    Department:           Counseling Services
    District Location:    South Education Center
    Position #:           6682
    New?:                 Yes
    Remarks:              Position approved on 11/14/17.
    Sal Grade/Stp:        21/1
    Salary:               $3,904.59/month
    % of Position:        100%
    # of Mos:             12
    Effective:            June 15, 2018
    Account #(s):         N-212200-462100-63100-0000000/100%

d.  Name:                 Terhea Williams
    Position:             Instructional Support Assistant IV
    Department:           Biology
    District Location:    South Education Center
    Position #:           6699
    New?:                 Yes
    Remarks:              Position was approved 11/14/17.
    Sal Grade/Stp:        27/1
    Salary:               $4,520.90/month
    % of Position:        100%
    # of Mos:             12
    Effective:            June 15, 2018
    Account #(s):         W-222000-346200-04070-0000000/100%

e.  Name:                 Andrea Salvatierra
    Position:             Administrative Specialist I
    Department:           Languages and Literature
    District Location:    South Education Center
    Position #:           6676
    New?:                 Yes
    Remarks:              Position was approved 11/14/17.
    Sal Grade/Stp:        18/1
    Salary:               $3,629.69/month
    % of Position:        100%
    # of Mos:             12
    Effective:            June 13, 2018
    Account #(s):         W-212200-321110-61100-0000000/100%

f.   Name:                     Skyler Pray
     Position:                 Custodian I
     Department:               Custodial Services
     District Location:        South Education Center
     Position #:               6687
     New?:                     Yes
     Remarks:                  Position was approved 11/14/17.
     Sal Grade/Stp:            9/1
     Salary:                   $2,913.57/month
     % of Position:            100%
     # of Mos:                 12
     Effective:                June 15, 2018
     Account #(s):             W-212200-542200-65300-0000000/100%

## 12.  RECOMMENDATION: ACTION – RATIFY DISTRICT-INITIATED DEMOTION OF CLASSIFIED POSITION

The Governing Board hereby ratifies the recommendation of the Superintendent/President regarding the change to the following classified position:

a.   Position:                 Administrative Specialist I
     Department:               Instruction Office
     District location:        Main campus
     Name:                     Barbara Llamas
     Position #:               6571
     New?:                     No
     Remarks:                  District-intitiated involuntary transfer and demotion. Position was formerly Education Center Specialist grade 19 at the Mt. Carmel Education Center.
     Sal Grade/Stp:            18/24
     Salary:                   $2,141.97/month
     % of Position:            45%
     # of Mos:                 12
     Effective:                June 4, 2018
     Account #(s):             A-212200-311100-60910-0000000/100%
     Normal Work Schedule:     Monday – Thursday, 12:30 p.m. – 5:00 p.m.

## 13.  RECOMMENDATION: ACTION – RATIFY NEW CLASSIFIED POSITION

The Governing Board hereby ratifies the recommendation of the Superintendent/President regarding the approval of the following new classified position

a.   Position:                 Environmental Health and Safety Specialist
     Department:               Environmental Health and Safety
     District Location:        Main campus
     Position #:               6470
     New?:                     Yes
     Sal Grade/Step:           32/1
     Salary:                   $3,640.20/month
     % of Position:            100%
     # Months:                 12
     Effective:                June 13, 2018
     Account #(s):             A-212200-545100-67740-0000000/100%

14. **RECOMMENDATION: ACTION – APPROVE PERSONNEL ACTIONS/HISTORY FOR MAY AND JUNE**

The Governing Board hereby approves the Personnel Actions/History report, including student employee hires for the months of May 2018 and short-term employee hires for the month of June 2018.

**EXHIBIT J-14**

15. **RECOMMENDATION: ACTION – RATIFY LEAVE(S) OF ABSENCE FOR ONE EMPLOYEE**

The Governing Board hereby ratifies the recommendation of the Superintendent/President granting a 26.67% Personal Leave of Absence without pay and with no effect on benefits, effective August 20, 2018 through December 20, 2018 to Daniel Clegg, Professor, Mathematics Department.

16. **RECOMMENDATION: ACTION – RATIFY REVISION TO RETIREMENT FOR ONE EMPLOYEE**

On behalf of the Governing Board of the Palomar Community College District, the following retirement has been revised and accepted by the Superintendent/President, as authorized by the Governing Board, under Group I:

- Takashi Nakajima, Professor, Physics and Engineering, effective June 1, 2018.  He has served Palomar College for 28 years from February 6, 1986 to May 31, 2018.

17. **RECOMMENDATION: ACTION – RATIFY RESIGNATIONS**

The Governing Board hereby ratifies the resignations, accepted by the Superintendent/President in accordance with Board Policy 7350, of the following employees:

- Mitch Howard, Senior Programmer Analyst, Programming, effective May 16, 2018.

- Katherine Kelp-Stebbins, Assistant Professor, English Department, effective August 1, 2018.

18. **INFORMATION – ACKNOWLEDGEMENT OF RETIREMENT(S) OF THREE EMPLOYEES**

The Governing Board hereby acknowledges the following retirement(s) accepted on its behalf by the Superintendent/President in accordance with Administrative Procedure 7380 – Retiree Health Benefits:

Group I
- Rebecca Barr, Professor, Counseling Department, effective August 14, 2018.  She has served Palomar College for 32 years from August 19, 1986 to August 13, 2018.

- Marilyn Lunde, Administrative Specialist II, Student Affairs Department, effective June 30, 2018.  She has served Palomar College for 32 years from August 1, 1986 to June 29, 2018.

Group II
- Henry P. Ordille, Director, Emergency Medical Education Department, effective August 1, 2018.  He has served Palomar College for 13 years from August 19, 2005 to July 31, 2018.

19. **INFORMATION: FACULTY INITIATED WITHDRAW OF SABBATICAL LEAVE APPLICATIONS FOR THREE FACULTY**

- Travis Ritt, Economics, History, Political Science Department, has withdrawn his application for sabbatical leave for the Spring 2019 term, previously approved March 13, 2018.

- Cynthia Anfinson, Mathematics Department, has withdrawn her application for sabbatical leave for the Fall 2018 term, previously approved March 13, 2018.

- Daniel Finkenthal, Physics/Engineering Department has withdrawn his application for sabbatical leave for the Spring 2018 term, previously approved March 14, 2017.

20. **INFORMATION: REVIEW OF SABBATICAL LEAVE ABSTRACTS HIGHLIGHTING WORK AND PROJECTS UNDERTAKEN AS WELL AS BENEFITS DERIVED**

    **EXHIBIT J-20**

21. **RECOMMENDATION: ACTION – APPROVE MAY 2 AND 16, 2018 CURRICULUM ACTION ITEMS FOR INCLUSION IN THE COLLEGE CURRICULUM INVENTORY EFFECTIVE FALL 2018**

    The Governing Board hereby approves Curriculum Action Items dated May 2, 2018 and May 16, 2018 previously approved by the Curriculum Committee and the Faculty Senate.

    **EXHIBIT J-21**

22. **RECOMMENDATION: ACTION – APPROVE NEW COMMUNITY EDUCATION OFFERINGS AND AUTHORIZE WORKFORCE DEVELOPMENT & EXTENDED STUDIES TO CONTRACT WITH PERSONNEL AS LISTED IN THE EXHIBIT**

    **EXHIBIT J-22**

23. **RECOMMENDATION: ACTION – APPROVE REAPPOINTMENT OF SARAH ROSENFIELD TO THE INDEPENDENT CITIZENS' OVERSIGHT COMMITTEE (ICOC)**

    **EXHIBIT J-23**                                    **RESOLUTION 17-21541**

24. **RECOMMENDATION: ACTION – APPROVE REIMBURSEMENT OF CANDIDATE FOR INTERVIEW EXPENSES**

    The Governing Board hereby approves reimbursement of travel expenses for interview for the following candidate:

    a.  Name:              Daisy Pitel
        For:               Airfare and parking
        To Attend:         Second-level interview for Director, Education Center
        Location:          Tucson, AZ to San Marcos, CA
        Date:              April 25, 2018
        Amount:            $560.46
        Budget Account #:  575400-11-611200-67600-10-0611950/100%

25. **RECOMMENDATION: ACTION – APPROVE BANK SIGNATURE AUTHORIZATIONS EFFECTIVE JULY 1, 2018 THROUGH JUNE 30, 2019**

    The Governing Board authorizes the following individuals:

    - Joi Blake, Ed.D., Superintendent/President, or
    - Ronnie E. Ballesteros-Perez, Assistant Superintendent/Vice President, Finance & Administrative Services, or
    - Carmen Coniglio, Director, Fiscal Services

    To deposit and/or withdraw funds currently deposited to the following Palomar Community College District accounts:

    - Financial Aid Federal Account
    - State of California Cal Grant Account
    - Transfer Account and the Revolving Cash Fund

The Governing Board authorizes the following individuals to deposit and/or withdraw funds currently deposited to the Palomar Community College District Associated Students of Palomar College.

- Joi Blake, Ed.D., Superintendent/President, or
- Ronnie E. Ballesteros-Perez, Assistant Superintendent/Vice President, Finance & Administrative Services, or
- Carmen Coniglio, Director, Fiscal Services, and
- Amber Bancroft, President, Associated Student Government

The Governing Board authorizes (and requires) any two of the following individuals to sign for deposits and/or withdrawals of funds currently deposited to the Palomar College Payroll Account (automatic payroll deposit and electronic funds transfer for state and federal taxes).

- Joi Blake, Ed.D., Superintendent/President, or
- Ronnie E. Ballesteros-Perez, Assistant Superintendent/Vice President, Finance and Administrative Services, or
- Carmen Coniglio, Director, Fiscal Services, or
- Brandi Y. Taveuveu, Manager, Budget and Payroll

## 26. RECOMMENDATION: ACTION – APPROVE SIGNATURES FOR COUNTY BUSINESS EFFECTIVE JULY 1, 2018 THROUGH JUNE 30, 2019

The Governing Board of Palomar Community College District hereby authorizes the following business procedures effective July 1, 2018 through June 30, 2019. Persons authorized, pursuant to the provisions of the Education Code Section 85232, to sign any and all school orders in the name of the District, drawn on the funds of the District:

- Ronnie E. Ballesteros-Perez, Assistant Superintendent/Vice President, Finance and Administrative Services, or
- Carmen Coniglio, Director, Fiscal Services

Persons authorized to receive mail from the Accounting Section of the San Diego County Office of Education:

- Ronnie E. Ballesteros-Perez, Assistant Superintendent/Vice President, Finance and Administrative Services, or
- Carmen Coniglio, Director, Fiscal Services

Persons authorized to designate employees that can initiate, authorize and process wire transfers with the County of San Diego:

- Ronnie E. Ballesteros-Perez, Assistant Superintendent/Vice President,
- Finance and Administrative Services, or
- Carmen Coniglio, Director, Fiscal Services

## 27. RECOMMENDATION: ACTION – AUTHORIZE DESIGNATED PERSONNEL TO SIGN CONTRACTS

The Governing Board of the Palomar Community College District authorizes Joi Blake, Ed.D., Superintendent/President or Ronnie E. Ballesteros-Perez, Assistant Superintendent/Vice President, Finance and Administrative Services or Carmen M. Coniglio, Director, Fiscal Services, to sign contracts on behalf of the District, pursuant to California Education Code Section 81655.

28. **RECOMMENDATION: ACTION – APPROVE QUARTERLY REPORT OF THE FISCAL SERVICES DIRECTOR**

The Governing Board hereby approves the Quarterly Report of Fiscal Services Director, Regarding Disclosure of District Investments as of March 31, 2018.

**EXHIBIT J-28**

29. **RECOMMENDATION: ACTION – APPROVE CALIFORNIA COMMUNITY COLLEGES QUARTERLY FINANCIAL STATUS REPORT**

The Governing Board hereby approves the California Community Colleges Quarterly Financial Status Report (CCFS-311Q) for quarter ending March 31, 2018.

**EXHIBIT J-29**

30. **RECOMMENDATION: ACTION – CONFIRM CLASSIFICATION OF THE OFFICE OF CONTRACT SERVICES RECORDS TO CLASS-3 DISPOSABLE AND AUTHORIZE DESTRUCTION OF RECORDS**

The Governing Board hereby authorizes the classification of expired agreements/contracts prior to May 2012 to Class 3:  Disposable Records and authorizes destruction pursuant to Title 5, Sections 16023 through 16028, California Administrative Code.

**EXHIBIT J-30**

31. **RECOMMENDATION: ACTION (SECOND READING) – APPROVE PALOMAR COMMUNITY COLLEGE DISTRICT BOARD POLICIES**

The Governing Board hereby approves the following Board Policies, previously reviewed and approved by the Policies and Procedures Committee and the Strategic Planning Council. These items were presented to the Board for first reading on May 8, 2018.

BP 7260 – Classified Administrators                BP 7270 – Student Workers
          and Supervisors

**EXHIBIT J-31**

32. **RECOMMENDATION: ACTION – ACCEPT DONATIONS WITH A TOTAL ESTIMATED VALUE OF $1,000.00.**

The Governing Board hereby accepts the following gifts and directs that appropriate letters of appreciation be sent to Josie Silva, 1119 Ariana Rd., San Marcos, CA 92069 for the donation of luxury fabrics, lace and trims, value estimated by donor totals $1,000.00.

33. **RECOMMENDATION: ACTION – EXCUSE ABSENCE OF TRUSTEES**

In accordance with Section 72425(d) of the CA Education Code, the Governing Board hereby acknowledges and excuses the absences' of Chris Hopp and Nancy Ann Hensch from the May 22, 2018 special meeting due to personal necessity.

**RESOLUTION 17-21542**

| Resumption of<br>**REGULAR AGENDA** |
| :---: |

**K.**     **ACTION ON ITEMS REMOVED FROM CONSENT CALENDAR**

**L.**     **REPORTS FROM COLLEGE GROUPS**

       **1.**    **INFORMATION: Report of the Faculty Senate**

       **2.**    **INFORMATION: Report of the Palomar Faculty Federation**

       **3.**    **INFORMATION: Report of the Administrative Association**

       **4.**    **INFORMATION: Report of the Confidential and Supervisory Team**

       **5.**    **INFORMATION: Report of the CCE/AFT**

       **6.**    **INFORMATION: Report of the Associated Student Government**

**M.**     **UNFINISHED BUSINESS**

**N.**     **NEW BUSINESS**

       **1.**    **RECOMMENDATION: ACTION – REVIEW AND APPROVE PURCHASES MADE MARCH 23 – MAY 31, 2018 TOTALING $4,153,961.59**

           The Governing Board pursuant to Resolutions 14-21157 and 14-21158 adopted November 12, 2013 hereby reviews and approves purchase transactions and contracts entered into on behalf of the Palomar Community College District as listed on the attached exhibit.  Purchases listed are made against the 2017-2018 fiscal year budgets:

| | |
|---|---|
| Purchase Orders Time Period: 04/26/18–05/31/18 | $3,852,294.14 |
| Procurement Card Time Period: 03/23/18-04/22/18 | $138,373.30 |
| Procurement Card Time Period: 04/23/18-05/22/18 | $163,294.15 |
| | $4,153,961.59 |

           **EXHIBIT N-1**

       **2.**    **RECOMMENDATION: ACTION – APPROVE NOTICE OF PUBLIC HEARING FOR THE FISCAL YEAR 2018-2019 ADOPTED BUDGET**

           The Governing Board hereby approves that the proposed Fiscal Year 2018-2019 Adopted Budget for the Palomar Community College District will be on display and available for public inspection on Tuesday, September 4, 2018 through Monday, September 10, 2018  8:00 a.m. to 4:30 p.m. in Fiscal Services, Room A-4C Administrative Services Building at Palomar College.

           FURTHER, The Governing Board of the Palomar Community College District will conduct a Public Hearing on the Adopted Budget at a meeting of the Governing Board on Tuesday, September 11, 2018 at 5:00 p.m., Board Conference Room, Palomar College.  Said Notice of Public Hearing is to be published by the San Diego Union Tribune on July 30, July 31, August 6, and August 7, 2018.

       **3.**    **RECOMMENDATION: ACTION – APPROVE FISCAL YEAR 2017-2018 BUDGET ADJUSTMENTS AND YEAR-END TRANSFERS**

           The Governing Board of Palomar Community College District hereby approves the budget transfers and adjustments of Fiscal Year 2017-2018 from August 31, 2017 through May 30, 2018.   The Governing Board of Palomar Community College District also hereby authorizes the Vice President, Finance and Administrative Services to make any year end transfers as necessary to assist with the close of the books for the fiscal year.  This report shows the revised budgets as of May 30, 2018.

           **EXHIBIT N-3**

4.  **RECOMMENDATION: ACTION – APPROVE THE FISCAL YEAR 2018-2019 TENTATIVE BUDGET FOR THE PALOMAR COMMUNITY COLLEGE DISTRICT** *Ron Ballesteros-Perez Vice President for Finance & Administrative Services will present.*

The Governing Board hereby approves the Fiscal Year 2018-2019 Tentative Budget for the Palomar Community College District.

**EXHIBIT N-4**

5.  **RECOMMENDATION: ACTION – APPROVE EDUCATION PROTECTION ACT RESOLUTION AND 2017-2018 PROP 30 EPA EXPENDITURE REPORT**

The Governing Board hereby adopts a resolution in accordance with the provisions of Article XIII, Section 36 of the California Constitution and accepts the 2017-2018 Prop 30 Education Protection Account (EPA) Expenditure Report.

**EXHIBIT N-5**                                                              **RESOLUTION 17-21543**

6.  **RECOMMENDATION: ACTION – APPROVE 2018-2019 GANN APPROPRIATION LIMIT PER ARTICLE XIII-B, CALIFORNIA CONSTIT (GANN LIMIT) FOR PALOMAR COMMUNITY COLLEGE DISTRICT**

The Governing Board hereby adopts a resolution establishing the 2018-2019 Gann Appropriation Limit as required by Article 13B of the California State Constitution and State Law.

**EXHIBIT N-6**                                                              **RESOLUTION 17-21544**

7.  **RECOMMENDATION: ACTION – APPROVE CHANGE ORDERS**

The Governing Board hereby approves the following Change Orders as detailed in the exhibit:

1.  CO #1 for $9,675.00 for changes required by unforeseen conditions and modifications to the construction details for the Anita & Stan Maag Food and Nutrition Center Project.

2.  CO #8 for $302,139.00 for Owner Additions and Unforeseen Conditions for the Rancho Bernardo Education Center project.

3.  CO #3 for $390,113 for Owner Additions and Unforeseen Conditions for the M&O project.

**EXHIBIT N-7**

8.  **RECOMMENDATION: ACTION – APPROVE SUBSCRIPTION AGREEMENT WITH AD ASTRA INFORMATION SYSTEMS FOR PLATINUM ANALYTICS, A SAAS ENTERPRISE-CLASS SCHEDULING SOFTWARE AND ASTRA SCHEDULING**

The Governing Board hereby approves an agreement with Ad Astra Information Systems for a scheduling system that provides analysis and optimization of academic resources and supports management of resources.  Platinum Analytics is a solution that provides predictive analytics for the creation of aligned course schedule that incorporates historical records, degree audit, student progress, student plan data and business intelligence.   The agreement is for five (5) year term with five (5) additional one-year renewals.  Total amount of agreement is $460,000.00.

**EXHIBIT N-8**

9.   **RECOMMENDATION: ACTION – ACCEPT MEMORANDUM OF UNDERSTANDING FROM THE SAN DIEGO MIRAMAR COLLEGE SUB-AWARD OF THE ADVANCED TRANPORTATION AND RENEWABLE ENERGY INITIATIVE TO FOSTER A PARTNERSHIP WITH PALOMAR COLLEGE'S DRONE CONFERENCE**

The Governing Board approves memorandum of understanding with San Diego Miramar College's sub-award master of Advanced Transportation and Renewable Energy (ATRE) initiative to foster a partnership between San Diego Miramar College and the drone program at Palomar College in conjunction with the Drone Conference for Educators and Industry Professionals. Paid to District: $6,000.00.

**EXHIBIT N-9**

10.  **RECOMMENDATION: ACTION – APPROVE LICENSE AGREEMENT FOR INTERNSHIP PROGRAM WITH MOSTRA COFFEE, INC. TO INSTALL AND OPERATE ONE COFFEE CART AT THE RANCHO BERNARDO EDUCATION CENTER AND TO SELL MOSTRA COFFEE PRODUCTS AND PASTRIES**

The Governing Board hereby approves a license agreement with Mostra Coffee, Inc. to install one coffee cart at the Rancho Bernardo Education Center campus for the purpose of facilitating internships and job training in food services, coffee roasting and business management for District students to obtain academic credit for internship/work experience.  Paid to District: License base fee $1,000.00/month plus if goal of $24,000.00 / month is achieved District to receive 15% monthly revenue.

**EXHIBIT N-10**

11.  **RECOMMENDATION: ACTION – APPROVE REQUEST TO REDUCE CONTRACTOR'S RETENTION**

The Governing Board hereby approves the request to reduce retention being held from 5% to 2.5% for Elite Earthworks & Engineering, Bid #CM-17-18-01-NEC-01-A:  North Education Center.

The Governing Board hereby approves the request to reduce retention being held from 5% to 2.5% for Rossin Steel, Bid #CM-17-18-01-NEC-01-A:  South Education Center.

**EXHIBIT N-11**

12.  **RECOMMENDATION: ACTION – REVIEW AND APPROVE THE SIX FACILITY NAMING ITEMS AS RECOMMENDED BY THE SUPERINTENDENT/PRESIDENT**

**EXHIBIT N-12**

13.  **REVIEW AND APPROVE INCREASING THE STUDENT PARKING PERMIT FEE FROM $40.00 TO $46.00 AND THE BOG WAIVER PERMIT FROM $20.00 TO $26.00.**

The Governing Board hereby approves the adoption of $46.00 student parking permit fee effective Fall 2018 for the San Marcos and Escondido campus locations and effective June 2019 for the Rancho Bernardo and Fallbrook locations.

**EXHIBIT N-13**

14.  **RECOMMENDATION: ACTION – CALL FOR SPECIAL MEETING OF THE GOVERNING BOARD ON JUNE 26, 2018.**

**O.**    <u>**BOARD REQUESTS FOR REPORTS**</u>

The Governing Board hereby requests that the District provide for it a report, agenda item, or general information at a later date as follows: _____.

**P.**    <u>**RECESS TO CLOSED SESSION**</u>: *If needed, for further discussion of items as listed in section D. The Board will recess to Room A-1.*

**Q.**    <u>**RECONVENE TO OPEN SESSION**</u>: *If needed. The Board will reconvene to Open Session outside Room A-1 in accordance with GC 54957.7(c). Actions Taken In Closed Session: (The Governing Board President shall report the overall action and if unanimous; otherwise, the individual votes of each trustee.)*

**R.**    <u>**ADJOURNMENT**</u>

# EXHIBIT C



**PALOMAR COLLEGE®**
Learning for Success

1140 West Mission Road, San Marcos, California 92069-1487 • 760-744-1150 • www.palomar.edu

<u>**PERSONAL AND CONFIDENTIAL**</u>

<u>**DELIVERY VIA EMAIL AND REGULAR U.S. MAIL**</u>

June 11, 2018

Kathryn Kailikole
1145 Festival Ave.
San Marcos, CA 92078

Dear Dr. Kailikole:

**RE: 24-Hour Notice Pursuant to Government Code § 54957**

This letter constitutes formal notice that the Governing Board of the Palomar Community College District ("District") will consider, pursuant to Education Code § 72411 and Section 14 of your employment contract, whether to terminate your employment as Dean, Instructional, Mathematics and the Natural Sciences.

The possible action is scheduled to take place during a closed session of the Governing Board on June 11, 2018 at approximately 5:00 p.m. at the District's Governing Board room, SSC-1, Student Services Building, located at 1140 West Mission Rd., San Marcos, California, 92069.

Pursuant to Government Code § 54957, you may request that the matter be heard in an open session rather than a closed session. If you want the matter to be heard in an open session rather than a closed session, you must make this request in writing to me so that I actually receive it no later than June 12, 2018, at 10:00 a.m. At either a closed session or an open session, you and/or your representative will have the opportunity to present any oral or written statements and any other information that you believe appropriate; however, the session will not be a formal evidentiary hearing within the meaning of the California Code of Civil Procedure § 1094.5.

If you have any questions, please contact me.

Sincerely,

Lisa Norman, Ed.D., J.D.
Assistant Superintendent/Vice President, Human Resource Services
PALOMAR COMMUNITY COLLEGE DISTRICT

**EXHIBIT D**



**APPROVED 7/10/2018**
**GOVERNING BOARD MINUTES**
**MEETING OF THE GOVERNING BOARD**
**TUESDAY, JUNE 12, 2018**
**PALOMAR COMMUNITY COLLEGE DISTRICT**
**ROOM SSC-1, SAN MARCOS CAMPUS**
**1140 W. MISSION RD., SAN MARCOS, CALIFORNIA**

A.   **CALL MEETING TO ORDER**

Board President Paul McNamara called the meeting to order at 4:00 p.m. in SSC-1.

B.   **ROLL CALL**

**PRESENT**
PAUL P. MCNAMARA, PRESIDENT
JOHN HALCÓN, VICE PRESIDENT
MARK R. EVILSIZER, SECRETARY
NINA DEERFIELD, TRUSTEE
NANCY ANN HENSCH, TRUSTEE
AMBER BANCROFT, STUDENT TRUSTEE (arrived 5:00 pm)

**ABSENT**
NONE

C.   **PUBLIC COMMENTS** There were none.

D.   **RECESS TO CLOSED SESSION** The Board recessed to closed session in room A-1 at 4:00 p.m.

E.   **RECONVENE TO OPEN SESSION** The Board reconvened to open session in SSC-1 at 5:42 p.m. All trustees present.

1.   Reporting of actions(s) taken in Closed Session. Board President McNamara reported there were three reportable actions taken in closed session as follows:

   - By unanimous vote, the Board took action to approve the Final Settlement Agreement with Release of all Claims between the District and employee #007560785.

   - By unanimous vote, the Board took action to approve the Final Settlement Agreement with Release of all Claims between the District and employee #004201742.

   - The Board took final action by unanimous vote to terminate employee number # 009482406 effective June 12, 2018.

2.   Presentation: 2018 NAACP Salute To Women of Color Distinguished Woman Award. Representatives from the North San Diego County NAACP: Satia Austin, Kelley Gillespie, Inez Williams and Stephen Davis attended the meeting and presented an award to Dr. Blake.

3.   Following the Pledge of Allegiance the meeting continued.

4.   Board President McNamara Administered Oath of Office to incoming Student Trustee, Amber Bancroft, and to newly hired Police Officers: Daniel Lopez, Gerald Rabidou and Mark Lynch.

5.   Call for Removal of Items from – or Changes to – the Agenda. There were none.

# EXHIBIT E



**PALOMAR COLLEGE®**
Learning for Success          1140 West Mission Road, San Marcos, California 92069-1487 • 760-744-1150 • www.palomar.edu

June 13, 2018

**PERSONAL AND CONFIDENTIAL**

**BY EMAIL AND U.S. MAIL**

Kathryn Kailikole
1145 Festival Ave.
San Marcos, CA 92078

**Re:  Termination of Employment**

Dear Dr. Kailikole:

This letter is to notify you that the Governing Board of the Palomar Community College District took official action on June 12, 2018, to terminate you from your position as Dean, Instructional, of Mathematics and the Natural and Health Sciences, pursuant to Section 15 of the Administrative Association Handbook and the Notice of Proposed Disciplinary Action (Termination) provided to you on May 2, 2018 ("Notice").

The Notice advised you of your right to attend an informal pre-disciplinary Skelly conference with Ron Ballesteros-Perez, Assistant Superintendent/Vice President, Finance and Administrative Services, prior to the imposition of the disciplinary action. As you did not confirm or attend the meeting with Mr. Ballesteros-Perez, you waived your right to a pre-disciplinary (Skelly) meeting regarding your proposed termination. After reviewing the Notice of Proposed Disciplinary Action and its attachments, Mr. Ballesteros-Perez recommended to uphold your termination.

The Notice also advised you of your right, upon written request, to an evidentiary hearing pursuant to Section 15 of the Administrative Association Handbook. The Notice specifically informed you that your request for an evidentiary hearing was required to be made in writing within ten (10) workdays days from receipt of the Notice and that no hearing would be held unless a written request for hearing was timely submitted to the District.  You did not request a hearing, and therefore waived your right to an evidentiary hearing. Accordingly, the termination of your employment, effective June 13, 2018, is final.

Respectfully,

Lisa Norman, Ed.D., J.D.
Assistant Superintendent/Vice President, Human Resource Services
PALOMAR COMMUNITY COLLEGE DISTRICT

1

## CERTIFICATE OF SERVICE

2

I, the undersigned, am employed in the County of San Diego, State of California. I am over the age of 18 and not a party to the within action; am employed with the law offices of Fisher & Phillips LLP and my business address is 4747 Executive Drive, Suite 1000, San Diego, California, 92121.

3

4

On February 1, 2019 I served the foregoing document entitled **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT PALOMAR COMMUNITY COLLEGE DISTRICT'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT PURSUANT TO F.R.C.P. 12(B) AND 12(B)(6)** on all the appearing and/or interested parties in this action by placing ☐ *the original* ☒ *a true copy* thereof enclosed in sealed envelope(s) addressed as follows:

5

6

7

8

9

Evan Dwin
DWIN LEGAL, APC
2121 Palomar Airport Road, Suite 170
Carlsbad, CA 92011

Telephone: (760) 536-6471
Facsimile: (760) 585-4649
E-Mail: EDwin@DwinLegal.com
Attorneys for Plaintiff
Kathryn Kailikole

10

11

☒  **[by ELECTRONIC SUBMISSION]** - I served the above listed document(s) described via the United States District Court's Electronic Filing Program on the designated recipients via electronic transmission through the CM/ECF system on the Court's website. The Court's CM/ECF system will generate a Notice of Electronic Filing (NEF) to the filing party, the assigned judge, and any registered users in the case. The NEF will constitute service of the document(s). Registration as a CM/ECF user constitutes consent to electronic service through the court's transmission facilities.

12

13

14

15

16

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

17

18

Executed February 1, 2019 at San Diego, California.

19

Angela D. Mastin                    By: _Angela D Mastin_

20

21

22

23

24

25

26

27

28

1
CERTIFICATE OF SERVICE