1
2
3
4
5
6
7
8

**DWIN LEGAL, APC**
Evan Dwin (SBN 241027)
2121 Palomar Airport Road, Suite 170
Carlsbad, CA 92011
Tel: (760) 536-6471
Fax: (760) 585-4649
Email: edwin@dwinlegal.com

Attorneys for Plaintiff
KATHRYN KAILIKOLE

9

## UNITED STATES DISTRICT COURT

10

## SOUTHERN DISTRICT OF CALIFORNIA

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| KATHRYN KAILIKOLE, an individual,<br><br>        Plaintiff,<br><br>   v.<br><br>PALOMAR COMMUNITY COLLEGE DISTRICT, a governmental entity; and DOES 1 through 25, inclusive,<br><br>        Defendants. | Case No: 3:18-cv-02877-AJB-MSB<br><br>**DECLARATION OF PLAINTIFF KATHRYN KAILIKOLE IN SUPPORT OF OPPOSITION TO DEFENDANT PALOMAR COMMUNITY COLLEGE DISTRICT'S SPECIAL MOTION TO STRIKE PLAINTIFF'S FIRST AMENDED COMPLAINT**<br><br>**DATE: June 20, 2019**<br>**TIME: 2:00 p.m.**<br>**PLACE: Courtroom 4A** |

1

DECLARATION OF PLAINTIFF KATHRYN KAILIKOLE IN SUPPORT OF OPPOSITION
TO SPECIAL MOTION TO STRIKE

I, Kathryn Kailikole, hereby declare and state as follows:

1.    I am over the age of eighteen and have personal knowledge of the matters contained herein.   If called as a witness, I could and would testify competently to the matters set forth in this Declaration.  I make this Declaration in support of Plaintiff's Opposition to Defendant Palomar Community College District's Special Motion to Strike Plaintiff's First Amended Complaint.

2.    On January 13, 2016, I was hired as Interim Dean of the Mathematics and the Natural and Health Sciences Division ("MNHS") at Palomar College.  Attached hereto as **Exhibit 1** is a true and correct copy of my Employment Contract for the position Interim Dean, Instructional, of the MNHS Division, dated January 13, 2016.

3.    On April 28, 2017, my supervisor at the time, Daniel Sourbeer ("Sourbeer"), Vice-President of Instruction, gave me a superlative performance review.  Attached hereto as **Exhibit 2** is a true and correct copy of the review by Sourbeer.  In the review, among other things, Sourbeer states that I am an "excellent communicator," that my "grant writing and management" are "superior," that I am "a fierce advocate for students" and that I have an "excellent understanding of budgets and how to use them."

4.    As a result of my excellent performance as Interim Dean, the District promoted me to Dean of the MNHS Division.  Attached hereto as **Exhibit 3** is a true and correct copy of my Employment Contract for the position of Dean of the MNHS Division.

5.    As an academic dean, I was responsible for administering the instructional program in my division.  I was not a compliance or human resources officer.  There are separate departments, such as the Equal Opportunity and Compliance Office ("EEO Office") and Human Resources, that enforce compliance with anti-discrimination laws.

2

DECLARATION OF PLAINTIFF KATHRYN KAILIKOLE IN SUPPORT OF OPPOSITION
TO SPECIAL MOTION TO STRIKE

6.     On May 8, 2017, I was in a meeting and started to feel like I was suffering from a heart attack. I immediately went to urgent care for treatment where it was determined that I suffered a panic attack. I was diagnosed with anxiety which causes me to suffer feelings of being overwhelmed, helpless and nervous as well as dizziness, vertigo and insomnia. My anxiety and its symptoms make it more difficult for me to engage in mental, physical and social activities as well as working. Attached hereto as **Exhibit 4** is a true and correct copy of my Medical Report and Diagnosis dated May 8, 2017 and records from follow-up appointments.

7.     In May of 2017, a professor in the Physics and Engineering Department, Dr. Daniel Finkenthal ("Finkenthal"), reported to me that a student complained about materials posted in labs used by Professors Takashi Nakajima ("Nakajima") and Arthur Gerwig ("Gerwig"). On behalf of the students, I reported the postings to Shawna Cohen, the Manager of EEO and Deputy Title IX Coordinator. The postings included:

- A recitation of a mnemonic device stating: "Black Boys Rape Our Young Girls But Violet Gives Willingly Get Some Now."
- A posting entitled "Vogue May Edition" portraying a student lying on the hood of a pickup truck holding a drawing of a penis.
- A posting portraying a latino student named Juan which stated "2017 you know you juant me?/Hello Ladies" as a racist play on Juan's name.
- A sexually harassing and racist posting which stated "Dick got her like" which was accompanied by a hashtag remark of "#black cock slut."

8.     I reported the sexist and racist postings to the EEO and Title IX Office because it is that department's responsibility to investigate discrimination and ensure compliance with anti-discrimination laws and policies. I made the report to complain about the racist and sexist conduct taking place in the lab and to advocate

3

1   for students, staff and faculty.  I hoped that the District would investigate and take

2   appropriate action to ensure an academic environment free from discrimination and

3   harassment.

4         9.    On June 28, 2017, the Title IX Office began an investigation of my

5   complaint about the racist and sexist postings in Nakajima and Gerwig's lab.  I was

6   interviewed as a witness in the investigation, which was conducted by an outside

7   attorney, Jeffrey Love ("Love").  The investigation was still pending when the

8   school year began in late August of 2017.

9         10.   On November 1, 2017, nearly five months after I initially complained

10   about the racist and sexist postings in the physics lab, the District concluded its

11   investigation.  The District found that Nakajima and Gerwig displayed the racist

12   and sexist postings themselves or that they allowed or even encouraged others to

13   do so.  I was extremely alarmed by the District's findings and was concerned for

14   the safety and well-being of students, faculty and staff who interact with Nakajima

15   and Gerwig and especially female and minority students who take classes with

16   Nakajima and Gerwig.  Attached hereto as **Exhibit 5** is a copy a Confidential

17   Summary of Investigation Report dated November 1, 2017 regarding the

18   investigation of Nakajima and Gerwig.

19         11.   After the District determined that Nakajima and Gerwig were

20   responsible for the racist and sexually explicit postings, I approached Dr. Lisa

21   Norman ("Norman"), the Assistant Superintendent/Vice-President of Human

22   Resources and suggested the District should terminate Nakajima and Gerwig.

23   Norman refused to pursue terminating Nakajima and Gerwig, claiming that the

24   offense did not merit harming their careers and livelihood.  I was shocked by

25   Norman's indifference to the severity of Nakajima and Gerwig's conduct and was

26   equally shocked by her desire to protect them.

27         12.   On or about November 27, 2017, Finkenthal informed me of

28

<div align="center">4</div>

complaints about Nakajima's and Gerwig's classroom practices, which I forwarded to Norman. Given Nakajima and Gerwig's history, including their discriminatory and harassing postings in the lab, I requested that Nakajima and Gerwig be removed from the classroom. Norman refused to take any action, but "highly recommended" that Finkenthal and I "observe" Nakajima and Gerwig.

13.   The District cut off my access to my e-mails on or about December 14, 2017. However, in support of its special motion to strike, the District included copies of the November 27, 2017 e-mail exchange in which Norman requested that I involve Finkenthal in observing Nakajima and Gerwig. For reference, attached hereto as **Exhibit 6** copy of pages 248-252 to Exhibit A to Dr. Kahn's declaration. Starting near the bottom of the first page of Exhibit 6 is a copy the e-mail chain wherein Norman refused to take any action on my request to remove Nakajima and Gerwig from the classroom and recommended that I enlist Finkenthal in observing Nakajima and Gerwig.

14.   In December 2017, consistent with Norman's directive and Finkenthal's role as Department Chair, I forwarded Finkenthal an e-mail from around April 2016 regarding a report from a student that Nakajima was using an airsoft gun in an unsafe manner as part of a lab.

15.   When the airsoft incident occurred in April 2016, two students came to my office to report it but I was in a meeting so they spoke to my assistant, Debbie McBrayer. Ms. McBrayer called the Campus Police. When I arrived at the office, Ms. McBrayer was upset because she felt that her report was not taken seriously. I then called the Police and insisted that they come back to my office, at which point I provided them with a copy of a policy restricting the use of firearms in the classroom. The Police were responsive to my concerns and conducted a further investigation. The Police determined that Nakajima should have obtained approval from the police before using of the gun. In addition to requesting that the Campus

DECLARATION OF PLAINTIFF KATHRYN KAILIKOLE IN SUPPORT OF OPPOSITION
TO SPECIAL MOTION TO STRIKE

1   Police investigate the matter and providing the Police with the applicable firearm
2   policy, I also reported the incident to Sourbeer, who was my supervisor at the time.
3   The Police determined that the use of the gun should have been approved by the
4   Chief of Police.  Accordingly, I instructed Nakajima to stop using the gun.  He
5   agreed and I received no more complaints or reports about anyone using a gun in
6   any classroom or lab.  The District attached the Police Report from the airsoft gun
7   incident to Dr. Kahn's Declaration in support of its special motion to strike.  For
8   reference, I have attached the same to this Declaration as **Exhibit 7**.

9       16.    The reason that I forwarded the e-mail about the gun incident to
10  Finkenthal in December of 2017 was so Finkenthal could confirm that Nakajima
11  followed the prior directive not to use the airsoft gun.  In fact, after Norman directed
12  me to enlist Finkenthal in observing Nakajima and Gerwig, I contacted Finkenthal
13  to tell him about the airsoft gun incident and to make sure it was not being used
14  any more.  Finkenthal said he did not think a gun was being used and requested
15  further information so he could check on it.  Accordingly, I forwarded him the e-
16  mail about the incident.  There was nothing improper about me providing this
17  information to Finkenthal, who was the Chair of the Department, particularly when
18  Norman had just instructed me to enlist Finkenthal in observing Nakajima and
19  Gerwig's practices in the classroom.

20      17.    On or about December 4, 2017, I met with my supervisor, Dr. Jack
21  Kahn ("Kahn").  I discussed my anxiety with Khan and expressed concern about
22  my overwhelming workload, which included duties that are not part of a dean's
23  job.   I told Kahn about my anxiety because I was seeking an appropriate
24  accommodation.  Kahn assured me that I was a valued member of the team and that
25  he would provide me with whatever support I needed and that he looked forward
26  to continuing to work with me.  Kahn also confirmed that he was aware of my
27  "medical concerns."  At no point in that meeting did Kahn mention that he was

28

DECLARATION OF PLAINTIFF KATHRYN KAILIKOLE IN SUPPORT OF OPPOSITION
TO SPECIAL MOTION TO STRIKE

considering any discipline against me for any reason and he certainly did not mention that I might be terminated.

18.     On December 12, 2017, despite the finding that they engaged in gross acts of discrimination and harassment in the classroom, the District placed Nakajima and Gerwig on unpaid leave for only one month.

19.     On December 14, 2017 the District suddenly placed me on paid leave. I was escorted out of my office, cut off from my e-mail account and instructed not to speak with anyone at the College.  I was extremely confused and shocked by this action by the District.  I requested to know why I was being placed on leave, but the District refused to provide me with an explanation except that there was a purported "breach of confidential information."  I had no idea why I was accused of breaching any purported confidentiality obligations and I have never breached any confidentiality obligations.  Attached hereto as **Exhibit 8** is a true and correct copy of the memorandum the District sent me on December 14, 2017 advising me that I was being placed on leave.

20.     On February 22, 2018, the District sent me a letter acknowledging that my counsel indicated to it that I believed the decision to place me on leave was in retaliation for reporting Nakajima's and Gerwig's harassing and discriminatory conduct in the lab.  The letter advised me of my right to either file a formal complaint with the District or to pursue my claims with the DFEH or EEOC.  The letter also advised me that "District policy and applicable law prohibit retaliation against any employee for filing a complaint of unlawful discrimination/harassment and/or for participating in any manner in an investigation thereof."  Attached hereto as **Exhibit 9** is a true and correct copy of the District's Letter dated February 22, 2018.

21.     Four days later, on February 26, 2018, the District notified me that the Board was considering non-renewing my contract.  Attached hereto as **Exhibit 10**

7

1   is a true and correct copy of the Notice of Proposed Non-Renewal dated February

2   26, 2018. The next day, the District decided, in a closed meeting, to non-renew my

3   contract which it later announced in an open meeting. The District did not provide

4   any reason or explanation for non-renewing my contract. Attached as **Exhibit 11**

5   is a true and correct copy of the Notice of Non-Renewal dated February 28, 2018

6           22.     The day after my contract was non-renewed, I was interviewed by

7   Love.   The District did not provide me with any documents or information

8   regarding the investigation before my interview with Love.

9           23.     Love interviewed me about, among other things, the incident in

10  April 2016 where Nakajima used an airsoft gun in the classroom. I also confirmed

11  that I forwarded an e-mail about the incident to Finkenthal, which was entirely

12  proper.   Love asked me whether I ever agreed with Finkenthal to forward the

13  information about the airsoft gun incident to his wife or the District Board. I did

14  not ever agree with Finkenthal that he should forward any e-mail about the gun

15  incident, or any other e-mail or information, to anyone. Accordingly, I informed

16  Love that I never made any such agreement with Finkenthal and that Finkenthal

17  never indicated to me that he planned to share the information with anyone. I am

18  aware that the District claims that Finkenthal later forwarded the e-mail about the

19  gun incident to his wife. I had no idea that Finkenthal forwarded any of my e-mails

20  to his wife and I certainly did not ask him to do so.

21          24.     On March 4, 2018, I was informed that Kahn told faculty members

22  that I was not returning. I found this strange because the purported investigation

23  of me was still pending and I had not been informed that any discipline against me

24  was in any way being considered.  It also seemed odd that I was placed on

25  administrative leave pending an investigation of a purported "confidentiality issue"

26  after the District refused to place Nakajima and Gerwig on leave while they were

27  being investigated for making racist and sexist postings in the physics lab.

28

DECLARATION OF PLAINTIFF KATHRYN KAILIKOLE IN SUPPORT OF OPPOSITION
TO SPECIAL MOTION TO STRIKE

25.     On May 2, 2018, I was informed through a Notice of Recommended Termination that Dr. Kahn recommended my termination.   The Notice of Recommended Termination included an Investigative Report by Love, a number of e-mails, and letters sent to me by Dr. Kahn.  The District contends in its special motion to strike that the e-mails and letters attached to the Notice of Recommended Termination relate to purported issues with my job performance.  These alleged e-mails and letters were not discussed with me as a potential ground for discipline prior me receiving the May 2, 2018 Notice of Recommended Termination.  Further, the District never told that it considered any alleged performance issues when it decided to place me on paid leave and non-renew my contract.

26.     On June 13, 2018, the District terminated my employment.

I declare under penalty of perjury under the laws of the United States of America and California that the foregoing is true and correct.

Executed this 16th day of April 2019 in Carlsbad, California.

Kathryn Kailikole

9

DECLARATION OF PLAINTIFF KATHRYN KAILIKOLE IN SUPPORT OF OPPOSITION TO SPECIAL MOTION TO STRIKE

# INDEX OF EXHIBITS

| Ex. | Pages | Description |
|-----|-------|-------------|
| 1 | 1-9 | Employment Contract for the position Interim Dean, Instructional, of the MNHS Division, dated January 13, 2016. |
| 2 | 10-17 | Palomar College District Administrative Employee's Evaluation Form dated April 28, 2017. |
| 3 | 18-25 | Employment Contract for the position of Dean of the MNHS Division dated April 2017. |
| 4 | 26-37 | Medical Report and Diagnosis dated May 8, 2017 and records from follow up appointments. |
| 5 | 38-51 | Confidential Summary of Investigative Report dated November 1, 2017. |
| 6 | 52-57 | Documents including November 27, 2017 e-mail chain including an e-mail from Dr. Daniel Finkenthal to Dr. Kathryn Kailikole, an e-mail from Dr. Kathryn Kailikole to Dr. Lisa Norman and Dr. Jack Kahn and an e-mail from Dr. Lisa Norman to Dr. Kathryn Kailikole. |
| 7 | 58-65 | Palomar College Police Department Report dated April 21, 2016. |
| 8 | 66-67 | District Memorandum dated December 14, 2017. |
| 9 | 68-70 | Letter from the District dated February 22, 2018. |
| 10 | 71-72 | Notice of Proposed Non-Renewal dated February 28, 2018. |
| 11 | 73-74 | Notice of Non-Renewal Dated February 28, 2018. |

10

DECLARATION OF PLAINTIFF KATHRYN KAILIKOLE IN SUPPORT OF OPPOSITION TO SPECIAL MOTION TO STRIKE

# EXHIBIT 1

# PALOMAR COMMUNITY COLLEGE DISTRICT
## INTERIM EDUCATIONAL ADMINISTRATOR,
## EMPLOYMENT CONTRACT

This employment contract (hereinafter referred to as the "Agreement") is made and entered into this 13th day January of by and between the Governing Board of the Palomar Community College District (hereinafter referred to as the "Board" and "District") and **Kathryn Kailikole** (hereinafter referred to as the "Employee").

**WHEREAS** it is the desire of the Board to employ Employee in the Position of **Interim Dean, Instructional, Mathematics and the Natural and Health Sciences**(hereinafter referred to as "Position").

**NOW, THEREFORE,** the parties mutually agree as follows:

1.   **EMPLOYMENT.**  The Board hereby offers to employ Employee in the above identified Position on the conditions contained in this Agreement.  Employee is a member of the Administrative Team as described in the Administrative Team Handbook adopted by the Board, an academic employee as defined by Education Code section 87001(a), an educational administrator as defined in Education Code section 87002(b), and a management employee as defined by Government Code section 3540.1(g).   The Employee and the Board agree that this Agreement is not binding or enforceable unless it is ratified by the Board in open session at a regular meeting of the Board.

2.   **STATUTORY AUTHORIZATION AND EXTENSION.**  This Agreement is a contract of employment entered into pursuant to Education Code section 72411(d).   Employee understands upon Employee's execution of this Agreement and its adoption by the Board, this Agreement is an assignment to an acting Position, and Employee shall have no continuing rights to the Position unless Employee is selected for the Position on a regular basis in an open recruitment, or unless the term of agreement is extended for up to an additional one (1) year and six (6) months term by mutual agreement.  Employee further understands that Position terminates upon the expiration of this Agreement unless or as extended, provided that Employee is not terminated for cause and/or material and substantial breach of this Agreement as such terms are defined in paragraph 13 herein.

3.   **TERM.**  The term of this Agreement will begin on January 13, 2016, and continues through and including June 30, 2016. Employee shall be required to render full and regular service to the District during the period covered by this Agreement.  This Agreement shall be renewable or extended only by mutual, written agreement of the parties as set forth in paragraph 2 above.  In no event shall this Agreement be interpreted in any way to authorize a renewal or extension of this Agreement for an additional term of more than one (1) year and six (6) months pursuant to Title 5, California Code of Regulations section 53021(c)(7). Employee further understands that Position terminates when the Position is filled on a permanent basis or upon the expiration of this Agreement, unless it is extended or the Employee is terminated for cause and/or material and substantial breach of this Agreement as such terms are defined in paragraph 13 herein.

Exhibit 1
P. 1

4. **SALARY.** Employee shall be compensated in accordance with the Administrative Salary Schedule as established, approved and revised from time to time by the Board, at Salary **Grade 75/2, plus an administrative doctoral stipend** from January 13, 2016 through June 30, 2016. The Board reserves the right to increase or decrease the schedule including across the board salary reduction or furloughs on the same basis and for the same time as faculty bargaining unit reductions. Any actions to modify the salary schedule shall not be interpreted as a new Agreement for employment or renewal or extension of this Agreement. The Board reserves the right to increase the Employee's salary. However, any action to increase the salary of the Employee shall not be interpreted as a new Agreement for employment or a renewal or extension of this Agreement.

5. **DUTIES.** Employee will perform the duties of the above Position as set forth in any Position description adopted by the Board, and all other duties as shall be assigned or required by the Superintendent/President, or designee, provided that such additional duties shall be consistent with Employee's Position. The Board may adopt or amend the Position description for the Employee's Position at any time as long as the modifications are not inconsistent with the terms of the Agreement. The Board reserves the right to reassign the Employee at any time during the term of this Agreement to another educational or student services administrative Position within the District. Reassignment during the term of this Agreement solely for discretionary reasons will not result in a reduction of the Employee's compensation during the term of this Agreement. Reassignment will be made in compliance with the California Education Code and the Administrative Handbook.

6. **EXCLUSION FROM OVERTIME PROVISIONS.** Employee shall be exempt from the minimum wage and overtime provisions of the Fair Labor Standards Act and the California Education Code, and shall not be entitled to compensatory time off.

7. **VACATION AND SICK LEAVE.** Employee is entitled to accrue twenty-four (24) working days of vacation annually in accordance with the Administrative Vacation Policy set forth in the Administrative Team Handbook as adopted by the Board. Vacation days are exclusive of holidays otherwise granted to twelve (12) month regular administrative employees of the District. Employee is entitled to accrue twelve (12) days of paid sick leave for illness or injury. Employee is eligible for any leaves authorized by law or provided in the Administrative Association Handbook as adopted by the Board

8. **FRINGE BENEFITS.** Employee shall be afforded all fringe benefits of employment which are provided to the District's regular educational and student services administrators for which they are eligible under the terms of the Administrative Team Handbook.

9. **TRAVEL.** Reasonable and necessary transportation and travel expenses will be provided in accordance with policies duly adopted by the Board.

10. **SERVICE CLUBS AND COMMUNITY ORGANIZATIONS.** The Board authorizes payment of dues and meals for meetings of one service or community organization. Funds

shall be allocated to the appropriate expense accounts in the annual budget approved by the Governing Board.

11. **APPLICABLE LAW.** This Agreement is subject to all applicable laws of the State of California, the rules and regulations of the State Board of Governors, and the rules, regulations, and policies of the Board, all of which are made a part of the terms and conditions of this Agreement as though set forth herein, to the extent that such terms are not inconsistent with the lawful terms of this Agreement.

12. **MAXIMUM CASH SETTLEMENT UPON TERMINATION OF THIS AGREEMENT WITHOUT CAUSE.** Regardless of the term of this Agreement, the Board may terminate this Agreement at any time prior to the date on which the term of this Agreement would have otherwise expired, without cause. In such an event, the maximum cash settlement that the Employee shall receive will be an amount equal to the monthly base salary of the Employee multiplied by the number of months remaining on the unexpired term of this Agreement minus any amount(s) that could have been earned if the Employee has retreat rights, and an instructional Position is offered for the balance of the term of this Agreement. Any cash settlement shall not include any other noncash items except health benefits, which may be continued for the same duration of time as covered in the settlement, or until Employee finds other employment, whichever occurs first. The intent of this provision is to satisfy the requirements of Government Code sections 53260-53264, and this provision shall be interpreted in a manner consistent with those statutes.

The District agrees to pay Employee the lump sum cash payment ("Severance Pay"), less legally required for authorized deductions except contributions to CalSTRS, within fifteen (15) days of the effective date of termination.

In exchange for and as a condition to receipt of the Severance Pay, Employee shall execute a release and waiver, in a form acceptable to the legal counsel for the District, releasing the District, and all of its elected officers, employees, agents, representations, and attorneys, from any claim associated with the termination.

13. **TERMINATION OF THIS AGREEMENT DURING ITS TERM WITH CAUSE.** The Board may terminate this Agreement during its term and discharge Employee if Employee commits a material and substantial breach of this Agreement and/or for cause. Such breach of Agreement and discharge shall nullify the terms of this Agreement and Employee shall cease to receive any form of compensation upon the effective date of termination. The term "cause" is defined as those actions, omissions, or behaviors which are detrimental to the operations of the District and/or its major instructional, student and administrative divisions, or which impair the District's mission, purpose, or objectives. Conduct which constitutes a breach of contract and cause for discharge, includes, but is not limited to: unsatisfactory work performance, dishonesty, misconduct, unprofessional conduct, or insubordination. Disciplinary actions, up to and including discharge from employment, shall be carried out in compliance with the disciplinary provisions applicable

to administrative employees as set forth in the Administrative Team Handbook as adopted by the Board.

14.   **PROVISIONS OF GOVERNMENT CODE SECTIONS 53243.3-53243.4.**

(a)   In the event that the District provides paid leave to Employee pending an investigation of a crime involving abuse of his office or position covered by Government Code section 53243.4, and should that investigation lead to a conviction, the Employee shall fully reimburse District for any salary provided for that purpose.

(b)   In the event that the District provides funds for the legal criminal defense of Employee pending an investigation of a crime involving an abuse of his office or position covered by Government Code section 53243.4, and should that investigation lead to a conviction, the Employee shall fully reimburse the District for any funds provided for that purpose.

(c)   In the event that the District provides a cash settlement related to the termination of Employee as defined in the terms of this Agreement and Employee subsequently is convicted of a crime involving abuse of office or position covered by Government Code section 53243.4, Employee shall fully reimburse the District for any funds provided for that purpose.

(d)   "Abuse of office or position" is defined in Government Code section 53243.4 to mean either of the following:

(i)   An abuse of public authority, including, but not limited to, waste, fraud, and violation of the law under color of authority.

(ii)   A crime against public justice, including, but not limited to, a crime described in Title 5 (commencing with Section 67), Title 6 (commencing with Section 85) or Title 7 (commencing with Section 92) of Part 1 of the Penal Code.

15.   **MODIFICATION OF CONTRACT.** This Agreement may be modified by mutual consent of the parties provided, however, that the party seeking such change shall give not less than 45 (forty-five) calendar days, written notice to the other party of the requested modification.

16.   **RESIGNATION.** Employee may resign from employment at any time during the term of this Agreement upon ninety (90) days prior written notice to the Board or upon a shorter period of time if approved by the Board.

17.   **SAVINGS CLAUSE.** If any provision of this Agreement is held to be contrary to law by a court of competent jurisdiction, such provision shall not be deemed valid or binding except

Exhibit 1
P. 4

to the extent permitted by law, but all other provisions shall continue to remain in full force and effect.

18. **ENTIRE AGREEMENT.** This Agreement contains and expresses the entire and final agreement of the parties with respect to the matters covered herein, and supersedes all negotiations, prior discussions, prior agreements and preliminary agreements between the parties. No promises or representations, express or implied, concerning this Agreement have been made by the parties other than those contained in this Agreement concerning the offer and acceptance of employment described herein.

19. **NO CONTINUING WAIVER.** No waiver of any term or condition of this Agreement by either party shall be deemed a continuing waiver of such term and condition.

20. **GOVERNING LAW.** This Agreement is delivered in the State of California, concerns employment in the State of California, and the rights and obligations of the parties hereto shall be construed and enforced in accordance with the laws of the State of California.

21. **MISCELLANEOUS PROVISIONS.** This Agreement and applicable provisions of the Administrative Team Handbook contain the entire agreement and understanding between the parties. There are no oral understandings, or terms and conditions not contained or referenced in this Agreement. This Agreement cannot be changed orally. It may be modified in writing by mutual agreement of the parties as set forth above. This Agreement supersedes all Board Policies, rules, regulations, handbooks or practices which are inconsistent with or in conflict with this Agreement.

Exhibit 1
P. 5

**ACCEPTANCE OF INTERIM EDUCATIONAL ADMINISTATOR**
**EMPLOYMENT CONTRACT**

I have reviewed this Interim Educational Administrator Employment Contract, and I accept this Agreement and the terms and conditions of employment it contains. I have not agreed to employment and/or contracted for employment with the governing board of any other school, university, college, or community college district which will in any way conflict with the satisfactory performance of all of the duties of the Position for which employed.

Please return signed contract to Human Resource Services as soon as possible.

Date: 1-13-2016

Kathryn Kailikole

Approved by the Governing Board of Palomar Community College District in open session at regular Board meeting.

Date: 2/2/16                    By:

Adrian Gonzales, Secretary to the
Governing Board

Copy: Employee

2623-024719-0001
8583065 I a01-04/16

-6-

Kailikole, Kathryn 1.12.16

Exhibit 1
P. 6

EXHIBIT J-7

## PALOMAR COMMUNITY COLLEGE DISTRICT
## INTERIM EDUCATIONAL ADMINISTRATOR
## FIRST AMENDMENT TO EMPLOYMENT CONTRACT

This First Amendment to Employment Contract (hereinafter referred to as the "First Amendment") is made and entered into this tenth day of May, 2016 of by and between the Governing Board of the Palomar Community College District (hereinafter referred to as the "Board" and "District") and **Kathryn Kailikole** (hereinafter referred to as the "Employee").

**WHEREAS,** Board and Employee entered into an initial employment contract ("Original Agreement") with a term of January 13, 2016 through and including June 30, 2016; and

**WHEREAS,** it is the desire of the Board to continue to employ Employee in the Position of **Interim Dean, Instructional, Mathematics and the Natural and Health Sciences** (hereinafter referred to as "Position").

**NOW, THEREFORE,** the parties mutually agree as follows:

1.　　**TERM.**　The term of this First Amendment shall begin on July 1, 2016, and continue through and including June 30, 2017.

2.　　**SALARY.**　Employee shall be compensated in accordance with the Administrative Salary Schedule established and approved by the Board, at step 3 of salary grade 75, plus a $114.23 monthly doctoral stipend for earned doctorate.

3.　　**NO CHANGES TO OTHER TERMS AND CONDITIONS.**　All other terms and conditions of Employee's Original Agreement remain in full force and effect for the term of this First Amendment, unless otherwise terminated or modified in accordanace with the terms of the Original Agreement.



Kailikole, Kathryn 5.10.16

Exhibit 1
P. 7

**ACCEPTANCE OF**
**INTERIM EDUCATIONAL ADMINISTRATOR**
**FIRST AMENDMENT TO EMPLOYMENT CONTRACT**

I have reviewed this First Amendment to Employment Contract, and I accept this First Amendment and the terms and conditions of employment it contains.  I have not agreed to employment and/or contracted for employment with the governing board of any other school, university, college, or community college district which will in any way conflict with the satisfactory performance of all of the duties of the Position for which employed.

Please return signed contract to Human Resource Services as soon as possible.

Date: __5/20/2016__                    _Kathryn Kaillkole_
                                        Employee Signature

Approved by the Governing Board of Palomar Community College District in open session at regular Board meeting.

Date: ___5/31/16___          By: ___Adrian Gonzales___
                                  Adrian Gonzales, Secretary to
                                  the Governing Board

Copy: Employee

2623-024719-0001
0616502.1 a05-03-16

Kailikole, Kathryn 5.10.16

Exhibit 1
P. 8

# EXHIBIT 2

**PALOMAR COLLEGE DISTRICT**
**ADMINISTRATIVE EMPLOYEE'S EVALUATION FORM**

EVALUATION PERIOD: **From** April 27 2016 **TO** April 26 2017

| Employee<br>Kathryn Kailikole | Department<br>Mathematics and the Natural and Health Sciences |
|---|---|
| Title<br>Interim Dean | Evaluator<br>Daniel Sourbeer |

**COMPONENT A:   REVIEW OF PERSONAL GOALS AND OBJECTIVES FOR THE EVALUATION PERIOD (PLEASE ADD ADDITIONAL PAGES IF NEEDED)**

| GOAL/OBJECTIVE | STATUS AS OF REVIEW DATE |
|---|---|
| **Learn about each department in the MNHS Division:** | **I have familiarized myself with each of the departments but feel that I need to spend more time with each department to fully understand how to work with them.** |
| **a) Department course offerings and scheduling practices** | **I feel that I understand the course offerings and scheduling practices but am still trying to understand the history that sometimes seems to be driving the scheduling practices.** |
| **b) Understand department needs and limitations** | **I believe I have a good understanding of most of the departments' needs and limitations.  I have yet to learn CSIS departmental needs and limitations.** |
| **Finish last year of Title III HSI Grant:** | **The Title III grant was completed on time September 1, 2016** |
| **a) Implement STEM CTE Summer Academy** | **The STEM CTE Summer Academy was implemented with 20 high school students and 2 Palomar college students.  The 2017 Summer Academies are based on this academy.** |
| **b) Facilitate completion of final report** | **Worked with Jennifer Patel and Phyllis Sensenig to complete the final report.** |
| **c) Effectively invest remaining funds on infrastructure to enhance STEM instruction** | **Invested remaining funds on Active Learning Classrooms and study spaces.** |
| **Learn Palomar policies, processes and procedures** | **Participate on the Policy and Procedures Committee have become familiar with policies and procedures reviewed in committee.  Also, I have learned others through daily duties.** |

ENTERED
4·28·17

Exhibit 2
P. 1

| Write and submit a Title III HSI proposal | Wrote and submitted the Title III. It did not get funded however the proposal was used to help secure the $2 million Innovation in Higher Education Award. |
|---|---|

**EMPLOYEE'S SIGNATURE:** _Kathryn Kailikole_ **DATE** 4/27/17

**I CONCUR__X__ DO NOT CONCUR_____ WITH THE EMPLOYEE'S REVIEW OF HIS/HER PERSONAL GOALS FOR THE PREVIOUS EVALUATION PERIOD.**

**EVALUATOR'S COMMENTS**

Kathy stepped into the MNHS Interim Dean position with confidence and passion. She has been a fierce advocate for students and has taken on some difficult issues. She works well with her chairs and faculty, understands enrollment management, has tremendous skills in writing and managing grants, and has an unparalleled work ethic. I would like Kathy to engage the other Deans and faculty early on when pursuing grants and look for opportunities to expand our definition of STEM. Kathy has done a wonderful job, is a wonderful addition to our campus, and I expect her to have a long a fulfilling career at Palomar College.

**EVALUATOR'S SIGNATURE:** _____ **DATE** 04/27/17

2

Exhibit 2
P. 2

**PALOMAR COLLEGE DISTRICT**
**ADMINISTRATIVE EMPLOYEE'S EVALUATION FORM**

**EVALUATION TYPE:  PROBATIONARY___    ANNUAL X       OTHER___**
(If "OTHER", please explain.)

**EVALUATION PERIOD:   From** April 27 2016    **TO** April 26 2017

| Employee | Department |
|---|---|
| Kathryn Kailikole | Mathematics and the Natural and Health Sciences |
| Title | Evaluator |
| Interim Dean | Daniel Sourbeer |

**COMPONENT B: PERFORMANCE**

PLEASE ASSESS THE PERFORMANCE OF THE EMPLOYEE IN EACH OF THE FACTORS LISTED. SPECIFIC COMMENTS ARE REQUIRED FOR FACTORS RATED BELOW SATISFACTORY OR WEAK.

1.    **Planning and Organization** – Develops achievable objectives and goals.  Sets logical and effective courses of action.   Makes efficient use of all resources.   Works cooperatively and collaboratively with faculty, staff, and students in situations calling for teamwork.

     ⬜Strong     √Above Satisfactory     ⬜Satisfactory     ⬜Below Satisfactory     ⬜Weak

     Comments: Kathy cannot always meet her deadlines or make meetings on time.  This is largely because there is so much to do and she has taken on so much.

2.    **Leadership Qualities** – Inspires confidence, respect, enthusiasm and cooperation. Performs duties and responsibilities with integrity and high professional standards.  Is accessible for consultation and appointments.

     ⬜Strong     √Above Satisfactory     ⬜Satisfactory     ⬜Below Satisfactory     ⬜Weak

     Comments: Kathy is a natural leader capable of building support for her ideas.  She can be somewhat limited in her focus at times, so I would like her to be more global in her perspective and be sure to keep the other deans aware of her activities.

3



Exhibit 2
P. 3

3.   **Supervisory Skills** – Fosters a consistent, productive work environment, builds morale, counsels, guides and evaluates staff accurately.  Stimulates staff to excel.  Delegates and assigns tasks appropriately. Listens to and considers the points of view of others in establishing supervisory practices.   Functions well in a multicultural environment. Provides opportunities for staff training and professional growth activities.

   :Strong      √Above Satisfactory      ::Satisfactory      :Below Satisfactory      :Weak

   Comments: Morale is high in the division which speaks to ability to work effectively with faculty and staff in her division.

4.   **Oral and Written Communication** – Delivers articulate presentations.   Prepares clear, concise written communication.   Responds promptly to requests for information and assistance.

   √Strong      :Above Satisfactory      ::Satisfactory      :Below Satisfactory      :Weak

   Comments: Kathy is an excellent communicator.  Her contributions towards grant writing and management have been superior.

5.   **Budgeting** – Prepares accurate budget projections. Able to operate effectively within budget allocation. Uses innovative methods to leverage fund allocations.

   √Strong      :Above Satisfactory      ::Satisfactory      :Below Satisfactory      :Weak      :NA

   Comments: Kathy has an excellent understanding of budgets and how to use them.

6.   **Judgment/Decision Making** – Analyzes situations and data and makes appropriate decisions.  Forms objective opinions.  Exercises foresight.  Demonstrates flexibility and resourcefulness.  Relates decisions, activities, goals and objectives to the philosophy and goals of the institution.

   ::Strong      √Above Satisfactory      ::Satisfactory      :Below Satisfactory      :Weak

   Comments: As mentioned above, I would like Kathy to have a larger perspective when she considers her role—beyond MNHS and students.

4



Exhibit 2
P. 4

7.   **Initiative** – Self-motivated.  Able to work independently.  Seeks greater responsibility.

√Strong       ⸱Above Satisfactory       ⸱Satisfactory       ⸱⸱Below Satisfactory       ⸱Weak

Comments: Kathy has a tremendous work ethic and works to exhaustion.  Wrote a funded proposal for $2M in one day.

8.   **Creativity** – Develops and implements new ideas and methods when appropriate.

√Strong       ⸱Above Satisfactory       ⸱Satisfactory       ⸱⸱Below Satisfactory       ⸱Weak

Comments: Kathy has excellent ideas and feels free to voice them.  Not afraid to float non-traditional ideas.

9.   **Attitude** – Committed to college objectives and philosophy.  Represents the college community well.  Is collegial in dealings with others.

√Strong       ⸱Above Satisfactory       ⸱Satisfactory       ⸱⸱Below Satisfactory       ⸱Weak

Comments: Kathy has a very good attitude.  Her student focus can sometimes be viewed as harsh, and she needs to remember to smile when she is stressed.

10.   **Knowledge and Experience** - Knows and follows institutional policies and practices. Solves problems appropriately.  Professional development plan and activities reflect recognition of deficiencies in knowledge and experience and continued growth.

⸱Strong       √Above Satisfactory       ⸱⸱Satisfactory       ⸱Below Satisfactory       ⸱Weak

Comments: Kathy is evolving into a top rate administrator.  She just needs a little more time to experience all that a dean can experience.

11.   **Sensitivity** - Demonstrates interest in developing, utilizing and celebrating the talents of co-workers and team members. Listens to, considers and respects the views of others and provides appropriate feedback. Provides opportunities to fully participate in group decisions.

√Strong       ⸱Above Satisfactory       ⸱Satisfactory       ⸱⸱Below Satisfactory       ⸱Weak

Comments: Her student focus is to be commended.  Their welfare is always in her thoughts, and she is also appreciative of the commitments and work of staff and faculty.



Exhibit 2
P. 5

**12.** **Relationships With Other College Groups** – Collects and uses input from others when making decisions.  Participates in the shared governance process.

　Strong　　√Above Satisfactory　　Satisfactory　　Below Satisfactory　　Weak

Comments: As mentioned previously, I would like to see a more college-wide perspective as time goes on.

---

**COMPONENT C:  REVIEW PROCESS**

My signature acknowledges that I have read and discussed this evaluation with my supervisor and that we have established goals for the next evaluation period.  When new goals and objectives are attached to this administrative review, I know that the evaluation will become a permanent part of my professional file.  I have the right to submit written comments within ten (10) workdays and to have those comments attached to this evaluation for inclusion in my file.

Employee: _____ Date: 4/27/17
　　　　　　　　　　Signature

Supervisor/Evaluator: _____ Date: 04/27/17
　　　　　　　　　　Signature

Reviewed by: _____ Date: 5/2/17
　　　　　　　Next-level Administrator

**Comments of next-level administrator:**

6

Exhibit 2
P. 6

**COMPONENT D:  GOALS AND OBJECTIVES FOR THE NEXT REVIEW PERIOD**

| |
|---|
| **Manage the new Title V HSI Grant:** |
| **Pilot the STEM Academies** |
| **Establish an Annual Palomar STEM Conference** |
| **Pilot the Summer Academies** |
| **Maintain relationship with CSUSM** |
| **Manage San Diego Foundation grant** |
| **Manage the Innovation in Higher Education Award** |
| **Integrate virtual pre- and post-labs** |
| **Invest in learning spaces for students and faculty to work with virtual labs** |
| **Work with Faculty to move the Engineering Tech Certificate program forward** |
| **Learn more about the CSIS department** |
| **Provide a CSIS Project concept to the Palomar Foundation to give to potential funders** |
| **Facilitate the planning and ordering of equipment and furniture for the South and North Centers** |
| **Participate as appropriate in the implementation of IEPI recommendations for enrollment management, HR practices, and governance structure and communication.** |
| **Participate in Concurrent/Dual enrollment expansion for the district.** |

The signatures below acknowledge that the above goals and objectives for year 2017-18 have been mutually agreed upon by:

_Kathy Quililoko_ _____ 4/27/17
Employee                              Date

_____ 04/27/17
Supervisor                            Date

Revised 3/12/07

7

Exhibit 2
P. 7

EXHIBIT 3

EXHIBIT J-6

## PALOMAR COMMUNITY COLLEGE DISTRICT
## SENIOR EDUCATIONAL ADMINISTRATOR
## EMPLOYMENT CONTRACT

This employment contract (hereinafter referred to as the "Agreement") is made and entered into this eleventh day of April, 2017, of by and between the Governing Board of the Palomar Community College District (hereinafter referred to as the "Board" and "District") and **Kathryn Kailikole** (hereinafter referred to as the "Employee").

**WHEREAS** it is the desire of the Board to employ Employee in the Position of **Dean, Instructional, Mathematics and the Natural and Health Sciences** (hereinafter referred to as "Position").

**NOW, THEREFORE,** the parties mutually agree as follows:

1.  **EMPLOYMENT.** The Board hereby offers to employ Employee in the above identified Position on the conditions contained in this Agreement. Employee is a member of the Administrative Team as described in the Administrative Team Handbook adopted by the Board, an academic employee as defined by Education Code section 87001(a), an educational administrator as defined in Education Code section 87002(b), and a management employee as defined by Government Code section 3540.1(g). The Employee and the Board agree that this Agreement is not binding or enforceable unless it is ratified by the Board in open session at a regular meeting of the Board.

2.  **STATUTORY AUTHORIZATION AND EXTENSION.** This Agreement is a contract of employment entered into pursuant to Education Code section 72411(a). Employee understands upon Employee's execution of this Agreement and its adoption by the Board, this Agreement will automatically renew upon its expiration, and Employee will automatically be reemployed for one (1) additional year upon the expiration of this Agreement, unless the Governing Board provides written notice to Employee on or before March 15, 2018, of its intention not to reemploy Employee in Position for one additional academic year. If the Governing Board provides such written notice to Employee, Employee's employment in Position and this Agreement will terminate effective July 1, 2019, without further action by the Board, subject to the provisions of paragraph 3.

3.  **RETREAT/RETURN RIGHTS.** If the Governing Board provides notice to Employee of non-renewal of this Agreement, and Employee has seniority in another administrator or non-administrator education position in the District, such Employee may have the right to return to such position upon the expiration of this Agreement provided that Employee is not termination for cause.

2623/024719-0001
9473467.2 a04/06/17

Kailikole, Kathryn 4.11.2017



Exhibit 3
P. 1

4. **TERM.** The term of this Agreement shall begin on **July 1, 2017**, and continue through and including **June 30, 2019** or unless extended pursuant to paragraph 2. Employee shall be required to render full time and regular service to the District during the period covered by this Agreement. This Agreement shall be renewable or extended only by mutual, written agreement of the parties as set forth in paragraph 2 above. In no event shall this Agreement be interpreted in any way to authorize the renewal or extension of this Agreement for a term of more than twenty-nine (29) months. It is expressly understood, however, that if the position referred to in this Agreement is funded by a grant, categorical program, or other monies not in the District's unrestricted general fund, and if funding is discontinued, the Agreement will terminate on June 30 of the fiscal year in which the funding was discontinued, provided further that the District has given Employee written notice before May 15 of the year in which the funding is not received.

5. **SALARY.** Employee shall be compensated in accordance with the Administrative Salary Schedule as established, approved and revised from time to time by the Board, at salary grade 75/4 from July 1, 2017 through June 30, 2018 and at salary grade 75/5 from July 1, 2018 through June 30, 2019, **plus a $117.66 doctoral stipend.** The Board reserves the right to increase or decrease the schedule including across the board salary reduction or furloughs on the same basis and for the same time as faculty bargaining unit reductions. Any actions to modify the salary schedule shall not be interpreted as a new Agreement for employment or renewal or extension of this Agreement. The Board reserves the right to increase the Employee's salary. However, any action to increase the salary of the Employee shall not be interpreted as a new Agreement for employment or a renewal or extension of this Agreement.

6. **DUTIES.** Employee will perform the duties of the above Position as set forth in any Position description adopted by the Board, and all other duties as shall be assigned or required by the Superintendent/President, or designee, provided that such additional duties shall be consistent with Employee's Position. The Board may adopt or amend the Position description for the Employee's Position at any time as long as the modifications are not inconsistent with the terms of the Agreement. The Board reserves the right to reassign the Employee at any time during the term of this Agreement to another educational or student services administrative Position within the District. Reassignment during the term of this Agreement solely for discretionary reasons will not result in a reduction of the Employee's compensation during the term of this Agreement. Reassignment will be made in compliance with the California Education Code and the Administrative Handbook.

7. **EXCLUSION FROM OVERTIME PROVISIONS.** Employee shall be exempt from the minimum wage and overtime provisions of the Fair Labor Standards Act and the California Education Code, and shall not be entitled to compensatory time off.

Exhibit 3
P. 2

8.   **VACATION AND SICK LEAVE.**   Employee is entitled to accrue twenty-four (24) working days of vacation annually in accordance with the Administrative Vacation Policy set forth in the Administrative Team Handbook as adopted by the Board. Vacation days are exclusive of holidays otherwise granted to twelve (12) month regular administrative employees of the District.  Employee is entitled to accrue twelve (12) days of paid sick leave for illness or injury.  Employee is eligible for any leaves authorized by law or provided in the Administrative Association Handbook as adopted by the Board

9.   **FRINGE BENEFITS.**  Employee shall be afforded all fringe benefits of employment which are provided to the District's regular educational and student services administrators for which they are eligible under the terms of the Administrative Team Handbook.

10.   **TRAVEL.**  Necessary transportation and travel expenses will be provided in accordance with policies duly adopted by the Board.

11.   **SERVICE CLUBS AND COMMUNITY ORGANIZATIONS.**  The Board authorizes payment of dues and meals for meetings of one service or community organization. Funds shall be allocated to the appropriate expense accounts in the annual budget approved by the Governing Board.

12.   **APPLICABLE LAW.**  This Agreement is subject to all applicable laws of the State of California, the rules and regulations of the State Board of Governors, and the rules, regulations, and policies of the Board, all of which are made a part of the terms and conditions of this Agreement as though set forth herein, to the extent that such terms are not inconsistent with the lawful terms of this Agreement.

13.   **MAXIMUM CASH SETTLEMENT UPON TERMINATION OF THIS AGREEMENT.**  Regardless of the term of this Agreement, the Board may terminate this Agreement at any time prior to the date on which the term of this Agreement would have otherwise expired.  In such an event, the maximum cash settlement that the Employee shall receive will be an amount equal to the monthly base salary of the Employee multiplied by the number of months remaining on the unexpired term of this Agreement, or eighteen (18) months, whichever is less, minus any amount(s) that could have been earned if the Employee has retreat rights, and an instructional Position is offered for the balance of the term of this Agreement.  Any cash settlement shall not include any other noncash items except health benefits, which may be continued for the same duration of time as covered in the settlement, or until Employee finds other employment, whichever occurs first.  The intent of this provision is to satisfy the requirements of Government Code sections 53260-53264, and this provision shall be interpreted in a manner consistent with those statutes.

Exhibit 3
P. 3

The District agrees to pay Employee the lump sum cash payment ("Severance Pay"), less legally required for authorized deductions except contributions to CalSTRS, within fifteen (15) days of the effective date of termination.

In exchange for and as a condition to receipt of the Severance Pay, Employee shall execute a release and waiver, in a form acceptable to the legal counsel for the District, releasing the District, and all of its elected officers, employees, agents, representations, and attorneys, from any claim associated with the termination.

14. **TERMINATION OF THIS AGREEMENT DURING ITS TERM WITH CAUSE.** The Board may terminate this Agreement during its term and discharge Employee if Employee commits a material and substantial breach of this Agreement and/or for cause. Such breach of Agreement and discharge shall nullify the terms of this Agreement and Employee shall cease to receive any form of compensation upon the effective date of termination. The term "cause" is defined as those actions, omissions, or behaviors which are detrimental to the operations of the District and/or its major instructional, student and administrative divisions, or which impair the District's mission, purpose, or objectives. Conduct which constitutes a breach of contract and cause for discharge, includes, but is not limited to: unsatisfactory work performance, dishonesty, misconduct, unprofessional conduct, or insubordination. Disciplinary actions, up to and including discharge from employment, shall be carried out in compliance with the disciplinary provisions applicable to administrative employees as set forth in the Administrative Team Handbook as adopted by the Board. In the event of a termiantion of Agreement for cause, the provisons of Section 13 of Agreement shall not apply.

15. **PROVISIONS OF GOVERNMENT CODE SECTIONS 53243.3-53243.4.**

   (a) In the event that the District provides paid leave to Employee pending an investigation of a crime involving abuse of his office or position covered by Government Code section 53243.4, and should that investigation lead to a conviction, the Employee shall fully reimburse District for any salary provided for that purpose.

   (b) In the event that the District provides funds for the legal criminal defense of Employee pending an investigation of a crime involving an abuse of his office or position covered by Government Code section 53243.4, and should that investigation lead to a conviction, the Employee shall fully reimburse the District for any funds provided for that purpose.

   (c) In the event that the District provides a cash settlement related to the termination of Employee as defined in the terms of this Agreement and Employee subsequently is convicted of a crime involving abuse of office or position covered



Exhibit 3
P. 4

by Government Code section 53243.4, Employee shall fully reimburse the District for any funds provided for that purpose.

(d) "Abuse of office or position" is defined in Government Code section 53243.4 to mean either of the following:

    (i) An abuse of public authority, including, but not limited to, waste, fraud, and violation of the law under color of authority.

    (ii) A crime against public justice, including, but not limited to, a crime described in Title 5 (commencing with Section 67), Title 6 (commencing with Section 85) or Title 7 (commencing with Section 92) of Part 1 of the Penal Code.

16. **MODIFICATION OF CONTRACT.** This Agreement may be modified by mutual consent of the parties provided, however, that the party seeking such change shall give not less than 45 (forty-five) calendar days, written notice to the other party of the requested modification.

17. **RESIGNATION.** Employee may resign from employment at any time during the term of this Agreement upon ninety (90) days prior written notice to the Board or upon a shorter period of time if approved by the Board.

18. **SAVINGS CLAUSE.** If any provision of this Agreement is held to be contrary to law by a court of competent jurisdiction, such provision shall not be deemed valid or binding except to the extent permitted by law, but all other provisions shall continue to remain in full force and effect.

19. **ENTIRE AGREEMENT.** This Agreement contains and expresses the entire and final agreement of the parties with respect to the matters covered herein, and supersedes all negotiations, prior discussions, prior agreements and preliminary agreements between the parties. No promises or representations, express or implied, concerning this Agreement have been made by the parties other than those contained in this Agreement concerning the offer and acceptance of employment described herein.

20. **NO CONTINUING WAIVER.** No waiver of any term or condition of this Agreement by either party shall be deemed a continuing waiver of such term and condition.

21. **GOVERNING LAW.** This Agreement is delivered in the State of California, concerns employment in the State of California, and the rights and obligations of the parties hereto shall be construed and enforced in accordance with the laws of the State of California.

Exhibit 3
P. 5

22.    **MISCELLANEOUS PROVISIONS.**  This Agreement and applicable provisions of the Administrative Team Handbook contain the entire agreement and understanding between the parties.  There are no oral understandings, or terms and conditions not contained or referenced in this Agreement.  This Agreement cannot be changed orally.  It may be modified in writing by mutual agreement of the parties as set forth above.  This Agreement supersedes all Board Policies, rules, regulations, handbooks or practices which are inconsistent with or in conflict with this Agreement.

Exhibit 3
P. 6

## ACCEPTANCE OF SENIOR EDUCATIONAL ADMINISTRATOR
## EMPLOYMENT CONTRACT

I have reviewed this Senior Educational Adminstrator Employment Contract, and I accept this Agreement and the terms and conditions of employment it contains.  I have not agreed to employment and/or contracted for employment with the governing board of any other school, university, college, or community college district which will in any way conflict with the satisfactory performance of all of the duties of the Position for which employed.

Please return signed contract to Human Resource Services as soon as possible.

Date: 5/9/2017

Employee Signature

Approved by the Governing Board of Palomar Community College District in open session at a regular Board meeting.

Date: 5/15/17

Dr. Joi Lin Blake, Secretary to the Governing Board

Copy: Employee

2017 MAY 17 PM 2:40

Exhibit 3
P. 7

# EXHIBIT 4

Date 11-28-2017 *(illegible)* Name: Kailikole, Kathryn    55 y F.    DOB 10-28-1962

| | | |
|---|---|---|
| Wt: X 148# | Ht: 5'7" | |
| T: 98.5 | R: 19 | |
| P: 73 | SO₂ 97% | |
| B/P: L 130/93 | | |

LMP: _____ Last Tet: _____

Visual Acuity:

OS: _____ OD: _____

OU: _____

ALLERGIES: Sulfa.

CURRENT MEDICATIONS:
Cipro 500mg po BID
Xanax
Zoloft.

IN OFFICE LABS - UA:
Bilirubin
Urobilinogen
Ketone
Ascorbic Acid
Glucose
Protein
Blood
pH
Nitrite
Leukocytes
Compensation Area
Specific Gravity

HCG:      ☐ Neg  ☐ Pos
Strep Test: ☐ Neg  ☐ Pos
Mono:     ☐ Neg  ☐ Pos
H.Pylori:  ☐ Neg  ☐ Pos
Influenza: ☐ Neg  ☐ Pos
Glucose (Fingerstick): _____
HGB: _____

Nurse Notes:

Follow Up: RTC 11/30 for wound check

---

Cc: wound check ① mid back.
HPI: I+D abscess / sebaceous cyston 11/21/17.
"dizziness" started approx Oct 15. ⓞ plane flight. feeling of rocking ē nausea ōvomit. treated ē predisone. feeling ō gas. did easy man ō relief. symptoms returned 10/30. Flew tope 11/1. Home 11/3. feeling ō head cold 11/4. + UTI. Pt 11/12 married ō cipro. Symptoms persistant feeling of light headedness when lying down or changing positions quickly. No falls w/ loss of consciousness.

PMH: seasonal allergies.
PSHx: nose, basal cell ca.
FHx:
SHx: ⊖ tobacco.
ROS:
Neuro: difficulty falling asleep    MSK:
HEENT: intermittant ē hearing meds    Eye:
Cardio: Sinus congestion    Resp:
GI:    GU: ♂
GU♀:    G____ P____ AB____
PE:    Nml
Neuro: ☐ AO, WDWN, NAD. ①
HEENT: ☐ normocephalic PERRLA then oppasilurany ē good.
Neck: ☐ full rom
COR: ☐ S1 S2.
Chest: ☐ breathing freely
Abd: ☐
Breast: ☐
Vag: ☐
Cx: ☐
Uter/Ad: ☐
Back: ☐
Ortho: ☐
Skin: ☐ ① mid upper back ē 0.3cm incision. 0.5cm surrounding
Vascular: ☐ cld. injected ē lidocaine. irrigated ē iodine solution. packed ē 1 iu iodoform. app 3cm
Testes: ☐
Prostate: ☐
Rectal: ☐
Hernia: ☐

Assessment: Sinusitis. vertigo.
insomnia
wound check: ① mid back sebaceous cyst / abscess.

Plan: Medrol dose pak.
Refer to ENT.
continue cipro; 4 doses left.
Afrin 2-3 sprays each nostril BID max 3 days.
trazadone 50mg po take ½ to 3 tabs prn insomnia

Patient Ed: ☐ SBE  ☐ STB  ☐ Smoking/Drugs/ETOH  ☐ Diet  ☐ Exercise  ☐ STD  ☐ Disease/Risk

Signature: K COOPER NP. _____ M.D.

Exhibit 4
P. 1

Date 1-22-2017          Name: Kailikole, Kathryn          DOB 10-28-1962

| | |
|---|---|
| Wt: X   Ht: X | Cc: flu to follow? draining abscess. Pt. wants to discuss (illegible) |
| T: 98.3   R: 18 | 55 yo ♀ s/p I&D of left mid back abscess/sebaceous cyst on 11/21/17. |
| P: 51   SO₂ 98 | |
| B/P: 110/88 | |
| LMP: ____ Last Tet: ____ | |
| Visual Acuity: | PMHx: Anxiety/Depression, vertigo; UTI |
| OS_____ OD_____ | PSHx: none |
| OU_____ | FHx: non contributing |
| ALLERGIES: | SHx: ∅ smoking |
| Saifa | ROS: |
| | Neuro: _____     MSK: _____ |
| CURRENT MEDICATIONS: | HEENT: _____     Psyc: _____ |
| Cipro | Cardio: _____     Resp: _____ |
| meclizine | GI: _____     GU: ♂ _____ |
| Zoloft | GU♀: _____     G___ P___ AB___ |
| Xanax | PE:   Nml |
| buspar | Neuro: ☐ A&O×3, NAD |
| | HEENT: ☐ NC/AT |
| | Neck: ☐ _____ |
| | COR: ☐ S₁ S₂ RRR |
| IN OFFICE LABS - UA: | Chest: ☐ CTA throughout |
| Bilirubin | Abd: ☐ _____ |
| Urobilinogen | Breast: ☐ _____   left mid back c̄ 0.3cm |
| Ketones | Vag: ☐ _____   incision, very minimal |
| Ascorbic Acid | Cx: ☐ _____   erythema & induration. |
| Glucose | Uter/Ad: ☑ _____   (+) expression of sebaceous |
| Protein | Back: ☐ _____   appearing material with |
| Blood | Ortho: ☐ _____   pressure application & |
| pH | Skin: ☐ _____   irrigation? |
| Nitrite | Vascular: ☐ _____ |
| Leukocytes | Testes: ☐ _____ |
| Compensation Area | Prostate: ☐ _____ |
| Specific Gravity | Rectal: ☐ _____ |
| | Hernia: ☐ _____ |
| HCG: ☐ Neg ☐ Pos | Assessment: 1. left back sebaceous cyst/Abscess |
| Strep Test: ☐ Neg ☐ Pos | |
| Mono: ☐ Neg ☐ Pos | |
| H.Pylori: ☐ Neg ☐ Pos | Pt currently on Cipro for UTI. await completion of |
| Influenza: ☐ Neg ☐ Pos | Plan: abx and await wound culture results prior |
| Glucose (Fingerstick): | to initiating abx for Abscess. |
| HGB: | wound thoroughly irrigated c̄ NS iodine |
| Nurse Notes: | Repacked c̄ 1/4 inch iodoform and. |
| | Clean dressing applied |
| | Patient Ed: ☐ SBE ☐ STB ☑ Smoking/Drugs/ETOH ☐ Diet ☐ Exercise ☐ STD ☐ Disease/Risk |
| Follow Up: 11/24 @ 9am | Signature: mables Minscll N.P.          .M.D. |

Exhibit 4
P. 2

Date 11-21-2017    Name: Kalikole, Kathryn    DOB 10-28-1962

| | |
|---|---|
| Wt: _X_ Ht: 5'7 | Cc: _possible cyst on back CC_ |
| T: _985_ R: _19_ | _On cystin 2 more days left_ |
| P: _60_ SO₂ _98_ | _cyst Keiser borderd onset Wellway on_ |
| B/P: _124_ | _his back Routs et left Huisto left 6_ |
| _— 20 |_ | _Area of Science et Statement_ |
| LMP: _?_ Last Tet: | |
| Visual Acuity: | PMHx: |
| OS_____OD_____ | PSHx: |
| OU_____ | FHx: |
| ALLERGIES: (Sulfa) | SHx: |
| nausea | ROS: |
| | Neuro:_____ MSK:_____ |
| CURRENT MEDICATIONS: | HEENT:_____ Psyc:_____ |
| _Xanax prn_ | Cardio:_____ Resp:_____ |
| _Zoloft_ | GI:_____ GU♂:_____ |
| _Cipro_ | GU♀:_____ G___ P___ AB___ |
| | PE: Nml _NSS_ |
| | Neuro: ☐ _A+O A/AD CN 2-12 intact_ |
| | HEENT: ☐ |
| | Neck: ☐ |
| | COR: ☐ _RR_ |
| | Chest: ☐ _CV+S_ |
| | Abd: ☐ _Soft_ |
| IN OFFICE LABS - UA: | Breast: ☐ _Left flank_ |
| | Vag: ☐ |
| | Cx: ☐ |
| | Uter/Ad: ☐ |
| | Back: ☐ |
| | Ortho: ☐ |
| | Skin: ☐ _3x4cm cyst Tunnelled a Left flank_ |
| | Vascular: ☐ |
| | Testes: ☐ |
| | Prostate: ☐ |
| | Rectal: ☐ |
| | Hernia: ☐ |
| | Assessment: _Abscessed_ |
| HCG: ☐ Neg ☐ Pos | _S cyst left flank_ |
| Strep Test: ☐ Neg ☐ Pos | |
| Mono: ☐ Neg ☐ Pos | |
| H.Pylori: ☐ Neg ☐ Pos | |
| Influenza: ☐ Neg ☐ Pos | |
| Glucose (Fingerstick): | Plan: _2ml Lido & Epi Anesth_ |
| HGB: | _Drainage Sent_ |
| Nurse Notes: | _#11 blade I+D copious wt/beige foul smelling discharge_ |
| DF30412562 _OK_ | _Cleansed c Dinabex_ |
| _Scentgirl 11/31/17 OK_ | _1/4" Iodoform 12" of packing_ |
| | Patient Ed: ☐ SBE ☐ STE ☐ Smoking/Drugs/ETOH ☐ Diet ☐ Exercise ☐ STD ☒ Disease/Risk |
| Follow Up: _Tomorrow_ | Signature _Carol Sutton_ _____M.D. |

Exhibit 4
P. 3

Date 11-08-2017        Name: KAILIKOLE, KATHRYN        DOB 10-28-1962

| | |
|---|---|
| Wt: X   Ht: X | |
| T: 97.4   R: 18 | |
| P: 81   SO₂ 98 | |
| B/P: L 118/88 | |

Cc: Vertigo is back @ime in for some reason ID/he nic has UTI symptoms (BC)

Pt presents ē c/o recurring vertigo and recent fall on 10/28 d/t dizziness. She reports previous medications helped improve symptoms and that her and her boyfriend tried the epily man. successfully ē relief. Pt travels for work which exacerbates the vertigo. She also presents ē c/o urinary burning and frequency since Sunday w/o relief.

LMP: ____ UCST Last Tet ____

Visual Acuity:

OS ____ OD ____
OU ____
ALLERGIES: Sulfa

PMHx: Vit D def, Anx, Dep.

PSHx: ____

FHx: ____

SHx: Denies tobacco  ETOH - wine x2-3/week

ROS:
Neuro: Dizziness exac. by positional Δ's   MSK: ____
HEENT: nasal congestion- status post recent sinusitis   Psyc: ____
Cardio: ____   Resp: ____
GI: ____   GU: ₺
GU♀: ____ G ____ P ____ AB ____

PE:   Nml
Neuro: ∅ a/o x4, in no acute distress
HEENT: ∅ pharynx w/o drainage/erythema. Bilateral TMs pearly grey
Neck: ∅ supple, no lymphadenopathy   with mild fluid accumulation
COR: ∅ RRR   Light reflex normal
Chest: ∅ CTA
Abd: ☐ ____
Breast: ☐ ____
Vag: ☐ ____
Cx: ☐ ____
Uter/Ad: ☐ ____
Back: ∅ ē CVA tenderness
Ortho: ☐ ____
Skin: ☐ ____
Vascular: ☐ ____
Testes: ☐ ____
Prostate: ☐ ____
Rectal: ☐ ____
Hernia: ☐ ____

Assessment: 1) UTI
2) Vertigo - likely benign paroxysmal positional
3) Eustachian tube dysfunction

Plan: 1) Macrobid 100mg tab ÷ tab PO BID x 5days - send urine cx
2) Flonase 50 mm  2 puffs each nostril Daily
3) Recommend OTC antihistamine like Zyrtec.
4) Recommend Benadryl if needed if meclizine isn't sufficient
5) Recommend Sudafed subdued before travel/prior to flying.

CURRENT MEDICATIONS:
Xanax prn
Zoloft prn
MP citrate

**IN OFFICE LABS - UA:**

Bilirubin ☒
Urobilinogen ☐ 1 mg/dL
Ketones ☒
Ascorbic Acid ☒
Glucose ☒
Protein ☐
Blood ☐
pH ☐
Nitrite ☐
Leukocytes ☐
Compensation Area ☐
Specific Gravity ☐

HCG: ☐ Neg ☐ Pos
Strep Test: ☐ Neg ☐ Pos
Mono: ☐ Neg ☐ Pos
H.Pylori: ☐ Neg ☐ Pos
Influenza: ☐ Neg ☐ Pos
Glucose (Fingerstick): ____
HGB: ____

Nurse Notes:
DC604125492

Patient Ed: ☐ SBE ☐ STB ☐ Smoking/Drugs/ETOH ☐ Diet ☐ Exercise ☐ STD ☐ Disease/Risk

6) Flu if persist./worse

Follow Up: if persistent or worsening symptoms

Signature: _[signature]_ NP ____ M.D.

Exhibit 4
P. 4

Date 10—16-2017       Name: KAILIKOLE, KATHRYN ,        DOB: 10-28-1962

| | |
|---|---|
| Wt: | Ht: 57 |
| T: 9.3 | R: 17 |
| P: 100 | SO₂ 98 |
| B/P: 118 / 72 | |

LMP: ___  Last Tet: ___

Visual Acuity:
OS ___ OD ___
OU ___
ALLERGIES: Sulfa (nausea)

CURRENT MEDICATIONS:
Xanax as needed
Zoloft or Zoloft as needed
Super Vit D3

**IN OFFICE LABS - UA:**

HCG: ☐ Neg ☐ Pos
Strep Test: ☐ Neg ☐ Pos
Mono: ☐ Neg ☐ Pos
H.Pylori: ☐ Neg ☐ Pos
Influenza: ☐ Neg ☐ Pos
Glucose (Fingerstick): ___
HGB: ___
Nurse Notes:

Follow Up: ___

CC: Pt states she feels dizzy, hence seat
___
___
___
___

PMHx: Depr, Low Vit D, Anxiety,
PSHx:
FHx:
SHx:
ROS:
Neuro: ___ MSK: ___
HEENT: ___ Psyc: ___
Cardio: ___ Resp: ___
GI: ___ GU:♂
GU:♀ ___ G ___ P ___ AB ___
PE: Nml
Neuro: A&O; CN 2-12 intact, PERL, EOMI
HEENT: ___
Neck: full ROM; NT
COR: RRR no ___
Chest: CTA @987
Abd: ___
Breast: ___
Vag: ___
Cx: ___
Uter/Ad: ___
Back: ___
Ortho: ___
Skin: ___
Vascular: ___
Testes: ___
Prostate: ___
Rectal: ___
Hernia: ___
Assessment: Vertigo
Skin infection

Plan: ___
___
___
___
___

Patient Ed: ☐ SBE ☐ STE ☐ Smoking/Drugs/ETOH ☐ Diet ☐ Exercise ☐ STD ☐ Disease/Risk
Signature: ___ M.D.

Exhibit 4
P. 5

**Access Medical Centers, APC**
477 N. El Camino Real, Suite A100
Encinitas, CA 92024
Tel. (760) 943-9111  Fax (760) 943-0180

☐ Ramin H. Farsad, M.D.  CA Lic. G80992  DEA BF4214831
☐ Carol Butler, N.P.  CA Lic. NP9385  DEA MB0487074
☐ Mary Ann Cathey, N.P.  CA Lic. NP12008  DEA MC0915958
☐ Heather Smith, N.P.  CA Lic. 9500203Z  DEA MS3318836

☐ Nicole Dinnell, N.P.  CA Lic. NP95002253  DEA MD3520738
☐ Cambria DeMarco, N.P.  CA Lic. NP9265  DEA MD1004631
☐ Marianne Placey, N.P.  CA Lic. NP16019  DEA MP1842168
☐ Megan Watts, N.P.  CA Lic. NP16731  DEA MW1556068

| Patient Name | Kolbourn    Kail, Kole | Medical Record # | DOB 10/28/62 | Serial # A59268 |

Address

Circle No. of Drugs Prescribed: ① 2  3
Prescription is void if number of drugs prescribed does not match.

R 1   Xanax 0.5 mg  1/2 - 1  q 8°  PRN Anxiety  # 30
☐ 1-24  ☑ 25-49  ☐ 50-74
☐ 75-100  ☐ 101-150  ☐ 151 & OVER
☐ Units  ☐ Do not substitute  Refill 0 - 1 - 2 - 3 - 4 - 5 -PRN

R 2
☐ 1-24  ☐ 25-49  ☐ 50-74
☐ 75-100  ☐ 101-150  ☐ 151 & OVER
☐ Units  ☐ Do not substitute  Refill 0 - 1 - 2 - 3 - 4 - 5 -PRN

R 3
☐ 1-24  ☐ 25-49  ☐ 50-74
☐ 75-100  ☐ 101-150  ☐ 151 & OVER
☐ Units  ☐ Do not substitute  Refill 0 - 1 - 2 - 3 - 4 - 5 -PRN

No Refills allowed for Schedule II

x  Carol Butler

Date 10/16/17

• Security features are listed on back •  Void Rx has blue-gray background on white paper

Exhibit 4
P. 6

Date 06-05-2017          Name: KAILIKOLE, KATHRYN                    DOB 10-28-1962

| Wt: 198 | Ht: 57 |
| T: 97.2 | R: 19 |
| P: 60 | SO₂ 98 |
| B/P: 122 / 78 | |

C: *Flu checking in to see how well she's doing on the medication change ct*

States Zoloft does not make her feel "hung over" the harder to eat

Reports some Vivian or Mariner Recently

State School Schedule on Break - She is to can

LMP: Post menopause Last Tet:

**Visual Acuity:**
OS_____ OD_____
OU_____
ALLERGIES: Sulfa (nose)

**CURRENT MEDICATIONS:** ~~stopped~~
Xanax 0.5mg
Zoloft 25mg
Vit D 2000 IU

PMHx:
PSHx:
FHx:
SHx:
ROS:
Neuro:_____ MSK:
HEENT:_____ Psyc:
Cardio:_____ Resp:
GI:_____ GU:♂
GU♀:_____ G____ P____ AB____

PE:    Nml
Neuro: □ A+O / NAD, CN 2-12 Intact, Calm pleasant Affect
HEENT: □
Neck: □
COR: □ @ 60 RR
Chest: □ @98
Abd: □
Breast: □
Vag: □
Cx: □
Uter/Ad: □
Back: □ mild CVT
Ortho: □
Skin: □
Vascular: □
Testes: □
Prostate: □
Rectal: □
Hernia: □

**IN OFFICE LABS - UA:**

HCG:        □ Neg □ Pos
Strep Test:  □ Neg □ Pos
Mono:       □ Neg □ Pos
H.Pylori:    □ Neg □ Pos
Influenza:   □ Neg □ Pos
Glucose (Fingerstick):
HGB:

**Nurse Notes:**

Assessment: UTI - Frequency (only on Lab ↑WBC + Nitrates)
Low Vit D
Stress Controlled @ TOP, SHTV
Stress / Anxiety

Plan: ✓ Vit D in 4 months, if desired → Continue ct ctc
Rx for Cipro 500 ; BID x 7
Continue Zoloft @ 25mg ↑ 90

Patient Ed: □ SBE □ STE □ Smoking/Drugs/ETOH □ Diet □ Exercise □ STD □ Disease/Risk

Signature: _____ M.D.

Exhibit 4
P. 7

# ACCESS MEDICAL CENTERS

477 North El Camino Real, A100, Encinitas, CA 92024 • phone: 760-943-9111 • fax: 760-943-0180
www.accessmed.net

□ Ramin H. Farzad, M.D. Lic. #G80982
□ Carol Butler, N.P. Lic. #NP8386
□ Megan Walla, N.P. Lic. #NP16731
□ Apryl Fidding, N.P. Lic. #20027
□ Bonnie Eklund, N.P. Lic. #15285

□ Nicole Dinnell, N.P. Lic. #95002253
□ Mary Ann Cathey N.P. Lic. #NP12008
□ Heather Smith, N.P. Lic. #95002032
□ Marianne Placey, N.P. Lic. #NP18019

DATE _6/5/17_

Name _Kathryn Kavikole_        DOB _10/28/63_

| | QTY | TIMES REFILL |
|---|---|---|
| Rx ¹: _Cipro 500 j Bid x 7_    SIG | 14 | 0̸ 1 |
| | | 2 3 |
| | | 4 5 |
| Rx ¹: _____    SIG | | 0 1 |
| | | 2 3 |
| | | 4 5 |
| Rx ¹: _____    SIG | | 0 1 |
| | | 2 3 |
| | | 4 5 |

□ Label in Spanish      □ You May Substitute:

Physician Signature: _Carol Butler NP_

Exhibit 4
P. 8

Date 05-22-2017  Name: KAILIKOLE, KATHRYN  DOB 10-28-1962

Wt: 202  Ht: 5'7"
T: 97.8  R: 18
P: 63  SO₂: 96
B/P: L 140/90

LMP:  Last Tet:
Visual Acuity:
OS_____ OD_____
OU_____
ALLERGIES: Sulfa (nausea)

CURRENT MEDICATIONS:
Xanax 0.5 mg PRN

IN OFFICE LABS - UA:
Bilirubin
Urobilinogen
Ketones
Ascorbic Acid
Glucose
Protein
Blood
pH
Nitrite
Leukocytes
Compensation Area
Specific Gravity

HCG: ☐ Neg ☐ Pos
Strep Test: ☐ Neg ☐ Pos
Mono: ☐ Neg ☐ Pos
H.Pylori: ☐ Neg ☐ Pos
Influenza: ☐ Neg ☐ Pos
Glucose (Fingerstick):
HGB:
Nurse Notes:

Follow Up: 2 weeks.

Cc: f/u from visit two weeks ago - was seen for high blood pressure - discuss labs (a) Review labs also, takes Xanax @ night often. Reports feeling snappier at people at work. Fatigue. Occasional CP without numbness. feels like anxiety related. No dyspnea. Doing medifast. No supplements @ this time. Lost 78 lbs last year. No exercise.

PMHx:
PSHx:
FHx:
SHx:
ROS:
Neuro:        MSK:
HEENT:        Psyc:
Cardio:        Resp:
GI:           GU:♂
GU♀:          G___ P___ AB___

PE:  Nml
Neuro: ☑ A+Ox3, pleasant.
HEENT: ☐
Neck: ☐
COR: ☑ SSₓ no murmur
Chest: ☑ CTA.
Abd: ☐
Breast: ☐
Vag: ☐
Cx: ☐
Uter/Ad: ☐
Back: ☐
Ortho: ☐
Skin: ☐
Vascular: ☐
Testes: ☐
Prostate: ☐
Rectal: ☐
Hernia: ☐

Assessment: ① Vit D deficiency
② anxiety
③ Blood pressure Rʲ issues assessing for HTN

Plan: ① Vit D 2000 u daily
② Zoloft 25mg daily, Xanax PRN.
③ check BP every few days, set low cuff. RTC 2 weeks for cuff of recordings ④ LDL discussed. Diet reiterated

Patient Ed: ☐ SBE ☐ STE ☐ Smoking/Drugs/ETOH ☐ Diet ☐ Exercise ☐ STD ☐ Disease/Risk

Signature: _____ M.D.

RF  23-may-2017

Exhibit 4
P. 9

Date 05/08/17     Name: Kalikole, Kathryn     DOB 10/28/1962

Wt: 207     Ht: 5'7 1/2

T: 97.4     R: 19

P: 105     SO₂ 98

B/P: L 151 (delete) 130

_____ 114 _____ 88

LMP: post     Last Tet: _____

Visual Acuity:

OS _____ OD _____

OU _____

ALLERGIES: Sulfa based drugs, Cume Nausea

CURRENT MEDICATIONS:
Ø

**IN OFFICE LABS - UA:**

Bilirubin _____
Urobilinogen _____     mg/dL
Ketones _____
Ascorbic Acid _____
Glucose _____     mg/dL
Protein _____
Blood _____     RBC/µL
pH _____
Nitrite _____     Pinkish color = Positive
Leukocytes _____     WBC/µL
Compensation Area _____
Specific Gravity _____

HCG:     ☐ Neg  ☐ Pos
Strep Test:     ☐ Neg  ☐ Pos
Mono:     ☐ Neg  ☐ Pos
H.Pylori:     ☐ Neg  ☐ Pos
Influenza:     ☐ Neg  ☐ Pos
Glucose (Fingerstick): _____
HGB: _____

Nurse Notes:
given to pt
CRU04125692 5/8/17

Follow Up: 2 wks
5/22/17
8:30 am

CC: Chest pain, lips, face, left arm tingling + numbness. CP _____ in chili. 4 yrs a.c.c.
Hx of Meth P Pelvic. — Joint Pain and swelling?

PMHx: Ø
PSHx: Bmd cbc.
FHx: _____
SHx: _____
ROS:
Neuro: _____     MSK: _____
HEENT: _____     Psyc: _____
Cardio: _____     Resp: _____
GI: _____     GU:♂
GU♀:     G _____ P _____ AB _____

PE: Nml     55  ↑BP  _____     2E GOINg
Neuro: ☐ A+O  _____  CN 2-12 ?Hard
HEENT: ☐
Neck: ☐ Supple full ROM
COR: ☐ RRR w/o c̄ _____ 1°AV  R2S₁S₂  End 6 lh
Chest: ☐ CTA Bi Sats 98%
Abd: ☐ Nt
Breast: ☐
Vag: ☐
Cx: ☐
Uter/Ad: ☐
Back: ☐
Ortho: ☐
Skin: ☐
Vascular: ☐
Testes: ☐
Prostate: ☐
Rectal: ☐
Hernia: ☐
Assessment: Anx, ?OT
HTN ?

Plan: Xanax 0.5 mg Vo - 1 q 8° Pn. Anxiety, r/o TV
CKA - lab survey, urine.
Carmine Relaxation = BP caud, r/o panic
labs, CBC Chem, lipids, TSH, u/a, UDS

Patient Ed: ☐ SBE  ☐ STE  ☐ Smoking/Drugs/ETOH  ☐ Diet  ☐ Exercise  ☐ STD  ☐ Disease/Risk

Signature: Carol Buth, NP _____ M.D.
RF     09. May. 2017

Exhibit 4
P. 10

Access Medical Centers, APC
477 N. El Camino Real, Suite A100
Encinitas, CA 92024
Tel. (760) 943-9111 Fax (760) 943-0180

☐ Ramin H. Farsad, M.D. CA Lic. G80982 DEA BF4216631
☐ Carol Butler, N.P. CA Lic. NP8388 DEA MB0487074
☐ Mary Ann Cathey, N.P. CA Lic. NP12008 DEA MC0915958
☐ Heather Smith, N.P. CA Lic. 95002032 DEA MS3518838

☐ Nicole Dinnall, N.P. CA Lic. NP95002253 DEA MD3520725
☐ Cambria DeMarco, N.P. CA Lic. NP9266 DEA MD1004631
☐ Marianne Placey, N.P. CA Lic. NP18019 DEA MP1842158
☐ Megan Wells, N.P. CA Lic. NP15731 DEA MW1936068

| Patient Name | | Medical Record # | DOB | Serial # |
|---|---|---|---|---|
| | | | 10/28/65 | A59268 |

Address

**VOID**

**R₁**  Xanax X 0.5 mg  V₀-1  q 8  (w) Anxiety on HTN

**R₂**

**R₃**

No Refills allowed for Schedule II

Circle No. of Drugs Prescribed ①  2  3

Prescription is void if number of drugs prescribed is not circled

| ☐ 1-24 | ☒ 25-49 | ☐ 50-74 |
|---|---|---|
| ☐ 75-100 | ☐ 101-150 | ☐ 151 & OVER |
| ☒ Units | ☐ Do not substitute | Refill 0-①-2-3-4-5-PRN |

| ☐ 1-24 | ☐ 25-49 | ☐ 50-74 |
|---|---|---|
| ☐ 75-100 | ☐ 101-150 | ☐ 151 & OVER |
| ☐ Units | ☐ Do not substitute | Refill 0-1-2-3-4-5-PRN |

| ☐ 1-24 | ☐ 25-49 | ☐ 50-74 |
|---|---|---|
| ☐ 75-100 | ☐ 101-150 | ☐ 151 & OVER |
| ☐ Units | ☐ Do not substitute | Refill 0-1-2-3-4-5-PRN |

Date  5/18/17

Void Rx has blue-gray background on white paper

Exhibit 4
P. 11

# EXHIBIT 5

### Confidential Summary of Investigation Report
### Complaint of Unlawful Discrimination
### Daniel Finkenthal on Behalf of Anonymous Complainant vs.
### Arthur Gerwig, Takashi Nakajima, and Hector Garcia Villa, Respondents
### November 1, 2017

### PURPOSE OF INVESTIGATION.

This matter relates to an administrative investigation undertaken for Palomar Community District (District). This matter related to investigating material that was deemed objectionable which had been displayed on walls, doors and over doors in the Physics and Engineering Department at the District's main campus. Daniel Finkenthal (Dr. Finkenthal), the newly appointed Department Chair, had brought forward the complaint on behalf of an anonymous student, when he assumed his leadership role and claimed that the material was objectionable, discriminatory and inappropriate to be displayed or posted on District property.

The scope of this investigation was to determine whether certain District employees allowed and/or were aware that the objectionable material was displayed in the Physics and Engineering Department in certain areas, visible to both other employees, as well as students. Specifically, Professors Arthur Gerwig (Mr. Gerwig), Takashi Nakajima (Mr. Nakajima) and Hector Garcia Villa (Mr. Garcia Villa) were observed to teach in the department in the general area of these materials. The materials involved included pictures, images, wording and other items that were seen as patently offensive, discriminatory in content and nature and generally inappropriate for a District environment. Added to this, Dr. Finkenthal alleged that Mr. Gerwig and Mr. Nakajima had utilized a syllabus and other material that was inappropriate, threatening in nature and inconsistent with the department's philosophy and goals.

### BACKGROUND AND METHODOLOGY OF INVESTIGATION.

This matter began in May 2017 after Dr. Finkenthal was appointed the Chair of the Physics and Engineering Department. Previously, Mr. Nakajima had been the Department Chair for several years. Dr. Finkenthal contacted his dean, Kathryn Kailikole(Dr. Kailikole), who serves as the Dean, Mathematics and the Natural and Health Sciences, to report that a student had contacted him with concerns regarding various types of posters and other materials that were posted conspicuously on the walls and doors of rooms NS-249 and NS-252. Dr. Finkenthal showed Dr. Kailikole the various materials and indicated that he did not want to disclose the name of the student for fear that the student would be subject to some form of retaliation.

On May 31, 2017, Dr. Kailikole reported to Shawna Cohen (Ms. Cohen), Manager, Equal Employment Opportunity and Compliance and the District's Deputy Title IX Coordinator, that she had received the report from Dr. Finkenthal regarding the offensive postings in the two rooms. The following day, on June 1, 2017, a group of District administrators visited NS-249 and NS-252 to view the areas. The officials determined that a number of postings had been placed on the walls and other surfaces that violated federal, state, and District nondiscrimination regulations, including Title IX. The officials took pictures of the offending items and removed them from the rooms, retaining them for future reference.

Jack Kahn, Assistant Superintendent/Vice President, Instruction (Dr. Kahn), Dr. Kailikole, and Ms. Cohen met with Dr. Finkenthal, Mr. Garcia Villa, Mr. Gerwig, Mr. Nakajima, and Susan Snow (Ms. Snow), Palomar Faculty Federation Grievance Officer, on June 11, 2017 for purposes of determining whether the Physics and Engineering faculty had prior knowledge of the postings. During the meeting, Ms. Cohen distributed the postings to the parties and asked whether the faculty had seen them before. Dr. Finkenthal stated that he saw the items after the anonymous student had pointed them out to him; the other three faculty stated that they had never seen the postings before. Mr. Garcia Villa, Mr. Gerwig, and Mr. Nakajima all indicated that they occasionally used the two rooms, whereas Dr. Finkenthal stated that he never used them.

On June 28, 2017, Adrian Gonzales, Assistant Superintendent/Vice President, Student Services and the District's Title IX Coordinator, notified Ms. Cohen that an investigation into the complaint was necessary. Dr. Finkenthal met with Ms. Cohen on June 29, 2017 to present additional information relevant to the investigation. The District retained an independent investigator and attorney, Jeffrey Love (fact finder), to conduct the investigation. Mr. Love commenced the investigation on July 11, 2017. The investigation involved the review of documents, including evidence and applicable District rules and regulations, as well as conducting interviews of District employees. Once factual evidence was developed, the various statements of the interviewees were compared and contrasted with one another as well as other evidence and determinations of credibility were established. Once credibility was established along with a factual framework of the alleged events, conclusions were formed based on the greater weight of the credible evidence. For the purpose of findings, direct and circumstantial evidence may be given equal weight.

- Page 1 -

Exhibit A
P. 1

Exhibit 5
P. 1

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

## SCOPE OF THE INVESTIGATION.

The scope of this investigation was to determine:

A.  Did District employees allow and/or condone objectionable and/or discriminatory material to be displayed on District property in violation of District rules?

## SOURCE OF THE COMPLAINT.

A.  Daniel Finkenthal, Ph.D. (acting on behalf of an anonymous student)
Professor/Department Chair
Physics and Engineering
Palomar Community College District

## ACCUSED/FOCUS EMPLOYEES.

A.  Hector Garcia Villa
Assistant Professor
Physics and Engineering
Palomar Community College District

B.  Arthur Gerwig
Associate Professor
Physics and Engineering
Palomar Community College District

C.  Takashi Nakajima
Professor
Physics and Engineering
Palomar Community College District

## WITNESSES.

A.  Daniel Finkenthal, Ph.D.
Professor/Department Chair
Physics and Engineering Department
Palomar Community College District

B.  Kathryn Kailikole, Ed.D.
Dean
Mathematics and the Natural and Health Sciences Division
Palomar Community College District

C.  Arthur Gerwig
Associate Professor
Physics and Engineering Department
Palomar Community College District

D.  Takashi Nakajima
Professor
Physics and Engineering Department
Palomar Community College District

E.  Hector Garcia Villa
Assistant Professor
Physics and Engineering Department
Palomar Community College District

- Page 2 -

Exhibit A
P. 2

Exhibit 5
P. 2

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

F.   Susan Snow
     Professor
     Mathematics Department
     Palomar Community College District

## CREDIBILITY OF THE WITNESSES.

The analysis of the credibility of the witnesses is an important aspect of a fact-finding investigation.  As an accepted rule of evidence, a fact finder can disregard the statements of a witness who has been found to have provided false or unreliable information during their testimony in a matter.  Those witnesses' statements can be disregarded in their entirety and not believed unless there is compelling evidence to conclude that individual statements otherwise are true.[*]  Concerning the witnesses' statements, this fact finder considered:

a)  The witness' demeanor while providing a statement and the manner in which he/she provided the statement.

b)  The character of the witness' statement.

c)  The extent of the witness' capacity to perceive, to recollect, or to communicate any matter about which he/she gave a statement.

d)  The extent of the witness' opportunity to perceive any matter about which he/she gave a statement.

e)  The witness' character for honesty or veracity or their opposites.

f)  The existence or nonexistence of a bias, interest, or other motive.

g)  A statement previously made by the witness that is consistent with his/her statement during the fact-finding investigation.

h)  A statement made by the witness that is inconsistent with any part of his/her statement during the fact-finding investigation.

i)  The existence or nonexistence of any fact given in statement by the witness.

j)  The witness' attitude toward the fact-finding investigation in which he/she gave a statement or toward the giving of a statement.

### Discussion of Witness Credibility.

**Witness Daniel Finkenthal, Ph.D.**

Dr. Finkenthal appeared to be a credible witness in this matter.  Dr. Finkenthal is the current Chair of the Physics and Engineering Department of the District.  Dr. Finkenthal came forward after he had been elevated to his current position in order to make his complaint concerning the display of what he considered objectionable material in or about the Physics Department.  Dr. Finkenthal was deemed credible due to the fact that his statements to this fact finder tended to be corroborated by the physical evidence located in the area of the Physics Department, as well as the statements of other credible witnesses.

**Kathryn Kalilkote, Ed.D.**

Dr. Kalilkote appeared to be a credible witness in this investigation.  Dr. Kalilkote said that she observed the offensive materials and further noted that Mr. Gerwig and Mr. Nakajima had specifically denied knowledge of the materials that were displayed in areas that they were known to frequent on a daily basis.  Dr. Kalilkote also noted that she believed both Mr. Gerwig and Mr. Nakajima had been insubordinate concerning the publication and use of certain inappropriate policy and rules statements, syllabi and a student warning letter.

**Witness Arthur Gerwig**

Mr. Gerwig did not appear to be a credible witness in this matter.  Mr. Gerwig has been a long-term faculty member in the Physics and Engineering Department, and seemed to be unaware that materials had been displayed on various walls in

---

[*] See California Civil Jury Instruction Section 5003.

- Page 3 -

Exhibit A
P. 3

Exhibit 5
P. 3

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

the area in which he has worked nearly on a daily basis.  It appeared to the fact finder that Mr. Gerwig's statements were implausible, in that he would have observed these materials having worked in that area.

**Witness Takashi Nakajima**

Mr. Nakajima also appeared to lack credibility in his statements to the fact finder.  Many of the objectionable materials that were observed and removed from the Physics and Engineering Department were displayed on the doors and in the room associated with areas that Mr. Nakajima used on a daily basis.  Mr. Nakajima's statement that he was unaware of many of these materials was implausible and inconsistent with rational reason and logic.

**Witness Hector Garcia Villa**

Mr. Garcia Villa appeared to be a credible witness in this matter.  Mr. Garcia Villa is a relatively new Assistant Professor to the department.  Mr. Garcia Villa said that he was aware of some of the materials that had been displayed in the area, however, he was uncertain as to the ownership or who had authored these items.  Mr. Garcia Villa was deemed credible, as he was relatively new to the department, did not typically use the rooms where the associated objectionable materials were located and appeared earnest and truthful in his statements.

**Witness Susan Snow**

Ms. Snow did not appear to be a credible witness in this matter.  Ms. Snow appeared as a witness; however, she was little more than a thinly-veiled advocate for Mr. Gerwig and Mr. Nakajima.  Ms. Snow had represented both Mr. Gerwig and Mr. Nakajima at their interviews as their union representative as part of the Palomar Faculty Federation.  Ms. Snow claimed that she was a witness in this matter, as she had observed an item that had been hung over a door in one of the offices in the Physics and Engineering Department.  Ms. Snow knew early on, and prior to her representation of Mr. Nakajima and Mr. Gerwig, that she would therefore be a witness in this matter, yet she sat through and participated in their interviews, as a representative.  Ms. Snow appeared to be biased and motivated to advocate for her association members, and was seen as a witness who lacked credibility.

**FINDINGS.**

A.  **Did District employees allow and/or condone objectionable and/or discriminatory material to be displayed on District property in violation of District rules?**

   Short Answer:  **YES**

*Discussion*

Background.

Dr. Finkenthal indicated to the fact finder that he believes inappropriate behavior relevant to the allegations had taken place in the Physics and Engineering Department under the chairmanship of Mr. Nakajima for a number of years.

The facts further demonstrate that in 2009, a student with certain disabilities had filed a complaint with the Department of Education, Office of Civil Rights regarding discrimination by the Physics and Engineering faculty.  The Office of Civil Rights had upheld the student's complaint and Dr. Finkenthal provided a copy of these relevant documents to the fact finder.  Dr. Finkenthal also provided the fact finder with emails he had received that are purported to be between Mr. Nakajima and a student that had occurred on or about August 24, 2009.

Dr. Finkenthal pointed out that these emails display that Mr. Nakajima had violated the Americans with Disabilities Act (ADA) and refused to make a reasonable accommodation to the student who filed the complaint.  Dr. Finkenthal noted that this exchange occurred only four months after the Office of Civil Rights (OCR) had published their report concerning the previous violation of the ADA.

Materials Found Displayed in Rooms NS-249 and NS-252.

As part of the scope of this investigation, a number of items that were located in the areas surrounding rooms NS-252 and NS-249 in the Physics and Engineering area of the NS Building were documented in place, and removed.  This fact finder's charge was to investigate whether these items were placed by any District staff or whether any District staff

- Page 4 -

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Garwig, and Nakajima

members had allowed the placement of these materials, or were aware of their presence. The various items are identified by item number as detailed below.

| Item | | Room | Location |
|---|---|---|---|
| 1 | "Safe Space...No!!!" | Hallway | Above door into NS-252 |
| 2 | "Carbon Resistors" (mnemonic device) | NS-249 | Door exiting into hallway |
| 3 | "Vogue May Edition" | NS-249 | File cabinet |
| 4 | "2017 you know you juant me?"/"Hello Ladies" | NS-249 | Door leading into NS-252 |
| 5 | "Dick got her like" | NS-249 | Inside of door |
| 6 | "Peek a Boo"/"Jen's Height in Influence" | NS-249 | Covering of window of door to hallway |
| 7 | "TURN THIS SHIT OFF" | NS-252 | Taped to coffee pot |
| 8 | "Do not leave your shit in the sink." | NS-252 | Above sink |
| 9 | "Stop Making Fucking Tea in the Kettle!" | NS-252 | Above coffee pot/sink area |
| 10 | "In class what he taught us..." (cartoon) | NS-252 | Inside of door |
| 11 | "Resistance is FUTILE!" | NS-252 | Inside of door |
| 12 | Man with discus | NS-252 | Above microwave |
| 13 | Fluke Multi-Meter | NS-252 | Inside of door |

a)  Issues of Sexual and/or Gender, Racial, National Origin Harassment/Discrimination Relevant to Above Items

Several of these items concerned issues of either sexual and/or gender harassment and discrimination.  For instance, Item No. 2 was a document that was posted on the door exiting into the hallway from Room NS-249.  This item which was titled "Carbon Resistors" provided a mnemonic in order to allow students to memorize the names of the various colors of the bars on resistors.  Mnemonics are often aides to the memory and serve students and others to recall specific details with greater ease.

On this item, the mnemonic contained a negative, violent and racial reference to African American males raping women.  The mnemonic stated, "Black Boys Rape Our Young Girls But Violet Gives Willingly Get Some Now." Additionally, it also makes an objectified reference to a woman (Violet) who is purported to be promiscuous.  These sorts of comments touch on and concern issues of racial, sexual and/or gender harassment and discrimination.

Item No. 3 which was titled the "Vogue May Edition" portrayed a student lying across the hood of a pickup truck holding a paper where a large phallic symbol was drawn upon it.  This item also displays an issue of sexual or gender discrimination by portraying a male penis in a drawing in an enlarged and gratuitous characterization.  This item was posted on the file cabinet in Room NS-249.

Item No. 4, identified as "2017 You Know You Want Juant Me" portrayed a male adult student who appeared to be Latino in race.  The document indicates that women might have some form of sexual desire for the individual portrayed in the document.  This individual was identified as a student and the term want "juant" was a joking reference to the individual's true name, Juan.  The document indicates "Hello Ladies" in an apparent joking invitation to women who might want to have some form of sexual contact with the individual portrayed therein.

Item No. 5, another document located in NS-249 posted on the inside of the door shows a subject identified generally as a student in the Physics and Engineering Department staring at a large item that states "Dick got her like."  There is a hash tag remark below that states "#black cock slut."  This item was making reference to a penis and specifically the penis of an African American.

Item No. 6 was essentially a covering of a window located in a door that leads to the hallway from Room NS-249.  This item had the word "Peek-a-Boo" written on it as well as "Jen's height in influence."  "Jen" was identified by an interviewee as a former student assistant who was short in stature.  This item appears to have been posted in order to make light of "Jen's" height as well as her particular influence as a student assistant.  Both of these references can be seen as derogatory both towards the student concerning her height, as well as her influence in the department as female student staff member.

b)  Issues of Profanity and/or Intimidation/Inappropriate Behavior Relevant to Above Items

Item No. 7 was a paper sign taped to the coffee maker in the NS-252 laboratory classroom.  This sign states "Turn this Shit Off".  This sign was indicative of a seeming tolerance for profanity and/or intimidation in the department.  In addition

- Page 5 -

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

to this. Item No. 8 was a sign posted above the sink in NS-252 that stated, *"Do Not Leave Your Shit in the Sink."* Again, this sign uses profanity and tends to demonstrate issues of profanity and/or intimidation in the department.

Item No. 9 was a sign posted above the coffee pot and sink area in NS-252 that states, *"Stop Making Fucking Tea in the Kettle!"* Once again, this sign makes reference to issues of profanity and intimidation in the department. All of these signs posted in or about the coffee pot, kettle/sink area were both open to both staff members, as well as students.

Finally, Item No. 13 was a memorandum written and posted by Mr. Nakajima that contains threatening language concerning expelling a student from District and ruining their "life" over a missing Fluke multimeter. This item was left up long after the meter had been returned and/or located and was seen as another display in support of an intimidating academic environment.

**Additional Documents Relevant to this Fact Finding.**

| Item | Description |
|------|-------------|
| A | Physics 230/231 Student "Cautionary Letter" |
| B | Regulations and Rules for Physics 230 Lab |
| C | August 24, 2009 email exchange between Mr. Nakajima and student |
| D | April 16, 2009 United States Department of Education, OCR, Region IX Letter to the District |

a) Syllabus, Physics Department Policies/Procedures and Warning Materials

As part of the investigation, the fact finder was provided documents identified above as Document Items A and B. These items were seen as inappropriate and Dr. Kailikole had instructed faculty to cease using these items in 2016. These items had been placed on a non-District website known as PCpepso.com, which had been created years ago by Mr. Gerwig and remains active to this day.

Document Item A was titled *To Physics 230/231 students from Physics 230 and 231 instructors.* This item appears to be a portion of a syllabus for the Physics 230/231 courses. A review of this document demonstrates a rather harsh and threatening tone. Here, the document tends to threaten students who engage in certain behaviors such as "...studying only for an exam, trying to get a maximum score with a minimum effort, and dropping a course just before the deadline." The document states "...we don't want to see those students in our classes anymore."

The document goes on to make other negative and harsh comments making reference to students that are "lazy" or who "don't want to change your bad study habit." This document encourages such students to "give your seat to someone else who is more serious than you." Although it is laudable to encourage students to academic excellence and rigor, such commentary in a document seems inappropriate, threatening and demonstrates an unwelcoming commentary concerning these classes. Additionally, the second page of this document has an area that can seemingly be detached where a student was requested to print their name and sign and date the document agreeing to certain terms. These terms state:

> I (print your name) read the statements above. I am serious about my education and will follow the guidelines given above. I will be working my hardest to learn the subjects for me and I will decide whether or not this class is for me within the first 4 weeks. If I do not drop by the end of the fourth week, I will receive a course grade of whatever I deserve.

This document requires a signature and states "...this sheet is to be turned in by Friday of the first week of a semester. Any student who failed to turn it in will be dropped from the course."

Here, it appears that the student is required to sign this document and the document tends to want to amend the official course drop policies by the District. The document directly states that if a student fails to agree with the terms of this document and sign in agreement, that they would be dropped from the course.

In addition to this required signing aspect of the document, the document also details how students will be treated in class. In relevant part, the document states "...you'll be treated exactly the way you treat this class. If you want to be treated nicely, treat this class and the professor nicely."

This document tends to demonstrate a threatening and inappropriate tone and required students to sign a document that they were not legally bound to sign under pain and penalty of being dropped from the course.

Exhibit A
P. 6

Exhibit 5
P. 6

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Vita, Gerwig, and Nakajima

Document Item B seems to be the Rules and Regulations for the Physics Lab 230. This document, like Document Item A, has a threatening tone and makes reference to "lazy" students and encourages other students to "kick out" those students that they deem to be "lazy." Essentially, this document gives authority for students to apply peer pressure in what appears to be a rather capricious fashion in determining who they subjectively believe is being "lazy" and subjecting that student to be forced out of the laboratory course.

Ironically, the document states in bold underlined print that the "...instructor is not available to answer any questions regarding the lab during the lab period." Again, the instruction states "...if anyone who is not willing, capable, or lazy is in your group, kick that person out from your group." In a rather odd commentary, the document goes on to state "...this sounds very cold, but unless you don't mind losing your job because if that person does not do his/her part, you have to learn how to protect yourself."

Essentially, the document and its authors, Mr. Gerwig and Mr. Nakajima, are encouraging students to self-select other students from whom they differ and feel might not be operating or working to a particular standard. Essentially, Mr. Nakajima and Mr. Gerwig are allowing students to grade other students, something that is only under the purview of Mr. Gerwig and Mr. Nakajima as faculty of the District. This document, like Document Item A, contains a threatening tone and gives other students seemingly unfettered authority to pressure and/or remove other students from the course in what could only be seen as an inappropriate delegation of professorial authority.

Knowledge of the Materials.

One of the issues in this fact-finding investigation was to determine whether any members of the faculty had knowledge of the materials that were posted. Although during a meeting on June 22, 2017, both Mr. Gerwig and Mr. Nakajima denied general knowledge of any of these materials, the facts in this matter demonstrate that both of these faculty used the classrooms where these items were openly and notoriously posted for all to see.

Even though these two faculty denied particular knowledge during this meeting, and generally when interviewed by the fact finder, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima knew, or should have known, about the presence of these documents. Both faculty knew, or should have known, that these materials were patently offensive, inconsistent with the District's policy concerning sexual and/or racial discrimination and further inconsistent with the academic goals of the District.

The facts in this matter tend to demonstrate that Mr. Garcia Vita, a newly appointed Assistant Professor, was generally unaware of these documents, as he typically did not use the rooms where the documents were identified. It appeared to this fact finder that these rooms were typically and nearly exclusively used by both Mr. Gerwig and Mr. Nakajima.

In addition to the materials identified as posted on walls and doors in these areas, both Mr. Gerwig and Mr. Nakajima appeared to have been aware and/or even authored documents that were placed on an unauthorized non-District sponsored website known as "PCPepso." The facts in this matter demonstrate that PCPepso was set up by the department and was loosely run by student assistants with knowledge of internet technology. This website contained documents that portend to be syllabi and recitations of the department's rules and regulations; however, these items were seen as offensive, threatening, inappropriate, and inconsistent with District policy and/or state and/or federal law.

Concerning general knowledge of the materials located in rooms NS-249 and NS-252, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima were well aware of the materials that had been placed in this area. It appeared to this fact finder that there had been a general attitude of indifference to following the rules of the District concerning the avoidance of sexual harassment, discrimination and maintaining a wholesome student academic environment. It appeared that Mr. Gerwig and Mr. Nakajima routinely departed from established protocols and propriety, and had resisted changes by Dr. Kalikota.

According to Dr. Finkenthal, both Mr. Gerwig and Mr. Nakajima routinely, and continually, used rooms NS-249 and NS-252 and were often in that area. Even Mr. Gerwig stated that if he were looking for Mr. Nakajima, he would look in room NS-249. For Mr. Gerwig and Mr. Nakajima to claim that they were unaware of the items that were openly and notoriously displayed there requires a departure from reason, common sense and logic. Clearly, they were aware of these materials, had either displayed the items themselves or allowed and even encouraged others to do so. These items were inappropriate, displayed racial, gender and national identity discrimination and harassment, and supported an intimidating and unwelcoming academic environment. Dr. Finkenthal accurately described these areas as displaying a "frat house" environment.

Exhibit A
P. 7

Exhibit 5
P. 7

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

Dr. Kalikole told the fact finder that Mr. Gerwig and Mr. Nakajima had been insubordinate to her direction to remove the materials from the PCpepso website and to refrain from using the documents concerning their classes. Mr. Garcia Villa was aware of these directions and never used these materials, as directed by Dr. Kalikole. Even so, Mr. Nakajima and Mr. Gerwig continued to allow the PCpepso website to function, claiming they were unaware how to close the link and disallow access.

In summary, even though Mr. Gerwig and Mr. Nakajima deny knowledge of the aforementioned materials found in rooms NS-249 and NS-252, the greater weight of the credible evidence demonstrates that they were aware of the materials, allowed and/or participated in their postings and display, and were untruthful concerning their assertions otherwise.

**Findings in Reference to Respondents.**

Mr. Garcia Villa

1.  **PCPepso Website Documents**

Mr. Garcia Villa said that he was aware of the PCPepso website. Mr. Garcia Villa acknowledged that he had never used the documents contained on this unofficial website set up by Mr. Gerwig in the Physics and Engineering Department. Mr. Garcia Villa recalled that Dr. Kalikole had admonished him, as well as Mr. Gerwig and Mr. Nakajima, not to use these documents. Mr. Garcia Villa is a recently-hired Assistant Professor working full-time in the last year. It appeared to the fact finder that Mr. Garcia Villa abided by Dean Kalikole's direction and did not use these documents.

2.  **Offensive Materials in Rooms NS-252 and NS-249**

The facts tend to demonstrate that Mr. Garcia Villa was a relatively new Professor in the Engineering and Physics Department. Mr. Garcia Villa taught classes, as well as a lab portion in support of his lecture courses. Mr. Garcia Villa indicated that some of the materials that were identified as items No. 1 through 13, above, were placed in the interior areas generally of Room NS-252 and NS-249. Mr. Garcia Villa said that he did not utilize Room NS-249 and was rarely in that area. Interestingly, Mr. Garcia Villa seemed more forthright concerning his observations than Mr. Gerwig and Mr. Nakajima, who are known to utilize these rooms on a frequent basis. There was no information to conclude that Mr. Garcia Villa was aware of the more offensive materials located in these rooms, nor that he participated and/or encouraged their display.

3.  **Truthfulness**

This fact finder found that Mr. Garcia Villa was a credible witness in this matter. There was no credible evidence to conclude that Mr. Garcia Villa had been untruthful in his statements to this fact finder when questioned concerning the documents on the PCpepso website or the offensive material that was found to have been displayed in Rooms NS-252 and NS-249.

Mr. Gerwig and Mr. Nakajima

1.  **PCPepso Website Documents**

The facts in this matter demonstrate that Mr. Gerwig had developed the PCpepso website. This website was an unofficial District website that certain members of the Physics and Engineering Department used to post materials, such as syllabi and various rules and regulations. Some of these materials, identified as Document Items A and B, above were identified as being problematic and inappropriate. The facts demonstrate that in 2016, Dr. Kalikole directed staff that these documents not be used due to the inappropriate language and tone contained therein.

Even so, these documents remained on the website and were seemingly available to students even though there was insufficient credible evidence to show that students were purposely directed to this website after Dr. Kalikole's direction not to do so. Mr. Gerwig was responsible for maintaining this website, but claimed that he was unable to access the website to make any particular changes as this task had been assigned to previous students who acted as "webmasters." The facts demonstrated though that Mr. Gerwig made no real efforts in attempting to contact or take steps to remove the documents from the website after direction had been given to remove Document Items A and B from the website by Dean Kalikole.

Document Items A and B were documents that seemingly were created by Mr. Gerwig and Mr. Nakajima which, taken together, formed a syllabus for students for the Physics 230 and 231 class instruction. Both of these documents

- Page 8 -

Exhibit A
P. 8

Exhibit 5
P. 8

contained harsh verbiage, referred to students as being lazy and essentially encouraged students to take negative action against other students. For instance, Document Item B states in relative part, "If a member is not working or contributing for the group, I encourage you to kick out that student." Here, the document purports to allow and even encourage to take retribution on other students that they feel might not be "contributing" to a group effort. Clearly, this sort of peer pressure is inappropriate, as the faculty member should decide as to whether a student is putting forth sufficient effort in a group environment. It appeared to this fact finder that Document Item B attempts to relegate the duties of a faculty member to peer students concerning the performance of others.

Additionally, both Document Items A and B make reference to the term "lazy." Whereas laziness is not considered a laudable trait concerning academic performance, such language and negative characterizations seem inappropriate in a professional academic document such as these purport to be. It was clear to this fact finder that based on the greater weight of the credible evidence these documents were created in collaboration between Mr. Gerwig and Mr. Nakajima. Even though Mr. Nakajima attempted to claim some predecessor had created Document Item B described as the Regulations and Rules for Physics 230 Lab the facts tend to demonstrate that this is not true. Mr. Gerwig seemed to recall that he and Mr. Nakajima had crafted this document together, and the plain evidence in the document demonstrates that the only instructors referenced in the document were, in fact, Mr. Gerwig and Mr. Nakajima. There was no reference to any other faculty within this document.

Both Document Items A and B tend to depart from the District's code of ethics. These items do not tend to encourage the free pursuit of learning in their students, nor do they demonstrate respect for students as individuals. Instead, these documents present a harsh and threatening tone and encourage students to engage in self-selection by "kicking out" other students that they feel might be "lazy" or do not "deserve the same score" as they do. Neither Mr. Gerwig nor Mr. Nakajima seemed to understand or maintain their "proper roles as intellectual guides and counselors." Instead, they wrongfully delegated their authority and duties to students to essentially police other students in a group environment. Such authority and encouragement can lead to disastrous results, including the development of cliques, discriminatory behavior and bestowing of inappropriate authority to those who will not wield that authority in a prudential fashion.

**2. Offensive Materials in Rooms NS-252 and NS-249**

Concerning the offensive materials located in Room NS-252 and NS-249 identified herein as Items 1 through 13, it was clear to the fact finder that both Mr. Gerwig and Mr. Nakajima were aware of these materials, and had essentially allowed their display, participated in their display or were recklessly indifferent to the display of these items. The display of these items seems consistent with the tone as demonstrated in the two documents identified as Item A and Item B above. As Dr. Finkenthal described, Mr. Gerwig and Mr. Nakajima encouraged a "frat house" environment in the department and seemed to allow and encourage discriminatory behavior, as displayed in these offensive materials, and encourage other students to participate in this wrongful conduct.

Both Mr. Gerwig and Mr. Nakajima claimed that they were unaware of the more discriminatory and wrongful documents. However, the greater weight of the credible evidence, as described above under Section X.A.6, demonstrates that they were well aware of these items, but refused to acknowledge their presence in some attempt to evade culpability for either posting these materials or allowing their students to do so. Many of these items appear to have been potentially crafted by students that were in the Physics and Engineering Department.

Allowing these items to be created and then posted in the department demonstrated that Mr. Gerwig and Mr. Nakajima had given their imprimatur for students to engage in discriminatory and biased activities. Indeed, some of the items that had been identified in the room that Mr. Nakajima and Mr. Gerwig often used (NS-249) and specifically the "carbon resisters" mnemonic learning aid demonstrate a complete departure from the District's mandate of providing an academic environment free of discriminatory content and racist/sexist stereotypes. That these items were openly and notoriously displayed in the department where students often congregated would seemingly encourage students to engage in similar behavior and it appears that they did so.

In addition to obvious departures from the District's rules concerning discrimination and harassment, several items, such as various signs and notes located in room NS-252, in or about the sink and coffee service area displayed foul language and intimidating content that was wholly inappropriate in a professional academic environment. The idea that Mr. Gerwig and Mr. Nakajima were not fully aware of all of these items is absurd. The District has rules concerning sexual harassment and intimidation. B.P. 3430 Prohibition of Harassment states in relevant part:

> *The District shall be free of sexual harassment and all forms of sexual intimidation and exploitation including acts of sexual violence. It shall also be free of other unlawful harassment, including that which is based on any of the following statuses: race, religious creed, color, national origin, ancestry, physical*

Exhibit A
P. 9

Exhibit 5
P. 9

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Garvey, and Nakajima

disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, or sexual orientation of any person, or because he/she is perceived to have one or more of the foregoing characteristics.

In addition, the District has rules concerning general harassment that would be based on a legally recognized protected characteristic. A.P. 3430 Prohibition of Harassment states in relevant part:

General Harassment — Harassment based on race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, gender, gender identity, gender expression, sex, age, or sexual orientation of any person, or the perception that a person has one or more of these characteristics is illegal and violates District policy. Gender based harassment does not necessarily involve conduct that is sexual. Any hostile or offensive conduct based on gender can constitute prohibited harassment.

Apart from these harassment and discrimination rules, the District's mission statement requires "[d]iversity in learning environments, philosophies, cultures, beliefs and people" as well as "[i]nclusiveness of individual and collective viewpoints."

Article 3: Code of Ethics of the Constitution of the Faculty of Palomar College states, in relevant part:

Faculty members have an obligation to the District, their students, colleagues, profession, the public and themselves to maintain the highest standards of ethical conduct. In recognition of this obligation, faculty members adopt the following standards of ethical conduct: Adapted from the American Association of University Professors (AAUP) Ethics Statement.

1. Professors, recognizing their social responsibility:
   - Develop and improve scholarly competence,
   - Exercise critical self-discipline and judgment in transmitting knowledge,
   - Practice intellectual honesty.

2. Professors, as teachers:
   - Encourage the free pursuit of learning in their students,
   - Demonstrate respect for students as individuals,
   - Keep to their proper roles as intellectual guides and counselors,
   - Evaluate students in an unbiased manner,
   - Respect the confidentiality of students,
   - Acknowledge significant or scholarly assistance from students.
   - Do not exploit, harass, or discriminate against their students.

3. Professors, as colleagues:
   - Do not discriminate against or harass colleagues,
   - Respect and defend the free inquiry of associates,
   - Exchange criticism and ideas,
   - Acknowledge academic debt,
   - Strive to be objective in their professional judgment of colleagues,
   - Accept their share of faculty responsibilities for the governance of their institution.

4. Professors, as members of an academic institution:
   - Seek to be effective teachers and scholars,
   - Uphold academic freedom,
   - Maintain their right to criticize and seek revision,
   - Give due regard to their responsibilities within the institution, when considering termination of their employment, give due notice of their intentions.

5. Professors, as members of their community:
   - When they speak or act as private persons avoid creating the impression of speaking or acting for their District,
   - Promote free inquiry and further public understanding of academic freedom."

- Page 10 -

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

Finally, B.P. 3050 Institutional Code of Ethics states that "[t]he District is committed to the highest ethical standards in furtherance of our mission of education and public service:

*Excellence in teaching, learning, and service*
*Integrity as the foundation for all we do*
*Access to our programs and services*
*Equity and fair treatment of all in our daily interactions*
*Diversity in learning environments, philosophies, cultures, beliefs, and people*
*Inclusiveness of individual and collective viewpoints*
*Mutual respect and trust through transparency, civility, and open communications*
*Creativity and innovation in engaging students, faculty, staff, and administrators*
*Physical presence and participation in the community"*

Here, Mr. Gerwig and Mr. Nakajima departed from the District's anti-harassment and discrimination rules and further violated their duties as faculty of the District. It was clear, based on the greater weight of the credible evidence developed in this investigation, that both Mr. Gerwig and Mr. Nakajima were aware of the use of the inappropriate documents identified as Document Items A and B, above as well as the offensive materials located in rooms NS-249 and NS-252. Their knowledge of these items demonstrates a lack of prudential judgment and reckless indifference to the rules of the organization that mean to prevent discrimination, harassment and promote an open and welcoming academic environment.

In addition to Mr. Gerwig and Mr. Nakajima's violations of the District's rules concerning harassment and discrimination, as well as the breach of their ethical duties, it appeared clear that they both had resisted and had acted in a spiteful manner towards their supervisor, Dr. Kalilkole. Dr. Kalilkole informed the fact finder that student reviews for Mr. Nakajima's class contained negative references to Dr. Kalilkole that she attributed to comments by Mr. Nakajima made to students.

Indeed, Dr. Kalilkole is correct in her assumption here as Mr. Nakajima acknowledged that he had told students that somehow Dr. Kalilkole had promised additional equipment, but thereafter had reneged on that promise. Mr. Nakajima indicated that students were upset by this news. Mr. Nakajima appeared to have told students this derogatory information about Dr. Kalilkole in order to hold Dean Kalilkole out to hatred and ridicule by his students. There was no legitimate business reason for Mr. Nakajima to share such information with his students but for to cause students to be angry at Dr. Kalilkole with whom Mr. Nakajima had differed and had actively resisted as a subordinate instructor.

**3. Student Matter – Mr. Nakajima**

The facts in this matter demonstrate that in April 2009 the Physics and Engineering Department had been investigated by the United States Department of Education, Office of Civil Rights (Document Item D) concerning a violation of the Americans with Disabilities Act. Immediately thereafter, members of the Physics and Engineering Department were required to undergo sensitivity training in education concerning the ADA, and the idea concerning reasonable accommodations in an academic setting.

Dr. Finkenthal provided the fact finder with an email exchange, Document Item C, between a student and Mr. Nakajima. This email indicates the student, who had a disability and used a wheelchair, requested an accommodation concerning the Physics 230 course and its required lab section. The student was clearly seeking some form of accommodation when he wrote, "I was just wondering how flexible you would be under extreme circumstances."

Instead of working with the student and/or referring him to the District's Disability Resource Center, Mr. Nakajima wrote back to the student advising him to take "1,000 milligrams of Vitamin C, multivitamin, and CoQ-10, 50 milligrams or more every day, starting right now." Mr. Nakajima refused to entertain any sort of reasonable sort of accommodation for the student's disability and wrote in relevant part, "I can't give you an extra treatment, but if you start taking care of yourself as I suggested, you should be doing better than a regular semester."

Here, the District, per Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990, is obligated to provide accommodations to ensure the student's equal access to the District's programs and activities. It is the student's responsibility to notify instructors of the need for accommodations and thereafter the instructor is required to refer the student to the Disability Resource Center and work with the student in order to provide reasonable accommodations. In this instance, Mr. Nakajima failed in his obligation in regard to this potential disability. In this case, the student used a wheelchair, yet Mr. Nakajima purported to give the student advice on taking vitamins as opposed to

- Page 11 -

Exhibit A
P. 11

Exhibit 5
P. 11

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

engaging in meaningful communication concerning the use of the Disability Resource Center and the allowance of some form of reasonable accommodation, as required by law.

Added to this, this exchange occurred only months after the Physics and Engineering Department had undergone an investigation concerning the very same sort of issue. Mr. Nakajima and others had been interviewed in the matter and later had received training concerning reasonable accommodation requests. Even so, Mr. Nakajima failed to provide these required steps in potentially accommodating this disabled student.

4. Truthfulness

Here, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima failed to be truthful in their statements to the fact finder, as well as their statements during the June 22, 2017 meeting with District administrators concerning the offensive materials located in rooms NS-252 and NS-249. As detailed above, the greater weight of the credible evidence demonstrates that both Mr. Gerwig and Mr. Nakajima had knowledge of the materials that were displayed openly in areas that they frequented on a near daily basis.

The facts were clear that both Mr. Nakajima and Mr. Gerwig were often located in and using rooms NS-252 and NS-249 and were reasonably well aware of the items that were posted on doors in which they would pass and on walls in areas that they often frequented. Their claims that they were unaware of these items appear to this fact finder to be directly untruthful and offered merely for the purposes of evading culpability for allowing and/or encouraging the posting of such items.

Here, both Mr. Gerwig and Mr. Nakajima have failed to "accept their share of faculty responsibility for the governance of their institution" and "practice intellectual honesty" as required by the Constitution of the Faculty of Palomar College. B.P. 3050, the District's Institutional Code of Ethics, upholds "[i]ntegrity as the foundation for all we do." Here, both Mr. Gerwig and Mr. Nakajima failed to demonstrate integrity concerning their discussions on June 22, 2017, and then later when directly questioned specifically by the fact finder when questioned during this course of this fact-finding investigation.

Summary of Findings.

There appeared, based on the investigation, to be a pattern and practice of posting and/or allowing the posting and/or display of objectionable material in or about the rooms used by Mr. Gerwig and Mr. Nakajima. The fact finder determined that Mr. Garcia Villa, who was relatively new to the Department, was generally unaware of the true nature of the materials that had been displayed. However, both Mr. Gerwig and Mr. Nakajima both knew, or should have known, that the materials posted in the offices and rooms that they used on a consistent basis were inappropriate, offensive and discriminatory in nature, and yet they allowed the materials to remain.

The fact finder also determined that it appeared that both Mr. Gerwig and Mr. Nakajima both provided false information at a meeting on June 22, 2017 wherein they disavowed knowledge of the documents that were the subject of this investigation. Indeed, both faculty told the fact finder that they were largely unaware of the materials, or had no recollection of having observed them. These statements were inconsistent with the facts as discovered in this investigation.

In summary, based on the greater weight of the credible evidence, it appears that both Mr. Gerwig and Mr. Nakajima were or should have been aware that materials that were deemed objectionable, offensive and discriminatory in nature had been displayed and/or allowed to be displayed in offices and school areas under their dominion and control. Even though both professors feigned that they were unaware of these materials, the greater weight of the credible evidence demonstrates that they were aware of the materials, and allowed them to be displayed in the area. This behavior tends to demonstrate unbecoming conduct by these professors, as the materials were seen as objectionable, inappropriate and discriminatory in nature.

Additionally, the fact finder found that faculty members of the Physics and Engineering Department used a non-District website in order to disseminate a syllabus and other documents that students were required to read and/or sign and return. These documents were seen as warning documents that admonished students concerning their study habits and how to interact with other students. These warnings and instructions appeared inconsistent with the District's goal in their educational pursuits.

There was insufficient credible evidence to show that Mr. Garcia Villa was aware of the nature of these materials due to his lack of tenure in the Physics and Engineering Department, and his lack of use and exposure to the areas in which the

- Page 12 -

Exhibit A
P. 12

Exhibit 5
P. 12

CONFIDENTIAL
Palomar Community College District
Summary of Investigation Report: Anonymous Student vs. Garcia Villa, Gerwig, and Nakajima

materials were displayed. The fact finder therefore determines that the allegations are sustained as to Mr. Gerwig and Mr. Nakajima, and not sustained as to Mr. Garcia Villa.

## ADMINISTRATIVE DETERMINATION.

Based upon the investigator's assessment of the interviewees' credibility and documentary evidence, the burden of preponderance of evidence, which is required to uphold charge of unlawful discrimination and sexual harassment, is sufficient to sustain Dr. Finkenthal's allegations on behalf of the anonymous student. The District's administrative determination is therefore to sustain the complaint against Mr. Gerwig and Mr. Nakajima and to dismiss the complaint against Mr. Garcia Villa. This matter is hereby referred to the District's administration for disciplinary action against Mr. Gerwig and Mr. Nakajima.

The allegations were received and investigated as an informal complaint, although the District ensured that the usual steps undertaken in a formal investigation were followed. Dr. Finkenthal and the anonymous student have the right to submit a formal written complaint of unlawful discrimination to the District in accordance with Title 5, § 59328 et. seq. using the form available on the District website at http://www2.palomar.edu/pages/hr/files/2014/07/Discrimination-Harassment-Complaint-Form-Web.pdf. The form is also available at the Human Resource Services office in room ST-1. A written complaint submitted in this manner may be filed up to one (1) year from the date on which the unlawful discrimination allegedly occurred.

The anonymous student also has the right to file a complaint with United States Department of Education, Office of Civil Rights. Information regarding filing a complaint with OCR is available on OCR's website at http://www2.ed.gov/about/offices/list/ocr/docs/howto.html or by calling OCR's office at (800) 421-3481.

Respectfully submitted,

Shawna H. Cohen
Manager, Equal Employment Opportunity and Compliance
   and Deputy Title IX Coordinator
Palomar Community College District
November 1, 2017

- Page 13 -

# EXHIBIT 6

From: **Cohen, Shawna** SCohen@palomar.edu 🖉
Subject: FW: Student Complaint Today
Date: February 22, 2018 at 2:18 PM
To: Jeff Love lovejb@gmail.com



**Exhibit O**

Hi Jeff -

Below is another email related to the Kailikole/Finkenthal investigation.  It shows that on November 27, 2017, Dr. Norman advised Dr. Kailikole regarding proceeding with a student complaint brought forth by Dr. Finkenthal.  I will add this to the others to print for the interviews.

I've contacted both individuals and am waiting for confirmation for interviews next Wednesday, February 28th.

Thanks,
Shawna



*Shawna H. Cohen*

**Manager, Equal Employment Opportunity and Compliance
and Deputy Title IX Coordinator**

Tel: (760) 744-1150 ext. 2608 | Fax: (760) 761-3530
Email: scohen@palomar.edu | Web: www.palomar.edu/hr

**PALOMAR COLLEGE**
Learning for Success

**From:** Norman, Lisa M.
**Sent:** Wednesday, February 21, 2018 5:38 PM
**To:** Cohen, Shawna <SCohen@palomar.edu>
**Subject:** Fwd: Student Complaint Today

For Jeff Love's investigation

Sent from my iPhone

Begin forwarded message:

> **From:** "Norman, Lisa M." <lnorman@palomar.edu>
> **Date:** November 27, 2017 at 9:07:58 PM PST
> **To:** "Kailikole, Kathryn L." <kkailikole@palomar.edu>
> **Cc:** "Kahn, Jack S." <jkahn1@palomar.edu>
> **Subject: Re: Student Complaint Today**
>
> Hi Kathy,
> Because this concern addresses possible disciplinary actions. I did not include

**Ex. A, Page 248**

Exhibit 6
P. 1

Daniel in the email.

While I understand the concerns expressed below, these appear to be curriculum and instructional matters that would need to be addressed by providing due process to the instructors so they have opportunity to address the allegations. I understand the frustration in dealing with what sounds like their ongoing practices that is in violation of prior directives but we need to confirm that this is truly what is occurring. At the same time, we need to be cognizant that a student is presenting this complaint and make sure we follow any established process for addressing this type of complaint. If this conduct is substantiated then we will appropriately address it.

I understand that students may not want to come forward for fear of retaliation. If this is the case can you or Daniel go observe these additional Friday prep sessions? By witnessing this conduct directly can substantiate what has been shared by the students.

As you are aware, as administrators, it is our responsibility to address matters that impact the District that may create liability and deviate from our goals and mission. For this reason, placing the instructor on administrative leave with pay is not an appropriate remedy to this type of issue otherwise we may create precedence for why we would place instructors on leave, which is not an appropriate basis for an administrative leave.

As a next step, please ask Daniel if the student is willing to place his complaint in written form. If not, you can still proceed in asking both instructors, separately, about the expressed concerns that you have heard. However, prior to doing this, I would highly recommend you or Daniel trying to observe these actions firsthand.


Thanks,
Lisa

Sent from my iPhone

On Nov 27, 2017, at 6:00 PM, Kailikole, Kathryn L. <kkailikole@palomar.edu> wrote:

> Dear Drs. Norman and Kahn,
>
> Please read the email below from Dr. Finkenthal. Both Dr. Finkenthal and I believed that Instructors Nakajima and Gerwig should have been removed from classes this fall especially given their recent and past history in the District. I am re-issuing our request that Instructors Nakajima and Gerwig be removed from the

classroom as soon as practicable.  I want to make you aware that they continue to violate California Education Code and directives from Deans Sourbeer and Kailikole hence violating students' civil rights.  I appreciate administrative processes however protecting students' rights is also our responsibility especially our most vulnerable populations.  In a time of watershed moments, I hope to see the Palomar Community College District be transparent and humane in processes affecting both faculty and students.  More importantly, I would like that in their actions, the District validates the numerous students who have had not only their voices silenced but their college pathways ruinously impacted by these instructors.

I appreciate your time regarding such a serious matter.

Respectfully,

Dr. Kathryn Kailikole
Dean
Mathematics and the Natural and Health Sciences

Palomar College
1140 West Mission Road
San Marcos, CA 92069-1487
760-744-1150 ext. 2253
kkailikole@palomar.edu

-----Original Message-----
From: Finkenthal, Daniel
Sent: Monday, November 27, 2017 4:46 PM
To: Kailikole, Kathryn L. <kkailikole@palomar.edu>
Subject: Student Complaint Today

Hello Dean Kailikole,
I had a student come to my office today to make a complaint regarding our Physics 230 class taught by Professor Nakajima. His name is Nathan Uwin. I listened and provided advice as best I could, and asked that he make an appointment to discuss his issues with you directly.

Nathan appears to be a bright and effective student with a goal of transferring to Cal Poly in Mechanical Engineering. He chose to enroll in Professor Nakajima's Physics 230 because the class fit his

schedule with the college swim team. He said he took the 230 class "despite the reputation" since he had already earned an A in high school physics and Math 140 here at Palomar. Today he was told that he will fail the class and now plans to repeat the class at Mira Costa next spring. Nathan's complaint is that the expectations and requirements of the Physics 230 class are unfair and designed to cause students to fail unless they repeat the class two or three times.

Specifically:
*Students are required to take 3-hour plus long exams outside of the normally scheduled 1-hour lecture periods.
*Students are required to attend additional "lab prep" sessions on Friday afternoons in order to receive necessary instruction for the lab scheduled the following week. Nathan has attended every lab prep session this semester and reports that if he did not he would have gotten a zero for the lab.
*Students are expected to study and do homework for more than 20 hours per week for this one class.
*Students were unable to track their grade or standing in the class until today. Nathan and others received notice today that they are failing the class.
*Students are discouraged from taking the class with anyone other than Nakajima or Gerwig since they will "pay a price later" when they attempt other physics and engineering classes.

These complaints echo previous complaints, and indicate that there has been no attempt to reform the classroom environment in the Physics 230 courses taught by professors Nakajima and Gerwig. Of immediate concern is the requirement that students attend "lab prep" sessions and take exams outside of normally scheduled class times. All members of the Department have been previously notified by Dean Sourbeer that it is not appropriate to require students to attend exam sessions outside of class time. Last Fall you expressly forbid the department to require students to attend Friday Lab Prep sessions. The explanation in both cases was that these practices are not permitted by state education code.

The Physics 230 class is an introductory FIRST SEMESTER physics class and is a vital gateway for students who are considering a future in a STEM field. These ongoing violations are damaging our students and our program, and it is un-conscionable that the District permits them to continue. I am sorry to be a pest but I truly believe that the only way forward is to remove these two instructors from having power and authority over students. I have also made this clear to my union representatives and the faculty senate president.

Ex. A, Page 251

Exhibit 6
P. 4

Sincerely,
Daniel

Daniel Finkenthal, Ph.D.
Professor and Chair
Department of Physics and Engineering
Palomar College
San Marcos, CA  92069

# EXHIBIT 7

# 4. Palomar College Police Department Report 2016-00138

Exhibit 7
P. 1



Palomar College
PALOMAR COLLEGE
1140 W. MISSION ROAD
SAN MARCOS, CA. 92069

Case Report

Reported By   OFFICER SO'OTO

| Incident Types Label | Offender | Incident Disposition |
|---|---|---|
| INFORMATION ONLY | NAKAJIMA, TAKASHI (SUSPECT) | INFORMATION ONLY REPORT |

| Report Disposition | Method of Reporting |
|---|---|
| REPORT | |

Related Number:
2016-00021365

| Incident Occurred Date | Incident Occurred End Date | Incident Discovered / Called In |
|---|---|---|
| 04/19/2016 at 1030 | 04/21/2016 at 1115 | 04/21/2016 at 1115 |

| Location | Specific Location |
|---|---|
| 1140 W. MISSION RD. : SAN MARCOS CAMPUS : NS BLDG | NS252 |

| Manager/Supervisor On Duty | Manager/Supervisor Notified |
|---|---|
| | NO |

Report Synopsis/Overview

An Instructor of "PHYSICS-230", Takashi NAKAJIMA was using a 6 millimeter airsoft gun as a part of his semester exams in physics lab room NS-252. Students in the class reported the experiment created an unsafe environment.

**List of contacts in this report**

| BROWN, DALLAS | REPORTING PERSON |
|---|---|
| FRIENDS, SHELBY | REPORTING PERSON |
| NAKAJIMA, TAKASHI | SUSPECT |

**Contact # 1   (REPORTING PERSON)**

Full Name
DALLAS BROWN

| Age | Date of Birth | Gender | Race |
|---|---|---|---|
| 19 | 11/13/1996 | FEMALE | W - WHITE |

**Addresses**

Address :
2001 CACTUS PLACE

| City | State | Zip | Country | Address Type |
|---|---|---|---|---|
| ESCONDIDO | CA | 92027 | USA | HOME |

**Phones :**
([IMPORTED]) (760)547-4492

**Other Id Numbers**

| Id Type | ID Number |
|---|---|

| Prepared By: OFFICER SOOTO(P16 SOOTO) | Submitted Date 04/21/2016 1118 |
|---|---|
| Signature | Reviewed By/Date |

Ex. A, Page 254

Exhibit 7
P. 2

SID                                                                    010705068

## Contact # 2   (REPORTING PERSON)

Full Name

SHELBY  FRIENDS

| Age | Date of Birth | Gender | Race |
|-----|---------------|--------|------|
| 19 | 06/23/1996 | FEMALE | W - WHITE |

## Addresses

Address :

1265 STONE DR

| City | State | Zip | Country | Address Type |
|------|-------|-----|---------|--------------|
| SAN MARCOS | CA | 92078 | | [IMPORTED |

### Phones :

([IMPORTED]) (951)760-1317

## Other Id Numbers

| Id Type | ID Number |
|---------|-----------|
| SID | 010750984 |

## Contact # 3   (SUSPECT)

Full Name

TAKASHI  NAKAJIMA

| Drivers License | Drivers LicenseState | Email Address |
|-----------------|----------------------|---------------|
| N6386562 | CA | |

| Age | Date of Birth | Gender | Race |
|-----|---------------|--------|------|
| 58 | 12/24/1957 | MALE | A - ASIAN |

| Height | Weight | Hair Color | Eye Color |
|--------|--------|------------|-----------|
| 509 | 140 | BLK - BLACK | BRO - BROWN |

| Approx. Age | Demeanor | Build | Clothing |
|-------------|----------|-------|----------|
| | | MEDIUM | |

## Addresses

Address :

1156 MEADOW LAKE DRIVE

| City | State | Zip | Country | Address Type |
|------|-------|-----|---------|--------------|
| VISTA | CA | 92084 | USA | HOME |

Address :

1156 MEADOW LAKE DRIVE

| City | State | Zip | Country | Address Type |
|------|-------|-----|---------|--------------|
| VISTA | CA | 92084 | | [IMPORTED |

### Phones :

([IMPORTED]) (760)744-1150X4334

## Digital Media List

| Prepared By: | Submitted Date |
|--------------|----------------|
| OFFICER SOYOTO(P16 SOYOTO) | 04/21/2016 1118 |
| Signature | Reviewed By/Date |

Page 2 of 6

Digital Media # 1



Title
3219.JPG

Description

Digital Media # 2



Title

Description

Digital Media # 3



Title

Description

| Prepared By: | Submitted Date |
|---|---|
| OFFICER SO'OTO(P16 SO'OTO) | 04/21/2016 1118 |
| Signature | Reviewed By/Date |

Ex. A, Page 256

Exhibit 7
P. 4

Digital Media # 4



Title

Description

**Narrative text**

ORIGIN:

On 04/19/16 at about 1030 hours, I received a radio call of a BB gun being used in a lab class at NS-252. The complainants were waiting for me at NS-147 office.

Upon my arrival at NS-252, I spoke with Instructor NAKAJIMA. NAKAJIMA told me that he was not using a BB gun and that he was using an airsoft pellet gun to shoot at paper targets as part of his semester exams.

I then went to NS-147 and met with R/P-Students Dallas BROWN and Shelby FRIENDS. Health Science Interim Dean Kathryn KAILIKOLE was also present during my interview with BROWN and FRIENDS. BROWN and FRIENDS were basically concerned about how the airsoft gun was being handled unsafely during class. They were concerned that there were no protective goggles and no safety instructions prior to handling the weapon. (See statements for further details of BROWN and FRIENDS statements.) I then advised KAILIKOLE that NAKAJIMA told me the airsoft gun was part of his curriculum and he was using it for his semester exams. KAILIKOLE then told me that she will look in to it and get back to me if it fell within policy.

On 04/21/16 at about 1115 hours, I responded back to the NS-147 building and met with Interim Dean KAILIKOLE. KAILIKOLE handed me a copy of the Palomar Community College District Procedure and under AP 3530 WEAPONS ON CAMPUS. (See attached copy.) KAILIKOLE pointed out the section under Educational activities involving firearms or other weapons to be authorized by the Chief of Police before the activity take place. The airsoft gun utilized in NAKAJIMA's class was never approved by the Chief of Police.

STATEMENTS:

Statement of Victim/Witness Dallas BROWN:

BROWN essentially told me that Professor NAKAJIMA brought out a pellet gun and load it with a rubber pellet, then handed it to a student and told the student not to miss and collect the BB after they shoot the paper. BROWN said she thought it was a BB gun because NAKAJIMA was calling the pellets BBs'. BROWN said there were no instructions as how to load the gun or how to use it. BROWN said there were no safety classes and the students did not know how to shoot the gun. There were students walking in the line of fire and no one was watching the door into the classroom for a while. BROWN said as the students shot their paper, the pellets would bounce off the wall and other students were attempting to catch the pellets. BROWN said NAKAJIMA was in the class but he was talking with another instructor and not paying attention to the students shooting. BROWN said she is very concerned with the lack of safety instructions while handling the gun.

| Prepared By: | | Submitted Date |
|---|---|---|
| OFFICER SOTOTO(P16 SOTOTO) | | 04/21/2016 1118 |
| Signature | | Reviewed By/Date |

Exhibit 7
P. 5

BROWN said she was hit with a pellet that ricochets off one of the shots. BROWN said it did not hurt and she was not injured. BROWN does not desire prosecution.

Statement of Witness Shelby FRIENDS:
FRIENDS told me they were conducting a rotational "inertia" lab as part of the calculations to pick a point of origin. FRIENDS said NAKAJIMA had the students use an airsoft gun "which he called a BB gun". FRIENDS said NAKAJIMA would pull out the airsoft gun and load it, after making sure the class knew how the gun worked. He then cocked it and hand it to a student pointing the gun at the student in the process. NAKAJIMA would then leave the student to shoot the gun while he sat in the back of the class conversing with students and other professors and not paying attention to the transactions with the gun between the students. There was no safety lectures given on how to handle the gun or what not to do. FRIENDS said no student was required to wear safety glasses. FRIENDS said several students were almost shot due to the lack of any safety lecture.

FRIENDS also videotaped one of the airsoft lab exercises. FRIENDS send the video to Interim Dean KALILIKOLE.I watched the video and saw the following:

- A female student being coached by two students on how to shoot the airsoft gun
- A student standing by the main door and in the line of fire to prevent anyone entering class during the airsoft exercises
- A student siting to the left of the target, also in the line of fire and it appeared to be catching the spent rubber pellet and putting it back to a bucket or just on the desk
- NAKAJIMA was nowhere to be seen on the video
- No students on the video were wearing any protective gear ie: eye protection or body protection

Statement of Instructor Takashi NAKAJIMA:
NAKAJIMA told me he has been using the same airsoft gun for the last two years or more as part of his curriculum. The point of the airsoft is the students shoot at the paper target then they determined the point of origin on their paper targets. I asked NAKAJIMA if he knew about the policy of getting authorization from the Chief of Police before using any weapon on campus and he said, "No I didn't". I asked NAKAJIMA if he conducts any safety instructions prior to using the airsoft and he said he just tell the students to point it towards the target and shoot. NAKAJIMA also said he has all the students stand behind the line of fire. NAKAJIMA said he does not require students to wear safety goggles.

NAKAJIMA also showed me the other machine that he uses in his class to estimate velocity. (See attached photo.) It is called the "Balistic Pertulum". It is a metal machine with about an inch in diameter of a metal ball attached to a long screw with a spring that when the trigger is pulled, the round metal ball would fire forward while still attached to the screw and hit its point of rest on a metal catcher at the other side of the machine, which is about two feet in length. The metal ball never leaves or be separated from the machine.

NAKAJIMA said the second part of the curriculum is the firing of the airsoft pistol with rubber pellets in order for the student to determine its point of origin.

INVESTIGATION:
I took photos of the airsoft gun and the cabinet for where it is stored. (See attached.) The airsoft is kept inside its original box and stored inside the bottom drawer of the instructor's desk. The drawer is unlocked.

The airsoft gun is a P.169 Double Eagle Spring Airsoft Hand Gun. It shoots 6mm rubber pellets at 185 feet per second.

Based on BROWN and FRIENDS statements and the video, it appeared that it confirms the lack of any safety procedures and the lack of supervision by the Instructor(s) during airsoft gun exercises.

Pictures of the "Balistic Pertulum" was forwarded to KAILIKOLE.

| Prepared By: | Submitted Date |
|---|---|
| OFFICER SOTO(P16 SOTO) | 04/21/2016 1118 |
| Signature | Reviewed By/Date |

INJURIES:
None.

EVIDENCE:
A copy of the video to be placed into the evidence room for safekeeping.

PROPERTY DAMAGE:
None.

| Prepared By: | Submitted Date |
|---|---|
| OFFICER SO'OTO(P16 SO'OTO) | 04/21/2016 1118 |
| Signature | Reviewed By/Date |

Ex. A, Page 259

Exhibit 7
P. 7

# EXHIBIT 8





1140 West Mission Road
San Marcos, CA 92069-1487

## CONFIDENTIAL MEMORANDUM

**Date:** December 14, 2017

**To:** Kathryn Kailikole, Dean, Mathematics and the Natural and Health Sciences

**From:** Lisa Norman, Ed.D., J.D., Assistant Superintendent/Vice President, Human Resource Services

**RE:** Administrative Leave Pending Personnel Investigation

A personnel investigation has been initiated and you are included in the focus of the investigation. The investigation concerns allegations of misconduct involving a breach of confidentiality. Effective immediately, pending the outcome of the investigation, you are hereby placed on administrative leave with full pay and benefits until further notice.

During your administrative leave, you are not permitted to return to work or otherwise be at any District location unless you receive specific permission to be at a District location by me or my designee. Unless I or my designee authorize you in advance to do so, you are to have no written, oral, or electronic communications with any District employee or student, except me, my designee, and your representative.

Further, while you are on administrative leave, your District email account (kkailikole@palomar.edu) will be inaccessible to you. Accordingly, please provide me with your personal cell phone number and personal email account so we can maintain communication while you are on administrative leave. During the leave, please respond to our inquiries in a reasonably prompt manner.

You are required to turn in all District-issued equipment, including your District parking permit, keys, and all electronic devices, today. If you have personal property you need to retrieve from your office, notify me of the specific items and District personnel will retrieve it and contact you when it is ready for you to retrieve.

At some point in the future you will be interviewed regarding this matter. The date, location, and other details of the interview have not yet been determined. You will be notified in advance of these details when they become available. During your interview, you may have a representative with you. You are directed to cooperate with the interviewer and to be truthful in your responses. Additionally, you are not to retaliate in any fashion against anyone who may participate in the upcoming investigation or anyone whom you suspect may participate in an upcoming investigation.

*I acknowledge receipt of this memorandum.*

_____
Employee Signature (Kathryn Kailikole)

<u>December 14, 2017</u>
Date

Exhibit 8
P. 1

# EXHIBIT 9



**PALOMAR COLLEGE®**  1140 West Mission Road, San Marcos, California 92069-1487 • 760-744-1150 • www.palomar.edu
Learning for Success

February 22, 2018

**Joi Lin Blake, Ed.D.**
**Superintendent/President**

**PERSONAL AND CONFIDENTIAL**
**VIA EMAIL**

**Governing Board**
Nina Deerfield
Mark R. Evilsizer
John J. Halcón, Ph.D.
Nancy Ann Hensch
Paul P. McNamara
Student Trustee:
ASG President

**Office of the President**

Dr. Kathryn Kailikole
P.O. Box 308
Suisun City, CA 94585-0308

**Re:  Retaliation Complaint**

Dear Dr. Kailikole:

This letter is in response to emails from your counsel, Evan Dwin, dated
February 20 and 21, 2018, stating that you believe you were placed on paid
administrative leave by the District, and are under investigation, in retaliation for
reporting unlawful conduct by two professors in the Physics and Engineering
Department, including displaying sexually explicit and racist images in the
laboratory.

Your complaint is being processed under the District's Unlawful Discrimination
Complaint Procedures. (Attachment 1.) Please note that the complaint
procedures require that formal written complaints of unlawful discrimination,
harassment and/or retaliation against the District must be filed on a form
prescribed by the California Community Colleges Chancellor's Office. Attached
is the form for filing a formal written complaint. (Attachment 2.) Please
complete the form and return to the District's Human Resource Services office.
The timeline for rendering an administrative determination following receipt of a
written complaint is ninety (90) days.

An assessment of the accuracy of the allegations has not yet been made. The
District has appointed an outside investigator to conduct an investigation
regarding the allegations in your complaint. The investigator will investigate your
allegations of retaliation as part of the currently pending investigation. You will
be contacted to schedule an interview. You have the right to have a
representative of your choosing at your interview, however, should you choose
to have representation, please be advised that the District will not pay for the
cost of such. It is the District's understanding that you are represented by
attorney Evan Dwin and that Mr. Dwin will attend your interview(s). Please be
advised that confidentiality is necessary to protect the integrity of the
investigation.

Exhibit 9
P. 1

*Dr. Kathryn Kailikok*
*February 22, 2018*
*Page 2 of 2*

Please note that the District may undertake efforts to informally resolve the complaint, however, you are not required to participate in any informal resolution, nor will you be required to confront, or work out problems with, person accused of unlawful retaliation

District policy and applicable law prohibit retaliation against any employee for filing a complaint of unlawful discrimination/harassment and/or for participating in any manner in an investigation thereof. Please inform me immediately if you are subject to any retaliatory action.

Please be advised that you may also file a charge of retaliation with the Equal Employment Opportunity Commission located in San Diego or with the California Department of Fair Employment and Housing at www.dfeh.ca.gov.

Regards,

Shawna Cohen
Manager, Equal Employment Opportunity and Compliance
and Deputy Title IX Coordinator

Cc:  Evan Dwin, Attorney (via email: edwin@dwinlegal.com)

Enclosures:

1. District's Unlawful Discrimination Complaint Procedures
2. District's Complaint Form

Exhibit 9
P. 2

# EXHIBIT 10



**PALOMAR COLLEGE®** 1140 West Mission Road, San Marcos, California 92069-1487 • 760-744-1150 • www.palomar.edu
*Learning for Success*

**Joi Lin Blake, Ed.D.**
Superintendent/President

**Governing Board**
Nina Deerfield
Mark R. Evilsizer
John J. Halcón, Ph.D.
Nancy Ann Hensch
Paul P. McNamara
Student Trustee:
ASG President

**Office of the President**

February 26, 2018

**PERSONAL & CONFIDENTIAL**

**DELIVERY BY EMAIL AND REGULAR U.S. MAIL**

Dr. Kathryn Kailikole
P.O. Box 308
Suisan City, CA 94585-0308

Re:    **Twenty-Four (24) Hour Notice Pursuant to Government Code § 54957**

Dear Dr. Kailikole:

This letter constitutes formal notice that the Governing Board of the Palomar Community College District ("District") will consider, pursuant to Education Code Section 72411 and Section 2 of your employment contract, whether to non-renew your employment contract as Dean, Instructional, Mathematics and the Natural and Health Sciences.

The possible Board action is scheduled to take place during a closed session of the Governing Board on February 27, 2018, at approximately 5:00 p.m., at the District's Governing Board room, SSC-1, Student Services Building, located at 1140 West Mission Road, San Marcos, California, 92069.

Pursuant to Government Code section 54957, you may request that the matter be heard in an open session rather than a closed session.  If you want the matter to be heard in an open session rather than a closed session, you must make this request in writing to me so that I actually receive it no later than February 27, 2018, at 10:00 a.m.  At either a closed session or an open session, you and/or your representative will have the opportunity to present any oral or written statements and any other information that you believe appropriate, but the session will not be a formal evidentiary hearing within the meaning of California Code of Civil Procedure § 1094.5.

If you have any questions, please contact me.

Sincerely,

Lisa Norman, Ed.D., J.D.
Assistant  Superintendent/Vice President, Human Resource Services
PALOMAR COMMUNITY COLLEGE DISTRICT

cc:  Evan Dwin, Attorney (by email edwin@dwinlegal.com)

Exhibit 10
P. 1

# EXHIBIT 11



**PALOMAR COLLEGE®**   1140 West Mission Road, San Marcos, California 92069-1487 • 760-744-1150 • www.palomar.edu
Learning for Success

**Jol Lin Blake, Ed.D.**
Superintendent/President

**Governing Board**
Nina Deerfield
Mark R. Evilsizer
John J. Halcón, Ph.D.
Nancy Ann Hensch
Paul P. McNamara
Student Trustee:
ASG President

**Office of the President**

February 28, 2018

**PERSONAL AND CONFIDENTIAL**

**BY CERTIFIED MAIL**

Dr. Kathryn Kailikole
P.O. Box 308
Suisun City, CA 94585-308

**Re: Notice of Non-Renewal of Administrator Employment Contract
    Termination of Employment Effective July 1, 2019**

Dear Dr. Kailikole:

Please be advised that, pursuant to California Education Code Section 72411, a copy of which is attached, and the terms of your employment contract, the Governing Board of the Palomar Community College District, at its February 27, 2018, meeting, directed that you be sent official notice that it has determined that you shall not be reemployed or reappointed as the Dean, Instructional, Mathematics and the Natural and Health Sciences for the 2019-2020 academic year.  Your employment with the District will therefore terminate effective July 1, 2019.

Sincerely,

P.P. Shane Cohe

Lisa Norman, Ed.D., J.D.
Assistant Superintendent/Vice President, Human Resource Services

Enclosure

Exhibit 11
P. 1