**DWIN LEGAL, APC**
Evan Dwin (SBN 241027)
550 Laguna Drive, Suite A
Carlsbad, CA 92008
Tel: (760) 536-6471
Fax:(760) 585-4649

Attorneys for Plaintiff
KATHRYN KAILIKOLE

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

KATHRYN KAILIKOLE, an individual;

                    Plaintiff,

          vs.

PALOMAR COMMUNITY COLLEGE DISTRICT, a governmental entity; and DOES 1 through 25, inclusive;

                    Defendants.

Case No. 3:18-cv-02877-AJB-MSB

**DECLARATION OF EVAN DWIN IN SUPPORT OF PLAINTIFF KATHRYN KAILIKOLE'S APPLICATION FOR ATTORNEYS' FEES PURSUANT TO THE COURT'S ORDER DATED AUGUST 22, 2019 DENYING DEFENDANT'S ANTI-SLAPP MOTION**

## DECLARATION

I, Evan Dwin, declare:

1.      I am an attorney at law duly licensed to practice before this Court.  I am the principal of Dwin Legal, APC, counsel for Plaintiff Dr. Kathryn Kailikole.  I make this declaration in support of Plaintiff's Application for Attorneys' Fees Pursuant to Order Denying Defendant's Motion to Dismiss Pursuant to Cal. Code Civ. Proc. § 425.16.  I know the facts asserted in this declaration to be true of my own personal knowledge.

2.      I graduated law school in 2005 from the University of California, Los Angeles School of Law ("UCLA").

3.      After graduation, from 2005 through 2010, I worked for the Chicago based law firm of Katten Muchin Rosenman LLP ("Katten") in its Century City

1   Office in Los Angeles.  Katten is a national law firm which handles complex
2   litigation and transactions.  During the time I worked for Katten, my practice focused
3   on employment law, including litigating single-plaintiff discrimination cases and
4   wage and hour class actions, as well as complex litigation in a variety of substantive
5   areas.

6       4.      In 2011, I moved to San Diego, California and began working for
7   Troutman Sanders LLP ("Troutman").  Troutman is international law firm with a
8   home office in Atlanta, Georgia.  During the time I worked for Troutman, my
9   practice continued to focus on employment law, as well as commercial and other
10  complex litigation such as patent litigation.

11      5.      In April of 2013, I opened Dwin Legal, APC ("Dwin Legal"), a law firm
12  based on Carlsbad, California in San Diego County.  I am the sole owner of Dwin
13  Legal and the principal attorney.  My practice is primarily focused on employment
14  law, including litigation, as well as other civil litigation.  Since opening Dwin Legal, I
15  have handled numerous employment matters, including discrimination cases and
16  wage an hour class actions.

17      6.      Miguel Mendez-Pintado worked for Dwin Legal as an associate during
18  the time the District's anti-SLAPP motion was pending.  Mr. Mendez-Pintado
19  graduated in the top 10% of his class from the University of San Diego School of
20  Law in 2018.

21      7.      Anti-SLAPP motions are complex motions with an extremely high risk
22  to the party opposing it.  Specifically, if an anti-SLAPP motion is granted, not only is
23  the plaintiff's case dismissed, but the plaintiff is required to pay the Defendant's
24  attorney's fees.  In this case, the District's anti-SLAPP motion concerned seven
25  separate causes of action, including two federal claims for retaliation under Title VI
26  and Title IX, respectively, and five claims brought under California law, including
27  claims for retaliation for reporting harassment and for disability discrimination.  The
28  District submitted more than 800 pages of purported evidence in support of the anti-

1   SLAPP Motion.  In its brief, which was prepared by three lawyers from a national
2   employment law firm, the District cited 36 cases and 13 different statutes.
3        8.     The District's anti-SLAPP motion was further complicated by the fact
4   that the District removed the case to federal court where the Federal Rules of Civil
5   Procedure conflict with certain provisions of the anti-SLAPP statute, which is
6   contained in California's Code of Civil Procedure.  These procedural issues,
7   including the proper standard to apply to the merits, applied to all 7 of Plaintiff's
8   claims.  Plaintiff's attorneys were also forced to spend additional time opposing the
9   motion when the District submitted further briefing after the matter was taken under
10  submission by the Court.
11       9.     In her opposition to the Motion, in addition to addressing the issues that
12  applied to all of her claims, Plaintiff successfully argued that Motion must be denied
13  as to her federal claims because an anti-SLAPP motion cannot be brought as to
14  federal claims.  (Doc. 18, 10:18-11:2).  Plaintiff also responded Defendant's
15  argument that Plaintiff's federal claims in particular should be dismissed because, the
16  District claimed that a supervisor who reports discrimination and harassment did not
17  constitute under Title VI and Title IX.  (Doc. 14-1, 15:18-18:12).
18       10.    In total, I spent 44.8 hours researching the opposition, drafting the
19  opposition, gathering and preparing the evidence submitted in support of the
20  opposition, preparing for and appearing at the hearing on the anti-SLAPP motion and
21  responding to the District's supplemental briefing.  Mr. Mendez-Pintado spent 29.4
22  hours researching drafting, revising and preparing Plaintiff's Opposition to the
23  Motion.  Attached hereto as **Exhibit 1** is a true and correct copy of time records for
24  the work performed by me and Mr. Mendez-Pintado on the Opposition, not including
25  time I spent on the joint motion to extend the briefing schedule, and separately
26  summarizing the 11.9 hours I spent preparing this application for fees.  Exhibit 1 is
27  based on our contemporaneous time records and is an accurate reflection of the time
28  spent by me and Mr. Mendez-Pintado in connection with the Opposition.  Given the

DECLARATION OF EVAN DWIN

1  complexity of the motion, the number of authorities cited by the District, the volume

2  of purported evidence submitted, the critical importance of prevailing, the quality of

3  the briefing and the result achieved, the time spent on the opposition was reasonable.

4       11.   A court assessing attorneys' fees awarded in connection with an anti-

5  SLAPP motion "begins with the touchstone or lodestar figure, based on the 'careful

6  compilation of the time spent and reasonable hourly rate of each attorney . . .

7  involved in the presentation of the case." *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131-

8  32 (2001)1131-32 (*citing Serrano v. Priest*, 20 Cal. 3d 25, 48 (1977); *see also*

9  *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1028 (2000)

10       12.   The lodestar is "the basic fee for comparable legal services in the

11  community." *Ketchum, supra*, 24 Cal. 4th at 1132.  Recoverable fees include

12  compensation for all hours reasonably spent "including those necessary to establish

13  and defend the fee claim." *Serrano, supra*, 32 Cal. 3d at 369; *Davis v. City and Cty.*

14  *of San Francisco*, 976 F.2d 1536, 1544 (9th Cir. 1992) (citation omitted), *opinion*

15  *vacated on other grounds by* 984 F.2d 345 (9th Cir. 1993).

16       13.   If the lodestar method is applied, the reasonable rate applied is based on

17  the "market rate[s]" prevalent in the community where the court is located.  (*Syers*

18  *Properties III, Inc. v. Rankin* (2014) 226 Cal. App. 4th 691, 700-701.)  This applies

19  "regardless of whether the attorneys claiming fees charge nothing for their services,

20  charge at below-market rates or discounted rates, represent the client on a contingent

21  fee basis, or are in-house counsel." (*Chacon v. Litke* (2010) 181 Cal. App. 4th 1234,

22  1260.)

23       14.   Plaintiff requests that the Court apply a rate of $550 per hour for the

24  work I have done in opposition to the District's anti-SLAPP motion and $300 per

25  hour to Mr. Mendez-Pintado's work on the opposition.  These rates are reasonable for

26  attorneys of with skills, experience and reputations comparable to me and Mr.

27  Mendez-Pintado.  In fact, courts in the Southern District of California have

28  consistently approved rates of between $550 per hour and $730 for attorneys with

experience of between 10 and 15 years.  For example, in August of last year in *San Diego Comic Convention v. Dan Farr Prods.*, 2018 U.S. Dist. LEXIS 143802 **39, this Court found that, the following rates are reasonable for the San Diego market: 1) between $550 per hour and $685 per hour for a partner with over fourteen years of experience; 2) between $550 and $730 per hour for an attorney who graduated from the University of San Diego in 2007 (*i.e.*, approximately eleven years of experience); 3) $545 per hour for an associate attorney who graduated law school in 2014 (*i.e.*, approximately 4 years of experience); and 4) between $675 and $765 per hour for other partner level attorneys.  A true and correct copy of the Court's order approving these market rates in *San Diego Comic Convention* is attached hereto as **Exhibit 2**. (*See* Ex. 2, p. 24-26.)

15.   Similarly, in *Vess v. Bank of America, N.A.*, 2013 U.S. Dist. LEXIS 157427 **10 (S.D. Cal., October 24, 2013) six years ago, this Court, applying the lodestar method, approved attorneys' fees requested by the plaintiffs' lawyers which included a requested rate of $575 per hour for an employment attorney with approximately eleven years of experience; *see also Iorio v. Allianz Life Ins. Co. of N. Am.*, 2011 U.S. Dist. LEXIS 50452 *31-32 (S.D. Cal. March 3, 2011) (approving partner rates as high as $750 per hour in 2011).  Attached hereto as **Exhibit 3** is a copy of the Court's Order approving the attorneys' fees based on "the lodestar" in *Vess.* (*See* Ex. 3, 6:10.)  Attached hereto as **Exhibit 4** is a true and correct copy of the Declaration of Alisa Martin, without exhibits, submitted in support of the plaintiff's fee motion in *Vess.* (*See* Exhibit 3 ¶¶ 10, 16-17.).  A true and correct copy of the order approving attorneys' fees in *Iorio* is attached hereto as **Exhibit 5**.  (See Ex. 5, 16:16-17:4.)

16.   Attached hereto as **Exhibit 6** is a true and correct copy of billing survey listing 2014 rates for law firms across the country.  Several of the firms listed in the survey have offices in San Diego.  Even though the survey is five years old, the rates requested here by Plaintiff are lower than many of the rates for the firms listed in the

1  survey with offices in San Diego, are at the lower end of the rates listed in the survey

2  or are comparable to the rates listed in the survey.  Based on the foregoing orders and

3  survey, the rates requested herein and in the application for me and Mr. Mendez-

4  Pintado are reasonable.

5       17.    As set forth above, nearly all of the District's arguments in the anti-

6  SLAPP motion applied to all of Plaintiff's claims, including the critical issue of

7  whether the claims "arise out of protected activity."  Further, nearly all of the facts

8  stated in Plaintiff's opposition relate to her job performance, her participation in the

9  investigation of Professors Nakajima and Gerwig, and the retaliatory employment

10  actions taken by the District.  All of these facts are relevant to the District's argument

11  that all of Plaintiff's claims "arise out of protected activity" under the anti-SLAPP

12  statute and Plaintiff's argument that her termination was not pretextual, which apply

13  to all of her claims.  Further, the District also made at least one argument as to the

14  merits of each of Plaintiff's seven causes of action.  Thus, it is difficult if not

15  impossible to parse out which attorney hours related to specifically to Plaintiff's

16  federal claims as opposed to her claims under California state law.

17       18.    Because of the difficulty in allocating fees between her claims, Plaintiff

18  requests in its application that she be awarded attorneys' fees for 28.6% (i.e., 2/7) of

19  hours of attorney time spent opposing the Motion at the reasonable rate for the San

20  Diego market.  This allocation is reasonable and likely low because there are at least

21  two sections of the opposition – the section regarding the "manager rule" issue and

22  the section regarding the inapplicability of the anti-SLAPP statute to federal claims –

23  which apply only to the federal claims.  Further, while the Court did not reach the

24  merits because Plaintiff's claims do not arise out of "protected activity," Plaintiff had

25  no choice but to research, brief and present evidence on the merits as to all of her

26  claims in opposing the anti-SLAPP Motion.

27       19.    As set forth below in the chart below, the total lodestar for the entire

28  Opposition is $33,460.  By multiplying the total lodestar by .286 (i.e. 2/7) to account

- 6 -

for the fee award as to two of seven claims, the lodestar amount for the opposition with respect to the federal claims is $9,569.56:

| Attorney | Rate | Hours | Total Fees |
|---|---|---|---|
| Evan Dwin | $550 | 44.8 | $24,640 |
| Miguel Mendez-Pintado | $300 | 29.4 | $8,820 |
| | | | **$33,460** |

20.    Plaintiff is also seeking an additional $6,545 in attorneys' fees for the time spent in bringing this fee application (*i.e.*, 11.9 x $550).  Thus, the total amount of attorneys' fees being sought in the application is $16,114.56.

21.    On or about September 5, I spoke with Kevonna Ahmad, counsel for the District.  Like Mr. Mendez-Pintado, Ms. Ahmad graduated from law school in 2018.  In our phone conversation, Ms. Ahmad informed me that her rate is $310 per hour, which is $10 more than the rate requested for Mr. Mendez-Pintado in this application

I declare, under the penalty of perjury under the laws of the State of California that the foregoing is true and correct and was executed on September 10, 2019 in Carlsbad, California.

Evan Dwin

DECLARATION OF EVAN DWIN

EXHIBIT 1

Ex. 1
P. 1

# Dwin Legal, APC - User Summary

| Date | Matter | Description | Labor Time/ Quantity |
|------|--------|-------------|----------------------|
| **Evan Dwin** | | | |
| 03/19/2019 | Kailikole v. Palomar Community College District | Review Anti-SLAPP motion and research re time limits for Anti-SLAPP motions, procedural requirements in federal court and application to discrimination cases. | 2.30 |
| 03/25/2019 | Kailikole v. Palomar Community College District | Research re Anti-SLAPP motions by public entities in response to discrimination complaints. | 0.50 |
| 03/27/2019 | Kailikole v. Palomar Community College District | Review Anti-SLAPP motion and relevant e-mails, contracts and corresponednce in record (.5); begin drafting facts section of opposition to motion (.8). | 1.30 |
| 04/01/2019 | Kailikole v. Palomar Community College District | Draft and revise opposition to anti-SLAPP motion. | 2.30 |
| 04/02/2019 | Kailikole v. Palomar Community College District | Continue reviewing record and drafting and revising facts and legal argument in brief re opposition to Anti-SLAPP. | 1.80 |
| 04/04/2019 | Kailikole v. Palomar Community College District | Review record and research re temporal proximity and other evidence to establish pretext in discrimination case. | 0.90 |
| 04/05/2019 | Kailikole v. Palomar Community College District | Draft and revise brief in opposition to anti-SLAPP motion. | 1.30 |
| 04/09/2019 | Kailikole v. Palomar Community College District | Continue drafting and revising brief in opposition to anti-SLAPP re arguments re protected activity, summary judgment standard and relevant facts from record. | 6.40 |
| 04/11/2019 | Kailikole v. Palomar Community College District | Draft and revise brief in opposition to anti-SLAPP re relevant facts, alleged manager rule in discrimination cases and anti-SLAPP issues. | 3.20 |
| 04/12/2019 | Kailikole v. Palomar Community College District | Continue drafting and revising opposition to special motion to strike, | 5.10 |
| 04/14/2019 | Kailikole v. Palomar Community College District | Draft and revise opposition to special motion to strike. | 2.30 |
| 04/16/2019 | Kailikole v. Palomar Community College District | Continue drafting and revising opposition to special motion to strike. | 7.30 |
| 4/17/2019 | Kailikole v. Palomar Community College District | Review, revise finalize and file opposition to special motion to strike and supporting declarations | 4.50 |
| 7/17/2019 | Kailikole v. Palomar Community College District | Prepare for anti-SLAPP hearing. | 1.30 |
| 7/18/2019 | Kailikole v. Palomar Community College District | Hearing preparation and hearing on anti-SLAPP motion. | 2.50 |
| 07/24/2019 | Kailikole v. Palomar Community College District | Review new authority submitted by Defendant re anti-SLAPP motion and draft and revise response. | 1.40 |
| 07/24/2019 | Kailikole v. Palomar Community College District | Review new authority submitted by Defendant re anti-SLAPP motion and draft and revise response. | 1.40 |
| 7/25/2019 | Kailikole v. Palomar Community College District | Draft, revise and file response to Defendant's submission of new authority. | 1.80 |
| 09/02/2019 | Kailikole v. Palomar Community College District | Research re applicable standards for attorneys' motions and rates (1.3); begin drafting application for attorneys fees (1.4). | 2.70 |
| 09/03/2019 | Kailikole v. Palomar Community College District | Research re successful attorneys fee motions in Southern District of California and other federal courts (2.3); continue drafting and revising application for attorneys fees (.9). | 3.20 |
| 09/05/2019 | Kailikole v. Palomar Community College District | Research re standard for awarding fees (.4); continue drafting and revising application for fees and supporting declaration (1.1). | 1.50 |

| 09/09/2019 | Kailikole v. Palomar Community College District | Compile evidence in support of fee application (1.2); draft and revise fee application and supporting declaration (1.2). | 2.40 |
| 09/10/2019 | Kailikole v. Palomar Community College District | Continued drafting and revising fee application and supporting declaration (1.3); compile and prepare exhibits in support of motion (.8). | 2.10 |
| | | **Total Labor for Evan Dwin re Opposition** | 44.80 |
| | | **Total Labor for Evan Dwin re Attorney Fee Application** | 11.90 |

**Miguel Mendez-Pintado**

| 03/19/2019 | Kailikole v. Palomar Community College District | Research cases for Opposition to Districts Anti-SLAPP Motion | 2.40 |
| 03/20/2019 | Kailikole v. Palomar Community College District | Review Declaration of Jeff Love for facts and citations to record. | 2.30 |
| 03/20/2019 | Kailikole v. Palomar Community College District | Research re FRCP 56. | 0.30 |
| 03/20/2019 | Kailikole v. Palomar Community College District | Draft brief re the use of SLAPP motions for federal causes of action and discovery for SLAPP motions filed in federal court. | 2.60 |
| 03/21/2019 | Kailikole v. Palomar Community College District | Review Declaration of Jack Kahn for facts and citations to record. | 2.40 |
| 03/21/2019 | Kailikole v. Palomar Community College District | Review Declaration of Jeff Love for citations for facts and citations to record. | 3.30 |
| 03/22/2019 | Kailikole v. Palomar Community College District | Review of Declaration of Jeff Love for facts and citations to record. | 0.80 |
| 03/22/2019 | Kailikole v. Palomar Community College District | Review Declaration of Jack Kahn for facts and citations to record. | 0.20 |
| 03/25/2019 | Kailikole v. Palomar Community College District | Revise brief re federal issues in SLAPP motions. | 0.10 |
| 04/01/2019 | Kailikole v. Palomar Community College District | Draft brief re Vergos v. McNeal, Miller v. City of Los Angeles, and San Ramon v. Contra Costa. | 1.50 |
| 04/01/2019 | Kailikole v. Palomar Community College District | Research re FRCP 56. | 0.20 |
| 04/02/2019 | Kailikole v. Palomar Community College District | Research re Anti-SLAPP motion | 0.20 |
| 04/08/2019 | Kailikole v. Palomar Community College District | Research re summary judgment issues. | 1.40 |
| 04/12/2019 | Kailikole v. Palomar Community College District | Draft Declaration of Dr. Kailikole and Declaration of Dwin. | 1.90 |
| 04/13/2019 | Kailikole v. Palomar Community College District | Draft citations to the record for the Opposition to the anti-SLAPP motion. | 3.40 |
| 04/15/2019 | Kailikole v. Palomar Community College District | Review and revise the declaration of Dr. Kailikole in support of opposition. | 1.40 |
| 04/16/2019 | Kailikole v. Palomar Community College District | Draft citations for the Opposition to the anti-SLAPP motion. | 3.10 |
| 04/16/2019 | Kailikole v. Palomar Community College District | Prepare exhibits for declaration of Dr. Kailikole in support of the opposition. | 0.80 |
| 04/17/2019 | Kailikole v. Palomar Community College District | Review and revise Opposition to the anti-SLAPP motion. | 1.10 |
| | | **Total Labor For Miguel Mendez-Pintado** | 29.40 |

# EXHIBIT 2

1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11  SAN DIEGO COMIC CONVENTION, a
    California non-profit corporation,

12                                    Plaintiff,

13  v.

14  DAN FARR PRODUCTIONS, a Utah
    limited liability company, DANIEL

15  FARR, an individual, BRYAN
    BRANDENBURG, an individual,

16                                    Defendants.

17

18

Case No.:  14-cv-1865-AJB-JMA

**ORDER GRANTING IN PART AND
DENYING IN PART PLAINTIFF'S
MOTION FOR ATTORNEYS' FEES
AND COSTS PURSUANT TO 15
U.S.C. § 1117(a)**

(Doc. No. 425)

19

20        Pursuant to 15 U.S.C. § 1117(a), a court may in "exceptional cases" award

21  reasonable attorneys' fees and costs to the prevailing party in a trademark infringement

22  lawsuit. Plaintiff San Diego Comic Convention ("SDCC") moves this Court to find that

23  the instant case is "exceptional." (Doc. No. 425.) Defendants Dan Farr Productions, Daniel

24  Farr, and Bryan Brandenburg (collectively referred to as "DFP") oppose SDCC's request.

25  (Doc. No. 512.) On May 31, 2018, the Court held a hearing on the motion and then

26  submitted the matter. (Doc. No. 504.) Finding that this case is in fact "exceptional," the

27  Court awards SDCC reasonable attorneys' fees and costs subject to certain deductions.

28

Case 3:14-cv-01865-AJB-JMA   Document 541   Filed 08/23/18   PageID.43290   Page 2 of 37

1    Accordingly, the Court **GRANTS IN PART AND DENIES IN PART** SDCC's motion.

2    (Doc. No. 425.)

3                                    **BACKGROUND**

4          The Court is already well-versed as to the events leading up to the institution of this

5    action. Thus, for the purposes of this Order, the Court will only provide a narrow review

6    of this lawsuit's factual and procedural background.

7          On August 7, 2014, SDCC filed a lawsuit against DFP alleging two causes of action:

8    (1) Federal Trademark Infringement, 15 U.S.C. § 1114; and (2) False Designation of

9    Origin, 15 U.S.C. § 1125(a). (*See generally* Doc. No. 1.) SDCC is a non-profit corporation,

10   formed in 1975, that is dedicated to the awareness and appreciation of comics and related

11   popular art forms. (Doc. No. 1 ¶ 10.) Every year since 1970, SDCC has produced and held

12   its convention known as the "Comic-Con convention" in San Diego, California. (*Id.* ¶ 11;

13   Doc. No. 97 at 9.)[1] The convention spans several days in length and showcases several

14   hundred events, workshops, educational and academic programs, games, award shows,

15   costume contests, as well as hosts panels of special guests that include science fiction and

16   fantasy authors, film and television actors, directors, producers, and writers. (Doc. No. 1 ¶

17   12; Doc. No. 97 at 9.) In 2016, attendance to San Diego Comic-Con exceeded over 135,000

18   attendees. (Doc. No. 97 at 9.)

19         SDCC's family of trademarks at issue in this case are:

20              1. Comic-Con;

21              2. Comic Con International;

22              3. Anaheim Comic-Con; and

23

24

25

26

27

28

---

[1] Page numbers refer to the CM/ECF number and not the number listed on the original document.

Ex. 2
14-cv-1865-AJB   P. 2

4.

(Doc. No. 1 ¶ 13; Doc. No. 244 at 11.) Each of these registered trademarks is incontestable. (Doc. No. 381 at 25:15–25.) Additionally, SDCC states that it has used these marks extensively and continuously in interstate commerce and thus the marks have become valuable assets as well as symbols of its goodwill and positive industry reputation. (Doc. No. 1 ¶ 15.)

In early 2013, Defendant Dan Farr Productions, a limited liability company, began to advertise and promote its own popular arts convention named "Salt Lake Comic Con" ("SLCC"). (Doc. No. 234-2 at 7; Herrera Decl. Ex. 5 ("Farr Depo." 11:4–9, Doc. No. 95-7).) Similar to SDCC's convention, SLCC is a three-day fan event featuring the best in movies, television shows, gaming, sci-fi, fantasy, and comic books. (Doc. No. 244 at 12.) Since 2013, SLCC has been held every year and in the beginning of 2014, Dan Farr Productions created its Salt Lake Comic Con FanXperience event, which has also been held every year since its inception. (Farr Depo. at 11:10–15; Doc. No. 97 at 11.)

Thus, the marrow of this case is whether DFP's comic arts and popular fiction event named "Salt Lake Comic Con" infringed on SDCC's three incontestable trademarks.[2] On December 8, 2017, after an eight-day jury trial, the jury found that DFP had indeed infringed on SDCC's family of trademarks. (Doc. No. 395 at 2–5.) As to unfair competition and false designation of origin however, the jury found in favor of DFP. (*Id.* at 6.) In total, the jury awarded corrective advertising damages to SDCC in the amount of $20,000.00. (*Id.* at 8.)

---

[2] The Court notes that after the trial, DFP changed the name of their event to "FanX Salt Lake Comic Convention." (Doc. No. 513 at 7–8.)

1    Post-trial, SDCC filed three motions: (1) its motion for permanent injunction, (Doc.

2    No. 419); (2) the instant motion, its motion for attorneys' fees and costs, (Doc. No. 425);

3    and (3) its motion for judgment as a matter of law or in the alternative motion for new trial,

4    (Doc. No. 433). Thereafter, on August 8, 2018, the Court ordered SDCC to file a

5    supplemental brief breaking down the total amount of fees it requested. (Doc. No. 523.)

6    DFP then asked for the opportunity to respond to SDCC's supplemental brief. (Doc. No.

7    531.) The Court granted this request, and DFP's response was filed on August 22, 2018.

8    (*Id.*; Doc. No. 532.)

9                                  **DISCUSSION**

10   A.    This Case is Exceptional Pursuant to 15 U.S.C. § 1117(a)

11          SDCC's motion provides an exhaustive and detailed account of the actions it

12   believes makes this case exceptional. (*See generally* Doc. No. 425-1.) In opposition, DFP

13   asserts that SDCC's motion is based on distortions, is unpersuasive, and relies on critiques

14   that are hyperbolic and hypocritical. (*See generally* Doc. No. 512.)

15          The Lanham Act permits an award of reasonable attorneys' fees to the prevailing

16   party in "exceptional cases." 15 U.S.C. § 1117(a). Originally, "[w]hile the term

17   'exceptional' [was] not defined in the statute, generally a trademark case [was] exceptional

18   for purposes of an award of attorneys' fees when the infringement [was] malicious,

19   fraudulent, deliberate or willful." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400,

20   1409 (9th Cir. 1993).

21          In 2016, the Ninth Circuit in *SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*, 839

22   F.3d 1179 (9th Cir. 2016), relied on the Supreme Court's decision in *Octane Fitness, LLC

23   v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014), to abrogate *Lindy Pen Co.*

24   and modify the standard definition of "exceptional" in attorney fee recovery Lanham Act

25   cases. *SunEarth, Inc.*, 839 F.3d at 1180. Ultimately, the Ninth Circuit held that "district

26   courts analyzing a request for fees under the Lanham Act should examine the 'totality of

27   the circumstances' to determine if the case [is] exceptional, exercising equitable discretion

28

1   in light of the nonexclusive factors identified in *Octane Fitness* and *Fogerty*, and using a

2   preponderance of the evidence standard." *Id.* at 1181 (internal citation omitted).

3        The Ninth Circuit also defined an exceptional case as one that simply "stands out

4   from others with respect to the substantive strength of a party's litigating position

5   (considering both the governing law and the facts of the case) or the unreasonable manner

6   in which the case was litigated." *Id.* at 1180 (citation omitted). The nonexclusive factors in

7   determining if a case is "exceptional" include: "frivolousness, motivation, objective

8   unreasonableness (both in the factual and legal components of the case) and the need in

9   particular circumstances to advance considerations of compensation and deterrence." *Id.* at

10   1181 (citation omitted).[3] Additionally, despite the Ninth Circuit's decision to alter the

11   definition of "exceptional," the Federal Circuit held that *Octane Fitness* "gave no

12   indication that [the Federal Circuit] should rethink [its] litigation misconduct line of § 285

13   cases" and stated that "district courts can turn to [] pre-*Octane Fitness* case law for

14   guidance" regarding such arguments. *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1349

15   (Fed. Cir. 2015).

16        In sum, litigation brought in bad faith or with objectively baseless claims may be

17   considered exceptional, as may litigation demonstrating inequitable conduct or willful

18   infringement. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 525 n.12 (1994); *see also Octane

19   Fitness*, 134 S. Ct. at 1757 ("[A] case presenting either subjective bad faith or exceptionally

20   meritless claims may sufficiently set itself apart from mine-run cases to warrant a fee

21   award."). Similarly, courts "have awarded attorneys' fees . . . where a party advances

22   arguments that are particularly weak and lack support in the record or seek only to re-

23   litigate issues the court has already decided." *Intex Recreation Corp. v. Team Worldwide

24   Corp.*, 77 F. Supp. 3d 212, 217 (D.C. Cir. 2015). Thus, the determination of "exceptional"

25

26

27

28   ―――――――――――――

[3] "*Octane Fitness* lowered the bar for an exceptional case finding[.]" *Veracode, Inc. v. Appthority, Inc.*, 137 F. Supp. 3d 17, 102 (D. Mass. 2015).

1 | falls squarely within the discretion of the trial court. *Highmark Inc. v. Allcare Health Mgmt.*
2 | *Sys., Inc.*, 134 S. Ct. 1744, 1748 (2014).
3 |      Here, the jury found that DFP infringed on all three of SDCC's trademarks, yet also
4 | found that DFP did not willfully infringe the marks. (*See generally* Doc. No. 395.) Thus,
5 | under the original definition of "exceptional," SDCC's request for attorneys' fees would
6 | have been difficult to advance successfully. *See Gracie v. Gracie*, 217 F.3d 1060, 1068
7 | (9th Cir. 2000) ("Here the jury explicitly found that [the defendant] engaged in 'willful'
8 | infringement . . .The district court's decision to make a fee award to [the plaintiff] thus
9 | flows quite naturally from the jury's finding of willful infringement . . ."). However, after
10 | *SunEarth*, examining the totality of the circumstances, the Court finds that this case is not
11 | a dime a dozen. Instead, it is a trademark infringement lawsuit that stands out from others
12 | based on the unreasonable manner it was litigated and thus an award of attorneys' fees and
13 | costs to SDCC is justified.
14 |      ***i. SDCC is the Prevailing Party***
15 |      As an initial matter, the Court addresses DFP's assertion that the "split verdict" in
16 | this case illustrates that there is no clear winner. (Doc. No. 512 at 8–9.) Accordingly, as
17 | the Lanham Act only authorizes an award of fees "to the prevailing party," DFP contends
18 | that SDCC's motion is flawed. (*Id.*) DFP's argument is both unpersuasive and legally
19 | unsound.
20 |      Had DFP researched this issue thoroughly, DFP would have discovered that the jury
21 | verdict in favor of SDCC for trademark infringement renders SDCC the prevailing party.
22 | *See Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992) (illustrating that a party prevails "when
23 | actual relief on the merits of [the plaintiff's] claim materially alters the legal relationship
24 | between the parties by modifying the defendant's behavior in a way that directly benefits
25 | the plaintiff."); *see also Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) (holding that a
26 | prevailing party is one that "succeed[s] on any significant issue in litigation which achieves
27 | some of the benefit the parties sought in bringing suit.") (citation omitted); *Orantes-*
28 | *Hernandez v. Holder*, 713 F. Supp. 2d 929, 942 (C.D. Cal. 2010) ("A plaintiff is deemed

1  the 'prevailing party' if, as a result of a judgment or consent decree entered in the legal

2  action he or she brought, there is a 'material alteration of the legal relationship of the

3  parties.'") (citation omitted). Based on the foregoing, in the instant matter, SDCC is the

4  prevailing party for § 1117(a) purposes.

5      Next, the Court identifies the various circumstances of this case that warrant an

6  award of attorneys' fees and costs under § 1117(a).

7      ***ii.    DFP's Failure to Comply with Court Rules***

8      The Court highlights three incidents that occurred prior to trial. First, in

9  contravention to this Court's Local Rules, DFP filed two summary judgment motions that

10 totaled over forty pages in length. (Doc. Nos. 216, 218, 244, 245.) The local rules clearly

11 explicate that when filing a motion, all the arguments should be contained in one brief, not

12 exceeding a total of twenty-five (25) pages. CivLR 7.1.h.

13     DFP advances two arguments to explain their actions, both of which are nonsensical

14 and only further support this Order's final conclusion. DFP asserts that they had leave to

15 make their filings because the Clerk gave out a single hearing date for all dispositive

16 motions and that SDCC also broke the rules as it filed both a motion for summary judgment

17 and a motion to exclude on the same day, which totaled over forty-three pages. (Doc. No.

18 512 at 20–21.) DFP's reasoning is disconcerting. Logically, all arguments relating to a

19 specific motion need to be contained in a single motion. Under DFP's theory of motion

20 practice, a party could file a separate brief for every cause of action it sought to dismiss

21 under Federal Rule of Civil Procedure 12(b)(6), thereby violating the page limits set by

22 this Court. This is erroneous. Thus, in contrast to DFP's belief that SDCC broke the rules,

23 it did not.

24     The Court also highlights that DFP did not file a timely Daubert challenge to

25 SDCC's expert Patrick Kennedy. The Court then denied DFP's motion to file a late

26 challenge, however despite this, DFP utilized a motion in limine to revisit the issue. (Doc.

27 Nos. 321, 345, 340; Transcript of Motion in Limine Hearing at 169:14–16, November 14,

28 2017.) In the same vein, after DFP lost a Daubert challenge to SDCC's expert Mr. Ezell,

1   (Doc. No. 263 at 10), DFP attempted to re-introduce their argument that Mr. Ezell and his

2   Teflon Survey were irrelevant both during motion in limine, (Doc. No. 314-1 at 7), and in

3   their motion for judgment as a matter of law, (Doc. No. 429-1 at 14).

4       Finally, the most prominent example of DFP's disregard for this Court's rules and

5   procedures occurred on  June 23, 2017, when DFP filed a motion for leave to amend their

6   pleading that expressly referenced testimony that had been designated "Confidential—

7   Attorneys' Eyes Only" by SDCC and the Protective Order in this case. (Doc. No. 129-1 at

8   3.) In spite of the highly confidential information contained in the document, Defendant

9   Bryan Brandenburg also disseminated the information on the Internet through his social

10   media accounts and SLCC's Twitter Page. (*Id.*)

11       In sum, DFP's indifference to this Court's rulings and the Local Rules are actions

12   that should be deterred by compensation furnished to SDCC.

13       ***iii. DFP's Unreasonable Manner of Litigation***

14           a. DFP's Persistent Desire to Re-Litigate Issues Already Decided

15       At every opportunity, DFP has repeated, re-argued, and recycled arguments already

16   briefed by both parties and analyzed and ruled on by the Court. This type of wasteful

17   litigation tactic forced SDCC to expend extra, unnecessary legal fees and drove this Court

18   to squander already limited judicial resources.

19       The Court first focuses on DFP's naked licensing defense. This defense was first

20   produced at summary judgment. (Doc. No. 263-1 at 20–25.) However, finding insufficient

21   evidence to support the theory, the Court denied DFP's motion on the matter. (Doc. No.

22   263 at 26–29.) Thereafter, during the pre-trial conference, after the Court expressed its

23   concern that there was not enough evidence to bring this defense to trial, DFP offered to

24   prepare a formal proffer document on the issue and submit that in advance of the motion

25   in limine hearing. (Doc. No. 265 at 9:11–11:19.)

26       DFP's formal proffer document provided the Court relatively the same evidence

27   supplied at summary judgment. (Doc. Nos. 315, 344.) Accordingly, still finding the

28   evidence inadequate, the Court denied the motion. (Doc. No. 340.) Post-trial, DFP's motion

1  for new trial inexplicably argues that they are "entitled to a proper adjudication of its naked

2  licensing defense." (Doc. No. 436-1 at 7.) Thus, in total, DFP has attempted to re-argue

3  this defense three times, blatantly ignoring the record and this Court's previous rulings.

4        DFP's repetitive motion practice also manifested itself in their "generic ab initio"

5  defense. Initially, when this theory was first presented to the Court during summary

6  judgment, DFP argued that this case "is not a genericide case." (Doc. No. 244 at 23.)

7  Instead, DFP argued that "Comic-Con" was generic "before it was applied as a trademark

8  to the products in question." (*Id.* at 24 (citing *Horizon Mills Corp. v. QVC, Inc.*, 161 F.

9  Supp. 2d 208, 220 n.16 (S.D.N.Y. 2001)).)

10        After carefully considering the evidence outlined by DFP, the Court denied DFP's

11  summary judgment motion arguing that SDCC's trademarks are generic ab intio. (Doc. No.

12  263 at 18.) Notwithstanding this fact, DFP brought a motion in limine "regarding

13  genericness evidence." (Doc. No. 314-1.) Finding the in limine motion improper, the Court

14  stated during the hearing:

15        **The Court:** Well, it could be that I ruled out generic ab initio, already. And
16        re-arguing it again is questionable to whether it's in conformity to what
          motion in limine is about.
17            . . .
18        This is a motion in limine. We're talking about a time line and you've tried to
          reargue the summary judgment.
19

20  (Doc. No. 425-7 at 4:21–10:12.) This motion was then denied. (Doc. No. 340.)

21        In spite of the summary judgment order and the in limine ruling, DFP's motion for

22  new trial devotes several pages to arguing that they should have been "allowed to show

23  *Genericness Ab Initio*." (Doc. No. 436-1 at 17–27.) DFP supported this argument with

24  more or less the same evidence produced at summary judgment. Altogether, "Generic ab

25  intio" has been discussed, analyzed, and denied by this Court three times.[4]

26

27  ───────────────

28  [4] Generic ab initio was not only repeatedly discussed, but it is also a defense that DFP
    strategically used and then disposed of depending on the evidence they sought to exclude.

9

1    Though not referenced by SDCC, DFP's use of the Oxford Dictionary definition of

2  "Con" is another blatant example of DFP's "head in the sand" litigation strategies that has

3  resulted in this Court repeatedly re-analyzing the same arguments. At summary judgment,

4  to support their "generic ab intio" theory of defense, DFP argued that one may look to the

5  individual parts of a mark. (Doc. No. 244 at 16, 19.) DFP then referenced the Oxford

6  Dictionary definition of "con." (*Id.*) In its order denying DFP's summary judgment motion

7  on "generic ab intio," the Court clearly explained that courts have not only held that

8  dictionary definitions are weak evidence of genericness, but that courts have routinely

9  rejected the breaking down of phrases into their individual and often generic parts. (Doc.

10  No. 263 at 17.)

11    Astonishingly, ignoring the case law provided to them, DFP's motion for new trial

12  again points to the same Oxford dictionary definition. (Doc. No. 436-1 at 25.) As a result,

13  this argument has been recycled by DFP twice in complete disregard of this Court's

14  previous rulings and Ninth Circuit precedent. *See Advertise.com, Inc. v. AOL Advertising,*

15  *Inc.*, 616 F.3d 974, 978 (9th Cir. 2010) (concluding that in determining similarity of marks

16  "we look to the mark as a whole and that the combination of generic terms may, in some

17  instances, result in a distinctive mark.").

18    DFP also repeatedly sought to compel this Court to revisit their fraud defense. First,

19  DFP unsuccessfully requested leave to add fraud as an affirmative defense. (Doc. No. 202

20  at 6–10.) Thereafter, at the pretrial conference, DFP again referenced this defense. (Doc.

21  No. 265 at 12:8–20.) DFP then filed a motion in limine to be able to put forward evidence

22

23

24  The Court notes that at the outset DFP plainly asserted that this was not a genericide case.

(Doc. No. 244 at 23.) DFP's summary judgment motion then asserted that as SDCC's

25  trademarks were "generic ab initio," SDCC's Teflon survey was irrelevant. (*Id.* at 23–24.)

In contrast to the above, DFP's expert Jeffrey Kaplan stated in his report that he was hired

26  to "offer linguistic evidence supporting [his] opinion that the expression 'comic con' was

27  generic at the <u>time the above-captioned law suit was filed, and is currently generic</u>[.]" (Doc.

No. 91-2 at 3 (emphasis added).) This discrepancy was noted by the Court in its summary

28  judgment order. (Doc. No. 263 at 12.)

1   of SDCC's alleged fraud on the USPTO to the jury. (Doc. No. 319.) The Court ultimately

2   denied the motion after reminding DFP that it had already gotten rid of the fraud claim.

3   (Transcript of Motion in Limine hearing at 141:20–22, November 14, 2017.) In sum, fraud

4   was re-argued two times.

5         Ultimately, resembling a broken record, DFP has repetitively restated and rehashed

6   several contentions that they were unable to advance successfully prior to trial. This type

7   of cyclical motion practice is objectively unreasonable and has justified attorneys' fees

8   under the Lanham Act. *See Parks, LLC v. Tyson Foods, Inc.*, No. 5:15-cv-00946, 2017 WL

9   3534993, at *1 (E.D. Pa. Aug. 17, 2017) (holding that the hallmark of a case that has been

10  litigated in an unreasonable manner is one that involves "wasteful procedural maneuvers

11  or dilatory tactics") (citation and internal quotation marks omitted); *see also Cognex Corp.*

12  *v. Microscan Sys., Inc.*, No. 13- CV-2027 JSR, 2014 WL 2989975, at *4 (S.D.N.Y. June

13  30, 2014) (criticizing the plaintiff for post-trial motions that simply sought to relitigate

14  issues decided during trial and awarding fees at least as to those motions); *Precision Links*

15  *Inc. v. USA Prods. Grp., Inc.*, No. 3:08-cv-00576-MR, 2014 WL 2861759, at *3 (W.D.N.C.

16  June 24, 2014) (criticizing the plaintiff for seeking a preliminary injunction based in large

17  part on a previously rejected theory of liability and for filing frivolous post dismissal

18  motions).

19         b. DFP's Objectively Unreasonable Legal Arguments

20         DFP's efforts to formulate legal arguments based on factually and legally irrelevant

21  case law also help bolster this Court's conclusion that the instant matter is not a middle-of-

22  the-road trademark case. The Court notes that at certain points, DFP's zealous advocacy

23  has turned into gamesmanship.

24         To begin with, the Court focuses on DFP's motion to amend their pleading. DFP

25  sought to amend so that they could allege that SDCC committed fraud on the USPTO. (*See*

26  *generally* Doc. No. 204-1.) However, DFP's motion failed to cite to the correct legal

27  standard to support such a claim. Instead, DFP pointed the Court to a list of inapplicable

28  patent cases. (*Id.* at 5.)

11

1    Further, DFP requested amendment so as to add a defense of inequitable conduct.

2    (*Id.* at 16.) However, as the Court pointed out in its order, inequitable conduct is a defense

3    raised in patent infringement cases. (Doc. No. 202 at 11 (*see Mag Instrument, Inc. v. JS*

4    *Prods., Inc.*, 595 F. Supp. 2d 1102, 1109 (C.D. Cal. 2008) (holding that inequitable conduct

5    consists of several elements including "the failure to disclose known material information

6    during the prosecution of a patent, coupled with the intent to deceive the PTO.")).)

7    DFP's motion in limine proffering evidence of a naked license is yet another

8    example of DFP's faulty, hodgepodge legal reasoning. (Doc. No. 344.) DFP states:

9    Second, "where circumstances or the previous course of dealing between the
     parties places the offeree under a duty to act or be bound, his silence or
10   inactivity will constitute his assent": SDCC's silence, on the heels of its
11   "threatened immediate or vigorous enforcement," was "intentionally
     misleading"—and gave SDCC "a duty to speak," especially when coupled
12   with Reed's communicated reliance on its remedial measures' sufficiency and
13   years of friendly intercourse. Third, "implied license may arise by …
     acquiescence"; "permission or lack of objection is … equivalent to …
14   license ███████████████████████████████████████████████████████
15   ████████

16   (*Id.* at 6 (internal footnotes omitted).) The Court illustrates that in total, DFP selectively

17   chose and blended together specific phrases from five different cases. Specifically, DFP

18   quotes from: *Beatty Safway Scaffold, Inc. v. Skrable*, 180 Cal. App. 2d 650, 655 (1960);

19   *Hottel Corp. v. Seaman Corp.*, 833 F.2d 1570, 1574 (Fed. Cir. 1987); *Scholle Corp. v.*

20   *Blackhawk Molding Co.*, 133 F.3d 1469, 1472 (Fed. Cir. 1998); *I.A.E., Inc. v. Shaver*, 74

21   F.3d 768, 775 (7th Cir. 1996); and *Winbond Elec. Corp. v. ITC*, 262 F.3d 1363, 1374 (Fed.

22   Cir. 2001). (*Id.*) However, DFP's reliance on the foregoing cases is misplaced—both *Hottel*

23   *Corp.* and *Scholle Corp.*, analyze equitable estoppel defenses in the patent infringement

24   context, 833 F.2d at 1574; 133 F.3d at 1472, *Shaver*, examined how a copyright owner

25   could transfer to another person any exclusive rights an owner has in a copyright, 74 F.3d

26   at 774–75, and *Winbond* examined an implied license/waiver in a patent infringement case,

27   262 F.3d 1374.

28

Ex. 2
Ex. 12

1        A final example of DFP's groundless legal reasoning comes from their opposition

2    brief to SDCC's instant motion. DFP's brief cites to *Kellogg Co.*, to demonstrate that Mr.

3    Brandenburg did not admit that Comic Con is a brand. (Doc. No. 512 at 10–11.) Instead,

4    DFP claims that what Mr. Brandenburg meant when he said "brand" was the "goodwill"

5    of SDCC's events, not that he meant "brand" in a legal trademark sense. (*Id.* at 11.) The

6    portion of *Kellogg* DFP employs is:

7        Kellogg Company is undoubtedly sharing in the goodwill of the article known
    as "Shredded Wheat"; and thus is sharing in a market which was created by

8        the skill and judgment of plaintiff's predecessor and has been widely extended

9        by vast expenditures in advertising persistently made. But that is not unfair.
    Sharing in the goodwill of an article unprotected by patent or trade-mark is

10       the exercise of a right possessed by all—and in the free exercise of which the

11       consuming public is deeply interested.

12   *Id.* (citing *Kellogg Co. v. Nat'l Biscuit Co.*, 305 U.S. 111, 122 (1938)).

13       It is plainly clear to the Court and should be evidently unmistakable to DFP that

14   *Kellogg* is factually immaterial. In *Kellogg*, the plaintiff did not have an exclusive right to

15   the use of the term "Shredded Wheat" as a <u>trade name</u> as it was determined that the term

16   was generic of the article it described. *Id.* at 116 (emphasis added). In fact, "Shredded

17   Wheat" was never used as a trademark. *Id.* at 117. Additionally, the patent for the product

18   and the process of making the item was "dedicated to the public" as the patent had expired

19   on October 15, 1912. *Id.* The present matter involves three incontestable trademarks—

20   trademarks DFP knew were registered with the USPTO—and there is no patent in play.[5]

21   (Doc. No. 394 at 21.)

22       The above-mentioned examples are simply a small collection of DFP's unreasonable

23   manner of litigation and do not encompass every instance they misrepresented a case for

24   their own benefit. This type of frivolous motion practice should be deterred. *See Monolithic*

25

26   [5] The Court notes that *Kellogg* is also a recycled argument, having already determined its

27   inapplicability during motion in limine. (*See generally* Doc. No. 314; Transcript of Motion
in Limine Hearing at 29:5–19, November 14, 2017.)

28

1   *Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 726 F.3d 1359, 1366 (Fed. Cir. 2013) ("[L]itigation

2   misconduct and unprofessional behavior may suffice, by themselves, to make a case

3   exceptional . . . .").

4         Beyond gamesmanship, there has been inappropriate citation to as well as

5   incomplete or inaccurate references to purported case authority throughout this litigation

6   by DFP. In each order on every post-trial matter, DFP has been called out in this regard.

7                    c. DFP's Objectively Unreasonable Responses to this Litigation

8         More convincing evidence of this case's exceptional nature materializes itself in

9   DFP's unreasonable responses to this litigation. DFP admits to receiving SDCC's cease

10  and desist letter. (Doc. No. 383 at 92:9–20; Tr. Ex. 127.) However, instead of consulting

11  an attorney or trying to reach out to SDCC's legal team, DFP continued to use "Comic

12  Con" in their event name. (*Id.* at 92:13–23.) Moreover, within a week of receiving the cease

13  and desist letter and with full knowledge of SDCC's trademark registrations, DFP sought

14  and successfully registered their Salt Lake Comic Con mark with the USPTO. (Doc. No.

15  304-1 at 2.) The Court finds DFP's foregoing reactions to be both factually and legally

16  unreasonable.

17        DFP asserts that since the jury sided with them on willfulness, the Court may not

18  reach a different result by applying the same stipulated definition of willfulness to the same

19  body of evidence and return a different result. (Doc. No. 512 at 13.) DFP then asserts that

20  willfulness in the trademark infringement context is the same as "motivation" under §

21  1117(a). (*Id.* at 12–13.) The Court disagrees.

22        First, DFP's assertion that the definition of "willfulness" mirrors "motivation" is

23  completely unsupported. This is simply a legal theory conjured up by DFP. Second, a

24  finding of exceptionality pursuant to § 1117(a) includes examining the totality of the

25  circumstances, which includes factors such as objective unreasonableness, frivolousness,

26  compensation, deterrence, and motivation. *SunEarth, Inc.*, 839 F.3d at 1181. Thus, the

27  Court is not altering the jury's willfulness verdict as DFP suggests. Instead, the Court is

28

1   reviewing the circumstances of this case under the lens of § 1117(a), a review process that

2   is distinct from a willfulness analysis.

3       Accordingly, the Court finds DFP's various reactions listed above objectively

4   unreasonable pursuant to § 1117(a). *See Decus, Inc. v. Heenan*, No. 16-5849, 2018 WL

5   1082842, at *3 (E.D. Pa. Feb. 27, 2018) ("Cases finding exceptionality based on litigation

6   in an 'unreasonable manner' include a defendant's continued trademark infringement after

7   it knew, through the [USPTO] and plaintiff's cease and desist letters, its mark 'was

8   confusingly similar' to plaintiff's mark[.]"); *see also Mountz, Inc. v. Northeast Indus.*

9   *Bolting and Torque, LLC*, No. 15-cv-04538-JD (MEJ), 2017 WL 780585, at *2 (N.D. Cal.

10   Jan. 27, 2017) ("Defendant's response to the litigation, including the threats to Plaintiff's

11   business, the attempt to register the offending mark with the PTO, and the failure to respond

12   to the Complaint, was objectively unreasonable.").

13                d. Objectively Unreasonable Litigation Conduct

14       An additional component to the Court's analysis is DFP's misconduct during trial.

15   SDCC places a great emphasis on this conduct, (Doc. No. 425-1 at 22–26), while DFP's

16   opposition brief focuses the Court's attention on SDCC's misconduct during trial, (Doc.

17   No. 512 at 27–30). The Court finds SDCC's assertions more persuasive.

18       At the outset, DFP's opening statement included the following comment:

19       The fact is Comic Con is thriving. Okay. They made more money each year
20       since Salt Lake Comic Con came on the scene. They haven't lost a single
        customer to us . . . We're small potatoes. They also have $15 million in cash
21       sitting in their bank. They own a downtown office building they paid $5 million
22       cash for. They're not for-profit, but they're the deep pocket.
        . . .
23       So Defendants, if they have to pay even a fraction of what CCI asks would be
24       put out of business and the people of Utah would be paying for it. But they're
        also suing them individually. So they would be pushing them to bankruptcy.
25

26   (Doc. No. 381 at 52:12–53:24.) Referencing a party's wealth to play off the bias of the jury

27   is clear misconduct. *See Hoffman v. Brandt*, 65 Cal. 2d 549, 552–53 (1966) ("The argument

28   was clearly error . . . a deliberate attempt by counsel to appeal to social or economic

1   prejudices of the jury, including the wealth or poverty of the litigants, is misconduct where

2   the asserted wealth or poverty is not relevant to the issues of the case."); *see also Martinez*

3   *v. Dep't of Transp.*, 238 Cal. App. 4th 559, 566 (2015) ("The law, like boxing, prohibits

4   hitting below the belt. The basic rule forbids an attorney to pander to the prejudice, passion

5   or sympathy of the jury. In more concrete terms, attorneys cannot make appeals based on

6   irrelevant financial aspects of the case such as the hardship that would be visited on a

7   defendant from a plaintiff's verdict.") (internal citation omitted).

8        During trial, DFP also introduced different concepts that played off of their "generic

9   ab initio" theory of defense—a defense that this Order clearly delineates was excluded at

10  summary judgment, the pre-trial conference, and motion in limine. For instance, DFP made

11  references to a "generic brand." (Doc. No. 381 at 35:19–20.) SDCC objected to such

12  classification  and  the  Court  sustained  the  objection  stating  that  it  was  a

13  "mischaracterization" and asked the jury to disregard the comment. (*Id.* at 35:24–36:5.)

14       DFP however did not stop in their quest to put this legally flawed notion before the

15  jury. After being admonished, DFP began referring to Comic-Con as a "national brand."

16  (*Id.* at 39:18.) For example, during Mr. Brandenburg's testimony, the Court had to censure

17  DFP.

18       Q. And when you said, but we are hijacking the brand, were you referring to
         San Diego's brand?
19       A. No, I was not.
20       Q. Whose brand were you referring to?
         A. As you can see in the next sentence, I clarify what I was referring to was
21       the national Comic Con brand.
22       Ms. Bjurstrom: Objection, your honor.
         The Court: Sustained. Jury will disregard the last comment.
23       Mr. Katz: I'm not sure why.
24       The Court: There is no evidence of a national comic brand, sir.

25  (Doc. No. 383 at 123:23–124:9.) Then during closing arguments, despite the Court's

26  previous rulings, DFP continued to use the phrases "Comic Con circuit" and "Comic Con

27  Brand." (Doc. No. 403 at 40:9–43:5.)

28

1    Further, DFP misstated the law. For instance, DFP argued a "substantial confusion"

2   standard instead of the likelihood of confusion test utilized by the Ninth Circuit. (*Id.* at

3   46:9–14.) Moreover, DFP constantly and repeatedly referred to SDCC's trademark as

4   "Comic dash Con." (Doc. No. 381 at 37:2–4 ("And you saw on the screen that Plaintiff's

5   showed you, Comic-Dash-Con as she described each era of Comic Con."); *Id.* at 39:11–16

6   ("In fact, in 1998, there were 30 events that called themselves Comic Con, and that's ten

7   years before San Diego Comic Convention, or SDCC, ever applied for their mark in

8   Comic-Dash-Con alone.").)

9    The Ninth Circuit has repeatedly emphasized that similarity of two marks is first

10   "considered in their entirety[.]" *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206

11   (9th Cir. 2000). Second, "similarity is adjudged in terms of appearance, sound, and

12   meaning, and third, similarities are weighed more heavily than differences." *Id.* (internal

13   citations omitted). Under this standard, cases from this district as well as others have held

14   that a dash or hyphen is inconsequential in determining the similarity of two marks. *See*

15   *Maxim Integrated Prods., Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1031–32 (N.D. Cal.

16   2009) (placing little emphasis on the hyphen in the mark "My-iButton" when comparing

17   its similarity to "i Button"); *see also Therma-Scan, Inc., v. Thermoscan, Inc.*, 295 F.3d 623,

18   633–34 (6th Cir. 2002) (finding the dash insignificant in the mark Therma-Scan when

19   comparing its similarity to the mark Thermoscan).

20    Despite the foregoing, at trial, DFP proceeded under the belief that the dash was

21   significant in determining the similarity of their mark and SDCC's "Comic-Con"

22   trademark. For example, DFP stated:

23    Mr. Katz: It's Comic-Dash-Con, and their position is it's enforceable as
     Comic Con with nothing in between, a space, a dash. You know, they use the
24    dash when they use it alone, and they use the space when they use it with
     something else.
25
     . . .
26    Ms. Bjurstrom: We have Comic Con International without a dash, and we
27   have San Diego Comic Con International without a dash.

     . . .
28

17

1
2
3
4
5
6
7
8
9
10
11

> The Court: But as to Comic Con with the dash, does the mark cover Comic Con without the dash in its plain and literal meaning?
> Ms. Bjurstrom: Absolutely.
> The Court: How?
> Ms. Bjurstrom: It is. It's likely to be confusing. You don't say Comic-Hyphen-con.
> Mr. Katz: That's what we're trying to establish, that it is not likely to be confusing.
> Ms. Bjurstrom: It's the same mark.
> The Court: So if - -
> Ms. Bjurstrom: You look at how it looks, how it sounds, how it's perceived. You don't say Comic - -
> Mr. Katz: We disagree.
> Ms. Bjurstrom: Please. You don't say Comic-Hyphen-Con. You don't say Coca-Hyphen-Cola. You say Coca-Cola.

(Doc. No. 382 at 58:10–59:13.)

12
13
14
15
16

In light of the case law from this district, DFP's forceful attempts to draw the jury's attention to the dash in "Comic-Con" in analyzing the similarity of the two trademarks at issue is legally groundless. *See Super-Krete Int'l, Inc. v. Sadleir*, 712 F. Supp. 2d 1023, 1032 (C.D. Cal. 2010) ("While Defendants argue that the hyphen is significant in modifying the term, this argument is contrary to the case law—and common sense.").

17
18

Finally, during closing argument, DFP doubled down and broke the "Golden Rule." DFP's counsel stated:

19
20
21
22
23
24

> Even if you accept the dismissive "they're just infringers, we'll get to them." Okay. They've caused harm, too. What share of the harm did they cause to this brand erosion that we haven't seen any measure of? So we are just asking you to think critically about the evidence. Think about what it means. And what it would mean to you if you were personally involved in this.
> **The Court:** Golden Rule. Jury is not--you are not to put the jury in the place of either party. The jury will disregard the last comment.
> **Mr. Katz:** I apologize for that. I will state it differently.

25
26
27
28

(Doc. No. 403 at 71:2–13.) The "Golden Rule" argument, "asking the jury to put itself in the position of the party, is improper." *Reynolds v. Gerstel*, No. 1:09-cv-00680-SAB, 2013 WL 4815788, at *5 (E.D. Cal. Sept. 9, 2013); *see also Lovett v. Union Pac. R.R. Co.*, 201

1   F.3d 1074, 1083 (8th Cir. 2000) (explaining that the Golden Rule "argument is universally

2   condemned because it encourages the jury to depart from neutrality and to decide the case

3   on the basis of personal interest and bias rather than on the evidence.") (citation omitted).

4       In sum, DFP's trial misconduct further supports the Court's conclusion that this case

5   is "exceptional" pursuant to § 1117(a).

6       ***iv. Remaining Issues***

7       One additional factor in determining the exceptionality of a case under the Lanham

8   Act is the substantive strength of a party's litigating position. *See Veracode*, 137 F. Supp.

9   3d at 101. SDCC points to the following pieces of evidence to demonstrate the strength of

10   its case: (1) the incontestable status of its trademarks; (2) its trademark survey that

11   demonstrated that 83% of consumers recognize it as a brand; (3) Mr. Brandenburg's

12   admission that Comic-Con is a brand; and (4) the commercial strength of its marks. (Doc.

13   No. 425-1 at 11–12.) In opposition, DFP argues that their case is equally strong. (Doc. No.

14   512 at 9–10.)

15       The Court finds that this case is not so "deeply lopsided" in regards to strength to

16   warrant finding it exceptional under this specific factor. *See Veracode, Inc.*, 137 F. Supp.

17   3d at 101 (holding that a case must present the "indicia of a deeply lopsided case" for the

18   moving party to satisfy this element). The Court explicates that though SDCC's case is

19   compelling and heavily supported by persuasive evidence, DFP's case, including the

20   evidence of over one hundred comic events using "comic con" in their event name, is not

21   objectively frivolous.

22       Thus, this factor weighs neutrally. *See Gametek LLC v. Zynga, Inc.*, No. CV 13-2546

23   RS, 2014 WL 4351414, at *3 (N.D. Cal. Sept. 2, 2014) (explaining that although the

24   opposing party's briefing "consisted of granular parsing of the claimed steps rather than

25   any substantive explanation of how this differed from the underlying abstract idea[,] [i]t

26   did not . . . descend to the level of frivolous argument or objective unreasonableness.").

27       Next, the Court turns to SDCC's argument that DFP's abuse of the media makes this

28   case "exceptional." (Doc. No. 425-1 at 7, 8, 14–15.) Specifically, SDCC takes issue with

1   the press releases and interviews DFP gave after they received SDCC's cease and desist

2   letter, their articles published through social media that attacked SDCC and its executives,

3   and DFP's alleged "public bullying strategy" that persisted over three years all aimed at

4   denigrating SDCC before the public. (*Id.*) DFP asserts that they cannot be punished for

5   exercising their First Amendment rights. (Doc. No. 512 at 15–16.)

6       The Court's analysis under this factor is best explained by quoting to Defendant

7   Brandenburg himself. In a news article, Mr. Brandenburg explained his reaction to

8   receiving SDCC's cease and desist letter:

9       "Our knee jerk reaction was that [SDCC was] trying to intimidate us" . . . "We
        were not going to cease and desist using the name. We decided to go public
10      about it." After consulting with their lawyers, the team behind the Salt Lake
        Comic Con knew they had strong legal ground to stand on, but they didn't
11      want to go to court, they wanted to win in the court of public opinion . . .
        "Everyone said that San Diego had no leg to stand on, but the only way to win
12      this would be to outspend them on legal fees" . . . "Our strategy was, if we
        are going to spend legal fees vs. legal fees, we wanted to be creative. We put
13      it out to the public, challenging the cease and desist letter publically."
14

15

16   (Doc. No. 126-3 at 2–3.)

17       Refusing to cease and desist and turning to the media to litigate a trademark

18   infringement case in the court of "public opinion" is objectively irrational. The Court

19   clarifies that it is not maintaining that Mr. Brandenburg was not entitled to his First

20   Amendment rights. Instead, looking to the standard proscribed by the Ninth Circuit,

21   objectively, DFP's reaction and actions in response to SDCC's cease and desist letter force

22   this case to stand out from others. Nevertheless, the Court notes that this argument is but

23   one small factor in this Order's analysis. In fact, even without this element, the

24   circumstances discussed *supra* pp. 7–18 adequately and reasonably justify SDCC's request

25   for attorneys' fees pursuant to § 1117(a).

26       Finally, DFP's opposition brief is littered with statements such as: "The jury

27   disagreed; but in finding no willfulness, the jury accepted DFP's explanation that when the

28   defendants used the term 'brand,' they were referring to *that* goodwill, the goodwill of the

1   events." (Doc. No. 512 at 11.) These blatant, unsupported statements are plainly specious—

2   DFP has no idea what the jury believed or how they understood the evidence. Thus, the

3   Court ignored such statements in coming to its conclusion.

4          ***v.***    ***Conclusion***

5         SDCC's motion is bursting at the seams with incidents that it believes demonstrates

6   the exceptional nature of this case. After careful consideration of the totality of the

7   circumstances, the Court agrees with SDCC and finds that it has satisfied its burden.

8   Accordingly, the Court **GRANTS** SDCC's motion for attorneys' fees and costs, subject to

9   the deductions delineated below. *See Kilopass Tech. Inc. v. Sidense Corp.*, No. C 10-02066

10   SI, 2014 WL 3956703, at *10–14 (N.D. Cal. Aug. 12, 2014) (concluding that the case was

11   exceptional based on the defendant's "exceptionally meritless" claims, the unreasonable

12   manner in which the case was litigated, the defendant's shifting theories of infringement,

13   and conduct that amounted to gamesmanship).

14   B.    SDCC's Requested Fees are Subject to Deductions

15         SDCC argues that its fees and the allocated time spent are reasonable. (Doc. No.

16   425-1 at 27–29.) DFP's opposition brief devotes the last two pages to arguing that

17   bifurcation is proper in the instant matter as they could not "fully respond to both liability

18   *and* the proper amount of any award" in their opposition brief. (Doc. No. 512 at 30.) DFP

19   then requests that an additional proceeding be had on the amount. (*Id.*)

20         The Court declines DFP's request for bifurcation and for a further proceeding. DFP

21   was provided the opportunity to oppose SDCC's motion. Their decision to forego the

22   chance to rebut the rates of SDCC's attorneys and the reasonableness of their time sheets,

23   not only fails to satisfy their burden at this stage of the litigation, but also acts as a waiver

24   to any arguments not presented in their opposition brief. *See Stichting Pensioenfonds ABP*

25   *v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("In most

26   circumstances, failure to respond in an opposition brief to an argument put forward in an

27   opening brief constitutes waiver or abandonment in regard to the uncontested issue.")

28   (citation omitted).

| | |
|---|---|
| 1 | Moreover, as DFP has failed to challenge or dispute SDCC's hourly rate or provide |
| 2 | substantial assertions opposing SDCC's hours logged, the Court's inquiry ends after it |
| 3 | determines whether the fee request is reasonable. *See United States v. $28,000.00 in U.S.* |
| 4 | *Currency*, 802 F.3d 1100, 1105 (9th Cir. 2015) ("When … a fee target has failed to offer |
| 5 | either countervailing evidence or persuasive argumentation in support of its position, we |
| 6 | do not think it is the court's job either to do the target's homework or to take heroic |
| 7 | measures aimed at salvaging the target from the predictable consequences of self-indulgent |
| 8 | lassitude.") (citation omitted). |
| 9 | The Court now turns to an evaluation of the reasonableness of SDCC's fees. Courts |
| 10 | typically determine reasonableness by conducting a lodestar analysis of the hours expended |
| 11 | and the hourly rate charged. *See McGrath v. Cty. of Nevada*, 67 F.3d 248, 252 (9th Cir. |
| 12 | 1995); *see also Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008) |
| 13 | (explaining that in the Ninth Circuit, courts calculate an award of attorneys' fees using the |
| 14 | lodestar method, multiplying "the number of hours the prevailing party reasonably |
| 15 | expended on the litigation by a reasonable hourly rate.") (citation omitted). The burden is |
| 16 | on the fee applicant to demonstrate that the number of hours spent were "reasonably |
| 17 | expended" and that counsel made a "good faith effort to exclude from [the] fee request |
| 18 | hours that are excessive, redundant, or otherwise unnecessary[.]" *Hensley*, 461 U.S. at 434. |
| 19 | The district court has broad discretion in determining the reasonableness of attorney's fees. |
| 20 | *See Gates v. Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992). |
| 21 | Additionally, "[a]lthough in most cases, the lodestar figure is presumptively a |
| 22 | reasonable fee award, the district court may, if circumstances warrant, adjust the lodestar |
| 23 | to account for other factors which are not subsumed within it." *Ferland v. Conrad Credit* |
| 24 | *Corp.*, 244 F.3d 1145, 1149 n.4 (9th Cir. 2001). The factors are: |
| 25 | (1) the time and labor required, (2) the novelty and difficulty of the questions |
| 26 | involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, |
| 27 | (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time |
| 28 | limitations imposed by the client or the circumstances, (8) the amount |

1
2
3

involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

4

*Ballen v. City of Redmond*, 466 F.3d 736, 746 (9th Cir. 2006) (citation omitted).

5
6
7
8
9

In total, SDCC requests **$4,994,245.20** in attorneys' fees and costs incurred by it from the inception of this case through August 10, 2018. (Doc. No. 527 ¶ 5.) In addition, SDCC also requests certain non-taxable costs, including **$243,833.06** that SDCC paid to its two expert witnesses: Matthew G. Ezell and Patrick Kennedy, along with their assistants. (Doc. No. 425-3 ¶ 24.)

10

***i. Reasonable Hourly Rate***

11
12
13
14
15
16
17

The determination of reasonable hourly rates is made by examining the prevailing market rates in the relevant community charged for similar services by "lawyers of reasonably comparable skill, experience, and reputation." *Davis v. City and Cty. of San Francisco*, 976 F.2d 1536, 1546 (9th Cir. 1992) (citation omitted), *opinion vacated on other grounds by* 984 F.2d 345 (9th Cir. 1993). The "relevant community" for these purposes is the district in which the lawsuit proceeds. *Barjon v. Dalton*, 132 F.3d 496, 500 (9th Cir. 1997).

18
19
20
21
22
23
24
25

The moving party has the burden to produce "satisfactory evidence, in addition to the affidavits of its counsel, that the requested rates are in line with those prevailing in the community for similar services of lawyers of reasonably comparable skill and reputation." *Jordan v. Multnomah Cty.*, 815 F.2d 1258, 1263 (9th Cir. 1987). Once the fee applicant has met its burden, the opposing party "has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Gates*, 987 F.2d at 1397–98.

26
27

SDCC cites to several Southern District of California cases as well as employs the declarations of Callie A. Bjurstrom and Peter K. Hahn to illustrate that its attorney rates

28

14-cv-1865· Ex. 2
Ex. 23

1    are reasonable. The following are the rates for the SDCC attorneys, paralegals, and
2    litigation support team members who worked on the present matter.

3    1. Callie A. Bjurstrom, lead trial attorney with over twenty-nine years of experience—
4        $675.00 to $760.00 an hour.

5    2. Peter K. Hahn, a partner and member of Pillsbury's Intellectual Property ("IP")
6        Section with over twenty-eight years of experience—$675.00 to $760.00 an hour.

7    3. Michelle A. Herrera, an attorney with over sixteen years of litigation experience—
8        $525.00 to $585.00 an hour.

9    4. Conor Civins, a partner with over fourteen years of experience—$550.00 to $685.00
10       an hour.

11   5. Kirsten Gallacher, an associate in Pillsbury's IP section—$385.00 to $545.00 an
12       hour.

13   6. Nathaniel Smith, a University of San Diego School of Law 2007 graduate—$550.00
14       to $730.00 an hour.

15   7. Matthew Stephens, an associate in Pillsbury's IP Section—$545.00 an hour.

16   8. Tim Rawson, a 2014 Pepperdine University School of Law graduate—$545.00 an
17       hour.

18   9. Lauren Wardle, an associate in Pillsbury's IP Section—$560.00 an hour.

19   10. David Stanton, a partner and member of Pillsbury's Litigation section—$765.00 an
20       hour.

21   11. Andrew Chevalier, William Collier, Carl DiCarlo, Benton McDonough, Wilton
22       McNair, Allison Porter, Candes Prewitt, Jennifer Romeo, Kelly Sims, Jenny
23       Villalobos, Eboni Wooden, and Calumn Yeaman, contract attorneys who work out
24       of Pillsbury's office in Nashville, Tennessee who assisted with eDiscovery,
25       document review, and legal research—$110.00 an hour.

26   12. Sandra Edge, a senior legal analyst in Pillsbury's IP Section with over thirty years
27       of experience—$285.00 to $315.00.

28   13. Cody Gartman, a trial paralegal with over seven years of experience—$245.00 an

1    hour.

2    14. Louie Perez, a senior legal analyst in Pillsbury's IP section with over five years of

3    experience—$295.00.

4    15. Colin Drake, a Litigation Support Project Management Coordinator with over ten

5    years of experience—$275.00 to $305.00 an hour.

6    16. Val Trinidad, a Senior Litigation Support Analyst with over nine years of

7    experience—$295.00 to $305.00 an hour.

8    17. John Monarrez, a Research Specialist—$150.00 an hour.

9    18. Stacey Barnes, a paralegal in Pillsbury's IP section—335.00 an hour.

10   19. Martin Bridges, a consulting manager in Pillsbury's Corporate Securities Group

11   whose testimony was read into the record at trial—$425.00 an hour.

12   20. Thomas Brooks, the Discovery Project Manager—$305.00 an hour.

13   21. Stacey Campbell, a paralegal in Pillsbury's IP section who provided trial

14   preparation support—$285.00 an hour.

15   22. John Farahjood, a Litigation Support Specialist who assisted with review of

16   electronically stored information—$305.00 an hour.

17   23. Gordon Moffat, Director of Litigation Support Services—$390.00 an hour.

18   24. Patrick Ng, a Litigation Support Project Manager—$305.00 an hour.

19   25. Anthony Vugrinecz, a Senior Litigation Support Analyst—$299.42 an hour.

20   (Doc. No. 425-3 ¶¶ 2–16; Doc. Nos. 527-2, 530.)

21   Ultimately, the Court finds that SDCC has satisfied its initial burden and guided the

22   Court as to the reasonable hourly rate prevailing in the community for similar work

23   performed by attorneys of comparable skill and reputation. *See Chalmers v. City of Los*

24   *Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986). First, as to the two cases provided by SDCC,

25   the hourly rates determined to be reasonable were $607.50 for Ms. Bjurstrom, $472.50 for

26   Ms. Herrera, (Doc. No. 425-4 at 17), and $630 an hour for a partner and $495 an hour for

27   an associate, (*Id.* at 24). The remainder of the cases cited to by SDCC demonstrate that

28   rates for attorneys in the intellectual property division have earned upwards of $800.00 an

1    hour. *See Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, No. 10-CV-0541-GPC

2    (WVG), 2014 WL 6851612, at *5–6 (S.D. Cal. Dec. 3, 2014) (finding rates reasonable

3    where plaintiffs sought "an hourly rate of between $170 per hour and $895 per hour

4    depending on the particular attorney or paralegal" for work by a "multi-state/national law

5    firm"). Thus, based off the cases delineated above, the Court finds SDCC's unopposed

6    attorneys' rates listed *supra* pp. 23–24 reasonable.

7         The Court notes that DFP's response to SDCC's supplemental fee brief argues that

8    SDCC has not justified its lawyers' hefty year-over-year rate increases. (Doc. No. 532 at

9    6.) DFP then requests that the Court should substantially lower rates in calculating the

10   lodestar. (*Id.* at 7.) This argument is nonsensical. DFP produces no rational justification for

11   why SDCC's lawyers should not receive raises each year they progress within their firm.

12   Moreover, DFP's conclusory arguments, unsupported by evidence or case law, do not

13   satisfy their burden of rebuttal.

14        Next as to the paralegal rates, SDCC fails to provide any case law to support the

15   rates of its paralegals and litigation support team members.[6] *See Blum v. Stenson*, 465 U.S.

16   886, 895 n.11 (1984) ("To inform and assist the court in the exercise of its discretion, the

17   burden is on the fee applicant to produce satisfactory evidence—in addition to the

18   attorney's own affidavits—that the requested rates are in line with those prevailing in the

19   community for similar services . . . ."). Nevertheless, the Court may consider SDCC's

20   declaration in addition to similar cases and its own knowledge and familiarity with the

21   Southern District of California legal market in setting a reasonable hourly rate. *See Ingram*

22   *v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011).

23        Reasonable rates for paralegals in this district have ranged from $125 to $225. *See*

24   *In re Maxwell Techs., Inc., Derivative Litig.*, No. 13CV966 BEN (RBB), 2015 WL

25   12791166, at *5 (S.D. Cal. July 13, 2015) (awarding $225 paralegal rate to paralegals with

26

27   _____

28   [6] For purposes of this Order, the Court will group SDCC's paralegals, legal analysts, litigation support team members, and research specialists into one group.

1   "significant experience"); *see also Flowrider Surf, Ltd. v. Pac Surf Designs, Inc.*, No.

2   15cv1879-BEN (BLM), 2017 WL 2212029, at *2–3 (S.D. Cal. May 18, 2017) (awarding

3   paralegal fees of $150 per hour in a patent infringement case); *LG Corp. v. Huang Xiaowen*,

4   No. 16-CV-1162-JLS (NLS), 2017 WL 3877741, at *3 (S.D. Cal. Sept. 5, 2017) (finding

5   reasonable a rate of $225 per hour for a paralegal with over twenty years of experience).

6   At its highest, this district has approved a paralegal rate of $290.00. *See In re Maxwell*

7   *Techs., Inc.*, 2015 WL 12791166, at *5.

8       Pillsbury is an American Lawyer Top 100 law firm with its IP litigation practice

9   named in the Best Lawyers in America for 2017. (Doc. No. 425-3 ¶ 17.) Thus, the Court

10   does not dispute the quality of the work Pillsbury's paralegals provided. However, SDCC

11   has failed to produce evidence to demonstrate that its paralegal rates of over $300.00 an

12   hour are reasonable. Accordingly, taking into consideration Pillsbury's national and global

13   presence, the Court will cap SDCC's paralegal, legal analysts, and litigation support team

14   members' hourly rates at $290.00—the high end of paralegal rates provided by this district.

15   *See Carr v. Tadin, Inc.*, 51 F. Supp. 3d 970, 981 (S.D. Cal. 2014) (listing paralegal rates

16   that ranged from $110.00 to $295.00, but concluding that as rates of $125–$150

17   predominated, a $150.00 per hour rate for paralegals was reasonable). The final award will

18   be adjusted in light of the above mentioned modification.

19       In sum, the Court finds SDCC's attorneys' rates in this case reasonable—these rates

20   were largely unopposed by DFP. The paralegals and litigation support team members with

21   rates over $290.00 an hour will be capped at $290.00. The remainder of the paralegal rates

22   that do not exceed $290.00 are considered reasonable.

23       ***ii. Hours Reasonably Spent***

24       "The moving party bears the burden of documenting the appropriate hours spent in

25   the litigation and submitting evidence in support of the hours worked." *Zest IP Holdings*,

26   2014 WL 6851612, at *6. After the moving party provides evidence of the hours billed, the

27   opposing party has the burden of submitting evidence "challenging the accuracy and

28   reasonableness of the hours charged or the facts asserted by the prevailing party in its

14-cv-1865-AJB-   Ex. 2
                  Ex. 27

1   submitted affidavits." *Gates*, 987 F.2d at 1398. "Even if the opposing party has not objected

2   to the time billed, the district court 'may not uncritically accept a fee request,' but is

3   obligated to review the time billed and assess whether it is reasonable in light of the work

4   performed and the context of the case." *Rodriguez v. Barrita, Inc.*, 53 F. Supp. 3d 1268,

5   1280 (N.D. Cal. 2014).

6       District courts have discretion to reduce the number of hours that were not

7   reasonably expended. *Hensley*, 461 U.S. at 434. When determining whether the number of

8   hours expended is reasonable, the following criterion may be taken into account, but each

9   factor cannot be an independent basis to reduce hours: "(1) the novelty and complexity of

10  the issues, (2) the special skill and experience of counsel, (3) the quality of representation,

11  and (4) the results obtained." *Cabrales v. Cty. of Los Angeles*, 864 F.2d 1454, 1464 (9th

12  Cir. 1988) (citation omitted), *judgment vacated on other grounds by* 490 U.S. 1087 (1989).

13      SDCC requests all hours billed from the inception of this case to August 10, 2018.

14  (Doc. No. 527 ¶¶ 3, 4.) In analyzing reasonableness, the Court first notes that DFP requests

15  a deduction for quarter-hour billing. (Doc. No. 512 at 30.) Courts have recognized that

16  billing by the quarter-hour, not by the tenth is a "deficient" practice "because it does not

17  reasonably reflect the number of hours actually worked." *See Zucker v. Occidental*

18  *Petroleum Corp.*, 968 F. Supp. 1396, 1403 n.11 (C.D. Cal. 1997) (demonstrating that an

19  attorney with a $300 hourly rate who works six minutes on a matter would charge $30 if

20  he bills by the tenth of an hour and $75 if he bills by the quarter hour). Due to this, courts

21  have reduced the fee award by a percentage to account for the unearned increment based

22  on quarter-hour billing. *See Preseault v. United States*, 52 Fed. Cl. 667, 680–81 (Fed. Cl.

23  2002). In the present case, the Court in its discretion reduces SDCC's attorneys' fee award

24  by twenty percent to account for the practice of billing by the quarter-hour. *See Zest IP*

25  *Holdings*, 2014 WL 6851612, at *10 n.2 (taking a 20% overall reduction in fees based on

26  quarter-hour billing).

27      DFP also briefly asserts that a reduction is appropriate as SDCC failed to delegate

28  tasks to staff or colleagues with lower billing rates. (Doc. No. 512 at 30–31.) The Court

1   disagrees. As SDCC's time sheet demonstrates, the senior attorneys such as Ms. Herrera,

2   Ms. Bjurstrom, and Mr. Hahn were mainly in charge of researching and drafting the

3   dispositive motions in this case as well as settlement and discovery matters. (Doc. No. 507

4   at 23, 29.) It is only logical to have the more senior attorneys personally involved in these

5   major parts of the litigation process. Moreover, the timesheet demonstrates that SDCC did

6   in fact delegate other more basic legal tasks to associate attorneys with lower billing rates

7   such as Lauren Wardle and Tim Rawson. (Doc. No. 507 at 102, 103, 105, 159, 163.)

8       The Court notes however that it finds that some tasks were not properly delegated

9   amongst SDCC's paralegal and litigation support team members. For example, on June 7,

10  2017, John Farahjood was given the task of printing redacted PDF files. Printing files is

11  not a reasonable use of a litigation support specialist who has a rate of $305.00 an hour.

12  (Doc. No. 507 at 122 (*see Banas v. Volcano Corp.*, 47 F. Supp. 3d 957, 970 (N.D. Cal.

13  Dec. 12, 2014).) Thus, a reduction in the final lodestar amount is warranted.

14      Finally, DFP spends a sentence broadly concluding that SDCC's task descriptions

15  are highly general and frequently redacted and therefore warrant closer scrutiny. (Doc. No.

16  512 at 30.) First, as to the redactions, "[a] party seeking fees may redact certain portions of

17  the relevant time entries when doing so is necessary to protect the attorney client privilege,

18  so long as the unredacted portions still afford[] the Court sufficient detail to determine the

19  reasonableness of the hours requested." *Shame on You Productions, Inc. v. Banks*, CV 14-

20  03512-MMM (JCx), 2016 WL 5929245, at *16 (C.D. Cal. Aug. 15, 2016) (citation and

21  internal quotation marks omitted).

22      The Court notes that there are certain time entries that have been so heavily redacted

23  that the Court cannot assess the reasonableness of the time expended. For example on

24  August 6, 2017, Michelle Herrera stated "Research regarding [REDACTED]." (Doc. No.

25  507 at 150.) This type of redaction has resulted in courts declining to award fees as to those

26  heavily redacted billing entries. *See Shame on You Productions*, 2016 WL 5929245, at *16.

27  However, in the instant matter, SDCC redacted time entries, but also made the entries

28  available to the Court for in-camera review. (Doc. No. 425-3 ¶ 23.) Thus, DFP's attack on

1    SDCC's redacted time entries fails. *See Vogel v. Tulaphorn*, CV 13-464 PSG (PLAx), 2014

2    WL 12629679, at *10 (C.D. Cal. Jan. 30, 2014) (refusing to reject the defendant's request

3    for fees as it willingly stated that it could provide the redacted entries for in-camera

4    review); *see also R.M. v. Encinitas Union Sch. Dist.*, No. 08cv412-L (JMA), 2013 WL

5    3873069, at *3 (S.D. Cal. July 25, 2013) (conducting an in-camera review of the

6    defendant's invoice to determine reasonableness).

7         Next, as to DFP's assertion that the time entries are too general, the Court agrees in

8    part. Though, SDCC's counsel "is not required to record in great detail how each minute

9    of his [or her] time was expended," *Lytle v. Carl*, 382 F.3d 978, 989 (9th Cir. 2004), a

10   certain amount of specificity is required. Presently, some entries are incredibly vague. For

11   instance, there are several entries that simply state in some form: "Assist with review

12   project." (Doc. No. 507 at 121, 122, 124, 136.) Additionally, on October 28, 2016, the time

13   entry states: "Call with S. Edge regarding additional documents for review and review

14   plan," (*Id.* at 61), and on November 29, 2016, the narrative described states: "Document

15   review," (*Id.* at 67). This is a billing deficiency that justifies a reduction.

16        In that same vein the Court also reduces the amount of hours SDCC requests for

17   duplicative attorney effort. Although it has been recognized that "the participation of more

18   than one attorney does not necessarily constitute an unnecessary duplication of effort[,] *see*

19   *McGrath*, 67 F.3d at 255, the Court believes that certain hours were not reasonably

20   expended. For example in July of 2017, Mr. Hahn, Ms. Herrera, and Mr. Smith all took

21   turns revising a sanctions motion. (Doc. No. 507 at 136.) Similarly, in that same month,

22   Mr. Hahn, Mr. Smith, Mr. Stephens, Ms. Bjurstrom, and Ms. Herrera all billed for

23   reviewing the opposition brief to DFP's motion for leave to amend the pleading. (*Id.* at

24   140.) Thus, another reduction in the lodestar figure is appropriate. *See Mogck v. Unum Life*

25   *Ins. Co. of Am.*, 289 F. Supp. 2d 1181, 1195 (S.D. Cal. 2003) (finding a reduction of fees

26   reasonable as both attorneys billed for reviewing the defendant's objection and two

27   attorneys billed for reviewing the Ninth Circuit opinion in the case); *see also Hensley*, 461

28   U.S. at 432–34 (holding that counsel submitting fee applications must exclude hours that

1  are "excessive, redundant, or otherwise unnecessary[.]"); *AT&T Mobility LLC v. Yeager*,

2  No. 2:13-cv-00007 KJM DB, 2018 WL 1567819, at *2 (E.D. Cal. Mar. 30, 2018)

3  (highlighting that the court has broad discretion to adjust the lodestar fee downward if it

4  concludes the attorneys performed work that was excessive or duplicative).

5     Finally, the Court addresses the arguments present in DFP's response to SDCC's

6  supplemental brief. (Doc. No. 532.) Finding that most of DFP's qualms have already been

7  addressed above, the Court focuses solely on the assertion that a reduction is justified based

8  on overstaffing. (*Id.* at 4.) Here, the Court agrees with DFP that SDCC's decision to send

9  three lawyers to the post-trial motion hearing is an unreasonable use of time. As Mr. Hahn

10  did not actively participate at the hearing, the Court will not award Mr. Hahn's fees totaling

11  $3,532.50 in relation to this matter. (Doc. No. 527-1 at 15.)

12     In sum, the Court reduces SDCC's fee request by 20% for quarter-hour billing.

13  Additionally, based on the other billing deficiencies delineated above, an additional 5%

14  reduction is warranted as well as a reduction of $3,532.50 for overstaffing. As to the

15  remainder of the hours, after an in-camera review, the Court finds the billed hours are well

16  within the bounds of reason and include sufficient descriptions reflecting the date, amount,

17  and nature of the work SDCC's attorney's performed. *See LG Corp.*, 2017 WL 3877741,

18  at *4. Thus, the Court finds no further deduction necessary based on the nature and context

19  of the case, quality of the representation, and result obtained.

20  ### iii.   *Lodestar Calculation*

| Table 1: Hourly Rates 2014 | | | |
|---|---|---|---|
| Timekeeper | Hourly Rate Billed | Hourly Rate Awarded | Time Billed |
| Bjurstrom, Callie A. | $675.00 | $675.00 | 24.05 hours |
| Hahn, Peter K. | $675.00 | $675.00 | 89 hours |
| Herrera, Michelle A. | $525.00 | $525.00 | 41.20 hours |

| Drake, Colin B. | $275.00 | $275.00 | 0.50 hours |
| Edge, Sandra V. | $285.00 | $285.00 | 19.25 hours |

| Table 2: Hourly Rates 2015 | | | |
| --- | --- | --- | --- |
| Timekeeper | Hourly Rate Billed | Hourly Rate Awarded | Time Billed |
| Bjurstrom, Callie A. | $705.00 | $705.00 | 24 hours |
| Gallacher, Kirsten F. | $385.00 | $385.00 | 10.25 hours |
| Hahn, Peter K. | $705.00 | $705.00 | 174 hours |
| Herrera, Michelle A. | $550.00 | $550.00 | 72 hours |
| Drake, Colin B. | $290.00 | $290.00 | 5.25 hours |
| Edge, Sandra V. | $295.00 | $290.00 | 21.50 hours |

| Table 3- Hourly Rates 2016 | | | |
| --- | --- | --- | --- |
| Timekeeper | Hourly Rate Billed | Hourly Rate Awarded | Time Billed |
| Bjurstrom, Callie A. | $735.00 | $735.00 | 93.25 hours |
| Gallacher, Kirsten F. | $480.00 | $480.00 | 98.75 hours |
| Hahn, Peter K. | $735.00 | $735.00 | 480.75 hours |
| Herrera, Michelle A. | $565.00 | $565.00 | 229.50 hours |
| Stanton, David | $765.00 | $765.00 | 0.25 hours |
| Drake, Colin B. | $295.00 | $290.00 | 16.50 hours |
| Edge, Sandra V. | $305.00 | $290.00 | 172.50 hours |
| Trinidad, Val | $295.00 | $290.00 | 6.25 hours |

14-cv-1865-AJB-JMA
Ex. 2
P. 32

| Table 4-Hourly Rates 2017 | | | |
|---|---|---|---|
| Timekeeper | Hourly Rate Billed | Hourly Rate Awarded | Time Billed |
| Bjurstrom, Callie A. | $760.00 | $760.00 | 1085 hours |
| Chevalier, Andrew | $110.00 | $110.00 | 85.25 |
| Civins, Conor M. | $608.16 | $608.16 | 283.75 hours |
| Collier, William E. | $110.00 | $110.0 | 167.50 hours |
| DiCarlo, Carl | $110.00 | $110.00 | 205.50 hours |
| Gallacher, Kirsten F. | $545.00 | $545.00 | 119 hours |
| Hahn, Peter K. | $760.00 | $760.00 | 1422.75 hours |
| Herrera, Michelle A. | $585.00 | $585.00 | 967.55 hours |
| McDonough, Benton | $110.00 | $110.00 | 88.25 hours |
| McNair, Wilton A. | $110.00 | $110.00 | 85.75 hours |
| Porter, Allison | $110.00 | $110.00 | 69 hours |
| Prewitt, Candes V. | $110.00 | $110.00 | 81.75 hours |
| Rawson, P.E., Tim | $485.35 | $485.35 | 50.25 hours |
| Romeo, Jennifer R. | $110.00 | $110.00 | 123.25 hours |
| Sims, Kelly J. | $110.00 | $110.00 | 184.75 hours |
| Smith, Nathaniel R. | $578.42 | $578.42 | 45.00 hours |
| Stanton, David | $790.00 | $790.00 | 12.75 hours |
| Stephens, Matthew R. | $545.00 | $545.00 | 200.75 hours |
| Villalobos, Jenny R. | $110.00 | $110.00 | 167.25 hours |
| Wardle, Lauren E. | $560.00 | $560.00 | 145.45 hours |

33

| | | | |
|---|---|---|---|
| Wooden, Eboni T. | $110.00 | $110.00 | 141.75 hours |
| Yeaman, Calumn J. | $110.00 | $110.00 | 98.75 hours |
| Barnes, Stacey | $335.00 | $290.00 | 5 hours |
| Bridges, Martin | $425.00 | $290.00 | 1 hour |
| Brooks, Thomas | $305.00 | $290.00 | 1 hour |
| Campbell, Stacey | $285.00 | $285.00 | 7.25 hours |
| Drake, Colin B. | $305.00 | $290.00 | 89 hours |
| Edge, Sandra V. | $315.00 | $290.00 | 1,195.75 hours |
| Farahjood, John | $305.00 | $290.00 | 17 hours |
| Gartman, Cody A. | $245.00 | $245.00 | 224.80 hours |
| Moffat, Gordon | $390.00 | $290.00 | 15.75 hours |
| Monarrez, John D. | $150.00 | $150.00 | 12.75 hours |
| Ng, Patrick | $305.00 | $290.00 | 0.50 hours |
| Perez, Louie | $295.00 | $290.00 | 120.25 hours |
| Trinidad, Val | $300.63 | $290.00 | 151 hours |
| Vugrinecz, J. Anthony | $299.42 | $290.00 | 18.75 hours |

| Table 5-Hourly Rates 2018 | | | |
|---|---|---|---|
| Timekeeper | Hourly Rate Billed | Hourly Rate Awarded | Time Billed |
| Bjurstrom, Callie A. | $795.00 | $795.00 | 221.70 hours |
| Civins, Conor M. | $675.00 | $675.00 | 14.25 hours |
| Hahn, Peter K. | $785.00 | $785.00 | 221 hours |
| Herrera, Michelle A. | $605.00 | $605.00 | 330.30 hours |
| Wardle, Lauren E. | $615.00 | $615.00 | 120.75 hours |

| Edge, Sandra V. | $325.00 | $290.00 | 143.95 hours |
| Monarrez, John D. | $300.00 | $290.00 | 0.25 hours |

SDCC requests **$4,994,245.20** in attorneys' fees and costs. (Doc. No. 527 ¶ 5.) The Court notes however, that the lodestar number based off of the declarations provided by SDCC is **$5,278,438.88**. This discrepancy is due to the fact that the lodestar number does not include courtesy discounts that occurred in March 2017 ($11,000), April 2017 ($30,000), May 2017 ($30,000), June 2017 ($50,000), July 2017 ($20,000), August 2017 ($25,000), September 2017 ($25,000), October 2017 ($30,000), November 2017 ($55,000), December 2017 ($20,000), January 2018 ($10,000), and February 2018 ($10,000). In total, SDCC provided **$316,000** in courtesy discounts. Subtracting the courtesy discounts, the new lodestar number is **4,962,438.88**. After the 20% reduction for quarter-hour billing, the 5% reduction for other billing deficiencies, and the **$3,532.50** for overstaffing, the final lodestar number is **$3,767,921.06.**

### iv.    *Expert Costs*

The Lanham Act provides that "[w]hen a violation of any right of the registrant of a mark registered in the Patent and Trademark Office . . . have been established in any civil action . . . the plaintiff shall be entitled to . . . (3) the costs of the action." 15 U.S.C. § 1117(a). Under Federal Rule of Civil Procedure 54, costs other than attorney's fees may be allowed to the prevailing party unless a federal statute or a court order provides otherwise. Fed. R. Civ. P. 54(d)(1).

SDCC seeks to recover certain non-taxable costs. Specifically, SDCC requests **$243,833.06** that SDCC paid to its two experts: Matthew G. Ezell and Patrick Kennedy, along with their assistants. (Doc. No. 425-3 ¶ 24.) DFP does not oppose this request. (*See generally* Doc. No. 512.)

Ms. Bjurstrom's declaration delineates the various benefits and advantages provided by both experts. For instance, Mr. Ezell conducted the Teflon Survey that addressed the primary significance of "Comic-Con" to the public. (Doc. No. 425-3 ¶ 25.) Additionally,

35

1    Mr. Ezell performed substantive research and helped analyze and develop a response to the

2    report prepared by DFP's expert Jeffrey Kaplan. (*Id.*) As to Mr. Kennedy, he was hired to

3    assess SDCC's damage remedies and also prepared and submitted a detailed expert report

4    and supplemental report. (*Id.* ¶ 26.) Both experts' invoices were provided to the Court.

5    (Doc. No. 425-6.)

6         It is clear from the record that Mr. Ezell's work was critical to SDCC's ultimate

7    success in the action—specifically to its trademark infringement claim. Thus, given the

8    reliance on Mr. Ezell and his survey, his fee of **$92,323.56** for his work in connection with

9    this matter was reasonably necessary for the prosecution of SDCC's case. *See SAS v.*

10   *Sawabeh Info. Servs. Co.*, No. CV 11-04147 MMM (MANx), 2015 WL 12763541, at *35

11   (C.D. Cal. June 22, 2015.) The Court will thus award **$92,323.56** in costs.

12        In comparison, Mr. Kennedy's necessity is less clear. Though he testified to various

13   important financial matters, his corrective advertising report stating that a brand repair

14   program would cost $9.62 million was not well-received by the jury as evidenced by the

15   jury award of only $20,000. (Doc. No. 234-1 at 22; Doc. No. 395 at 8.) Based on the

16   foregoing, the Court in its discretion, advances only **$120,000.00** instead of $151,509.50

17   as costs to cover Mr. Kennedy's expenses. (Doc. No. 423-3 ¶ 26 (*see Brighton Collectibles,*

18   *LLC v. Believe Production, Inc.*, No. 2:15-cv-00579-CAS (ASx), 2018 WL 1381894, at *5

19   (C.D. Cal. Mar. 15, 2018)).)

20        Accordingly, the Court awards SDCC **$212,323.56** to cover the costs of its two

21   experts. *See Lanyard Toys Ltd. v. Novelty, Inc.*, No. CV 05-8406-GW (JWJx), 2008 WL

22   11333941, at *21 (C.D. Cal. Mar. 18, 2008) (explaining that the district courts "may award

23   otherwise non-taxable costs . . .") (citation omitted).

## CONCLUSION

25        The Court has exhaustively and carefully considered the totality of the

26   circumstances in this case. Having done so, the Court finds that this case stands out when

27   compared to run of the mill trademark infringement cases. Accordingly, in its discretion,

28

1  finding this case "exceptional" pursuant to 15 U.S.C. § 1117(a), SDCC as the prevailing

2  party is awarded attorneys' fees and costs subject to the deductions listed above.

3      It is accordingly **ORDERED** that SDCC is awarded attorneys' fees and costs

4  totaling **$3,962,486.84**.[7] This award includes **$3,767,921.06** in attorneys' fees and

5  **$212,323.56** in expert costs. The Clerk of Court must enter judgment for SDCC and against

6  DFP, and each of them, in this amount, as well as the $20,000 awarded by the jury, in this

7  case. The Clerk of Court is also directed to issue the permanent injunction. As no issues

8  remain, the Clerk is instructed to **CLOSE** the docket of this case. Accordingly, SDCC's

9  motion for attorneys' fees and costs is **GRANTED IN PART AND DENIED IN PART.**

10

11  **IT IS SO ORDERED**.

12

13  Dated:  August 23, 2018

14                                    Hon. Anthony J. Battaglia

15                                    United States District Judge

16

17

18

19

20

21

22

23

24

_____

25

26  [7] The Court notes that the final award was adjusted by deducting $17,757.78 in attorneys' fees that were awarded to SDCC and paid by DFP in relation to DFP's unsuccessful motion

27  for sanctions. (Doc. Nos. 484, 522; Doc. No. 532 at 3.) The Court disagrees with DFP that the award should be reduced by $23,238, which is the amount SDCC initially requested.

28  (Doc. No. 532 at 3.)

EXHIBIT 3

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

SOUTHERN DISTRICT OF CALIFORNIA

10

11  BRYAN VESS, on behalf of himself    )  Civil No.10cv0920 AJB (WVG)
    and all others similarly situated,   )
12                                        )  CLASS ACTION
                       Plaintiff,         )
13  v.                                    )  FINAL ORDER APPROVAL CLASS
                                          )  ACTION SETTLEMENT
14  BANK OF AMERICA, N.A.; and            )
    DOES 1 through 50, inclusive,         )
15                                        )
                       Defendants.        )
16  _____        )

17        On October 24, 2013, this Court heard Plaintiff Bryan Vess' motion for final

18  approval of the proposed class action settlement (Dkt. No. 78) and motion for attorneys'

19  fees, costs, and incentive award (Dkt. No. 76).  This Court reviewed:  (a) the motions and

20  the supporting papers, including, the Settlement Agreement; (b) documents filed or

21  presented to the Court as objections  (Dkt. Nos. 53-56, 58-61, 63-72, 75, 77); (c)

22  responses to the objections (Dkt. No. 80); and (d) counsels' oral arguments.  Based on

23  this review and the findings below, the Court found good cause to grant the motion.

24  FINDINGS:

25        1.     Proper Jurisdiction.  This Court has jurisdiction over the subject matter of

26  this Action, all parties to the Action, and all class members who have not timely and

27  validly requested exclusion

28

1    2.    Adequate Performance.  The parties adequately performed their obligations

2  under the Settlement Agreement to date.

3    3.    Notice Disseminated.  Defendant Bank of America, N.A. provided direct

4  notice to class members via first-class mail, postage pre-paid, in compliance with

5  paragraph 5 of the Settlement Agreement, due process, and Rule 23 of the Federal Rules

6  of Civil Procedure.  The notice:  (i) fully and accurately informed class members about

7  the lawsuit and settlement; (ii) provided sufficient information so that class members

8  were able to decide whether to accept the benefits offered, opt-out and pursue their own

9  remedies, or object to the proposed settlement; (iii) provided procedures for class

10  members to file written objections to the proposed settlement, to appear at the hearing,

11  and to state objections to the proposed settlement; and (iv) provided the time, date, and

12  place of the final fairness hearing, which the Court subsequently changed (Dkt. No. 74).

13    4.    Certification Requirements Satisfied.  For the reasons stated in the order

14  granting preliminary approval of class action settlement and provisional class certifica-

15  tion (Dkt. No. 51), and having found nothing that would disturb these previous findings,

16  this Court finds and determines that the proposed class, as defined below, meets all of

17  the legal requirements for class certification, for settlement purposes only, under Federal

18  Rule of Civil Procedure 23(a) and (b)(3).

19    5.    Fair Settlement.  Upon review of the record pursuant to the factors identi-

20  fied in *Officers for Justice v. Civil Serv. Commission*, 688 F.2d 615, 625 (9th Cir. 1982)

21  and *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), the Court finds that

22  the Settlement Agreement has been entered into in good faith and is fair, reasonable,

23  adequate, and in the class' best interest.  The Settlement Agreement fully complies with

24  the Federal Rules of Civil Procedure, the Rules of the Court, due process, and any other

25  applicable law.  As to the determination that the Settlement Agreement is fair, reason-

26  able, and adequate, the Court notes that (a) whether the outcome on the merits would

27  result in a ruling in Plaintiffs and the class' favor is uncertain; (b) the parties conducted

28  sufficient discovery; (c) the Settlement Agreement was reached through negotiations

Ex. 3
P. 2

1 with experienced and informed counsel; (d) the consideration provided to the class

2 reflects benefits to the class; and (e) less than a fraction of one percent of the class

3 objected to the settlement.

4    6.  Proper Negotiations.  The Court also finds that extensive arm's-length

5 negotiations have taken place, in good faith and free from collusion between class

6 Counsel and Defendant's Counsel.  Parts of these negotiations were presided over by a

7 mediator, Bruce A. Friedman, Esq.

8    7.  Reasonable Attorneys' Fees and Costs.  An award of $700,000 in attorneys'

9 fees and costs to Class Counsel is fair and reasonable in light of the nature of this case,

10 Class Counsel's experience and efforts in prosecuting this Action, and the benefits

11 obtained for the class.

12    8.  Reasonable Incentive Award.  An incentive award of $7,500 to Plaintiff

13 Bryan Vess is fair and reasonable in light of:  (a) Plaintiff's respective risks (including

14 financial, professional, and emotional) in commencing this action as the Class Represen-

15 tative; (b) the time and effort spent by Plaintiff in litigating this action as the Class

16 Representative; and (c) Plaintiff's public interest service.

17    9.  Non-Persuasive Objections.  The objectors' arguments do not preclude

18 approval of the settlement and are overruled.   Twenty documents (for 22 class members)

19 were filed as objections.  Five documents were mislabeled as objections.  Five docu-

20 ments were facially invalid because they failed to provide any legal and factual basis for

21 an objection, and instead expressed frustrations over individual dealings with BANA

22 (e.g. refusal of loan modification or loan forgiveness and personal hardship), which do

23 not affect the settlement's terms or benefits.  The remaining ten objections challenged the

24 equitable value of the relief provided, and the mechanism for ensuring compliance.  The

25 Court, however, finds that the settlement provides valuable equitable relief to the class

26 and has sufficient mechanisms for ensuring compliance.

27 IT IS ORDERED THAT:

28

1. **Class.** The class is defined as:

> All Bank of America customers in the United States that currently have open HELOC Accounts that were suspended or reduced during the period from January 1, 2008 to April 29, 2010 based on Bank of America's claim that the property securing the HELOC had significantly declined in value. Excluded from the class are the Judges presiding over this case and any of their employees or immediate family members.

2. **Binding Effect of Order.** This order applies to all claims or causes of action settled under the Settlement Agreement, and binds all class members, including those who did not properly request exclusion under paragraph 6 of the preliminary approval of class action settlement and provisional class certification Order. This order does not bind persons who filed timely and valid Requests for Exclusions. At the hearing, Plaintiff's Counsel submitted an updated list of persons who properly requested to be excluded from the settlement. The list was accepted an evidence and will be docketed as Plaintiff's Exhibit 1 to the hearing. Plaintiff's Exhibit 1 will supersede the previouslt submitted Exhibit A in these regards.

3. **Release.** Plaintiff and all class members who did not properly request exclusion are: (1) deemed to have released and discharged Defendant from all claims arising out of or asserted in this action and all claims released under the Settlement Agreement; and (2) barred and permanently enjoined from asserting, instituting, or prosecuting, either directly or indirectly, these claims. The full terms of the release described in this paragraph are set forth in paragraph 4 of the Settlement Agreement.

4. **Benefits for the Proactive Reinstatement Group.** Per the settlement, Defendant will proactively offer partial or full account reinstatement, under its current reinstatement and underwriting guidelines, to a subset group of class members. Defendant will notify this group about the reinstatements as provided in the Settlement Agreement.

5. **Benefits for the Qualifying Accounts Group.** No later than 90 days after entry of this Order, but without limitation to Defendant mailing letters prior to this date, Defendant will send the Notice of Right to Request Reinstatement letters, substantially

4

10cv0920

1    similar to the form attached to the Settlement Agreement as Exhibit C.3 to class members

2    with accounts deemed to be Qualifying Accounts, as the term is defined in the Settlement

3    Agreement, and who will not receive the proactive reinstatement letters, i.e., Exhibit C.1

4    or Exhibit C.2.  Qualifying Accounts is defined to mean HELOC accounts that do not

5    meet any of the following criteria:

6        a.    The securing property has a Combined Loan to Value Ratio over 100
              percent;

7

8        b.    BANA's AVM shows 75 percent or greater reduction securing property's
              equity;

9        c.    Any borrower has a FICO score less than 640;

10       d.    Any borrower has been delinquent on HELOC payments within the prior 12
              months;

11

12       e.    Any borrower has completed or is in negotiation for a home equity or first
              mortgage workout (short sale, deed in lieu, foreclosure, etc.);

13       f.    Any borrower has been declined for reinstatement within the last 6 months;

14       g.    Any borrower is currently past due on his/her HELOC payments;

15       h.    The initial draw period on the HELOC will expire within 6 months of the
              date the Notice of Right to Request Reinstatement letter is sent; or

16

17       i.    Any named borrower is subject to marketing restrictions, such as do not
              solicit requests, is subject to a bankruptcy proceeding, or is in litigation
              regarding the HELOC Account.

18

19   The letter will inform the group that BANA will review their accounts for full or partial

20   reinstatement if they complete and return (within 30 days of the date the Notice of Right

21   to Request Reinstatement Letter is sent) an enclosed Request for Reinstatement form and

22   explain why their property has not significantly declined in value.  If a class member

23   elects to be considered for reinstatement through this process, he/she agrees to waive any

24   notice required under the Fair Credit Reporting Act or state equivalents attendant with

25   the relief contemplated under the Settlement Agreement.  Utilization of this method of

26   review does not otherwise affect a class member's rights under any applicable statutes.

27       6.    Benefits for the Non-Qualifying Accounts Group.  Class members without

28   Qualifying Accounts will have the right to request BANA to review their accounts for

1   full or partial reinstatement.  The procedures for making that request were provided in

2   the court-approved Class Notice and modified by the Court's Order Granting the Parties'

3   Joint Motion to Extend Deadlines (Dkt. No. 74).  BANA will accept requests submitted

4   until 120 days after entry of this Order.  These class members will not be sent a Notice of

5   Right to Request Reinstatement letter (Exhibit C.3).  Any class member who timely

6   requests reinstatement of a non-Qualifying Account shall be afforded the same review as

7   class members' with Qualifying Accounts, i.e., Defendant will consider the Request for

8   Reinstatement Review according to Defendant's then current underwriting guidelines.

9         7.     Enhanced Suspension Notice Benefit.  For at least 3 years after the Effective

10  Date, Defendant will maintain a toll-free phone number that customers can call to

11  request the valuation Defendant placed on the securing property.  Defendant also will

12  include this number in its HELOC suspension and reduction notices for suspensions and

13  reductions based on a significant decline in property value.

14        8.     Enhanced Valuation Method Benefit.  For HELOC Accounts of $250,000 or

15  more, Defendant will utilize an additional valuation methodology in determining the

16  value of the property or dwelling securing the HELOC Accounts where the AVM does

17  not support a partial or full reinstatement.

18        9.     Attorney's Fees and Costs.  Class Counsel is awarded $700,000 in fees and

19  costs.  Defendant must pay Class Counsel this amount to Patterson Law Group, APC

20  within the timeline set forth in the Settlement Agreement.

21        10.    Calculation of Attorneys' Fees.  The Court used the lodestar method to

22  calculate the attorneys' fees award.  The Court finds that Class Counsel's hours and

23  expenses were reasonable.  The Court did not apply a multiplier because the requested

24  amount of attorneys' fees and costs was less than Class Counsel's base lodestar.

25        11.    Incentive Award.  Plaintiff Bryan Vess is awarded $7,500 as an incentive

26  award.  Defendant must pay Plaintiff this amount within the timeline set forth in

27  paragraph 8.4 of the Settlement Agreement.

28

1      12.    Objections Overruled.  The objections are overruled for the reasons stated

2  above.

3      13.    Appellate Bond.  Pursuant to Rule 7 of the Federal Rules of Civil Proce-

4  dure, in a civil case, the district court may require an appellant to file a bond or provide

5  other security in any form and amount necessary to insure that any appellants have the

6  ability to pay Plaintiff's costs and fees should opposing an appeal be necessary.  See

7  A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1028 (9th Cir. 2001); See also Fed.

8  R. App. P. 7 ("Rule 7").  The Court orders that a $15,000 bond must accompany an

9  appeal of this Order.

10      14.    Court's Jurisdiction.  Pursuant to the parties' request, the Court will retain

11  jurisdiction over this action and the parties until final performance of the Settlement

12  Agreement.

13      IT IS SO ORDERED.

14

15  DATED:  October 24, 2013

16

17                             Hon. Anthony J. Battaglia
                           U.S. District Judge

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 4

1  James R. Patterson, State Bar No. 211102
   jim@pattersonlawgroup.com
2  Alisa A. Martin, State Bar No. 224037
   alisa@pattersonlawgroup.com
3  PATTERSON LAW GROUP
   402 West Broadway, 29th Floor
4  San Diego, CA 92101
   Telephone:  (619) 398-4760
5  Facsimile:  (619) 756-6991

6
   Attorneys for Plaintiff and the Class
7

8

9

10                    **UNITED STATES DISTRICT COURT**

11                  **SOUTHERN DISTRICT OF CALIFORNIA**

12 | BRYAN VESS, on behalf of himself and all others similarly situated, | CASE NO.: 3:10-cv-00920 AJB(WVG) |
13 |  |  |
   | Plaintiff, | **CLASS ACTION** |
14 |  |  |
   | vs. | **DECLARATION OF ALISA A. MARTIN IN SUPPORT OF IN SUPPORT OF MOTION FOR ATTORNEYS' FEES, COSTS, AND INCENTIVE AWARD** |
15 | BANK OF AMERICA, N.A., |  |
16 | Defendants. |  |
17 |  | DATE: OCTOBER 24, 2013 |
18 |  | TIME: 2:00 P.M. |
   |  | JUDGE: HON. ANTHONY J. BATTAGLIA |
19 |  | COURTROOM: 12 |

20

21

22

23

24

25

26

27

28

---

MARTIN DECL. ISO MOTION FOR ATTORNEYS' FEES, COSTS,
AND INCENTIVE AWARD

1  I, Alisa A. Martin, declare as follows:

2      **1.**    I am a member of the bar of the State of California and a senior

3  attorney of Patterson Law Group, attorneys for Plaintiff Bryan Vess. I make this

4  declaration in support of Plaintiff's motion for attorneys' fees, costs, and incentive

5  award. If called as a witness, I would and could testify to the following:

6  ***Settlement***

7      **1.**    Attached as **Exhibit 1** is a true and correct copy of the Settlement

8  Agreement.

9  ***Briefing, Discovery, Mediation, and Settlement***

10      **2.**    We briefed oppositions to two motions to dismiss. We amended the

11  complaint. We engaged in focused and thorough discovery. Our efforts included:

12  exchanging numerous documents; interviewing witnesses; researching various

13  issues and laws; preparing a damages analysis and policy changing framework;

14  analyzing similar case settlements; and reviewing and analyzing documents

15  produced. We also conferred with experts.

16      **3.**    We engaged in initial settlement discussions early on in the case.

17  During these discussions, among other things, we discussed the legal landscape

18  with respect to HELOC cases against other banks, BANA's policies and

19  procedures for suspending and reducing HELOCs, as well as their respective views

20  on the instant litigation.

21      **4.**    On September 5, 2012, following a full-day of mediation before Bruce

22  A. Friedman, Esq., an experienced mediator, the parties settled the lawsuit in

23  principal. Over the following months, the parties continued to negotiate, at arms-

24  length, the remaining terms of the preliminarily approved settlement.

25  ***Post-Preliminary Approval Work***

26      **5.**    Following preliminary approval, notice was sent to the class members.

27  Since that time, we received thousands of inquires including telephone calls,

28  emails, and letters from class members regarding the nature of the litigation and

-1-

1  the meaning of the settlement terms and seeking advice with respect to how to
2  proceed. We worked diligently to promptly address each and every inquiry, which
3  writing letters and returning telephone calls. We even hired additional employees,
4  including a Spanish speaker, to assist with this task.   We continue to respond to
5  inquiries and anticipate that it will continue to do so well after final approval.

6      **6.**    To complete this case, we must continue to respond to inquiries from
7  class members about the settlement, prepare this attorneys' fee motion, prepare the
8  final approval papers, prepare for the final approval hearing, prepare a response to
9  the objections filed, and attend the final approval hearing.  We also must spend
10  additional hours addressing any post final approval issues, including overseeing all
11  subsequent notices and mailings by BANA following final approval, respond to
12  additional inquires from class members, and respond to any appeal issues

13                  ***Class Size and Settlement Acceptance***

14      **7.**    Defendant Bank of America, N.A. ("BANA") represented to our firm
15  that notice was mailed to 383,354 class members.

16      **8.**    To date, 14 class members objected to the settlement and 93 requested
17  to be excluded from the settlement.

18                           ***Time***

19      **9.**    We had to turn down other work to properly and comprehensively
20  perform the job required of this case and prepare for all contingencies that may
21  arise.

22      **10.**    The below chart summarizes our work hours and billing rates.  My
23  time is designated "AAM," Mr. Patterson's time is designated "JRP," and Mr.
24  Kaatz' time is designated "JK."

25  / / /

26

27

28

-2-

| GENERAL DESCRIPTION | | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| 1. | *Pre-Filing Tasks:* Conducts client and witness meetings; performed legal research and analysis; reviewed client documents; drafted complaint. | 34 hrs (AAM) 29 hrs (JRP) | $575 $675 | $19,550 $19,575 |
| 2. | *Post Filing Pleading Amendment;* Drafted amended pleadings and researched issues related to same. | 15.3 hrs (AAM) 13 hrs (JRP) | $575 $675 | $8,797.50 $8,775 |
| 3. | *Discovery:* Review and analyze documents produced; prepare discovery; confer with opposing counsel re discovery issues. | 3.2 hrs (AAM) 14 hrs (JRP) | $575 $675 | $1,840 $9,450 |
| 4. | *Motion Practice:* Prepare oppositions to motions to dismiss; research issues re motion for class certification. | 27 hrs (AAM) 19 hrs (JRP) | $575 $675 | $15,525 $12,825 |
| 5. | *Prepare for Mediation:* Prepared mediation brief and damage analysis report; consulted with professional re damage analysis; consulted with clients re damage analysis and potential settlement options. | 2.1 hrs (AAM) 17 hrs (JRP) | $575 $675 | $1,207.50 $11,475 |
| 6. | *Mediation:* Traveled to and attended mediation; traveled to and attended settlement meeting; engaged in post mediation conferences with mediator and defense counsel. | 17 hrs (AAM) 37 hrs (JRP) | $575 $675 | $9,775 $24,975 |
| 7. | *Settlement Agreement:* Negotiated settlement agreement and supporting documents; conferred with client about settlement terms; draft settlement documents. | 64 hrs (AAM) 18 hrs (JRP) | $575 $675 | $36,800 $12,150 |

-3-

| | GENERAL DESCRIPTION | HOURS | RATE | LODESTAR |
|---|---|---|---|---|
| 8. | *Motion for Preliminary Approval and Provisional Certification:* Prepared motion for preliminary approval; coordinated preliminary approval order; prepared motion for attorneys fees, costs, and incentive award. | 42 hrs (AAM) 28.3 hrs (JRP) | $575 $675 | $24,150 $19,102.50 |
| 9. | *General Case Management Issues:* Prepared ENE and joint motions; met and conferred with opposing counsel re discovery plan; strategize with co-counsel on various issues; attend hearings; met with co-counsel twice | 20 hrs (AAM) 26 hrs (JRP) | $575 $675 | $11,500 $17,550 |
| 10. | *Post-Preliminary Approval Correspondence with Class Members:* Respond to inquiries from class members re settlement; review and attention to matters re objections and opt out requests. | 162 hrs (AAM) 88.4 hrs (JRP) 184.65 hrs (JK) | $575 $675 $175 | $93,150 $59,670 $32,313.75 |
| 11. | *Anticipated Additional Work* Prepare final approval documents; attend final approval hearing; respond to additional inquiries from class members about settlement; oversee implementation of settlement terms; correspond with opposing counsel re same. | 180 hrs (AAM) 100 hrs (JRP) | $575 $675 | $103,500 $67,500 |
| | AAM TOTAL | 566.60 hrs | $575 | $325,795 |
| | JRP TOTAL | 389.70 hrs | $675 | $263,047.50 |
| | JK TOTAL | 184.65 hrs | $175 | $32,313.75 |
| | COMBINED TOTAL | 1,140.95 hrs | | **$621,156.25** |

-4-

11.   Co-counsel's lodestar is $106,923.50.  *See* Declaration of Attorney Steven Woodrow in support of Final Approval of Class Action Settlement Agreement and Award of Reasonable Attorneys Fees and Class Member Incentive Awards.

12.   We incurred $11,452.51 in costs, which include filing fees, copying costs and mediation.  The combined fees for Patterson Law Group, APC and Edelson LLC is $728,079.75, plus $$11,452.51 in costs, totaling $739,532.26.

### *Reasonableness of Class Counsel's Hourly Rate*

13.   Our hourly rates are reasonable in comparison to rates charged by other firms that handle complex litigation.  Attached as **Exhibits 2** are true and correct copies of billing surveys.

14.   My co-counsel and I command a high hourly rate due to our success in consumer and wage-and-hour actions and are held in very high regard by the legal community.  This case was complex and difficult, not one that any lawyer could litigate, but a highly specialized area of employment law that requires highly skilled, experienced, and competent lawyers.

### *Class Counsel's Experience*

15.   The attorneys at Patterson Law Group have substantial experience in class action litigation, including numerous wage and hour cases.  A copy of the firm resume and attorney profiles is attached hereto as **Exhibit 3**.

16.   I graduated from University of San Diego's law school and was admitted to the bar in 2002.  The same year, I joined the law firm of Cooley LLP in San Diego, California, of the State of California.  Cooley is a large national firm that focuses, among other things in complex litigation, including class action defense.  Since joining Cooley, I have spent the last decade successfully litigating complex cases, including numerous class actions.

-5-

17.    In or about February 2009, I left Cooley to work as senior attorney at the law firm of Harrison Patterson & O'Connor.  In approximately July of 2011, the partners of Harrison Patterson & O'Connor elected to spin off their practice groups: Patterson Law Group, APC and Harrison & Bodell, LLP.   I joined Patterson Law Group and opened my own law firm as well.

18.    My co-counsel, James R. Patterson, graduated from University of San Diego's law school and admitted to the bar in 2000.  Mr. Patterson's experience is described in the firm resume and attorney profiles, attached hereto as **Exhibit 3**.

19.    Our current practice almost exclusively focuses on complex class actions on behalf of consumers and employees.  We served as counsel in multiple class cases, including, but not limited to the class actions described below, which make up a partial sampling of our cases:

    a.  *Berry v. Weboyalty.com, Inc.,* Case No. 11-55764 (9th Cir. Court of Appeals) (consumer class action on deceptive marketing practices);

    b.  *In re EasySaver Rewards Litigation,* Case No. 09-cv-02094-ALB-WVG (S.D. Cal.) (consumer class action on deceptive marketing practices);

    c.  *Cox v. Clarus Marketing Group, LLC,* Case No. 3:11-cv-02711-H-RBB (S.D. Cal.) (consumer class action on deceptive marketing practices);

    d.  *Winkler v. Citibank,* Case No. 09-cv-1999-BTM-CAB (S.D. Cal.) (consumer class action on HELOC reductions and suspensions);

    e.  *Brewster v. USAA Federal Savings Bank,* Case No. 10-cv-1633-JAH-BLM (S.D. Cal.) (consumer class action on HELOC reductions and suspensions); and

    f.  *O'Leary v. Wells Fargo Bank,* Case No. 2:10-cv-01913-MCE-GGH (E.D. Cal.) (consumer class action on HELOC reductions and suspensions).

-6-

g.  *Pompa v. Target Corporation*, Case No. CV-10-0634 AHM (FFMx) (C.D. Cal.) (over $3,000,000 in compensation received on behalf of pharmacist employees);

h.  *DeLapp v. U.S. Bank*, Case No. CGC-10-500638 (San Francisco County Sup. Ct.) (over $1,800,000 recovered for former employees for lost vacation pay);

i.  *Fletcher v. The Toro Company*, Case No. 37-2008-00095573 (San Diego County Sup. Ct.) (approximately $1,000,000 in compensation recovered for the class of only 119 people);

j.  *Von Retteg v. La Costa Limousine*, Case No. 37-2008-00086676 (San Diego County Sup. Ct.) (approximately $300,000 in compensation recovered for a small class of limousine drivers);

k.  *Chase, et al. v. Rite Aid Corp.*, Case No. BC381055 (Los Angeles County Sup. Ct.) (wage and hour class action on behalf of Rite Aid pharmacists);

l.  *Republic Services Wage and Hour Cases,* Case No. JCCP No. 4658 (San Diego County Sup. Ct.) (wage and hour class action on behalf of security guards and factory workers);

m. *La Masa, et al. v. Indymac Resources, Inc.,* Case No. 626836 (Stanislaus County Sup. Ct.) (wage and hour class action on behalf of bank workers);

n.  *Alburez v. CRC Health Group, Inc.,* Case No. 37-2010-89945 (San Diego County Sup. Ct.) (wage and hour class action on behalf of clinic workers);

o.  *Verdugo v. Richman Management Corp., et al.,* Case No. 37-2008-00081654 (San Diego County Sup. Ct.) (wage and hour class action on behalf of security guards);

-7-

**20.**   I have also successfully handled numerous individual employment and business litigation cases.

### *Plaintiff's Efforts and Risks*

**21.**   Plaintiff, among other things, reviewed filings and case-related documents, participated in consultations and meetings.   Plaintiff was always available to respond to our inquiries.   Plaintiff produced valuable information and assisted with evaluating the proposed settlement.   This work was undertaken in order to evaluate and achieve the proposed settlement.   In short, Plaintiff is committed to this case and has taken on considerable risk in pursuing this case and settlement.

### *Non-Opposition*

**22.**   BANA will not oppose this motion.

I declare under penalty of perjury under California laws that the foregoing is true and correct.   Executed on September 6, 2013 in San Diego, California.


          */s/  Alisa A. Martin*
          Alisa A. Martin

## CERTIFICATION OF SERVICE

I, Alisa A. Martin, hereby certify that on September 6, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all counsel of record registered with the CM/ECF system.

*/s/ Alisa A. Martin*
Alisa A. Martin

MARTIN DECL. ISO MOTION FOR ATTORNEYS' FEES, COSTS,
AND INCENTIVE AWARD                                    3:10-CV-00920-AJB-WVG

Ex. 4
p. 10

EXHIBIT 5

1
2
3
4
5
6
7
8

**UNITED STATES DISTRICT COURT**

9

**SOUTHERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11 ANTHONY J. IORIO, MAX FREIFIELD, and<br>12 RUTH SCHEFFER, on behalf of themselves and<br>all others, similarly situated,<br>13<br>14 Plaintiffs,<br>15 v.<br>16 ALLIANZ LIFE INSURANCE COMPANY OF<br>17 NORTH AMERICA, INC.,<br>18 Defendant. | CASE NO. 05-CV-0633-JLS (CAB)<br><br>[CLASS ACTION]<br><br>**FINAL ORDER: (1) APPROVING CLASS<br>ACTION SETTLEMENT, (2) AWARDING<br>CLASS COUNSEL FEES AND<br>EXPENSES, (3) AWARDING CLASS<br>REPRESENTATIVES INCENTIVES, (4)<br>PERMANENTLY ENJOINING<br>PARALLEL PROCEEDINGS, AND (5)<br>DISMISSING ACTION WITH<br>PREJUDICE**<br><br>**Fairness Hearing**<br>Date:   March 3, 2011<br>Time:   1:30 p.m.<br>Court:  Courtroom 6<br>        Hon. Janis L. Sammartino |

19
20
21
22
23
24
25
26
27
28

1

*Iorio, et al. v. Allianz*

1    Following a hearing on July 1, 2010, ("Preliminary Approval Hearing"), this Court entered

2    its Order (1) Preliminarily Approving Class Action Settlement, (2) Directing Distribution of the

3    Class Action Settlement Notice, (3) Setting a Final Approval Hearing, and (4) Preliminarily

4    Enjoining Parallel Proceedings, (Doc. No. 437) ("Preliminary Approval Order"), preliminarily

5    approving the Settlement entered into by the parties in the above-captioned Action, and scheduling

6    a hearing to determine whether the Settlement is fair, reasonable, adequate, in the best interests of

7    the Class, and free from collusion, whether the Settlement should be finally approved by the Court,

8    and to consider a motion by Class Counsel for an award of attorneys' fees, costs and litigation

9    expenses, and incentives for the Class Representatives ("Fairness Hearing").

10    The Court has considered: (i) the points and authorities submitted in support of the motion

11    for final approval of the Settlement ("Final Approval Motion"); (ii) the points and authorities

12    submitted in support of the motion for an award of attorneys' fees and costs and litigation

13    expenses, and approval of incentive awards for the Class Representatives ("Fee Motion"); (iii) the

14    declarations and exhibits submitted in support of said motions; (iv) Allianz's separate request for

15    final approval of the Settlement and entry of judgment herein, on the terms and conditions set forth

16    in the Settlement; (v) the *Settlement Stipulation* and *Amendment to Settlement Stipulation*; (vi) the

17    entire record in this proceeding, including but not limited to the points and authorities,

18    declarations, and exhibits submitted in support of preliminary approval of the Settlement, filed

19    June 3, 2010 (Doc. Nos. 424-435); (vii) the full and fair notices provided to the Class of the

20    pendency of this class action, the Settlement, the Fairness Hearing, and Class members' rights with

21    respect to this class action lawsuit and Settlement; (viii) the relatively few members of the class

22    certified by the Court who requested exclusion pursuant to their right to do so at the time of the

23    notices of the pendency of this class action; (ix) the existence of only six objections to the

24    Settlement, out of more than 12,000 Class Members, three of which have been withdrawn by the

25    objector; (x) the absence of any objection or response by any official after the provision of all

26    notices required by the Class Action Fairness Act of 2005, 28 U.S.C. §1715; (xi) the oral

27    presentations of Class Counsel and Counsel for Allianz at the Preliminary Approval Hearing and

28

2

*Iorio, et al. v. Allianz*

Fairness Hearing; (xii) this Court's experiences and observations while presiding over this matter, and the Court's file herein; and (xiii) the relevant law.

Based upon these considerations, the Court's findings of fact and conclusions of law as set forth in the Preliminary Approval Order and in this *Final Order: (1) Approving Class Action Settlement, (2) Awarding Class Counsel Fees and Expenses, (3) Awarding Class Representatives Incentives, (4) Permanently Enjoining Parallel Proceedings, and (5) Dismissing Action with Prejudice* ("Final Approval Order"), and good cause appearing:

**IT IS HEREBY ORDERED AND DECREED**, as follows:

1.    **Definitions.**   The capitalized terms used in this Final Approval Order shall have the meanings and/or definitions given to them in the Settlement, or if not defined therein, the meanings and/or definitions given to them in this Final Approval Order.

2.    **Incorporation of Documents.**   This Final Approval Order incorporates and makes a part hereof:

A.    the Parties' *Settlement Stipulation*, filed as Exhibit 1 to the Declaration of Robert S. Gianelli in support of final settlement approval, on February 10, 2011, ("Gianelli Declaration"), including all exhibits thereto and the Parties' *Amendment to Settlement Stipulation* filed as Exhibit 2 to the Gianelli Declaration including all exhibits thereto, (collectively, "Settlement Stipulation"), which sets forth the terms and provisions of the proposed settlement ( "Settlement");

B.    the Court's findings and conclusions contained in its Preliminary Approval Order dated July 1, 2010, 2010, (Doc. No. 437), ("Preliminary Approval Order").

3.    **Jurisdiction.**   The Court has personal jurisdiction over the Parties, the Class Members (as defined below at paragraph 4 below), including objectors.   The Court has subject matter jurisdiction over this action, including, without limitation, jurisdiction to approve the Settlement, to settle and release all claims alleged in the action and all claims released by the Settlement,

3

1    including the Released Transactions (as defined in the Settlement Stipulation), to adjudicate any

2    objections submitted to the proposed Settlement (including objections by Class Members or CAFA

3    officials), and to dismiss this Action with prejudice.   All Class Members, by failing to exclude

4    themselves according to the Court's prior orders and the terms of the prior notices of the pendency

5    of the Action, have consented to the jurisdiction of this Court for purposes of this Action and the

6    Settlement of this Action.

7

8    **4.      Definition of the Class and Class Members.**   The "Class," which is comprised of the

9    "Class Members," is defined by the Court's Order Granting Plaintiffs' Motion for Class

10   Certification, dated July 25, 2006 (the "Class Certification Order"), (Doc. No. 113), and is as

11   follows:   All persons who purchased one of the following annuities from Allianz Life Insurance

12   Company of North America or LifeUSA Insurance Company while they were California residents,

13   age 65 years or older, and prior to July 26, 2006: Bonus Maxxx (including Accumulator Bonus

14   Maxxx, Bonus Maxxx 12% and Bonus Maxxx 14%), BonusDex, Bonus Maxxx Elite, BonusDex

15   Elite, 10% Bonus PowerDex Elite and MasterDex 10; subject to the following categories of

16   persons which are specifically excluded from the Class:

17         **A.**      Officers, directors or employees of Allianz; any entity in which Allianz has a

18   controlling interest; the affiliates, legal representatives, attorneys or assigns of Allianz; any federal,

19   state or local governmental entity; and any judge, justice or judicial official presiding over this

20   matter, and the staff and immediate family of any such judge, justice or judicial officer.

21         **B.**      Any person who acted as an independent insurance Agent licensed by the State of

22   California and appointed by Allianz in the sale of Annuities that are in the Class.

23         **C.**      Any person who, under the terms of the previous orders and notices to class

24   members in this Action, timely and properly submitted a written request to be excluded from the

25   Class.

26

27

28

4

*Iorio, et al. v. Allianz*

1      All Class Members are subject to this Final Approval Order and the Final Judgment to be

2  entered by the Clerk of Court in accordance herewith.

3

4  **5.**    **Findings and Conclusions.**  The Court finds that the Settlement was not the product of

5  collusion or any other indicia of unfairness, is fair, reasonable, and adequate to the Class in light of

6  the complexity, expense, and likely duration of the litigation (including appellate proceedings),

7  and the risks involved in establishing liability, damages, and in maintaining the Action as a class

8  action, through trial and appeal.  The Court finds that the Settlement represents a fair and complete

9  resolution of all claims asserted in a representative capacity on behalf of the Class and should fully

10  and finally resolve all such claims.  In support of these findings and conclusions, the Court further

11  finds:

12      A.    There is no evidence of collusion.  The proposed settlement, as set forth in the

13  Settlement Stipulation, resulted from extensive arms-length negotiation.  The Action was

14  extensively and vigorously litigated, up to the commencement of trial (as further described below),

15  prior to any settlement.  Plaintiffs and Allianz engaged in intensive arms-length negotiations, over

16  the course of multiple mediation sessions before a capable and well-respected mediator, Robert J.

17  Kaplan of Judicate West, with extensive experience in mediating complex consumer and insurance

18  cases.  Extensive negotiations thereafter resulted in the proposed settlement reflected by the

19  Settlement Stipulation.

20      B.    The Settlement provides for substantial cash payments and/or other monetary

21  benefits to every Class Member, without requiring any Class Member to affirmatively participate

22  in a claims process (although some of the categories of Settlement Relief, by their nature, are

23  dependent upon the Class Member's future policy choices, and require an affirmative election to

24  annuitize, convert an existing annuitization option to a different annuitization option, and/or

25  request partial withdrawal).  No portion of the substantial Settlement Relief would be consumed by

26  attorneys' fees, litigation expenses, notice expenses, settlement administration expenses, or the

27  requested incentive awards for the Named Plaintiffs, since such amounts are all separately

28  provided for.  The Court has considered the realistic range of outcomes in this matter, including

5

*Iorio, et al. v. Allianz*

1    the amount Plaintiffs might receive if they prevailed at trial, the strength and weaknesses of the

2    case, the novelty and number of the complex legal issues involved, and the risk that Plaintiffs

3    would receive less than the Settlement Relief or take nothing at trial. The amount offered by the

4    Settlement is fair, reasonable, and adequate in view of these factors.

5            C.      Before reaching the proposed settlement, Plaintiffs and Allianz fully and vigorously

6    litigated their claims and defenses in extensive proceedings before this Court and in the appellate

7    courts. A detailed procedural history of this action is set forth in the Court's docket, and is

8    described in the declaration of Robert S. Gianelli and in Plaintiffs' points and authorities submitted

9    in support of preliminary approval. *Inter alia*, Allianz's challenges to the pleadings, class

10   certification, class decertification, summary judgment, motion to "clarify" the Court's orders

11   regarding class certification, motion to modify the class definition, motion to strike various

12   remedies in the prayer for relief, and motion to decertify the Class' punitive damages claim, and

13   the Parties' motions *in limine* and other trial motions, were all heard and decided prior to

14   Settlement. Class certification issues were repeatedly submitted to the Ninth Circuit, through three

15   separate Rule 23(f) petitions filed by Allianz. Trial briefs, witness lists, jury instructions and

16   verdict forms, and deposition testimony designations were all filed and exchanged. All final pre-

17   trial conferences were completed. The Parties reported ready for trial on March 29, 2010, while

18   settlement negotiations involving a mediator were ongoing. Based on the Parties' reported

19   progress made in mediation, a brief continuance to April 1, 2010 was granted. On that morning,

20   with jury selection scheduled to commence, the Parties reported their proposed settlement to the

21   Court.

22           D.      Before reaching the proposed settlement, Plaintiffs and Allianz also conducted

23   extensive discovery, fully completing all fact and expert discovery. More than 40 lay and expert

24   depositions, cumulatively hundreds of hours of testimony, were completed. Plaintiffs took the

25   depositions of 16 key Allianz managerial employees. Plaintiffs defended the depositions of the

26   class representatives (each was deposed twice) and the depositions of 10 absent class members.

27   All seven expert depositions were completed by the parties. Written discovery was no less

28   comprehensive. In addition to extensive requests for production of documents at deposition,

6

*Iorio, et al. v. Allianz*

1   Plaintiffs propounded three sets of inspection demands (cumulatively 56 requests), plus pre-trial
2   interrogatories and requests for admission.  Plaintiffs also subpoenaed additional documents from
3   selling agents.  Properly authenticated and verified policy data and mailing data was produced for
4   every single individual class member and annuity.  Voluminous documentary evidence (including
5   22 separate batches of records produced by Allianz) was produced, reviewed and analyzed.  The
6   class representatives submitted to extensive written discovery from Allianz as well.  Plaintiffs
7   responded to three rounds of written discovery, including interrogatories, inspection demands, and
8   requests for admission.

9        E.      Based upon this full litigation of relevant legal issues affecting this litigation,
10   extensive investigation of the underlying facts in discovery, and full preparation by the Parties for
11   the trial in the action, Plaintiffs and Allianz were fully informed of the legal bases for the claims
12   and defenses herein, and capable of balancing the risks of continued litigation (both before this
13   Court and on appeal) and the benefits of the proposed settlement.

14        F.      The Class is and was at all times adequately represented by Named Plaintiffs and
15   Class Counsel, including in entering into and implementing the Settlement, and has satisfied the
16   requirements of *Federal Rules of Civil Procedure,* Rule 23, and applicable law.  Class Counsel
17   submit that they have fully and competently prosecuted all causes of action, claims, theories of
18   liability, and remedies reasonably available to the Class Members.  Further, both Class Counsel
19   and Allianz's Counsel are highly experienced trial lawyers with specialized knowledge in
20   insurance and annuity litigation, and complex class action litigation generally.  Class Counsel and
21   Allianz's Counsel are capable of properly assessing the risks, expenses, and duration of continued
22   litigation, including at trial and on appeal.  Class Counsel submit that the Settlement is fair,
23   reasonable and adequate for the Class Members.  Allianz denies all allegations of wrongdoing and
24   disclaims any liability with respect to any and all claims alleged by Plaintiffs and the Class,
25   including their claims regarding the propriety of class certification, but agrees that the proposed
26   settlement will provide substantial benefits to Class Members.  Allianz considers it desirable to
27   resolve the Action to finally put Plaintiffs' and the Class' claims to rest and avoid, among other
28

1  things, the risks of continued litigation, the expenditure of time and resources necessary to proceed

2  through trial and any subsequent appeals, and interference with ongoing business operations.

3      G.      The selection and retention of the Settlement Administrator was reasonable and

4  appropriate.

5      H.      As further addressed below, through the mailing of the Notice of Pendency of Class

6  Action and the Settlement Notice, each in the forms and manners ordered by this Court, the Class

7  has received the best practicable notice of the pendency of this class action, of the Settlement, the

8  Fairness Hearing, and of Class Members' rights and options, including their rights to opt out (at

9  the time of the notices of pendency), to object to the settlement, and/or to appear at the Fairness

10  Hearing in support of a properly submitted objection, and of the binding effect of the Orders and

11  Judgment in this Action, whether favorable or unfavorable, on all Class Members. Said notices

12  have fully satisfied all notice requirements under the law, including the Federal Rules of Civil

13  Procedure and all due process rights under the U.S. Constitution and California Constitution.

14      I.      The response of the Class to this Action, the certification of a class in the Action,

15  and to the Settlement, including Class Counsel's application for an award of attorneys' fees,

16  litigation expenses, and the class representatives' incentives, after full, fair, and effective notice

17  thereof, strongly favors final approval of the Settlement.   Out of the 15,626 notices of the

18  pendency of this class action mailed to the members of the class certified by the Court, only 196

19  valid requests for exclusion (affecting 239 Class Annuities) were received.   In response to the

20  more than 16,000 Settlement Notices mailed to the Class, as of February 10, 2011 (five months

21  after the deadline for objecting to the Settlement), just six objections have been received, four of

22  which have been withdrawn by the objectors.   These objections have been filed in the Action,

23  considered by the Court, and are fully addressed below.

24      J.      As set forth in the Settlement, Allianz has denied, and continues to deny, any

25  wrongdoing or liability relating to the Action.   Allianz does not join in Plaintiffs' Final Approval

26  Motion or Fee Motion or the points and authorities and supporting papers filed in support of said

27

28

8

_Iorio, et al. v. Allianz_

1    motions.   Notwithstanding, Allianz has separately requested final approval of the Settlement,

2    dismissal of the Action with prejudice, and entry of judgment in the Action, on the terms and

3    conditions set forth in the Settlement.

4

5    **6.      Prior Notices of Pendency of Class Action and of Right to Opt Out.**  The Court hereby

6    finds that the "Notice of Pendency of Class Action" in the Action was mailed to the Class

7    Members, in three stages, on November 13, 2006, December 26, 2006, and October 2, 2007, in the

8    form and manner approved by the Court in its orders of October 11, 2006 (Doc. No.126),

9    December 12, 2006 (Doc. No. 136), and September 21, 2007 (Doc. No. 190).  The Court finds that

10   said notices were the best notice practicable, and were reasonably calculated, under the

11   circumstances, to apprise the Class Members of their rights, including their right to opt out of the

12   Class at that juncture, as set forth in the notices, and fully satisfied the requirements of due process

13   and all other applicable provisions of law.

14

15   **7.      Special Notice of Right to Remain a Class Member or Request Exclusion:**  For a small

16   segment of the Class (318 individuals with 353 Class Annuities), identified as potential Class

17   Members only at the settlement stage (and after the foregoing notices of pendency had been

18   mailed), a supplemental notice of their right to opt out was mailed on August 5, 2010.  These Class

19   Members were omitted from prior notices due to an administrative error.  Said supplemental notice

20   advised these previously omitted Class Members of their right to remain Class Members or to

21   request exclusion from the Class, and the procedures for doing so.  Notice was mailed to these

22   previously-omitted Class Members on August 5, 2010, in accordance with the Court's Order dated

23   July 1, 2010, (Doc. No. 438).  The Court finds that said notices were the best notice practicable,

24   and were reasonably calculated, under the circumstances, to apprise these previously-omitted Class

25   Members of their right to opt out of the Class at that juncture, as set forth in the notices, and fully

26   satisfied the requirements of due process and all other applicable provisions of law.

27

28

9

*Iorio, et al. v. Allianz*

1   **8.      Requests for Exclusion.**  After the mailing of the 15,626 notices of the pendency of this

2   class action, and 318 supplemental notices, including specific notice of the Class Members' right

3   (at said times) to exclude themselves from the certified class, timely and valid requests request for

4   exclusion have been received for only 250 Class Annuities (out of more than 16,000).  In addition,

5   nine untimely and/or invalid requests for exclusion were received, (six untimely requests and three

6   requests by non-Class Members).  A list of those persons and entities who have timely and validly

7   requested exclusion from the Class, according to the terms of the prior notices of the pendency of

8   the class action and the Court's orders regarding said notices, was filed with the Court in support

9   of final settlement approval as Exhibit C to the Settlement Administrator's declaration (**Pl. Ex. 5**,

10   attached to the Gianelli Declaration), and is incorporated herein and made a part hereof.  The

11   persons and Annuities on that list are excluded from the class previously-certified by the Court and

12   are therefore not Class Members, shall not be bound by the Settlement or Judgment in the Action,

13   and shall not receive any Settlement Relief.

14

15   **9.      Notice of Settlement.**  Based upon the declarations of counsel and the Settlement

16   Administrator, the Court finds that the Settlement Notice was mailed on August 5, 2010, in the

17   form and manner agreed to under the Settlement and approved by the Court in the Preliminary

18   Approval Order, (Doc. No. 437).  The Settlement Notice provided fair and effective notice to the

19   Class of the Settlement and the terms thereof, including but not limited to those terms related to the

20   Class recovery and the Settlement Relief, the claims and parties released, the binding effect of the

21   Settlement (if approved) on all Class Members, the provisions for attorneys' fees, litigation

22   expenses, administrative expenses, and Named Plaintiffs' incentives, Class Counsel's intention to

23   petition for an award of such fees, expenses, and incentives in the maximum amounts permitted

24   under the Settlement, the date, time, and place of the Final Approval Hearing, and Class members'

25   rights to object to the Settlement  and to appear at the Fairness Hearing (on their own or through

26   counsel of their own selection, at their own expense) in support of any timely and validly

27   submitted objection, all as set forth in the Settlement Notice.  The Court finds that said form and

28   manner of giving notice, including the steps taken for updating the Class notice mailing database,

*Iorio, et al. v. Allianz*

1  researching alternate mailing data, re-mailing any returned notices, and receiving and responding

2  to Class Member inquiries (including the support services to be provided by the Settlement

3  Administrator and Class Counsel), constitute the best notice practicable, and were reasonably

4  calculated, under the circumstances, to apprise the Class Members of the Settlement and Class

5  Members' rights thereunder. The Court further finds that the Class members were afforded a

6  reasonable period of time to exercise such rights.

7      Based on the foregoing, the prior notices of pendency and the Settlement Notice, in the

8  forms and manners approved by the Court, collectively fully satisfy the requirements of due

9  process, the United States and California Constitutions, the *Federal Rules of Civil Procedure*, and

10  all other applicable provisions of law.

11

12  **10.    Notices Pursuant to 28 U.S.C. § 1715.** Based on the requirements of the Settlement

13  Stipulation and the declarations submitted in support of settlement approval, the Court finds that

14  all notices and requirements of the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. §

15  1715, have been satisfied. Allianz' provision of CAFA Notices is attested to by the Declaration of

16  Roland C. Goss, (Doc. Nos. 471-1 and 471-2). The proposed settlement was filed on June 3, 2010

17  (Doc. Nos. 425-1, 425-2). On June 11, 2010, Allianz served the notices required by 28 U.S.C. §

18  1715(b), (*see* Doc. No. 432), which included a copy of the Stipulation of Settlement and other

19  documents required by CAFA. This Court entered an Order granting the motion for preliminary

20  approval of the proposed settlement on July 1, 2010 (Doc. No. 437). On July 6, 2010, Allianz

21  served a supplemental CAFA Notice of the entry of the Preliminary Approval Order, *see*

22  Declaration of Roland C. Goss, (Doc. Nos. 471-1 and 471-2), including notice of the date, time,

23  and place of the Fairness Hearing set forth therein. Supplemental CAFA Notices were served by

24  Allianz when this Court re-noticed the Fairness Hearing. The final supplemental CAFA Notice

25  was served by Allianz on January 18, 2011, providing a copy of the Amendment to the Stipulation

26  of Settlement and the date, time and place of the Fairness Hearing set for March 3, 2011. More

27  than ninety (90) days have passed since the service of the foregoing June 11, 2010 and July 6,

28  2010 notices. No objection or response to the Settlement has been filed by any federal or state

*Iorio, et al. v. Allianz*

1  official, including any recipient of the foregoing notices.  No federal or state official, including any

2  recipient of the foregoing notices, has appeared or requested to appear at the Fairness Hearing.

3

4  **11.    Class Member Objections.**  As set forth in detail *supra*, full and fair notice of Class

5  Members' right to object to the proposed settlement and to appear at the Fairness Hearing in

6  support of such an objection has been provided in the form and manner required by the Settlement

7  Stipulation, the Court's Preliminary Approval Order, the requirements of due process, and any

8  other applicable law.  The deadline for objection expired on September 9, 2010.  Six objections

9  have been submitted by the Class Members (all of which have been filed with the Court, (directly

10  by the objector (Doc. Nos. 441, 442, 444-446) and/or by class counsel in support of final

11  settlement approval).  Four of these objections (Doc. Nos. 442, 444, 445, 446) have been

12  withdrawn by the objector.  The remaining two pending objections are hereby overruled, for the

13  reasons set forth in Plaintiffs' motion for final settlement approval and Allianz' response thereto

14  (Doc. No. 471). No person has requested leave to appear at the Fairness Hearing to object to the

15  Settlement.

16

17  **12.    Final Settlement Approval and Binding Affect.**  The terms and provisions of the

18  Settlement have been entered into in good faith, and are fair, reasonable and adequate as to, and in

19  the best interests of, the Parties and the Class Members, and in full compliance with all applicable

20  requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the

21  Due Process Clause), the California Constitution, and any other applicable law.  Therefore, the

22  Settlement is approved.  The Settlement, this Final Order and Judgment shall be forever binding on

23  the Plaintiffs and all Class Members, as well as their heirs, executors and administrators,

24  successors and assigns, and shall have *res judicata* and other preclusive effect in all pending and

25  future claims, lawsuits or other proceedings maintained by or on behalf of any such persons, to the

26  fullest extent allowed by law.

27

28

*Iorio, et al. v. Allianz*

**13.     Implementation of Settlement.**  The parties are directed to implement the Settlement according to its terms and conditions.  Allianz is authorized, at its sole option and in its sole discretion, in accordance with the terms of the Settlement Stipulation, and without requiring further approval of the Court, to implement the Settlement before the Final Settlement Date (as defined in the Settlement Stipulation).

**14.     Appeal after Early Implementation.**  Any Class Member who failed to timely and validly submit his or her objection to the Settlement, in the manner required by the Settlement, the Settlement Notice, and this Court's Preliminary Approval Order, has waived any objection.  Any Class Member seeking to appeal from the Court's rulings must first:  (a) move to intervene upon a representation of inadequacy of counsel (if they did not object to the proposed settlement under the terms of the Settlement Stipulation); (b) request a stay of implementation of the Settlement; and (c) post an appropriate bond.  Absent satisfaction of all three of these requirements, Allianz is authorized, at its sole option and in its sole discretion, to proceed with the implementation of the Settlement, including before the Final Settlement Date, even if such implementation would moot any appeal.

**15.     Release.**  The Release set forth in Section VII of the Settlement Stipulation is expressly incorporated herein in all respects, is effective as of the date of the entry of this Final Order, and forever discharges the Releasees from any claims or liabilities released by the Settlement, including the Released Transactions (as those terms are defined in the Settlement Stipulation). This Release covers, without limitation, any and all claims for attorneys' fees and expenses, costs or disbursements incurred by Class Counsel or other counsel representing Plaintiffs or Class Members in this Action, the settlement of this Action, the administration of such Settlement, and the Released Transactions, except to the extent otherwise specified in this Order and the Settlement Stipulation.

*Iorio, et al. v. Allianz*

**16.    Permanent Injunction.**  All Class Members are hereby permanently enjoined from filing, commencing, prosecuting, intervening in, maintaining, participating (as class members or otherwise) in, or receiving any benefits from, any lawsuit (including putative class action lawsuits), arbitration, administrative or regulatory proceeding or order in any jurisdiction asserting any claims released by this Agreement; and from organizing Class Members into a separate class for purposes of pursuing as a purported class action any lawsuit (including by seeking to amend a pending complaint to include class allegations, or seeking class certification in a pending action) asserting any claims released by this Agreement.  Nothing in this paragraph, however, shall require any Class Member to take any affirmative action with regard to other pending class action litigation in which they may be absent class members. Allianz has reserved the right to file motions or to take other actions to enforce the release provisions of the Settlement Stipulation and of this injunction, as it may deem appropriate. The Court finds that issuance of this permanent injunction is necessary and appropriate in the aid of the Court's jurisdiction over the Action and its judgments.

**17.    Enforcement of Settlement.**  Nothing in this Final Order shall preclude any action to enforce or interpret the terms of the Settlement Stipulation.  Any action to enforce or interpret the terms of the Settlement Stipulation shall be brought solely in this Court.

**18.    Communications with Class Members.**    Allianz may not be privy to or respond to inquiries from Class Members to Class Counsel regarding the Settlement.  However, Allianz has the right to communicate with, and to respond to inquiries directed to it, from Class Members, Annuity Owners, and Annuity Beneficiaries, orally and/or in writing, regarding matters in the normal course of administering the Annuities, including responding to any Complaints received through state agencies, state officials or otherwise, and may do so through any appropriate agents or agencies.  If Allianz receives any inquiry relating to the merits of the Settlement or a Class Member's rights or options under the Settlement, from a Class Member or other Person entitled or potentially entitled to Settlement Relief, Allianz shall not respond to the inquiry but shall forward

14

*Iorio, et al. v. Allianz*

1  it to or refer the inquiring party to Class Counsel. However, Allianz may respond to questions

2  from Class Members, Owners and Beneficiaries in the ordinary course of business if such Persons

3  initiate contact with Allianz and ask for information about annuitizations, withdrawals, loans and

4  other Annuity contract terms and benefits.

5

6  **19.    Attorneys' Fees and Litigation Expenses.** The Court orders that Class Counsel shall be

7  entitled to an award of reasonable attorneys' fees and litigation expenses incurred in connection

8  with the Action and in reaching this Settlement, to be paid by Allianz at the time and in the manner

9  provided in the Settlement. The Court finds that an award of reasonable attorneys' fees and

10  litigation expenses, as provided for herein, is appropriate based on the contractual agreement to

11  pay such fees and expenses set forth in the Settlement, the private attorney general doctrine and

12  *Code of Civil Procedure* §1021.5, and the Court's equitable powers under California law.

13      The Court finds to be reasonable, and awards to Class Counsel, attorneys' fees, to be paid

14  as provided in the Settlement, in the total amount of eighteen million dollars and no cents

15  ($18,000,000.00). The Court finds to be reasonable, and awards to Class Counsel, litigation

16  expenses, to be paid as provided in the Settlement, in the total amount of one million three hundred

17  thousand and no cents ($1,300,000.00), subject to any reduction therefrom pursuant to the terms of

18  the *Amendment to Settlement Stipulation.* The Court further orders that in accordance with the

19  Settlement, in addition to the foregoing award of litigation expenses, Allianz shall pay to the

20  Settlement Administrator (and the former administrator, if applicable) all reasonable settlement

21  notice and administration expenses billed thereby in connection with the Settlement, consistent

22  with the contracts that such administrators entered into for the performance of such work and any

23  additional work requested by the Parties jointly.

24      The award of attorneys' fees and litigation expenses to Class Counsel in this Final

25  Approval Order shall be the sole reimbursement to which Class Counsel is entitled from Allianz or

26  Releasees with respect to the Action, the Settlement, or the administration of the Settlement.

27  Allianz and Releasees shall have no obligation to pay attorneys' fees or costs or litigation expenses

28

15

*Iorio, et al. v. Allianz*

with respect to the Action, the Settlement, or the administration of the Settlement, to any other person, firm, or entity other than as provided in this Final Order. No Named Plaintiff, or any other Class Member, shall have any obligation to pay Class Counsel any further amounts for attorneys' fees, costs, or litigation expenses in the Action. No Named Plaintiff, or any other Class Member, shall be entitled to seek or receive any further payment of attorneys' fees or litigation expenses in connection with the Action from Allianz or any Releasee.

Allianz does not join in Class Counsel's motion for an award of attorneys' fees and litigation expenses. Allianz does not join in requesting and does not necessarily agree with any of the related findings requested by Class Counsel and made by the Court in connection with Class Counsel's motion for an award of attorneys' fees and litigation expenses, including the findings set forth in this paragraph 19 of the Final Order. Notwithstanding, pursuant to the Settlement, Allianz does not oppose an award of attorneys' fees and litigation expenses as provided for by Section VIII of the Settlement.

In support of the foregoing attorneys' fee and litigation expense award, the Court finds as follows:

A.      The following hourly billing rates are reasonable in light of the complexity of this litigation, the work performed, Class Counsels' reputation, experience, and competence, and the prevailing billing rates for comparably complex work by comparably qualified counsel in the relevant market:

1.      For Robert S. Gianelli, $750 per hour;

2.      For Raymond E. Mattison, $750 per hour;

3.      For Don A. Ernst, $750 per hour;

4.      For Ronald A. Marron, $595 per hour;

5.      For Dean Goetz, $595 per hour;

6.      For Sherril Nell Babcock, $575 per hour;

7.      For Christopher D. Edgington, $575 per hour;

8.      For Jully C. Pae, $500 per hour;

9.      For Richard R. Fruto, $450 per hour;

16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    10.     For Joanne Victor, $450 per hour;

    11.     For Scott Juretic, $410 per hour;

    12.     For future attorney time in connection with settlement administration, $410 per hour, as further described below.

The reasonableness of these billing rates is supported by the declarations of these attorneys, the Declaration of Gary Greenfield, by Class Counsel's prior attorneys' fee awards in comparably complex class action insurance litigation in the relevant legal market, by prior attorneys' fee awards in this and other judicial districts for comparably qualified counsel in comparably complex work, and by published industry billing rates, all as set forth in Class Counsel's motion for an award of attorneys' fees, and the supporting declarations and exhibits.

    With respect to future attorney time in connection with settlement administration, Class Counsel have provided an estimate in their submitted declarations, based upon administration of past, comparable class action settlements, of the attorney time which will be incurred for this purpose. The Court approves the requested $410 per hour billing rate for such attorney settlement administration work.

    B.    The $195 hourly billing rate for work performed by certified paralegals is reasonable in light of the experience and qualifications of these non-attorney billers. The reasonableness of this billing rate is supported by a recent fee awards for work performed by these paralegals in the relevant market, in comparable litigation, and the submitted declarations of counsel. Paralegal time, which is normally billed to fee-paying clients, is properly included and reimbursable under a lodestar analysis. *See, e.g., United Steelworkers v. Phelps Dodge Corp.* (9th Cir. 1990) 896 F. 2d 403, 407-08.

    C.    The time declared to have been expended by Class Counsel and Class Counsel's paralegals, as set forth in Class Counsel's motion for an award of attorneys' fees and supporting declarations, is reasonable in amount in view of the complexity and subject matter of this litigation, and the skill and diligence with which it has been prosecuted and defended, and the quality of the result obtained for the Class.

17

*Iorio, et al. v. Allianz*

D.      The reasonableness of the fee awarded by this Final Approval Order is supported by a "multiplier" analysis, the second requisite step in a lodestar analysis. A fee multiplier is properly applied if supported by appropriate factors, including the extent of the risks of the litigation and the purely contingent nature of the fee award (factors which are not subsumed in Class Counsel's lodestar amount). Here, Class Counsel consisted of two small firms, Gianelli & Morris and Ernst and Mattison (now Ernst Law Group and Mattison Law Firm), and a sole practitioner, the Law Offices of Ronald A. Marron. Cumulatively, the eleven lawyers working on the file expended in excess of 15,200 hours over a five and one-half year period, plus more than 1,800 paralegal/law clerk hours, and more than $1.49 million in out-of-pocket litigation expenses, a very substantial commitment given the small size of these offices. Class Counsel's ability to recover fees and expenses in this action was purely contingent upon a successful outcome or settlement. The contingency risks presented by this litigation were significant, as analyzed in the preliminary and final approval motions and supporting declarations. *Inter alia*, it is significant that a related nationwide class action (from which the Class here was carved out), asserting certain similar claims and theories, was defeated by Allianz in a jury trial. *Mooney v. Allianz Life Insurance Company of North America*, D. Minn. Case No. 06-545 ADM/FLN. The *Mooney* jury verdict has been reduced to judgment, that judgment has become final, and the *Mooney* class recovered nothing. Risks relating to Class certification are also significant. In various procedural postures, Allianz vigorously challenged class certification throughout this lawsuit, both before this Court (opposing certification, seeking decertification, seeking "clarification" regarding the certified claims, seeking to modify the class definition, and seeking to decertify plaintiffs' punitive damages claims) and in three separate Rule 23(f) petitions for permission to appeal in the Ninth Circuit. Although this Court rejected these challenges to class certification, the Ninth Circuit has not considered any of Allianz' challenges on their merits to date. Despite this risk, plaintiffs litigated this action up to only hours before the commencement of jury selection, when the Settlement was reached.

In view of the foregoing contingency/litigation risk, factors which are not subsumed in Class Counsel's lodestar, the Court finds that application of the requested fee multiplier of 1.70

18

(which supports an award of attorneys' fees in the full unopposed amount of $18.0 million dollars) is appropriate. Multipliers ranging from 2-4 (and higher) have been approved in comparably complex litigation, under such circumstances. *See, e.g., Wershba v. Apple Computer*, 91 Cal. App. 4th 224, 255 (2001); *Behrens v. Wometco Enterprises, Inc.*, 118 F.R.D. 534, 549 (S.D. Fla. 1988); *Declaration of Geoffrey P. Miller*, 30-35, (*Gianelli Declaration*, **Pl. Ex. 17**). The requested fee multiplier falls on the low end of the reasonable range, based on typical multipliers approved in comparable litigation, as reflected in the foregoing cases and in the *Declaration of Geoffrey P. Miller*, ¶¶30-35, (*Gianelli Declaration*, **Pl. Ex. 17**). The Court approves the requested fee multiplier of 1.70, (thereby limiting the awarded fee to the unopposed amount of $18.0 million).

E.      Based upon the valuation of settlement benefits set forth in the *Declaration of Vincent P. Gallagher, Ph.D.*, (*Gianelli Declaration*, **Pl. Ex. 15**), the amount of attorneys' fees approved here by the Court (based on the foregoing lodestar/multiplier), in the amount of $18.0 million, represents 16.48% of the Settlement's "full utilization value" (*i.e.*, the value of the benefits made available to the Class) and 29.95% of the Settlement's "projected utilization value" midpoint, (*i.e.*, the midpoint of the range of the projected value of the benefits which will be received by the Class). The Ninth Circuit has determined that 25% of the recovery is a "benchmark" award for class action cases, and recognized that percentage fees in the range of 20-30% are generally appropriate. *Hanlon v. Chrysler Corp.*, 150 F. 3d 1011, 1029 (9th Cir. 1998); *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990). The fee award sought in the present case is reasonable when judged by this standard. The projected utilization value midpoint (29.95%) falls within this generally appropriate range, and the full utilization value (16.48%) falls well below the *Hanlon* benchmark. A fee award at the higher end of the accepted range, under *Hanlon*, is justified here, in part, by the same contingency/litigation risk discussed above. The percentage of recovery here, both with respect to full utilization value and the projected utilization value midpoint, is reasonable in light of prior fee awards (measured as a percentage of recovery) in comparable class action litigation, as set forth in the *Declaration of Geoffrey P. Miller*, ¶¶36-57, (*Gianelli Declaration*, **Pl. Ex. 17**).

19

*Iorio, et al. v. Allianz*

F.      Out of approximately 12,000 Class members and more than 16,000 Settlement Notices mailed, including explicit notice of the fees and expenses requested here, there is only a single complaint regarding attorneys' fees, (Doc. No. 441). The stated objection ("[a]s usual, the only party benefiting from a class action lawsuit is the attorneys") is refuted by the foregoing percentage of recovery analysis, and the valuation of the direct class relief performed by Dr. Gallagher. Plaintiffs' contend that this complaint is not a valid objection, since there is no stated basis for the objection. Notwithstanding, this isolated objection to the attorneys' fee award is overruled.

G.      Based on the declarations of Class Counsel submitted in support of the Fee Motion, the Court finds that Class Counsel have incurred out-of-pocket litigation expenses (paid and un-reimbursed, or currently due) in an amount more than $1.49 million, that said expenses were of a nature typically billed to fee-paying clients, and that said expenses were reasonable and necessary to the prosecution of this action in light of the extent of proceedings both on and off the Court's docket, the complexity of the legal and factual issues in the case, the amount at stake in this litigation, and the vigorous efforts of counsel for all parties herein.   The Court finds these expenses are reasonable in this case.

H.      The proposed division of awarded attorneys' fees among Class Counsel, as set forth in the *Client Consent for Amendment to Co-Counsel Association and Fee Distribution Agreement*, filed by Class Counsel in support of preliminary settlement approval as Exhibit 12 to the Declaration of Christopher D. Edgington, and as set forth by the declarations of Mr. Mattison and Mr. Ernst in support of final approval, is reasonable and is hereby approved. The attorneys' fees awarded by this Final Approval Order shall be divided among Class Counsel according to said approved division.

**20.      Named Plaintiffs' Incentives.** The hereby Court approves incentives for each of the Named Plaintiffs, Anthony J. Iorio, Ruth Scheffer, and Max Freifield, to be paid by Allianz at the time and in the manner provided in the Settlement.   The amount of said incentive shall be the full unopposed amount provided for by the Settlement, *to wit*: twenty-five thousand dollars and no

20

1   cents ($25,000.00), for each Named Plaintiff.  To the extent that any Named Plaintiff may become
2   deceased prior to payment of these incentives, the Parties shall cooperate to ensure that any sums
3   so awarded are distributed to his or her heirs.

4          Based on the declarations of Class Counsel and the Named Plaintiffs submitted in support
5   of final settlement approval, Named Plaintiffs have actively participated and assisted Class
6   Counsel in this litigation for the substantial benefit of the Class despite facing significant personal
7   limitations.   Each has waived their right to pursue potential individual claims or relief in the
8   Action.  Apart from these incentives, the Named Plaintiffs will receive no settlement payments or
9   benefits of any nature other than their share of the Settlement Relief available to the Class
10  generally.  These incentives are approved to compensate the Named Plaintiffs for the burdens of
11  their active involvement in this litigation and their commitment and effort on behalf of the Class.

12         The amount of these incentives shall not affect or reduce the Settlement Relief generally
13  payable to any Class Member, including to Named Plaintiffs, under the Settlement, and shall not
14  affect or reduce the amount of attorneys' fees and litigation expenses payable to Class Counsel
15  under the Settlement and this Final Approval Order.

16

17  **21.     Modification of Settlement Stipulation.**   The Parties are hereby authorized, without
18  needing further approval from the Court, to agree to and adopt such amendments to, and
19  modifications and expansions of, the Settlement Stipulation, if such changes are consistent with
20  this Order and do not limit the rights of Class Members or any other Person entitled to Settlement
21  Relief under this Agreement.

22

23  **22.     Retention of Jurisdiction.**  The Court has jurisdiction to enter this Final Order.  Without
24  in any way affecting the finality of this Final Order or the Final Judgment, for the benefit of the
25  Class and Allianz, and to protect this Court's jurisdiction, the Court expressly retains continuing
26  jurisdiction as to all matters relating to the Settlement, and the administration, consummation,
27  enforcement, and interpretation of the Settlement Stipulation and of this Final Order, and for any
28  other necessary and appropriate purpose.

21

1    Without limiting the foregoing, the Court will retain continuing jurisdiction over all aspects

2    of this case including but not limited to any modification, interpretation, administration,

3    implementation, effectuation, and enforcement of the Settlement, the administration of the

4    Settlement and Settlement Relief, including notices, payments, and benefits thereunder, the

5    Settlement Notice and sufficiency thereof, any objection to the Settlement, any request for

6    exclusion from the certified class, the adequacy of representation by Class Counsel and/or the

7    Class Representatives, the amount of attorneys' fees and litigation expenses to be awarded Class

8    Counsel, the amount of any incentives to be paid to the Class Representatives, any claim by any

9    person or entity relating to the representation of the Class by Class Counsel, to enforce the release

10   and injunction provisions of the Settlement and of this Order, any remand after appeal or denial of

11   any appellate challenge, any collateral challenge made regarding any matter related to this

12   litigation or this Settlement or the conduct of any party or counsel relating to this litigation or this

13   Settlement, and all other issues related to this Action and Settlement.

14       Further, without limiting the foregoing, the Court retains continuing jurisdiction to:

15       A.    enforce the terms and conditions of the Settlement Stipulation and resolve any

16   disputes, claims or causes of action that, in whole or in part, are related to or arise out of the

17   Settlement Stipulation, this Final Order and Judgment (including, without limitation, determining

18   whether a person is or is not a Class Member, and enforcing the permanent injunction that is a part

19   of this Final Order and Judgment), and determining whether claims or causes of action allegedly

20   related to this case are barred by this Final Order and Judgment;

21       B.    enter such additional orders as may be necessary or appropriate to protect or

22   effectuate this Final Order and Judgment, or to ensure the fair and orderly administration of the

23   Settlement; and

24       C.    enter any other necessary or appropriate orders to protect and effectuate the Court's

25   retention of continuing jurisdiction; provided however, nothing in this paragraph is intended to

26   restrict the ability of the Parties to exercise their rights under the Settlement Stipulation.

27

28   **23.    No Admissions.**  This Final Order and the Settlement Stipulation, all provisions herein or

therein, all other documents referred to herein or therein, any actions taken to carry out this Final

22

*Iorio, et al. v. Allianz*

Order and Judgment and the Settlement, and any negotiations, statements, or proceedings relating to them in any shall not be construed as, offered as, received as, used as, or deemed to be evidence of any kind, including in this Action, any other action, or in any other judicial, administrative, regulatory, or other proceeding, except for purposes of obtaining approval of the Settlement and the entry of judgment in the Action, enforcement or implementation of the Settlement, or to support any defense by Allianz based on principles of *res judicata*, collateral estoppel, release, waiver, good-faith settlement, judgment bar or reduction, full faith and credit, setoff, or any other theory of claim preclusion, issue preclusion, release, injunction, or similar defense or counterclaim to the extent allowed by law.  Without limiting the foregoing, neither the Settlement Stipulation nor any related negotiations, statements, mediation positions, notes, drafts, outlines, memoranda of understanding, or Court filings or proceedings relating to the Settlement or Settlement approval, shall be construed as, offered as, received as, used as, or deemed to be evidence or an admission or concession by any person, including but not limited to, of any liability or wrongdoing whatsoever on the part of Allianz, to Plaintiffs, or the Class, or as a waiver by Allianz, of any applicable defense, including without limitation any applicable statute of limitation.

24.    **Dismissal of Action.**  This action, including all individual and Class claims resolved in it, shall be dismissed on the merits and with prejudice, without an award of attorneys' fees or costs to any party except as provided in this Order.

25.    **Mattison Law Firm Appointed as Co-Class Counsel.**  The law firm of Ernst and Mattison, previously appointed by this Court as co-Class Counsel in the Action, has changed names to Ernst Law Group, and one of the class attorneys of record, Mr. Mattison, has formed a new firm, Mattison Law Group.  Notice of the prior firm's name change, and association of the Mattison Law Firm in the Action, have been filed with the Court.  Based on the Court's prior findings at the time of the certification of the Class, in support of the appointment of Mr. Mattison

//

//

23

*Iorio, et al. v. Allianz*

1   and Ernst and Mattison as co-class counsel, the Court now hereby appoints the Mattison Law Firm

2   as co-class counsel.  Allianz has not objected to the appointment of the Mattison Law Firm as co-

3   class counsel.

4

5   26.     Pursuant to the Settlement, the proposed *Fourth Amended Complaint*, Exhibit A to the

6   Settlement, previously served and filed as Plaintiffs' Exhibit 1 in support of final settlement

7   approval, (Doc. No. 468-2, pp. 106-114), is deemed to be signed by Class Counsel and filed as of

8   the date of this order, superseding any previous complaint in the Action.

9

10   **IT IS SO ORDERED.**

11

12   Dated:  March 3, 2011

13

14                               Honorable Janis L. Sammartino

15                                United States District Judge

16

17

18

19

20

21

22

23

24

25

26

27

28

24

*Iorio, et al. v. Allianz*

EXHIBIT 6

| Year | Firm Name | Location | Average FTE Attorneys | Partner Billing Rate High | Partner Billing Rate Low | Partner Billing Rate Avg | Associate Billing Rate High | Assoc Law Billing Rate Low | Associate Billing Rate Avg | Counsel Avg | Counsel Low | Counsel High | NLJ Billing Source | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | Adams and Reese | New Orleans, LA | 318 | $700.00 | $305.00 | $420.00 | $315.00 | $220.00 | $270.00 | $500.00 | $425.00 | $575.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Akerman | Miami, FL | 523 | $880.00 | $360.00 | $535.00 | $465.00 | $205.00 | $305.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Akin Gump Strauss Hauer & Feld | Washington, DC | 609 | $1220.00 | $615.00 | $785.00 | $660.00 | $365.00 | $525.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Allen Matkins Leck Gamble Mallory & Natsis | Los Angeles, CA | 191 | $680.00 | $525.00 | $615.00 | | | | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Alston & Bird | Atlanta, GA | 789 | $875.00 | $495.00 | $675.00 | $575.00 | $260.00 | $425.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Andrews Kurth | Houston, TX | 337 | $1090.00 | $745.00 | $890.00 | $1090.00 | $265.00 | $670.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Archer & Greiner | Haddonfield, NJ | 194 | $460.00 | $330.00 | $400.00 | $295.00 | $200.00 | $245.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Arent Fox | Washington, DC | 330 | $860.00 | $500.00 | $650.00 | $595.00 | $275.00 | $395.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Arnall Golden Gregory | Atlanta, GA | 140 | $520.00 | $430.00 | $490.00 | | | | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media Properties, LLC. All rights reserved.

1

888-770-5647
www.alm.com
US_ADMIN-75220863 v1

Ex. 6
p. 2

| 2014 | Arnold & Porter | Washington, DC | 720 | $950.00 | $670.00 | $815.00 | $610.00 | $345.00 | $505.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Amstein & Lehr | Chicago, IL | 144 | $595.00 | $350.00 | $465.00 | $350.00 | $175.00 | $250.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Baker & Hostetler | Cleveland, OH | 798 | $670.00 | $275.00 | $445.00 | $350.00 | $210.00 | $272.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Baker & McKenzie | Chicago, IL | 4087 | $1130.00 | $260.00 | $755.00 | $925.00 | $100.00 | $395.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Baker, Donelson, Bearman, Caldwell & Berkowitz | Memphis, TN | 588 | $495.00 | $340.00 | $400.00 | $465.00 | $245.00 | $295.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Ballard Spahr | Philadelphia, PA | 483 | $650.00 | $395.00 | $475.00 | $495.00 | $235.00 | $315.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Barnes & Thornburg | Indianapolis, IN | 522 | $580.00 | $320.00 | $480.00 | $370.00 | $260.00 | $320.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Benesch, Friedlander, Coplan & Aronoff | Cleveland, OH | 150 | $535.00 | $360.00 | $455.00 | $475.00 | $155.00 | $280.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Best Best & Krieger | Riverside, CA | 175 | $555.00 | $340.00 | $455.00 | $385.00 | $235.00 | $280.00 | $439.83 | $340.00 | $595.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Bingham McCutchen | Boston, MA | 795 | $1080.00 | $220.00 | $795.00 | $605.00 | $185.00 | $450.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

z

888-770-5647
www.alm.com
US_ADMIN-76258653 v1

| Year / Firm | City | # | | | | | | | | | | Source | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 Blank Rome | Philadelphia, PA | 447 | $940.00 | $445.00 | $640.00 | $565.00 | $175.00 | $350.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Bond, Schoeneck & King | Syracuse, NY | 198 | $520.00 | $240.00 | $355.00 | $310.00 | $160.00 | $225.00 | $360.00 | $275.00 | $485.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Bowles Rice | Charleston, WV | 140 | $285.00 | $165.00 | $230.00 | $180.00 | $115.00 | $135.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Bracewell & Giuliani | Houston, TX | 441 | $1125.00 | $575.00 | $760.00 | $700.00 | $275.00 | $440.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Bradley Arant Boult Cummings | Birmingham, AL | 413 | $605.00 | $325.00 | $430.00 | $340.00 | $200.00 | $260.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Broad and Cassel | Orlando, FL | 150 | $465.00 | $295.00 | $380.00 | | | | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Brown Rudnick | Boston, MA | 187 | $1045.00 | $650.00 | $855.00 | | | | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Brownstein Hyatt Farber Schreck | Denver, CO | 214 | $700.00 | $310.00 | $520.00 | $345.00 | $265.00 | $305.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Bryan Cave | St. Louis, MO | 995 | $900.00 | $410.00 | $620.00 | $595.00 | $220.00 | $405.00 | $635.00 | $355.00 | $865.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Buchalter Nemer | Los Angeles, CA | 139 | $695.00 | $475.00 | $505.00 | $375.00, $350.00 | | $365.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

3

| | Location | | | | | | | | Source | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| 2014 Burr & Forman | Birmingham, AL | 261 | $525.00 | $300.00 | $371.00 | $275.00, $200.00 | $241.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Butler Snow | Ridgeland, MS | 280 | $335.00 | $235.00 | $302.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Cadwalader, Wickersham & Taft | New York, NY | 437 | $1050.00 | $500.00 | $990.00 | $750.00 $395.00 | $505.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Carlton Fields | Tampa, FL | 272 | $840.00 | $455.00 | $600.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Cole, Schotz, Meisel, Forman & Leonard | Hackensack, NJ | 118 | $730.00 | $590.00 | $553.00 | $340.00, $275.00 | $302.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Connell Foley | Roseland, NJ | 129 | $575.00 | $275.00 | $425.00 | $325.00 $200.00 | $265.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Cooley | Palo Alto, CA | 673 | $990.00 | $660.00 | $820.00 | $640.00 $335.00 | $515.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Covington & Burling | Washington, DC | 760 | $990.00 | $505.00 | $790.00 | $665.00, $320.00 | $415.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Cozen O'Connor | Philadelphia, PA | 495 | $1135.00 | $275.00 | $670.00 | $640.00 $180.00 | $355.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Curtis, Mallet-Prevost, Colt & Mosle | New York, NY | 323 | $980.00 | $730.00 | $800.00 | $785.00 $345.00 | $480.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

4

888-770-5647
www.alm.com
US_ADMIN-79230853 v1

Ex. 6
Ex. 5

| Year | Firm | City | | | | | | | | | Source | Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | Davis Graham & Stubbs | Denver, CO | 145 | $635.00 | $315.00 | $435.00 | $350.00 $200.00 | $255.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Davis Polk & Wardwell | New York, NY | 810 | $985.00 | $850.00 | $975.00 | $975.00 $130.00 | $915.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Debevoise & Plimpton | New York, NY | 595 | $1075.00 | $955.00 | $1055.00 | $760.00 $120.00 | $490.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Dechert | New York, NY | 845 | $1095.00 | $670.00 | $900.00 | $735.00 $395.00 | $530.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Dentons | New York, NY | 2503 | $1090.00 | $345.00 | $700.00 | $655.00 $210.00 | $425.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Dickstein Shapiro | Washington, DC | 254 | $1250.00 | $690.00 | $750.00 | $585.00 $310.00 | $475.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Dinsmore & Shohl | Cincinnati, OH | 415 | $650.00 | $250.00 | $411.00 | $365.00 $180.00 | $238.00 | $380.00 | $160.00 | $518.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | DLA Piper | New York, NY | 3962 | $1025.00 | $450.00 | $765.00 | $750.00 $250.00 | $510.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Dorsey & Whitney | Minneapolis, MN | 501 | $585.00 | $340.00 | $435.00 | $510.00 $215.00 | $315.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Duane Morris | Philadelphia, PA | 613 | $960.00 | $415.00 | $589.00 | $585.00 $260.00 | $373.00 | $638.00 | $460.00 | $1015.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

6

888-770-5647
www.alm.com
US_AD18N-79256553 v1

| 2014 | Edwards Wildman Palmer | Boston, MA | 540 | $765.00 | $210.00 | $535.00 | $415.00 | $245.00 | $325.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Faegre Baker Daniels | Minneapolis, MN | 573 | $580.00 | $355.00 | $455.00 | $315.00 | $110.00 | $260.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Foley & Lardner | Milwaukee, WI | 844 | $990.00 | $405.00 | $600.00 | $470.00 | $210.00 | $335.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Foley Hoag | Boston, MA | 221 | $775.00 | $590.00 | $670.00 | $385.00 | $280.00 | $325.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Fox Rothschild | Philadelphia, PA | 531 | $750.00 | $335.00 | $530.00 | $500.00 | $245.00 | $310.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Fried, Frank, Harris, Shriver & Jacobson | New York, NY | 450 | $1100.00 | $930.00 | $1000.00 | $760.00 | $375.00 | $595.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Frost Brown Todd | Cincinnati, OH | 414 | $600.00 | $220.00 | $387.00 | $315.00 | $150.00 | $234.00 | $417.00 | $350.00 | $540.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Gardere Wynne Sewell | Dallas, TX | 218 | $775.00 | $430.00 | $535.00 | $330.00 | $290.00 | $303.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Gibbons | Newark, NJ | 201 | $865.00 | $440.00 | $560.00 | $475.00 | $295.00 | $350.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Gibson, Dunn & Crutcher | New York, NY | 1154 | $1800.00 | $765.00 | $990.00 | $930.00 | $175.00 | $590.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

888-770-5647
www.alm.com
US_ADMIN-79290853 v1

| Year | Firm | City | FTE | | | | | | | | | | Source | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | Gordon Rees Scully Mansukhani | San Diego, CA | 478 | $475.00 | $375.00 | $420.00 | $325.00 | $285.00 | $300.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Greenberg Traurig | New York, NY | 1690 | $955.00 | $535.00 | $763.00 | $570.00 | $325.00 | $470.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Harris Beach | Rochester, NY | 198 | $400.00 | $298.00 | $348.00 | $285.00 | $175.00 | $230.00 | $297.50 | $175.00 | $400.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Harter Secrest & Emery | Rochester, NY | 132 | $465.00 | $300.00 | $335.00 | $290.00 | $195.00 | $250.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Haynes and Boone | Dallas, TX | 483 | $1020.00 | $450.00 | $670.00 | $580.00 | $310.00 | $405.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Hogan Lovells | Washington, DC | 2313 | $1000.00 | $705.00 | $835.00 | | | | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Holland & Hart | Denver, CO | 423 | $725.00 | $305.00 | $442.00 | $425.00 | $175.00 | $277.00 | $363.00 | $225.00 | $535.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Holland & Knight | Washington, DC | 956 | $1085.00 | $355.00 | $625.00 | $595.00 | $210.00 | $340.00 | $575.00 | $420.00 | $910.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Honigman Miller Schwartz and Cohn | Detroit, MI | 231 | $580.00 | $280.00 | $380.00 | $225.00 | $205.00 | $220.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Hughes Hubbard & Reed | New York, NY | 351 | $995.00 | $725.00 | $880.00 | $675.00 | $365.00 | $555.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC, All rights reserved.

888-770-5647
www.alm.com
US_ADMIN-79286863 v1

| Year | Firm | City | | | | | | | | | | Source | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | Husch Blackwell | St. Louis, MO | 539 | $785.00 | $250.00 | $449.00 | $440.00 | $190.00 | $275.00 | $418.00 | $240.00 | $825.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Ice Miller | Indianapolis, IN | 291 | $530.00 | $335.00 | $450.00 | $305.00 | $245.00 | $270.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Irell & Manella | Los Angeles, CA | 165 | $975.00 | $800.00 | $890.00 | $780.00 | $395.00 | $535.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Jackson Kelly | Charleston, WV | 179 | $535.00 | $270.00 | $345.00 | $315.00 | $200.00 | $243.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Jackson Lewis | Los Angeles, CA | 724 | $440.00 | $310.00 | $360.00 | $315.00 | $275.00 | $290.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Jackson Walker | Dallas, TX | 333 | $575.00 | $575.00 | $622.00 | $385.00 | $255.00 | $335.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Jeffer, Mangels, Butler & Mitchell | Los Angeles, CA | 125 | $875.00 | $590.00 | $690.00 | | | | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Jenner & Block | Chicago, IL | 434 | $925.00 | $565.00 | $745.00 | $550.00 | $390.00 | $485.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Jones Day | New York, NY | 2484 | $975.00 | $445.00 | $748.00 | $775.00 | $265.00 | $435.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Jones Walker | New Orleans, LA | 383 | $425.00 | $275.00 | $385.00 | $240.00 | $200.00 | $225.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

| Year | Firm | City | FTE | | | | | | | | Source | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | Kasowitz, Benson, Torres & Friedman | New York, NY | 372 | $1195.00 | $600.00 | $835.00 | $625.00-$200.00 | $340.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Katten Muchin Rosenman | Chicago, IL | 612 | $745.00 | $500.00 | $615.00 | $595.00; $340.00 | $455.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Kaye Scholer | New York, NY | 392 | $1250.00 | $725.00 | $650.00 | $795.00 $370.00 | $597.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Kelley Drye & Warren | New York, NY | 283 | $815.00 | $435.00 | $640.00 | $600.00 $305.00 | $490.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Kilpatrick Townsend & Stockton | Atlanta, GA | 581 | $775.00 | $400.00 | $550.00 | $475.00 $315.00 | $385.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | King & Spalding | Atlanta, GA | 874 | $995.00 | $545.00 | $775.00 | $735.00 $125.00 | $460.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Kirkland & Ellis | Chicago, IL | 1554 | $995.00 | $590.00 | $825.00 | $715.00 $235.00 | $540.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Knobbe Martens Olson & Bear | Irvine, CA | 260 | $810.00 | $450.00 | $575.00 | $455.00 $305.00 | $350.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Kramer Levin Naftalis & Frankel | New York, NY | 313 | $1100.00 | $745.00 | $921.00 | $815.00 $515.00 | $675.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Lane Powell | Seattle, WA | 170 | $675.00 | $375.00 | $515.00 | $425.00 $260.00 | $331.00 | $477.00 | $300.00 | $650.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

888-770-5647
www.alm.com
US_ADMIN-76363333.v1

| Year | Firm | City | Attorneys | Col1 | Col2 | Col3 | Col4 | Col5 | Source | Note |
|------|------|------|-----------|------|------|------|------|------|--------|------|
| 2014 | Latham & Watkins | New York, NY | 2060 | $1110.00 | $895.00 | $990.00 | $725.00, $455.00 | $505.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Lathrop & Gage | Kansas City, MO | 283 | $700.00 | $285.00 | $420.00 | $375.00, $195.00 | $250.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report. |
| 2014 | Lewis Roca Rothgerber | Phoenix, AZ | 228 | $695.00 | $380.00 | $505.00 | $525.00 $205.00 | $400.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Lindquist & Vennum | Minneapolis, MN | 178 | $600.00 | $460.00 | $520.00 | $470.00 $275.00 | $365.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report. |
| 2014 | Littler Mendelson | San Francisco, CA | 1002 | $615.00 | $395.00 | $550.00 | $420.00 $245.00 | $290.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Lowenstein Sandler | Roseland, NJ | 261 | $990.00 | $600.00 | $765.00 | $550.00 $300.00 | $450.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Manatt, Phelps & Phillips | Los Angeles, CA | 329 | $795.00 | $640.00 | $740.00 | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | McCarter & English | Newark, NJ | 371 | $625.00 | $450.00 | $530.00 | $370.00 $220.00 | $300.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | McDermott Will & Emery | Chicago, IL | 1021 | $835.00 | $525.00 | $710.00 | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | McElroy, Deutsch, Mulvaney & Carpenter | Morristown, NJ | 274 | $560.00 | $325.00 | $445.00 | $335.00 $200.00 | $285.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

888-770-5647
www.alm.com
US_ADMIN-79283853 v1

| Year | Firm | City | FTE | | | | | | | | | | Source | Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | McGuireWoods | Richmond, VA | 931 | $725.00 | $450.00 | $595.00 | $525.00 | $265.00 | $360.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | McKenna Long & Aldridge | Atlanta, GA | 516 | $650.00 | $480.00 | $530.00 | $425.00 | $375.00 | $395.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Michael, Best & Friedrich | Milwaukee, WI | 189 | $650.00 | $235.00 | $445.00 | $425.00 | $200.00 | $283.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Miles & Stockbridge | Baltimore, MD | 226 | $740.00 | $340.00 | $478.00 | $425.00 | $230.00 | $290.00 | $419.00 | $225.00 | $895.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Moore & Van Allen | Charlotte, NC | 274 | $870.00 | $315.00 | $490.00 | $480.00 | $190.00 | $280.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Morgan, Lewis & Bockius | Philadelphia, PA | 1363 | $765.00 | $430.00 | $620.00 | $585.00 | $270.00 | $390.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Morris, Manning & Martin | Atlanta, GA | 148 | $575.00 | $400.00 | $480.00 | | | | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Morrison & Foerster | San Francisco, CA | 1020 | $1,195.00 | $595.00 | $865.00 | $725.00 | $230.00 | $525.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Nelson Mullins | Columbia, SC | 466 | $600.00 | $280.00 | $444.00 | $395.00 | $215.00 | $271.00 | $376.00 | $195.00 | $500.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Nixon Peabody | Boston, MA | 584 | $850.00 | $295.00 | $520.00 | $550.00 | $180.00 | $300.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

888-770-5647
www.alm.com
US_ADMIN-79289553 v1

| Year | Firm | City | No. | | | | | | | | | Source | Description |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | Norris McLaughlin & Marcus | Bridgewater, NJ | 128 | $505.00 | $485.00 | $495.00 | $365.00 $185.00 | $275.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Norton Rose Fulbright | Houston, TX | 3537 | $900.00 | $625.00 | $775.00 | $515.00 $300.00 | $400.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Nossaman | Los Angeles, CA | 148 | $800.00 | $370.00 | $578.00 | $460.00 $255.00 | $340.00 | $495.00 | $440.00 | $550.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Nutter McClennen & Fish | Boston, MA | 146 | $715.00 | $470.00 | $575.00 | $460.00 $295.00 | $375.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Ogletree Deakins | Atlanta, GA | 656 | $650.00 | $250.00 | $360.00 | $365.00 $200.00 | $280.00 | $315.00 | $230.00 | $555.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | O'Melveny & Myers | Los Angeles, CA | 721 | $850.00 | $615.00 | $715.00 | | | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Orrick Herrington & Sutcliffe | New York, NY | 954 | $1095.00 | $715.00 | $845.00 | $375.00 $710.00 | $560.00 | $735.00 | $685.00 | $550.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Parker Poe Adams & Bernstein | Charlotte, NC | 185 | $500.00 | $425.00 | $460.00 | | | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Paul Hastings | New York, NY | 889 | $900.00 | $750.00 | $815.00 | $755.00 $335.00 | $540.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Paul, Weiss, Rifkind, Wharton & Garrison | New York, NY | 854 | $1120.00 | $760.00 | $1040.00 | $735.00 $595.00 | $578.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

888-770-5647
www.alm.com
US_ADMIN-79280853.v1

| Firm | Location | | | | | | | | | Source | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 Pepper Hamilton | Philadelphia, PA | 510 | $950.00 | $465.00 | $645.00 | $525.00 $280.00 | $390.00 | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Perkins Coie | Seattle, WA | 861 | $1000.00 | $330.00 | $615.00 | $610.00 $215.00 | $425.00 | $635.00 | $280.00 | $800.00 National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Pillsbury Winthrop Shaw Pittman | Washington, DC | 591 | $1070.00 | $615.00 | $865.00 | $850.00 $375.00 | $520.00 | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Polsinelli | Kansas City, MO | 616 | $775.00 | $325.00 | $435.00 | $350.00 $235.00 | $279.00 | $375.00 | $300.00 | $450.00 National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Proskauer Rose | New York, NY | 712 | $950.00 | $725.00 | $360.00 | $675.00 $295.00 | $465.00 | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Quarles & Brady | Milwaukee, WI | 422 | $625.00 | $425.00 | $519.00 | $600.00 $210.00 | $335.00 | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Quinn Emanuel Urquhart & Sullivan | New York, NY | 673 | $1075.00 | $810.00 | $915.00 | $675.00 $320.00 | $410.00 | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Reed Smith | Pittsburgh, PA | 1555 | $890.00 | $605.00 | $737.00 | $550.00 $295.00 | $420.00 | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Richards, Layton & Finger | Wilmington, DE | 124 | $800.00 | $600.00 | $678.00 | $465.00 $350.00 | $414.00 | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Riker Danzig Scherer Hyland & Perretti | Morristown, NJ | 146 | $495.00 | $430.00 | $465.00 | $295.00 $210.00 | $250.00 | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

888-770-5647
www.alm.com
US_ADMIN-79286853 v1

| Year | Firm | City | FTE | | | | | | | Source | Notes |
|------|------|------|-----|---|---|---|---|---|---|--------|-------|
| 2014 | Robinson & Cole | Hartford, CT | 201 | $700.00 | $295.00 | $500.00 | $445.00 | $215.00 | $300.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Rutan & Tucker | Costa Mesa, CA | 147 | $675.00 | $345.00 | $490.00 | $500.00 | $230.00 | $320.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Saul Ewing | Philadelphia, PA | 240 | $575.00 | $375.00 | $546.00 | $590.00 | $225.00 | $344.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Schiff Hardin | Chicago, IL | 317 | | | | $415.00 | $250.00 | $333.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Sedgwick | San Francisco, CA | 342 | $615.00 | $305.00 | $425.00 | $475.00 | $250.00 | $525.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Seward & Kissel | New York, NY | 143 | $850.00 | $625.00 | $735.00 | $600.00 | $290.00 | $400.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Seyfarth Shaw | Chicago, IL | 779 | $650.00 | $375.00 | $610.00 | $505.00 | $225.00 | $365.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Sheppard Mullin Richter & Hampton | Los Angeles, CA | 549 | $875.00 | $490.00 | $665.00 | $535.00 | $275.00 | $415.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Shumaker Loop & Kendrick | Toledo, OH | 224 | $595.00 | $305.00 | $413.00 | $338.00 | $160.00 | $266.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Shutts & Bowen | Miami, FL | 230 | $660.00 | $250.00 | $430.00 | $345.00 | $195.00 | $260.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC, All rights reserved.

888-770-5647
www.alm.com
US_ADMIN-79268853 v1

| Year | Firm | Location | Count | | | | | | | | | | Source | Note |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | Skadden, Arps, Slate, Meagher & Flom | New York, NY | 1664 | $1150.00 | $845.00 | $1035.00 | $845.00 | $340.00 | $620.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Snell & Wilmer | Phoenix, AZ | 411 | $845.00 | $325.00 | $525.00 | $470.00 | $180.00 | $280.00 | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Spilman Thomas & Battle | Charleston, WV | 131 | | | | | | | $260.00 | $215.00 | $350.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Squire Patton Boggs | | | $950.00 | $350.00 | $655.00 | $530.00 | $250.00 | $355.00 | | | | National Law Journal, December 2014 | Location data not available due to merger in 2014. Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Sterne, Kessler, Goldstein & Fox | Washington, DC | 122 | $795.00 | $450.00 | $577.00 | $470.00 | $265.00 | $346.00 | $483.57 | $450.00 | $520.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Stevens & Lee | Reading, PA | 154 | $800.00 | $525.00 | $625.00 | | | | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Stoel Rives | Portland, OR | 365 | $800.00 | $300.00 | $492.00 | $465.00 | $205.00 | $287.00 | $312.00 | $280.00 | $510.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Strasburger & Price | Dallas, TX | 217 | $990.00 | $290.00 | $435.00 | $355.00 | $210.00 | $270.00 | $475.00 | $300.00 | $690.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Stroock & Stroock & Lavan | New York, NY | 285 | $1125.00 | $975.00 | $960.00 | $340.00 | $350.00 | $549.00 | $979.00 | $745.00 | $1095.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

888-770-5647
www.alm.com
US_ADMIN-79250053-v1

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2014 | Taft Stettinius & Hollister | Cincinnati, OH | 357 | $535.00 | $285.00 | $415.00 | $475.00 | $200.00 | $285.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Thompson & Knight | Dallas, TX | 290 | $740.00 | $425.00 | $535.00 | $610.00 | $240.00 | $370.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Thompson Coburn | St. Louis, MO | 317 | $510.00 | $330.00 | $440.00 | $350.00 | $220.00 | $270.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Troutman Sanders | Atlanta, GA | 557 | $975.00 | $400.00 | $520.00 | $570.00 | $245.00 | $340.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Ulmer & Berne | Cleveland, OH | 178 | $415.00 | $315.00 | $380.00 | | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Varnum | Grand Rapids, MI | 133 | $465.00 | $280.00 | $390.00 | | | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Venable | Washington, DC | 533 | $1075.00 | $470.00 | $660.00 | $575.00 | $295.00 | $430.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Vinson & Elkins | Houston, TX | 650 | $770.00 | $475.00 | $600.00 | $565.00 | $275.00 | $350.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Waller Lansden Dortch & Davis | Nashville, TN | 178 | $600.00 | $350.00 | $460.00 | $335.00 | $160.00 | $245.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 | Weil, Gotshal & Manges | New York, NY | 1157 | $1075.00 | $625.00 | $933.00 | $790.00 | $300.00 | $600.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

888-770-5647
www.alm.com
US_ADMIN-79290353 v1

Ex. 6
p. 17

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 2014 White & Case | New York, NY | 1695 | $1050.00 | $700.00 | $575.00 | $1050.00- $220.00 | $525.00 | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Wiley Rein | Washington, DC | 277 | $950.00 | $550.00 | $695.00 | $535.00 $320 00. | $445.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Williams Mullen | Richmond, VA | 233 | $410.00 | $360.00 | $385.00 | $350.00; $260.00. | $265.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Willkie Farr & Gallagher | New York, NY | 526 | $1090.00 | $790.00 | $950.00 | $790.00 $350.00 | $580.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Wilmer Cutler Pickering Hale and Dorr | Washington, DC | 968 | $1250.00 | $735.00 | $905.00 | $695.00; $75.00 | $290.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Winston & Strawn | Chicago, IL | 822 | $995.00 | $650.00 | $800.00 | $590.00 $425.00 | $520.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Wolff & Samson | West Orange, NJ | 125. | $450.00 | $325.00 | $400.00 | $450.00 $225.00 | $340.00 | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Womble Carlyle Sandridge & Rice | Winston-Salem, NC | 492 | $640.00 | $470.00 | $554.00 | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |
| 2014 Wyatt Tarrant & Combs | Louisville, KY | 202 | $500.00 | $280.00 | $418.00 | | | National Law Journal, December 2014 | Full-time equivalent (FTE) attorneys at the firm and the city of the firm's largest U.S. office as listed in the 2014 NLJ 350 report |

Copyright 2014 ALM Media properties, LLC. All rights reserved.

888-770-5647
www.alm.com
US_ADMIN-79282653 v1